# EXHIBIT A

# In the Superior Court of the State of Arizona
# In and For the County of Maricopa

Clerk of the Superior Court
*** Electronically Filed ***
C. McWhorter, Deputy
10/22/2024 3:33:28 PM
Filing ID 18727336

**Plaintiff's Attorneys:**

Thomas A Connelly - Primary Attorney
Bar Number: 019430, issuing State: AZ
Law Firm: Mills + Woods Law, PLLC
5055 N. 12th St. Suite 101
Phoenix, AZ 85014
Telephone Number: (480)999-4556X1008
Email address: tconnelly@millsandwoods.com

DeeAn Gillespie Strub
Bar Number: 009987, issuing State: AZ
Law Firm: Gillespie Shields & Taylor
Telephone Number: (602)879-9700

Jenny D. Jansch
Bar Number: 024431, issuing State: AZ
Law Firm: Gillespie Shields & Taylor
Telephone Number: (602)879-9700

**CV2024-030202**

**Plaintiffs:**

Jessica Fidler
5055 N. 12th St. Suite 101
Phoenix, AZ 85014
Email address: fidlerjessica@gmail.com

Jessica Fidler, a parent for Eliron Fidler, a minor
Minor's Date of Birth: 11/26/2011
5055 N. 12th St. Suite 101
Phoenix, AZ 85014
Email address: fidlerjessica@gmail.com

**Defendants:**

State of Arizona
2005 N. Central Avenue
Phoenix, AZ 85004

Alonzo Borboa
3003 N. Central Avenue

Phoenix, AZ 85012

Nichole Garcia
3003 N. Central Avenue
Phoenix, AZ 85012

Desiree Manrique
9440 N. 25th Avenue
Phoenix, AZ 85021

Edwin Wangler
30134 N. 71st Drive
Peoria, AZ 85388

Dana Burden
20413 N. 29th Place
Phoenix, AZ 85980

David Lujan
3003 N. Central Avenue
Phoenix, AZ 85012

Janet Cahill PHD
2884 San Juan Circle
Minden, NV 89423

Discovery Tier t3

Case Category: Other Civil Case Categories
Case Subcategory: Civil Rights 42 USC 1983

AZTurboCourt.gov Form Set #10468284

Clerk of the Superior Court
*** Electronically Filed ***
C. McWhorter, Deputy
10/22/2024 3:33:28 PM
Filing ID 18727339

Person Filing: Thomas A Connelly
Address (if not protected): 5055 N. 12th St. Suite 101
City, State, Zip Code: Phoenix, AZ 85014
Telephone: (480)999-4556X1008
Email Address: tconnelly@millsandwoods.com
Representing [□ ] Self or [☒ ] Attorney for:
Lawyer's Bar Number: 019430, Issuing State: AZ

# SUPERIOR COURT OF ARIZONA
## IN MARICOPA COUNTY

Case Number: **CV2024-030202**

Jessica Fidler, et al.
_____
Name of Plaintiff

**SUMMONS**

AND

State of Arizona, et al.
_____
Name of Defendant

| **WARNING**: This is an official document from the court that affects your rights.  Read this carefully.  If you do not understand it, contact a lawyer for help. |
| --- |

**FROM THE STATE OF ARIZONA TO:** Alonzo Borboa
_____
Name of Defendant

1. **A lawsuit has been filed against you.**  A copy of the lawsuit and other court papers are served on you with this *"Summons"*.

2. If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint.  To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to <u>Clerk of the Superior Court,</u> <u>or electronically file your Answer through one of Arizona's approved electronic filing systems at</u> <u>http://www.azcourts.gov/efilinginformation</u>. Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons. Note:  If you do not file electronically you will not have electronic access to the document in this case.

AZturboCourt.gov Form Set #10468284

3.  If this "Summons" and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your "Response" or "Answer" must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served.  If this "Summons" and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

4.  You can get a copy of the court papers filed in this case from the Petitioner at the address at the top of this paper, or from the Clerk of the Superior Court.

5.  Requests for reasonable accommodation for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least ten (10) judicial days before your scheduled court date.

6.  Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case at least ten (10) judicial days in advance of your scheduled court date.

SIGNED AND SEALED this Date: *October 22, 2024*

*JEFF FINE*
Clerk of Superior Court

By: *C. MCWHORTER*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

AZturboCourt.gov Form Set #10468284

Person Filing: Thomas A Connelly
Address (if not protected): 5055 N. 12th St. Suite 101
City, State, Zip Code: Phoenix, AZ 85014
Telephone: (480)999-4556X1008
Email Address: tconnelly@millsandwoods.com
Representing [☐ ] Self or [☒ ] Attorney for:
Lawyer's Bar Number: 019430, Issuing State: AZ

Clerk of the Superior Court
*** Electronically Filed ***
C. McWhorter, Deputy
10/22/2024 3:33:28 PM
Filing ID 18727343

# SUPERIOR COURT OF ARIZONA
## IN MARICOPA COUNTY

Case Number: **CV2024-030202**

Jessica Fidler, et al.
_____
Name of Plaintiff

**SUMMONS**

AND

State of Arizona, et al.
_____
Name of Defendant

| |
|---|
| **WARNING**: This is an official document from the court that affects your rights. Read this carefully. If you do not understand it, contact a lawyer for help. |

**FROM THE STATE OF ARIZONA TO:** Dana Burden
_____
Name of Defendant

1.  **A lawsuit has been filed against you.** A copy of the lawsuit and other court papers are served on you with this *"Summons"*.

2.  If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint. To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to <u>Clerk of the Superior Court,</u> <u>or electronically file your Answer through one of Arizona's approved electronic filing systems at</u> <u>http://www.azcourts.gov/efilinginformation</u>. Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons. Note: If you do not file electronically you will not have electronic access to the document in this case.

AZturboCourt.gov Form Set #10468284

3.    If this "Summons" and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your "Response" or "Answer" must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served.  If this "Summons" and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

4.    You can get a copy of the court papers filed in this case from the Petitioner at the address at the top of this paper, or from the Clerk of the Superior Court.

5.    Requests for reasonable accommodation for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least ten (10) judicial days before your scheduled court date.

6.    Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case at least ten (10) judicial days in advance of your scheduled court date.

SIGNED AND SEALED this Date: *October 22, 2024*

*JEFF FINE*
Clerk of Superior Court

By: *C. MCWHORTER*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

AZturboCourt.gov Form Set #10468284

Clerk of the Superior Court
*** Electronically Filed ***
C. McWhorter, Deputy
10/22/2024 3:33:28 PM
Filing ID 18727345

Person Filing: Thomas A Connelly
Address (if not protected): 5055 N. 12th St. Suite 101
City, State, Zip Code:  Phoenix, AZ 85014
Telephone: (480)999-4556X1008
Email Address: tconnelly@millsandwoods.com
Representing [☐  ] Self or [☒  ] Attorney for:
Lawyer's Bar Number: 019430, Issuing State: AZ

# SUPERIOR COURT OF ARIZONA
## IN MARICOPA COUNTY

Case Number: **CV2024-030202**

Jessica Fidler, et al.
Name of Plaintiff

**SUMMONS**

AND

State of Arizona, et al.
Name of Defendant

**WARNING**:  This is an official document from the court that affects your rights.  Read this carefully.
If you do not understand it, contact a lawyer for help.

**FROM THE STATE OF ARIZONA TO:** Janet Cahill PHD

Name of Defendant

1.  **A lawsuit has been filed against you.**  A copy of the lawsuit and other court papers are served on you with this *"Summons"*.

2.  If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint.  To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to Clerk of the Superior Court, or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation. Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons. Note:  If you do not file electronically you will not have electronic access to the document in this case.

AZturboCourt.gov Form Set #10468284

**3.**    If this "Summons" and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your "Response" or "Answer" must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served.  If this "Summons" and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

**4.**    You can get a copy of the court papers filed in this case from the Petitioner at the address at the top of this paper, or from the Clerk of the Superior Court.

**5.**    Requests for reasonable accommodation for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least ten (10) judicial days before your scheduled court date.

**6.**    Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case at least ten (10) judicial days in advance of your scheduled court date.

SIGNED AND SEALED this Date: *October 22, 2024*

*JEFF FINE*
Clerk of Superior Court

By: *C. MCWHORTER*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

AZturboCourt.gov Form Set #10468284

Arizona Supreme Court
Summons
                          Page 2 of 2
                                  EFCV11f-042523

Person Filing: Thomas A Connelly

Address (if not protected): 5055 N. 12th St. Suite 101

City, State, Zip Code:  Phoenix, AZ 85014

Telephone: (480)999-4556X1008

Email Address: tconnelly@millsandwoods.com

Representing [□  ] Self or [☒  ] Attorney for:

Lawyer's Bar Number: 019430, Issuing State: AZ

Clerk of the Superior Court
*** Electronically Filed ***
C. McWhorter, Deputy
10/22/2024 3:33:28 PM
Filing ID 18727340

# SUPERIOR COURT OF ARIZONA
## IN MARICOPA COUNTY

Case Number: **CV2024-030202**

Jessica Fidler, et al.

Name of Plaintiff

**SUMMONS**

AND

State of Arizona, et al.

Name of Defendant

---

**WARNING**:  This is an official document from the court that affects your rights.  Read this carefully.
If you do not understand it, contact a lawyer for help.

---

**FROM THE STATE OF ARIZONA TO:** Nichole Garcia

Name of Defendant

1.    **A lawsuit has been filed against you.**  A copy of the lawsuit and other court papers are served on you with this *"Summons"*.

2.    If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint.  To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to Clerk of the Superior Court, or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation. Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons. Note:  If you do not file electronically you will not have electronic access to the document in this case.

AZturboCourt.gov Form Set #10468284

**3.**     If this "Summons" and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your "Response" or "Answer" must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served.  If this "Summons" and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

**4.**     You can get a copy of the court papers filed in this case from the Petitioner at the address at the top of this paper, or from the Clerk of the Superior Court.

**5.**     Requests for reasonable accommodation for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least ten (10) judicial days before your scheduled court date.

**6.**     Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case at least ten (10) judicial days in advance of your scheduled court date.

SIGNED AND SEALED this Date: *October 22, 2024*

*JEFF FINE*
Clerk of Superior Court

By: *C. MCWHORTER*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

Person Filing: Thomas A Connelly
Address (if not protected): 5055 N. 12th St. Suite 101
City, State, Zip Code: Phoenix, AZ 85014
Telephone: (480)999-4556X1008
Email Address: tconnelly@millsandwoods.com
Representing [ ☐ ] Self or [ ☒ ] Attorney for:
Lawyer's Bar Number: 019430, Issuing State: AZ

Clerk of the Superior Court
*** Electronically Filed ***
C. McWhorter, Deputy
10/22/2024 3:33:28 PM
Filing ID 18727344

# SUPERIOR COURT OF ARIZONA
## IN MARICOPA COUNTY

Case Number: **CV2024-030202**

Jessica Fidler, et al.
_____
Name of Plaintiff

**SUMMONS**

AND

State of Arizona, et al.
_____
Name of Defendant

| |
|---|
| **WARNING**:  This is an official document from the court that affects your rights.  Read this carefully.  If you do not understand it, contact a lawyer for help. |

**FROM THE STATE OF ARIZONA TO:** David Lujan
_____
Name of Defendant

1.  **A lawsuit has been filed against you.**  A copy of the lawsuit and other court papers are served on you with this *"Summons"*.

2.  If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint.  To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to <u>Clerk of the Superior Court,</u> <u>or electronically file your Answer through one of Arizona's approved electronic filing systems at</u> <u>http://www.azcourts.gov/efilinginformation</u>. Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons. Note:  If you do not file electronically you will not have electronic access to the document in this case.

AZturboCourt.gov Form Set #10468284

**3.**     If this "Summons" and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your "Response" or "Answer" must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served.  If this "Summons" and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

**4.**     You can get a copy of the court papers filed in this case from the Petitioner at the address at the top of this paper, or from the Clerk of the Superior Court.

**5.**     Requests for reasonable accommodation for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least ten (10) judicial days before your scheduled court date.

**6.**     Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case at least ten (10) judicial days in advance of your scheduled court date.

SIGNED AND SEALED this Date: *October 22, 2024*

*JEFF FINE*
Clerk of Superior Court

By: *C. MCWHORTER*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

AZturboCourt.gov Form Set #10468284

Person Filing: Thomas A Connelly
Address (if not protected): 5055 N. 12th St. Suite 101
City, State, Zip Code:  Phoenix, AZ 85014
Telephone: (480)999-4556X1008
Email Address: tconnelly@millsandwoods.com
Representing [□ ] Self or [☒ ] Attorney for:
Lawyer's Bar Number: 019430, Issuing State: AZ

Clerk of the Superior Court
*** Electronically Filed ***
C. McWhorter, Deputy
10/22/2024 3:33:28 PM
Filing ID 18727341

# SUPERIOR COURT OF ARIZONA
## IN MARICOPA COUNTY

Case Number: **CV2024-030202**

Jessica Fidler, et al.
_____
Name of Plaintiff

**SUMMONS**

AND

State of Arizona, et al.
_____
Name of Defendant

| **WARNING**:  This is an official document from the court that affects your rights.  Read this carefully. If you do not understand it, contact a lawyer for help. |
| --- |

**FROM THE STATE OF ARIZONA TO:** Desiree Manrique
_____
Name of Defendant

1.  **A lawsuit has been filed against you.**  A copy of the lawsuit and other court papers are served on you with this *"Summons"*.

2.  If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint.  To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to <u>Clerk of the Superior Court,</u> <u>or electronically file your Answer through one of Arizona's approved electronic filing systems at</u> <u>http://www.azcourts.gov/efilinginformation</u>. Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons. Note:  If you do not file electronically you will not have electronic access to the document in this case.

AZturboCourt.gov Form Set #10468284

3.   If this "Summons" and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your "Response" or "Answer" must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served.  If this "Summons" and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

4.   You can get a copy of the court papers filed in this case from the Petitioner at the address at the top of this paper, or from the Clerk of the Superior Court.

5.   Requests for reasonable accommodation for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least ten (10) judicial days before your scheduled court date.

6.   Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case at least ten (10) judicial days in advance of your scheduled court date.

SIGNED AND SEALED this Date: *October 22, 2024*

*JEFF FINE*
Clerk of Superior Court

By: *C. MCWHORTER*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

Clerk of the Superior Court
*** Electronically Filed ***
C. McWhorter, Deputy
10/22/2024 3:33:28 PM
Filing ID 18727338

Person Filing: Thomas A Connelly
Address (if not protected): 5055 N. 12th St. Suite 101
City, State, Zip Code:  Phoenix, AZ 85014
Telephone: (480)999-4556X1008
Email Address: tconnelly@millsandwoods.com
Representing [□  ] Self or [☒  ] Attorney for:
Lawyer's Bar Number: 019430, Issuing State: AZ

# SUPERIOR COURT OF ARIZONA
## IN MARICOPA COUNTY

Case Number: **CV2024-030202**

Jessica Fidler, et al.
Name of Plaintiff

**SUMMONS**

AND

State of Arizona, et al.
Name of Defendant

> **WARNING**:  This is an official document from the court that affects your rights.  Read this carefully.
> If you do not understand it, contact a lawyer for help.

**FROM THE STATE OF ARIZONA TO:** State of Arizona

Name of Defendant

1. **A lawsuit has been filed against you.**  A copy of the lawsuit and other court papers are served on you with this *"Summons".*

2. If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint.  To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to Clerk of the Superior Court, or electronically file your Answer through one of Arizona's approved electronic filing systems at http://www.azcourts.gov/efilinginformation. Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons. Note:  If you do not file electronically you will not have electronic access to the document in this case.

AZturboCourt.gov Form Set #10468284

3.  If this "Summons" and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your "Response" or "Answer" must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served.  If this "Summons" and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

4.  You can get a copy of the court papers filed in this case from the Petitioner at the address at the top of this paper, or from the Clerk of the Superior Court.

5.  Requests for reasonable accommodation for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least ten (10) judicial days before your scheduled court date.

6.  Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case at least ten (10) judicial days in advance of your scheduled court date.

SIGNED AND SEALED this Date: *October 22, 2024*

*JEFF FINE*
Clerk of Superior Court

By: *C. MCWHORTER*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

Person Filing: Thomas A Connelly

Address (if not protected): 5055 N. 12th St. Suite 101

City, State, Zip Code:  Phoenix, AZ 85014

Telephone: (480)999-4556X1008

Email Address: tconnelly@millsandwoods.com

Representing [☐ ] Self or [☒ ] Attorney for:

Lawyer's Bar Number: 019430, Issuing State: AZ

Clerk of the Superior Court
*** Electronically Filed ***
C. McWhorter, Deputy
10/22/2024 3:33:28 PM
Filing ID 18727342

# SUPERIOR COURT OF ARIZONA
## IN MARICOPA COUNTY

Case Number: **CV2024-030202**

Jessica Fidler, et al.

Name of Plaintiff

**SUMMONS**

AND

State of Arizona, et al.

Name of Defendant

| |
|---|
| **WARNING**:  This is an official document from the court that affects your rights.  Read this carefully. If you do not understand it, contact a lawyer for help. |

**FROM THE STATE OF ARIZONA TO:** Edwin Wangler

Name of Defendant

1.  **A lawsuit has been filed against you.**  A copy of the lawsuit and other court papers are served on you with this *"Summons"*.

2.  If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint.  To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to <u>Clerk of the Superior Court,</u> <u>or electronically file your Answer through one of Arizona's approved electronic filing systems at</u> <u>http://www.azcourts.gov/efilinginformation.</u> Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons. Note:  If you do not file electronically you will not have electronic access to the document in this case.

AZturboCourt.gov Form Set #10468284

3.  If this "Summons" and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your "Response" or "Answer" must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served.  If this "Summons" and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

4.  You can get a copy of the court papers filed in this case from the Petitioner at the address at the top of this paper, or from the Clerk of the Superior Court.

5.  Requests for reasonable accommodation for persons with disabilities must be made to the office of the judge or commissioner assigned to the case, at least ten (10) judicial days before your scheduled court date.

6.  Requests for an interpreter for persons with limited English proficiency must be made to the office of the judge or commissioner assigned to the case at least ten (10) judicial days in advance of your scheduled court date.

SIGNED AND SEALED this Date: *October 22, 2024*

*JEFF FINE*
Clerk of Superior Court

By: *C. MCWHORTER*
Deputy Clerk



Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

If you would like legal advice from a lawyer, contact Lawyer Referral Service at 602-257-4434 or https://maricopabar.org. Sponsored by the Maricopa County Bar Association.

Clerk of the Superior Court
*** Electronically Filed ***
C. McWhorter, Deputy
10/22/2024 3:33:28 PM
Filing ID 18727335

1  Thomas A. Connelly (AZ Bar #109430)
2  Robert T. Mills (AZ Bar #018853)
   Sean A. Woods (AZ Bar #028930)
3  **MILLS + WOODS LAW PLLC**
   5055 North 12th Street, Suite 101
4  Phoenix, Arizona 85014
   Telephone 480.999.4556
5  docket@millsandwoods.com
6
7  DeeAn Gillespie Strub (AZ Bar #009987)
   Jenny D. Jansch (AZ #024431)
8  **GILLESPIE, SHIELDS, & TAYLOR**
   7319 North 16th Street
9  Phoenix, Arizona 85020
   Telephone: (602) 870-9700
10 Fax: (602) 870-9783
   mailroom@gillaw.com
11
12 *Attorneys for Plaintiffs*
13
14
15            **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
              **IN AND FOR THE COUNTY OF MARICOPA**
16
   JESSICA FIDLER, an individual; E.F., a       Case No.:
17 minor, through his parent and guardian
   JESSICA FIDLER,                              **CV2024-030202**
18
            Plaintiffs,                         **COMPLAINT**
19
          vs.
20
   STATE OF ARIZONA, a government
21 entity; ALONZO BORBOA, individually
   and as an employee with the State of
22 Arizona Department of Child Safety;
   NICHOLE GARCIA, individually and as          **JURY TRIAL REQUESTED**
23 an employee with the State of Arizona
   Department of Child Safety; DESIREE
24 MANRIQUE, individually and as an
   employee with the State of Arizona
25 Department of Child Safety; EDWIN
   WANGLER, individually and as an
26 employee with the State of Arizona
   Department of Child Safety; DANA
27 BURDEN, individually and as an
28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

1
2
3
4
5
6
7

| |
|---|
| employee with the State of Arizona Department of Child Safety; DAVID LUJAN, individually and as Cabinet Executive Officer with the State of Arizona Department of Child Safey; JANET CAHILL, Ph.D, individually, JOHN and JANE DOES I-X; BLACK and WHITE ENTITES I-X |
| Defendants. |

8

Plaintiffs, Jessica Fidler and E.F.[1], (together, "Plaintiffs") by and through their

9

counsel, file this Complaint against Defendants State of Arizona, Alonso Borboa, Nichole

10

Garcia, Desiree Manrique, Edwin Wangler, Dana Burden, David Lujan, Janet Cahill, John

11

and Jane Does I-X, and Black and White Entities I-X.  Plaintiffs state and allege the

12

following:

13

## **JURISDICTION AND VENUE**

14

1.      Plaintiffs bring this civil rights lawsuit pursuant to the Fourth and Fourteenth

15

Amendments to the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. §

16

1983, A.R.S. § 12-641, and Arizona common law.

17

2.      The amount in controversy exceeds the minimal jurisdiction limits of this

18

Court.

19

3.      This Court has original subject matter jurisdiction over the claims made in

20

this Complaint pursuant to Article 6, Section 14 of the Arizona Constitution.

21

4.      This Court has original subject matter jurisdiction over the federal question

22

claims made in this Complaint pursuant to 28 U.S.C. § 1331 to the extent of those claims

23

that arise under 42 U.S.C. § 1983, 42 U.S.C. § 1985, and the U.S. Constitution.

24

5.      This Court has supplemental jurisdiction over all other claims in this action

25

pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or

26

controversy as the federal questions claims, including those claims that are made pursuant

27

to Article 6, section 14 of the Arizona Constitution.

28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

---

[1] E.F. is a fictitious name used to protect the identity of the minor.

2

6.    The acts and events giving rise to the cause of action alleged herein occurred in Maricopa County, Arizona, and all Defendants are subject to the personal jurisdiction of this Court in accordance with A.R.S. § 12-123 and as otherwise provided under Arizona law and the Arizona Rules of Civil Procedure.

7.    Venue lies in this Court pursuant to 28 U.S.C. § 1391 and A.R.S. § 12-401 in that, among other reasons, the specific acts giving rise to the causes of action alleged herein occurred with primary effect in Maricopa County, Arizona.

## THE PARTIES

8.    Plaintiff Jesssica Fidler ("Jessica") is an individual, a citizen of the United States, and a resident of Maricopa County, Arizona.  At all times relevant to the present Complaint, Jessica resided in Maricopa County, Arizona.

9.    Plaintiff E.F., is an individual, minor, a citizen of the United States, and a resident of Maricopa County, Arizona.  At all times relevant to the present Complaint, E.F., resided in Maricopa County, Arizona.

10.    Defendant State of Arizona, is a government entity, operating through several agencies, including the Arizona Department of Child Safety ("DCS"), Office of Child Welfare Investigations "OCWI) which acts by and through its officials, employees, and agents, including, without limitation, each of the other Defendants in this action.

11.    Defendant Alonzo Borboa ("Borboa") is an individual who resided in Maricopa County, Arizona, at all times relevant to the Complaint.  Borboa was, at all times relevant to this Complaint, acting under the color of law as an employee of State of Arizona with DCS.  He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Borboa was employed by the State of Arizona and DCS, OCWI to perform the role of a DCS investigator and assistant manager.

12.    Defendant Nichole Garcia ("Garcia") is an individual who resided in Maricopa County Arizona, at all times relevant to the Complaint.  Garcia was, at all times relevant to this Complaint, acting under color of law as an employee of the State of Arizona

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

3

with DCS.  She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Garcia was employed by State of Arizona with DCS and OCWI to perform the role of a DCS investigator and manager.

13.    Defendant Desiree Manrique ("Manrique") is an individual who resided in Maricopa County, Arizona, at all times relevant to the Complaint.  Manrique was, at all times relevant to this Complaint, acting under the color of law as an employee of State of Arizona with DCS.  She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Manrique was employed by the State of Arizona with DCS at the Welcome Center.

14.    Defendant Edwin Wangler ("Wangler") is an individual who resided in Maricopa County, Arizona, at all times relevant to the Complaint.  Wangler was, at all times relevant to this Complaint, acting under the color of law as an employee of the State of Arizona with DCS.  He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Wangler was employed by the State of Arizona with DCS, as the Chief of OCWI who is responsible for OCWI employees, investigators, Deputy Chief and head decision maker for OCWI.

15.    Defendant Dana Burden ("Burden") is an individual who resided in Maricopa County, Arizona, at all times relevant to the Complaint.  Burden was, at all times relevant to this Complaint, acting under the color of law as an employee of the State of Arizona with DCS.  He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Burden was employed by State of Arizona with DCS as the Deputy Chief of OCWI who is responsible for OCWI employees, Investigators and supervisor to Barboa and Garcia.

16.    Defendant David Lujan ("Lujan") is an individual who resided in Maricopa County Arizona, at all times relevant to the Complaint.  Lujan was, at all times relevant to

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

this Complaint, acting under the color of law as an employee of the State of Arizona with DCS.  He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Lujan was employed by the State of Arizona as the Cabinet Executive Officer for DCS.

17.    Defendant Janet Cahill, Ph.D. ("Cahill") is an individual who resided in Minden, Neveda, at all times relevant to this Complaint.  At all times relevant, Cahill provided consulting services for DCS and was acting under the color of law.  She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

18.    Whenever in this Complaint reference is made to any act of "Defendants" such allegations shall be deemed to mean all named Defendants, John and Jane Does I-X and Black and White Entities I-X, or their officers, agents, managers, members, representative, employees, heirs, assignees, customers, tenants, and that they did or authorized such acts while actively engaged in the operation, management, direction, or control of the affairs of Defendants and while acting within the course and scope of their duties, expect as specifically alleged otherwise.

19.    At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiffs allege, upon information and belief, that each Defendant was and is the agent, employee, principal, employer, co-conspirator, or any combination thereof of each of the remaining defendants, vice versa, or both.  In addition, Plaintiffs allege, upon information and belief, that the Defendants named herein, and each of them, are responsible in some manner for the occurrences herein alleged, and that each of the above Defendants conspired with, directed, ratified, approved, aided, abetted, jointly collaborated, or any combination thereof, each of the remaining Defendants in committing the acts herein alleged or failed to prevent such acts when having the power, duty, or authority to do so with full knowledge of said acts.

5

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

# FACTUAL ALLEGATIONS[2]

## I.    BACKGROUND FACTS

20.    E.F. (born in 2011) is the natural child of Jessica.

21.    Jessica is the "sole" parent to E.F. who was conceived via intrauterine insemination using an anonymous sperm donor in 2011 in Israel. Jesica's pregnancy with E.F. was complicated, and E.F. was born three (3) weeks early via C-Section at Rambam Hospital in Haifa, Israel.

22.    Jessica was raised in Michigan and is raising E.F. in the Jewish faith in Arizona.

23.    Although Jessica is a single mother, she was not alone in raising E.F. Jessica has an extended family network that has always loved and supported her and E.F. She, like any loving parent, always put E.F. first. Jessica recognized when she needed help and asked for it.

### A.    E.F. has suffered from chronic illnesses his entire life, starting at birth.

24.    From birth, E.F. suffered from chronic health issues that at times were life-threatening. What's worse is that E.F.'s health problems were very difficult to diagnose and treat. E.F. suffered from an array of chronic, non-specific but troubling symptoms including dizziness, labile body temperature, apnea (stopping to breathe), chronic fatigue, chronic constipation, fecal and urinary incontinence, and global developmental delays.

25.    By the time E.F. was four years old, doctors told Jessica that E.F. could have a variety of different diagnoses including congenital disorders, food allergies, cystic fibrosis, seizures, mitochondrial disorder, dysautonomia disorder, weakened immune system, and postural orthostatic tachycardia syndrome ("POTS"). However, while some of the treatments the doctors offered would lessen E.F.'s symptoms at times, none were curative.

---

[2] Plaintiffs make the allegations in this Complaint based upon personal knowledge as to those matters in which they had personal involvement and upon information and belief as to all other matters.

26.    At all times, Jessica was very concerned for the health and well-being of her son, and sought the least amount of medical treatments possible, as it was her wish the E.F. would "just be a kid."

27.    Prior to the State and DCS's involvement, E.F. was frequently seen by doctors, and was even hospitalized on occasion when medically necessary, due to his chronic health issues.

28.    E.F. also had a home-health nurse, a primary care physician, specialists, and a DDD service provider.

**B.    An IV access is place in E.F. in 2016, which necessitated additional doctor's visits.**

29.    In the time prior to the State and DCS's involvement, doctor-recommended treatments for E.F. included the placement of an intravenous ("IV") access to allow for IV administration of fluids and antibodies.

30.    Phoenix Children's Hospital ("PCH") doctors placed the IV access on August 26, 2016.

31.    After the IV access was placed, PCH doctors told Jessica to bring E.F. to a hospital if he ever ran a fever of 100.4 F, as any infection in the IV would be life-threatening.  Because E.F. has a weakened immune system and temperature instability, he frequently ran a fever over 100.4 F; and as a result, his doctor visits were many.

32.    Prior to the State and DCS involvement, E.F. was also seen by doctors when the issues with his GI tract would flare up.

33.    E.F.'s home-health nurse documented the reasons why Jessica took E.F. to the doctor when she did.  The home-health nurse's medical records evidence E.F.'s temperatures and any issue E.F. may have had with his GI tract, among other things.

34.    At the recommendations of E.F.'s medical specialist, E.F. was also seen by medical specialists in Cincinnati, Ohio and at Stanford hospital in California during the time prior to the State and DCS involvement with this family.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

7

35.    At all times, Jessica has been concerned about her son's medical conditions. She entrusted E.F.'s medical providers with his care, and always followed their advice.

36.    At no time, before or after E.F. was seized by the State and DCS, did any of E.F.'s treating physicians, home-health care nurse, school nurse, or DDD service providers express any concern that Jessica was medically abusing E.F.

37.    At no time, before or after E.F. was seized by the State and DCS, did Jessica argue with PCH doctors or any other doctor to seek unnecessary medical treatments against their recommendations.

**C.    In 2019, Cincinnati doctors recommend that E.F. have a lifestyle altering surgery, an ileostomy.**

38.    In the summer of 2019, E.F. was continuing to be severely impacted by his GI issues.

39.    At the recommendation of PCH doctors, Jessica took E.F. to a specialist located in Cincinnati.

40.    The Cincinnati doctor recommended that E.F. have a life-altering surgery, *i.e.*, an ileostomy.

41.    An ileostomy involves cutting a hold in the abdominal wall and leaving the hole open.

42.    E.F. returned to PCH to have the life-altering surgery (*i.e.*, the ileostomy) performed.

43.    Dr. Hurliman, E.F.'s long-term primary care physician, and E.F.'s PCH GI specialists, all agreed with the Cincinnati doctor that the ileostomy would be beneficial for E.F.   However, the PCH surgeon who would have performed the operation disagreed. Because there was now not a consensus at PCH, Dr. Hurliman and E.F.'s PCH GI specialist recommended that Jessica take E.F. to Banner Hospital for another opinion.

**D.    The Banner doctor found the ileostomy was unwarranted and performed a much less drastic procedure instead.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

8

44.    The Banner doctor requested that a test known as a barium enema be performed to better see E.F.'s bowels on x-rays. None of the other doctors had ever performed this test.

45.    The barium enema x-ray found that E.F. had an extra or "redundant," piece of the bowel.

46.    The Banner doctor then conferred with Dr. Hurliman, the PCH GI specialists, and the PCH surgeon who had disagreed with the ileostomy. With the new barium enema x-ray results in hand, the four doctors agreed that an ileostomy was not warranted, and that a less invasive surgery (*i.e.* a hemi-colectomy) to remove the redundant bowel was the better option.

47.    A hemicolectomy does not require leaving an open hole in the abdominal wall and is *not* a lifestyle altering surgery like an ileostomy.

48.    Banner doctors performed the hemi-colectomy in October 2019.

49.    Later in October 2019, E.F. was admitted to PCH for three days for abdominal pain, vomiting, and constipation arising from the hemi-colectomy surgery he had at Banner a few weeks earlier.

50.    When the results came back negative for an infection on January 28, 2020, the next day, one PCH's doctor, Bo Borch-Christensen, who had a run in with Jessica in 2017, decided to review E.F.'s records and falsely claimed that Jessica had taken E.F. to Banner to have the ileostomy performed after the PCH surgeon refused to do so. This PCH doctor later recounted this falsehood to DCS and the police. As noted above, an ileostomy was never performed. Further, all doctors involved (PCH GI doctor, PCH surgeon, Banner doctor and E.F.'s primary care physician) conferred beforehand and agreed that the less invasive surgery, the hemi-colectomy, which was performed, was the best option for E.F.

51.    Apart from this minor complication in late October 2019, the hemi-colectomy performed at Banner helped lessened E.F.'s bowel issues significantly and he was starting feel better in late fall and early Winter of 2019.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

9

52.    In late January 2020, Jessica brough E.F. to the Emergency Department at PCH because E.F. was running a fever.  As noted above, Jessica had been instructed by E.F.'s doctors that any infection with the IV access in place could be life threatening, so she must take him to the hospital to see if there was an infection.  The Emergency Department doctor ran a test to see if there was an infection.

53.    The results came back negative for an infection on January 28, 2020.

54.    PCH doctor Christensen, who only examined E.F. one time in 2017, called the DCS Hotline on January 29, 2020, with the false allegation that Jessica was medically abusing E.F. by Factitious Disorder Imposed on Another ("FDIA") a/k/a Munchausen by Proxy ("MBP").

55.    When Christensen made the call to DCS on January 29, 2020, he was acting as a mere by-stander, not as E.F.'s treating physician, and not as a mandatory reporter.

56.    During this DCS hotline call, Christensen made the false allegation that Jessica took E.F. to another hospital (i.e. Banner) to have an unnecessary bowel surgery performed (i.e. the purported ileostomy) and that now E.F. was eating through a feeding tube.

57.    E.F never had an ileostomy, never had any other unnecessary bowel surgery, was never on a feeding tube.  In other words, each of Dr. Christensen's material medical statements to DCS were false.

58.    Then on February 20, 2020, Christensen went to Scottsdale Police Department and made a false report against Jessica.  DCS investigator Lisa Burns, and DCS service provider joined by phone.

**E.    The State through DCS and its Agents first wrongful removal of E.F. based upon false allegations**

59.    Without ever speaking with any of E.F.'s treating doctors, including E.F.'s primary care physician.  None of E.F.'s treating doctors agreed with the assessment that Jessica was medically abusing E.F.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

60.     The State, DCS and their agents failed to speak to E.F.'s service provider at that State of Arizona, Division of Developmental Disabilities ("DDD").

61.     The DDD service provider cared for E.F. since 2017, had access to all of his medical records, including the home-health nurses' records, and did not agree with the assessment that Jessica was medically abusing E.F.

62.     On March 31, 2020, the State through DCS and its agents filed a dependency petition and requested a temporary order for removal of E.F. from the juvenile court falsely claiming that Jessica was seeking unnecessary medical treatments for E.F., Jessica was doctor shopping, and that Jessica brough E.F. to Banner to have an unnecessary surgery (i.e. an ileostomy) when PCH doctors refused to perform the surgery.  All these allegations would have been refuted had the State through DCS and their agents conducted a proper investigation

63.     At no time did the State, DCS, or its agents properly investigate the January 2020 allegation before removing E.F. on or about April 20, 2020.  Instead, the State through DCS and their agents outsourced the investigation to the hotline caller himself, and relied on the opinion of a freelance DCS contractor who has no medical training and was not qualified to investigate the FDIA claim.

64.     After E.F.'s removal the State through DCS and their agents held E.F. in the hospital for two weeks (for, by their own admission, no medical reason), stopped all his medications and treatment, and then placed him with complete strangers, where he regressed medically, was bullied and denied any ability to practice his Jewish faith in which he was raised.

65.     While E.F. was in foster care, E.F.'s bowel symptoms started to flare up and he began to soil himself.  This symptom had largely resolved after the hemi-colectomy performed at Banner in October 2019, and only re-occurred after PCH doctor removed all E.F.'s medical treatments.

66.     After the State through DCS and their agents sought to permanently terminate the relationship between Jessica and E.F., the Juvenile Court conducted two interim

11

evidentiary hearings that were held on August 19 and 20, 2020 and September 14, 2020. The juvenile court questioned the State and DCS if there was *any* factual basis to support the dependency petition once it heard testimony from E.F.'s treating physicians, all of whom testified that Jessica had not abused E.F.  None agreed that Jesica was abusive by FDIA.

67.    Shortly thereafter, the State through DCS and its agents dismissed its unfounded case against Jessica and E.F. was returned to his mother.

68.    However, even after the petition was withdrawn, the State through DCS and their agents would not close out the case as unsubstantiated.  Instead, they implemented a family reunification team wherein they can continue to falsely allege that Jessica medically abused her son.

69.    The State, DCS and their agents never corrected the gross and material errors in its records.

70.    The case remained open at DCS until January 2021, when finally, after Jessica's counsel contacted the State's attorney to look into the matter, DCS then closed the case.

## II.    FACTS GIVING RISE TO THIS ACTION

### A.  The Lack of Reasonable Investigation

71.    After E.F. was returned home, the foster mother began stalking Jessica and E.F. and due to the State and DCS' publication of Jessica and E.F.'s personal information, strangers were harassing Jessica.  Out of concern for their safety, Jessica moved and obtained a protected address through the Arizona Address Confidentiality Program.

72.    On Friday, January 20, 2023, the State through DCS and OCWI investigators Natasha Pavlina and Borboa showed up at Jessica's new home when she was not there.  She saw Natasha Pavlina on her Ring doorbell camera.  She spoke with Natasha Pavlina and Borboa through her Ring doorbell camera.  Ironically, Jessica happened to be at the law office of Gillespie, Shields & Taylor at the time.  Jessica repeatedly asked what the allegation was and DCS' concern and they refused to inform her without meeting in person.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

12

73.    Ms. Pavlina agreed to meet with Jessica and Ms. Gillespie at the law office on the following Monday, January 23, 2023 to explain the alleged new allegations. However, Ms. Pavlina cancelled that meeting.  No one from the State or DCS met with Jessica or her counsel.  This, despite numerous correspondence and attempts by Jessica and her counsel to reach not only the DCS agents, but also the Arizona Attorney General's office and the Ombudsman's office.

74.    During these communications, Ms. Pavlina, her supervisor Borboa and their manager/ supervisor Garcia were put on notice that Jessica and E.F. are still suffering the lasting traumatic effects from the 2020 unlawful removal of E.F. by the State and DCS.

75.    Also on January 20, 2023, Ms. Pavlina and her manager/supervisor Garcia contacted the Gilbert Police Department Detective Halliday, reporting Jessica for child abuse based on the same doctor's report in January 2020, which resulted in E.F.'s wrongful removal.

76.    However, Ms. Pavlina and Garcia failed to inform detective Halliday that the juvenile court questioned the State and DCS' evidence of abuse resulting in the State and DCS withdrawing its petition and E.F. Being returned to his mother's care.

77.    Ms. Pavlina and Garcia also claimed that Jessica's insurance company contacted the State through DCS in January 2023, regarding the frequent doctors' visits and falsely alleged (i.e., non- existent) decline in E.F.'s health.

78.    Detective Halliday turned the case over to lead investigator, Gilbert Police Detective Jo Roman on January 25, 2023.

79.    The State through DCS and its agent Garcia, sent Detective Roman only three selected documents from the State and DCS's files:  the Case Review, Psychiatric Touchtone, and Jessica's psychological evaluation.

80.    On or about January 24, 2023, the State through DCS and its agents Pavlina, Borboa and Garcia requested Jessica's protected address from the Address Confidentiality Program.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

13

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

81.    In their request, the State through DCS and its agents Pavlina, Borboa and Garcia told the Address Confidentiality Program that the request was for an open OCWI criminal conduct investigation, that the State and DCS are obligated to make physical contact with the victim-child, and that the State and DCS were notified that the child was not receiving needed medical equipment delivered to the home and that Jessica refused to provide her address to medical providers. However, this was false.

82.    Jessica also learned through a police investigator that the State through DCS and its agents Wangler, Burden, Garcia and Borboa were working in concert with Maricopa County Attorney prosecutor Dyanne Greer to again investigate the 2020 allegations of medical child abuse.

83.    Because the State and DCS records were never corrected to expunge false information from 2020, a simple address mix-up escalated into another false allegation, investigation, warrantless removal, and unfounded dependency petition for child medical abuse.

84.    Jessica attempted to identify how DCS knew her physical address before following proper protocol to request it from the Address Confidentiality Program and nobody was identified how her physical address was known by someone other than the Address Confidentiality Program.

85.    The State through DCS and its agents Pavlina and Garcia provided Jesscia's physical address to the Gilbert Police Department and now her address is a matter of public record.

86.    On February 1, 2023, Detective Roman sent a medical records request for E.F. to Banner Health Medical for the period of January 1, 2021 through February 1, 2023. However, the State through DCS and its agents Garcia and Borboa informed Detective Roman that the requests should have gone back to January 1, 2020.

87.    On February 9, 2023, per the State through DCS and its agents Garcia and Borboa requested, Detective Roman sent a new medical records request to Banner Health Medical requesting E.F.'s medical records starting on January 1, 2020.

14

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

88.     On February 15, 2023, Detective Roman spoke with Jessica after receiving a voicemail message from her and explained the allegation made by the State and DCS.  He explained that the allegation being investigated was for the time frame of January 1, 2020 to the present.

89.     Jessica told Detective Roman that the Scottsdale Police Department had already investigated the same back in 2020, which was unsubstantiated due to lack of evidence.

90.     On February 16, 2023, Jessica's attorney sent a letter to Detective Roman with additional documentation for his review.  Detective Roman continued his investigation by obtaining additional documents from the Scottsdale Police Department and the Gillespie, Shields & Taylor Law Firm.

91.     On May 10, 2023, Pavlina refused to meet with Jessica if her attorney was present.  Pavlina indicated that she would need her managers/supervisor's Garcia's permission if a meeting with her attorney present would be possible.  However, Defendant Garcia ignored this request.

92.     Pavlina nor Garcia followed up on this request and they both failed to return any of the subsequent voice messages left by Gillespie Shields & Taylor law firm trying to arrange a meeting.

93.     On May 13, 2023, Pavlina at the request and direction of her supervisors Borboa and Garcia, sent Jessica an email with a *Notice of Duty to Inform* form attached stating the reason for the investigation as "abuse and neglect."  The form included a space for Jessica to sign an acknowledgment that DCS "reviewed the conformation contained in this notice" with her.  The State through DCS and its agents had not done so despite numerous requests by Jessica and her attorney for them to do so.

94.     On May 17, 2023, Gillespie, Shields & Taylor law office sent a letter to Ms. Pavlina informing her that Jessica could not sign the form because no one from DCS reviewed the information with her and she did not understand the broad and vague

15

allegations of "abuse and neglect."  The State through DCS and its agents Pavlina, Garcia and Borboa failed to reply to this request.

95.     Meanwhile, the State through DCS and its agents Wangler, Burden, Garcia, Pavlina, and Borboa continued its own criminal conduct investigation by doing absolutely nothing on the case even though the State through DCS' own policy gives them sixty (60) days to investigate a case and either take action to protect a child at risk for abuse or neglect or close out the case.

96.     Upon information and belief, as part of their joint investigation, Dyanne Greer, of the Maricopa County's Attorneys' Office, informed the State through DCS and its agents Wangler, Burden, Garcia and Borboa of the County Attorney's Office's decision to decline prosecution because their medical review found no reviewing doctors who were reporting Jessica's action as consistent with child abuse.  Ms. Greer told them that her office was closing their investigation into the allegations of child abuse.  The state and DCS failed to follow the Maricopa County Joint Investigation protocol and policy.

**B. DCS Attempts to Solidify the Allegations of Abuse by Doctor Shopping**

97.     In a desperate attempt to solidify its allegations of abuse, the State through DCS and its agents, Wangler, Burden, Garcia and Natanya Wilson staff the case and made the decision to doctor shop and manipulate information to the ultimate detriment and harm of E.F. so that they could once again remove him.

98.     On September 26, 2023, the State through DCS and its agents Wangler, Burden and Garcia contacted an out-of-state, retired professor from Rowan University Department of Psychology, Defendant Janet Cahill, Ph.D., to do a records review to find evidence of Factitious Disorder Imposed on Another ("FDIA").

99.     Later that afternoon on September 26, 2023, Cahill contacted  Wangler, Burden, and Garcia to discuss the medical records that she needed; particularly, she wanted examples of where Jessica appeared to deliberately fabricate, exaggerate, or induced symptoms in E.F., as well as instances she could characterized as doctor shopping by Jessica.

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

16

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

100.    Knowing that the State through DCS and its agents never corrected the gross and material errors in their records, Wangler and Burden instructed Garcia and Borbora to provide the erroneous records.

101.    On September 28, 2023, Detective Roman contacted the Maricopa County Attorney's Office for a status update on the medical records review.  Detective Roman was advised there are no reviewing doctors who are reporting Jessica's action are consistent with child abuse.  Based on the lack of element of a crime, Detective Roman closed Gilbert Police Department's investigation as unfounded.

102.    On October 12, 2023,  Cahill reported to the State through DCS and its agent Borboa that her initial review of the medical records sent did not clearly support the allegation that Jessica was overtreating E.F.

103.    Cahill continued to feed into the State through DCS and its agents Wangler's, Burden's, Garcia's and Borboa's narrative by requesting other specific documentation that would support the possibility of "symptoms" of FDIA.

104.    To solidify the requested diagnosis of FDIA, the State through DCS and its agents Wangler, Burden and Garcia instructed and had Borboa provide Cahill with faulty, unsubstantiated and erroneous records i.e. 2020 CSRA previous investigation, DCS 2020 case notes, and cecostomy tube removal in 2020.

105.    Borboa falsely informed Cahill that when E.F. was initially removed and in foster care that he had no medical issues and was improving.

106.    That State through DCS and its agents,  Wangler, Burden, Garcia and Borboa never provided the documentation showing that E.F. continued to have encopresis and nocturnal enuresis while in foster care; that is, records showing that E.F. was not improving. They continued to provide selective erroneous records to Cahill so that she would reach a diagnosis of FDIA.

107.    On October 24, 2023, Cahill issues a report diagnosing Jessica as meeting the criteria for FDIA.

17

108.    Cahill's diagnosis of FDIA is forensically unreliable and there is no medical evidence to support her diagnosis.

109.    Had Cahill performed the appropriate rigorous assessment, FDIA would have been ruled out.

110.    Cahill's only basis for her assertion that Jessica fabricated and exaggerated information are faulty assumptions fed to her by the State through DCS and its agents Wangler, Burden, Garcia and Borboa.

111.    Cahill even went as far as to say that "[E.F.] was returned to his mother's care, she is not sure how that happened, but it is likely Ms. Fiddler appeared to change and E.F. was returned to her."  This clearly demonstrates that the State through DCS and its agents Wangler, Burden, Garcia and Borboa failed to provide the determinative information from the 2020 dependency matter, as Cahill could only guess as to why E.F. was returned to his mother.

112.    The State through DCS and its agents Wangler, Burden, Garcia and Borboa deliberately failed to give Cahill the records and information that E.F. continued to have encopresis and nocturnal enuresis while in DCS foster care.

113.    Had Cahill conducted a rigorous, independent review of all pertinent information and records, she would have known her initial impression that Jessica was not overtreating E.F. was correct.

114.    Upon information and belief, State Defendants Wangler, Burden and Garcia had a staffing and/or meeting and made the decision to remove E.F. based on Cahill's unreliable report.

**C.  The Unlawful Seizure and Removal of E.F.**

115.    With Cahill's forensically unreliable report in hand, the State through DCS and its agents Wangler, Burden and Garcia instructed and had Borboa file the *Application and Declaration for Ex-Parte Removal of Child* on October 24, 2023.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

18

116.    Upon information and belief, Garcia reviewed *the Application and Declaration for Ex-Parte Removal of Child* with Borboa to make sure it is accurate as to their false narrative.

117.    At the direction of Wangler, Burden and Garcia,  Borboa claimed that based on Cahill's report and her conclusion that Jessica meets the criteria of FDIA, E.F. will continue to be exposed to countless unnecessary and harmful medical procedure if E.F. remains in Jessica's care.  If E.F. improves while in State's care, Cahill suggests that Jessica's parental rights be terminated.

118.    Borboa's sworn *Application and Declaration for Ex-Parte Removal of Child* to the court (*See* **Exhibit 1**), falsely stated that the following:

    a.  Cahill reviewed copious amounts of medical records pertaining to E.F.

    b.  Ms. Fidler exposed E.F. to an alarming number of medical and psychological diagnosis.

    c.  E.F. was removed from Ms. Fidler's care in 2020 and showed significant improvement in a short period of time.

    d.  E.F. asked to have his cecostomy tube removed and fine afterwords.

    e.  E.F. was able to complete his tasks of daily living and did not show evidence of cognitive or mental health issues.

    f.  Once E.F. was returned to Ms. Fidler's care she insisted on having his cecostomy tube replaced without anesthesia causing E.F. to suffer immensely.

    g.  Ms. Fidler is obsessed with constipation and constantly flushing E.F.'s cecostomy tube and feeding him laxatives.

    h.  E.F. did not see a doctor for thirty (30) days when in foster care but now has numerous specialists to attend to many of E.F.'s fabricated conditions and diagnosis.

    i.  Cahill reports that Ms. Fidler is abusing E.F. and recommends E.F. be removed from Ms. Fidler's care for a period of 4-8 weeks with no contact.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

19

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

j.  If E.F. improves again, this would support the diagnosis of FDIA and Cahill suggests that parental rights be terminated.

k.  E.F. will continue to be exposed to countless unnecessary and harmful medical procedures if E.F. remains in Ms. Fidler's care.

119.   The State through DCS and its agents Wangler, Burden, Garcia and Borboa willfully chose not to speak with E.F.'s pediatrician, his surgeon, the DDD regional Nurse or E.F.'s therapist or even Jessica prior to obtaining an *ex parte* judicial removal order.

120.   The State through DCS and its agents Wangler, Burden, Garcia and Borboa failed to inform the court that E.F.'s cecostomy tube was replaced only after exhausting all other possible remedies, that the cecostomy tube was replaced in September 2021 under the direction and recommendation of E.F.'s surgeon, his GI doctor and since its reinsertion that E.F.'s condition has steadily improved.

121.   The State through DCS and its agents Wangler, Burden, Garcia and Borboa violated Jessica and E.F.'s due process by refusing multiple requests from Jessica and her counsel to correct highly prejudicial and grossly inaccurate misinformation in their records.

122.   The State through DCS and its agents Wangler, Burden, Garcia and Borboa misled the court in obtaining the 2023 Ex-Parte Removal Order.

123.   That afternoon, on October 24, 2023, E.F. was unlawfully seized from school by the State through DCS and its agents Wangler, Burden, Garcia and Borboa and placed in DCS' Welcome Center to the detriment of E.F.

124.   The State through DCS and its agents Wangler, Burden, Garcia and Borboa removed a happy, thriving child from his mother by means of judicial deception, actively withholding information, and falsely claiming that the child needed to be removed due to eminent danger to his physical well-being.

**D. DCS Places E.F. in Eminent Danger While in DCS Custody -- Due to its Negligence**

125.    The worst horror of this second foolish action of removing E.F. by the State through DCS and its agents, on October 26, 2023, E.F. was rushed to Banner Hospital's Pediatric Intensive Care Unit due to the State through DCS Welcome Center's negligence.

126.    On October 26, 2023, the State through DCS Welcome Center employee, Desiree Manrique, dispensed to E.F. a cocktail of toxic medications, i.e., 5mg Aripiprazole, 25mg Hydroxyzine, and 50mg Sertraline.  These medications were not E.F.'s.

127.    The 5mg Aripiprazole, 25mg Hydrozyzine, and 50mg Setraline were negligently dispensed to E.F. in violation of the State and DCS's own medication policy.

128.    The State and DCS's medication policy requires the following:

1.  Case aid is required to document time/dosage given on the medication log;

2.  Medication must be prepared in secure are without children present and administered to one child at a time in a controlled environment away from other children;

3.  Prior to administering medication must verbally identify child's name, verify name matches wristband, verify child's name matches prescriptions and medication log, and verify time/dosage of medication; and

4.  A second witness must verify all of the foregoing conditions.

129.    The State through DCS Welcome Center agents failed to even notice the medical error for almost two hours when the female child who was supposed to receive the medication brought it to their attention that she had not received her medications.

130.    Instead of immediately taking E.F. to the emergency room the Welcome Center staff called poison control and waited.

131.    Sometime around 11:30 p.m., the State through DCS' Welcome Center employee Alexandra Moreno-Banovich finally took E.F. to the Banner ER in her personal vehicle arriving sometime after midnight.

21

132.    While in the waiting room, E.F. became unresponsive.  In fact, at one point, his heart rate blood pressure dropped so low that his heart almost stopped beating – a condition rightly described as being unresponsive.

133.    After being admitted to Banner and during transport to a room, E.F. became unresponsive again.

134.    Heaping more bad judgment on an already tragic situation, the State's agent, Ms. Moreno-Banovich provided false information on how E.F. obtained the medication, stating that the medication was left on the counter and E.F. just took it on his own.

135.    The State through DCS and its agents Defendants Wangler, Burden, Garcia and Borboa prohibited E.F.'s mother from being with E.F. during treatment at the hospital.

136.    E.F. was alone in the hospital with an Aide – a total stranger –instead of his own mother.

137.    The State through DCS and its agents Defendants Wangler, Burden, Garcia and Borboa prohibited the Banner doctors from consulting with or advising Jessica about E.F.'s medical status and that he had almost died only to be revived by Banner doctors. They refused Jessica the opportunity to speak with or see E.F. at the hospital.  Borboa even told Jessica that "they" did not know what medications E.F. took that caused E.F. to be hospitalized.

138.    Banner doctors were given the State and DCS' false narrative.

139.    The State through DCS and its agents Defendants Wangler, Burden, Garcia and Borboa acted if as they knew what was better for E.F. medically, they recommended stopping all of E.F.'s medications and stopped all medications without consulting with E.F.'s pediatrician, GI doctor,  surgeon or following the recommendations of Banner doctors to continue all medications.

140.    After E.F. was released from the hospital, the State through DCS and its agents Defendants Wangler, Burden, Garcia and Borboa immediately placed E.F. with DCS' legend Group Home.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

22

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

141.    On October 26, 2023, the State through DCS agents Garcia and Borboa completed a Team Decision Making ("TDM") Summary Report and Safety Planning falsely claiming that Jessica had behaviors supporting a diagnosis of Munchausen Syndrome by Proxy ("MSBP"); that she replaced the cecostomy tube, that the case had been open an extended period from January 2023 due to lake of communication and updates because of the medical review and police involvement.

142.    Jessica pointed out the inaccuracies and the lack of communication by DCS with E.F.'s medical providers and expressed her concern for E.F.'s safety and well-being while being in DCS' care.  Jessica's concerns became a reality when E.F., while in the State and DCS's custody, was negligently fed a lethal medication cocktail that nearly killed him.

**E.  Dependency Petition is Filed**

143.    The next day, On October 27, 2023, the State through its Assistant Attorney General ("AAG"), Kristi Villarreal-Rex, filed a second Dependency Petition (See **Exhibit 2**), which contained unsubstantiated allegations and statements which the State through DCS agents Defendants Borboa and Garcia provided and knew, or reasonable should have known, were false. Stating the following:

  a.  When E.F. was removed from Jessica's care in 2020 his symptoms improved dramatically.

  b.  E.F.'s medical interventions were decreased successfully.

  c.  After returning to Jessica's care, his health care utilization has significantly increased.

  d.  Relying on the 2020 forensic psychological evaluation, falsely alleged that Jessica continued to engage in Munchausen behaviors, such as:

  i.  Inducing and/or fabrication and/or falsifying and/or exaggerating the child's symptoms; and

  ii.  That Jessica acknowledged that her anxiety significantly contributed to the child receiving excessive medical care.

23

e. Falsely alleging that the January 2023, hotline report indicated continued concerns that Jessica's behavior has led to excessive and/or unnecessary medical interventions for the child.

144. The Dependency Petition was verified by Garcia as being true and accurate.

145. The State through its agent AAG Kristi Villarreal-Rex failed to inform the court that E.F.'s cecostomy tube was replaced only after exhausting all other possible remedies, that the cecostomy tube was replaced in September 2021 under the direction and recommendation of E.F.'s surgeon, his GI doctor and since its reinsertion that E.F.'s condition has steadily improved.

146. The State through its agent AAG Krisit Villarreal-Rex failed to inform the court that E.F.'s medical interventions were not decreased successfully.

147. The State through its agent AAG Kristi Villarreal-Rex failed to inform the court that after stopping all his medical interventions, while he was in foster care, E.F.'s bowel symptoms started to flare up and he began to soil himself. This symptom had largely resolve after the hemi-colectomy performed at Banner in October 2019, and only re-occurred after the State through its PCH doctor removed all of E.F.'s medical treatments.

148. The State through its agent AAG Kristi Villarreal-Rex willfully chose not to speak with E.F.'s pediatrician, his surgeon, the DDD regional Nurse or E.F.'s therapist but relied on Wangler, Burden, Garcia and Borboa's false narrative.

149. If the above Dependency Petition was true and so concerning, why did the State through DCS and its agents Wangler, Burden, Garcia and Borboa wait more than ten months to reinvestigate and remove E.F.

150. The only reason the State through DCS and its agents Wangler, Burden, Garcia and Borboa waited ten months is that they needed to find pliable doctor to endorse their faulty narrative to support the FDIA diagnosis in a desperate attempt to save face following the 2020 investigation and resulting failed dependency.

151. The State through DCS and its agents Wangler, Burden, and Garcia had to go out-of-state to find a retired doctor, Cahill, they could lead with error-filled and misleading

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

24

documents and information to obtain the erroneous and unreliable medical opinion that Jessica meets the criteria for FDIA to support another otherwise unfounded removal.

152.    The State through DCS and its agents Wangler, Burden, Garcia and Borboa inflicted on this already traumatized family more grief, horror, and trauma again without ever talking with E.F.s doctors, who are mandatory reporters themselves but who never made any reports of abuse or neglect by Jessica.

153.    On November 1, 2023, the State through its agents AAG's Lisa Boddington and Kathleen E. Martonick filed DCS' *Motion to Suspend Visitation and Motion for Temporary Emergency Suspension of Visitation Pending Status Conference* ("Motion") based upon Defendant Cahill's dubious report and falsely alleged:

> a.  Child was subject to a prior dependency case in 2020 to 2021 due to concerns that mother's behaviors led to excessive and/or unnecessary medical interventions for the child
>
> b.  While the child was removed from Mother's care in the prior case, his symptoms improved dramatically, and medical interventions were decreased successfully
>
> c.  Family participated in services, the child returned home to Mother and the dependency was dismissed.
>
> d.  In January 20, 2023, DCS received hotline report with concerns of medical child abuse by mother.
>
> e.  DCS obtained a forensic records review by Dr. Cahill who noted concerns that Mother was engaging in behavior consistent with a diagnosis of FDIA.
>
> f.  According to Cahill, mother continued to engage in behaviors such as inducing and/or fabricating and/or falsifying and/or exaggerating the child's symptoms.
>
> g.  Which have led to excessive and/or unnecessary medical interventions for the child.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

25

h. Dr. Cahill recommended that mother and the child be separated for a period between four to eight weeks with no contact during that time.

i. Dr. Cahill noted that if the child improves both medical and psychologically and in terms of his overall function, it will confirm the diagnosis of FDIA as to mother.

j. Dr. Cahill strongly suggested that mother have little to no contact with the child during the separation test as individuals with the diagnosis of FDIA will continue to try and manipulate the child even with brief contact.

154.    Ironically, the State through its agents AAG Boddington and Martonick failed to inform the court that while in DCS's care and custody just a few days before, that E.F. suffered a medical emergency because of DCS's negligence and nearly died.

155.    On November 2, 2023, the State through its agents AAG Boddington and Martonick in their updated report shamelessly and disgustingly sought to deflect blame for nearly killing E.F. and inferred that somehow Jessica and E.F. himself were to blame.

156.    After his removal, E.F. has been cruelly deprived of all contact with his mother, relatives, his doctors and therapist, his regular enrichment activities and his religious and cultural heritage causing more harm to E.F.

**F.    With No Evidence of Alleged Abuse, DCS Moves to Substantiate the Allegations of Abuse based on Cahill's Unreliable Report**

157.    Upon information and belief, the State through DCS agents Garcia and Borboa met regarding substantiating the allegations of abuse.  At the direction of Wangler and Burden, they were all in agreement to substantiate the allegations of abuse.

158.    On November 2, 2023, the State through DCS agent Borboa, sent Jessica a letter titled "Notice of Proposed Substantiation of Child Safety Report."

159.    Again ironically, after the passage of ten months since this second investigation started, the State through DCS and its agents Wangler, Burden, Garcia and Borboa had not completed its so-called investigation of suspected child abuse, neglect, or

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

abandonment and was recommending a psychological evaluation, counseling/mediation management, and family connections.

160.    The State through DCS and its agent Borboa stated that DCS found credible evidence supporting abuse and was proposing to substantiate the report.

161.    The State through DCS and its agents Wangler, Burden, Garcia and Borboa are the only ones who felt that they could substantiate abuse.  The Maricopa County Attorney's Office prosecutor and Gilbert Police Department were unable to substantiate a charge of abuse and found no credible evidence of abuse.  The State and DCS failed to follow the Maricopa County Joint Investigation protocol and policy.

162.    Given that information Borboa was given by Jessica and her attorneys, this report was directed by DCS higher ups *i.e.* Lujan, Wangler, Burden and Garcia, and not the first time such a thing occurred withing the halls of DCS.

**G.    Fourteen Days after E.F.'s Wrongful Removal, He is Returned to His Mother**

163.    Upon information and belief, the State through its agents AAG Lisa Boddington and Kathleen Martoncick reach out to DCS higher ups *i.e.* Lujan, Wangler, Burden and Garcia to discuss the lack of evidence and recommendation to return E.F. to his mother.

164.    Upon information and belief, based on the lack of evidence of abuse, the State through DCS agents Lujan, Wangler, Burden, Garcia and Borboa have a meeting to discuss the lack of evidence of abuse and recommend returning E.F. to his mother care.

165.    In a confounding turn of fact, apparently finally understanding that the State and DCS were wrong, on November 7, 2023, the State and DCS through its agents, Wangler, Burden, and Garcia instructed Borboa to return E.F. to Jessica's custody.

166.    After being returned to his mother, E.F. had a well-visit with Ronald M. Serbin, M.D., who noted in his chart that after E.F.'s removal, he "had multiple email and phone conversations with Borboa expressing his concern that none of his present physicians caring for [E.F's] medical needs were contacted by the State or DCS in their evaluation,

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

that [E.F.] was more at risk under DCS care as exhibited by his unintentional multi-medication overdose requiring him to be hospitalized, that DCS as a result of not contacting his medical team of physicians does not understand [E.F.'s] medical condition. . ."

167.    Due to the State through DCS and its agents Wangler, Burden, Garcia and Borboa's instructions to stop all of E.F.'s medications while he was at Banner against Banner doctors recommendations, on December 13, 2023, E.F. was admitted to the hospital again due to being so backed up and constipated that he required hospitalization and a cleanout.

**H.    The State Once Again Moves to Dismiss the Dependency Petition**

168.    At the pre-hearing conference on January 11, 2024, the State through its agent AAG Kathleen Martonick on the record moved to dismiss the dependency petition admitting that the State could not meet its burden of proof that Jessica had medically abused E.F.

169.    The Court also accepted the parties stipulation that Jessica never has been diagnosed with FDIA.

170.    Unfortunately, neither the State through AAG nor DCS agents Wangler, Burden, Garcia or Borboa agreed to issue a written letter stating that the investigation starting in January 2023 was unsubstantiated.

171.    The State through DCS and its agents Wangler, Burden, Garcia and Borboa refused to close the case and instead wanted to have more follow-up with E.F.

172.    Upon information and belief, the State through DCS and its agents Wangler, Burden, Garcia and Borboa still have not corrected the material and harmful gross errors in its records.

173.    The Juvenile Court also ordered that the State through DCS agents to turn over the hotline call records and report, which they have ignored.

174.    After the second dependency was dismissed, the case did not close by the State through DCS and its agents Wangler, Burden, Garcia and Borboa until January 17, 2024.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

28

175.    Jessica had to send numerous emails to the State through DCS, Protective Services Review Team ("PSRT"), calling PSRT, and filing a complaint with the Ombudsman's office to find out if the January 2023 allegations would be unsubstantiated and she would not be put on the abuse registry.

176.    Borboa responded claiming that DCS's investigation closed on December 7, 2023, and DCS would not be sending out additional documentation.  Jessica was persistent in following up.

177.    Finally, on February 7, 2024, the State through DCS agent Kristal Karmer, Regional Review Specialist, sent a letter stating that the January 19, 2023 Intake No. IN10301578, is unsubstantiated and she will not be entered into the DCS Central Registry.

**I.      Defendants Knew or Should Have Known of Plaintiffs' Legal Rights**

178.    At all relevant times, the State, DCS and its agents Wangler, Burden, Garcia and Borboa ("State Defendants"), knew or should have known the well-established law that the U.S. Constitution protects the fundamental right of parents to make decision concerning the care, custody, upbring, management, and control of their children.  *Troxel v. Granville*, 530 U.S. 57, 66 (2000).

179.    At all relevant times, State Defendants knew or should have known that fit parents are presumed to act in the best interests of their children.  *Id.* at 68; *Dove v. Heck*, 327 F.3d 492, 521 (7th Cir. 2003).

180.    At all relevant times, State Defendants knew or should have known that in Arizona, until a court declares a parent unfit, the law requires State actor to presume that a parent is fit and acting in the best interest of their child.  *In re Marriage of Friedman & Roels*, 244 Ariz. 111, 119 (2018), Yet, Lujan, Wangler, Burden, Garcia and Borboa acted directly contrary to this law, and used their influence to advance a damaging agenda to remove E.F. and prevent Jessica from exercising her parental rights.

181.    At all relevant times, State Defendants knew or should have known that the right to family associations is sheltered against the government's unwarranted usurpation, disregard, or disrespect, *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996), and families have a

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

29

well-established constitutional right to live together without government interference, *Arce v. Children's Hospital Los Angeles*, 211 CalApp.4th 1455, 1473 (Cal. App. 2012).  Yet, Wangler, Burden, Garcia and Borboa disregarded this law and acted in direct contravention of their duty under the law by perpetuating a damaging false narrative to advance and unwarranted agenda of removal to attempt to sever Jessica's parental rights.

182.    At all relevant times, State Defendants knew or should have known that State actors are not permitted to ignore the dictates of the United States Constitution.  *Wallis v. Spencer*, 202 F.3d 1126, 1130 (9th Cir. 1999).

183.    At all relevant times, State Defendants knew or should have known that any motive to protect a child from abuse does not overrides a parent's constitution rights. *Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999); *Franz v. Lytle*, 997 F.2d 784, 792-93 (10th Cir. 1993).

184.    At all relevant times, State Defendants knew or should have known that the government's interest in the welfare of children embraces not only protecting children from physical abuse, but also protecting children's interest in the privacy and dignity of their homes and in the lawfully exercised authority of their parents.  *Calabretta*, 189 F.3d at 820. Wangler, Burden, Garcia and Borboa's conduct of abandoning their duties and actively perpetuating the damaging false narrative about the child's parent violated the child's right as set forth by the law.

185.    At all relevant times, State Defendants knew or should have known that at the time E.F. was seized, it was well established by the First, Fourth, and Fourteenth Amendments to the United States Constitution that any infringement upon the right to familial association must be by the least intrusive means possible and only to the extent necessary to accomplish a compelling State interest.  See, *e.g., Wallis v. Spencer*, 202 F.3d 1126 (9th Cir. 1999).

186.    At all relevant times, State Defendants knew or should have known that the Fourth Amendment protects the child from unlawful searches and seizures.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

30

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

187.    At all relevant times, State Defendants knew or should have known that a parent's right to continued custody of their child arises under the First and Fourteenth Amendments and is composed of both a substantive and procedural component.  Wangler, Burden, and Garcia by their dereliction of duties not only allowed but participated as noted above in the violation of these rights.

188.    At all relevant times, State Defendants knew or should have known that a social worker, or other government agent, acts under color of state law while acting or purporting to act in his or her official capacity, or while exercising his or her responsibilities pursuant to state law.  *McDade v. West*, 223 F.3d 1135, 1139-40 (9th Cir. 2000).

189.    Given the facts of this case, Plaintiffs are entitled to relief under 42 U.S.C. §1983 and Arizona Law.

## CLAIMS

## CLAIM ONE
## UNLAWFUL SEIZURE

**(Under 42 U.S.C. § 1983, Defendants Wangler, Burden, Garcia, Borboa and Cahill are liable for violating Jessica's Right to Freedom of Association under the First Amendment and Due Process, under the Fourteenth and Fourth Amendment to the U.S. Constitution for unlawfully seizing and detaining E.F.)**

190.    Plaintiffs re-allege incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

191.    On October 24, 2023, E.F. was unlawfully seized from his parent by the State through DCS and its agents Wangler, Burden, Garcia and Borboa on purported strength of an Order obtained prematurely on incomplete and inaccurate information.

192.    Upon information and belief, Wangler, Burden and Garcia had a meeting with Borboa on what misleading information and/or what information should be withheld in his *Application and Declaration for Ex-Parte Removal of a Child* presented to the Juvenile Court to obtain a removal order.

193.    Borboa at the direction and instructions of Wangler, Burden and Garcia intentionally presented misleading information and/or withheld information from the Juvenile Court in an effort to present Jessica as FDIA and unfit parent to E.F. in order to unlawfully seize E.F.

194.    As Borboa's supervisors, Wangler, Burden, and Garcia set in motion the acts by Borboa and knowingly refused to terminate and/or correct Borboa's actions, which they knew were false and harmful to this family.

195.    Cahill substantially participated in the seizure of E.F. based upon her forensically unreliable report and recommendations for seizure.

196.    Wangler, Burden, Garcia, Borboa and Cahill each substantially participated in the seizure of E.F.

197.    On or about October 24, 2023, Cahill attributed E.F.'s health issues to Jessica having FDIA.  Cahill based this diagnosis only on the erroneous information supplied by Wangler, Burden, Garcia and Borboa and she never spoke with E.F.'s treating physicians.

198.    On October 24, 2023, Cahill helped orchestrate E.F.'s seizure with her forensically unreliable report claiming that Jessica met the criteria for FDIA.  Cahill's report failed to perform the appropriate rigorous assessment.

199.    The information that the State through DCS and its agents  Wangler, Burden, Garcia, Borboa and Cahill possessed at the time of the seizure did not provide reasonable cause to believe that EF was in danger but pursued this course of action as result of the first failed seizure.

200.    E.F. was actively treating with physicians who were mandatory reporters, his health was improving and the State through DCS and its agents spent ten months investigating the allegations of abuse.  These facts weigh heavily against a finding of imminent danger to justify a seizure.

201.    E.F. was not in imminent danger until he was seized by State Defendants and placed in the Welcome Center.  It was the State and State Defendant's negligence that caused harm to E.F.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

202.    The State through DCS and its agents Wangler, Burden, and Garcia met, instructed, and oversaw Borboa's filing of *the Application and Declaration for Ex-Parte Removal of Child* based upon Cahill's unreliable report and making false allegations that E.F. was in danger.

203.    The State through DCS and its agents Wangler, Burden, Garcia and Borboa failed to conduct a prompt and thorough investigation, as is required under A.R.S. §8-456(C)(1), before filing the dependency petition for E.F, which falsely alleged abuse and neglect based upon Cahill's unreliable report.  They failed to consider material, exculpatory facts which refuted the stated concerns in violation of the law and as required by A.R.S. §8-456(C)(1).

204.    At the time Wangler, Burden, Garcia, Borboa and Cahill substantially participated in the unlawful activities, it was well established that the Fourteenth Amendment protects the right of parents and children to live together without government interference. *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000).

205.    At the time Wangler, Burden, Garcia, Borboa and Cahill substantially participated in these unlawful activities, it was well established that the First Amendment also protects "family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Lee v. City of Los Angeles*, 250 F. 3d 668, 685 (9th Cir. 2001).

206.    At the time Wangler, Burden, Garcia, Borboa and Cahill substantially participated in these unlawful activities, it was well established that a state official or an individual "cannot seize children suspected of being abused or neglects unless reasonable avenues of investigation are first pursued," the "scope of the intrusion" must be "reasonable necessary to avert" a specific injury, and the intrusion cannot be longer than necessary to avert the injury. *Wallis*, 202 F.3d at 1138-1141.

207.    At all relevant times when E.F. was seized and/or detained, the State through DCS and its agents Wangler, Burden, Garcia and Borboa did not have any information that

33

established reasonable cause to believe that E.F. was in danger of serious bodily and there were no exigent circumstances, yet, they persisted in removing E.F. and keeping him from his only parent.

208.    At that relevant times when Wangler, Burden, Garcia, Borboa, and Cahill participated in the seizure and detention of E.F., each of them, individually acted under color of law.

209.    Wangler, Burden, Garcia, Borboa, and Cahill violated Jessica's constitutional rights with their unlawful conduct.

210.    As a direct and proximate result of the violation of Jessica's constitutional rights, Jessica suffered irreparable harm and will continue to suffer general and special damages, in an amount not yest ascertained but which shall be shown according to proof at trial.

## CLAIM TWO

**(Under 42 U.S.C. §1983, Defendants Wangler, Burden, Garcia, Borboa and Cahill are Liable for Violating E.F.'s Right to Be Free from Unlawful Seizure and Detention under the Fourth Amendment and Fourteenth Amendment to the U.S. Constitution.)**

211.    Plaintiffs re-allege incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

212.    On October 24, 2023, Cahill helped orchestrate E.F.'s seizure with her forensically unreliable report claiming that Jessica met the criteria of FDIA.

213.    At the time Wangler, Burden, Garcia and Borboa seized E.F. from his parent Jessica based on the recommendation of Cahill, it is well established that children have a Fourth Amendment right, incorporated to the States through the Fourteenth Amendment, to not be unlawfully seized from his parent. *Wallis*, 202 F.3d at 1138-1141.

214.    At the time Wangler, Burden, Garcia, Borboa and Cahill sized E.F., no reasonable person in their position would have believed that they had the lawful right to seize E.F. from his mother.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

34

215.    Wangler, Burden, Garcia, Borboa and Cahill, and each of them, acted under the color of law when they violated E.F.'s constitutional rights.

216.    As a direct and proximate result of the violation of his constitutional rights E.F. suffered irreparable harm and will continue to suffer, general and special damages, in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM THREE
## JUDICIAL DECEPTION

**(Under 42 U.S.C. § 1983, Defendants Wangler, Burden, Garcia and Borboa are liable for violating Plaintiffs' right to Due Process under the Fourth and Fourteenth Amendments for making misrepresentations and/r omissions to the court which were deliberate falsehoods/ and or which demonstrated a reckless disregard for the truth.)**

217.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

218.    It is well established that Liability for a § 1983 claim will lie for judicial deception. *Liston v. County of Riverside*, 120 F.3d 965, 972 (9th Cir. 1997).

219.    Although the Ninth Circuit has "recognized absolute immunity for social workers. . . for the discretionary, quasi-prosecutorial decision to institute court dependency proceeding to take custody of away from parents," the "scope of absolute immunity for social workers is extremely narrow." *Miller v. Gammie*, 335 F.3d 889, 989 (9th Cir. 2003).

220.    Absolute immunity does not extend to the fabrication of false evidence or perjury. *Hardwick v. County of Orange*, 844 F.3d 1112 (9th Cir. 2017).

221.    There is no absolute or qualified immunity for making false statements to a court, including signing an application and petition under penalty of perjury. *Kalina v. Fletcher*, 552 U.S. 118, 130-31 (1997*); Beltran v Santa Clara County*, 514 F.3d 906, 908 (9th Cir. 2008); *Miller*, 335 F.3d at 897; *Hardwick*, 844 F.3d at 1118.

222.    At all relevant times, "the constitutional right to be free from the knowing presentation of false or perjured evidence' was clearly established. *Hardwick*, 844 F.3d 1112; see also *Devereaux v. Perez*, 218 F.3d 1045 (9th Cir. 2000); *Whitaker v. Garcetti*, 486

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

F.3d 572, 582 (2007)(concluding that "the contours of the Fourth Amendment right against judicial deception" were clearly established by 1996).

223.    The *Application and Declaration for Ex-Parte Removal of Child* ("Application") was filed by Borboa and declared under penalty of perjury that the information contained within it was true and accurate.

224.    Upon information and belief, Wangler, Burden, Garcia and Borboa have a meeting to discuss the information that should be contained within the Application, set in motion Borboa's false narrative, knowingly refused to terminate the series of acts by Borboa and Garcia, which they knew or should have known would cause Garcia and Borboa to inflict a constitutional injury on this family to the detriment of E.F. by his unlawful removal.

225.    The Application contained the false statements listed in paragraph 116 above. These statements were deliberately false and/or demonstrated a reckless disregard for the truth.

226.    If not for the dishonesty in the Application, the Court would not have signed the Order for removal.

227.    When committing this act of judicial deception, Wangler, Burden, Garcia and Borboa were acting under color of law.

228.    The deception to the court continued when the State through its agent Kristi Villareal-Rex submitted the dependency petition.

229.    Prior to submitting the dependency petition, upon information and belief Ms. Villareal-Rex met with Wangler, Burden, Garcia and Borboa to discuss the information that should be contained within the Dependency Petition and set in motion their false narrative, knowingly refused to terminate the series of acts, which they knew or should have known would cause Villareal-Rex to inflict a constitutional injury on this family to the detriment of E.F. by his unlawful removal.

230.    The dependency petition contained the false statement listed in paragraphs 143-147.  These statements were deliberately false and/or demonstrated a reckless disregard for the truth.  The dependency petition was verified by Garcia as true and accurate.

231.    If not for the dishonesty in the Application and the Petition, the court would have found that removal and continued custody of E.F. by DCS was necessary.

232.    At the request of Wangler, Burden, Garcia and Borboa the State through its AAG Lisa Boddington and Kathleen Martonik moved to suspend Jessica's visits with E.F.

233.    The Judicial Deception continued when the State through its agents AAG Boddington and Martonick filed DCS Motion to Suspend Visitation and Motion for Temporary Emergency Suspension of Visitation Pending Status Conference.

234.    The motion contained the false statement listed in paragraphs 153-155.  These statements were deliberately false and/or demonstrated a reckless disregard for the truth.

235.    Wangler, Burden, Garcia and Borboa set in motion Boddington and Martonick's false narrative, knowingly refused to terminate the series of acts by Boddington and Martonick, which they knew or should have known would cause Boddington and Martonick to inflict a constitution injury on this family to the detriment of E.F. causing undue separation from one another.

236.    When committing these acts of judicial deception Wangler, Burden, Garcia and Borboa were acting individually under color of law.

237.    As a direct and proximate result of the violations of Plaintiffs' constitutional rights by judicial deception, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof.

### CLAIM FOUR

### MEDICAL DECISIONS

**(Under 42 U.S.C. § 1983 Wangler, Burden, Garcia and Borboa are liable for violating Plaintiff Jessica Fidler's right to Due Process under the Fourteenth Amendment to the U.S. Constitution to Make Medical Decisions for E.F. and E.F.'s Due Process Right Under the Fourteenth**

37

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**Amendment to the U.S. Constitution to have medical decision for him by his parent)**

238.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

239.    At all relevant times, it was well established that the constitutional due process "right to family association includes the right of parents to make important medical decision for their children, and of children to have those decisions made by their parents rather than the state." *Wallis*, 202 F.3d at 1141 (citing *Parham v. J.R.*, 442 U.S. 584, 602 (1979)(holding that it is in the interest of both parents and children that parents have ultimate authority to make medical decisions for their children unless a "neutral fact finder" determines, through due process hearing, that parent is not acting in child's best interests)).

240.    At all relevant times, it was also well established that the "Constitution assures parents that, in the absence of parental consent, [medical treatment] of their child may not be undertaken . . .at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an [treatment] exists and that the administration of the procedure is reasonable under all circumstances." *Wallis*, 202 F.3d at 1141(9th Cir. 2000).  "Moreover, parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or part of the medical procedure is being conducted).

241.    Wangler, Burden, Garcia and Borboa violated Jessica's right to make medical decisions for E.F. and E.F.'s right to have Jessica make medical decisions for him by refusing to allow Jessica to be present, nearby, or made aware that the State through DCS's negligence caused E.F. to be hospitalized on or about October 26, 2023.

242.    Wangler, Burden, Garcia and Borboa violated Jessica's right to make medical decisions for E.F. and E.F.'s right to have Jessica make medical decisions for him by prohibiting Jessica from being able to be with E.F. or nearby while E.F. was admitted to Banner.

38

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

243.    Wangler, Burden, Garcia and Borboa violated Jessica's right to make medical decisions for E.F. and E.F. right to have Jessica make medical decision for him by prohibiting Banner doctors from consulting with or advising Jessica about E.F.'s medical status.

244.    Wangler, Burden, Garcia and Borboa acted as if they knew what was better for E.F. medically, when they recommended, without Jessica's consent or knowledge, to stop all of E.F. medications against Banner doctors recommendations and without consulting with E.F.'s pediatrician, GI doctor, surgeon or even Jessica.

245.    Wangler, Burden, Garcia and Borboa violated Jessica's right to make medical decisions for E.F. and E.F.'s right to have his mother make medical decisions for him by taking steps to prohibit Jessic from providing medical information regarding E.F. to the Banner doctors.

246.    Wangler, Burden, Garcia and Borboa violated Jessica's right to make medical decisions for E.F. and E.F.'s right to have his parent make medical decision for him by making medical decisions regarding E.F.'s medical care without Jessica's knowledge and/or consent.

247.    When violating Plaintiffs' constitutional rights regarding E.F.'s medical care, Wangler, Burden, Garcia and Borboa, and each of them, were acting under color of law.

248.    As a direct and proximate result of the violation of their constitutional rights Jessic and E.F. suffered irreparable harm and will continue to suffer, general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

**CLAIM FIVE**

**MEDICAL TREATMENTS**

**(Under 42 U.S.C. § 1983, Defendants Wangler, Burden, Garcia and Borboa are liable for violating Plaintiff's Due Process Right under the Fourteenth Amendment to the U.S. Constitution to be E.F. during medical treatment and E.F.'s Due Process Right under the Fourteenth**

39

**Amendment to the U.S. Constitution to have his parent with him during medical treatments.)**

249.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

250.    At all relevant times, It was well establish that the "Constitution assures parents that, in the absence of parental consent, [medical treatment] of their child may not be undertaken . . . at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an [treatment] exist and that the administration of the procedure is reasonable under all the circumstances." *Wallis*, 202 F. 3d at 1141 (9th Cir. 2000).  "Moreover, parents have a right arising from the liberty interest in family association to be with their child while they are receiving medical attention (or to be in a waiting room or other nearby area if there is there is a valid reason from excluding them while all or part of the medical procedure is being conducted)." *Id*.

251.    Wangler, Burden, Garcia and Borboa interfered with Jessica's constitutional right to be present during E.F.'s medical treatment while he was hospitalized.

252.    Wangler, Burden, Garcia and Borboa acted if as they knew what was better for E.F. medically, they recommended and stopped all of E.F.'s medications against Banner doctors' recommendations and without consulting with E.F.'s pediatrician, GI doctor, his surgeon, or his mother.

253.    When they violated Jessica's right to be with E.F. during medical treatment, Wangler, Burden, Garcia and Borboa, each of them, were acting under color of law.

254.    As a direct and proximate result of the violations of their constitutional right Jessica and E.F. suffered irreparable harm and will continue to suffer, general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM SIX

## CONSPIRACY

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

1

2

3

4

5

6

7

8

9

10

11

12

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**(Under 42 U.S.C. § 1983 Defendants Wangler, Burden, Garcia, Borboa and Cahill are liable for conspiring to violate Jessica's Right to Freedom of Association Under the First Amendment and Due Process under the Fourteenth Amendment to the U.S. Constitution to not have E.F. unlawfully seized and E.F.'s Right to be free from Unlawful Seizure under the Fourth Amendment and Fourteenth Amendment to the U.S. Constitution.)**

255.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

256.    At all relevant times, it was well established that liability for a conspiracy in a §1983 case will lie when there exists an "agreement or meeting of the minds" to violate constitution rights. *Crowe v. Cty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010). Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Id*.

257.    At all relevant times, it was also well established: "A private individual may be liable under § 1983 if she conspired or enter joint action with a state actor.*" Franklin v. Fox*, 312 F.3d 423, 442 (9th Cir. 2002).

258.    Defendant Cahill conspired with Defendants Wangler, Burden, Garcia and Borboa to violate Jessica's right to freedom of association under the First Amendment and Due process under the Fourteenth Amendment to the U.S. Constitution to have E.F. unlawfully seized and E.F.'s right to be free from unlawful seizure under the Fourth Amendment and Fourteenth Amendment to the U.S. Constitution by Wangler, Burden, Garcia and Borboa providing Cahill with false, misleading, and/or unfounded information alleging the Jessica was medically abusing E.F.

259.    Cahill conspired with Wangler, Burden, Garcia and Borboa to violate Jessica's right to freedom of association under the First Amendment and Due Process under the Fourteenth Amendment to the U.S. Constitution to have E.F.. unlawfully seized and detained, and E.F.'s right to be free from unlawful seizure under the Fourth Amendment and Fourteenth Amendment to the U.S. Constitution by refusing to have E.F. discharged to the custody of his parent, and instead discharging him to the custody of the State through DCS.

41

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

260.    When conspiring to violate Plaintiffs' right to Due Process under the Fourth and Fourteenth Amendments, Defendants Cahill, Wangler, Burden, Garcia and Borboa and each of them, were acting under the color of law.

261.    As a direct and proximate result of the violations of their constitutional rights, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM SEVEN

### Retaliatory Harassment

**(42 U.S.C. § 1983 Retaliatory Harassment against the State through DCS and its agents Wangler, Burden, Garcia and Borboa)**

262.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

263.    The State through DCS and its agents wrongfully removed E.F. on April 20, 2020 claiming that Jessica was medically abusing E.F. without properly investigating the January 2020 allegation and without ever speaking with E.F.'s pediatrician, his surgeon, the DDD regional Nurse or E.F.'s therapist.

264.    After removing E.F. in 2020, the State through DCS and their agents sought to permanently terminate the relationship between Jessica and E.F., the Juvenile Court conducted two interim evidentiary hearings that were held on August 19 and 20, 2020 and September 14, 2020,  The Juvenile court quested the State and DCS if there was any factual basis to support the dependency petition once it heard testimony from E.F.'s treating physicians, all of whom testified that Jessica had not abused E.F.  None agreed that Jessica was abusive by FDIA.

265.    When Jessica's attorney filed a motion for summary judgment, the State and its agent State's Attorney finally interviewed four of E.F.'s treating physicians.  None agreed that Jessica was abusive by FDIA.

266.    In the face of this reality, the State through DCS and its agents dismissed its unfounded case against Jessica and E.F. was returned to his mother.

42

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

267. However, the State through DCS and their agents never corrected the gross and material errors in the records.

268. Fast forward to January 20, 2023, the State through DCS and its agents Pavlina and Garcia contact the Gilbert Police Department reporting Jessica for child abuse based on the same allegation in January 2020, which resulted in E.F.'s first wrongful removal.

269. The Gilbert Police Department and the Maricopa County Attorney's office both who were investigating Jessica on the State through DCS and its agents alleged new allegations of medical abuse but found that there was lack of evidence to charge or prosecute Jessica for medical abuse. The State and DCS failed to follow the Maricopa County Joint Investigation protocol and policy.

270. In a desperate attempt to solidify its allegations of abuse, the State through DCS and its agents Wanlger, Burden, Garcia and Natanya Wilson staff the case and made the decision to doctor shop and manipulate information to the ultimate detriment and harm of E.F. so that they could once again remove him.

271. On September 26, 2023, the State through DCS and its agents Wangler, Burden, and Garcia contacted an out-of-state, retired professor from Rowan University Department of Psychology, Defendant Cahill, to do a records review to find evidence of FDIA.

272. Knowing that the State through DCS and its agents never corrected the gross and material errors in the records, Wangler and Burden instructed Garcia and Borboa to provide the erroneous records so that Cahill could find Jessica met the criteria of FDIA.

273. On October 12, 2023, Cahill reported to the State through DCS and its agent Borboa that her initial review of the medical records sent did not clearly support the allegation that Jessica was overtreating E.F.

274. To solidify the requested diagnosis of FDIA, the State through DCS and its agents Wangler, Burden and Garcia instructed and had Borboa provide Cahill with faulty,

43

unsubstantiated and erroneous records i.e. 2020 CSRA previous investigation, DCS 2020 case notes and cecostomy tube removal in 2020.

275.    Borboa also falsely informed Cahill that when E.F. was initially removed and foster care that he had no medical issues and was improving.

276.    As a result of the false and erroneous records provided, Cahill issues a forensically unreliable report diagnosing Jessica as meeting the criteria of FDIA.

277.    Cahill's only basis for her assertion that Jessica fabricated and exaggerated information are faulty assumptions fed to her by the State through DCS and its agents Wangler, Burden, Garcia and Borboa.

278.    The State through DCS and its agents Wangler, Burden, Garcia and Borboa deliberately failed to give Cahill the records and information that E.F. continued to have encopresis and nocturnal enuresis while in DCS foster care.

279.    With Cahill's forensically unreliable report in hand, the State through DCS and its agents Wangler, Burden and Garcia instructed and had Borboa file the *Application and Declaration for Ex-Parte Removal of Child* on October 24, 2023.

280.    The State through DCS and its agents, AAG Kristi Villarreal-Rex, filed the second Dependency Petition with the State through DCS and its agents Wangler, Burden, Garcia and Borboa's false narrative to once again attempt to sever Jessica's parental rights in retaliation for having to dismiss the first dependency petition.

281.    With no real evidence of abuse, the State through DCS and its agents Wangler, Burden, Garcia and Borboa return E.F. to his mother's care on November 7, 2023.

282.    Then on January 11, 2024, the State through DCS and its agent AAG Kathleen Martonick on the record moved to dismiss the dependency petition admitting that the State could not meet its burden of proof that Jessica had medically abused E.F.

283.    The second removal was retaliatory and means to harass Jesscia as the first dependency failed which resulted in a lawsuit against the State and State Defendants for their actions for the wrongful removal in 2020.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

284.    As a result of the State through DCS and its agents Wangler, Burden, Garcia and Borboa's retaliatory actions, Plaintiffs suffered severe emotional distress, anxiety, depression, physical injury, and loss of familial association.

285.    As alleged herein, the State and State Defendants Wangler, Burden, Garcia and Borboa's retaliatory actions in depriving Plaintiffs of their constitutional rights were willful, wanton, malicious, and oppressive, and justify an award of exemplary and punitive damages, the precise amount of which will be proven at trial.

### CLAIM EIGHT

#### Abuse of Process
**(Under established Arizona Law, Defendants Wangler, Burden, Garcia and Borboa are liable for Abuse of Process)**

286.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

287.    The elements of an abuse-of process claim are (1) a willful act in the use of judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings." *Nienstedt v. Wetzel*, 133 Ariz. 348, 353, 651 P.2d 876, 881 (App. 1982).  A party can demonstrate the latter element by "showing that the process has been used primarily to accomplish a purpose for which the process was not designed." *Id.*  In the context of this tort, Arizona interprets "process" as encompassing "the entire range of procedures incident to the litigation process." *Id.* at 352.

288.    Defendants Wangler, Burden, Garcia instructed and had Borboa file the *Application and Declaration of Ex-Parte Removal of Child* on October 24, 2023 full of false information to get an order to remove E.F. as set forth in paragraphs 115-122 above.

289.    Defendants Wangler, Burden, Garcia and Borboa had AAG filed a fraudulent dependency petition.  Despite their knowledge of exculpatory information and continued to assert false allegations against Jessica.

290.    Defendants Wangler, Burden, Garcia and Borboa also had the AAG file a *Motion to Suspend Visitation and Motion for Temporary Emergency Suspension of*

45

*Visitation Pending Status Conference* on November 1, 2023 based upon Cahill's dubious report full of false allegations. Again, despite their knowledge of exculpatory information.

291.    Defendants Wangler, Burden, Garcia and Borboa continued to assert false allegations against Jessica until the petition was ultimately dismissed by them on January 11, 2024 admitting that the State could not meet its burden of proof that Jessica had medically abused E.F. and stipulated that Jessica never has been diagnosed with FDIA.

292.    After this second dependency action was dismissed, the case did not close by the State through DCS and its agents Wangler, Burden, Garcia and Borboa and instead they wanted to have more follow-up with E.F.

293.    The case did not close by the State through DCS and its agent Wangler, Burden, Garcia and Borboa until January 17, 2023.

294.    The failure of Wangler, Burden, Garcia and Borboa to be forthright in the court filings and case reports to the juvenile court was not supported by law or fact and was an abuse of the judicial process.

295.    The court filings by the State through DCS and its agents Wangler, Burden, Garcia and Borboa were willful act for ulterior purpose to retaliate and harass Plaintiffs and not proper in the regular conduct of the proceedings.

296.    As a direct and proximate result of Defendants Wangler, Burden, Garcia and Borboa's abuse of process, Plaintiff suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof of trial.

### CLAIM NINE

### FALSE IMPRISONMENT

**(Defendants the State, Wangler, Burden, Garcia and Borboa falsely imprisoned E.F. when they unlawfully seized him and placed him in the Welcome Center and DCS Legend Group Home holding him against his will.)**

297.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

46

298.    The State through DCS and its agents Wangler, Burden, Garcia and Borboa acted intentionally to unlawfully seized and restrained E.F., acted without lawful authority or consent, their actions resulted in the direct restraint of E.F.'s liberty, freedom  by the fear of force and falsely imprisoned him.

299.    The State through DCS and its agents Wangler, Burden, Garcia and Borboa held E.F. against his will and Jessica's well; failed to properly and timely investigate the alleged allegation of abuse; failed to discuss or obtain E.F.'s conditions, diagnosis with any key specialists or treating physicians; and imprisoned him in DCS Welcome Center and DCS Legend Group Home without justification and prohibiting Jessica from visiting E.F.

300.    At no time during E.F.'s seizure and false imprisonment by the State through DCS agents Wangler, Burden, Garcia and Borboa did Jessica pose an "imminent danger" to E.F.

301.    E.F. exhibited zero objective evidence of mistreatment insofar as signs of medical abuse by Jessica or medical evidence that Jessica was medically abusing E.F.

302.    The only evidence that the State through DCS and its agents Wangler, Burden, Garcia and Borboa had was the highly prejudicial and grossly inaccurate records from the first unlawful seizure which was ultimately dismissed by the State through DCS and found unsubstantiated.

303.    Given the absence of "imminent danger" to E.F., along with the State through DCS agents inability to substantiate the first removal, the State's through DCS and its agents Wangler, Burden, Garcia, and Borboa imprisonment of E.F. was unreasonable, unwarranted, and without excuse or justification, legally, medically or morally.

304.    The State through DCS and its agents Wangler, Burden, Garcia and Borboa acted without legal authority and against its own polices and procedures and held E.F. against his will and his mother's will, imprisoning him in DCS Welcome Center and DCS Legend Group home without access to his family, extracurricular activities, school, his counselor, his Rabbi or the comforts of his home.

47

305.    If the State through DCS and its agents Wangler, Burden, Garcia and Borboa changed their wrongful, baseless, erroneous records it would have exonerated Jessica and there is a high probability that it would have prevented the unlawful seizure and imprisonment of E.F. in the first place.

306.    The false imprisonment of E.F. was unreasonable, unwarranted, without legal justification or such justification was obtained through false allegations by the State through DCS and its agents Wangler, Burden, Garcia and Borboa's hiding exculpatory evidence, such as evidence from all his physicians that Jessica was not medically abusing E.F.

307.    As the direct and proximate result of this false imprisonment at the hands of the State, Wangler, Burden, Garcia and Borboa, E.F. suffered the loss of his mother's care, comfort and support; mental pain, anguish and embarrassment concerning the false allegation of child abuse and resulting separation; almost killing him; fear and internal family distress.

308.    The actions of the State, Wangler, Burden, Garcia, and Borboa were willful, wanton, and malicious and evidence as callous and intentional disregard for the life, health and well-being of E.F., which actions and/or inactions caused or substantially contributed to grievous physical, emotional, and psychological injury to E.F.

309.    As a direct and proximate result of the State, Wangler, Burden, Garcia and Borboa's false imprisonment, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof of trial.

## CLAIM TEN

### Negligence Per Se
**(Under Arizona law, Defendants Wangler, Burden, Garcia, Borboa and Lujan are liable for Neglicence Per Se for Violating A.R.S. §§ 8-514(B), 8-456, 8-802(D)(1), 8-451, and 8-453)**

310.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

48

311.    Under Arizona law, "[a] person who violates a legislative enactment that establishes the standard of care or that has been adopted by a court as the relevant standard of care is negligent *per se* and the violation is conclusive as to negligence." *St. George v. Plimpton*, 241 Ariz. 163, 166, 384 P.3d 1243, 1246 (App. 2016).

312.    Under Arizona law, "[a] statute or regulation typically gives rise to a tort duty premised on public policy only if it is designed to protect the class of person, in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation." *Lorenz v. State*, 238 Ariz. 556, 558 (App. 2015).

313.    The Arizona legislature enacted A.R.S. § 8-456(A) to establish a standard of care for DCS investigators to protect children and families from harm arising from a violation of their legal and due process rights.  Under A.R.S. §8-456(A), DCS "shall train all investigators in forensic interviewing and processes and the protocols. . . [and] [t]he training must include . . .[t]he duty to protect the legal and due process rights of children and families from the time of the initial contact through case closure."

314.    The State through DCS and its agents Wagner, Burden, Garcia and Borboa violated A.R.S. § 8-456 (A) and are negligent *per se*.

315.    The Arizona legislature enacted A.R.S. § 8-802(D)(1) to establish a standard of care for DCS child safety workers to protect children and families from harm arising from a violation of their legal rights.  Under A.R.S. §8-802(D)(1), "[a]ll child safety workers shall be trained and demonstrate competency in [their] duty to protect the legal right of children and families form the time of the initial contact through treatment."

316.    Defendants Wagner, Burden, Garcia and Borboa, as investigators and child safety workers, did not protect the legals rights of E.F. or this family in violation of §§ 8-456(A) and 8-802(D)(1) when they failed to properly investigate whether the State through DCS should remove and detain E.F. in the State's custody; (2) forbid Jessica's visits with her son; (3) made representations to the court or that were provided to the court that were false and/or demonstrated a reckless disregard for the truth; and (4) conspired to violate

49

Plaintiffs' constitutional rights.  This is conclusive evidence of negligence under Arizona law.  *St. George*, 241 Ariz. at 166, 384 P.3d at 1246.

317.    Arizona legislature enacted A.R.S. § 8-456(C)(1) to establish a standard of care for the DCS investigators to protect children and families from harm arising from the lack of a prompt and through investigation of allegations of abuse or neglect.  Under A.R.S. § 8-456(C)(1) "an investigator shall do all of the following:  1.  Make a prompt and through investigation.  An investigation must evaluate and determine the nature, extent and cause of any condition created by the parents. . . that would tend to support or refute the allegation that thee child is a victim of abuse or neglect."

318.    Defendants Wagner, Burden, Garcia and Borboa, as investigators sat on their investigation for ten months.

319.    Defendants Wagner, Burden, Garcia and Borboa after learning that the Maricopa County Attorney's Office and the Gilbert Police Department found no evidence of abuse, they went doctor shopping and found an out-of-sate doctor, Cahill, to claim that Jessica had FDIA.

320.    Defendants Wagner, Burden, Garcia and Borboa failed to consider the significant information in their possession or easily obtained which refuted the allegations, including reports or even speaking with E.F.'s pediatrician, his surgeon, DDD Regional Nurse, or E.F.'s therapist.  This is in direct violation of A.R.S. § 8-456(C)(1) and is conclusive evidence of negligence under Arizona law.  *St. George*, 241 Ariz. at 166, 384 P.3d at 1246.

321.     Under A.R.S. §8-451, "the primary purpose of the department is to protect children."  Under A.R.S. § 8-453, the Director of DCS has the duty to "[f]ormulate policies, plans and programs to effectuate the . . . purposes of the department."

322.    Here, upon information and belief, the State, DCS and its employees and agents acted in accordance to the Department's policies, plans, and programs in place at the time, which were not protective of children.  The State through DCS has no policies, plans, or programs in place to ensure its employees and agents i.e. Wangler, Burden, Garcia and

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

50

Borboa complied with A.R.S. §8-456. As a result, E.F., a minor child, was not protected by DCS; instead, was irreparably harmed—nearly killed.

323.    Defendant Lujan as the Director of DCS is negligent *per se* for violation of A.R.S. §§ 8-451, 8-453, 8-456.

324.    As a direct and proximate result of Defendants' negligence *per se* arising from violation of Arizona Statutes, Plaintiffs have suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM ELEVEN

### NEGLIGENCE AND/OR GROSS NEGLIGENCE
**(Defendants Wangler, Burden, Garcia, Borboa and Lujan are liable to Plaintiffs, each of them for the Negligence and/or Gross Negligence in carrying out their duty to protect the legal rights of children and families)**

325.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as through fully set forth herein.

326.    Under A.R.S. §8-802 (D)(1), "[a]ll child safety workers shall be trained and demonstrate competency in [their] duty to protect the legal rights of children and families from the time of the initial contact through treatment."

327.    "A statute or regulation typically gives rise to a tort duty premised on public policy only if it is designed to protect the class of person, in which the Plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation." Lorenz, 238, Ariz. at 558.

328.    Wangler, Burden, Garcia, Borboa and Lujan acted with negligence and/or gross negligence and breached their duty to protect Plaintiffs' legal rights when they failed to properly and thoroughly investigate whether the State through DCS should remove E.F. from his parent's care.

329.    Wangler, Burden, Garcia, Borboa and Lujan, each of them, acted with negligence and gross negligence and breached their duty to protect the legal rights of

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

51

Plaintiffs by failing to complete a prompt and through investigation, as required by A.R.S. § 8-456(C)(1).

330.    Wangler, Burden, Garica, Borboa and Lujan were negligent and acted with gross negligence and breached their duty to protect Plaintiffs' legal rights by forbidding Jessica contact with or visits with her son.

331.    Wangler, Burden, Garcia, Borboa and Lujan were negligent and grossly negligent by placing E.F. in the Welcome Center that nearly cost him his life when the Welcome Center gave him a lethal medication cocktail of 5mg Aripiprazole, 25mg Hydroxyxine, and 50mg Sertraline.

332.    Wangler, Burden, Garcia and Borboa were negligent and grossly negligence and breached they duty to protects Plaintiffs' legal rights when they made representations to the juvenile court that were false and/or demonstrated a reckless disregard for the truth.

333.    As a direct and proximate result of Wangler's, Burden's, Garcia's, Borboa's and Lujan's breaches of their duties, Plaintiffs suffered irreparable harm and will continue to suffer, general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM TWELVE

### NEGLIGENCE AND/OR GROSS NEGLIGENCE
### (Defendants State of Arizona through DCS and its agent Defendant Manrique Negligence and Gross Negligence as to Plaintiff E.F.)

334.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraph as through fully set forth herein.

335.    The State through DCS and its agents negligently placed E.F. in the Welcome Center to his detriment.

336.    On October 26, 2023, the state through DCS Welcome Center employee, Defendant Manrique, dispensed to E.F. a cocktail of toxic medications, *i.e.* 5mg Aripiprazole, 25mg Hydroxyzine and 50mg Sertraline. These medications were not E.F.'s and belonged to another patient.

52

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

337.    The 5 mg Aripiprazole, 25 mg Hydrozyzine, and 50 mg Setraline were negligently dispensed to E.F. in violation of the State and DCS' own medication policy as set for in paragraph 128 above.

338.    Defendant Manrique failed to recognize that she gave the wrong medication to E.F.

339.    The State through DCS Welcome Center agents, including Defendant Manrique, failed to even notice the medical error for almost two hours when the female child who was supposed to receive the medication brought it to their attention that she had not received her medication.

340.    Instead of immediately taking E.F. to the emergency room, the State through the Welcome Center staff called poison control.

341.    Due to the negligent actions of the State through DCS and Defendant Manrique, E.F. had to be hospitalized due to becoming unresponsive two times.

342.    Heaping more bad judgment on an already tragic situation, the State through DCS agent, Ms. Moreno-Banovich provided false information on how E.F. obtained the medication.

343.    The State owed E.F. a duty to ensure its employees, officers and agents were qualified to serve in the respective roles before hiring and assigning employees at the Welcome Center and follow their own policies and procedures when dispensing medication.

344.    Defendant State owed a duty to E.F. to ensure that tis employees, officers and agents were properly trained and possess the skill and knowledge to perform their assigned job tasks in a competent manner.

345.    Defendant Manrique owed a duty of care to E.F. to follow proper procedures and not give him someone's medication.

346.    The above-mentioned incident was caused by the careless, negligent and unlawful acts and/or omission of the State and Defendant Manrique.

53

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

347.    As a direct and proximate result of the State and Manrique's negligence, E.F. suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM THIRTEEN
### BATTERY
### (Defendant Manrique)

348.    Plaintiffs re-allege and incorporate all allegation contained in the foregoing paragraphs as fully set forth herein.

349.    After E.F. was unlawfully seized and falsely imprisoned at the DCS Welcome Center, and employee of the Welcome Center, Defendant Manrique, battered E.F. by dispensing a cocktail of toxic medications i.e. 5mg Aripiprazole, 25mg Hydroxyzine and 50mg Sertraline, that were not prescribed for E.F.

350.    This multi-medication overdose caused E.F. to be hospitalized, lose consciousness, drop his blood pressure and heart rate so low almost causing his heart to stop.

351.    These medications were negligently given in violation of the State and DCS' own medication policy.

352.    Manrique caused this harmful or offensive contact with E.F.

353.    Manrique's willful, wanton, and malicious actions lead to this callous and intentional disregard for the life, health and well-being of E.F., which actions and/or inactions alleged above caused or substantially contributed to physical, emotional, and psychological injury to E.F.

354.    As a direct and proximate result of the actions of Manriques, E.F. suffered irreparable harm and will continue to suffer general and special damages in an amount not yest ascertained but which shall be shown according to proof at trial.

## CLAIM FOURTEEN
### INTENTIONAL INFLECTION OF EMOTIONAL DISTRESS

54

1

2

**(Defendants Wangler, Burden, Garcia, Borboa, Lujan and Manrique are liable to Plaintiffs for Intentional Infliction of Emotional Distress ("IIED"))**

3

4

355.    Plaintiff re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

5

6

7

8

9

10

356.    "The tort of intentional infliction of emotional distress requires proof of three elements;  First, the conduct by defendant must be 'extreme' and 'outrageous'; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of defendant's conduct." *Citizen Publ'g. Co. v. Miller*, 210 Ariz. 513, 516, ¶11, 115 P.3d 107, 110 (2005)(emphasis in the original).

11

12

357.    It is extreme and outrageous to continue to prosecute and harass a mother and child for years after the first wrongful removal was dismissed.

13

14

358.    It is extreme and outrageous to fail to correct the erroneous records and then use them to base a second wrongful removal without justification.

15

16

17

18

19

359.    Wangler, Burden, Garcia, Borboa and Lujan's conduct was extreme and outrageous.  The unwarranted removal of a child from his loving mother and then wrongfully and repeat it by falsely accusing the parent of medical abuse is extreme and outrageous.  What is worse the State through DCS agents repeated this twice and both times had to dismiss their dependency actions since they had no evidence of medical abuse.

20

21

22

23

24

360.    The negligence and/or gross negligence and negligence *per se* by Wangler, Burden, Garcia, Borboa and Lujan was extreme and outrageous.  This conduct is unquestionably extreme and outrageous because it was clear to any rational, unbiased observer that Jessica was loving, caring parent and that they simply gotten it wrong—badly wrong—and then tried to cover up their mistakes or were too arrogant to admitting it.

25

26

27

361.    Wangler, Burden, Garcia, Borboa and Lujan made false and unreasonable claim, without investigating thoroughly, that E.F.'s was suffering from health issues due to FDIA by Jessica, and that E.F. should be removed in spite of the overwhelming evidence

28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

55

to the contrary that was available to them at that time. This is extreme and outrageous conduct.

362. The extreme and outrageous conduct of Wangler, Burden, Garcia, Borboa and Lujan refused to consider the overwhelming available evidence that Jessica was a loving, caring parent who never abused or neglected E.F. but was only following medical advice. Instead, they pursued a false narrative that Jessica had FDIA.

363. The extreme and outrageous conduct of Wangler, Burden, Garcia and Borboa to doctor shop to find an out of state doctor to solidify FDIA so they can wrongfully remove E.F. even though the Maricopa County Attorney's Office reported no doctors are reporting medical abuse and Gilbert Police Department closed its investigation due to the lack of evidence of abuse.

364. Its extreme and outrageous conduct for Wangler, Burden, Garcia and Borboa to feed Cahill with the erroneous records from the first removal which was unsubstantiated to help her find that Jessica was FDIA.

365. Wangler, Burden, Garcia, Borboa and Lujan acted with either intent to cause emotional distress or recklessly disregarded the near certainty that such distress would result from their conduct when they wrongfully removed and imprisoned E.F. and prohibited Jessica from having any visits with E.F.

366. Wangler, Burden, Garcia, Borboa and Lujan's conduct alleged above caused Plaintiffs severe emotional distress.

367. Manrique dispensed to E.F. a cocktail of toxic medications, i.e. 5mg Aripiprazole, 25mg Hydroxyzine, and 50mg Sertraline which were not E.F.'s medication. Manrique failed to follow DCS' own medication policy and had she did this would have been avoided.

368. Manrique acted with either intent to cause emotional distress or recklessly disregarded the near certainty that such distress would result from her negligent conduct in giving E.F. a cocktail of toxic medications i.e. 5mg Aripiprazole, 25mg Hydroxyzine and 50mg Sertraline.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

369.    Manrique's conduct caused Plaintiffs severe emotional distress.

370.    As a direct and proximate result of Wangler, Burden, Garcia, Borboa, Lujan and Manrique's actions, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM FIFTEEN

### NEGLIGENT SUPERVISION, TRAINING AND RETENTION

**(Under Arizona Law, Defendants State, Wangler, Burden, Garcia and Lujan are liable to Plaintiffs for Negligent Supervision, Training and Retention)**

371.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

372.    The State, Wangler, Burden, Garcia and Lujan had the duty to supervise the actions of their agents and employees.

373.    The State, Wangler, Burden, Garcia and Lujan owed a duty to Plaintiffs to ensure their employees, officers, and agents were qualified to serve in their respective roles before hiring and assigning employees to act as investigators and/or case managers for the State through DCS.

374.    The State, Wangler, Burden, Garcia and Lujan owed a duty to Plaintiffs to ensure that their employees, officers, and agents were properly trained and possessed the skill and knowledge to perform their assigned job tasks in competent manner.

375.    The State, Wangler, Burden, Garcia and Lujan owed a duty to Plaintiffs to ensure that their employees, officers, and agents followed the law and not use the process for an ulterior motive to harass, retaliate, intimidate or any other unlawful purpose.

376.    The State, Wangler, Burden, Garcia and Lujan owed a duty to Plaintiffs to ensure that their employees, officers, and agents followed their policies, plans and procedures or programs in place as set forth by law, the State and DCS. These policies and due process requirements were repeatedly breached by the Defendants.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

57

377.    The State, Wangler, Burden, Garcia and Lujan owned a duty to Plaintiffs to correct their erroneous records.

378.    State, Wangler, Burden, Garcia and Lujan had a duty to adequately supervise, train, control, and otherwise monitor the activities of their agents and employees to avoid unreasonable risk of harm to Plaintiffs.

379.    The State and Lujan allowed Wangler, Burden, Garcia and Borboa to pursue a false narrative and allegations against Jessica and allowed the unlawful seizure and imprisonment of E.F. and allowed them to continue their false narrative in Court filings and testimony.

380.    The State, Lujan, Wangler, Burden and Garcia knew or should have known that their employees and agents had received inadequate training and supervision, were failing to follow procedures, and were acting illegally by violating E.F.'s and Jessica's constitutional rights.

381.    The State, Lujan, Wangler, Burden and Garcia had knowledge, either constructive or actual, of the incident in which their agents and employees failed to adequately protect Plaintiffs from harm.

382.    As set forth above, the State, Wangler, Burden, Garcia and Lujan breached these duties.

383.    The State, Lujan, Wangler, Burden and Garcia had a duty to retain only competent, qualified, and safe employees and agents.  These Defendants' breach of their supervisory and training duties to Plaintiffs was the direct and proximate cause of the loss suffered by Plaintiffs.

384.     As a direct and proximate result of Defendants' breaches of these duties, Plaintiffs were damaged in that they, among other things, were denied their constitutionally protected individual and familial rights thereby suffering damages and will continue to suffer damage into the future, all in an amount that will be demonstrated at trial.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

58

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A. General damages and special damages according to proof, but no event less than $12,500,000.00, including, but not limited to economic losses, medical costs, hedonic damages, psychological trauma, and emotional distress;

B. For injunctive relief in the form of the State agreeing to provide training to all DCS case workers regarding:

1. When exigent circumstance exist that justify the unwarranted seizure of a child.

2. That denying a parent their right to be represented by counsel at any meeting, proceeding associated with DCS's actions, including investigations is unconstitutional and unlawful;

3. That prior to removing a child from the custody of his or her parent, DCS has a legal and constitutional obligation to conduct a thorough investigation into any allegations justifying removal, including investigating facts, witnesses, and evidence that refutes the allegations;

4. That unless and until a court has determined otherwise after a hearing and an opportunity for a parent to be heard, that the parent retains the sole legal right to make all medical decisions for their child;

5. That is a violation of the Constitutional rights of children and parents to make misrepresentations or omission to the court which are false or which demonstrate a reckless disregard for the truth.

6. That facilitating regular contact between parent and child through visitation is perhaps the most basic and essential of the services provided by the State and thus all reasonable efforts must be expended to ensure that visitation occurs regularly.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

C. The training described in (B) above must be provided, at a minimum, annually to all DCS case workers and must be included in the training provided to persons upon their becoming a DCS case worker;

D. For taxable cost and pre- and post-judgment interest to the extent permitted by law;

E. For punitive and/or exemplary damages to extent permitted by law and in an amount appropriate to punish the wrongful conduct alleged herein and to deter such conduct in the future;

F. For attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1998 and state law, as applicable; and

G. For such other relief as the Court deems just and proper under the circumstances.

**RESPECTFULLY SUBMITTED** this <u>22nd</u> day of October 2024.

**MILLS + WOODS LAW PLLC**

By <u>*/s/ Thomas A. Connelly*</u>
Thomas A. Connelly
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014

**GILLESPIE, SHIELDS, & TAYLOR**

DeeAn Gillespie Strub
Jenny D. Jansch
7319 North 16th Street
Phoenix, AZ 85020

*Attorneys for Plaintiffs*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

# EXHIBIT 1

# APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILD
## Superior Court of Arizona for Maricopa County

REMOVAL REQUEST # RR2023-22793

COUNTY OF ORIGIN Maricopa

DCS CASE ID AS00863831

I, Alonzo Borboa, hereby affirm the following statement of facts:

1. I am employed by the Arizona Department of Child Safety. By virtue of my education, training and experience I am qualified and authorized to conduct child abuse and neglect investigations. I am currently assigned to investigate the case involving the child named in this application and declaration for removal, or am that person's supervisor. I make this declaration in support of this application. Further, I have the following qualifications: Positions:
   August 2022 – Present OCWI Assistant Training Manager
   December 2019 – August 2022 OCWI Investigator
   April 2018 – December 2019 DCS Program Specialist
   May 2016 – April 2018 DCS Child Safety Investigator

   Training:
   Safe AZ Renovations Advanced Forensic Interview Training (AFIT)
   DCS Specialist CORE training (240 hours)

   Education:
   Bachelor's in Secondary Education (2011)
   Master's in Psychology (2020)

2. This application and declaration is in support of for ex-parte removal of the following children:

| Child Name | DOB | Sex | ICWA Status |
|---|---|---|---|
| E█ F█ | █/2011 | F | No |

3. The mother(s) is/are:
   The mother of E█ F█ is Jessica Fidler

4. The father(s) is/are:
   The father of E█ F█ is Unknown

5. The legal guardian(s) is/are:
   The legal guardian of E█ F█ is None or Unknown

# APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILD
## Superior Court of Arizona for Maricopa County

6. Probable cause exists to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect, and it is contrary to the child's welfare to remain in the home under A.R.S. §8-821(A). Specifically, Specific present danger condition(s) or impending danger threat(s) for each child listed on this application:

Child's condition is the result of deliberate, preconceived planning or thinking that the caregiver is responsible for and that preceded the child's serious injuries or condition;

Circumstances that require temporary custody including a detailed account of circumstances and supporting facts:

Today, Dr. Cahill completed a forensic medical review of documents pertaining to ▉ and Ms. Fidler and Dr. Cahill arrived at the conclusion that Ms. Fidler meets the criteria for Factitious Disorder Imposed on Another (FDIA). Dr. Cahill has reviewed copious amounts of medical records pertaining to ▉, and Ms. Fidler has exposed ▉ to an alarming number of medical and psychological diagnoses. ▉ was removed from Ms. Fidler's care in 2020 and he showed significant improvement in a short period of time. He asked to have his cecostomy tube removed from him and was fine afterwards. ▉ was able to complete his tasks of daily living and he did not show evidence of the cognitive or mental health issues that Ms. Fidler claimed he had. After ▉ was returned to Ms. Fidler's care she insisted on having his cecostomy tube replaced in the emergency room. Ms. Fidler did not want ▉ to use anesthesia, so he suffered immensely. Ms. Fidler is obsessed with constipation and she is constantly flushing the child's cecostomy tube and feeding him laxatives. ▉ did not see a doctor for 30 days when he was previously in foster care, and he now has numerous specialists to attend to many of his fabricated conditions and diagnoses. Dr. Cahill reports that Ms. Fidler is abusing ▉ and she recommends that ▉ be removed from her care for a period of 4-8 weeks, and that she have no contact with the child. If ▉ improves again then, this would support the diagnoses of FDIA and Dr. Cahill suggests that parental rights be terminated.

▉ will continue to be exposed to countless unnecessary and harmful medical procedures if he remains in Ms. Fidler's care. The child has a cecostomy tube placed in him, which was removed when he was in foster care and Ms. Fidler had it replaced once the child returned to her care. The child will continue to suffer and he will not have the opportunity to live a more normal life if he remains in Ms. Fidler's care. The father was an unknown sperm donor.

7. I, Alonzo Borboa, declare under penalty of perjury that the information contained within this application and declaration is true and correct to the best of my knowledge and belief.

10/24/2023 2:36 PM

## ORDER FOR EX-PARTE REMOVAL OF CHILD
### Superior Court of Arizona for Maricopa County

REMOVAL REQUEST # RR2023-22793

COUNTY OF ORIGIN Maricopa

DCS CASE ID AS00863831

## TO ANY DCS REPRESENTATIVE IN THE STATE OF ARIZONA

Proof by application and declaration having been made this date 10/24/2023 before me by Alonzo Borboa of the Department of Child Safety ("DCS"), and on the basis of the evidence presented in such application and declaration, and pursuant to A.R.S. §8-821(A), I find probable cause exists to believe that temporary custody is clearly necessary to protect the following child █ F█ from suffering abuse or neglect. I further find, for the reasons indicated below and pursuant to A.R.S. §8-821(A), that probable cause exists to believe that it is contrary to the child's welfare to remain in the home.

- ☑ Domestic violence or violent behavior
- ☑ Mental health issues
- ☑ Risk of abuse or neglect of child(ren)
- ☑ Unfit or unsafe home environment for child(ren)

Therefore, **IT IS ORDERED** granting DCS's request for authorization to remove █ F█ and authorizing DCS to remove this child.

**IT IS FURTHER ORDERED** directing DCS to conduct a due diligence search pursuant to A.R.S. § 8-514.07.

_ETBingert_

_____     10/24/2023 2:44 PM
Hon. Elizabeth Bingert

CSO-1039A (8-14)
PS-058 (6-14)

**ARIZONA DEPARTMENT OF CHILD SAFETY**

## NOTICE OF REMOVAL/*AVISO DE TRASLADO*

Check (✓) the applicable section (A or B) of this form./ *Marque con* ✓ *la sección(es) pertinente (A o B) en este formulario.*

☑ **A. Notice of Removal -** **School/Day Care/Safe Haven/Other Location**
   *Aviso de Traslado*    *Escuela/Cuidado Diurno/Refugio Seguro/Otro Local*

As of   10/24/2013    2 56 PM   The following child(ren)   I̶ ▮▮▮   F̶ ▮▮▮
*Desde*    Date /*Fecha*     Time/*Hora*    *El siguiente niño(s)*     Name of Children/*Nombre de niño(s)*

                             Gilbert Az 85296

          at
          *en*

Address of School/Day Care/Safe Haven/Other Location *(No., Street, City, State, ZIP)*
*Dirección de Escuela/Cuidado Diurno/Refugio Seguro/Otro Local (Núm. Calle, Ciudad, Estado, Código Postal)*

was/were placed into temporary custody by Arizona Department of Child Safety (DCS). A **"Temporary Custody Notice"** or other notice as appropriate to the situation concerning the above action will be served by DCS to the child(ren)'s parent, guardian or custodian following requirements of A.R.S.§ 8-821, in addition to a copy of this notice of removal.

*fue/fueron colocado(s) bajo la custodia temporal del Departamento de Seguridad del Menor (DCS por sus siglas en inglés) del Departamento de Seguridad del Menor de Arizona. Según los requisitos de A.R.S.§ 8-821, además del presente Aviso de Traslado, DCS presentará al padre/madre/guardián o custodio del niño(s) un "Aviso de Custodia Temporal" u otro aviso pertinente a la situación y acción de referencia.*

☐ **B. Notice of Removal -** **Court Ward**
   *Aviso de Traslado*    *Bajo Tutela del Tribunal*

As of                      The following child(ren)
*Desde*    Date /*Fecha*     Time/*Hora*      *El siguiente niño(s)*        Name of Child(ren)/*Nombre de niño(s)*

          at
          *en*

Address of School/Day Care/Safe Haven/Other Location *(No., Street, City, State, ZIP)*
*Dirección de Escuela/Cuidado Diurno/Refugio Seguro/Otro Local (Núm. Calle, Ciudad, Estado, Código Postal)*

was/were placed into temporary custody by Arizona Department of Child Safety (DCS). The Arizona Department of Child Safety intends to notify the court of the removal of the above-named child(ren) by filing a Motion for a Change of Physical Custody. If you are the parent, guardian or custodian and oppose the removal of the child from your physical custody, you or your attorney must notify the court and request a hearing.

*fue/fueron colocado(s) bajo la custodia temporal de Departamento de Seguridad del Menor (DCS). El Departamento de Seguridad del Menor de Arizona va a presentar una Moción para Cambio de Custodia Física y así notifica al tribunal que el niño(s) mencionado arriba ha sido traslado(s). Si usted es el padre/madre, guardián o custodio de este niño(s) y se opone a que se le(s) traslada de sus custodia física, usted o su abogado debe así informarlo al tribunal y pedir una audiencia.*

The following signature block pertains to section A or B, whichever is used, and must be completed.
*La sección siguiente se relaciona con ambas partes A o B, la que se haya usado, y es requisito llenarla.*

| DCS REPRESENTATIVE'S NAME (Please Print and sign) | DCS OFFICE PHONE NO. | DATE/FECHA |
|---|---|---|
| *Nombre en letra de imprenta, y firma del representante del DCS* | *TEL. OFICINA DE DCS* | |
| Alonzo Borboa | E ▮▮▮▮ ▮▮8 | 10/24/2013 |

| DCS ADDRESS (No., Street, City, State, ZIP)/ *Dirección de DCS (Núm. Calle, Ciudad, Estado, Código Postal)* |
|---|
| 3003 N. Central Ave. Phoenix, Az 85012 |

| DCS SUPERVISOR'S NAME (Please print and sign) | DATE/FECHA |
|---|---|
| *Nombre en letra de imprenta, y firma del supervisor(a) del DCS* | 10/24/2013 |
| N. Hale Garcia | |

**DISTRIBUTION: Original** of section **A** – location of removal; **Original** of Section **B** – person(s) who had physical custody of the child at time of removal of a Court Ward; **Copy** of section A – parent, guardian or custodian to whom a Temporary Custody Notice is served, and the case record; **Copy** of section **B** – the case record.

See reverse for EOE/ADA/GINA Disclosures.
*Vea al reverse para la Declaraciones de EOE/ADA/GINA.*

CSO-1000A (6-18)
PAGE 2 ON REVERSE

**ARIZONA DEPARTMENT OF CHILD SAFETY**
**TEMPORARY CUSTODY NOTICE**

On (Date) 10/24/13    At (Time) 4:54    ☐ AM  ☑ PM , temporary custody of (child's name) E▬▬  F▬▬
was taken at (Address) C-lhart Abyvegenty DCW I /OCS

**Type of abuse or neglect requiring temporary custody:** Select the circumstance(s) that most clearly describe the danger to the child(ren) and reason temporary custody is necessary.

☐ Medical examination is required to diagnose abuse.

☐ The child is unsupervised or alone now or on a daily basis, or has been left with a person who is unwilling or unable to provide adequate care.

☐ The caregiver is unable to perform essential parental responsibilities due to substance use, mental illness, physical impairment, cognitive limitations.

☐ The caregiver is unable or unwilling to perform essential parental responsibilities and there is no other appropriate caretaker immediately available.

☐ The caregiver is out of control and cannot focus or manage his/her behavior in ways to properly perform parental responsibilities.

☐ The caregiver's behavior is violent, bizarre, erratic, unpredictable, incoherent, or totally inappropriate and is a threat to child safety.

☐ The caregiver is brandishing weapons, known to be dangerous and aggressive, or is behaving in attacking or aggressive ways that are a threat to child safety.

☐ The caregiver has not, cannot, or will not protect the child from serious or severe harm, including harm from other persons having access to the child.

☐ Dynamics in the household include a person establishing power, control, or coercion over a caregiver in a way that impairs necessary supervision or care of the child and has caused, or will likely cause, serious or severe harm to the child's physical, mental, or emotional health.

☐ The caregiver has an extremely negative perception of the child, and/or has extremely unrealistic expectations for the child's behavior.

☐ Physical conditions in the home are hazardous and immediately threaten the child's safety.

☐ The caregiver is subjecting the child to brutal or bizarre punishment or there is severe to extreme maltreatment alleged to be occurring.

☐ The child requires immediate medical attention, and the absence of medical treatment could seriously affect the child's health and well-being.

☐ The child is actively endangering self or others and the caregiver cannot or will not control the child's behavior or arrange or provide necessary care.

☐ There is evidence of recent sexual abuse, the perpetrator currently has access to the child, and no protective action is being taken by a caregiver.

☐ The child has injuries such as facial bruises, injuries to the head, multiple plane injuries, injuries to a non-ambulatory child, immersion burns.

☐ The child has serious injuries that the caregivers and others cannot or will not explain, or the explanation is inconsistent with the child's injuries or condition.

☑ The caregiver deliberately harmed the child, or caused or threated to cause serious or severe harm to the child.

☐ The child is profoundly fearful (terrified) of their present home situation, or a particular person living in or having access to the home.

☐ The caregiver previously endangered a child and/or caused harm to a child and circumstances indicate the person will likely cause severe harm to the child.

☐ There is evidence of abuse or neglect and the caregiver cannot produce the child, refuses access to or is likely to flee with the child, or actively avoids DCS.

☐ Criminal activity by the caregiver or criminal activity of other persons living in or having access to the home will likely result in severe harm to the child.

Select how temporary custody was obtained: ☐ Parent or Guardian Consent  ☑ Court Authorized  ☐ Exigent Circumstances

**The Department of Child Safety (DCS) must:**

- Return your child within **72 hours** *(not including weekends and holidays)* unless DCS files a legal paper, called a petition, with Juvenile Court. If a petition is filed, your child will be kept in the temporary custody of DCS.

- Return your child within **12 hours** if your child was removed for a medical examination, unless abuse is revealed, **and**

- Inform you of the right to give a verbal, telephonic or written response to the allegations and have the response included in the investigation report. Any documentation you give, what you say or write, will be included in the case record and can be used in court proceedings.

| DCS REPRESENTATIVE'S NAME (Please print) | AREA CODE AND PHONE NO. |
|---|---|
| Alonzo Gorboa | (480)341-2748 |

| ARIZONA DEPARTMENT OF CHILD SAFETY ADDRESS (No., Street, City, State, ZIP) |
|---|
| 3003 N. Central Ave. Phoenix, AZ 85012 |

| DCS SUPERVISOR'S NAME (Please print) | AREA CODE AND PHONE NO. |
|---|---|
| Nichole Garcia | (601)542-1013 |

**METHOD OF NOTICE:** On (date) 10/24/13 ,at (time) 7:12    ☐ AM  ☑ PM , I served noticed to (parent, guardian or custodian) (print name)

Method used: ☑ In-Person  ☐ Left at Residence  ☐ Verbal  ☐ Fax    Date: 10/27/13    Time: 7:17 PM
Address where mailed/left/given (No., Street, City, State, ZIP)    Gilbert AZ 85296

**What is the child or child's parents American Indian heritage/ancestry:**    Has the tribe been notified? ☐ Yes  ☐ No  ☑ N/A
PARENT, GUARDIAN OR CUSTODIAN'S SIGNATURE

| DCS REPRESENTATIVE'S SIGNATURE (Or law enforcement officer) | DATE |
|---|---|
|  | 10/24/13 |

ROUTING: Original – Parent/Guardian/Custodian; 1ˢᵗ Copy – Sent to Assistant Attorney General to file with the Petition; 2ⁿᵈ Copy – Retained in the case record

# NOTICE OF DUTY TO INFORM

When the Department of Child Safety (DCS) receives an allegation of child abuse or neglect by a parent, guardian custodian or adult member of household and a report is taken, Arizona law requires DCS to conduct an investigation. The following allegation concerning your child (or children) is currently being investigated by DCS.

IN 10701578

neglect / physical abuse

This *notice* is to inform you that:

- DCS has no legal authority to compel or make you cooperate with the investigation or to accept services, but it is our hope that by working together we can find solutions to ensure that your child (or children) is safe and that your family has what it needs.

- DCS has a duty to proceed with the investigation even if you decide not to cooperate to ensure that your child (or children) is safe, although we would prefer to carry on with the investigation with your support.

- DCS has the authority to petition the Juvenile Court for a determination that your child (or children) is dependent and in need of protection. Your refusal to cooperate with the investigation or services offered does not in itself form a basis for DCS to take temporary custody of your child (or children), unless it is clearly necessary to protect your child (or children) from abuse or neglect.

- You have the right to provide written, telephonic or verbal responses to the allegation, including any documentation, and to have the information considered in determining whether your child (or children) is in need of child safety services.

- Anything you say or write can be used in a court proceeding and may be included in DCS's report of the investigation.

- Any written response that you provide, including any documentation, will be included in the DCS case record.

- Any information that you provide in response to the complaint or allegation(s) will be considered during the investigation.

- You have the right to appeal determinations made by DCS about the results of the investigation and will be notified in writing of these results and how to appeal.

- You may call the DCS Office of the Ombudsman to file a complaint regarding services, actions, lack of actions, or treatment by the DCS staff. The Office of the Ombudsman will review your complaint and determine the type of response needed. The telephone number is 1-877-527-0765 or (602) 364-0777.

- You have the right to file a complaint with the Arizona Ombudsman-Citizens Aide. The telephone number in Phoenix is (602) 277-7292, and statewide, toll-free is 1-800-872-2879. The Ombudsman-Citizen Aide office is available to handle inquiries, concerns and complaints about agency actions, including DCS.

More information about DCS and your parental rights are outlined in the pamphlet, **"Guide to Department of Child Safety"** that I am leaving with you today.

**ASK: Is the child's parent(s) of American Indian heritage/ancestry?** ☐ Yes ☒ No

*If Yes, Mother's Tribe:* _____     *Father's Tribe:* _____

☐ Unknown *(explain):* _____

By signing this form, you are acknowledging that I have reviewed the information contained in this notice with you.

| PARENT, GUARDIAN OR CUSTODIAN'S SIGNATURE | PARENT, GUARDIAN OR CUSTODIAN'S NAME *(Please print)* | | DATE |
|---|---|---|---|
| *telephonic* | Jessica Fidler | | 10/24/23 |
| **DCS REPRESENTATIVE'S SIGNATURE** | **DCS REPRESENTATIVE'S NAME** *(Please print)* | **TELEPHONE NUMBER** | **DATE** |
| | Alonzo Borbon | (406) 741-1718 | 10/24/23 |

Equal Opportunity Employer/Program • Under Titles VI and VII of the Civil Rights Act of 1964 (Title VI & VII), and the Americans with Disabilities Act of 1990 (ADA), Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title II of the Genetic Information Nondiscrimination Act (GINA) of 2008; the Department prohibits discrimination in admissions, programs, services, activities, or employment based on race, color, religion, sex, national origin, age, disability, genetics and retaliation. The Department must make a reasonable accommodation to allow a person with a disability to take part in a program, service or activity. For example, this means if necessary, the Department must provide sign language interpreters for people who are deaf, a wheelchair accessible location, or enlarged print materials. It also means that the Department will take any other reasonable action that allows you to take part in and understand a program or activity, including making reasonable changes to an activity. If you believe that you will not be able to understand or take part in a program or activity because of your disability, please let us know of your disability needs in advance if at all possible. To request this document in alternative format or for further information about this policy, contact your local office; TTY/TDD Services: 7-1-1. • Free language assistance for department services is available upon request. • Disponible en español en la oficina local.

CSO-1034A
(03/2019)



### ARIZONA DEPARTMENT OF CHILD SAFETY
## PRESENT DANGER PLAN

**Describe the present danger condition that is occurring and is placing the child(ren) in danger:**

There are concerns that mother is abusing ▅
as ▅▅ is prott his cecostomy tube was placed
back and she ▅▅▅ is harming him.

▅ ▅
List Names of U... ...

**Select the type of present danger plan:**

☐ The threatening person leaves the home.

☐ The protective parent and child leave the home and go a safe environment.

☐ A responsible adult is in the home at the predetermined specific time.

☐ A responsible adult routinely monitors the home.

☐ A responsible adult moves into the home seven days a week, 24 hours per day.

☐ The child is cared for outside of the home periodically.

☐ The child lives with someone in the family network part-time.

☐ The child lives with a responsible adult for seven days a week, 24 hours per day.

☐ The child is placed in the temporary custody of DCS by a Voluntary Placement Agreement, CSO-1043.

☑ The child is placed in the temporary custody of DCS.

**Describe the specific action(s) to keep the child(ren) safe, when the action(s) is required, and the adult(s) who will be responsible for those actions:**

▅ ▅ will reside ▅▅ ▅▅▅ in a foster home.

**End date of present danger plan (must be within 14 days or less):** 10/27/23

**Level of contact allowed between child and parent/caregiver: (frequency, duration, location, level of supervision)**

Jessica is currently allowed no contact with ▅ .

**Describe how the DCS Specialist will oversee that the plan is followed and sufficient:**

OCWI will maintain contact with the family.

*~ Must also complete Page 2. See Page 2 for EOE/ADA/GINA Disclosure ~*

CSO-1034A
(03/2019)
Page 2

## ARIZONA DEPARTMENT OF CHILD SAFETY
# PRESENT DANGER PLAN



### Present Danger Plan Participants

Name of Responsible Adult, if applicable | Phone No. (include area code)

Address ( No., Street, Apt. No., City, State, Zip Code)

Name of Responsible Adult, if applicable | Phone No. (include area code)

Address ( No., Street, Apt. No., City, State, Zip Code)

### As a Responsible Adult, *I acknowledge the following:*
**Please initial each item:**

| | | |
|---|---|---|
| | | To follow the Present Danger Plan as prescribed; |
| | | To be present at times needed to ensure child's safety; |
| | | To be present when threats are likely to occur; |
| | | That I am physically able to protect child; |
| | | That I will cooperate with and support DCS in carrying out the Present Danger Plan; |
| | | That I will maintain contact with the DCS Specialist; |
| | | That I will notify the DCS Specialist or DCS Supervisor immediately if I am unable to carry out the plan; |
| | | That I will notify the DCS Specialist or DCS Supervisor immediately if the parent/caregiver attempts to have unapproved contact with the child; and |
| | | That I will ask for assistance and guidance from DCS as needed. |

**Specialist Phone No.:** `480-341-7778`

*Child Abuse Hotline: 1-888-767-2445*

### As a Parent/Guardian, *I acknowledge the following:*
**Please initial each item:**

| | |
|---|---|
| | I have read the Present Danger Plan (the PDP) and/ or the PDP has been explained to me. I understand that the PDP is necessary to keep my child(ren) safe. |
| | I was given a chance to ask questions and discuss the PDP. I was told I did not have to agree to the PDP. |
| | I understand that agreeing to the PDP is not an admission of wrongdoing. |
| | I have received a copy of the PDP. |
| | I understand the PDP is voluntary, meaning I have a choice of whether to agree or not agree to the PDP. |
| | I may end the PDP at any time. I understand that to end the PDP before the time expires, I need to notify the DCS Specialist or the DCS Program Supervisor immediately. |
| | I understand that if DCS believes the PDP is not working to keep my child(ren) safe, or if DCS believes I am ending the PDP in a way that causes my child(ren) to be unsafe, DCS may take temporary custody of my child(ren). |
| | I understand that if DCS takes temporary custody of my child(ren), it allows DCS to make decisions about where my child can live and make legal decisions about their care. |
| | I understand that if DCS takes temporary custody of my child(ren), DCS must provide me with either a court order and/or temporary custody notice. |

| Parent/Guardian 1 Signature | Date | Parent/Guardian 2 Signature | Date |
|---|---|---|---|
| Responsible Adult's Signature | Date | Additional Responsible Adult's Signature | Date |
| Child's Signature (as appropriate) Alonzo Borbon | Date 10/24/23 | Child's Signature (as appropriate) | Date 10/24/23 |
| Print name of DCS Representative Nichole | Date | DCS Representative Signature | Date |

### Supervisory Approval of Present Danger Plan

| ☐ By Phone  ☐ In Person | | | 10/24/23 |
|---|---|---|---|
| Supervisor Approval | Print name of DCS Representative Garcia | DCS Representative Signature | Date |

Routing: Original – Parent/Caregiver; Yellow – Responsible Adult; Pink – DCS Record

Equal Opportunity Employer/Program. The Department of Child Safety (DCS) prohibits discrimination in admissions, programs, services, activities, or employment based on race, color, religion, sex, national origin, age, disability, genetics, or retaliation. Reasonable accommodations to allow a person with a disability to take part in a program, service, or activity are available upon request. To request this document in alternative format or for further information about this policy contact your local office; TTY/TDD Services: 7-1-1. Free language assistance for DCS services is available upon request.

# EXHIBIT 2

Clerk of the Superior Court
*** Electronically Filed ***
M. Engle, Deputy
10/27/2023 12:53:58 PM
Filing ID 16814687

1  KRISTIN K. MAYES
   Attorney General
2

3  KRISTI VILLARREAL-REX
   Assistant Attorney General
4  State Bar No. 024797
   CFP/PSS
5  2005 N. Central Ave. C007AG
   Phoenix, Arizona 85004
6  Telephone: (602) 542-1645
   PSSDurango@azag.gov
7

8  Attorneys for the Department of Child Safety

9           IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
10
11          IN AND FOR THE COUNTY OF MARICOPA

12 | In the Matter of:                    | No. JD533286 R

13 | E██████  F█████                     | **DCS'S DEPENDENCY PETITION AND**
14 |     d.o.b. ████/2011                 | **PETITION FOR PATERNITY AND/OR**
                                          | **CHILD SUPPORT**
15
16                                          **(OUT-OF-HOME)**

17                                          DCS CASE I.D. NO. AS00850609
18 | Person under 18 years of age.

19
20         Petitioner, the Department of Child Safety (DCS or the Department), by and
21 through undersigned counsel, hereby alleges upon information and belief:
22
                                      **I.**
23                              <u>**Jurisdiction**</u>

24         The Juvenile Court has exclusive original jurisdiction over dependency matters
25
26 pursuant to A.R.S. § 8-202(B).   The Superior Court has original jurisdiction in

27 proceedings to establish paternity pursuant to A.R.S. § 25-801.
28
                                       1

**II.**
**Venue**

Venue in this county is proper pursuant to A.R.S. §§ 8-206(A) and 25-802 as Maricopa County is the residence of the child and/or the acts of dependency are alleged to have occurred in Maricopa County.

**III.**
**Identity of Child, Placement and Applicability of the**
**Indian Child Welfare Act**

A.     E███████ F███████:

    1.     E███████ F███████ is a male child whose date of birth is ████████████ 2011.

    2.     E███████ F███████ is a dependent child within the provisions of A.R.S. § 8-201(15).

    3.     E███████ F███████ is currently placed with DCS.

    4.     E███████ F███████ is not an Indian child as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4).  DCS has no information that the child is an enrolled member of any tribe or that a parent is an enrolled member of a tribe and the child is eligible for enrollment.

**IV.**
**Parties**

The following individuals are alleged to be the parents, guardians, and/or Indian Custodians of the child who is the subject of this Petition, upon information and belief:

A.     JESSICA FIDLER is the mother of E███████ F███████.

2

1.    Her date of birth is June 30, 1980.

2.    Her address is confidential.  Her phone number is confidential.

**V.**
**Temporary Custody**

Upon information and belief, E███████ F████████ was taken into temporary physical custody on October 24, 2023, at 2:54 p.m., as authorized by an order of the Superior Court dated October 24, 2023.  The Superior Court authorization and DCS's application for court authorization are attached to this Petition.

**VI.**
**Allegations**

A.    Upon information and belief, DCS alleges that E███████ F████████ is dependent due to abuse and/or neglect as to Mother, JESSICA FIDLER.

1.    Mother is unable to provide proper and effective parental care and control due to an unfit home and/or abuse and/or neglect.  The child was subject to a prior dependency case in 2020 to 2021 due to concerns that Mother's behaviors led to excessive and/or unnecessary medical interventions for the child.  When the child was removed from Mother's care in the prior case, his symptoms improved dramatically, and medical interventions were decreased successfully.  The family participated in services, the child returned home to Mother, and the dependency was dismissed.  Since the child has been with Mother, his health care utilization has significantly increased.  According to a forensic psychological evaluation, Mother has

3

continued to engage in behaviors such as inducing and/or fabricating and/or falsifying and/or exaggerating the child's symptoms, which have led to excessive and/or unnecessary medical interventions for the child. The child is at risk of further abuse and/or neglect in Mother's care and the psychologist recommended that Mother and the child be separated for the child's safety.

2.    Mother is unable to provide proper and effective parental care and control due to mental health issues. Mother has a history of mental health issues. There was a prior dependency case on the child due to concerns that Mother's behaviors led to excessive and/or unnecessary medical care for the child. A 2020 psychological evaluation that Mother underwent as part of that dependency case concluded that she has several mental health diagnoses, including an unspecified depressive disorder and a generalized anxiety disorder. As part of the evaluation, Mother acknowledged that her anxiety significantly contributed to the child receiving excessive medical care. While the child was placed out of the home, his symptoms improved dramatically and his medical care utilization significantly decreased. The family participated in services and the child returned home to Mother. Since the child has been with Mother, his health care utilization has again increased considerably and Mother's mental health continues to be a concern. Mother reported to DCS that she went into a mental health hospital due to her self-harming behaviors after the prior dependency case

4

was dismissed. Mother reported that she take an antidepressant. The Department received a hotline report in January 2023 with continued concerns that Mother's behavior has led to excessive and/or unnecessary medical interventions for the child. As part of its investigation, DCS obtained a medical records review and evaluation by a psychologist. As a result of this evaluation, the psychologist reported that Mother meets the criteria for Factitious Disorder Imposed Upon Another and recommended that Mother and the child be separated.

### VII.
### Aggravating Circumstances

Pursuant to A.R.S. §§ 8-841(C)(5) and 8-846(D)(1), DCS has not yet made a determination or cannot determine at this time whether aggravating circumstances exist.

### VIII.
### Paternity

The Department, pursuant to A.R.S. §§ 25-803 and 25-806, alleges:

A.    The State of Arizona is entitled to bring this action pursuant to A.R.S. §§ 25-801 through 25-817.

B.    The Department requests the Court for any child identified herein whose paternity has not been legally established, enter a judgment of paternity.

C.    If any of the identified fathers fails to timely comply with an order from this Court to establish his paternity, the Court may immediately enter a judgment of paternity upon request of DCS.

D.    Upon information and belief, Mother reported that the child's father was a sperm donor from Israel and that she does not have information regarding his identity or whereabouts.

**IX.**
**Facts Supporting Contrary to the Welfare of the Children Finding**

Continuation of the child in the home would be contrary to the child's welfare. Mother has a history of mental health issues.  The child was subject to a prior dependency case in 2020 to 2021 due to concerns that behaviors by Mother, JESSICA FIDLER, led to excessive and/or unnecessary medical interventions for the child.  A 2020 psychological evaluation that she underwent as part of the dependency case concluded that she has several mental health diagnoses, including an unspecified depressive disorder and a generalized anxiety disorder.  As part of the evaluation, Mother acknowledged that her anxiety significantly contributed to the child receiving excessive medical care.  When the child was removed from Mother's care in the prior case, his symptoms improved dramatically, and medical interventions were decreased successfully.   The family participated in services and the child returned home to Mother.  Since the child has been with Mother, his health care utilization has again increased considerably and Mother's mental health continues to be a concern.  Mother reported to DCS that she went into a mental health hospital due to her self-harming behaviors after the child was returned to her care in the previous dependency case.   Mother reported that she take an antidepressant.  After receiving a hotline report in January 2023 with continued concerns that Mother's behavior has led to excessive and/or unnecessary medical interventions for

the child, DCS obtained a medical records review and evaluation by a psychologist. According to the evaluation, Mother has continued to engage in behaviors such as inducing and/or fabricating and/or falsifying and/or exaggerating the child's symptoms, which have led to excessive and/or unnecessary medical interventions for the child. The evaluation noted that Mother meets the criteria for Factitious Disorder Imposed Upon Another and recommended that Mother and the child be separated. The identity and whereabouts of the child's father are unknown.

## X.
## Facts Supporting Reasonable Efforts Finding

It is further requested that the Court find, based upon the verified allegations of the petition, that reasonable efforts have been made to prevent removal of the child from the home. The child was subject to a prior dependency case due to similar concerns as those outlined in this petition. The family engaged in services on that case and the case was dismissed in November 2021. In January 2023, DCS received another hotline report with concerns of medical child abuse by Mother. The Department obtained a forensic records review by a psychologist and the psychologist noted concerns that Mother was engaging in behavior consistent with a diagnosis of Factitious Disorder Imposed upon Another. The psychologist recommended that Mother and the child be separated. The Department obtained a court order authorizing the child's removal and took the child into temporary custody. The Department held a Team Decision Making meeting on October 26, 2023.

///

///

1
2

## XI.
## Facts Supporting Relative or Non-Relative Placement

3       The Department made attempts to identify and assess placement with the child's
4
grandparent or another member of the child's extended family, including a person who
5
has a significant relationship with the child, but such a placement is not in the child's best
6
interests at this time because the Department obtained a forensic medical records review
7
8
by a psychologist, and the psychologist noted concerns that Mother was engaging in
9
behavior consistent with a diagnosis of Factitious Disorder Imposed upon Another.  The
10
psychologist recommended that the child and Mother be separated to see if the child's
11
symptoms improve.  The psychologist recommended that during this time, Mother should
12
13
not have access to the child and that the child should not be placed with anyone who is
14
supportive of Mother.  The child's current placement is the least restrictive consistent
15
with the child's best interests.
16

17      ## XII.
## Financial Responsibility for the
18      ## Support of the Child

19
20      The parent(s) should pay an appropriate amount as determined by law for the care,
21
maintenance and support of the child while in care pursuant to A.R.S. §§ 8-241, 8-243
22
and 8-243.01.
23      ///
24      ///
25      ///
26      ///
27
28
8

## XIII.
## <u>Education</u>

With regard to possible special education issues of any child named herein who is not placed with a parent, or for any child subsequently removed from a parent(s) physical custody, DCS hereby requests an order providing that:

1. In the event a public education agency or Arizona early intervention provider advises DCS that it needs to locate a parent of any child named in this petition to serve as the Individuals With Disabilities Education Act (IDEA) parent for that child and a parent can no longer be located by DCS; or

2. In the event the parent or legal counsel for the parent tells the public education agency, or DCS/its legal counsel that the parent will not serve as the IDEA parent for the child named in this petition; or

3. If the parent is subject to a no contact order as to any of the children; or

4. If a public education agency or an Arizona early intervention provider following reasonable efforts to try and get a parent to respond to its requests to act as the IDEA parent for any child named in this petition, fails to obtain a response or any cooperation of a parent, an adult relative, stepparent, or foster parent with whom the child lives (but not staff of a group home or other residential facility) shall have authority to serve as the IDEA parent.

The IDEA parent represents the children's special education interests under Parts B or C of the IDEA.  The purpose of such representation is to ensure that a child with a

suspected/known disability receives prompt assessment and evaluation for eligibility for early intervention services or appropriate educational services, which may include special education and related services designed to meet the child's unique needs.

## REQUEST FOR RELIEF

Based upon the foregoing allegations, immediate action is required.

WHEREFORE, DCS requests this Court find and/or order that:

1. The Juvenile Court has jurisdiction over the subject matter and, after proper service on the parents, guardians, and/or Indian custodians, the persons before this Court;

2. Venue is proper in this county;

3. The child is a temporary ward of the Court, placed in the care, custody, and control of DCS, 3003 North Central Avenue, Phoenix, Arizona 85012, and;

   a. Placing E██████ F██████ in the physical custody of DCS;

4. Continuation of the child in the home would be contrary to the child's welfare;

5. Reasonable efforts have been made to prevent removal of the child from the home;

6. The Department made attempts to identify and assess placement with a grandparent or extended family, including a person who has a significant relationship with the child and such a placement is not in the child's best interest at this time;

10

7.   The child is not an Indian child as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4);

8.   In accordance with A.R.S. § 25-809 and other applicable law that:

    a.   JESSICA FIDLER is the mother of the child born out of wedlock;

    b.   A determination as to the identity of the biological father is necessary to establish paternity for any child named in this petition who was born out of wedlock;

    c.   If genetic testing has been ordered, a father's failure to participate may result in an order of paternity naming him the legal father; and

    d.   After the establishment of paternity, enter an order requiring the Clerk of the Court to send a certified copy of the paternity order for any child born in the State of Arizona, to the Arizona Office of Vital Records, P.O. Box 3887, Phoenix, Arizona 85030-3887, which shall establish, pursuant to A.R.S. § 36-323, a new birth certificate for the child reflecting the name of the father;

9.   A Preliminary Protective Hearing be set pursuant to A.R.S. § 8-824, an Initial Dependency Hearing pursuant to A.R.S. §§ 8-842 and 8-843, a Publication Hearing, and a Permanency Hearing pursuant to A.R.S. § 8-862;

10.   The matter be assigned to the Court-Appointed Special Advocate (CASA) Program to determine if it is appropriate for the assignment of an advocate;

11

11.   The matter be assigned to the Foster Care Review Board (FCRB) to perform the duties required by statute;

12.   All persons are prohibited from removing the children from the State of Arizona without prior written approval of DCS;

13.   Any judgment and orders for the care, paternity, custody, support or such other relief, as the child's welfare and the interests of the State may require under the provisions of Title 8 and Title 25 of the Arizona Revised Statutes;

14.   That the parent(s) or legal guardian(s) shall provide the DCS Child Safety Worker or its attorney with a recent educational history (including the name(s) and location(s) of the school(s) each child named in the Petition recently attended and the grade in which each child was most recently enrolled.)  The parent(s) or legal guardian(s) shall also provide or confirm the date of birth of each child named in the Petition;

15.   An individual other than a biological or adoptive parent is authorized to act as the IDEA parent under the circumstances delineated herein;

16.   All medical, dental and mental health providers, health plans, Regional Behavioral Health Authorities (RBHAs), as well as other Health Insurance Portability and Accountability Act (HIPAA) covered providers who have provided any services to the child, make available to any guardian ad litem for the child and/or attorney for the child the various medical, dental, mental health, genetic and other health care records of the child;

12

17.  The allegations in this Petition are true by a preponderance of the evidence and that the child is dependent to all alleged parents, guardians, and/or Indian custodians as defined by A.R.S. § 8-201(15), and that the child be made a ward of the court committed to the care, custody, and control of DCS;

**18.  The parent, guardian, or Indian custodian be advised as follows;**

**a.  Failure to appear without good cause may result in a finding that the parent, guardian or Indian custodian has waived his/her legal rights and admitted the allegations in the dependency petition;**

**b.  That hearings may go forward in his/her absence and may result in an adjudication of dependency, permanent guardianship or termination of parental rights based upon the record and evidence presented to the Court, as well as an order of paternity, suspension or termination of an existing current child support order, custody, or change of custody in a consolidated family law matter and an order for child support if paternity has been established;**

**c.  Proceedings for permanent guardianship pursuant to A.R.S. §§ 8-871 and 8-872 or proceedings for termination of parental rights pursuant to A.R.S. § 8-533 may be initiated based upon**

13

**the grounds set forth in statute or for failure to participate in reunification services; and**

**d.     If a child is under three years of age, within six months after removal from the home, the Court will determine whether the parent, guardian or Indian custodian has substantially neglected or willfully refused to participate in reunification services offered by DCS; admonish the parent, guardian, or Indian custodian that substantially neglecting or willfully refusing to remedy the circumstances that cause a child to be in an out-of-home placement, including refusing to participate in reunification services, is a ground for termination of parental rights; and**

19.     That the parent(s) or legal guardian(s) provide to this Court, as required by A.R.S. § 8-841(E)(5), at the Preliminary Protective Hearing and/or the Initial Dependency Hearing:  the names, type of relationship, and all available information necessary to locate persons related to the child or who have a significant relationship with the child.  Persons related to the child include the child's grandparents, great-grandparents, brothers or sisters of whole or half-blood, aunts, uncles and first cousins. If the parent(s) or legal guardian(s) do not have sufficient information available to locate a relative or person with a significant relationship with the child, the parent or guardian must inform this Court of this fact.  The parent(s) or legal

guardian(s) must inform DCS immediately if the parent(s) or guardian(s) becomes aware of information related to the existence or location of a relative or person with a significant relationship with the child.

20.  Notice is given that if DCS has temporary custody of a child or legal custody pursuant to a court order, it has the authority to consent to: evaluation and treatment for emergency conditions that are not life threatening; routine medical and dental treatment and procedures, including early periodic screening diagnosis and treatment services, and services by health care providers to relieve pain or treat symptoms of common childhood illnesses or conditions; surgery; blood transfusions; general anesthesia; and testing for the presence of the Human Immunodeficiency Virus (HIV).  A.R.S. § 8-514.05(C).

21.  Notice is given that DCS is proposing to substantiate any allegations of abuse and/or neglect contained in the dependency petition for placement in the DCS Central Registry.  The DCS Central Registry is a confidential list of DCS findings that tracks abuse and neglect.  If the court finds your child dependent based upon allegations of abuse and/or neglect contained in the dependency petition, you will be placed in the DCS Central Registry.  *See* A.R.S. § 8-804.

22.  Notice is given that under the Arizona Rules of Family Law Procedure 5.1(C), during any dependency/guardianship proceeding in the juvenile division, the assigned juvenile division may suspend, modify, or terminate a

child support order for current support if the parent entitled to receive the child support no longer has legal or physical custody of the child, and, except in Title IV-D cases may make appropriate orders regarding any past due support or child support arrears.  The assigned juvenile division may direct that the wage assignment be quashed or modified.

RESPECTFULLY SUBMITTED this 27th day of October, 2023.

KRISTIN K. MAYES
Attorney General

/s/ Kristi Villarreal-Rex

KRISTI VILLARREAL-REX
Assistant Attorney General

16

1

**VERIFICATION**

2

STATE OF ARIZONA          )
                          )  ss.
3

COUNTY OF MARICOPA        )

4

5      I, Nichole Garcia, am an employee of the Petitioner, the Department of Child

6

Safety, and I am authorized to make this verification on its behalf. I verify under penalty

7

of perjury that I have read the foregoing Petition and upon information and belief the

8

9      foregoing contents are true and correct.

10     DATED this 27th day of October, 2023.

11

12                                        _Nichole Garcia_
                                          Signature of Nichole Garcia
13

14                                        _OCWI manager_
                                          Title
15

16

17

18

19

20

21

22

23

24

25     AF / Fidler / HDM#11636961

26

27

28
                                          19

# APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILD
## Superior Court of Arizona for Maricopa County

REMOVAL REQUEST # RR2023-22793

COUNTY OF ORIGIN Maricopa

DCS CASE ID AS00863831

I, Alonzo Borboa, hereby affirm the following statement of facts:

1. I am employed by the Arizona Department of Child Safety. By virtue of my education, training and experience I am qualified and authorized to conduct child abuse and neglect investigations. I am currently assigned to investigate the case involving the child named in this application and declaration for removal, or am that person's supervisor. I make this declaration in support of this application. Further, I have the following qualifications: Positions:
August 2022 – Present OCWI Assistant Training Manager
December 2019 – August 2022 OCWI Investigator
April 2018 – December 2019 DCS Program Specialist
May 2016 – April 2018 DCS Child Safety Investigator

Training:
Safe AZ Renovations Advanced Forensic Interview Training (AFIT)
DCS Specialist CORE training (240 hours)

Education:
Bachelor's in Secondary Education (2011)
Master's in Psychology (2020)

2. This application and declaration is in support of for ex-parte removal of the following children:

| Child Name | DOB | Sex | ICWA Status |
|---|---|---|---|
| E█ F█ | █2011 | F | No |

3. The mother(s) is/are:
The mother of E█ F█ is Jessica Fidler

4. The father(s) is/are:
The father of E█ F█ is Unknown

5. The legal guardian(s) is/are:
The legal guardian of E█ F█ is None or Unknown

APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILD
Superior Court of Arizona for Maricopa County

6.  Probable cause exists to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect, and it is contrary to the child's welfare to remain in the home under A.R.S. §8-821(A). Specifically, Specific present danger condition(s) or impending danger threat(s) for each child listed on this application:
Child's condition is the result of deliberate, preconceived planning or thinking that the caregiver is responsible for and that preceded the child's serious injuries or condition;

Circumstances that require temporary custody including a detailed account of circumstances and supporting facts:
Today, Dr. Cahill completed a forensic medical review of documents pertaining to E█████ and Ms. Fidler and Dr. Cahill arrived at the conclusion that Ms. Fidler meets the criteria for Factitious Disorder Imposed on Another (FDIA).  Dr. Cahill has reviewed copious amounts of medical records pertaining to E████, and Ms. Fidler has exposed E█████ to an alarming number of medical and psychological diagnoses.  E███ was removed from Ms. Fidler's care in 2020 and he showed significant improvement in a short period of time.  He asked to have his cecostomy tube removed from him and was fine afterwards.  E████ was able to complete his tasks of daily living and he did not show evidence of the cognitive or mental health issues that Ms. Fidler claimed he had.  After E███ was returned to Ms. Fidler's care she insisted on having his cecostomy tube replaced in the emergency room.  Ms. Filder did not want E████ to use anesthesia, so he suffered immensely.  Ms. Fidler is obsessed with constipation and she is constantly flushing the child's cecostomy tube and feeding him laxatives.  E████ did not see a doctor for 30 days when he was previously in foster care, and he now has numerous specialists to attend to many of his fabricated conditions and diagnoses.  Dr. Cahill reports that Ms. Fidler is abusing E████ and she recommends that E███ be removed from her care for a period of 4-8 weeks, and that she have no contact with the child.  If E████ improves again then, this would support the diagnoses of FDIA and Dr. Cahill suggests that parental rights be terminated.

E███ will continue to be exposed to countless unnecessary and harmful medical procedures if he remains in Ms. Fidler's care.  The child has a cecostomy tube placed in him, which was removed when he was in foster care and Ms. Fidler had it replaced once the child returned to her care.  The child will continue to suffer and he will not have the opportunity to live a more normal life if he remains in Ms. Fidler's care.  The father was an unknown sperm donor.

7.  I, Alonzo Borboa, declare under penalty of perjury that the information contained within this application and declaration is true and correct to the best of my knowledge and belief.

10/24/2023 2:36 PM

## ORDER FOR EX-PARTE REMOVAL OF CHILD
Superior Court of Arizona for Maricopa County

REMOVAL REQUEST # RR2023-22793

COUNTY OF ORIGIN Maricopa

DCS CASE ID AS00863831

TO ANY DCS REPRESENTATIVE IN THE STATE OF ARIZONA

Proof by application and declaration having been made this date 10/24/2023 before me by Alonzo Borboa of the Department of Child Safety ("DCS"), and on the basis of the evidence presented in such application and declaration, and pursuant to A.R.S. §8-821(A), I find probable cause exists to believe that temporary custody is clearly necessary to protect the following child █████ █████ from suffering abuse or neglect. I further find, for the reasons indicated below and pursuant to A.R.S. §8-821(A), that probable cause exists to believe that it is contrary to the child's welfare to remain in the home.

- ☑ Domestic violence or violent behavior
- ☑ Mental health issues
- ☑ Risk of abuse or neglect of child(ren)
- ☑ Unfit or unsafe home environment for child(ren)

Therefore, **IT IS ORDERED** granting DCS's request for authorization to remove █████ █████ and authorizing DCS to remove this child.

**IT IS FURTHER ORDERED** directing DCS to conduct a due diligence search pursuant to A.R.S. § 8-514.07.

_ETBingert_

10/24/2023 2:44 PM

_____

Hon. Elizabeth Bingert

CSO-1000A (6-18)
PAGE 2 ON REVERSE

ARIZONA DEPARTMENT OF CHILD SAFETY
**TEMPORARY CUSTODY NOTICE**

On *(Date)* 10/24/13   At *(Time)* 1:54   ☐ AM ☑ PM , temporary custody of *(child's name)* ▮▮▮▮▮▮
was taken at *(Address)* ▮▮▮▮▮▮▮ by *(Agency)* DCS/DCS

**Type of abuse or neglect requiring temporary custody:** Select the circumstance(s) that most clearly describe the danger to the child(ren) and reason temporary custody is necessary.

☐ Medical examination is required to diagnose abuse.

☐ The child is unsupervised or alone now or on a daily basis, or has been left with a person who is unwilling or unable to provide adequate care.

☐ The caregiver is unable to perform essential parental responsibilities due to substance use, mental illness, physical impairment, cognitive limitations.

☐ The caregiver is unable or unwilling to perform essential parental responsibilities and there is no other appropriate caretaker immediately available.

☐ The caregiver is out of control and cannot focus or manage his/her behavior in ways to properly perform parental responsibilities.

☐ The caregiver's behavior is violent, bizarre, erratic, unpredictable, incoherent, or totally inappropriate and is a threat to child safety.

☐ The caregiver is brandishing weapons, known to be dangerous and aggressive, or is behaving in attacking or aggressive ways that are a threat to child safety.

☐ The caregiver has not, cannot, or will not protect the child from serious or severe harm, including harm from other persons having access to the child.

☐ Dynamics in the household include a person establishing power, control, or coercion over a caregiver in a way that impairs necessary supervision or care of the child and has caused, or will likely cause, serious or severe harm to the child's physical, mental, or emotional health.

☐ The caregiver has an extremely negative perception of the child, and/or has extremely unrealistic expectations for the child's behavior.

☐ Physical conditions in the home are hazardous and immediately threaten the child's safety.

☐ The caregiver is subjecting the child to brutal or bizarre punishment or there is severe to extreme maltreatment alleged to be occurring.

☐ The child requires immediate medical attention, and the absence of medical treatment could seriously affect the child's health and well-being.

☐ The child is actively endangering self or others and the caregiver cannot or will not control the child's behavior or arrange or provide necessary care.

☐ There is evidence of recent sexual abuse, the perpetrator currently has access to the child, and no protective action is being taken by a caregiver.

☐ The child has injuries such as facial bruises, injuries to the head, multiple plane injuries, injuries to a non-ambulatory child, immersion burns.

☐ The child has serious injuries that the caregivers and others cannot or will not explain, or the explanation is inconsistent with the child's injuries or condition.

☑ The caregiver deliberately harmed the child, or caused or threatened to cause serious or severe harm to the child.

☐ The child is profoundly fearful (terrified) of their present home situation, or a particular person living in or having access to the home.

☐ The caregiver previously endangered a child and/or caused harm to a child and circumstances indicate the person will likely cause severe harm to the child.

☐ There is evidence of abuse or neglect and the caregiver cannot produce the child, refuses access to or is likely to flee with the child, or actively avoids DCS.

☐ Criminal activity by the caregiver or criminal activity of other persons living in or having access to the home will likely result in severe harm to the child.

Select how temporary custody was obtained: ☐ Parent or Guardian Consent ☑ Court Authorized ☐ Exigent Circumstances

**The Department of Child Safety (DCS) must:**

- Return your child within **72 hours** *(not including weekends and holidays)* unless DCS files a legal paper, called a petition, with Juvenile Court. If a petition is filed, your child will be kept in the temporary custody of DCS.

- Return your child within **12 hours** if your child was removed for a medical examination, unless abuse is revealed, **and**

- Inform you of the right to give a verbal, telephonic or written response to the allegations and have the response included in the investigation report. Any documentation you give, what you say or write, will be included in the case record and can be used in court proceedings.

DCS REPRESENTATIVE'S NAME *(Please print)*
Alonzo Ochoa

AREA CODE AND PHONE NO.
(480)341-2748

ARIZONA DEPARTMENT OF CHILD SAFETY ADDRESS *(No., Street, City, State, ZIP)*
3003 N. Central Ave Phoenix AZ 85012

DCS SUPERVISOR'S NAME *(Please print)*
Nichole Garcia

AREA CODE AND PHONE NO.
(602)542-1013

**METHOD OF NOTICE:** On *(date)* 10/14/13 ,at *(time)* 7:11 ☐ AM ☑ PM , I served noticed to *(parent, guardian or custodian) (print name)* ▮▮▮▮▮▮

Method used: ☑ In-Person ☐ Left at Residence ☐ Verbal ☐ Fax    Date: 9/11/13    Time: 52:96
Address where mailed/left/given (No., Street, City, State, ZIP) 389▮ Jasper D.L Dctar 5296

What is the child or child's parents American Indian heritage/ancestry:    Has the tribe been notified? ☐ Yes ☐ No ☐ N/A
PARENT, GUARDIAN OR CUSTODIAN'S SIGNATURE

DCS REPRESENTATIVE'S SIGNATURE *(Or law enforcement officer)*    DATE
10/24/13

ROUTING: Original – Parent/Guardian/Custodian; 1st Copy – Sent to Assistant Attorney General to file with the Petition; 2nd Copy – Retained in the case record

CSO-1524
(8-19)

ARIZONA DEPARTMENT OF CHILD SAFETY
**TEAM DECISION MAKING (TDM) SUMMARY REPORT**
**SAFETY PLANNING**



| CHILDS CASE NAME: Jessica Fidler | | CHILDS CASE ID NO.: AS00863831 | |
|---|---|---|---|
| DCS SPECIALIST'S NAME: Alonzo Borboa | | DCS SUPERVISOR'S NAME: Nichole Garcia | |
| TDM FACILITATOR'S NAME: Monica Sandoval | | TDM MEETING: Date: 10/26/2023 Time : 1:00PM | |

| Child(ren) with Safety Concerns | | Mother/Guardian's Name | Father/Guardian's Name |
|---|---|---|---|
| **Name** | **DOB** | | |
| E███ F███ | ███2011 | Jessica Fidler | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

What efforts have been made to include all parents and/or legal guardians in the meeting?
Mother, Jessica stated that the father was a sperm donor from Israel and she has provided the Department with the donor number ID.

What is the reason for today's meeting?
-Mother, Jessica provided a history of her involvement with the Department regarding Munchausen syndrome
-The Dept served of 10/24/23 of the child, for concerns of abuse, and they have 72 hours to either return him or move forward with the Dependency.
-Jessica stated that the removal order contained in accuracy, the professional and the Department is relying on may not have given accurate information that could have influenced the Department's decision.
-Jessica stated that one of the letters from the Doctor at PCH in the prior dependency has inaccuracies in the CSRA and that is influencing the Department perspective.

What are the current safety concerns? *(What is worrying us)*
Mother has behaviors that indicate she has Munchausen syndrome
Mother replaced the C-Tube
Mother is fabricating or exaggerating the child's symptoms
This case has been open an extended period of time January of 2023, a lack of communication and updates because of the medical review and police involvement
Jessica stated that she has no concerns of child safety while the child is in her care and only has concerns with inaccuracies, lack of communication from medical providers and DCS, and the child's safety and well-being while being with the Department. Jessica stated that E███ was abused in the past while in the foster care system.
Jessica stated that the Department has not following up
MGM, Jamie stated that she is concerned that she was not approved as placement
MGM, Jamie is concerned that E███ is not being noticed or heard and the child experiencing trauma

How have parent's demonstrated protection of the child(ren) in the past? *(Including thinking, feeling, doing):*
Jessica stated that B███ has therapy, social group with other reunified children, and Mother has assited him in communicating with her and having self-advocacy
Jessica stated that he's in sports, music, and karate
Jessica stated that he is involved in the Jewish church and religious activities
Jessica stated that he has games & they do game night together
Jessica stated that she is in IDC therapy
Jessica stated that she knows how to seek community resources
Jessica stated that she has insurance and he go to medical and dental appointments
B███ is a pleasant kid, smart kid, good personality, and Jessica has been in communication with the Department
Jessica stated that she shows concern for the child
Jessica stated that she has family support and is able to maintain connections (they are there for emotional support for Mother)
Jessica stated that maternal uncles are male role models for B███
Jessica stated that she has stable housing
MGM, Jamie stated that Jessica is a good mom and communicates well with him, she engages with him, and is aware of his developmental milestones when he was growing up
MGM, Jamie stated that Jessica is tolerant
MGM, Jamie stated that B███ has good behaviors she lets him have choices
Jessica stated that she is supportive, she allows him choices when it comes to discipline and to reflect on his behaviors
Jessica stated that B███ is maturing, resilient, more independent, and becoming responsible
Jessica stated that she uses a love and logic style parenting, she is confident in her parenting and communicate with doctors, and is protective
MGM, stated that B███ has a positive view of his mother
Jessica stated that he has ALTCS insurance
Jessica stated that she is employed at community league service
Jessica stated that she has transportation

Strengths and resources available to help support the plan:
Jessica stated that she would like communication with the child
Jessica stated that Therapy (DBT-Mom) & (Child-DDD) for both her and the child is in place
Jessica stated that she has support from family, friends, and her attorney
Jessica stated that Sonja Rodriguez or a 3rd party goes to medical appointments with her
The Department suggested a Psychological evaluation
It was suggested by La Frontera that a Casa or GAL for the child
Jessica suggested that the current caregiver and doctors are consulted before B███ is seen by another medical provider

What needs to happen to ensure the safety of the child(ren)? *(Ideas regarding custody and placement, supportive resources, and/or transition planning)*:
Jessica stated that she wants the child returned to her care and communication with the child
Jessica stated that Placement with MGM, Jamie
Jessica suggested that other family and friends be assessed and considered for placement
Jessica stated that the Department takes into consideration to continue with their Jewish practices and activities
MGM, Jaime suggest an OOH placement with the mother removed from the home and MGM being placement
The Department suggested an OOH, dependency petition file w/o MGM being placement
The Department suggest Psychological evaluation
La Frontera suggest Casa or GAL for the child
Jessica suggested that the current caregiver and doctors are consulted before he is seen by another medical provider

Can the threat be effectively managed in the home? *(Explain why or why not)*
No

1.  Is it possible to manage the danger in the home? If it is possible, what actions need to be taken to keep the child safe, when do we need those actions to be taken, and are there appropriate adults who are available and can carry out the actions needed?
    No

2.  Are the parents, guardians, and/or custodians willing, demonstrating and able to cooperate with an in-home safety plan?
    Yes

3.  Is the home environment (and behaviors) calm, consistent, and predictable enough?
    No

4.  Can the danger threat be managed without the results of a professional evaluation?

No

5.  Is there a suitable place/residence available for the duration of the plan?
    Yes

---

If the answer is no to one or more of the questions above, what would need to occur for an in-home plan to be sufficient *(Conditions for Return)*?
The Department stated that the conditions of return requires additional information from their legal Department and other parties in order to determine the conditions of return.

---

Recommendations/Safety Plan:
OOH

---

**Legal Custody** *(Specify for each child)*

| Maintain child in parent/guardian's custody | In-home dependency | Return child to parent/guardian's custody |
|---|---|---|
| Voluntary out-of-home care | In-home intervention | Dependency out-of-home care<br>E▮▮▮ P▮▮▮ |

Placement *(Specify for each child)*:
OOH

---

Current/Last school attended *(Specify for each child):* If a safety, out-of-home placement or permanency decision results in a change to the child's living arrangement, document the school placement decision (remain in the school of origin or enroll in a new school) using the Best Interests Determination and Transportation Plan CSO 1348A.

The child will remain in the same school Learning Foundation for Performing Arts

---

Plan for sibling contact (if applicable) and parenting time *(Specify for each child):*
  Not applicable

**Follow up tasks to be completed (within 7-10 days)**

| WHO | WHAT | WHEN |
|---|---|---|
| DCS | File out of home dependency petition | 72 hours |
| DCS | TCN | completed |
| DCS | Case Aide vistation | TBD |
| DCS | Parenting Time | TBD |
| DCS | In-unit Psych Consult | 7-10 Days |
| DCS | RR | Completed |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Back-up plan *(If applicable, is valid for 5 business days from the TDM date):*
N/A

**Signatures of Participants (Signature does not imply agreement)**
**Firmas de Participantes (Su firma no significa que acepta un acuerdo)**

| Print Name<br>*Nombre en Letra de Molde* | Signature/*Firma* | Role/*Relacion* | Telephone Number<br>*Numero de Telefonico* |
|---|---|---|---|
| Jessica Fidler | | Mother | In-Person |
| Nicole Garcia | | OCWI  Supervisor | In-Person |
| Alonzo Borboa | | OCEI Specialist | In-Person |
| Christine LaLonggia | | La Frontera | In-Person |
| Jamie | | MGM | In-Person |
| Garette | | Maternal Uncle | Virtual |
| DeeAn Gillespie | | Attorney for Mother | In-Person |
| Michelle Feltes | | Paralegal | In-Person |
| Sonya Rodriguez | | DDD District Nurse | Virtual |
| Annette Heywood Ruskin | | Therapsit for child | Virtual |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Equal Opportunity Employer/Program • Under Titles VI and VII of the Civil Rights Act of 1964 (Title VI & VII), and the Americans with Disabilities Act of 1990 (ADA), Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title II of the Genetic Information Nondiscrimination Act (GINA) of 2008; the Department prohibits discrimination in admissions, programs, services, activities, or employment based on race, color, religion, sex, national origin, age, disability, genetics and retaliation. The Department must make a reasonable accommodation to allow a person with a disability to take part in a program, service or activity. For example, this means if necessary, the Department must provide sign language interpreters for people who are deaf, a wheelchair accessible location, or enlarged print materials. It also means that the Department will take any other reasonable action that allows you to take part in and understand a program or activity, including making reasonable changes to an activity. If you believe that you will not be able to understand or take part in a program or activity because of your disability, please let us know of your disability needs in advance if at all possible. To request this document in alternative format or for further information about this policy, contact your local office; TTY/TDD Services: 7-1-1. • Free language assistance for Department services is available upon request. • Ayuda gratuita con traducciones relacionadas con los servicios del DCS está disponible a solicitud del cliente.

1    ORIGINAL of the foregoing filed
     this 27th day of October, 2023, with:
2

3    Clerk of the Court
     Maricopa County Superior Court
4    Juvenile Division/Durango Facility
     3131 West Durango
5    Phoenix, AZ 85009-6292

6
     Copy of the foregoing hand-delivered
7    this 27th day of October, 2023, to:

8
     Honorable
9    Maricopa County Superior Court
     Juvenile Division/Durango Facility
10   3131 West Durango
     Phoenix, AZ 85009-6292
11

12   Copies of the foregoing mailed
     this 27th day of October, 2023, to:
13

14   Foster Care Review Board
     1501 W. Washington, Suite 128
15   Phoenix, Arizona 85007

16

17   Alonzo Borboa
     Case Manager
18   Site Code:  O15A

19

20    _/s/ Andrea Fontes_____
21   AF / Fidler / HDM#11636961

22

23

24

25

26

27

28
                                    17

Clerk of the Superior Court
*** Electronically Filed ***
C. McWhorter, Deputy
10/22/2024 3:33:28 PM
Filing ID 18727337

Person/Attorney Filing: Thomas A Connelly
Mailing Address: 5055 N. 12th St. Suite 101
City, State, Zip Code: Phoenix, AZ 85014
Phone Number: (480)999-4556X1008
E-Mail Address: tconnelly@millsandwoods.com
[ ☐ ] Representing Self, Without an Attorney
(If Attorney) State Bar Number: 019430, Issuing State: AZ

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Jessica Fidler, et al.<br>Plaintiff(s),<br>v.<br>State of Arizona, et al.<br>Defendant(s). | Case No. **CV2024-030202**<br><br>**CERTIFICATE OF COMPULSORY ARBITRATION** |

I certify that I am aware of the dollar limits and any other limitations set forth by the Local Rules of Practice for the Maricopa County Superior Court, and I further certify that this case IS NOT subject to compulsory arbitration, as provided by Rules 72 through 77 of the Arizona Rules of Civil Procedure.

RESPECTFULLY SUBMITTED this October 22, 2024

By: Thomas A Connelly /s/
    Plaintiff/Attorney for Plaintiff

Clerk of the Superior Court
*** Electronically Filed ***
Y. Moralez, Deputy
1/15/2025 8:46:49 AM
Filing ID 19167294

1  Thomas A. Connelly (AZ Bar #109430)
2  Robert T. Mills (AZ Bar #018853)
   Sean A. Woods (AZ Bar #028930)
3  **MILLS + WOODS LAW PLLC**
   5055 North 12th Street, Suite 101
4  Phoenix, Arizona 85014
   Telephone 480.999.4556
5  docket@millsandwoods.com
6
7  DeeAn Gillespie Strub (AZ Bar #009987)
   Jenny D. Jansch (AZ #024431)
8  **GILLESPIE, SHIELDS, & TAYLOR**
   7319 North 16th Street
9  Phoenix, Arizona 85020
   Telephone: (602) 870-9700
10 Fax: (602) 870-9783
   mailroom@gillaw.com
11
12 *Attorneys for Plaintiffs*
13
14       **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
         **IN AND FOR THE COUNTY OF MARICOPA**
15
16 JESSICA FIDLER, an individual;        Case No. CV2024-030202
   E.F., a minor, through his parent and
17 guardian JESSICA FIDLER,              **FIRST AMENDED COMPLAINT**
18              Plaintiffs,
                                         (Assigned to the Honorable
19       vs.                             Christopher Whitten)
20 STATE OF ARIZONA, a government
   entity;                              **JURY TRIAL REQUESTED**
21 ALONZO BORBOA, individually and as
   an employee with the State of Arizona
22 Department of Child Safety;
23 NICHOLE GARCIA, individually and as
   an employee with the State of Arizona
24 Department of Child Safety;
25 EDWIN WANGLER, individually and as
   an employee with the State of Arizona
26 Department of Child Safety;
27 DANA BURDEN, individually and as an
   employee with the State of Arizona
28 Department of Child Safety;

*(sidebar, rotated)* MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

JOHN and JANE DOES 1-10;
BLACK and WHITE ENTITES 1-10,

Defendants.

Plaintiffs Jessica Fidler and E.F.[1] (jointly, "Plaintiffs") submit their Complaint against Defendants State of Arizona, Alonso Borboa, Nichole Garcia, Desiree Manrique, Edwin Wangler, Dana Burden, Janet Cahill, John and Jane Does I-X, and Black and White Entities I-X. Plaintiffs state and allege the following:

## JURISDICTION AND VENUE

1.      Plaintiffs bring this civil rights lawsuit pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, A.R.S. § 12-641, and Arizona common law.

2.      The amount in controversy exceeds the minimal jurisdiction limits of this Court.

3.      This Court has original subject matter jurisdiction over the claims made in this Complaint pursuant to Article 6, Section 14 of the Arizona Constitution.

4.      The acts and events giving rise to the cause of action alleged herein occurred in Maricopa County, Arizona, and all Defendants are subject to the personal jurisdiction of this Court in accordance with A.R.S. § 12-123 and as otherwise provided under Arizona law and the Arizona Rules of Civil Procedure.

5.      Venue lies in this Court pursuant to 28 U.S.C. § 1391 and A.R.S. § 12-401 in that, among other reasons, the specific acts giving rise to the causes of action alleged herein occurred with primary effect in Maricopa County, Arizona.

## THE PARTIES

6.      Plaintiff Jesssica Fidler ("Jessica") is an individual, a citizen of the United States, and a resident of Maricopa County, Arizona. At all times relevant to the present Complaint, Jessica resided in Maricopa County, Arizona.

---

[1]      E.F. is a fictitious name used to protect the identity of the minor.

2

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

7.      Plaintiff E.F., is an individual, minor, a citizen of the United States, and a resident of Maricopa County, Arizona.  At all times relevant to the present Complaint, E.F., resided in Maricopa County, Arizona.

8.      Jessica is the biological and legal mother of E.F.

9.      Defendant State of Arizona, is a government entity. Its divisions and agencies include the Arizona Department of Child Safety ("DCS"), Office of Child Welfare Investigations "OCWI" which acts by and through its officials, employees, and agents, including, without limitation, each of the other Defendants in this action.

10.     Among the facilities operated by the DCS includes a "Welcome Center," opened, upon information and belief, in August of 2023 (the "Welcome Center"). It is intended, in short, to be a "one-stop" facility for children coming into care of the DCS who have experienced significant trauma.

11.     Defendant Alonzo Borboa ("Borboa") is an individual who resided in Maricopa County, Arizona, at all times relevant to the Complaint.  Borboa was, at all times relevant to this Complaint, acting under the color of law as an employee of State of Arizona with DCS.  He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Borboa was employed by the State of Arizona and DCS, OCWI as a DCS investigator and assistant manager.

12.     Defendant Nichole Garcia ("Garcia") is an individual who resided in Maricopa County Arizona, at all times relevant to the Complaint.  Garcia was, at all times relevant to this Complaint, acting under color of law as an employee of the State of Arizona with DCS.  She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Garcia was employed by State of Arizona with DCS and OCWI as a DCS investigator and manager.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

13.    Defendant Edwin Wangler ("Wangler") is an individual who resided in Maricopa County, Arizona, at all times relevant to the Complaint.  Wangler was, at all times relevant to this Complaint, acting under the color of law as an employee of the State of Arizona with DCS.  He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Wangler was employed by the State of Arizona with DCS, as the Chief of OCWI who is responsible for OCWI employees, investigators, Deputy Chief and head decision maker for OCWI.

14.    Defendant Dana Burden ("Burden") is an individual who resided in Maricopa County, Arizona, at all times relevant to the Complaint.  Burden was, at all times relevant to this Complaint, acting under the color of law as an employee of the State of Arizona with DCS.  He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Burden was employed by State of Arizona with DCS as the Deputy Chief of OCWI who is responsible for OCWI employees and investigators, and supervisor to Barboa and Garcia.

15.    Defendant Janet Cahill, Ph.D. ("Cahill") is an individual who resided in Minden, Neveda, at all times relevant to this Complaint.  At all times relevant, Cahill provided consulting services for DCS and was acting under the color of law.  She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

16.    Whenever in this Complaint reference is made to any act of "Defendants" such allegations shall be deemed to mean all named Defendants, John and Jane Does I-X and Black and White Entities I-X, or their officers, agents, managers, members, representative, employees, heirs, assignees, customers, tenants, and that they did or authorized such acts while actively engaged in the operation, management, direction, or control of the affairs of Defendants and while acting within the course and scope of their duties, expect as specifically alleged otherwise.

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

4

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

17.     At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiffs allege, upon information and belief, that each Defendant was and is the agent, employee, principal, employer, co-conspirator, or any combination thereof of each of the remaining defendants, vice versa, or both.  In addition, Plaintiffs allege, upon information and belief, that the Defendants named herein, and each of them, are responsible in some manner for the occurrences herein alleged, and that each of the above Defendants conspired with, directed, ratified, approved, aided, abetted, jointly collaborated, or any combination thereof, each of the remaining Defendants in committing the acts herein alleged or failed to prevent such acts when having the power, duty, or authority to do so with full knowledge of said acts.

18.     At all times relevant herein, Defendants John and Jane Does 1-10 were individuals who live in or have substantial ties to Maricopa County, Arizona, who, upon information and belief, helped to cause the injuries alleged herein. In particular, upon information and belief, these individuals participated in the conspiracy set forth below. The true names of John and Jane Does 1-10 are not presently known but will be provided to this Court as they are learned.

19.     At all times relevant herein, Defendants Black and White Entities 1-10 were corporations, partnerships, limited liability companies, or other organizations and entities who, upon information and belief, operate in and have substantial ties to Maricopa County, Arizona, and upon information and belief, helped to cause the injuries alleged herein.  In particular, upon information and belief, these individuals participated in the conspiracy set forth below.  The true names of Black and White Entities 1-10 are not presently known but will be provided to this Court as they are learned.

## FACTUAL ALLEGATIONS[2]

### A.     Jessica and her son, E.F.

---

[2] Plaintiffs make the allegations in this Complaint based upon personal knowledge as to those matters in which they had personal involvement and upon information and belief as to all other matters.

20.    The two plaintiffs in this matter are Jessica Fidler and her son, E.F., born in November of 2011.

21.    E.F. was conceived via intrauterine insemination using an anonymous sperm donor in March 2011. The procedure conducted in Israel.

22.    Jessica's pregnancy with E.F. was complicated, and E.F. was born three weeks early via C-Section at Rambam Hospital in Haifa, Israel.

23.    Jessica returned to the State of Michigan, where she raised E.F. She had an extended family network there who supported both Jessica and E.F.

24.    Jessica raised E.F. in her own personal faith, Judaism.

25.    In 2013, Jessica moved to Arizona for better employment opportunities and her extended network both in Arizona and Michigan.

26.    From birth, E.F. suffered from chronic health issues—most issues that could be objectively measured and observed. These issues included dizziness, labile body temperature, apnea (stopping to breathe), chronic fatigue, chronic constipation, fecal and urinary incontinence, and global developmental delays.

27.    By the time E.F. was four years old, doctors told Jessica that E.F. could have a variety of different diagnoses including congenital disorders, food allergies, cystic fibrosis, seizures, mitochondrial disorder, dysautonomia disorder, weakened immune system, and postural orthostatic tachycardia syndrome. Some of the treatments the doctors offered would lessen E.F.'s symptoms at times, none were curative.

28.    Although Jessica was very concerned for the health and well-being of her son, she sought the least amount of medical treatments possible, as it was her wish that E.F. would "just be a kid."

29.    All medical treatment and medications provided to E.F. were procedures and medicines prescribed by mainstream doctrines and providers. Jessica did not provide E.F. with treatments or medications not prescribed by doctors, nor did she seek medical treatment from nontraditional or unlicensed medical practitioners.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

6

30.    E.F. was frequently seen by doctors, and was even hospitalized on occasion when medically necessary, due to his chronic health issues. All decisions as to whether to admit E.F. to the hospital were made by the hospitals' treating physicians.

31.    In Arizona, E.F. also had a home-health nurse, a primary care physician, specialists, and an Arizona Department of Development Disabilities service provider, all of whom had regular and continuous access to E.F.

**B.    Doctors at Phoenix Children's Hospital treat E.F.**

32.    In August of 2016, doctors at Phoenix Children's Hospital ("PCH") placed a central line IV in E.F. Doctors would occasionally use IVs to facilitate administration of fluids and antibodies. After administering the IV, PCH doctors told Jessica to bring E.F. to a hospital if he ever ran a fever over 100.4 F, as any infection in the central line IV would be life-threatening.

33.    Because E.F. has a weakened immune system and temperature instability, he frequently ran a fever over 100.4 degrees Fahrenheit.

34.    Jessica followed the advice of the PCH doctors and sought medical treatment every time his documented temperature exceeded 100.4 degrees.

35.    E.F.'s home-health nurse documented the reasons why Jessica took E.F. to the doctor when she did. These home-health nurse medical records evidenced E.F.'s temperatures and any issues E.F. may have had with his GI tract, among other things.

36.    E.F.'s medical specialists specifically recommended that Jessica take E.F. to be seen by medical specialists in Cincinnati, Ohio and at the Stanford University Medical Center.

37.    In June of 2017, PCH doctors decided to admit E.F. to PCH following a visit to his pediatrician. While at PCH, E.F. (and Jessica), a PCH hospitalist concluded that "there was nothing wrong" with E.F.—an opinion that only this doctor had.

38.    In the summer of 2019, E.F.'s gastrointestinal woes continued. At the recommendation of PCH doctors, Jessica took E.F. to a specialist located in Cincinnati. The

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

7

Cincinnati specialist recommended that E.F. undergo a major surgical procedure, an ileostomy, a procedure that involves cutting a hole in the abdominal wall and leaving the hole open as a means of clearing the colon of waste.

39.    Other medical providers agreed with the Cincinnati specialist, but others at PCH disagreed. Ultimately, Jessica chose to have a less invasive procedure performed on E.F. rather than the ileostomy.

**C.    E.F. returns to PCH in January of 2020**

40.    In late January of 2020, Jessica brought E.F. to PCH because he was running a fever—doing just as she had been instructed by E.F.'s doctors. Tests at PCH concluded that E.F. did not have an infection.

41.    The same PCH hospitalist that had earlier concluded that there was nothing wrong with E.F. contacted the Department of Child Safety ("DCS") and suggested that Mother was overtreating E.F.

42.    During its subsequent investigation, DCS investigators did not interview E.F.'s primary care physician, who had monitored E.F. and his health for many years, or any of his other treating physicians.

43.    They did not interview E.F.'s service provider with the Arizona Division of Developmental Disabilities ("DDD"), a licensed nurse.

44.    They did not interview E.F.'s home health nurse.

**D.    The first dependency/severance proceeding**

45.    Nonetheless, on March 31, 2020, DCS filed a dependency petition and requested a temporary order for removal from the juvenile court.

46.    On April 3, 2020, the Department removed E.F. from the care and custody of his mother, Jessica.

47.    Despite the Department's claim that Jessica was "over treating" E.F., when the Department took custody of E.F. on April 3, 2020, Department employees not only took him to PCH, but kept him hospitalized for two weeks. In subsequent dependency

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

8

proceedings, a DCS investigator admitted that there was no medical reason for E.F. to be hospitalized in April 2020, let alone for two-weeks, other than for DCS to investigate the abuse allegations.

48.     Notwithstanding these other foster options of placement with his grandmother or with members of his own faith community, the Department placed E.F. with a non-Jewish foster family who had two prior DCS referrals.

49.     E.F.'s gastronomical issues returned in the care of placement. Specifically, E.F.'s bowel symptoms started to flare up and he began to soil himself, a symptom that had largely resolved after the hemi-colectomy performed at Banner in October 2019, and only re-occurred when Dr. Christensen removed all of E.F.'s medical treatments.

50.     Placement's own children bullied E.F. They denied E.F. food as a form of punishment. They did not allow E.F. to wear his prescription glasses.

51.     In May of 2020, the Department believed it had enough evidence to move to permanently sever the relationship between E.F. and the only caregiver he had ever known, Jessica.

52.     On August 19, 2020 and September 14, 2020, the juvenile court conducted two interim evidentiary hearings. By then, the Department had had many months to investigate its allegations. Nonetheless, after multiple doctors who had actually treated E.F. testified, the juvenile court questioned DCS about if there was any factual basis to support their petition. DCS had no good response. *See Partial Transcripts of Proceeding*, **Exhibit 1** hereto**.**

53.     Following these interim hearings, on October 16, 2020, Jessica filed a motion for summary judgment, noting that the Department had no evidence to support either the dependency or severance claims. A redacted version of this summary judgment motion is attached as **Exhibit 2**.

54.     The Department did not file a response to the motion.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

9

55.    Instead, at a November 3, 2020, pretrial conference, the Department orally moved to dismiss the proceedings against Mother. The trial court granted the motion, and E.F. was returned to his mother, Jessica.

**E.    The first civil rights action**

56.    Thereafter, in light of the paucity of any evidentiary basis to disrupt the relationship between E.F. and Jessica, they filed a civil rights and negligence complaint against Dr. Christiansen, other PCH providers, and the State of Arizona and relevant DCS employees on November 3, 2021. *See Fidler and E.F. v. State of Arizona, et al.*, Maricopa County Superior Court No. CV 2021-017147.

57.    The defendants in the first civil rights matter removed the matter to federal court. *See* CV-22-00300-PHX-ROS.

58.    Thereafter, the federal court dismissed Plaintiffs' complaint and entered a final judgment on April 3, 2023. The Ninth Circuit affirmed in a memorandum decision dated April 10, 2024.

**F.    E.F. returns home, and Jessica moves to a new residence for her protection.**

59.    Meanwhile, after E.F. was returned home, Jessica took steps to assist E.F. in his emotional recovery for the forcible separation from his mother and caregiver and the abuse at the hands of the foster placement family.

60.    After the prior foster mother began stalking Jessica and E.F., Jessica thereafter moved to a new residence and obtained a protected address through the Arizona Address Confidentiality Program.

**G.    DCS  begins a new investigation of Jessica regarding E.F.**

61.     On January 19, 2023, the Department of Child Safety purportedly received a new report about Jessica's care of E.F.

62.    DCS investigators, including Natacha Pavlina ("Pavlina") and Defendant Borboa, asserted that the new report related to Jessica's care of E.F. since the dismissal of

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

the prior dependency, but the focus of their "investigation" was on the events that occurred in 2020 and the period of the prior dependency.

63.    For example, on January 20, 2023, Pavlina and her manager/supervisor Defendant Garcia contacted the Gilbert Police Department Detective Halliday, reporting Jessica for child abuse; this report was based on *the same doctor's report* in January 2020, which resulted in E.F.'s wrongful removal at that time.

64.    Further, Pavlina, Defendants Garcia and Borboa provided only selected information to the Gilbert Police Department. They provided only the Gilbert Police Department with three selected documents: the Case Review, E.F.'s Psychiatric notes from when he was in foster care in 2020, and Jessica's psychological evaluation.   Further, they did not provide the Gilbert Police Department with the outcome of the prior case, that none of E.F.'s regular medical providers would support the Department's allegations, or that the Department did not interview any of these providers.

65.    Indeed, when the Gilbert Police Department requested medical records from January 1, 2021, to the present, Defendants Garcia and Borboa informed Detective Roman that the requests should have gone back to January 1, 2020.

66.    Although the Department clearly had Jessica's new home address, as evidenced by their January 20, 2023, visit, on January 24, 2023, they "officially" sought discovery of the address by filing a request with the Address Confidentiality Program, asserting that it was needed for an ongoing DCS and criminal investigation and, further, falsely claiming that E.F. was not receiving needed medical equipment delivered to the home and that Jessica refused to provide her address to medical providers.

67.    Further, Pavlina and Defendants Garcia and Borboa refused to meet with Jessica and/or her representatives, and refused to provide the factual basis for the new claims and investigation.

68.    For many months thereafter, Defendants did nothing, despite their legal obligation to investigate such claims promptly.

11

**H.    The DCS Defendants hire an out-of-state expert in an effort to resurrect the prior dismissed allegations.**

69.    Having found no current medical provider that would support the Defendants' contention that Jessica was overtreating E.F. or otherwise had FDIA, on September 26, 2023, Defendants Wangler, Burden and Garcia contacted an out-of-state, retired professor from Rowan University Department of Psychology, Defendant Janet Cahill, Ph.D.

70.    They asked her to find evidence of Factitious Disorder Imposed on Another ("FDIA").

71.    That same day, Dr. Cahill contacted  Defendants Wangler, Burden, and Garcia to discuss the medical records that she needed, particularly, she wanted examples of where Jessica appeared to deliberately fabricate, exaggerate, or induced symptoms in E.F., as well as instances she could characterized as doctor shopping by Jessica.

72.    Knowing that DCS had never corrected the errors in their records, Wangler and Burden instructed Garcia and Borbora to provide the erroneous records.

73.    On October 12, 2023,  Dr. Cahill reported to the State through DCS and its agent Borboa that her initial review of the medical records sent did not clearly support the allegation that Jessica was overtreating E.F.

74.    Defendants  Wangler, Burden and Garcia instructed Defendant Borboa to provide Dr. Cahill with more erroneous records including the 2020 CSRA previous investigation, DCS 2020 case notes, and cecostomy tube removal in 2020.

75.    Further, Defendant Borboa informed Dr. Cahill that when E.F. was initially removed and in foster care that he had no medical issues and was improving, although this was not correct.

76.    Defendants Wangler, Burden, Garcia and Borboa never provided the documentation showing that E.F. continued to have encopresis and nocturnal enuresis while in foster care; that is, records showing that E.F. was not improving. They continued to provide selective erroneous records to Cahill so that she would reach a diagnosis of FDIA.

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

12

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

77.     Despite the evident misrepresentations and omissions in the records that DCS provided to Dr. Cahill, on October 24, 2023, Cahill issued a report diagnosing Jessica as meeting the criteria for FDIA.

78.     Dr. Cahill's diagnosis of FDIA is forensically unreliable and there is no medical evidence to support her diagnosis. The only basis for Dr. Cahill's assertion that Jessica fabricated and exaggerated information are faulty assumptions fed to her by the State through DCS and its agents  Wangler, Burden, Garcia and Borboa.

79.     Dr. Cahill's statements in her report demonstrate the insufficient information that the Defendants provided to her. She states in her report that "[E.F.] was returned to his mother's care, she is not sure how that happened, but it is likely Ms. Fiddler appeared to change and E.F. was returned to her." As noted above, the Department simply provided no evidence of her FDIA and ultimately moved to dismiss the prior dependency.

80.     Upon receipt of Dr. Cahill's inaccurate report, Defendants Wangler, Burden and Garcia, upon information and belief, had a staffing and/or meeting and made the decision to remove E.F. based on Cahill's unreliable report.

**I.      The Unlawful Seizure and Removal of E.F.**

81.     On October 24, 2023, Defendants Wangler, Burden and Garcia instructed Defendant Borboa to file an *Application and Declaration for Ex-Parte Removal of Child* with respect to E.F.

82.     Upon information and belief, Defendant Garcia reviewed *the Application and Declaration for Ex-Parte Removal of Child*.

83.     At the direction of Wangler, Burden, Garcia, and Borboa claimed that based on Dr. Cahill's report and her conclusion that Jessica meets the criteria of FDIA, E.F. will continue to be exposed to countless unnecessary and harmful medical procedure if E.F. remains in Jessica's care.  If E.F. improves while in State's care, Cahill suggests that Jessica's parental rights be terminated.

13

84.    Borboa's sworn *Application and Declaration for Ex-Parte Removal of Child* to the court (*See* **Exhibit 3**), falsely stated that the following:

    a.  Cahill reviewed copious amounts of medical records pertaining to E.F.

    b.  Ms. Fidler exposed E.F. to an alarming number of medical and psychological diagnosis.

    c.  E.F. was removed from Ms. Fidler's care in 2020 and showed significant improvement in a short period of time.

    d.  E.F. asked to have his cecostomy tube removed and was fine thereafter.

    e.  E.F. was able to complete his tasks of daily living and did not show evidence of cognitive or mental health issues.

    f.  Once E.F. was returned to Ms. Fidler's care she insisted on having his cecostomy tube replaced without anesthesia causing E.F. to suffer immensely.

    g.  Ms. Fidler is obsessed with constipation and constantly flushing E.F.'s cecostomy tube and feeding him laxatives.

    h.  E.F. did not see a doctor for thirty (30) days when in foster care but now has numerous specialists to attend to many of E.F.'s fabricated conditions and diagnosis.

    i.  Dr. Cahill reported that Ms. Fidler is abusing E.F. and recommends E.F. be removed from Ms. Fidler's care for a period of 4-8 weeks with no contact; noting that if E.F. improved, this improvement would support the diagnosis of FDIA and  Cahill suggests that parental rights be terminated.

    j.  E.F. will continue to be exposed to countless unnecessary and harmful medical procedures if E.F. remains in Ms. Fidler's care.

85.    Defendants Wangler, Burden, Garcia and Borboa willfully chose not to speak with E.F.'s pediatrician, his surgeon, GI physician, the DDD regional Nurse or E.F.'s therapist or even Jessica prior to obtaining an *ex parte* judicial removal order.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

86.    Defendants Wangler, Burden, Garcia and Borboa failed to inform the court that E.F.'s cecostomy tube was replaced only after exhausting all other possible remedies, that the cecostomy tube was replaced in September 2021 under the direction and recommendation of E.F.'s surgeon, his GI doctor and since its reinsertion that E.F.'s condition has steadily improved.

87.    Defendants Wangler, Burden, Garcia and Borboa misled the court in obtaining the 2023 Ex-Parte Removal Order.

88.    That afternoon, on October 24, 2023, Defendants Wangler, Burden, Garcia and Borboa removed E.F. from his school and placed him in DCS' Welcome Center.

89.    The State through DCS and its agents Wangler, Burden, Garcia and Borboa removed a happy, thriving child from his mother by means of judicial deception, actively withholding information, and falsely claiming that the child needed to be removed due to eminent danger to his physical well-being.

**J.    DCS placed E.F. imminent danger while in its custody, due to its medication-related negligence**

90.    Within two days of taking custody of E.F., on October 26, 2023, Defendant Desiree Manrique dispensed to E.F. a cocktail of toxic medications, intended for another child at the Welcome Center, not E.F.

91.    These incorrect medications included 5 milligrams of Aripiprazole, 25 milligrams of Hydroxyzine, and 50 milligrams of Sertraline.

92.    DCS's medication policy provides that:

1.    Case aid is required to document time/dosage given on the medication log;

2.    Medication must be prepared in secure are without children present and administered to one child at a time in a controlled environment away from other children;

3.    Prior to administering medication must verbally identify child's name, verify name matches wristband, verify child's name matches

15

prescriptions and medication log, and verify time/dosage of medication; and

4.   A second witness must verify all of the foregoing conditions.

93.    The medications    5mg Aripiprazole, 25mg Hydrozyzine, and 50mg Setraline--were dispensed to E.F. in violation of these policies and procedures.

94.    DCS Welcome Center employees failed to notice the medical error for almost two hours when the female child who was supposed to receive the medication brought it to their attention that she had not received her medications.

95.    Instead of immediately taking E.F. to the emergency room the Welcome Center staff called poison control and waited.

96.    Sometime around 11:30 p.m., Welcome Center employee Alexandra Moreno-Banovich finally took E.F. to the Banner ER, using her personal vehicle and arriving sometime after midnight.

97.    While in the waiting room, E.F. became unresponsive.  At one point, his heart rate blood pressure dropped so low that his heart almost stopped beating.

98.    After being admitted to Banner and during transport to a room, E.F. became unresponsive again.

99.    Defendant Moreno-Banovich provided false information on how E.F. obtained the medication, stating that the medication was left on the counter and E.F. just took it on his own.

100.    Defendants Wangler, Burden, Garcia and Borboa prohibited E.F.'s mother from being with E.F. during treatment at the hospital.

101.    Defendant E.F. was alone in the hospital with an Aide – a total stranger – instead of his own mother.

102.    Defendants Wangler, Burden, Garcia and Borboa prohibited the Banner doctors from consulting with or advising Jessica about E.F.'s medical status or that he had almost died only to be revived by Banner doctors.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

16

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

**K.**   **Defendants again seek a dependency as to E.F.**

103.   After E.F. was released from the hospital, Defendants Wangler, Burden, Garcia and Borboa immediately placed E.F. with DCS' legend Group Home.

104.   The next day, on October 27, 2023, the Department filed a second Dependency Petition (see **Exhibit 4**), which contained unsubstantiated allegations and statements which the Defendants Borboa and Garcia provided and knew, or reasonable should have known, were false. Stating the following:

    a. When E.F. was removed from Jessica's care in 2020 his symptoms improved dramatically.

    b. E.F.'s medical interventions were decreased successfully.

    c. After returning to Jessica's care, his health care utilization has significantly increased.

    d. Relying on the 2020 forensic psychological evaluation, falsely alleged that Jessica continued to engage in Munchausen behaviors, such as:

        i. Inducing and/or fabrication and/or falsifying and/or exaggerating the child's symptoms; and

        ii. That Jessica acknowledged that her anxiety significantly contributed to the child receiving excessive medical care.

    e. Falsely alleging that the January 2023, hotline report indicated continued concerns that Jessica's behavior has led to excessive and/or unnecessary medical interventions for the child.

105.   Defendant Garcia verified the Dependency Petition as being true and accurate.

106.   The Department failed to inform the Court that E.F.'s cecostomy tube was replaced only after exhausting all other possible remedies, that the cecostomy tube was replaced in September 2021 under the direction and recommendation of E.F.'s surgeon, his

17

GI doctor and since its reinsertion that E.F.'s condition has somewhat improved but he continues to have issues.

107.    The Department failed to inform the court that E.F.'s medical interventions had not decreased successfully.

108.    The Department failed to inform the court that after stopping all his medical interventions, while he was in foster care, E.F.'s bowel symptoms started to flare up and he began to soil himself.  This symptom had largely resolved after the hemi-colectomy performed at Banner in October 2019, and only re-occurred after E.F.'s medical treatments were removed.

109.    The Department chose not to speak with E.F.'s pediatrician, his surgeon, the DDD regional Nurse or E.F.'s therapist but relied on Wangler, Burden, Garcia and Borboa's false narrative.

110.    On November 1, 2023, the Department filed DCS' *Motion to Suspend Visitation and Motion for Temporary Emergency Suspension of Visitation Pending Status Conference* ("Motion") based upon Defendant Cahill's report.

111.    Ironically, the Department failed to inform the court that while in DCS's care and custody just a few days before, that E.F. suffered a medical emergency because of DCS's negligence and nearly died.

112.    In a November 2, 2023, report, the Department updated its report and suggested that Jessica and E.F. himself were to blame for the medication issue.

113.    After his removal, E.F. was deprived of all contact with his mother, relatives, his doctors and therapist, his regular enrichment activities and his religious and cultural heritage.

**L.    DCS advises Jessica of its intent to substantiate a finding of abuse**

114.    On November 2, 2023, Defendant Borboa sent Jessica a letter titled "Notice of Proposed Substantiation of Child Safety Report."

18

115.    September 2023, both the Maricopa County Attorney's Office prosecutor and Gilbert Police Department did not substantiate a charge of abuse and found no credible evidence of abuse.

116.    The Department failed to follow the Maricopa County Joint Investigation protocol and policy.

**M.    Fourteen Days after E.F.'s Wrongful Removal, He is Returned to His Mother**

117.    Following a meeting with attorneys at the Arizona Attorney General's Office, on November 7, 2023, Defendants Wangler, Burden, and Garcia instructed Borboa to return E.F. to Jessica's custody.

118.    After being returned to his mother, E.F. had a well-visit with Ronald M. Serbin, M.D., who noted in his chart that after E.F.'s removal, he "had multiple email and phone conversations with Borboa expressing his concern that none of his present physicians caring for [E.F's] medical needs were contacted by the State or DCS in their evaluation, that [E.F.] was more at risk under DCS care as exhibited by his unintentional multi-medication overdose requiring him to be hospitalized, that DCS as a result of not contacting his medical team of physicians does not understand [E.F.'s] medical condition. . ."

119.    On December 13, 2023, E.F. was admitted to the hospital due to gastro-intestinal issues, a result of being denied his medications while under the care of the Department.

**N.    The State Moves to Dismiss the Second Dependency Petition**

120.    At a pre-hearing conference on January 11, 2024, the State moved to dismiss the dependency petition, admitting that the State could not meet its burden of proof that Jessica had medically abused E.F.

121.    The Court accepted the parties' stipulation that Jessica never has been diagnosed with FDIA.

122.    Defendants Wangler, Burden, Garcia and Borboa refused to close the case and instead wanted to have more follow-up with E.F.

19

123.    Upon information and belief, Defendants Wangler, Burden, Garcia and Borboa still have not corrected the material errors in its records.

124.    The Juvenile Court also ordered that the Department to turn over the hotline call records and reports..

125.    Jessica had to send numerous emails to the State through DCS, Protective Services Review Team ("PSRT"), calling PSRT, and filing a complaint with the Ombudsman's office to find out if the January 2023 allegations would be unsubstantiated and she would not be put on the abuse registry.

126.    On February 7, 2024, the Department sent a letter stating that the January 19, 2023 Intake No. IN10301578, is unsubstantiated and she will not be entered into the DCS Central Registry.

## CLAIMS FOR RELIEF

### Count One

### 42 U.S.C. § 1983 – Breach of Plaintiffs' First, Fourth and Fourteenth Amendment rights to familial association

### (Against Defendants Wangler, Burden, Garcia, Borboa, and Cahill)

127.    Plaintiffs re-allege incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

128.    Plaintiffs allege this claim against Defendants Wangler, Burden, Garcia, and Borboa.

129.    Defendants Wangler, Garcia, Burden and Garcia breached Plaintiffs' right to familial association under the First, Fourth, and Fourteenth Amendments by causing the forced separation of Jessica and E.F. and by denying Jessica her right to direct and/or participate in the medical care and, by extension, E.F.'s right to have his medical care directed by his mother or her presence during medical procedures.

130.    Defendants Wangler, Garcia, Burden and Garcia violated Plaintiffs' constitutional rights by:

a. Providing false, incorrect, and/or incomplete information to law enforcement agencies investigating abuse allegations against Jessica;

b. Providing false, incorrect, and/or incomplete information to the juvenile court;

c. Resurrecting allegations that had been disproven or rejected in a prior dependency proceeding;

d. Removing E.F. from the care and custody of Jessica; and

e. Preventing Jessica from participating in or directing the medical care of E.F., and E.F. from having the care and direction from his mother.

131.    Defendants Wangler, Burden, Garcia and Borboa failed to conduct a prompt and thorough investigation, as is required under A.R.S. §8-456(C)(1), before filing the dependency petition for E.F, which falsely alleged abuse and neglect based upon Cahill's unreliable report.   They failed to consider material, exculpatory facts which refuted the stated concerns in violation of the law and as required by A.R.S. §8-456(C)(1).

132.    At all relevant times when E.F. was seized and/or detained, Defendants Wangler, Burden, Garcia and Borboa did not have any information that established reasonable cause to believe that E.F. was in danger of serious bodily and there were no exigent circumstances, yet, they persisted in removing E.F. and keeping him from his only parent.

133.    The information initially provided to Dr. Cahill demonstrated that there was inadequate evidence to make a finding of FDIA. Even after Defendants Wangler, Burden, Garcia, and Borboa provided additional information, the evidence did not support a finding of FDIA.

134.    Upon information and belief, Dr. Cahill had learned from Defendants Wangler, Burden, Garcia, and Borboa that a finding of FDIA was necessary for the Department to remove custody of E.F. from Jessica.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

21

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

135.    As such, Dr. Cahill had a meeting of the minds with the DCS states actors to make such a diagnosis to facilitate E.F.'s removal and dependency proceedings, even though the actual medical evidence did not support such a finding.

136.    Each of the foregoing defendants was an integral participant in the investigation, wrongful seizure, and limitations on medical care as outlined herein.

137.    Defendants Wangler, Burden, Garcia, and Borboa violated Jessica's and E.F.'s constitutional rights to familial association.

138.    As a direct and proximate result of the violation of Jessica's and E.F.'s constitutional rights, Jessica and E.F. suffered irreparable harm and will continue to suffer general and special damages, in an amount not yest ascertained but which shall be shown according to proof at trial.

### Count 2

### Retaliation

### (Against Defendants Wangler, Burden, Garcia, and Borboa)

139.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

140.    Plaintiffs allege this claim against Defendants Wangler, Burden, Garcia, and Borboa.

141.    Defendants Wangler, Burden, Garcia, and Borboa committed the wrongful acts alleged herein, including their decision to resuscitate the allegations from the prior dependency, institute a new investigation based on the prior discredited allegations, provide incomplete or false information to other law enforcement officers or agencies, remove E.F. from Jessica, and prevent Jessica from directing or participating in E.F.'s medical care in retaliation for (1) her defense of the prior dependency, and (2) her filing of a civil rights complaint against the State of Arizona and various employees of the Department of Child Safety.

142.    These retaliatory measures were intended to not only deprive Plaintiffs of their First, Fourth, and Fourteenth Amendment right of familial association, but also to chill Plaintiff Jessica Fidler's First Amendment right to petition the courts.

143.    Each of the foregoing defendants was an integral participant in the retaliatory actions as outlined herein.

144.    As a result of the State through DCS and its agents Wangler, Burden, Garcia and Borboa's retaliatory actions, Plaintiffs suffered severe emotional distress, anxiety, depression, physical injury, and loss of familial association.

145.    As alleged herein, the State and State Defendants Wangler, Burden, Garcia and Borboa's retaliatory actions in depriving Plaintiffs of their constitutional rights were willful, wanton, malicious, and oppressive, and justify an award of exemplary and punitive damages, the precise amount of which will be proven at trial.

**Count Three**

**Abuse of Process**

**(As Against Defendants Wangler, Burden, Garcia and Borboa)**

146.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

147.    Plaintiffs allege this claim against Defendants Wangler, Burden, Garcia, and Borboa.

148.    Defendants Wangler, Burden, Garcia, and Borboa caused the judicial filings of the *Application and Declaration of Ex-Parte Removal of Child* on October 24, 2023, the second dependency petition, and the *Motion to Suspend Visitation and Motion for Temporary Emergency Suspension of Visitation Pending Status Conference* on November 1, 2023.

149.    Defendants Wangler, Burden, Garcia, and Borboa caused these judicial filings knowing that they lacked a factual basis. They caused the filings of these documents for the improper purpose of retaliating against Plaintiffs as set forth above.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

150.    As a direct and proximate result of Defendants Wangler, Burden, Garcia and Borboa's abuse of process, Plaintiff suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof of trial.

**Count Four**

**Negligence Per Se**

**(Against Defendants Wangler, Burden, Garcia, and Borboa)**

151.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

152.    Plaintiffs allege this claim against Defendants Wangler, Burden, Garcia, and Borboa.

153.    Arizona statutes require Department of Child Safety employees "to protect the legal and due process rights of children and families from the time of the initial contact through case closure," **A.R.S. § 8-456(A); see also A.R.S. § 8-802(D)(1)** (DCS workers have a "duty to protect the legal right of children and families form the time of the initial contact through treatment").

154.    Defendants Wagner, Burden, Garcia and Borboa, as investigators and child safety workers, did not protect the legals rights of E.F. or this family in violation of §§ 8-456(A) and 8-802(D)(1) when they failed to properly investigate whether the State through DCS should remove and detain E.F. in the State's custody; (2) forbade Jessica's visits with her son; (3) made representations to the court or that were provided to the court that were false and/or demonstrated a reckless disregard for the truth; and (4) conspired to violate Plaintiffs' constitutional rights.

155.    Arizona Revised Statutes section 8-456 sets forth the standards for a Department investigator, including that "an investigator shall do all of the following: … [m]ake a prompt and through investigation.  An investigation must evaluate and determine the nature, extent and cause of any condition created by the parents. . . that would tend to

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

24

support or refute the allegation that thee child is a victim of abuse or neglect." **A.R.S. § 8-456(C)(1).**

156.    Defendants Wagner, Burden, Garcia and Borboa, as investigators, sat on their investigation for ten months.

157.    Defendants Wagner, Burden, Garcia and Borboa, after learning that the Maricopa County Attorney's Office and the Gilbert Police Department found no evidence of abuse, sought nationwide for an expert who would assert that Jessica had FDIA, Dr. Cahill.

158.    Defendants Wagner, Burden, Garcia and Borboa failed to consider the significant information in their possession or easily obtained which refuted the allegations, including reports or even speaking with E.F.'s pediatrician, his surgeon, DDD Regional Nurse, or E.F.'s therapist.  This is in direct violation of A.R.S. § 8-456(C)(1) and is conclusive evidence of negligence under Arizona law.  *St. George*, 241 Ariz. at 166, 384 P.3d at 1246.

159.    As a direct and proximate result of Defendants' negligence *per se* arising from violation of Arizona Statutes, Plaintiffs have suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

**Count Five**

**Negligence And/Or Gross Negligence**

**(Against Defendants Wangler, Burden, Garcia,  and Borboa)**

160.     Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as through fully set forth herein.

161.    Plaintiffs allege this claim against Defendants Wangler, Burden, Garcia, and Borboa.

162.    Wangler, Burden, Garcia, Borboa and Lujan, each of them, acted with negligence and gross negligence and breached their duty to protect the legal rights of

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

Plaintiffs by (1) failing to complete a prompt and through investigation, (2) seeking to create favorable evidence, rather than evaluating the existing evidence, (3) resurrecting old and discredited claims against Jessica, (4) separating E.F. from his mother for a second significant period of time, and (5) separating E.F. from his mother at a time of medical crisis.

163.    As a direct and proximate result of Wangler's, Burden's, Garcia's, and Borboa's breaches of their duty of care, Plaintiffs suffered irreparable harm and will continue to suffer, general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

### Count Six

### Negligence And/Or Gross Negligence
### (Against Defendant State of Arizona)

164.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraph as through fully set forth herein.

165.    The State negligently placed E.F. in the Welcome Center to his detriment.

166.    On October 26, 2023, DCS Welcome Center employee Manrique dispensed to E.F. a cocktail of toxic medications, *i.e.* 5mg Aripiprazole, 25mg Hydroxyzine and 50mg Sertraline.  These medications were not E.F.'s and belonged to another patient.

167.    The 5 mg Aripiprazole, 25 mg Hydrozyzine, and 50 mg Setraline were negligently dispensed to E.F. in violation of the State and DCS' own medication policy as set for in paragraph 128 above.

168.    Manrique failed to recognize that she gave the wrong medication to E.F.

169.    The State failed to notice the medical error for almost two hours when the female child who was supposed to receive the medication brought it to their attention that she had not received her medication.

170.    The State through  the Welcome Center staff called poison control.

171.    Due to the negligent actions of the State E.F. had to be hospitalized after becoming unresponsive two times.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

26

172.    The above-mentioned incident was caused by the careless, negligent and unlawful acts and/or omission of the State and Defendant Manrique.

173.    As a direct and proximate result of the State and Manrique's negligence, E.F. suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

**Count Seven**

**Intentional Inflection Of Emotional Distress**

**(Against All Defendants)**

174.    Plaintiff re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

175.     This claim is asserted against all Defendants.

176.    The actions of the Defendants in removing E.F. from his sole caretaker and mother for a second time, while he was still recovering from the trauma of the first forced separation from his mother, was extreme and outrageous, when there was no factual foundation or basis for this removal, and any purported evidence to support the removal—the report of Dr. Cahill—was essentially manufactured.

177.    The Defendants acted with either intent to cause emotional distress or recklessly disregarded the near certainty that such distress would result from their conduct when they wrongfully removed E.F. and prohibited Jessica from having any visits with E.F.

178.    Defendants' conduct alleged above caused Plaintiffs severe emotional distress.

179.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

27

**Count Eight**

**Aiding and Abetting Tortious Conduct**

**(Against Defendant Cahill)**

180.    Plaintiff re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

181.    This claim is asserted against Defendant Cahill.

182.    The State of Arizona and the DCS Defendants committed various torts against Plaintiffs resulting is E.F.'s wrongful removal, as alleged herein.

183.    Defendant Cahil knew that the removal of E.F. was wrongful.

184.    She substantially assisted or encouraged the DCS Defendants' tortious conduct by preparing a report purporting to "substantiate" FDIA, despite the lack of any meaningful or reliable medical evidence supporting such a diagnosis.

185.    As a direct and proximate result of Defendant Cahill's conduct, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A. General damages and special damages according to proof including, but not limited to economic losses, medical costs, hedonic damages, psychological trauma, and emotional distress;

B. For taxable cost and pre- and post-judgment interest to the extent permitted by law;

C. For punitive and/or exemplary damages to extent permitted by law and in an amount appropriate to punish the wrongful conduct alleged herein and to deter such conduct in the future;

D. For attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1998 and state law, as applicable; and

E.  For such other relief as the Court deems just and proper under the circumstances.

**RESPECTFULLY SUBMITTED** this 15th day of January, 2025.

**MILLS + WOODS LAW PLLC**

By */s/ Thomas A. Connelly*
Thomas A. Connelly
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014

**GILLESPIE, SHIELDS, & TAYLOR**

DeeAn Gillespie Strub
Jenny D. Jansch
7319 North 16th Street
Phoenix, AZ 85020

*Attorneys for Plaintiffs*

# EXHIBIT 1

1           THE COURT:  Ms. Gillespie, I have a couple

2    of questions I need to ask and then you can resume,

3    but --

4           MS. GILLESPIE-STRUB:  Okay.  Thank you,

5    Judge.

6           THE COURT:  Ma'am, I just -- I said I want

7    enlist form (phonetic) from you.  The verified

8    petition says, "Medical professionals are concerned of

9    others subjecting the child to medical abuse."  I know

10   Dr. Christensen said that.  Is there any other medical

11   care provider that you're aware of that expressed

12   concerns that mother is subjecting the child to

13   medical abuse of Dr. Christensen?

14          THE WITNESS:  None, Your Honor.  Only

15   Christensen.  Dr. Schroeder did indicate that she did

16   see no more need for any of this and more than

17   anything was just the concern of what the past was,

18   but she did on -- when she testified, that she

19   indicated that ███████ is doing great, so

20   (indiscernible).

21          UNIDENTIFIED FEMALE SPEAKER:  From child

22   abuse.

23          THE COURT:  Okay.  What --

24          UNIDENTIFIED FEMALE SPEAKER:

25   (Indiscernible) Christensen.

```
 1          THE COURT:  Okay.  So I don't know who is
 2    speaking.  I think it's perhaps Ms. Fidler but again,
 3    I can hear you.  Please stop.
 4          MS. GILLESPIE-STRUB:  It was not us, Your
 5    Honor.  It was not us.  I'm on mute.
 6          THE COURT:  Okay.  Well, if somebody else is
 7    observing, then I will certainly expel you from this
 8    proceeding.  Stop that.
 9          All right.  Ma'am, specifically the verified
10    petition states, she meaning mom, has sought medical
11    testing and procedures performed on the child despite
12    multiple medical professionals determining that they
13    were unnecessary.  Tell me exactly the medical testing
14    that she has sought and who determined it was
15    unnecessary.
16          THE WITNESS:  One of the examples, Your
17    Honor, was the one from January 2020 wherein she went
18    to PCH with ███████ indicating that he had fever and
19    asked for additional tests and assessment, and after
20    denied, you know, she became not upset, but, you know,
21    it was what everybody testified on a minute ago.
22          THE COURT:  Okay.  So the one incident that
23    you're referring to is the fever incident; is that
24    correct?  Is there any other --
25          THE WITNESS:  The one I can think of right
```

1    now.  The one I can think of right now at this moment,

2    yes, Your Honor.

3              THE COURT:  Okay.  So she thinks she says

4    there was a fever.  By the time she gets to the

5    hospital, there isn't a fever and that's what you're

6    talking about.  Okay, any -- and then what procedures

7    has she sought despite multiple medical professionals

8    determining they were unnecessary?

9              THE WITNESS:  At the moment when I wrote my

10   report, it was on the medical records and the initial

11   record review that was completed indicated that PCH

12   was not in agreement with the procedure, and that's

13   when she went to Banner in order to have the procedure

14   completed for ███████

15             THE COURT:  Okay.  And then we just heard

16   the testimony from a doctor that that was something

17   that that Dr. Huliman, I believe it was, perhaps it

18   was the other doctor, recommended that she see Dr.

19   Acosta, right?

20             THE WITNESS:  Correct.  Yes, Your Honor.

21             THE COURT:  Okay.  So has there been any

22   healthcare provider that you're aware of that

23   suggested that that, the October surgery, was

24   unnecessary?

25             THE WITNESS:  Not to my knowledge right now.

1    I'm sorry.

2              THE COURT:  Okay.  All right.  I know there

3    is the -- I'm looking at the next line of the

4    dependency petition, page 7.  Mother has reported that

5    the symptoms and behaviors that are -- have reported

6    symptoms and behaviors that are inconsistent with

7    medical observation.  What specifically, aside from

8    the fever, are you talking -- are you referring to?

9              THE WITNESS:  I'm not too sure from on page

10   -- you are, Your honor.  I only have two pages.

11             THE COURT:  And is the dependency petition,

12   I believe that it's verified by Ms. Burns but are you

13   aware of any symptoms that are reported that are

14   inconsistent with medical observation?

15             THE WITNESS:  The only thing I am aware of

16   is one of some of ███████ allergic reactions, so what

17   he believes to be allergic to like red iodine, the red

18   food coloring that we were clear that that is not

19   something that he's allergic to but no, Your Honor.  I

20   cannot think of anything else.

21             THE COURT:  Okay.  And was that a basis of a

22   removal?

23             THE WITNESS:  I apologize.  No.

24             THE COURT:  Okay.  What information has

25   mother provided in the medical history that is

1    inconsistent with the medical record?  Can you

2    identify everything for me?

3              THE WITNESS:  No, Your Honor.  I would not

4    be able to identify everything for you.

5              THE COURT:  Anything?

6              THE WITNESS:  I mean, one of the situations

7    was the procedure that was done by Dr. Acosta that,

8    you know, the Department believed, it was not

9    recommended.  And now after the trial, we see that --

10   I apologize -- the doctor that testified a minute ago

11   did complete the referral.

12             THE COURT:  Okay.  And so that brings us to

13   the next line of the dependency petition that says,

14   "In particular, mother sought having an ileostomy

15   surgery performed on the child despite multiple

16   professionals determining that the procedure was

17   unnecessary."  And I think you've just testified --

18   please, correct me if I'm wrong, every doctor has

19   believed it has been necessary, correct?

20             THE WITNESS:  Correct, Your Honor.

21             THE COURT:  Ma'am?

22             THE WITNESS:  Correct, Your Honor.

23             Your Honor?

24             THE COURT:  Yes.

25             THE WITNESS:  Oh, I apologize.

```
 1              THE COURT:  Okay.  So largely at this point
 2    in time, the incident involving the fever back in
 3    January where mom took the kid in the fever and -- or
 4    took the kid to the ER and the kid maybe had a fever
 5    that resolved or maybe didn't have a fever and she's
 6    making it up.  At this point in time, is that the
 7    basis of this case or is there anything else?
 8              THE WITNESS:  I mean, it was the continuous
 9    medical appointments that the Department was able to
10    find, you know, about 500 and so medical visits of
11    ██████  and mom's to the doctor including Emergency
12    Room.
13              THE COURT:  Okay.  But which one of those
14    were not warranted and throughout the child's several
15    years.  I mean, we agreed that he had some medical
16    issues, right, and developmental issues.
17              THE WITNESS:  Yes, Your Honor.
18              THE COURT:  Okay.  So of those 500 that you
19    have counted up, other than the number, was there any
20    particular visit that you believed to have been
21    exaggerated other than the fever incident?
22              THE WITNESS:  Not at the moment, Your Honor.
23              THE COURT:  Okay.
24              Ms. Strub, anything else from you?
25              MS. GILLESPIE:  No, thank you, Your Honor.
```

1                    THE COURT:  Okay.  Ms. Boddington, any

2        redirect?

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

**GILLESPIE SHIELDS GOLDFARB & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
Email: mailroom@gillaw.com

**DeeAn Gillespie Strub, Esq.**
*Attorneys for Mother, Jessica Fidler*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

### IN AND FOR THE COUNTY OF MARICOPA

In Re the Matter of:

█████████

DOB: ██████

Person(s) under 18 years of age.

Case No. JD533286

**MOTHER'S MOTION FOR SUMMARY JUDGMENT**

Assigned to:
*The Honorable Kristin Culbertson*

Pursuant to Ariz. Juv. Ct. Rule of Proc. 46(D), Mother, JESSICA FIDLER ("Mother"), moves for summary judgement of that portion of the Dependency Petition ("the Petition") filed by the Department of Child Safety ("DCS") on March 31, 2020, which asks that this Court to find █████ F████ ("█████ dependent as to her. There are no genuine issues of material fact and, as a matter of law, DCS cannot satisfy its burden to prove that █████ is dependent as to Mother. Mother's Statement of Facts (MSOF) in support of this motion is filed concurrently with this motion. *See* Ariz. R. Civ. P. 56(c)(3)(B) and is incorporated herein by reference.

Mother requests to be heard on this motion at oral argument. This Motion is supported by the following Memorandum of Points and Authorities.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 • Fax (Mesa): (480) 985-7552

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   DCS' ALLEGATIONS OF DEPENDENCY ARE NOT SUPPORTED BY CREDIBLE MATERIAL FACTS

In proving dependency, DCS is limited to the allegations contained in the petition. *See* Carolina H. v. ADES, 232 Ariz. 569, 571 ¶ 11 (App. 2013). In light of this well-established law, the undisputed material facts of this matter support the Court granting summary judgment on the issue of dependency. Over the course of the three days of the recent hearing, the Court heard from numerous medical professionals not only that ███ questioned hemi-colectomy surgery was medically recommended and beneficial, but that they had no concerns that Mother was subjecting ███ to over-medicalization.

At the recent September 14, 2020 hearing, this Court correctly questioned Marisol Manjarrez, the current DCS caseworker, as to what evidence supported the numerous allegations in the dependency petition. Caseworker Manjarrez conceded that as to each of the allegations in the dependency petition about which this Court questioned her, there was no actual evidence to support the same, aside from Mother taking the child to the hospital in January 2020 due to a fever, plus ███ overall number of hospital visits. ███ is a child with an indisputably complex medical history. *See* **MSOF No. 8(M), 17, 65.**

None of ███ treating doctors have indicated that the child has been over-medicalized, or that any of the child's numerous hospital visits were unwarranted. ███ medical professionals include his pediatrician Dr. Hurliman, his immunologist, Dr. Bauer, the GI specialist Dr. Schroeder, the geneticist Dr. Grebe, the mitochondrial specialist Dr. Frye, the surgeon Dr. Acosta, the cardiologist Dr. Alhadheri, and the interim head of psychology, Dr. Carlson.

Dr. Hurliman unequivocally testified he never observed Mother to push for any unnecessary medical treatments. *See* **MSOF No. 8(A).** The DDD nurse supervisor, Sonya

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

Rodriguez, who oversaw ▮▮▮ medical care for an extended period of time, indicated that while ▮▮ was put on the excessive hospital visit list for 2017, he was not on the list for 2018 or 2019. *See* **MSOF No. 3(U)**. 2017 was a medically trying year for ▮▮ *See* **MSOF Nos. 3(A), 3(U), 55-59, 71 and 72**. The home health nurse, Leslie Barrett, who saw the child on an almost-daily basis, stated that she saw the same symptoms which Mother reported to the medical professionals. *See* **MSOF No. 4(V) and 5(O)**. Dr. Hurliman and both Nurses Rodriguez and Barrett testified they had no concerns that Mother ever subjected ▮▮ to over-medicalization, and that ▮▮ is safe and happy in her care. *See* **MSOF No. 4(Q), 4(T), 6(C), 6(E), 8(A), 8(B) and 8(M)**.

The following are the Court's instructive questions to DCS as stated at the September 14, 2020 hearing:

THE COURT: ...The verified petition says, "Medical professionals are concerned of others subjecting the child to medical abuse." I know Dr. Christensen said that. Is there any other medical care provider that you're aware of that expressed concerns that mother is subjecting the child to medical abuse of Dr. Christensen?

THE WITNESS: None, Your Honor. Only Christensen...

THE COURT: All right. Ma'am, specifically the verified petition states, she meaning mom, has sought medical testing and procedures performed on the child despite multiple medical professionals determining that they were unnecessary. Tell me exactly the medical testing that she has sought and who determined it was unnecessary.

THE WITNESS: One of the examples, Your Honor, was the one from January 2020 wherein she went to PCH with ▮▮ indicating that he had fever and asked for additional tests and assessment, and after denied, you know, she became not upset, but, you know, it was what everybody testified on a minute ago.

THE COURT: Okay. So the one incident that you're referring to is the fever incident; is that correct? Is there any other--

THE WITNESS: The one I can think of right now. The one I can think of right

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 • Fax (Mesa): (480) 985-7552

now at this moment, yes, Your Honor.

THE COURT: Okay. So she thinks she says there was a fever. By the time she gets to the hospital, there isn't a fever and that's what you're talking about. Okay, any -- and then what procedures has she sought despite multiple medical professionals determining they were unnecessary?

THE WITNESS: At the moment when I wrote my report, it was on the medical records and the initial record review that was completed indicated that PCH was not in agreement with the procedure, and that's when she went to Banner in order to have the procedure completed for ▇▇▇▇▇

THE COURT: Okay. And then we just heard the testimony from a doctor that that was something that that Dr. Hurliman, I believe it was, perhaps it was the other doctor, recommended that she see Dr. Acosta, right?

THE WITNESS: Correct. Yes, Your Honor.

THE COURT: Okay. So has there been any healthcare provider that you're aware of that suggested that that, the October surgery, was unnecessary?

THE WITNESS: Not to my knowledge right now. I'm sorry.

THE COURT: Okay. All right. I know there is the -- I'm looking at the next line of the dependency petition, page 7. Mother has reported that the symptoms and behaviors that are -- have reported symptoms and behaviors that are inconsistent with medical observation. What specifically, aside from the fever, are you talking -- are you referring to?

THE WITNESS: I'm not too sure from on page--you are, Your honor. I only have two pages.

THE COURT: And is the dependency petition, I believe that it's verified by Ms. Burns but are you aware of any symptoms that are reported that are inconsistent with medical observation?

THE WITNESS: The only thing I am aware of is one of some of ▇▇▇▇▇ allergic reactions, so what he believes to be allergic to like red iodine, the red food coloring that we were clear that that is not something that he's allergic to but no, Your Honor. I cannot think of anything else.

THE COURT: Okay. And was that a basis of a removal?

THE WITNESS: I apologize. No.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

THE COURT: Okay. What information has mother provided in the medical history that is inconsistent with the medical record? Can you identify everything for me?

THE WITNESS: No, Your Honor. I would not be able to identify everything for you.

THE COURT: Anything?

THE WITNESS: I mean, one of the situations was the procedure that was done by Dr. Acosta that, you know, the Department believed, it was not recommended. And now after the trial, we see that--I apologize--the doctor that testified a minute ago did complete the referral.

THE COURT: Okay. And so that brings us to the next line of the dependency petition that says, "In particular, mother sought having an ileostomy surgery performed on the child despite multiple professionals determining that the procedure was unnecessary." And I think you've just testified--please, correct me if I'm wrong, every doctor has believed it has been necessary, correct?

THE WITNESS: Correct, Your Honor.

THE COURT: Ma'am?

THE WITNESS: Correct, Your Honor, Your Honor?

THE COURT: Yes.

THE WITNESS: Oh, I apologize.

THE COURT: Okay. So largely at this point in time, the incident involving the fever back in January where mom took the kid in the fever and--or took the kid to the ER and the kid maybe had a fever that resolved or maybe didn't have a fever and she's making it up. At this point in time, is that the basis of this case or is there anything else?

THE WITNESS: I mean, it was the continuous medical appointments that the Department was able to find, you know, about 500 and so medical visits of ▇▇▇▇▇ and mom's to the doctor including Emergency Room.

THE COURT: Okay. But which one of those were not warranted and throughout the child's several years, I mean, we agreed that he had some medical issues, right, and developmental issues.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1830 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax: (602) 870-9783
Telephone (Mesa) (480)-985-4000 • Fax (Mesa)' (480) 985-7552

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. So of those 500 that you have counted up, other than the number, was there any particular visit that you believed to have been exaggerated other than the fever incident?

THE WITNESS: Not at the moment, Your Honor.

THE COURT: Okay.

## II.    FACTUAL BACKGROUND

On January 20, 2020, Mother took █████ to PCH because he had had an elevated fever at home.[1] *See* **MSOF No. 2**. On January 29, Dr. Bo Borch-Christensen called DCS.[2] The CSRA intake information (based on Dr. Christensen's call) contains glaring and prejudicial inaccuracies, including among other things, that Mother insisted on an unnecessary and harmful surgery for her son and "doctor-shopped." The inaccurate and prejudicial information in the CSRA, when coupled with DCS' botched investigation, led to █████ being unnecessarily removed from his Mother and hospitalized in early April 2020. █████ was healthy when he was hospitalized. *See* **MSOF Nos. 5(I) and 7(B)**. The only basis for his hospitalization was for observation, to remove the IV fluids prescribed by Dr. Alhadheri, and take him off the regime of supplements prescribed by Dr. Frye that

[1] The child's fever had subsided by the time he arrived at the hospital due to Mother following Dr. Alhadheri's protocol for providing an IV bolus. Mother nevertheless insisted on a blood culture because the child had a central line, which causes a persistent danger of infection. In May 2019, a similar situation occurred when █████ had a temperature at home, necessitating a trip to the ER. His temperature had dropped by the time he reached the hospital just as it had in this instance. At that time, a subsequent blood culture revealed Eliron had an infection. Mother was understandably concerned that the possibility of an infection should be ruled out and reasonably insisted a blood culture be taken. Dr. Hurliman affirmed that blood cultures should be taken if the child presents with a fever. *See* **MSOF No. 8(C)**.

[2] Dr. Christensen is a hospitalist at PCH who admittedly only treated █████ on one occasion in 2017 until he called DCS in 2020. Thereafter, he worked closely with the initial caseworker Lisa Burns and orchestrated the child's hospitalization at PCH on April 3, 2020. *See* **MSOF No. 6(C), 6(G) and 7(A)**. Shortly after his interaction with █████ and Mother in 2017, Mother filed a grievance with PCH against Dr. Christensen regarding his abrupt and inappropriate disparaging of the child's other treating professionals in his conversations with Mother.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ◆ Fax (Mesa): (480) 985-7552

were associated with his mitochondrial disorder. While hospitalized, the cecostomy flushes were discontinued, but ▮▮▮ remained on Miralax for constipation.

During Eliron's April 2020 hospitalization, DCS only accelerated what Mother and the child's treating professionals had already planned and anticipated.[3] The IVIG was scheduled to be tapered and discontinued in the Spring of 2020.[4] Mother had questioned both geneticist Dr. Grebe and pediatrician Dr. Hurliman as to whether ▮▮▮ needed Dr. Frye's recommended supplements, but followed their advice to heed Dr. Frye's recommendation.

Finally, Dr. Acosta's remedial hemicolectomy surgery provided ▮▮▮ significant relief from his previous bowel issues (*See* **MSOF No. 4(BB) and 5(E)**), and the child was well on his way to the greater sense of GI regulation that occurred during the April hospitalization.[5] It was not necessary to remove ▮▮▮ from his Mother to accomplish the

---

[3] Mother followed medical advice as her child's symptoms fluctuated. She worked closely with ▮▮▮ medical team in their efforts to unravel the tangled web of ▮▮▮ complex medical needs. Mother sought for a responsible tapering of medical interventions, which has now occurred.

[4]       Home health nurse Leslie Barrett testified as follows:

     Q     Okay. As it relates to the Broviac and the fluids, was it mother's hope that that too can be eliminated overtime?
     A     Yes.
     Q     In fact, in the spring of 2020, did you accompany mother to an appointment with Dr. -- the immunologist doctor, Bauer to discuss lessening the frequency of the IVIg fluids he was receiving?
     A     Yes, (indiscernible).
     Q     Was there a plan set forth in 2019 that it was a hope as Eliron grew and mature that the Broviac could eventually be removed?
     A     Yes, there was a hope of planning.
     Q     And was mother in concurrent with that?
     A     Yes.

See MSOF No.

[5] Early in his life, ▮▮▮ was diagnosed with a troubling redundant colon. PCH, which is a primarily a teaching hospital, did not recognize this critical condition. See MSOF No. 10 and 42. ▮▮▮ suffered for years until Dr. Acosta at Banner requested the barium enema that definitively identified the source of much ▮▮▮ GI distress. See MSOF No. 23.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax (602) 870-9783
Telephone (Mesa): (480)-985-4000 • Fax (Mesa) (480) 985-7552

reduction of ▇▇▇ interventions. *See* **MSOF No. 2**. Lisa Burns testified that Mother consented to the removal of the Broviac, the supplements, and the eventual removal of the cecostomy tube. *See* **MSOF Nos. 3(E), 5(H), 7(H) and 82.**

Dr. Christensen, in concert with DCS, orchestrated ▇▇▇ unnecessary removal from his Mother on the day of the initial TDM so ▇▇▇ could be promptly hospitalized. This was DCS' attempt to support Dr. Christensen's (and then Drue Kaplan Siekmann's)[6] "concerns" that Mother over-medicalized her son. Dr. Christensen still labored under the false belief that Mother caused her son to be subjected to an unnecessary surgery. *See* **SMOF No. 7(F) and 7(G)**. DCS' woefully inadequate investigation (*see* **MSOF Nos. 6(C), 6(F), 6(G) and 6(H)**), in contravention of the statutory mandate to perform a *thorough investigation* per ARS § 8-456(C)(1), irresponsibly compounded the initial errors. DCS simply stepped up in a joint effort with Dr. Kathryn Coffman of PCH's child-protective team to validate Dr. Christensen's uninformed and biased "concerns."

DCS is mandated by statute to perform a thorough investigation. However, DCS failed to do any of the following, all of which should have been part of a thorough investigation in a complex matter such as this one, and which would have brought to light information leading to the referral being closed as unsubstantiated:

1.     DCS failed to return calls to DDD and get information from supervising nurse Sonya Rodriguez, who had critical information specifically rebutting Dr. Christensen's concerns.

---

[6] Ms. Kaplan Siekmann's report is as unreliable and uninformed as Dr. Christensen's report. It carries over gross fundamental error. She is not a medical provider, nor was she provided with all available and relevant documents. She cherry-picked information that would conform with pre-conceived erroneous notions. Exhibit 40, 569: "I don't believe that I've reviewed those [home health nurse documentation]. Exhibit 40, 570: "It [home health nurse documentation] would definitely be helpful in confirming information reported by mother to doctors at the hospital." Exhibit 40, 575: "They [Dr. Hurliman's records] were not part of my initial review." Exhibit 40, 568: "I would like to see specifically where that said that, but I'm not really sure because I'm not a medical doctor."

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 • Fax (Mesa): (480) 985-7552

2.    DCS failed to communicate with or reach out to ████ long-time treating pediatrician, Dr. Hurliman, who was very involved in coordinating all of the specialists who treated ████ Dr. Hurliman would also have rebutted Dr. Christensen's concerns and clarified his factual inaccuracies, for example, that Mother was "doctor-shopping" and seeking for unnecessary procedures and surgeries, and that no PCH doctors recommended an ileostomy as a form of relief for ████

3.    DCS failed to speak with Dr. Bauer, who would have verified there was a plan in place to taper ████ off his fluids by the spring of 2020 and that in general, many children with immune issues did much better after the COVID lockdowns.

4.    DCS failed to speak with ████'s cardiologist Dr. Alhadheri, who also would have rebutted Dr. Christensen's concerns that Mother was seeking unnecessary treatments and interventions. Dr. Alhadheri would have clarified that 2017 was an especially difficult year for ████ medically. He would verify that during 2017, it was discovered that guanfacine, an ADHD medication, was causing unintended side effects mirroring POTS and causing great difficulty for ████

5.    DCS failed to contact Dr. Frye, who would verify the tests he ordered for ████ were of his own accord and not pushed by Mother. The mito cocktail supplements he prescribed for ████ were not pushed by Mother but were a result of Dr. Frye's impressions ████ coupled with the child's test results.

6.    DCS failed to communicate with Dr. Grebe, ████ geneticist, who would have verified Mother was hesitant to put ████ on the mito cocktail recommended by Dr. Frye and sought Dr. Grebe's opinion. Mother thereafter

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa) (480) 985-7552

followed Dr. Grebe's opinion that she simply follow Dr. Frye's recommendations.

7.    DCS failed to speak with ▮▮▮ GI specialist, Dr. Schroeder, who would have rebutted Dr. Christiansen's claims that Mother was "doctor-shopping," that no medical professional recommended an ileostomy, and that the hemi-colectomy ultimately performed by Dr. Acosta was not warranted or beneficial.

8.    DCS failed to discuss with Mother the fact that Dr. Christensen only saw the child once in summer 2017, and that she filed a complaint with PCH against Dr. Christensen because of his unprofessional and unfair criticism of Drs. Alhadheri and Bauer, e.g. calling Dr. Bauer a "quack."

Instead of doing any of the above, DCS relied solely on Dr. Christensen, who sought to bolster his position by involving his colleague, Dr. Coffman, who fell prey to Dr. Christensen's biased, inaccurate and uninformed impressions.

In her medical note electronically signed on April 16, 2020, after DCS' involvement, Dr. Coffman claimed that she was "peripherally following this case *at the request of Dr. Borch-Christensen* because of concern about possible medical child abuse" (emphasis added). She acknowledged that ▮▮▮ is "a seven-year-old boy with a complex medical history who has been a patient at PCH since 2013 and carries multiple diagnoses including ADHD, developmental delay, dysautonomia, seizures, hypogammaglobinemia, GERD, constipation, GI dysmotility, asthma, allergic rhinitis, recurrent sinusitis, postural orthostatic tachycardia syndrome (POTS), mitochondrial disorder, recurrent fevers, and skin eruptions." She goes on to say that over the course of ▮▮▮ 524 visits to PCH over a seven-year period, *"concern about over-medicalization has arisen"* (emphasis added). She does not reference any doctor besides Dr. Borch-Christensen and his associate, Dr.

10

Kovacik, neither of whom are ▓▓▓▓ treating specialists. She simply parrots Dr. Christensen's narrative *without firsthand knowledge or specifics*, as follows: "Many of the diagnoses he carries are not supported by the results of medical evaluation, and there is a concern that there is misrepresentation of some of his symptoms by his Mother, as well as demands by her for more and more testing and procedures."[7] *See* **MSOF No. 83**.

Dr. Coffman negligently misstated that ▓▓▓▓ was on Atenolol for presumed POTS. Her statement is inaccurate. *See* **MSOF No. 4(B) and 83**. Dr. Alhadheri prescribed ▓▓▓▓ Atenolol in March 2020, not for POTS, but for exaggerated sinus tachycardia after test results revealed said condition. Had she done a careful medical review, Dr. Coffman would have seen that the issue of possible POTS was resolved back in 2017 when the child was taken off Guanfacine. Unfortunately, she simply took her colleague, Dr. Christensen, at his word.

Dr. Coffman points to no specific procedure or testing Mother has requested that was not recommended by a medical professional. Dr. Coffman was unable to do so because there are none. In fact, Dr. Coffman egregiously misstates part ▓▓▓▓ surgical history. She claims "a cecostomy… was placed at Banner for reported constipation and motility problems. This was done despite an eval at Cincinnati Children's Motility Center in 2018 that revealed no primary colonic motility issues." *See* **MSOF No. 83**. If she had carefully reviewed her own PCH records rather than simply relying on Dr. Christensen's misapprehensions, Dr. Coffman would have verified that ▓▓▓▓ cecostomy was put in place back in 2016 at PCH by its own surgeon, Dr. Notrica. Further, a careful review of ▓▓▓▓ medical records would have informed Dr. Coffman that the surgery ▓▓▓▓

---

[7] DCS' completion of a *thorough* investigation, as noted above, would have uncovered the complexities of ▓▓▓▓ underlying medical circumstances and the vital fact that ▓▓▓▓ numerous treating specialists did not share Dr. Christensen's "concerns." ▓▓▓▓ medical history as contained in the stipulation the Court requested (which was filed with the Court on September 14, 2020) directly undercuts Dr. Christensen and the State's position that ▓▓▓▓ was an otherwise healthy child made sick by his Mother.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa) (480) 985-7552

received at Banner in October 2019 was the partial hemi-colectomy, not a cecostomy, a beneficial surgery supported by referrals from ███ s PCH medical team for his redundant colon that had plagued him for years and went undiagnosed during his years of care at PCH.

Mother has carefully followed the recommendations ███ treating physicians. Dr. Coffman naïvely allowed himself to be pulled into "substantiating" Dr. Christensen's uninformed, inaccurate and irresponsible false narrative regarding Mother over-medicalizing ███ *See* **MSOF No. 83.** ███ is indisputably a child with complex medical issues. *See* **MSOF No. 8(M), 17, 64 and 65.** Dr. Christensen simply used Dr. Coffman as an authoritative figure to bolster and justify his wrong-headed DCS referral.

Dr. Christensen failed to inform himself regarding the nature and necessity of ███ GI surgery, which led to his grossly inaccurate referral to DCS on January 29, 2020. Dr. Christensen falsely asserted in his DCS referral that Mother "doctor-shopped" for an ileostomy, which he claimed no doctors at PCH recommended, which was untrue. Dr. Christensen failed to understand that Drs. Hurliman and Schroeder were both supportive of an ileostomy (which is a reversible surgery) to allow ███ bowels to rest from his GI distress. Dr. Hurliman testified "…I think she was looking for a solution. Truly, …that was going to be beneficial for him, and wanted to make sure that… it was the right thing." *See* **MSOF No. 8(K).** Mother did not push for an ileostomy, but was seeking for a medical solution to help her son.

Dr. Christensen failed to inform himself. Dr. Christensen was also uninformed concerning Dr. Acosta's astute diagnosis of ███ redundant colon and the necessity of the subsequent hemi-colectomy to resolve the child's chronic GI distress. ███ hemicolectomy surgery was recommended and beneficial. It was a permanent solution in place of a temporary ileostomy procedure. *See* **MSOF Nos. 3(D), 4(BB), 5(D), 5E, 5(O),**

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

Dr. Bo Borch-Christensen's conference with PCH child abuse specialist Dr. Kathryn Coffman, (who has never seen ███ nor carefully reviewed his chart,) only compounded Dr. Christensen's error and caused further confusion regarding the misdiagnosis of over-medicalization. Dr. Coffman irresponsibly authorized a letter (Exhibit 13, Bates 2964, written on 4/10/20, and electronically signed on 4/16/20) based on her conference with Dr. Christensen, which contained serious inaccuracies.

Dr. Christensen acknowledged the child's pediatrician, Dr. Hurliman, with whom he had spoken *after* placing the January 29, 2020 call to DCS, *did not share or agree with his view* that Mother was a danger to the child. *See* **MSOF Nos. 6(C) and 7(I).** Dr. Christensen failed to mention Dr. Hurliman's critical opinion to investigator Lisa Burns or to her assistant Drue Kaplan Siekmann, who participated in Ms. Burns' investigation.

If either Burns or Kaplan Siekmann had fulfilled their duty to complete a thorough investigation prior to ███ removal from his Mother, they would have unequivocally learned that Dr. Hurliman did not support Dr. Christensen's concerns. They would have also learned that Mother did not "doctor-shop," and that Dr. Hurliman was supportive of a potential ileostomy surgery, as well as the ultimate hemi-colectomy surgery.

Dr. Hurliman's pivotal and clarifying information was absent, both from the CSRA, as well as Drue Kaplan Siekmann's report, rendering both forensically unreliable. Shamefully, Dr. Christensen also omitted any reference to Dr. Hurliman's position from the medical file he orchestrated upon the child's April 3, 2020 admission for observation. Christensen created an incomplete and inaccurate medical file to justify his January 29, 2020 call to DCS. In his recent testimony, accompanied by his attorney, Dr. Christensen tellingly stated he could not say if ███ would be in danger if returned to his Mother's care. *See* **MSOF No. 7(A).**

Caseworker Lisa Burns was assigned to investigate Dr. Christensen's referral to

DCS. As part of her investigation, on March 3, 2020, she interviewed ▮▮▮ at his home and determined he was healthy and safe.[8] ▮▮▮ was also healthy and safe on April 3, 2020, when she caused him to be needlessly removed from his Mother's care. DCS' verified dependency petition was irresponsibly inaccurate. This pivotal and damaging deficit was revealed by the Court's astute questioning of DCS caseworker Marisol Manjarrez at the hearing on September 14, 2020. *See* **MSOF No. 2.**

When the sources of information are properly evaluated, what becomes manifestly clear is that the field of medical professionals who worked with ▮▮▮ on a regular basis do not support the notion that he is not safe with his Mother, was subjected to unnecessary procedures, that he is over-medicated, or unsafe in his Mother's care. These professionals each worked with ▮▮▮ independently, sometimes conferring, but each had their own independent opinions. In contrast, DCS' entire case is built solely on the allegations made by Dr. Christensen, as supported by Dr. Coffman and Drue Kaplan Siekmann.[9] However, the reports submitted by the latter two were both largely derivative of Dr. Christensen's inaccurate and uninformed assessment. Neither Dr. Coffman nor Ms. Kaplan Siekmann ever even met the child. Neither of them ever spoke with the pediatrician, Dr. Hurliman; the surgeon, Dr. Acosta; the DDD Nurse Rodriguez.; or the home health Nurse Barrett.

## III.    STANDARD OF REVIEW.

---

[8] Exhibit 2, 133: During that visit, the home was found to be free of visible safety hazards. Adequate food for the child was observed in the home. ▮▮▮ had his own room and bed. Ms. Burns also spoke with the child's home health nurse, who had no concerns regarding the child remaining in Mother's care. She also received the name of DDD supervising nurse, Sonya Rodriguez. Ms. Burns assigned Drue Kaplan Siekmann, a licensed master's-level social worker, to help with her investigation. However, Lisa Burns did not request that Ms. Kaplan speak with the DDD nurse; the home health nurse; the child's pediatrician, Dr. Hurliman; surgeon, Dr. Acosta; or any other of ▮▮▮ treating specialists, nor did Ms. Burns herself speak with any of these individuals as part of her investigation.

[9] Christensen cannot constitute material fact neither can anything that flows from it. (expand)

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

A.    **Because Parents have a Fundamental, Constitutional Right, and a Statutory Right, to the Custody of their Child, a Heightened Standard of Review is Required**.

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Nearly a century ago, in *Meyer v. Nebraska*, the Supreme Court "held that the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own.'" *Id.* at 65 (citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923).) Given the extensive Supreme Court precedent on this issue, "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66.

The Supreme Court has recognized a parent's rights to their child as being as essential to the functioning of a free society as other fundamental rights, such as the right of persons to speak freely or to exercise their chosen religion. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("In a long line of cases, [the Supreme Court has] held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the right[] ... to direct the education and upbringing of one's children.") Since *Meyer*, the decisions of the Supreme Court have "made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" *Lassiter v. Department of Social Services*, 452 U.S. 18, 27 (1981).

In Arizona, "[o]ur state's elected representatives enshrined those interests in statute as well." *Trish A. v. DCS*, 2019 WL 3819595, *8, ¶ 36 (August 15, 2019) (BOLICK, J, dissenting).. A.R.S. 1-601 (a), states: "The liberty of parents to direct the upbringing,

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 • Fax (Mesa): (480) 985-7552

education, health care and mental health of their children is a fundamental right." The legislature also saw fit to statutorily require that, "[t]his state...shall not infringe on these rights without demonstrating that the compelling governmental interest as applied to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." "A dependency petition invokes the authority of the court to act on behalf of a child who is alleged to be a dependent child." Ariz. R.P. Juv. Ct. 48(A). When the state files a dependency petition, it unquestionably seeks to infringe on the fundamental rights of parents. Thus, under Arizona statutory law, to infringe on the fundamental right of a parent by seeking to assume authority over a child, the State must therefore demonstrate that declaring a child dependent involves an interest of the highest order, that the dependency is narrowly tailored, and that dependency is the least restrictive means of achieving the compelling government interest.

Additionally, "[t]he Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.'" *Troxel*, 530 U.S. at 65. The Supreme Court has "long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.'" *Id.* (quoting *Glucksberg*, 521 U.S. at 719). "The Clause also includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Id.* Thus, under Supreme Court precedent, to properly invoke the authority of the court to infringe on the fundamental right of a parent, the State must provide the parent with due process. "The government may not interfere with [a parent's] fundamental right unless a court finds that: (1) the parent is unable to parent the child for any reason defined by statute; and (2) the parent has been afforded due process." *Carolina H. v. Arizona Dep't of Econ. Sec.*, 232 Ariz. 569, 571, ¶ 6 (Ct. App. 2013). Given the

fundamental rights involved, the Court should ensure that parents in dependency proceedings are afforded the utmost procedural protections.

## B.    Standard of Review Generally Applicable to Motions for Summary Judgment.

The rules of civil procedure "generally do not apply in juvenile proceedings." *Don L. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 556, ¶ 7 (App.1998). Here, however, Ariz. Juv. Ct. Rule of Proc. 46(D), with the exception of the timeframe within which a motion for summary judgment may be filed, expressly incorporates Ariz. R. Civ. P. 56. Under the rule, a "court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(a).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Substantive law identifies which facts are material. *Id.* at 248. And "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

When a party fails to make a sufficient showing establishing the existence of an essential element of that party's case, and on which the party bears the burden of proof, summary judgment is mandated. *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986). In cases where the nonmoving party will bear the burden of proof, a summary judgment motion may be made without the production of evidence showing the absence of a genuine issue of material fact. *Id.* at 324–25. "Instead, . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party satisfies

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 • Fax (Mesa): (480) 985-7552

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

this burden, the party opposing the motion is required to come forward with evidence establishing the existence of a genuine issue of material fact that must be resolved at trial. *National Bank of Arizona v. Thruston*, 218 Ariz. 112, 115 (App. 2008).

A court must view the evidence in a light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* Because the moving party bears the burden of persuasion, the movant must come forward with evidence it believes demonstrates the absence of a genuine issue of material fact and must explain why summary judgment should be entered in its favor. *Id.* This burden does not shift to the non-moving party. *Id.* Only where the evidence or inferences would permit a jury to resolve a material issue in favor of either party, is summary judgment improper. *Id.*

In considering a summary judgment motion, a trial court must apply the same standards used for a directed verdict and, further, must take into account the substantive evidentiary burden that will be applicable to the claim at trial. *Orme School v. Reeves*, 166 Ariz. 301, 310 (1990). If the evidence supports only one conclusion, and no reasonable fact-finder could conclude otherwise from the evidence, then the fact is not genuinely in dispute. *Id.* at 311. A trial court "view[s] the evidence and reasonable inferences in the light most favorable to the party opposing the motion," *Andrews v. Blake*, 205 Ariz. 236, 240 ¶ 12 (2003), to determine "whether any genuine issues of material fact exist," *Brookover v. Roberts Enter., Inc.*, 215 Ariz. 52, 55 ¶ 8 (App. 2007).

As relevant here, a "[d]ependent child" is defined as one who is "[i]n need of proper and effective parental care and control and who has ... no parent or guardian willing to exercise or capable of exercising such care and control." A.R.S. § 8–201(15)(a)(i)[10]. "[DCS] must prove dependency by a preponderance of the evidence." *Michael M. v. Ariz. Dep't of*

---

[10] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

*Econ. Sec.*, 217 Ariz. 230, 233, ¶ 10 (App. 2007). "Additionally, after the evidence has been presented, the juvenile court must find that [DCS] met its burden of proof and the factual allegations in the petition are true." *Carolina H. v. Arizona Dep't of Econ. Sec.*, 232 Ariz. 569, 571, 307 P.3d 996, 998 (Ct. App. 2013) (citing A.R.S. § 8–844(C)(1)(a)(ii)); Ariz. R.P. Juv. Ct. 55(E)(3)). "If, however, the court does not find by a preponderance of the evidence that the allegations contained in the petition are true, the court shall dismiss the petition, and return the child to the parent." *Id.* (internal quotation marks and brackets omitted) (citing A.R.S. § 8–844(C)(2); Ariz. R.P. Juv. Ct. 55(E)(2).)

There is an absence of evidence that ███ is dependent as to Mother. DCS will not be able to sustain its burden. Thus, there is no genuine issue of material fact, and summary judgment should be granted in Mother's favor.

**C.     ███ is Not Dependent as to Mother Under A.R.S. § 8-201(15)(a); DCS Will Not be Able to Satisfy its Burden of Proof.**

In order to prove that ███ is dependent to Mother, DCS must prove that the parent is unable to parent the child for a reason that is defined in A.R.S. § 8-201(15). *See Carolina H.*, 232 Ariz. at 571, ¶ 7 ("Before a child can be found dependent, the State must allege and prove by a preponderance of the evidence one of the grounds found in [the statute].") DCS is limited to proving dependency to the statutory grounds alleged in the Petition. *See id.* (holding that a court cannot amend a dependency petition to conform to the evidence). DCS cannot satisfy its burden as to any of the alleged statutory grounds in the Petition.

**D.     DCS Fails to Provide any Facts Supporting the Legal Definition of Abuse and Neglect.**

In section VI(A)(1) of its Petition, under the subtitle, "Allegations," DCS alleges: "Mother is *unable* to parent due to *abuse and neglect*." (Petition, l. 8.) DCS then lists various facts which it purports supports its allegation, including Mother "engaging in medical child abuse" by *subjecting* ███ to "at least 524 medical visits to providers "*set*

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

up by *Mother*," "doctor shopping," and "insist[ing] that the child undergo an *ileostomy* surgery."

By definition, under A.R.S. §8-201, "[a]buse means the infliction or allowing of physical injury, impairment of bodily function or disfigurement or the infliction of or allowing another person to cause serious emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior and which emotional damage is **diagnosed by a medical doctor or psychologist** and is caused by the acts or omission of an individual who has the care, custody and control of a child.

Arizona Revised Statutes § 201(2) includes:

(a)    Inflicting or allowing sexual abuse pursuant to section 13-1404, sexual conduct with a minor pursuant to section 13-1405, sexual assault pursuant to section 13-1406, molestation of a child pursuant to section 13-1410, commercial sexual exploitation of a minor pursuant to section 13-3552, sexual exploitation of a minor pursuant to section 13-3553, incest pursuant to section 13-3608 or child sex trafficking pursuant to section 13-3212.

(b)    Physical injury that results from permitting a child to enter or remain in any structure or vehicle in which volatile, toxic or flammable chemicals are found or equipment is possessed by any person for the purpose of manufacturing a dangerous drug as defined in section 13-3401.

(c)    Unreasonable confinement of a child.

None of the provisions defining abuse in the statute above are applicable in this matter.

Under A.R.S. § 8-201, "neglect" is defined. An allegation that a parent is *neglecting* to provide proper and effective parental care, however, is not a statutory ground for dependency. By statute, a child is only dependent if (1) a parent is *unable* or *unwilling* to provide proper and effective parental care and control; (2) the child is "[d]estitute or who is not provided with the necessities of life, including adequate food, clothing, shelter or medical care;" or (3) the "home is unfit by reason of abuse, neglect, cruelty or depravity by a parent." Under the statute, a child is not dependent if a child's parent is willing and able

21

to provide proper and effective parental care and control. Mother is willing and able to provide ▇▇▇ with proper care. DCS' allegation as to neglect therefore, fails to properly allege that ▇▇▇ is dependent as to Mother under any of the statutory definitions of dependency provided in A.R.S. § 201(15)(a).

**E.    No Material Facts Support DCS' Allegations in its Dependency Petition that ▇▇▇ is Dependent as to his Mother.**

DCS made twelve main allegations against Mother in its dependency petition. None are supported by any material facts. These allegations are addressed below.

1.    "Mother is unable to parent due to abuse and neglect." While DCS makes a sweeping generalization in this allegation, it has failed to produce any material facts that meet the legal definition of abuse or neglect as set forth above.

2.    "▇▇▇ medical providers have expressed concern that Mother is engaging in medical child abuse of ▇▇▇ This sweeping generalized allegation is not supported by any material fact. It is understandable that DCS investigated Dr. Christensen's January 29, 2020 referral. However, DCS failed in its statutory mandate to conduct a thorough investigation per ARS § 8-456(C)(1). If the law had been followed, DCS would have readily learned that Dr. Christensen's concerns were without factual basis and were not shared by a host of ▇▇▇ treating professionals and diagnostic physicians, and the matter would have been closed as unsubstantiated.[11]

Rather than performing its statutorily-mandated thorough investigation,[12] DCS allowed Dr. Borch-Christensen to act as their agent and unduly relied upon his influence.

---

[11] These include Dr. Hurliman, ▇▇▇ 's pediatrician; Dr. Carlson, the interim head of psychology at PCH; Dr. Schroeder, the GI; Dr. Bauer, the immunologist; Dr. Acosta, the surgeon who performed the hemicolectomy; and Sonya Rodriguez, the DDD supervising nurse and home health nurse, among others.

[12] DCS' completion of a *thorough* investigation would have uncovered the complexities of Efiron's underlying medical circumstances. ▇▇▇ medical history as contained in the stipulation the Court requested (which was filed with the Court on September 14, 2020) directly undercuts Dr. Christensen and the State's position that ▇▇▇ was an otherwise healthy child made sick by his Mother.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 • Fax (Mesa): (480) 985-7552

His biased and inaccurate conclusions are not supported by ███ medical records. His colleague, Dr. Kathryn Coffman of PCH conducted no independent review. She has never met the child. She also unreasonably relied on the opinion of Dr. Christensen. She acted without the awareness that many other medical professionals did not share his opinions. It was irresponsible for Dr. Coffman to rely solely on Dr. Christensen's report, given that she should have known he had only seen the child on one occasion, almost three years prior, and her own medical note acknowledged the complexity of the child's medical history. Dr. Coffman's unfortunate reliance on Dr. Christensen's opinion caused her to compound error and confusion by citing inaccurate information in her medical record.[13] In a situation where a child has a complex medical history, the doctors' failure to do a thorough review of the medical records or to consult with the child's treating specialists allowed their myopic view to perpetuate harmful and prejudicial error. For instance, the false notions that no PCH medical provider was supportive of an ileostomy to provide interim relief for ███ and that Mother "doctor-shopped" to obtain an invasive unnecessary surgery would have been promptly dispelled through proper inquiry. The home health nurse Leslie Barrett testified to those issues as follows:

> Q    Because Dr. Notrica declined to do the surgery, did Dr. Schroeder and Dr. Hurliman refer mother to a different hospital to have this reviewed?
> A    Yes, I believe they met together and they talked with -- excuse me, sorry. They met together and they discussed it and they referred mom to meet with Dr. Acosta.
> Q    Did Dr. Acosta find a better solution for ███
> A    He had an entirely a -- an different game plan is that the idea that he came up with was not what we were thinking. And he wanted to have a

---

[13] Exhibit 13, 2964. Dr. Coffman compounded Dr. Christensen's error by claiming in her medical record that ███ "has a central line in place for treatment of presumed POTS, as well as a cecostomy that was placed at Banner for reported constipation and motility problems." She erred with regard to the basis for the central line and she erred as to the cecostomy, which is actually placed in 2016 at PCH because Eliron's redundant bowel condition had not yet been properly diagnosed.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

barium enema done to see where the bowel was at and what was really going on. And then he -- his plan, as he has stated, he stated where the appointment I was at that he had taken care of kids -- other kids in that situation. And many times, they have redundant colon, meaning -- redundant meaning that it's been stressed or if there's excess, you know, a length to the colon which creates longer exit time and challenge with emptying. And his idea was to remove that redundant part and reconnect and create a shorter route for ████ to be able to exit his bowel more easily.

Q    Did mother confer with ████ pediatrician and Dr. Schroeder prior to the decision being made to go with Dr. Acosta's recommendation?

A    Yes, she did.

Q    Was there a consensus that that surgery from Dr. Acosta would help ████

A    Yes, there was.

Q    And did it help ████

A    Yes, I believe it did.

. . .

Q    Okay. In the years that you've worked with Jessica as ████ mom, did you ever have any concerns that she was not following medical advice?

A    No.

Q    Okay. Have you ever had concerns that mother was exaggerating or falsifying information about her son?

A    No.

Q    Did you ever have any concerns that mother was making up symptoms that did not exist?

A    No.

Q    What was mother's stated goals for her son, ████

A    To be a normal child.

Q    Okay.

A    A healthy, normal child.

Q    Okay. Did you have any concerns about her parenting or what you observed in her interaction with ████

A    No.

Q    Did you have any concerns about her as a parent assisting ████ with his medical needs and working with the doctors that he needed to work with?

A    No.

Q    Did you ever have concerns that she would not follow medical advice?

A    No.

3.    "The child has been subjected to at least 524 medical visits to providers set up by Mother." If proper inquiry had been made by investigator Lisa Burns and her assistant Drue Kaplan Siekmann, they would have learned from the DDD supervising nurse Sonya Rodriguez that Mother was actively seeking to reduce ████ hospitalizations and interventions. The following clarifying testimony from Sonya Rodriguez should have been elicited as part of the investigation:

Q    Did she express concerns there were too many hospitalizations and too many doctor's appointments?
A    I do remember the hospitalizations.
Q    Okay.
A    Of not wanting to go, not something said there was too many.
Q    Okay. What was her concern about not wanting to go to the hospital?
A    She was trying to keep him home as much as possible.
Q    Okay. Is there a list that sent to DDD of individuals who have excessive doctor's appointments?
A    Hospitalizations?
Q    Yes.
A    Related to hospitalizations?
Q    Yes.
A    Yes
Q    Okay. Has ████ ever been on that list?
A    He was.
Q    When was that? When was the last time he was on the list?
A    2017.
Q    Okay. He wasn't on the list in 2018?
A    No.
Q    He wasn't on the list in 2019?
A    No.
Q    And he wasn't on the list from January through April of 2020?
A    No.

Proper investigation would have also revealed that home health nurse Leslie Barrett recognized the complexity of ████ medical condition and Mother's frustration with the many hospitalizations.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

Q    Did ▮▮▮ temperature fluctuate significantly even within a short period of time?

A    Yes.

Q    Did mother have frustrations about a care plan that required her to take ▮▮▮ to the hospital if his temperature reached 100.4?

A    Yes, there was a concern for that.

Q    Did she feel like it was too much that it was sometimes not necessary to have to take him?

A    Yes.

Q    Did she often confer with the medical professionals to see if it was really necessary to take him to the hospital?

A    Yes.

Q    Is it your understanding when ▮▮▮ -- it was your observation when ▮▮▮ was taken to a hospital, it was according to a protocol that has been set forth by the medical providers?

A    Yes.

Q    Were there times you'll accompany his mother to the hospital with ▮▮▮ because of a temperature issue only to be turned away because by the time you got to the hospital, the temperature had changed? It has happened on more than one occasion?

A    Yes.

Q    Did you ever observed mother to seek any unnecessary care for her son?

A    No.

4.    "Medical professionals have not observed the symptoms and behaviors reported by Mother, and she is not providing medical professionals with ▮▮▮ medical history that is consistent with the medical records." Once again, a proper investigation would have included discussions with DDD nurse Sonya Rodriguez which would have verified Mother was simply following medical directives and was actively seeking to minimize ▮▮▮'s medical interventions if possible,

Q    Okay. Did mom express concern – did Dr. Frye also prescribe for ▮▮▮ Do you remember a Mito Cocktail being prescribed by Dr. Frye?

A    Yes.

Q    Did mom express some concerns about that and the complications it might provide ▮▮▮

A    Yes.

Q    Okay. Was ▮▮▮ taking Atenolol, a beta-blocker?

A    Yes.

Q    Why was he proscribed that?

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 • Fax (Mesa): (480) 985-7552

A    Tachycardia, increased heart rate?

Q    Do you know who prescribed it?

A    The cardiologist prescribed it.

Q    Do you know if Ms. Fidler spoke with Dr. Hurliman after it was prescribed to make sure that it was appropriate and that it wouldn't harm ▮▮▮

A    Yes.

Q    Okay. How was the tachycardia confirmed?

A    Holter monitor.

. . .

Q    Okay. We've talking about ▮▮▮ receiving IV fluids. Was there a time when ▮▮▮ did not received IV fluids?

A    Yes.

Q    And was that approximately August of '17 through April of '18?

A    I believe so about its progress

Q    Did any of ▮▮▮ physicians state that he should continue with the IV fluids – that he should not continue with the IV fluids?

A    No

Q    At the care conference, was there a consensus that he should continue with the IV fluids?

A    Yes.

Q    Recently, ▮▮▮ began receiving daytime fluids. Were you aware that the school indicated that they saw an improvement with ▮▮▮ with the daytime fluids?

A    Yes.

5.    "Medical professionals are concerned that Mother is 'doctor shopping' to find providers who will perform requested medical procedures on the child, despite multiple specialists having determined that such procedures are unnecessary." The false notion that Mother "doctor-shopped" perhaps arose because PCH *referred* her to Cincinnati for specialty GI testing not available locally. Mother was also *referred* to Dr. Acosta at Banner Hospital by Drs. Hurliman and Schroeder when PCH surgeon Dr. Notrica declined to perform the recommended ileostomy surgery. Mother did not doctor shop. She followed PCH's referrals.    DDD nurse Sonya Rodriguez provided the following clarifying information:

Q    Did you ever see mother seeking to Doctor Schroe--or find doctors who would agree with her if she didn't like what another doctor said?

A    No.

77

Q       Was there a circumstance where ▇▇▇▇ went back to Cincinnati at the recommendation of his GI specialist, Dr. Schroeder, to have some testing done at Cincinnati?

A       Yes.

Q       Did mother keep you in the loop of all of this recommended treatment?

A       Yes.

Q       After that, did mother confer with Dr. Hurliman, ▇▇▇▇ pediatrician, and Dr. Schroeder, his GI specialist, about potentially allowing the child's bowel to rest to a reversible surgery called an ileostomy?

A       Yes.

6.      "In particular, Mother insisted that the child undergo an ileostomy surgery, in which the end or loop of the small intestine is cut off and brought to the surface of the skin and waste is collected in an external pouch system adhered to the skin. Medical professionals have described ileostomy surgery as an invasive and lifestyle altering operation with potentially life-threating complications." Mother never insisted the child have an ileostomy. Dr. Hurliman, the child's pediatrician, as referenced on p. 12, stated, "...I think she was looking for a solution. Truly, ...that was going to be beneficial for him, and wanted to make sure that... it was the right thing." The ileostomy was a possible procedure recommended by professionals in Cincinnati and endorsed by Drs. Schroeder and Hurliman. A surgery date had actually been scheduled in Cincinnati for the ileostomy. The idea was to allow ▇▇▇▇ some relief from the lengthy bowel flushes and abdominal pain he was enduring. This reversible surgery was carefully contemplated to give the child's bowels a rest. ▇▇▇▇ had a cecostomy placed in 2016 because of his chronic bowel issues.

He suffered for years with chronic bowel issues including recurring abdominal pain and lengthy cecostomy flushes that interfered with him just being a kid. Ultimately, surgeon Dr. Acosta at Banner diagnosed the child with a significant redundant colon which was the root of much of his bowel distress. Again, proper communication with nurses Sonya Rodriguez and Leslie Barrett would have revealed the following:

Q       Do you know when – did ▇▇▇▇ have a cecostomy tube placed?

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

A    yes.

Q    Do you know when that was placed?

A    I'm the nurse (phonetic) in 2017 [*sic*, should read 2016].

Q    Okay. And did any doctors ever question whether or not – as long as you were on the case – ever question whether or not that was an appropriate medical intervention to help ███████

A    No

Q    Okay. Was it your understanding that Dr. Acosta's surgical intervention perhaps could eliminate that?

A    Yes.

. . . .

Q    Did ███████ have that procedure done by Dr. Acosta in October of 2018? '19?

A    Yes. '19, yes.

Q    Okay. All right. What are your observations of the outcome of the hemicolectomy that Dr. Acosta performed?

A    It appears now that he is able to stool.

7.    "While seeking to have this procedure performed, she subjected him to numerous laboratory tests, x-rays and hospitalizations." The barium enema x-ray ordered by Dr. Acosta was necessary to diagnose the root cause of ███████ chronic GI distress. There are no identified unnecessary laboratory tests or hospitalizations associated with the GI surgery. The imaging obtained after the barium enema evaluation revealed a significant amount of redundant colon no identified by any of the PCH medical professionals.

8.    "Multiple medical specialists determined that the surgery was unnecessary, but Mother continued to request the surgery be performed." This assertion is flatly wrong, and the issue has long since been put to rest as acknowledged by current caseworker Marisol Manjarrez's answers to the court's questions on September 14, 2020.

9.    "The child's symptoms have been observed by medical professionals to disappear when the child is isolated from Mother and then reappear after she reestablishes contact with him." DCS has provided no concrete examples of Mother inducing symptoms in ███████ Their effort to claim her responding to ███████ fever on January 20, 2020 by

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

takin ███ to PCH, where his fever was deemed to have subsided, is not a material fact

that supports this assertion for dependency.

To the contrary, ███ condition has actually regressed since removal from his

Mother's care as testified by DDD supervising nurse Sonya Rodriguez:

> Q     Okay. Discussing things that you had seen ███ regress and
> since he's been removed from mom, and where you mentioned that prior to
> removal, you had witnessed him being able to do certain things. I'll go back,
> my thinking is that he was able to cut up his food; was that correct?
> A     Yes.
> Q     Did you witness him do that or was that something the mother
> said?
> A     No, I witnessed it.
> Q     Okay. And you were made aware that since removal, he was not
> able to cut up his food?
> A     Yes.
> Q     And who told you that?
> A     During the CFT meeting, it was said.
> Q     Okay. And what were some of the other things that you said that
> he has regressed in since removal?
> A     Tying his shoes, riding a bike.
> Q     And were these things that you saw him do first like witnessed
> firsthand?
> A     Yes.
> Q     No, you didn't just – are these things the mother told you?
> A     No, I witnessed it.
> Q     You did witness – sorry. Okay. And you said in the CFT you
> were told that he wasn't able to do that. Who in the CFT said that ███ wasn't
> able to cut up his own food?
> A     Placements.

10.    "Specifically, during his hospitalizations, his condition has quickly stabilized and

has been released to Mother and then bring him back for further hospitalizations." Prior to

Dr. Acosta's corrective GI surgery, ███ experienced greater temperature fluctuations.

Because he had a central line, which subjected him to a higher risk of infection, Mother was

compelled to follow the medical directive to take ███ to the hospital if his temperature

reached 100.4 degrees. Home health nurse Leslie Barrett recognized Mother was frustrated

with the mandate to so frequently take her son to the hospital. She also observed there were numerous times when ▮▮▮▮ temperature at home warranted a trip to the hospital but by the time of admission had dropped to a normal range.

11.    "Medical professionals in Ohio raised concerns that Mother was potentially subjecting the child to medical abuse as early as 2013." DCS has provided no support at all for this assertion. ▮▮▮▮ was not in Ohio in 2013, so this allegation has no basis whatsoever. ▮▮▮▮ was in Cincinnati in 2018 and 2019, however, it is doubtful any Ohio medical professionals would raise concerns about medical abuse during that timeframe because the Cincinnati hospital actually scheduled the child for an ileostomy surgery. Mother elected not to have the surgery performed in Ohio because the child's treating physicians were in Arizona. DCS has flipped Mother's efforts to be a responsible parent in seeking relief for her son's chronic bowel issues and has unreasonably tried to use it against her.

12.    "Family members have also expressed concern to a DCS case manager and medical professionals that Mother was medically abusing ▮▮▮▮ This statement is a distortion of reality. A thorough investigation would have revealed that only one family member expressed concern regarding Dr. Acosta's surgery. That distant cousin lives out of state, had not seen Mother in decades and had never met the child. Drs. Acosta, Schroeder and Hurliman carefully considered this family member's letter and gave it the weight it was due: none. To the contrary, maternal grandmother and maternal uncles have been fully supportive of Mother's care ▮▮▮▮ DCS has completely ignored their input to ▮▮▮▮ detriment.

F.    **DCS cannot meet its burden to prove its allegation of dependency.**

The Court has heard Mother was sometimes short with medical providers out of her anxiety and concern for her son's complex medical conditions. This does not give rise to a dependency. The Arizona Court of Appeals has made it clear: "A child is not entitled to a

perfect parent or even a good one. What a child is entitled to is a parent that does not "engage in conduct that is unlawful or to abuse or neglect a child in violation of the laws of this state." *Aaron W. v. Dep't of Child Safety*, 2019 WL 4695887, at *7 (Ariz. Ct. App. Sept. 26, 2019)" (quoting A.R.S. § 1-602(B).) The court has cautioned that juvenile courts "must be vigilant in ensuring that the basic care provision in A.R.S. § 8-201(15)(a)(i) is not interpreted so broadly as to capture conduct that may be subjectively improper or ineffective, but adequate nonetheless." *Id*. The language of the statute is not unconstitutionally vague, only because courts applying it "utilize commonly understood terms which give clear notice of the standard to be applied in the adjudication proceeding." *Id*.

A parent being short, or anxious, with their child's physician may not fit the ideal of a perfect parent, but neither does it in any possible way satisfy the statutory definition of neglect or form the basis of a dependency. If DCS removed from every parent who ever reached the end of their tether, all children would be subject to removal by the State. Being short or anxious is not conduct that could possibly be commonly understood to be deemed "neglect" in violation of the laws of this state. Even if, however, contrary to the appellate court's caution, the court was to apply an expansive, broad and constitutionally questionable definition of neglect that included such conduct, such conduct is not at issue here. Mother has responsibly referred herself for counseling, DBT therapy, and relies upon an excellent family support system.

DCS may claim that this statutory basis for dependency is satisfied because Mother acknowledges she was dealing with heightened anxiety prior to ▉ removal from her care. At the most, however, DCS' assertions would support a determination that, in the past, ▉ may have been dependent as to Mother. But even these grounds would fail because they were not pled in the dependency petition. It has long been established that in

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1830 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 • Fax (Mesa): (480) 985-7552

dependency proceedings, the court's concern is the *current* welfare of the child. *See In re Pima County Juvenile Action No. J-31853*, 18 Ariz. App. 219 (1972); *Clifford v. Woodford*, 83 Ariz. 257, 260 (1957). The Court of Appeals has recently reiterated this fact, holding that the focus at every stage of a dependency proceeding is the present circumstances. *Dep't of Child Safety v. Stocking-Tate in & for Cty. of Yuma*, No. 1 CA-SA 19-0001, 2019 WL 2482325, at *5 (Ariz. Ct. App. June 14, 2019). "This focus," the court held," is consistent with the directive that, at all stages of the removal and dependency proceedings, the paramount concern is the child's health and safety." *Id.* (citing Ariz. R.P. Juv. Ct. 36 ("The rules [of procedure for the juvenile court] should be interpreted in a manner designed to protect the best interests of the child, giving paramount consideration to the health and safety of the child.") "When a state expresses such an interest through particular legislation, its policy judgments are entitled to judicial deference." *Id.* The court held that courts "cannot interpret the rules and statutes in a way that permits the court to ignore presently known facts...and remain true to the principle of treating the child's welfare as paramount." *Id.*

### G.    DCS cannot meet its burden under A.R.S. § 1-601.

As noted above, A.R.S. 1-601 (b), states: "[t]his state...shall not infringe on these rights without demonstrating that the compelling governmental interest as applied to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." "When a state expresses such an interest through particular legislation, its policy judgments are entitled to judicial deference." *Dep't of Child Safety v. Stocking-Tate in & for Cty. of Yuma*, No. 1 CA-SA 19-0001, 2019 WL 2482325, at *5 (Ariz. Ct. App. June 14, 2019) (quoting *Ariz. Dep't of Econ. Sec. v. Lee ex. rel. Cty. of Maricopa*, 228 Ariz. 150, 153, ¶ 13 (App. 2011). In its petition, DCS has not claimed any facts which it asserts demonstrate that declaring ████ dependent involves an interest of

the highest order, that the dependency is narrowly tailored, and that dependency is the least restrictive means of achieving the compelling government interest, nor does it even claim to do so. DCS' failure to follow its statutory mandate also supports this Court granting Mother's motion. In actuality, the facts demonstrate the opposite.

It is indisputable that ███ is a child with complex medical issues treated by numerous medical specialists. This can be verified by his PCH pediatrician, Dr. Hurliman; DDD nurse Sonya Rodriguez; and his home health nurse, Leslie Barrett – medical professionals with the most intimate knowledge of ███ medical conditions and care. These providers have no concerns of Mother over-medicating the child or reporting conditions that were different than what ███ was actually experiencing. To the contrary, all of these providers affirm that it was Mothers stated desire to seek not only a coordination of ███'s care among his various providers, but also to lessen the number of received interventions as her personal goal was to for her son to lead a healthy, happy life.

The coordinated efforts of Dr. Christensen and the inept investigator Lisa Burns resulted in a manipulative scheme to remove a healthy child from a parent to bolster claims that she over-medicalized her son. Mother should have been involved in the opportunity to converse with the doctors about removing the medications prescribed by Dr. Frye. Even though kept out of the loop, she agreed to do it. Mother was also excluded from the conversations with Dr. Bauer about terminating ███ IVIG, yet nevertheless consented, as that had been the plan all along. Mother also consented to the removal of ███ cecostomy tube recognizing Dr. Acosta's surgery created the foundation for the eventual elimination of the need for cecostomy flushes. Mother also readily consented to the removal of ███'s Broviac.

The United States Supreme Court has held that until the State has established that a parent is unfit, by presenting clear and convincing evidence of unfitness, "the interests of

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive. Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

14

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone  (602) 870-9700 • Fax  (602) 870-9783
Telephone (Mesa) (480)-985-4000 • Fax (Mesa)) (480) 985-7552

the child and his natural parents coincide to favor use of error-reducing procedures."
*Santosky v. Kramer*, 455 U.S. 745, 761 (1982); *see also Donald W. v. DCS*, 247 Ariz. 9, 22
¶ 48 (App. 2019) ("Until a parent is deemed unfit and unable to correct the problem, it
remains in the child's best interests to unite the child with the parent.") Thus, in this
dependency proceeding—in which, by definition, the State has not proven a parent unfit
and unable to correct the problem— the best interest of the child is the same as that of the
parent; that their relationship will not be erroneously infringed upon by the State. DCS's
statutorily defined interest is to protect children and *preserve families*. A finding of
dependency furthers neither interest. Thus, the State cannot show that its interest in
infringing on Mother's fundamental parental rights is an interest "of the highest order."

The State recklessly rushed to judgment in contravention of its duty to ▆▆▆▆ and
his Mother. Without a thorough investigation, DCS relied primarily on the claims of Dr.
Borch-Christensen, a hospitalist who only saw ▆▆▆▆ one time in 2017, and who may have
been offended because Mother complained to PCH about his lack of professionalism. Dr.
Christensen was brazenly critical of Dr. Acosta's surgery, claiming it was unnecessary,
despite having failed to consult with the many other doctors who had treated the child, or
even examining the surgery records proving up the life-altering benefit of the surgery for
▆▆▆▆.

## Conclusion.

Justice Bolick has recently observed: "the process our state has constructed," for
removing children from parents, "creates the very real prospect that parents will lose their
children not because they deserve to, but because they are unable to effectively defend their
rights in a system that is stacked hopelessly against them." *Trish A.*, * 15 ¶ 73 (BOLICK,
J, dissenting). This is such a case. The State's case plan from the beginning of this case was
severance.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

The State has used its unlimited resources to stubbornly resist admitting error. Dr. Hurliman, Dr. Schroeder, Dr. Carlson, DDD Nurse Rodriguez, Home Health Nurse Barrett, Dr. Christensen, investigator Burns, caseworker Manjarrez have all been interviewed and/or testified in this matter. The sum of the information revealed that Dr. Christensen was wrong; that Lisa Burns didn't know what she was talking about, and failed in her duty to conduct a thorough investigation; and that Marisol Manjarrez did not pay attention to the interviews or testimony and persists in her failure to recognize that Dr. Christensen was wrong and had motivation for bias.

The State's undaunted quest for a dependency finding, especially in light of the Court's questions and comments at the September 14 hearing, is manifestly unreasonable. Mother, a single parent, has borne an unnecessarily heavy burden of mounting attorney fee debt because of the State's inability to concede error. Even now, because there is no material fact to support its petition, the State is belatedly rushing to arrange interviews of mitochondrial Dr. Frye, geneticist Dr. Grebe, immunologist Dr. Bauer, and Dr. Christensen's colleague, Dr. Coffman in a desperate effort to find any shred of evidence to support its ill-fated dependency. If any of these doctors had material firsthand knowledge of Mother fabricating systems or over-medicalizing her son, that would have come to light long ago. The States unseemly and untimely effort is to avoid facing its error and unnecessarily and unreasonably running up Mother's fees.

The State cannot meet its burden to prove that ███ is dependent as to Mother. Mother requests that this Court find that DCS could not meet its burden to prove its allegations in the petition, grant summary judgment on the petition in Mother's favor, and dismiss the dependency so ███ can promptly be returned to his Mother's care.

The State opposed Mother's Motion for Summary Judgment. The Guardian Ad Litem has not provided his position.

Date:  October 16, 2020.

*Respectfully,*

**GILLESPIE SHIELDS GOLDFARB & TAYLOR**

By:

DeeAn Gillespie Strub, Esq.
7319 North 16th Street
Phoenix, Arizona 85020
*Counsel for Mother Jessica Fidler*

ORIGINAL filed this date with a copy
hand-delivered to The Honorable Kristin
Culbertson

COPY of the foregoing hand-delivered
this date to:

Lisa Boddington, Esq.
Lisa.boddington@azag.gov
Gregory Coordes, Esq.
Assistant Attorney General
120 West 1st Avenue, 2nd Floor
Mesa, Arizona 85210

Electronic copy provided this date via
DropBox to:

Jason M. Leach, Esq.
jasonleachlaw@outlook.com

By: */s/ Marie Costello*

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 • Fax (Mesa): (480) 985-7552

17

# EXHIBIT 3

# APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILD
## Superior Court of Arizona for Maricopa County

REMOVAL REQUEST # RR2023-22793

COUNTY OF ORIGIN Maricopa

DCS CASE ID AS00863831

I, Alonzo Borboa, hereby affirm the following statement of facts:

1. I am employed by the Arizona Department of Child Safety. By virtue of my education, training and experience I am qualified and authorized to conduct child abuse and neglect investigations. I am currently assigned to investigate the case involving the child named in this application and declaration for removal, or am that person's supervisor. I make this declaration in support of this application. Further, I have the following qualifications: Positions:
   August 2022 – Present OCWI Assistant Training Manager
   December 2019 – August 2022 OCWI Investigator
   April 2018 – December 2019 DCS Program Specialist
   May 2016 – April 2018 DCS Child Safety Investigator

   Training:
   Safe AZ Renovations Advanced Forensic Interview Training (AFIT)
   DCS Specialist CORE training (240 hours)

   Education:
   Bachelor's in Secondary Education (2011)
   Master's in Psychology (2020)

2. This application and declaration is in support of for ex-parte removal of the following children:

| Child Name | DOB | Sex | ICWA Status |
|---|---|---|---|
| E▮ F▮ | ▮/2011 | F | No |

3. The mother(s) is/are:
   The mother of E▮ F▮ is Jessica Fidler

4. The father(s) is/are:
   The father of E▮ F▮ is Unknown

5. The legal guardian(s) is/are:
   The legal guardian of E▮ F▮ is None or Unknown

# APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILD
## Superior Court of Arizona for Maricopa County

6.  Probable cause exists to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect, and it is contrary to the child's welfare to remain in the home under A.R.S. §8-821(A). Specifically, Specific present danger condition(s) or impending danger threat(s) for each child listed on this application:
    Child's condition is the result of deliberate, preconceived planning or thinking that the caregiver is responsible for and that preceded the child's serious injuries or condition;

    Circumstances that require temporary custody including a detailed account of circumstances and supporting facts:
    Today, Dr. Cahill completed a forensic medical review of documents pertaining to ▮▮▮ and Ms. Fidler and Dr. Cahill arrived at the conclusion that Ms. Fidler meets the criteria for Factitious Disorder Imposed on Another (FDIA). Dr. Cahill has reviewed copious amounts of medical records pertaining to ▮▮▮, and Ms. Fidler has exposed ▮▮▮ to an alarming number of medical and psychological diagnoses. ▮▮▮ was removed from Ms. Fidler's care in 2020 and he showed significant improvement in a short period of time. He asked to have his cecostomy tube removed from him and was fine afterwards. ▮▮▮ was able to complete his tasks of daily living and he did not show evidence of the cognitive or mental health issues that Ms. Fidler claimed he had. After ▮▮▮ was returned to Ms. Fidler's care she insisted on having his cecostomy tube replaced in the emergency room. Ms. Fidler did not want ▮▮▮ to use anesthesia, so he suffered immensely. Ms. Fidler is obsessed with constipation and she is constantly flushing the child's cecostomy tube and feeding him laxatives. ▮▮▮ did not see a doctor for 30 days when he was previously in foster care, and he now has numerous specialists to attend to many of his fabricated conditions and diagnoses. Dr. Cahill reports that Ms. Fidler is abusing ▮▮▮ and she recommends that ▮▮▮ be removed from her care for a period of 4-8 weeks, and that she have no contact with the child. If ▮▮▮ improves again then, this would support the diagnoses of FDIA and Dr. Cahill suggests that parental rights be terminated.

    ▮▮▮ will continue to be exposed to countless unnecessary and harmful medical procedures if he remains in Ms. Fidler's care. The child has a cecostomy tube placed in him, which was removed when he was in foster care and Ms. Fidler had it replaced once the child returned to her care. The child will continue to suffer and he will not have the opportunity to live a more normal life if he remains in Ms. Fidler's care. The father was an unknown sperm donor.

7.  I, Alonzo Borboa, declare under penalty of perjury that the information contained within this application and declaration is true and correct to the best of my knowledge and belief.

    10/24/2023 2:36 PM

ORDER FOR EX-PARTE REMOVAL OF CHILD
Superior Court of Arizona for Maricopa County

REMOVAL REQUEST # RR2023-22793

COUNTY OF ORIGIN Maricopa

DCS CASE ID AS00863831

TO ANY DCS REPRESENTATIVE IN THE STATE OF ARIZONA

Proof by application and declaration having been made this date 10/24/2023 before me by Alonzo Borboa of the Department of Child Safety ("DCS"), and on the basis of the evidence presented in such application and declaration, and pursuant to A.R.S. §8-821(A), I find probable cause exists to believe that temporary custody is clearly necessary to protect the following child E███ F███ from suffering abuse or neglect. I further find, for the reasons indicated below and pursuant to A.R.S. §8-821(A), that probable cause exists to believe that it is contrary to the child's welfare to remain in the home.

- ☑ Domestic violence or violent behavior
- ☑ Mental health issues
- ☑ Risk of abuse or neglect of child(ren)
- ☑ Unfit or unsafe home environment for child(ren)

Therefore, **IT IS ORDERED** granting DCS's request for authorization to remove E███ F███ and authorizing DCS to remove this child.

**IT IS FURTHER ORDERED** directing DCS to conduct a due diligence search pursuant to A.R.S. § 8-514.07.

*ETBingert*

_____          10/24/2023 2:44 PM
Hon. Elizabeth Bingert

CSO-1039A (8-14)
PS-058 (6-14)

ARIZONA DEPARTMENT OF CHILD SAFETY

## NOTICE OF REMOVAL/AVISO DE TRASLADO

Check (✓) the applicable section (A or B) of this form./ Marque con ✓ la sección(es) pertinente (A o B) en este formulario.

☑ **A. Notice of Removal -**     **School/Day Care/Safe Haven/Other Location**
    *Aviso de Traslado*     *Escuela/Cuidado Diurno/Refugio Seguro/Otro Local*

As of **10/24/2013**     **2:56 PM** The following child(ren) ▉ ▉ F ▉
*Desde*   Date /Fecha    Time/Hora    *El siguiente niño(s)*    Name of Child(ren)/Nombre de niño(s)

         **Gilbert Az 85296**

at
en

Address of School/Day Care/Safe Haven/Other Location (No., Street, City, State, ZIP)
*Dirección de Escuela/Cuidado Diurno/Refugio Seguro/Otro Local (Núm. Calle, Ciudad, Estado, Código Postal)*

was/were placed into temporary custody by Arizona Department of Child Safety (DCS). A **"Temporary Custody Notice"** or other notice as appropriate to the situation concerning the above action will be served by DCS to the child(ren)'s parent, guardian or custodian following requirements of A.R.S.§ 8-821, in addition to a copy of this notice of removal.

*fue/fueron colocado(s) bajo la custodia temporal del Departamento de Seguridad del Menor (DCS por sus siglas en inglés) del Departamento de Seguridad del Menor de Arizona. Según los requisitos de A.R.S.§ 8-821, además del presente Aviso de Traslado, DCS presentará al padre/madre/guardián o custodio del niño(s) un **"Aviso de Custodia Temporal"** u otro aviso pertinente a la situación y acción de referencia.*

☐ **B. Notice of Removal -**     **Court Ward**
    *Aviso de Traslado*     *Bajo Tutela del Tribunal*

As of _____ The following child(ren) _____
*Desde*   Date /Fecha    Time/Hora    *El siguiente niño(s)*    Name of Child(ren)/Nombre de niño(s)

at
en

Address of School/Day Care/Safe Haven/Other Location (No., Street, City, State, ZIP)
*Dirección de Escuela/Cuidado Diurno/Refugio Seguro/Otro Local (Núm. Calle, Ciudad, Estado, Código Postal)*

was/were placed into temporary custody by Arizona Department of Child Safety (DCS). The Arizona Department of Child Safety intends to notify the court of the removal of the above-named child(ren) by filing a Motion for a Change of Physical Custody. If you are the parent, guardian or custodian and oppose the removal of the child from your physical custody, you or your attorney must notify the court and request a hearing.

*fue/fueron colocado(s) bajo la custodia temporal de Departamento de Seguridad del Menor (DCS). El Departamento de Seguridad del Menor de Arizona va a presentar una Moción para Cambio de Custodia Física y así notifica al tribunal que el niño(s) mencionado arriba ha sido traslado(s). Si usted es el padre/madre, guardián o custodio de este niño(s) y se opone a que se le(s) traslada de sus custodia física, usted o su abogado debe así informarlo al tribunal y pedir una audiencia.*

The following signature block pertains to section A or B, whichever is used, and must be completed.
*La sección siguiente se relaciona con ambas partes A o B, la que se haya usado, y es requisito llenarla.*

| DCS REPRESENTATIVE'S NAME (Please Print and sign)<br>Nombre en letra de imprenta, y firma del representante del DCS<br>Alonzo Borboa | DCS OFFICE PHONE NO.<br>TEL\OFICINA DE DCS<br>(480)347-2748 | DATE/FECHA<br>10/24/2013 |
|---|---|---|
| DCS ADDRESS (No., Street, City, State, ZIP)/ Dirección de DCS (Núm. Calle, Ciudad, Estado, Código Postal)<br>3003 N. Central Ave. Phoenix, Az 85012 | | |
| DCS SUPERVISOR'S NAME (Please print and sign)<br>Nombre en letra de imprenta, y firma del supervisor(a) del DCS<br>N. Hale Garcia | | DATE/FECHA<br>10/24/2013 |

**DISTRIBUTION: Original** of section **A** – location of removal; **Original** of Section **B** – person(s) who had physical custody of the child at time of removal of a Court Ward; **Copy** of section **A** – parent, guardian or custodian to whom a Temporary Custody Notice is served, and the case record; **Copy** of section **B** – the case record.

See reverse for EOE/ADA/GINA Disclosures.
*Vea al reverse para la Declaraciones de EOE/ADA/GINA.*

CSO-1000A (6-18)
PAGE 2 ON REVERSE

**ARIZONA DEPARTMENT OF CHILD SAFETY**
**TEMPORARY CUSTODY NOTICE**

On (Date) 10/24/13   At (Time) 4:54   ☐ AM ☑ PM , temporary custody of (child's name) E████████ F████
was taken at (Address) C-Ilhart Abygægenfyl DCW I / OCS

**Type of abuse or neglect requiring temporary custody:** Select the circumstance(s) that most clearly describe the danger to the child(ren) and reason temporary custody is necessary.

☐ Medical examination is required to diagnose abuse.

☐ The child is unsupervised or alone now or on a daily basis, or has been left with a person who is unwilling or unable to provide adequate care.

☐ The caregiver is unable to perform essential parental responsibilities due to substance use, mental illness, physical impairment, cognitive limitations.

☐ The caregiver is unable or unwilling to perform essential parental responsibilities and there is no other appropriate caretaker immediately available.

☐ The caregiver is out of control and cannot focus or manage his/her behavior in ways to properly perform parental responsibilities.

☐ The caregiver's behavior is violent, bizarre, erratic, unpredictable, incoherent, or totally inappropriate and is a threat to child safety.

☐ The caregiver is brandishing weapons, known to be dangerous and aggressive, or is behaving in attacking or aggressive ways that are a threat to child safety.

☐ The caregiver has not, cannot, or will not protect the child from serious or severe harm, including harm from other persons having access to the child.

☐ Dynamics in the household include a person establishing power, control, or coercion over a caregiver in a way that impairs necessary supervision or care of the child and has caused, or will likely cause, serious or severe harm to the child's physical, mental, or emotional health.

☐ The caregiver has an extremely negative perception of the child, and/or has extremely unrealistic expectations for the child's behavior.

☐ Physical conditions in the home are hazardous and immediately threaten the child's safety.

☐ The caregiver is subjecting the child to brutal or bizarre punishment or there is severe to extreme maltreatment alleged to be occurring.

☐ The child requires immediate medical attention, and the absence of medical treatment could seriously affect the child's health and well-being.

☐ The child is actively endangering self or others and the caregiver cannot or will not control the child's behavior or arrange or provide necessary care.

☐ There is evidence of recent sexual abuse, the perpetrator currently has access to the child, and no protective action is being taken by a caregiver.

☐ The child has injuries such as facial bruises, injuries to the head, multiple plane injuries, injuries to a non-ambulatory child, immersion burns.

☐ The child has serious injuries that the caregivers and others cannot or will not explain, or the explanation is inconsistent with the child's injuries or condition.

☑ The caregiver deliberately harmed the child, or caused or threated to cause serious or severe harm to the child.

☐ The child is profoundly fearful (terrified) of their present home situation, or a particular person living in or having access to the home.

☐ The caregiver previously endangered a child and/or caused harm to a child and circumstances indicate the person will likely cause severe harm to the child.

☐ There is evidence of abuse or neglect and the caregiver cannot produce the child, refuses access to or is likely to flee with the child, or actively avoids DCS.

☐ Criminal activity by the caregiver or criminal activity of other persons living in or having access to the home will likely result in severe harm to the child.

Select how temporary custody was obtained: ☐ Parent or Guardian Consent  ☑ Court Authorized  ☐ Exigent Circumstances

**The Department of Child Safety (DCS) must:**

- Return your child within **72 hours** *(not including weekends and holidays)* unless DCS files a legal paper, called a petition, with Juvenile Court. If a petition is filed, your child will be kept in the temporary custody of DCS.

- Return your child within **12 hours** if your child was removed for a medical examination, unless abuse is revealed, **and**

- Inform you of the right to give a verbal, telephonic or written response to the allegations and have the response included in the investigation report. Any documentation you give, what you say or write, will be included in the case record and can be used in court proceedings.

DCS REPRESENTATIVE'S NAME (Please print)   AREA CODE AND PHONE NO.
Alonzo   Barboa   (480) 341-2748

ARIZONA DEPARTMENT OF CHILD SAFETY ADDRESS (No., Street, City, State, ZIP)
3003   N. Central   Ave.   Phoenix, AL 85012

DCS SUPERVISOR'S NAME (Please print)   AREA CODE AND PHONE NO.
Nichole   Garcia   (602) 542-1013

**METHOD OF NOTICE:** On (date) 10/14/13 , at (time) 7:13   ☐ AM ☑ PM , I served notice to (parent, guardian or custodian) (print name)

Method used: ☑ In-Person  ☐ Left at Residence  ☐ Verbal  ☐ Fax   Date: 10/27/13   Time: 7:17 PM

Address where mailed/left/given (No., Street, City, State, ZIP)   Tllert Az 85296

**What is the child or child's parents American Indian heritage/ancestry:**   Has the tribe been notified? ☐ Yes  ☐ No  ☑ N/A

PARENT, GUARDIAN OR CUSTODIAN'S SIGNATURE

DCS REPRESENTATIVE'S SIGNATURE (Or law enforcement officer)   DATE
FO/L 4/13

ROUTING: Original – Parent/Guardian/Custodian; 1ˢᵗ Copy – Sent to Assistant Attorney General to file with the Petition; 2ⁿᵈ Copy – Retained in the case record

ARIZONA DEPARTMENT OF CHILD SAFETY

## NOTICE OF DUTY TO INFORM

When the Department of Child Safety (DCS) receives an allegation of child abuse or neglect by a parent, guardian custodian or adult member of household and a report is taken, Arizona law requires DCS to conduct an investigation. The following allegation concerning your child (or children) is currently being investigated by DCS.

IN 0701 578

neglect / physical abuse

This *notice* is to inform you that:

- DCS has no legal authority to compel or make you cooperate with the investigation or to accept services, but it is our hope that by working together we can find solutions to ensure that your child (or children) is safe and that your family has what it needs.

- DCS has a duty to proceed with the investigation even if you decide not to cooperate to ensure that your child (or children) is safe, although we would prefer to carry on with the investigation with your support.

- DCS has the authority to petition the Juvenile Court for a determination that your child (or children) is dependent and in need of protection. Your refusal to cooperate with the investigation or services offered does not in itself form a basis for DCS to take temporary custody of your child (or children), unless it is clearly necessary to protect your child (or children) from abuse or neglect.

- You have the right to provide written, telephonic or verbal responses to the allegation, including any documentation, and to have the information considered in determining whether your child (or children) is in need of child safety services.

- Anything you say or write can be used in a court proceeding and may be included in DCS's report of the investigation.

- Any written response that you provide, including any documentation, will be included in the DCS case record.

- Any information that you provide in response to the complaint or allegation(s) will be considered during the investigation.

- You have the right to appeal determinations made by DCS about the results of the investigation and will be notified in writing of these results and how to appeal.

- You may call the DCS Office of the Ombudsman to file a complaint regarding services, actions, lack of actions, or treatment by the DCS staff. The Office of the Ombudsman will review your complaint and determine the type of response needed. The telephone number is 1-877-527-0765 or (602) 364-0777.

- You have the right to file a complaint with the Arizona Ombudsman-Citizens Aide. The telephone number in Phoenix is (602) 277-7292, and statewide, toll-free is 1-800-872-2879. The Ombudsman-Citizen Aide office is available to handle inquiries, concerns and complaints about agency actions, including DCS.

More information about DCS and your parental rights are outlined in the pamphlet, **"Guide to Department of Child Safety"** that I am leaving with you today.

**ASK: Is the child's parent(s) of American Indian heritage/ancestry?** ☐ Yes ☑ No

*If Yes, Mother's Tribe:* _____   ***Father's Tribe:*** _____

☐ Unknown *(explain):* _____

By signing this form, you are acknowledging that I have reviewed the information contained in this notice with you.

| PARENT, GUARDIAN OR CUSTODIAN'S SIGNATURE | PARENT, GUARDIAN OR CUSTODIAN'S NAME *(Please print)* | | DATE |
|---|---|---|---|
| *telephonic* | Jesica Fidler | | 10/24/23 |
| **DCS REPRESENTATIVE'S SIGNATURE** | **DCS REPRESENTATIVE'S NAME** *(Please print)* | **TELEPHONE NUMBER** | **DATE** |
| | Alonzo-Borbon | 480 791-2718 | 10/24/23 |

Equal Opportunity Employer/Program • Under Titles VI and VII of the Civil Rights Act of 1964 (Title VI & VII), and the Americans with Disabilities Act of 1990 (ADA), Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title II of the Genetic Information Nondiscrimination Act (GINA) of 2008; the Department prohibits discrimination in admissions, programs, services, activities, or employment based on race, color, religion, sex, national origin, age, disability, genetics and retaliation. The Department must make a reasonable accommodation to allow a person with a disability to take part in a program, service or activity. For example, this means if necessary, the Department must provide sign language interpreters for people who are deaf, a wheelchair accessible location, or enlarged print materials. It also means that the Department will take any other reasonable action that allows you to take part in and understand a program or activity, including making reasonable changes to an activity. If you believe that you will not be able to understand or take part in a program or activity because of your disability, please let us know of your disability needs in advance if at all possible. To request this document in alternative format or for further information about this policy, contact your local office; TTY/TDD Services: 7-1-1. • Free language assistance for department services is available upon request. • Disponible en español en la oficina local.

CSO-1034A
(03/2019)



## ARIZONA DEPARTMENT OF CHILD SAFETY
## PRESENT DANGER PLAN

**Describe the present danger condition that is occurring and is placing the child(ren) in danger:**

There are concerns that mother is abusing ▮
as she is prook his cecostomy tube was placed
back and she has to harming him.

List Names of U~~~~~~~~~: ▮        ▮

**Select the type of present danger plan:**

- [ ] The threatening person leaves the home.
- [ ] The protective parent and child leave the home and go a safe environment.
- [ ] A responsible adult is in the home at the predetermined specific time.
- [ ] A responsible adult routinely monitors the home.
- [ ] A responsible adult moves into the home seven days a week, 24 hours per day.
- [ ] The child is cared for outside of the home periodically.
- [ ] The child lives with someone in the family network part-time.
- [ ] The child lives with a responsible adult for seven days a week, 24 hours per day.
- [ ] The child is placed in the temporary custody of DCS by a Voluntary Placement Agreement, CSO-1043.
- [x] The child is placed in the temporary custody of DCS.

**Describe the specific action(s) to keep the child(ren) safe, when the action(s) is required, and the adult(s) who will be responsible for those actions:**

▮ will reside ▮ ▮ in a foster home.

---

*End date of present danger plan (must be within 14 days or less):*   10/27/23

**Level of contact allowed between child and parent/caregiver: (frequency, duration, location, level of supervision)**

Jessica is currently allowed no contact with ▮.

**Describe how the DCS Specialist will oversee that the plan is followed and sufficient:**

OCWI will maintain contact with the family.

---

~ *Must also complete Page 2. See Page 2 for EOE/ADA/GINA Disclosure* ~

CSO-1034A
(03/2019)
Page 2



### ARIZONA DEPARTMENT OF CHILD SAFETY
# PRESENT DANGER PLAN

## Present Danger Plan Participants

Name of Responsible Adult, if applicable _____ | Phone No. (include area code)

Address ( No., Street, Apt. No., City, State, Zip Code) _____

Name of Responsible Adult, if applicable _____ | Phone No. (include area code)

Address ( No., Street, Apt. No., City, State, Zip Code) _____

### As a Responsible Adult, *I acknowledge the following:*
**Please initial each item:**

| | | |
|---|---|---|
| | | To follow the Present Danger Plan as prescribed; |
| | | To be present at times needed to ensure child's safety; |
| | | To be present when threats are likely to occur; |
| | | That I am physically able to protect child; |
| | | That I will cooperate with and support DCS in carrying out the Present Danger Plan; |
| | | That I will maintain contact with the DCS Specialist; |
| | | That I will notify the DCS Specialist or DCS Supervisor immediately if I am unable to carry out the plan; |
| | | That I will notify the DCS Specialist or DCS Supervisor immediately if the parent/caregiver attempts to have unapproved contact with the child; and |
| | | That I will ask for assistance and guidance from DCS as needed. |

**Specialist Phone No.:** 480-341-2778

### *Child Abuse Hotline: 1-888-767-2445*

### As a Parent/Guardian, *I acknowledge the following:*
**Please initial each item:**

| | |
|---|---|
| | I have read the Present Danger Plan (the PDP) and/ or the PDP has been explained to me. I understand that the PDP is necessary to keep my child(ren) safe. |
| | I was given a chance to ask questions and discuss the PDP. I was told I did not have to agree to the PDP. |
| | I understand that agreeing to the PDP is not an admission of wrongdoing. |
| | I have received a copy of the PDP. |
| | I understand the PDP is voluntary, meaning I have a choice of whether to agree or not agree to the PDP. |
| | I may end the PDP at any time. I understand that to end the PDP before the time expires, I need to notify the DCS Specialist or the DCS Program Supervisor immediately. |
| | I understand that if DCS believes the PDP is not working to keep my child(ren) safe, or if DCS believes I am ending the PDP in a way that causes my child(ren) to be unsafe, DCS may take temporary custody of my child(ren). |
| | I understand that if DCS takes temporary custody of my child(ren), it allows DCS to make decisions about where my child can live and make legal decisions about their care. |
| | I understand that if DCS takes temporary custody of my child(ren), DCS must provide me with either a court order and/or temporary custody notice. |

Parent/Guardian 1 Signature _____ Date _____ | Parent/Guardian 2 Signature _____ Date _____

Responsible Adult's Signature _____ Date _____ | Additional Responsible Adult's Signature _____ Date _____

Child's Signature (as appropriate) Alonzo Borbon  Date 10/24/23 | Child's Signature (as appropriate) _____ Date 10/24/23
Print name of DCS Representative  Nichole  Date | DCS Representative Signature

## Supervisory Approval of Present Danger Plan

☐ By Phone  ☐ In Person | Print name of DCS Representative _____ Garcia | DCS Representative Signature _____ Date 10/24/23
Supervisor Approval

Routing: Original – Parent/Caregiver; Yellow – Responsible Adult; Pink – DCS Record

Equal Opportunity Employer/Program. The Department of Child Safety (DCS) prohibits discrimination in admissions, programs, services, activities, or employment based on race, color, religion, sex, national origin, age, disability, genetics, or retaliation. Reasonable accommodations to allow a person with a disability to take part in a program, service, or activity are available upon request. To request this document in alternative format or for further information about this policy contact your local office; TTY/TDD Services: 7-1-1. Free language assistance for DCS services is available upon request.

# EXHIBIT 4

Clerk of the Superior Court
*** Electronically Filed ***
M. Engle, Deputy
10/27/2023 12:53:58 PM
Filing ID 16814687

KRISTIN K. MAYES
Attorney General

KRISTI VILLARREAL-REX
Assistant Attorney General
State Bar No. 024797
CFP/PSS
2005 N. Central Ave. C007AG
Phoenix, Arizona 85004
Telephone: (602) 542-1645
PSSDurango@azag.gov

Attorneys for the Department of Child Safety

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| In the Matter of: | No. JD533286 R |
| ███ FIDLER<br>d.o.b. ███ | **DCS'S DEPENDENCY PETITION AND PETITION FOR PATERNITY AND/OR CHILD SUPPORT** |
| | **(OUT-OF-HOME)** |
| | DCS CASE I.D. NO. AS00850609 |
| Person under 18 years of age. | |

Petitioner, the Department of Child Safety (DCS or the Department), by and through undersigned counsel, hereby alleges upon information and belief:

**I.**
**Jurisdiction**

The Juvenile Court has exclusive original jurisdiction over dependency matters pursuant to A.R.S. § 8-202(B). The Superior Court has original jurisdiction in proceedings to establish paternity pursuant to A.R.S. § 25-801.

**II.**
**Venue**

Venue in this county is proper pursuant to A.R.S. §§ 8-206(A) and 25-802 as Maricopa County is the residence of the child and/or the acts of dependency are alleged to have occurred in Maricopa County.

**III.**
**Identity of Child, Placement and Applicability of the**
**Indian Child Welfare Act**

A.       ██████ FIDLER:

    1.       ██████ FIDLER is a male child whose date of birth is November 26, 2011.

    2.       ██████ FIDLER is a dependent child within the provisions of A.R.S. § 8-201(15).

    3.       ██████ FIDLER is currently placed with DCS.

    4.       ██████ FIDLER is not an Indian child as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4). DCS has no information that the child is an enrolled member of any tribe or that a parent is an enrolled member of a tribe and the child is eligible for enrollment.

**IV.**
**Parties**

The following individuals are alleged to be the parents, guardians, and/or Indian Custodians of the child who is the subject of this Petition, upon information and belief:

A.    JESSICA FIDLER is the mother of ██████ FIDLER.

2

1. Her date of birth is June 30, 1980.

2. Her address is confidential.  Her phone number is confidential.

**V.**
**Temporary Custody**

Upon information and belief, ████ FIDLER was taken into temporary physical custody on October 24, 2023, at 2:54 p.m., as authorized by an order of the Superior Court dated October 24, 2023.  The Superior Court authorization and DCS's application for court authorization are attached to this Petition.

**VI.**
**Allegations**

A. Upon information and belief, DCS alleges that ████ FIDLER is dependent due to abuse and/or neglect as to Mother, JESSICA FIDLER.

1. Mother is unable to provide proper and effective parental care and control due to an unfit home and/or abuse and/or neglect.  The child was subject to a prior dependency case in 2020 to 2021 due to concerns that Mother's behaviors led to excessive and/or unnecessary medical interventions for the child.  When the child was removed from Mother's care in the prior case, his symptoms improved dramatically, and medical interventions were decreased successfully.  The family participated in services, the child returned home to Mother, and the dependency was dismissed.  Since the child has been with Mother, his health care utilization has significantly increased.  According to a forensic psychological evaluation, Mother has

3

continued to engage in behaviors such as inducing and/or fabricating and/or falsifying and/or exaggerating the child's symptoms, which have led to excessive and/or unnecessary medical interventions for the child. The child is at risk of further abuse and/or neglect in Mother's care and the psychologist recommended that Mother and the child be separated for the child's safety.

2.    Mother is unable to provide proper and effective parental care and control due to mental health issues. Mother has a history of mental health issues. There was a prior dependency case on the child due to concerns that Mother's behaviors led to excessive and/or unnecessary medical care for the child. A 2020 psychological evaluation that Mother underwent as part of that dependency case concluded that she has several mental health diagnoses, including an unspecified depressive disorder and a generalized anxiety disorder. As part of the evaluation, Mother acknowledged that her anxiety significantly contributed to the child receiving excessive medical care. While the child was placed out of the home, his symptoms improved dramatically and his medical care utilization significantly decreased. The family participated in services and the child returned home to Mother. Since the child has been with Mother, his health care utilization has again increased considerably and Mother's mental health continues to be a concern. Mother reported to DCS that she went into a mental health hospital due to her self-harming behaviors after the prior dependency case

was dismissed. Mother reported that she take an antidepressant. The Department received a hotline report in January 2023 with continued concerns that Mother's behavior has led to excessive and/or unnecessary medical interventions for the child. As part of its investigation, DCS obtained a medical records review and evaluation by a psychologist. As a result of this evaluation, the psychologist reported that Mother meets the criteria for Factitious Disorder Imposed Upon Another and recommended that Mother and the child be separated.

### VII.
### Aggravating Circumstances

Pursuant to A.R.S. §§ 8-841(C)(5) and 8-846(D)(1), DCS has not yet made a determination or cannot determine at this time whether aggravating circumstances exist.

### VIII.
### Paternity

The Department, pursuant to A.R.S. §§ 25-803 and 25-806, alleges:

A.    The State of Arizona is entitled to bring this action pursuant to A.R.S. §§ 25-801 through 25-817.

B.    The Department requests the Court for any child identified herein whose paternity has not been legally established, enter a judgment of paternity.

C.    If any of the identified fathers fails to timely comply with an order from this Court to establish his paternity, the Court may immediately enter a judgment of paternity upon request of DCS.

D.    Upon information and belief, Mother reported that the child's father was a sperm donor from Israel and that she does not have information regarding his identity or whereabouts.

## IX.
## Facts Supporting Contrary to the Welfare of the Children Finding

Continuation of the child in the home would be contrary to the child's welfare. Mother has a history of mental health issues.  The child was subject to a prior dependency case in 2020 to 2021 due to concerns that behaviors by Mother, JESSICA FIDLER, led to excessive and/or unnecessary medical interventions for the child.  A 2020 psychological evaluation that she underwent as part of the dependency case concluded that she has several mental health diagnoses, including an unspecified depressive disorder and a generalized anxiety disorder.  As part of the evaluation, Mother acknowledged that her anxiety significantly contributed to the child receiving excessive medical care.  When the child was removed from Mother's care in the prior case, his symptoms improved dramatically, and medical interventions were decreased successfully.   The family participated in services and the child returned home to Mother.  Since the child has been with Mother, his health care utilization has again increased considerably and Mother's mental health continues to be a concern.  Mother reported to DCS that she went into a mental health hospital due to her self-harming behaviors after the child was returned to her care in the previous dependency case.   Mother reported that she take an antidepressant.  After receiving a hotline report in January 2023 with continued concerns that Mother's behavior has led to excessive and/or unnecessary medical interventions for

the child, DCS obtained a medical records review and evaluation by a psychologist. According to the evaluation, Mother has continued to engage in behaviors such as inducing and/or fabricating and/or falsifying and/or exaggerating the child's symptoms, which have led to excessive and/or unnecessary medical interventions for the child. The evaluation noted that Mother meets the criteria for Factitious Disorder Imposed Upon Another and recommended that Mother and the child be separated. The identity and whereabouts of the child's father are unknown.

## X.
### Facts Supporting Reasonable Efforts Finding

It is further requested that the Court find, based upon the verified allegations of the petition, that reasonable efforts have been made to prevent removal of the child from the home. The child was subject to a prior dependency case due to similar concerns as those outlined in this petition. The family engaged in services on that case and the case was dismissed in November 2021. In January 2023, DCS received another hotline report with concerns of medical child abuse by Mother. The Department obtained a forensic records review by a psychologist and the psychologist noted concerns that Mother was engaging in behavior consistent with a diagnosis of Factitious Disorder Imposed upon Another. The psychologist recommended that Mother and the child be separated. The Department obtained a court order authorizing the child's removal and took the child into temporary custody. The Department held a Team Decision Making meeting on October 26, 2023.

///

///

7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## XI.
## <u>Facts Supporting Relative or Non-Relative Placement</u>

The Department made attempts to identify and assess placement with the child's grandparent or another member of the child's extended family, including a person who has a significant relationship with the child, but such a placement is not in the child's best interests at this time because the Department obtained a forensic medical records review by a psychologist, and the psychologist noted concerns that Mother was engaging in behavior consistent with a diagnosis of Factitious Disorder Imposed upon Another. The psychologist recommended that the child and Mother be separated to see if the child's symptoms improve. The psychologist recommended that during this time, Mother should not have access to the child and that the child should not be placed with anyone who is supportive of Mother. The child's current placement is the least restrictive consistent with the child's best interests.

## XII.
## <u>Financial Responsibility for the</u>
## <u>Support of the Child</u>

The parent(s) should pay an appropriate amount as determined by law for the care, maintenance and support of the child while in care pursuant to A.R.S. §§ 8-241, 8-243 and 8-243.01.

///

///

///

///

8

# XIII.
## Education

With regard to possible special education issues of any child named herein who is not placed with a parent, or for any child subsequently removed from a parent(s) physical custody, DCS hereby requests an order providing that:

1.    In the event a public education agency or Arizona early intervention provider advises DCS that it needs to locate a parent of any child named in this petition to serve as the Individuals With Disabilities Education Act (IDEA) parent for that child and a parent can no longer be located by DCS; or

2.    In the event the parent or legal counsel for the parent tells the public education agency, or DCS/its legal counsel that the parent will not serve as the IDEA parent for the child named in this petition; or

3.    If the parent is subject to a no contact order as to any of the children; or

4.    If a public education agency or an Arizona early intervention provider following reasonable efforts to try and get a parent to respond to its requests to act as the IDEA parent for any child named in this petition, fails to obtain a response or any cooperation of a parent, an adult relative, stepparent, or foster parent with whom the child lives (but not staff of a group home or other residential facility) shall have authority to serve as the IDEA parent.

The IDEA parent represents the children's special education interests under Parts B or C of the IDEA.  The purpose of such representation is to ensure that a child with a

suspected/known disability receives prompt assessment and evaluation for eligibility for early intervention services or appropriate educational services, which may include special education and related services designed to meet the child's unique needs.

**REQUEST FOR RELIEF**

Based upon the foregoing allegations, immediate action is required.

WHEREFORE, DCS requests this Court find and/or order that:

1. The Juvenile Court has jurisdiction over the subject matter and, after proper service on the parents, guardians, and/or Indian custodians, the persons before this Court;

2. Venue is proper in this county;

3. The child is a temporary ward of the Court, placed in the care, custody, and control of DCS, 3003 North Central Avenue, Phoenix, Arizona 85012, and;

    a. Placing ▮▮▮▮ FIDLER in the physical custody of DCS;

4. Continuation of the child in the home would be contrary to the child's welfare;

5. Reasonable efforts have been made to prevent removal of the child from the home;

6. The Department made attempts to identify and assess placement with a grandparent or extended family, including a person who has a significant relationship with the child and such a placement is not in the child's best interest at this time;

7.    The child is not an Indian child as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4);

8.    In accordance with A.R.S. § 25-809 and other applicable law that:

    a.    JESSICA FIDLER is the mother of the child born out of wedlock;

    b.    A determination as to the identity of the biological father is necessary to establish paternity for any child named in this petition who was born out of wedlock;

    c.    If genetic testing has been ordered, a father's failure to participate may result in an order of paternity naming him the legal father; and

    d.    After the establishment of paternity, enter an order requiring the Clerk of the Court to send a certified copy of the paternity order for any child born in the State of Arizona, to the Arizona Office of Vital Records, P.O. Box 3887, Phoenix, Arizona 85030-3887, which shall establish, pursuant to A.R.S. § 36-323, a new birth certificate for the child reflecting the name of the father;

9.    A Preliminary Protective Hearing be set pursuant to A.R.S. § 8-824, an Initial Dependency Hearing pursuant to A.R.S. §§ 8-842 and 8-843, a Publication Hearing, and a Permanency Hearing pursuant to A.R.S. § 8-862;

10.    The matter be assigned to the Court-Appointed Special Advocate (CASA) Program to determine if it is appropriate for the assignment of an advocate;

11

11.    The matter be assigned to the Foster Care Review Board (FCRB) to perform the duties required by statute;

12.    All persons are prohibited from removing the children from the State of Arizona without prior written approval of DCS;

13.    Any judgment and orders for the care, paternity, custody, support or such other relief, as the child's welfare and the interests of the State may require under the provisions of Title 8 and Title 25 of the Arizona Revised Statutes;

14.    That the parent(s) or legal guardian(s) shall provide the DCS Child Safety Worker or its attorney with a recent educational history (including the name(s) and location(s) of the school(s) each child named in the Petition recently attended and the grade in which each child was most recently enrolled.)  The parent(s) or legal guardian(s) shall also provide or confirm the date of birth of each child named in the Petition;

15.    An individual other than a biological or adoptive parent is authorized to act as the IDEA parent under the circumstances delineated herein;

16.    All medical, dental and mental health providers, health plans, Regional Behavioral Health Authorities (RBHAs), as well as other Health Insurance Portability and Accountability Act (HIPAA) covered providers who have provided any services to the child, make available to any guardian ad litem for the child and/or attorney for the child the various medical, dental, mental health, genetic and other health care records of the child;

17.    The allegations in this Petition are true by a preponderance of the evidence and that the child is dependent to all alleged parents, guardians, and/or Indian custodians as defined by A.R.S. § 8-201(15), and that the child be made a ward of the court committed to the care, custody, and control of DCS;

**18.    The parent, guardian, or Indian custodian be advised as follows;**

**a.    Failure to appear without good cause may result in a finding that the parent, guardian or Indian custodian has waived his/her legal rights and admitted the allegations in the dependency petition;**

**b.    That hearings may go forward in his/her absence and may result in an adjudication of dependency, permanent guardianship or termination of parental rights based upon the record and evidence presented to the Court, as well as an order of paternity, suspension or termination of an existing current child support order, custody, or change of custody in a consolidated family law matter and an order for child support if paternity has been established;**

**c.    Proceedings for permanent guardianship pursuant to A.R.S. §§ 8-871 and 8-872 or proceedings for termination of parental rights pursuant to A.R.S. § 8-533 may be initiated based upon**

**the grounds set forth in statute or for failure to participate in reunification services; and**

d.   **If a child is under three years of age, within six months after removal from the home, the Court will determine whether the parent, guardian or Indian custodian has substantially neglected or willfully refused to participate in reunification services offered by DCS; admonish the parent, guardian, or Indian custodian that substantially neglecting or willfully refusing to remedy the circumstances that cause a child to be in an out-of-home placement, including refusing to participate in reunification services, is a ground for termination of parental rights; and**

19.   That the parent(s) or legal guardian(s) provide to this Court, as required by A.R.S. § 8-841(E)(5), at the Preliminary Protective Hearing and/or the Initial Dependency Hearing:  the names, type of relationship, and all available information necessary to locate persons related to the child or who have a significant relationship with the child.  Persons related to the child include the child's grandparents, great-grandparents, brothers or sisters of whole or half-blood, aunts, uncles and first cousins. If the parent(s) or legal guardian(s) do not have sufficient information available to locate a relative or person with a significant relationship with the child, the parent or guardian must inform this Court of this fact.  The parent(s) or legal

guardian(s) must inform DCS immediately if the parent(s) or guardian(s) becomes aware of information related to the existence or location of a relative or person with a significant relationship with the child.

20.  Notice is given that if DCS has temporary custody of a child or legal custody pursuant to a court order, it has the authority to consent to: evaluation and treatment for emergency conditions that are not life threatening; routine medical and dental treatment and procedures, including early periodic screening diagnosis and treatment services, and services by health care providers to relieve pain or treat symptoms of common childhood illnesses or conditions; surgery; blood transfusions; general anesthesia; and testing for the presence of the Human Immunodeficiency Virus (HIV).  A.R.S. § 8-514.05(C).

21.  Notice is given that DCS is proposing to substantiate any allegations of abuse and/or neglect contained in the dependency petition for placement in the DCS Central Registry.  The DCS Central Registry is a confidential list of DCS findings that tracks abuse and neglect.  If the court finds your child dependent based upon allegations of abuse and/or neglect contained in the dependency petition, you will be placed in the DCS Central Registry.  *See* A.R.S. § 8-804.

22.  Notice is given that under the Arizona Rules of Family Law Procedure 5.1(C), during any dependency/guardianship proceeding in the juvenile division, the assigned juvenile division may suspend, modify, or terminate a

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

child support order for current support if the parent entitled to receive the child support no longer has legal or physical custody of the child, and, except in Title IV-D cases may make appropriate orders regarding any past due support or child support arrears.  The assigned juvenile division may direct that the wage assignment be quashed or modified.

RESPECTFULLY SUBMITTED this 27th day of October, 2023.

KRISTIN K. MAYES
Attorney General

/s/ Kristi Villarreal-Rex

KRISTI VILLARREAL-REX
Assistant Attorney General

16

1

**VERIFICATION**

2   STATE OF ARIZONA          )
                              )  ss.
3   COUNTY OF MARICOPA        )

4

5        I, Nichole Garcia, am an employee of the Petitioner, the Department of Child

6   Safety, and I am authorized to make this verification on its behalf.  I verify under penalty

7
    of perjury that I have read the foregoing Petition and upon information and belief the
8
    foregoing contents are true and correct.
9

10       DATED this $\underline{27^{th}}$ day of October, 2023.

11

12                                              _Nichole Garcia_____
                                                Signature of Nichole Garcia
13

14                                              _OCWI manager_____
                                                Title
15

16

17

18

19

20

21

22

23

24

25   AF / Fidler / HDM#11636961

26

27

28

19

## APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILD
### Superior Court of Arizona for Maricopa County

REMOVAL REQUEST # RR2023-22793

COUNTY OF ORIGIN Maricopa

DCS CASE ID AS00863831

I, Alonzo Borboa, hereby affirm the following statement of facts:

1.  I am employed by the Arizona Department of Child Safety. By virtue of my education, training and experience I am qualified and authorized to conduct child abuse and neglect investigations. I am currently assigned to investigate the case involving the child named in this application and declaration for removal, or am that person's supervisor. I make this declaration in support of this application. Further, I have the following qualifications: Positions:
    August 2022 – Present OCWI Assistant Training Manager
    December 2019 – August 2022 OCWI Investigator
    April 2018 – December 2019 DCS Program Specialist
    May 2016 – April 2018 DCS Child Safety Investigator

    Training:
    Safe AZ Renovations Advanced Forensic Interview Training (AFIT)
    DCS Specialist CORE training (240 hours)

    Education:
    Bachelor's in Secondary Education (2011)
    Master's in Psychology (2020)

2.  This application and declaration is in support of for ex-parte removal of the following children:

| Child Name | DOB | Sex | ICWA Status |
|---|---|---|---|
| ▬ Fidler | 11/26/2011 | F | No |

3.  The mother(s) is/are:
    The mother of ▬ Fidler is Jessica Fidler

4.  The father(s) is/are:
    The father of ▬ Fidler is Unknown

5.  The legal guardian(s) is/are:
    The legal guardian of ▬ Fidler is None or Unknown

APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILD
Superior Court of Arizona for Maricopa County

6.  Probable cause exists to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect, and it is contrary to the child's welfare to remain in the home under A.R.S. §8-821(A). Specifically, Specific present danger condition(s) or impending danger threat(s) for each child listed on this application:
Child's condition is the result of deliberate, preconceived planning or thinking that the caregiver is responsible for and that preceded the child's serious injuries or condition;

Circumstances that require temporary custody including a detailed account of circumstances and supporting facts:
Today, Dr. Cahill completed a forensic medical review of documents pertaining to ███ and Ms. Fidler and Dr. Cahill arrived at the conclusion that Ms. Fidler meets the criteria for Factitious Disorder Imposed on Another (FDIA).  Dr. Cahill has reviewed copious amounts of medical records pertaining to ███ and Ms. Fidler has exposed ███ to an alarming number of medical and psychological diagnoses.  ███ was removed from Ms. Fidler's care in 2020 and he showed significant improvement in a short period of time.  He asked to have his cecostomy tube removed from him and was fine afterwards.  ███ was able to complete his tasks of daily living and he did not show evidence of the cognitive or mental health issues that Ms. Fidler claimed he had.  After ███ was returned to Ms. Fidler's care she insisted on having his cecostomy tube replaced in the emergency room.  Ms. Fidler did not want ███ to use anesthesia, so he suffered immensely.  Ms. Fidler is obsessed with constipation and she is constantly flushing the child's cecostomy tube and feeding him laxatives.  ███ did not see a doctor for 30 days when he was previously in foster care, and he now has numerous specialists to attend to many of his fabricated conditions and diagnoses.  Dr. Cahill reports that Ms. Fidler is abusing ███ and she recommends that ███ be removed from her care for a period of 4-8 weeks, and that she have no contact with the child.  If ███ improves again then, this would support the diagnoses of FDIA and Dr. Cahill suggests that parental rights be terminated.

███ will continue to be exposed to countless unnecessary and harmful medical procedures if he remains in Ms. Fidler's care.  The child has a cecostomy tube placed in him, which was removed when he was in foster care and Ms. Fidler had it replaced once the child returned to her care.  The child will continue to suffer and he will not have the opportunity to live a more normal life if he remains in Ms. Fidler's care.  The father was an unknown sperm donor.

7.  I, Alonzo Borboa, declare under penalty of perjury that the information contained within this application and declaration is true and correct to the best of my knowledge and belief.

10/24/2023 2:36 PM

# ORDER FOR EX-PARTE REMOVAL OF CHILD
Superior Court of Arizona for Maricopa County

REMOVAL REQUEST # RR2023-22793

COUNTY OF ORIGIN Maricopa

DCS CASE ID AS00863831

TO ANY DCS REPRESENTATIVE IN THE STATE OF ARIZONA

Proof by application and declaration having been made this date 10/24/2023 before me by Alonzo Borboa of the Department of Child Safety ("DCS"), and on the basis of the evidence presented in such application and declaration, and pursuant to A.R.S. §8-821(A), I find probable cause exists to believe that temporary custody is clearly necessary to protect the following child ▓▓▓ Fidler from suffering abuse or neglect. I further find, for the reasons indicated below and pursuant to A.R.S. §8-821(A), that probable cause exists to believe that it is contrary to the child's welfare to remain in the home.

- ☑ Domestic violence or violent behavior
- ☑ Mental health issues
- ☑ Risk of abuse or neglect of child(ren)
- ☑ Unfit or unsafe home environment for child(ren)

Therefore, **IT IS ORDERED** granting DCS's request for authorization to remove ▓▓▓ Fidler and authorizing DCS to remove this child.

**IT IS FURTHER ORDERED** directing DCS to conduct a due diligence search pursuant to A.R.S. § 8-514.07.

_ETBingert_
_____          10/24/2023 2:44 PM
Hon. Elizabeth Bingert

CSO-1000A (6-18)
PAGE 2 ON REVERSE

ARIZONA DEPARTMENT OF CHILD SAFETY
**TEMPORARY CUSTODY NOTICE**

On *(Date)* 10/24/13  At *(Time)* 454  ☐ AM  ☑ PM , temporary custody of *(child's name)* Elicia Poller
was taken at *(Address)* 7929 _____ Rd _____ by *(Agency)* DCS I/DCS

**Type of abuse or neglect requiring temporary custody:** Select the circumstance(s) that most clearly describe the danger to the child(ren) and reason temporary custody is necessary.

☐ Medical examination is required to diagnose abuse.

☐ The child is unsupervised or alone now or on a daily basis, or has been left with a person who is unwilling or unable to provide adequate care.

☐ The caregiver is unable to perform essential parental responsibilities due to substance use, mental illness, physical impairment, cognitive limitations.

☐ The caregiver is unable or unwilling to perform essential parental responsibilities and there is no other appropriate caretaker immediately available.

☐ The caregiver is out of control and cannot focus or manage his/her behavior in ways to properly perform parental responsibilities.

☐ The caregiver's behavior is violent, bizarre, erratic, unpredictable, incoherent, or totally inappropriate and is a threat to child safety.

☐ The caregiver is brandishing weapons, known to be dangerous and aggressive, or is behaving in attacking or aggressive ways that are a threat to child safety.

☐ The caregiver has not, cannot, or will not protect the child from serious or severe harm, including harm from other persons having access to the child.

☐ Dynamics in the household include a person establishing power, control, or coercion over a caregiver in a way that impairs necessary supervision or care of the child and has caused, or will likely cause, serious or severe harm to the child's physical, mental, or emotional health.

☐ The caregiver has an extremely negative perception of the child, and/or has extremely unrealistic expectations for the child's behavior.

☐ Physical conditions in the home are hazardous and immediately threaten the child's safety.

☐ The caregiver is subjecting the child to brutal or bizarre punishment or there is severe to extreme maltreatment alleged to be occurring.

☐ The child requires immediate medical attention, and the absence of medical treatment could seriously affect the child's health and well-being.

☐ The child is actively endangering self or others and the caregiver cannot or will not control the child's behavior or arrange or provide necessary care.

☐ There is evidence of recent sexual abuse, the perpetrator currently has access to the child, and no protective action is being taken by a caregiver.

☐ The child has injuries such as facial bruises, injuries to the head, multiple plane injuries, injuries to a non-ambulatory child, immersion burns.

☐ The child has serious injuries that the caregivers and others cannot or will not explain, or the explanation is inconsistent with the child's injuries or condition.

☑ The caregiver deliberately harmed the child, or caused or threated to cause serious or severe harm to the child.

☐ The child is profoundly fearful (terrified) of their present home situation, or a particular person living in or having access to the home.

☐ The caregiver previously endangered a child and/or caused harm to a child and circumstances indicate the person will likely cause severe harm to the child.

☐ There is evidence of abuse or neglect and the caregiver cannot produce the child, refuses access to or is likely to flee with the child, or actively avoids DCS.

☐ Criminal activity by the caregiver or criminal activity of other persons living in or having access to the home will likely result in severe harm to the child.

Select how temporary custody was obtained: ☐ Parent or Guardian Consent  ☑ Court Authorized  ☐ Exigent Circumstances

**The Department of Child Safety (DCS) must:**

- Return your child within **72 hours** *(not including weekends and holidays)* unless DCS files a legal paper, called a petition, with Juvenile Court. If a petition is filed, your child will be kept in the temporary custody of DCS.

- Return your child within **12 hours** if your child was removed for a medical examination, unless abuse is revealed, and

- Inform you of the right to give a verbal, telephonic or written response to the allegations and have the response included in the investigation report. Any documentation you give, what you say or write, will be included in the case record and can be used in court proceedings.

| | |
|---|---|
| DCS REPRESENTATIVE'S NAME *(Please print)*<br>Alonzo Barbosa | AREA CODE AND PHONE NO.<br>(480)341-2748 |
| ARIZONA DEPARTMENT OF CHILD SAFETY ADDRESS *(No., Street, City, State, ZIP)*<br>3003 N. Central Ave Phoenix AZ 85012 | |
| DCS SUPERVISOR'S NAME *(Please print)*<br>Nichole Garcia | AREA CODE AND PHONE NO.<br>(602)542-1013 |

**METHOD OF NOTICE:** On *(date)* 10/14/13 , at *(time)* 7:10  ☐ AM ☑ PM , I served noticed to *(parent, guardian or custodian) (print name)*

Method used: ☑ In-Person  ☐ Left at Residence  ☐ Verbal  ☐ Fax    Date: 9/17/13    Time: _____
Address where mailed/left/given (No., Street, City, State, ZIP) 3819 Juniper Dr. E Mesa AZ 85206

| What is the child or child's parents American Indian heritage/ancestry: | Has the tribe been notified? ☐ Yes  ☐ No  ☐ N/A |
|---|---|
| PARENT, GUARDIAN OR CUSTODIAN'S SIGNATURE | |

| | |
|---|---|
| DCS REPRESENTATIVE'S SIGNATURE *(Or law enforcement officer)* | DATE<br>10/24/13 |

ROUTING: Original – Parent/Guardian/Custodian; 1st Copy – Sent to Assistant Attorney General to file with the Petition; 2nd Copy – Retained in the case record

CSO-1524
(8-19)

ARIZONA DEPARTMENT OF CHILD SAFETY
**TEAM DECISION MAKING (TDM) SUMMARY REPORT**
**SAFETY PLANNING**



| CHILDS CASE NAME: | CHILDS CASE ID NO.: |
|---|---|
| Jessica Fidler | AS00863831 |

| DCS SPECIALIST'S NAME: | DCS SUPERVISOR'S NAME: |
|---|---|
| Alonzo Borboa | Nichole Garcia |

| TDM FACILITATOR'S NAME: | TDM MEETING: |
|---|---|
| Monica Sandoval | Date: 10/26/2023 Time : 1:00PM |

| Child(ren) with Safety Concerns | | Mother/Guardian's Name | Father/Guardian's Name |
|---|---|---|---|
| **Name** | **DOB** | | |
| ▉ Fidler | ▉ | Jessica Fidler | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

What efforts have been made to include all parents and/or legal guardians in the meeting?
Mother, Jessica stated that the father was a sperm donor from Israel and she has provided the Department with the donor number ID.

What is the reason for today's meeting?
-Mother, Jessica provided a history of her involvement with the Department regarding Munchausen syndrome
-The Dept served of 10/24/23 of the child, for concerns of abuse, and they have 72 hours to either return him or move forward with the Dependency.
-Jessica stated that the removal order contained in accuracy, the professional and the Department is relying on may not have given accurate information that could have influenced the Department's decision.
-Jessica stated that one of the letters from the Doctor at PCH in the prior dependency has inaccuracies in the CSRA and that is influencing the Department perspective.

What are the current safety concerns? *(What is worrying us)*
Mother has behaviors that indicate she has Munchausen syndrome
Mother replaced the C-Tube
Mother is fabricating or exaggerating the child's symptoms
This case has been open an extended period of time January of 2023, a lack of communication and updates because of the medical review and police involvement
Jessica stated that she has no concerns of child safety while the child is in her care and only has concerns with inaccuracies, lack of communication from medical providers and DCS, and the child's safety and well-being while being with the Department. Jessica stated that ▉ was abused in the past while in the foster care system.
Jessica stated that the Department has not following up
MGM, Jamie stated that she is concerned that she was not approved as placement
MGM, Jamie is concerned that ▉ is not being noticed or heard and the child experiencing trauma

How have parent's demonstrated protection of the child(ren) in the past? *(Including thinking, feeling, doing)*:
Jessica stated that ███ has therapy, social group with other reunified children, and Mother has assited him in communicating with her and having self-advocacy
Jessica stated that he's in sports, music, and karate
Jessica stated that he is involved in the Jewish church and religious activities
Jessica stated that he has games & they do game night together
Jessica stated that she is in IDC therapy
Jessica stated that she knows how to seek community resources
Jessica stated that she has insurance and he go to medical and dental appointments
███ is a pleasant kid, smart kid, good personality, and Jessica has been in communication with the Department
Jessica stated that she shows concern for the child
Jessica stated that she has family support and is able to maintain connections (they are there for emotional support for Mother)
Jessica stated that maternal uncles are male role models for ███
Jessica stated that she has stable housing
MGM, Jamie stated that Jessica is a good mom and communicates well with him, she engages with him, and is aware of his developmental milestones when he was growing up
MGM, Jamie stated that Jessica is tolerant
MGM, Jamie stated that ███ has good behaviors she lets him have choices
Jessica stated that she is supportive, she allows him choices when it comes to discipline and to reflect on his behaviors
Jessica stated that ███ is maturing, resilient, more independent, and becoming responsible
Jessica stated that she uses a love and logic style parenting, she is confident in her parenting and communicate with doctors, and is protective
MGM, stated that ███ has a positive view of his mother
Jessica stated that he has ALTCS insurance
Jessica stated that she is employed at community league service
Jessica stated that she has transportation

Strengths and resources available to help support the plan:
Jessica stated that she would like communication with the child
Jessica stated that Therapy (DBT-Mom) & (Child-DDD) for both her and the child is in place
Jessica stated that she has support from family, friends, and her attorney
Jessica stated that Sonja Rodriguez or a 3rd party goes to medical appointments with her
The Department suggested a Psychological evaluation
It was suggested by La Frontera that a Casa or GAL for the child
Jessica suggested that the current caregiver and doctors are consulted before ███ is seen by another medical provider

What needs to happen to ensure the safety of the child(ren)? *(Ideas regarding custody and placement, supportive resources, and/or transition planning)*:
Jessica stated that she wants the child returned to her care and communication with the child
Jessica stated that Placement with MGM, Jamie
Jessica suggested that other family and friends be assessed and considered for placement
Jessica stated that the Department takes into consideration to continue with their Jewish practices and activities
MGM, Jaime suggest an OOH placement with the mother removed from the home and MGM being placement
The Department suggested an OOH, dependency petition file w/o MGM being placement
The Department suggest Psychological evaluation
La Frontera suggest Casa or GAL for the child
Jessica suggested that the current caregiver and doctors are consulted before he is seen by another medical provider

Can the threat be effectively managed in the home? *(Explain why or why not)*
No

1.  Is it possible to manage the danger in the home? If it is possible, what actions need to be taken to keep the child safe, when do we need those actions to be taken, and are there appropriate adults who are available and can carry out the actions needed?
    No

2.  Are the parents, guardians, and/or custodians willing, demonstrating and able to cooperate with an in-home safety plan?
    Yes

3.  Is the home environment (and behaviors) calm, consistent, and predictable enough?
    No

4.  Can the danger threat be managed without the results of a professional evaluation?

5.   Is there a suitable place/residence available for the duration of the plan?
       Yes

---

If the answer is no to one or more of the questions above, what would need to occur for an in-home plan to be sufficient *(Conditions for Return)*?
The Department stated that the conditions of return requires additional information from their legal Department and other parties in order to determine the conditions of return.

---

Recommendations/Safety Plan:
OOH

---

**Legal Custody** *(Specify for each child)*

| Maintain child in parent/guardian's custody | In-home dependency | Return child to parent/guardian's custody |
|---|---|---|
| Voluntary out-of-home care | In-home intervention | Dependency out-of-home care<br>■ Fidler |

Placement *(Specify for each child)*:
OOH

---

Current/Last school attended *(Specify for each child):* If a safety, out-of-home placement or permanency decision results in a change to the child's living arrangement, document the school placement decision (remain in the school of origin or enroll in a new school) using the Best Interests Determination and Transportation Plan CSO 1348A.

The child will remain in the same school Learning Foundation for Performing Arts

---

Plan for sibling contact (if applicable) and parenting time *(Specify for each child):*
   Not applicable

**Follow up tasks to be completed (within 7-10 days)**

| WHO | WHAT | WHEN |
|-----|------|------|
| DCS | File out of home dependency petition | 72 hours |
| DCS | TCN | completed |
| DCS | Case Aide vistation | TBD |
| DCS | Parenting Time | TBD |
| DCS | In-unit Psych Consult | 7-10 Days |
| DCS | RR | Completed |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Back-up plan *(If applicable, is valid for 5 business days from the TDM date):*
N/A

**Signatures of Participants (Signature does not imply agreement)**
**Firmas de Participantes (Su firma no significa que acepta un acuerdo)**

| Print Name<br>*Nombre en Letra de Molde* | Signature/*Firma* | Role/*Relacion* | Telephone Number<br>*Numero de Telefonico* |
|---|---|---|---|
| Jessica Fidler | | Mother | In-Person |
| Nicole Garcia | | OCWI  Supervisor | In-Person |
| Alonzo Borboa | | OCEI Specialist | In-Person |
| Christine LaLonggia | | La Frontera | In-Person |
| Jamie | | MGM | In-Person |
| Garette | | Maternal Uncle | Virtual |
| DeeAn Gillespie | | Attorney for Mother | In-Person |
| Michelle Feltes | | Paralegal | In-Person |
| Sonya Rodriguez | | DDD District Nurse | Virtual |
| Annette Heywood Ruskin | | Therapsit for child | Virtual |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Equal Opportunity Employer/Program • Under Titles VI and VII of the Civil Rights Act of 1964 (Title VI & VII), and the Americans with Disabilities Act of 1990 (ADA), Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title II of the Genetic Information Nondiscrimination Act (GINA) of 2008; the Department prohibits discrimination in admissions, programs, services, activities, or employment based on race, color, religion, sex, national origin, age, disability, genetics and retaliation. The Department must make a reasonable accommodation to allow a person with a disability to take part in a program, service or activity. For example, this means if necessary, the Department must provide sign language interpreters for people who are deaf, a wheelchair accessible location, or enlarged print materials. It also means that the Department will take any other reasonable action that allows you to take part in and understand a program or activity, including making reasonable changes to an activity. If you believe that you will not be able to understand or take part in a program or activity because of your disability, please let us know of your disability needs in advance if at all possible. To request this document in alternative format or for further information about this policy, contact your local office; TTY/TDD Services: 7-1-1. • Free language assistance for Department services is available upon request. • Ayuda gratuita con traducciones relacionadas con los servicios del DCS está disponible a solicitud del cliente.

ORIGINAL of the foregoing filed
this 27th day of October, 2023, with:

Clerk of the Court
Maricopa County Superior Court
Juvenile Division/Durango Facility
3131 West Durango
Phoenix, AZ 85009-6292

Copy of the foregoing hand-delivered
this 27th day of October, 2023, to:

Honorable
Maricopa County Superior Court
Juvenile Division/Durango Facility
3131 West Durango
Phoenix, AZ 85009-6292

Copies of the foregoing mailed
this 27th day of October, 2023, to:

Foster Care Review Board
1501 W. Washington, Suite 128
Phoenix, Arizona 85007

Alonzo Borboa
Case Manager
Site Code:  O15A

  _/s/ Andrea Fontes_____
AF / ▓▓▓▓ / HDM#11636961

17

Clerk of the Superior Court
*** Electronically Filed ***
Y. Moralez, Deputy
1/15/2025 10:50:42 AM
Filing ID 19169152

1  Thomas A. Connelly (AZ Bar #109430)
2  Robert T. Mills (AZ Bar #018853)
   Sean A. Woods (AZ Bar #028930)
3  **MILLS + WOODS LAW PLLC**
   5055 North 12th Street, Suite 101
4  Phoenix, Arizona 85014
5  Telephone 480.999.4556
   docket@millsandwoods.com
6
7  DeeAn Gillespie Strub (AZ Bar #009987)
   Jenny D. Jansch (AZ #024431)
8  **GILLESPIE, SHIELDS, & TAYLOR**
   7319 North 16th Street
9  Phoenix, Arizona 85020
10 Telephone: (602) 870-9700
   Fax: (602) 870-9783
11 mailroom@gillaw.com

12 *Attorneys for Plaintiffs*

13        **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
14           IN AND FOR THE COUNTY OF MARICOPA**

15 JESSICA FIDLER, an individual;       Case No. CV2024-030202
16 E.F., a minor, through his parent and   **NOTICE OF ERRATA**
   guardian JESSICA FIDLER,
17                                       (Assigned to the Honorable
               Plaintiffs,              Christopher Whitten)
18
19            vs.

20 STATE OF ARIZONA, a government
   entity;
21 ALONZO BORBOA, individually and as
   an employee with the State of Arizona
22 Department of Child Safety;
23 NICHOLE GARCIA, individually and as
   an employee with the State of Arizona
24 Department of Child Safety;
25 EDWIN WANGLER, individually and as
   an employee with the State of Arizona
26 Department of Child Safety;
27 DANA BURDEN, individually and as an
   employee with the State of Arizona
28 Department of Child Safety;

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

1  JANET CAHILL, Ph.D, individually;
2  JOHN and JANE DOES 1-10;
   BLACK and WHITE ENTITES 1-10,
3
                              Defendants.
4
        Plaintiffs, by and through undersigned counsel, hereby files this Notice of Errata,
5
   advising the Court that Defendant Cahill was inadvertently left out of the caption in the
6
   First Amended Complaint filed today.  Plaintiffs are simultaneously filing a First Amended
7
   Complaint (Revised) to correct the caption.
8
        **RESPECTFULLY SUBMITTED** this 15th day of January, 2025.
9
10                                    **MILLS + WOODS LAW PLLC**

11                                    By */s/ Thomas A. Connelly*
12                                    Thomas A. Connelly
                                      Robert T. Mills
13                                    Sean A. Woods
                                      5055 North 12th Street, Suite 101
14                                    Phoenix, Arizona 85014
15
                                      **GILLESPIE, SHIELDS, & TAYLOR**
16
17                                    DeeAn Gillespie Strub
                                      Jenny D. Jansch
18                                    7319 North 16th Street
                                      Phoenix, AZ 85020
19
20                                    *Attorneys for Plaintiffs*
21
22
23
24
25
26
27
28

Clerk of the Superior Court
*** Electronically Filed ***
C. Nasui, Deputy
1/15/2025 11:00:26 AM
Filing ID 19169343

Thomas A. Connelly (AZ Bar #109430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ #024431)
**GILLESPIE, SHIELDS, & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com

*Attorneys for Plaintiffs*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| JESSICA FIDLER, an individual; E.F., a minor, through his parent and guardian JESSICA FIDLER, <br><br> Plaintiffs, <br><br> vs. <br><br> STATE OF ARIZONA, a government entity; ALONZO BORBOA, individually and as an employee with the State of Arizona Department of Child Safety; NICHOLE GARCIA, individually and as an employee with the State of Arizona Department of Child Safety; EDWIN WANGLER, individually and as an employee with the State of Arizona Department of Child Safety; DANA BURDEN, individually and as an employee with the State of Arizona Department of Child Safety; | Case No. CV2024-030202 <br><br> **FIRST AMENDED COMPLAINT (Revised)** <br><br> (Assigned to the Honorable Christopher Whitten) <br><br> **JURY TRIAL REQUESTED** |

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

JANET CAHILL, Ph.D, individually;
JOHN and JANE DOES 1-10;
BLACK and WHITE ENTITES 1-10,

Defendants.

Plaintiffs Jessica Fidler and E.F.[1] (jointly, "Plaintiffs") submit their Complaint against Defendants State of Arizona, Alonso Borboa, Nichole Garcia, Desiree Manrique, Edwin Wangler, Dana Burden, Janet Cahill, John and Jane Does I-X, and Black and White Entities I-X. Plaintiffs state and allege the following:

## JURISDICTION AND VENUE

1.      Plaintiffs bring this civil rights lawsuit pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, A.R.S. § 12-641, and Arizona common law.

2.      The amount in controversy exceeds the minimal jurisdiction limits of this Court.

3.      This Court has original subject matter jurisdiction over the claims made in this Complaint pursuant to Article 6, Section 14 of the Arizona Constitution.

4.      The acts and events giving rise to the cause of action alleged herein occurred in Maricopa County, Arizona, and all Defendants are subject to the personal jurisdiction of this Court in accordance with A.R.S. § 12-123 and as otherwise provided under Arizona law and the Arizona Rules of Civil Procedure.

5.       Venue lies in this Court pursuant to 28 U.S.C. § 1391 and A.R.S. § 12-401 in that, among other reasons, the specific acts giving rise to the causes of action alleged herein occurred with primary effect in Maricopa County, Arizona.

## THE PARTIES

6.      Plaintiff Jesssica Fidler ("Jessica") is an individual, a citizen of the United States, and a resident of Maricopa County, Arizona. At all times relevant to the present Complaint, Jessica resided in Maricopa County, Arizona.

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

---

[1]      E.F. is a fictitious name used to protect the identity of the minor.

2

7.      Plaintiff E.F., is an individual, minor, a citizen of the United States, and a resident of Maricopa County, Arizona.  At all times relevant to the present Complaint, E.F., resided in Maricopa County, Arizona.

8.      Jessica is the biological and legal mother of E.F.

9.      Defendant State of Arizona, is a government entity. Its divisions and agencies include the Arizona Department of Child Safety ("DCS"), Office of Child Welfare Investigations "OCWI") which acts by and through its officials, employees, and agents, including, without limitation, each of the other Defendants in this action.

10.     Among the facilities operated by the DCS includes a "Welcome Center," opened, upon information and belief, in August of 2023 (the "Welcome Center"). It is intended, in short, to be a "one-stop" facility for children coming into care of the DCS who have experienced significant trauma.

11.     Defendant Alonzo Borboa ("Borboa") is an individual who resided in Maricopa County, Arizona, at all times relevant to the Complaint.  Borboa was, at all times relevant to this Complaint, acting under the color of law as an employee of State of Arizona with DCS.  He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Borboa was employed by the State of Arizona and DCS, OCWI as a DCS investigator and assistant manager.

12.     Defendant Nichole Garcia ("Garcia") is an individual who resided in Maricopa County Arizona, at all times relevant to the Complaint.  Garcia was, at all times relevant to this Complaint, acting under color of law as an employee of the State of Arizona with DCS.  She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Garcia was employed by State of Arizona with DCS and OCWI as a DCS investigator and manager.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

3

13.    Defendant Edwin Wangler ("Wangler") is an individual who resided in Maricopa County, Arizona, at all times relevant to the Complaint.  Wangler was, at all times relevant to this Complaint, acting under the color of law as an employee of the State of Arizona with DCS.  He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Wangler was employed by the State of Arizona with DCS, as the Chief of OCWI who is responsible for OCWI employees, investigators, Deputy Chief and head decision maker for OCWI.

14.    Defendant Dana Burden ("Burden") is an individual who resided in Maricopa County, Arizona, at all times relevant to the Complaint.  Burden was, at all times relevant to this Complaint, acting under the color of law as an employee of the State of Arizona with DCS.  He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.  At all times relevant, Burden was employed by State of Arizona with DCS as the Deputy Chief of OCWI who is responsible for OCWI employees and investigators, and supervisor to Barboa and Garcia.

15.    Defendant Janet Cahill, Ph.D. ("Cahill") is an individual who resided in Minden, Neveda, at all times relevant to this Complaint.  At all times relevant, Cahill provided consulting services for DCS and was acting under the color of law.  She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

16.    Whenever in this Complaint reference is made to any act of "Defendants" such allegations shall be deemed to mean all named Defendants, John and Jane Does I-X and Black and White Entities I-X, or their officers, agents, managers, members, representative, employees, heirs, assignees, customers, tenants, and that they did or authorized such acts while actively engaged in the operation, management, direction, or control of the affairs of Defendants and while acting within the course and scope of their duties, expect as specifically alleged otherwise.

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

17.    At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiffs allege, upon information and belief, that each Defendant was and is the agent, employee, principal, employer, co-conspirator, or any combination thereof of each of the remaining defendants, vice versa, or both.  In addition, Plaintiffs allege, upon information and belief, that the Defendants named herein, and each of them, are responsible in some manner for the occurrences herein alleged, and that each of the above Defendants conspired with, directed, ratified, approved, aided, abetted, jointly collaborated, or any combination thereof, each of the remaining Defendants in committing the acts herein alleged or failed to prevent such acts when having the power, duty, or authority to do so with full knowledge of said acts.

18.    At all times relevant herein, Defendants John and Jane Does 1-10 were individuals who live in or have substantial ties to Maricopa County, Arizona, who, upon information and belief, helped to cause the injuries alleged herein. In particular, upon information and belief, these individuals participated in the conspiracy set forth below. The true names of John and Jane Does 1-10 are not presently known but will be provided to this Court as they are learned.

19.    At all times relevant herein, Defendants Black and White Entities 1-10 were corporations, partnerships, limited liability companies, or other organizations and entities who, upon information and belief, operate in and have substantial ties to Maricopa County, Arizona, and upon information and belief, helped to cause the injuries alleged herein.  In particular, upon information and belief, these individuals participated in the conspiracy set forth below.  The true names of Black and White Entities 1-10 are not presently known but will be provided to this Court as they are learned.

## **FACTUAL ALLEGATIONS**[2]

### A.    **Jessica and her son, E.F.**

---

[2] Plaintiffs make the allegations in this Complaint based upon personal knowledge as to those matters in which they had personal involvement and upon information and belief as to all other matters.

5

20.     The two plaintiffs in this matter are Jessica Fidler and her son, E.F., born in November of 2011.

21.     E.F. was conceived via intrauterine insemination using an anonymous sperm donor in March 2011. The procedure conducted in Israel.

22.     Jessica's pregnancy with E.F. was complicated, and E.F. was born three weeks early via C-Section at Rambam Hospital in Haifa, Israel.

23.     Jessica returned to the State of Michigan, where she raised E.F. She had an extended family network there who supported both Jessica and E.F.

24.     Jessica raised E.F. in her own personal faith, Judaism.

25.     In 2013, Jessica moved to Arizona for better employment opportunities and her extended network both in Arizona and Michigan.

26.     From birth, E.F. suffered from chronic health issues—most issues that could be objectively measured and observed. These issues included dizziness, labile body temperature, apnea (stopping to breathe), chronic fatigue, chronic constipation, fecal and urinary incontinence, and global developmental delays.

27.     By the time E.F. was four years old, doctors told Jessica that E.F. could have a variety of different diagnoses including congenital disorders, food allergies, cystic fibrosis, seizures, mitochondrial disorder, dysautonomia disorder, weakened immune system, and postural orthostatic tachycardia syndrome. Some of the treatments the doctors offered would lessen E.F.'s symptoms at times, none were curative.

28.     Although Jessica was very concerned for the health and well-being of her son, she sought the least amount of medical treatments possible, as it was her wish that E.F. would "just be a kid."

29.     All medical treatment and medications provided to E.F. were procedures and medicines prescribed by mainstream doctrines and providers. Jessica did not provide E.F. with treatments or medications not prescribed by doctors, nor did she seek medical treatment from nontraditional or unlicensed medical practitioners.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

6

30.    E.F. was frequently seen by doctors, and was even hospitalized on occasion when medically necessary, due to his chronic health issues. All decisions as to whether to admit E.F. to the hospital were made by the hospitals' treating physicians.

31.    In Arizona, E.F. also had a home-health nurse, a primary care physician, specialists, and an Arizona Department of Development Disabilities service provider, all of whom had regular and continuous access to E.F.

**B.    Doctors at Phoenix Children's Hospital treat E.F.**

32.    In August of 2016, doctors at Phoenix Children's Hospital ("PCH") placed a central line IV in E.F. Doctors would occasionally use IVs to facilitate administration of fluids and antibodies. After administering the IV, PCH doctors told Jessica to bring E.F. to a hospital if he ever ran a fever over 100.4 F, as any infection in the central line IV would be life-threatening.

33.    Because E.F. has a weakened immune system and temperature instability, he frequently ran a fever over 100.4 degrees Fahrenheit.

34.    Jessica followed the advice of the PCH doctors and sought medical treatment every time his documented temperature exceeded 100.4 degrees.

35.    E.F.'s home-health nurse documented the reasons why Jessica took E.F. to the doctor when she did. These home-health nurse medical records evidenced E.F.'s temperatures and any issues E.F. may have had with his GI tract, among other things.

36.    E.F.'s medical specialists specifically recommended that Jessica take E.F. to be seen by medical specialists in Cincinnati, Ohio and at the Stanford University Medical Center.

37.    In June of 2017, PCH doctors decided to admit E.F. to PCH following a visit to his pediatrician. While at PCH, E.F. (and Jessica), a PCH hospitalist concluded that "there was nothing wrong" with E.F.—an opinion that only this doctor had.

38.    In the summer of 2019, E.F.'s gastrointestinal woes continued. At the recommendation of PCH doctors, Jessica took E.F. to a specialist located in Cincinnati. The

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

7

Cincinnati specialist recommended that E.F. undergo a major surgical procedure, an ileostomy, a procedure that involves cutting a hole in the abdominal wall and leaving the hole open as a means of clearing the colon of waste.

39.      Other medical providers agreed with the Cincinnati specialist, but others at PCH disagreed. Ultimately, Jessica chose to have a less invasive procedure performed on E.F. rather than the ileostomy.

**C.      E.F. returns to PCH in January of 2020**

40.      In late January of 2020, Jessica brought E.F. to PCH because he was running a fever—doing just as she had been instructed by E.F.'s doctors. Tests at PCH concluded that E.F. did not have an infection.

41.      The same PCH hospitalist that had earlier concluded that there was nothing wrong with E.F. contacted the Department of Child Safety ("DCS") and suggested that Mother was overtreating E.F.

42.      During its subsequent investigation, DCS investigators did not interview E.F.'s primary care physician, who had monitored E.F. and his health for many years, or any of his other treating physicians.

43.      They did not interview E.F.'s service provider with the Arizona Division of Developmental Disabilities ("DDD"), a licensed nurse.

44.      They did not interview E.F.'s home health nurse.

**D.      The first dependency/severance proceeding**

45.      Nonetheless, on March 31, 2020, DCS filed a dependency petition and requested a temporary order for removal from the juvenile court.

46.      On April 3, 2020, the Department removed E.F. from the care and custody of his mother, Jessica.

47.      Despite the Department's claim that Jessica was "over treating" E.F., when the Department took custody of E.F. on April 3, 2020, Department employees not only took him to PCH, but kept him hospitalized for two weeks. In subsequent dependency

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

proceedings, a DCS investigator admitted that there was no medical reason for E.F. to be hospitalized in April 2020, let alone for two-weeks, other than for DCS to investigate the abuse allegations.

48.     Notwithstanding these other foster options of placement with his grandmother or with members of his own faith community, the Department placed E.F. with a non-Jewish foster family who had two prior DCS referrals.

49.     E.F.'s gastronomical issues returned in the care of placement. Specifically, E.F.'s bowel symptoms started to flare up and he began to soil himself, a symptom that had largely resolved after the hemi-colectomy performed at Banner in October 2019, and only re-occurred when Dr. Christensen removed all of E.F.'s medical treatments.

50.     Placement's own children bullied E.F. They denied E.F. food as a form of punishment. They did not allow E.F. to wear his prescription glasses.

51.     In May of 2020, the Department believed it had enough evidence to move to permanently sever the relationship between E.F. and the only caregiver he had ever known, Jessica.

52.     On August 19, 2020 and September 14, 2020, the juvenile court conducted two interim evidentiary hearings. By then, the Department had had many months to investigate its allegations. Nonetheless, after multiple doctors who had actually treated E.F. testified, the juvenile court questioned DCS about if there was any factual basis to support their petition. DCS had no good response. *See Partial Transcripts of Proceeding*, **Exhibit 1** hereto**.**

53.     Following these interim hearings, on October 16, 2020, Jessica filed a motion for summary judgment, noting that the Department had no evidence to support either the dependency or severance claims. A redacted version of this summary judgment motion is attached as **Exhibit 2**.

54.     The Department did not file a response to the motion.

9

55.     Instead, at a November 3, 2020, pretrial conference, the Department orally moved to dismiss the proceedings against Mother. The trial court granted the motion, and E.F. was returned to his mother, Jessica.

**E.      The first civil rights action**

56.     Thereafter, in light of the paucity of any evidentiary basis to disrupt the relationship between E.F. and Jessica, they filed a civil rights and negligence complaint against Dr. Christiansen, other PCH providers, and the State of Arizona and relevant DCS employees on November 3, 2021. *See Fidler and E.F. v. State of Arizona, et al.*, Maricopa County Superior Court No. CV 2021-017147.

57.     The defendants in the first civil rights matter removed the matter to federal court. *See* CV-22-00300-PHX-ROS.

58.     Thereafter, the federal court dismissed Plaintiffs' complaint and entered a final judgment on April 3, 2023. The Ninth Circuit affirmed in a memorandum decision dated April 10, 2024.

**F.      E.F. returns home, and Jessica moves to a new residence for her protection.**

59.     Meanwhile, after E.F. was returned home, Jessica took steps to assist E.F. in his emotional recovery for the forcible separation from his mother and caregiver and the abuse at the hands of the foster placement family.

60.     After the prior foster mother began stalking Jessica and E.F., Jessica thereafter moved to a new residence and obtained a protected address through the Arizona Address Confidentiality Program.

**G.      DCS  begins a new investigation of Jessica regarding E.F.**

61.      On January 19, 2023, the Department of Child Safety purportedly received a new report about Jessica's care of E.F.

62.     DCS investigators, including Natacha Pavlina ("Pavlina") and Defendant Borboa, asserted that the new report related to Jessica's care of E.F. since the dismissal of

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

10

the prior dependency, but the focus of their "investigation" was on the events that occurred in 2020 and the period of the prior dependency.

63.    For example, on January 20, 2023, Pavlina and her manager/supervisor Defendant Garcia contacted the Gilbert Police Department Detective Halliday, reporting Jessica for child abuse; this report was based on **the same doctor's report** in January 2020, which resulted in E.F.'s wrongful removal at that time.

64.    Further, Pavlina, Defendants Garcia and Borboa provided only selected information to the Gilbert Police Department. They provided only the Gilbert Police Department with three selected documents: the Case Review, E.F.'s Psychiatric notes from when he was in foster care in 2020, and Jessica's psychological evaluation.   Further, they did not provide the Gilbert Police Department with the outcome of the prior case, that none of E.F.'s regular medical providers would support the Department's allegations, or that the Department did not interview any of these providers.

65.    Indeed, when the Gilbert Police Department requested medical records from January 1, 2021, to the present, Defendants Garcia and Borboa informed Detective Roman that the requests should have gone back to January 1, 2020.

66.    Although the Department clearly had Jessica's new home address, as evidenced by their January 20, 2023, visit, on January 24, 2023, they "officially" sought discovery of the address by filing a request with the Address Confidentiality Program, asserting that it was needed for an ongoing DCS and criminal investigation and, further, falsely claiming that E.F. was not receiving needed medical equipment delivered to the home and that Jessica refused to provide her address to medical providers.

67.    Further, Pavlina and Defendants Garcia and Borboa refused to meet with Jessica and/or her representatives, and refused to provide the factual basis for the new claims and investigation.

68.    For many months thereafter, Defendants did nothing, despite their legal obligation to investigate such claims promptly.

11

**H.    The DCS Defendants hire an out-of-state expert in an effort to resurrect the prior dismissed allegations.**

69.    Having found no current medical provider that would support the Defendants' contention that Jessica was overtreating E.F. or otherwise had FDIA, on September 26, 2023, Defendants Wangler, Burden and Garcia contacted an out-of-state, retired professor from Rowan University Department of Psychology, Defendant Janet Cahill, Ph.D.

70.    They asked her to find evidence of Factitious Disorder Imposed on Another ("FDIA").

71.    That same day, Dr. Cahill contacted Defendants Wangler, Burden, and Garcia to discuss the medical records that she needed, particularly, she wanted examples of where Jessica appeared to deliberately fabricate, exaggerate, or induced symptoms in E.F., as well as instances she could characterized as doctor shopping by Jessica.

72.    Knowing that DCS had never corrected the errors in their records, Wangler and Burden instructed Garcia and Borbora to provide the erroneous records.

73.    On October 12, 2023, Dr. Cahill reported to the State through DCS and its agent Borboa that her initial review of the medical records sent did not clearly support the allegation that Jessica was overtreating E.F.

74.    Defendants Wangler, Burden and Garcia instructed Defendant Borboa to provide Dr. Cahill with more erroneous records including the 2020 CSRA previous investigation, DCS 2020 case notes, and cecostomy tube removal in 2020.

75.    Further, Defendant Borboa informed Dr. Cahill that when E.F. was initially removed and in foster care that he had no medical issues and was improving, although this was not correct.

76.    Defendants Wangler, Burden, Garcia and Borboa never provided the documentation showing that E.F. continued to have encopresis and nocturnal enuresis while in foster care; that is, records showing that E.F. was not improving. They continued to provide selective erroneous records to Cahill so that she would reach a diagnosis of FDIA.

12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

77.    Despite the evident misrepresentations and omissions in the records that DCS provided to Dr. Cahill, on October 24, 2023, Cahill issued a report diagnosing Jessica as meeting the criteria for FDIA.

78.    Dr. Cahill's diagnosis of FDIA is forensically unreliable and there is no medical evidence to support her diagnosis. The only basis for Dr. Cahill's assertion that Jessica fabricated and exaggerated information are faulty assumptions fed to her by the State through DCS and its agents  Wangler, Burden, Garcia and Borboa.

79.    Dr. Cahill's statements in her report demonstrate the insufficient information that the Defendants provided to her. She states in her report that "[E.F.] was returned to his mother's care, she is not sure how that happened, but it is likely Ms. Fiddler appeared to change and E.F. was returned to her." As noted above, the Department simply provided no evidence of her FDIA and ultimately moved to dismiss the prior dependency.

80.    Upon receipt of Dr. Cahill's inaccurate report, Defendants Wangler, Burden and Garcia, upon information and belief, had a staffing and/or meeting and made the decision to remove E.F. based on Cahill's unreliable report.

**I.    The Unlawful Seizure and Removal of E.F.**

81.    On October 24, 2023, Defendants Wangler, Burden and Garcia instructed Defendant Borboa to file an *Application and Declaration for Ex-Parte Removal of Child* with respect to E.F.

82.    Upon information and belief, Defendant Garcia reviewed *the Application and Declaration for Ex-Parte Removal of Child*.

83.    At the direction of Wangler, Burden, Garcia, and Borboa claimed that based on Dr. Cahill's report and her conclusion that Jessica meets the criteria of FDIA, E.F. will continue to be exposed to countless unnecessary and harmful medical procedure if E.F. remains in Jessica's care.  If E.F. improves while in State's care, Cahill suggests that Jessica's parental rights be terminated.

13

84.    Borboa's sworn *Application and Declaration for Ex-Parte Removal of Child* to the court (*See* **Exhibit 3**), falsely stated that the following:

a.  Cahill reviewed copious amounts of medical records pertaining to E.F.

b.  Ms. Fidler exposed E.F. to an alarming number of medical and psychological diagnosis.

c.  E.F. was removed from Ms. Fidler's care in 2020 and showed significant improvement in a short period of time.

d.  E.F. asked to have his cecostomy tube removed and was fine thereafter.

e.  E.F. was able to complete his tasks of daily living and did not show evidence of cognitive or mental health issues.

f.  Once E.F. was returned to Ms. Fidler's care she insisted on having his cecostomy tube replaced without anesthesia causing E.F. to suffer immensely.

g.  Ms. Fidler is obsessed with constipation and constantly flushing E.F.'s cecostomy tube and feeding him laxatives.

h.  E.F. did not see a doctor for thirty (30) days when in foster care but now has numerous specialists to attend to many of E.F.'s fabricated conditions and diagnosis.

i.  Dr. Cahill reported that Ms. Fidler is abusing E.F. and recommends E.F. be removed from Ms. Fidler's care for a period of 4-8 weeks with no contact; noting that if E.F. improved, this improvement would support the diagnosis of FDIA and Cahill suggests that parental rights be terminated.

j.  E.F. will continue to be exposed to countless unnecessary and harmful medical procedures if E.F. remains in Ms. Fidler's care.

85.    Defendants Wangler, Burden, Garcia and Borboa willfully chose not to speak with E.F.'s pediatrician, his surgeon, GI physician, the DDD regional Nurse or E.F.'s therapist or even Jessica prior to obtaining an *ex parte* judicial removal order.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

14

86.     Defendants Wangler, Burden, Garcia and Borboa failed to inform the court that E.F.'s cecostomy tube was replaced only after exhausting all other possible remedies, that the cecostomy tube was replaced in September 2021 under the direction and recommendation of E.F.'s surgeon, his GI doctor and since its reinsertion that E.F.'s condition has steadily improved.

87.     Defendants Wangler, Burden, Garcia and Borboa misled the court in obtaining the 2023 Ex-Parte Removal Order.

88.     That afternoon, on October 24, 2023, Defendants Wangler, Burden, Garcia and Borboa removed E.F. from his school and placed him in DCS' Welcome Center.

89.     The State through DCS and its agents Wangler, Burden, Garcia and Borboa removed a happy, thriving child from his mother by means of judicial deception, actively withholding information, and falsely claiming that the child needed to be removed due to eminent danger to his physical well-being.

**J.     DCS placed E.F. imminent danger while in its custody, due to its medication-related negligence**

90.     Within two days of taking custody of E.F., on October 26, 2023, Defendant Desiree Manrique dispensed to E.F. a cocktail of toxic medications, intended for another child at the Welcome Center, not E.F.

91.     These incorrect medications included 5 milligrams of Aripiprazole, 25 milligrams of Hydroxyzine, and 50 milligrams of Sertraline.

92.     DCS's medication policy provides that:

1. Case aid is required to document time/dosage given on the medication log;

2. Medication must be prepared in secure are without children present and administered to one child at a time in a controlled environment away from other children;

3. Prior to administering medication must verbally identify child's name, verify name matches wristband, verify child's name matches

15

prescriptions and medication log, and verify time/dosage of medication; and

    4.  A second witness must verify all of the foregoing conditions.

93.   The medications 5mg Aripiprazole, 25mg Hydrozyzine, and 50mg Setraline--were dispensed to E.F. in violation of these policies and procedures.

94.   DCS Welcome Center employees failed to notice the medical error for almost two hours when the female child who was supposed to receive the medication brought it to their attention that she had not received her medications.

95.   Instead of immediately taking E.F. to the emergency room the Welcome Center staff called poison control and waited.

96.   Sometime around 11:30 p.m., Welcome Center employee Alexandra Moreno-Banovich finally took E.F. to the Banner ER, using her personal vehicle and arriving sometime after midnight.

97.   While in the waiting room, E.F. became unresponsive. At one point, his heart rate blood pressure dropped so low that his heart almost stopped beating.

98.   After being admitted to Banner and during transport to a room, E.F. became unresponsive again.

99.   Defendant Moreno-Banovich provided false information on how E.F. obtained the medication, stating that the medication was left on the counter and E.F. just took it on his own.

100.  Defendants Wangler, Burden, Garcia and Borboa prohibited E.F.'s mother from being with E.F. during treatment at the hospital.

101.  Defendant E.F. was alone in the hospital with an Aide – a total stranger – instead of his own mother.

102.  Defendants Wangler, Burden, Garcia and Borboa prohibited the Banner doctors from consulting with or advising Jessica about E.F.'s medical status or that he had almost died only to be revived by Banner doctors.

16

**K.    Defendants again seek a dependency as to E.F.**

103.    After E.F. was released from the hospital, Defendants Wangler, Burden, Garcia and Borboa immediately placed E.F. with DCS' legend Group Home.

104.    The next day, on October 27, 2023, the Department filed a second Dependency Petition (see **Exhibit 4**), which contained unsubstantiated allegations and statements which the Defendants Borboa and Garcia provided and knew, or reasonable should have known, were false. Stating the following:

    a. When E.F. was removed from Jessica's care in 2020 his symptoms improved dramatically.

    b. E.F.'s medical interventions were decreased successfully.

    c. After returning to Jessica's care, his health care utilization has significantly increased.

    d. Relying on the 2020 forensic psychological evaluation, falsely alleged that Jessica continued to engage in Munchausen behaviors, such as:

        i. Inducing and/or fabrication and/or falsifying and/or exaggerating the child's symptoms; and

        ii. That Jessica acknowledged that her anxiety significantly contributed to the child receiving excessive medical care.

    e. Falsely alleging that the January 2023, hotline report indicated continued concerns that Jessica's behavior has led to excessive and/or unnecessary medical interventions for the child.

105.    Defendant Garcia verified the Dependency Petition as being true and accurate.

106.    The Department failed to inform the Court that E.F.'s cecostomy tube was replaced only after exhausting all other possible remedies, that the cecostomy tube was replaced in September 2021 under the direction and recommendation of E.F.'s surgeon, his

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

17

GI doctor and since its reinsertion that E.F.'s condition has somewhat improved but he continues to have issues.

107. The Department failed to inform the court that E.F.'s medical interventions had not decreased successfully.

108. The Department failed to inform the court that after stopping all his medical interventions, while he was in foster care, E.F.'s bowel symptoms started to flare up and he began to soil himself. This symptom had largely resolved after the hemi-colectomy performed at Banner in October 2019, and only re-occurred after E.F.'s medical treatments were removed.

109. The Department chose not to speak with E.F.'s pediatrician, his surgeon, the DDD regional Nurse or E.F.'s therapist but relied on Wangler, Burden, Garcia and Borboa's false narrative.

110. On November 1, 2023, the Department filed DCS' *Motion to Suspend Visitation and Motion for Temporary Emergency Suspension of Visitation Pending Status Conference* ("Motion") based upon Defendant Cahill's report.

111. Ironically, the Department failed to inform the court that while in DCS's care and custody just a few days before, that E.F. suffered a medical emergency because of DCS's negligence and nearly died.

112. In a November 2, 2023, report, the Department updated its report and suggested that Jessica and E.F. himself were to blame for the medication issue.

113. After his removal, E.F. was deprived of all contact with his mother, relatives, his doctors and therapist, his regular enrichment activities and his religious and cultural heritage.

**L.    DCS advises Jessica of its intent to substantiate a finding of abuse**

114. On November 2, 2023, Defendant Borboa sent Jessica a letter titled "Notice of Proposed Substantiation of Child Safety Report."

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

18

115.    September 2023, both the Maricopa County Attorney's Office prosecutor and Gilbert Police Department did not substantiate a charge of abuse and found no credible evidence of abuse.

116.    The Department failed to follow the Maricopa County Joint Investigation protocol and policy.

**M.    Fourteen Days after E.F.'s Wrongful Removal, He is Returned to His Mother**

117.    Following a meeting with attorneys at the Arizona Attorney General's Office, on November 7, 2023, Defendants Wangler, Burden, and Garcia instructed Borboa to return E.F. to Jessica's custody.

118.    After being returned to his mother, E.F. had a well-visit with Ronald M. Serbin, M.D., who noted in his chart that after E.F.'s removal, he "had multiple email and phone conversations with Borboa expressing his concern that none of his present physicians caring for [E.F's] medical needs were contacted by the State or DCS in their evaluation, that [E.F.] was more at risk under DCS care as exhibited by his unintentional multi-medication overdose requiring him to be hospitalized, that DCS as a result of not contacting his medical team of physicians does not understand [E.F.'s] medical condition. . ."

119.    On December 13, 2023, E.F. was admitted to the hospital due to gastro-intestinal issues, a result of being denied his medications while under the care of the Department.

**N.    The State Moves to Dismiss the Second Dependency Petition**

120.    At a pre-hearing conference on January 11, 2024, the State moved to dismiss the dependency petition, admitting that the State could not meet its burden of proof that Jessica had medically abused E.F.

121.    The Court accepted the parties' stipulation that Jessica never has been diagnosed with FDIA.

122.    Defendants Wangler, Burden, Garcia and Borboa refused to close the case and instead wanted to have more follow-up with E.F.

19

123. Upon information and belief, Defendants Wangler, Burden, Garcia and Borboa still have not corrected the material errors in its records.

124. The Juvenile Court also ordered that the Department to turn over the hotline call records and reports..

125. Jessica had to send numerous emails to the State through DCS, Protective Services Review Team ("PSRT"), calling PSRT, and filing a complaint with the Ombudsman's office to find out if the January 2023 allegations would be unsubstantiated and she would not be put on the abuse registry.

126. On February 7, 2024, the Department sent a letter stating that the January 19, 2023 Intake No. IN10301578, is unsubstantiated and she will not be entered into the DCS Central Registry.

## CLAIMS FOR RELIEF

### Count One

### 42 U.S.C. § 1983 – Breach of Plaintiffs' First, Fourth and Fourteenth Amendment rights to familial association

### (Against Defendants Wangler, Burden, Garcia, Borboa, and Cahill)

127. Plaintiffs re-allege incorporates by reference all allegations contained in the foregoing paragraphs as though fully set forth herein.

128. Plaintiffs allege this claim against Defendants Wangler, Burden, Garcia, and Borboa.

129. Defendants Wangler, Garcia, Burden and Garcia breached Plaintiffs' right to familial association under the First, Fourth, and Fourteenth Amendments by causing the forced separation of Jessica and E.F. and by denying Jessica her right to direct and/or participate in the medical care and, by extension, E.F.'s right to have his medical care directed by his mother or her presence during medical procedures.

130. Defendants Wangler, Garcia, Burden and Garcia violated Plaintiffs' constitutional rights by:

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

20

a.  Providing false, incorrect, and/or incomplete information to law enforcement agencies investigating abuse allegations against Jessica;

b.  Providing false, incorrect, and/or incomplete information to the juvenile court;

c.  Resurrecting allegations that had been disproven or rejected in a prior dependency proceeding;

d.  Removing E.F. from the care and custody of Jessica; and

e.  Preventing Jessica from participating in or directing the medical care of E.F., and E.F. from having the care and direction from his mother.

131.  Defendants Wangler, Burden, Garcia and Borboa failed to conduct a prompt and thorough investigation, as is required under A.R.S. §8-456(C)(1), before filing the dependency petition for E.F, which falsely alleged abuse and neglect based upon Cahill's unreliable report.  They failed to consider material, exculpatory facts which refuted the stated concerns in violation of the law and as required by A.R.S. §8-456(C)(1).

132.  At all relevant times when E.F. was seized and/or detained, Defendants Wangler, Burden, Garcia and Borboa did not have any information that established reasonable cause to believe that E.F. was in danger of serious bodily and there were no exigent circumstances, yet, they persisted in removing E.F. and keeping him from his only parent.

133.  The information initially provided to Dr. Cahill demonstrated that there was inadequate evidence to make a finding of FDIA. Even after Defendants Wangler, Burden, Garcia, and Borboa provided additional information, the evidence did not support a finding of FDIA.

134.  Upon information and belief, Dr. Cahill had learned from Defendants Wangler, Burden, Garcia, and Borboa that a finding of FDIA was necessary for the Department to remove custody of E.F. from Jessica.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

21

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

135.    As such, Dr. Cahill had a meeting of the minds with the DCS states actors to make such a diagnosis to facilitate E.F.'s removal and dependency proceedings, even though the actual medical evidence did not support such a finding.

136.    Each of the foregoing defendants was an integral participant in the investigation, wrongful seizure, and limitations on medical care as outlined herein.

137.    Defendants Wangler, Burden, Garcia, and Borboa violated Jessica's and E.F.'s constitutional rights to familial association.

138.    As a direct and proximate result of the violation of Jessica's and E.F.'s constitutional rights, Jessica and E.F. suffered irreparable harm and will continue to suffer general and special damages, in an amount not yest ascertained but which shall be shown according to proof at trial.

**Count 2**

**Retaliation**

**(Against Defendants Wangler, Burden, Garcia, and Borboa)**

139.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

140.    Plaintiffs allege this claim against Defendants Wangler, Burden, Garcia, and Borboa.

141.    Defendants Wangler, Burden, Garcia, and Borboa committed the wrongful acts alleged herein, including their decision to resuscitate the allegations from the prior dependency, institute a new investigation based on the prior discredited allegations, provide incomplete or false information to other law enforcement officers or agencies, remove E.F. from Jessica, and prevent Jessica from directing or participating in E.F.'s medical care in retaliation for (1) her defense of the prior dependency, and (2) her filing of a civil rights complaint against the State of Arizona and various employees of the Department of Child Safety.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

142.    These retaliatory measures were intended to not only deprive Plaintiffs of their First, Fourth, and Fourteenth Amendment right of familial association, but also to chill Plaintiff Jessica Fidler's First Amendment right to petition the courts.

143.    Each of the foregoing defendants was an integral participant in the retaliatory actions as outlined herein.

144.    As a result of the State through DCS and its agents Wangler, Burden, Garcia and Borboa's retaliatory actions, Plaintiffs suffered severe emotional distress, anxiety, depression, physical injury, and loss of familial association.

145.    As alleged herein, the State and State Defendants Wangler, Burden, Garcia and Borboa's retaliatory actions in depriving Plaintiffs of their constitutional rights were willful, wanton, malicious, and oppressive, and justify an award of exemplary and punitive damages, the precise amount of which will be proven at trial.

### Count Three

### Abuse of Process

### (As Against Defendants Wangler, Burden, Garcia and Borboa)

146.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

147.    Plaintiffs allege this claim against Defendants Wangler, Burden, Garcia, and Borboa.

148.    Defendants Wangler, Burden, Garcia, and Borboa caused the judicial filings of the *Application and Declaration of Ex-Parte Removal of Child* on October 24, 2023, the second dependency petition, and the *Motion to Suspend Visitation and Motion for Temporary Emergency Suspension of Visitation Pending Status Conference* on November 1, 2023.

149.    Defendants Wangler, Burden, Garcia, and Borboa caused these judicial filings knowing that they lacked a factual basis. They caused the filings of these documents for the improper purpose of retaliating against Plaintiffs as set forth above.

23

150.    As a direct and proximate result of Defendants Wangler, Burden, Garcia and Borboa's abuse of process, Plaintiff suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof of trial.

**Count Four**

**Negligence Per Se**

**(Against Defendants Wangler, Burden, Garcia, and Borboa)**

151.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

152.    Plaintiffs allege this claim against Defendants Wangler, Burden, Garcia, and Borboa.

153.    Arizona statutes require Department of Child Safety employees "to protect the legal and due process rights of children and families from the time of the initial contact through case closure," **A.R.S. § 8-456(A);** *see also* **A.R.S. § 8-802(D)(1)** (DCS workers have a "duty to protect the legal right of children and families form the time of the initial contact through treatment").

154.    Defendants Wagner, Burden, Garcia and Borboa, as investigators and child safety workers, did not protect the legals rights of E.F. or this family in violation of §§ 8-456(A) and 8-802(D)(1) when they failed to properly investigate whether the State through DCS should remove and detain E.F. in the State's custody; (2) forbade Jessica's visits with her son; (3) made representations to the court or that were provided to the court that were false and/or demonstrated a reckless disregard for the truth; and (4) conspired to violate Plaintiffs' constitutional rights.

155.    Arizona Revised Statutes section 8-456 sets forth the standards for a Department investigator, including that "an investigator shall do all of the following: … [m]ake a prompt and through investigation.  An investigation must evaluate and determine the nature, extent and cause of any condition created by the parents. . . that would tend to

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

support or refute the allegation that thee child is a victim of abuse or neglect." **A.R.S. § 8-456(C)(1).**

156.    Defendants Wagner, Burden, Garcia and Borboa, as investigators, sat on their investigation for ten months.

157.    Defendants Wagner, Burden, Garcia and Borboa, after learning that the Maricopa County Attorney's Office and the Gilbert Police Department found no evidence of abuse, sought nationwide for an expert who would assert that Jessica had FDIA, Dr. Cahill.

158.    Defendants Wagner, Burden, Garcia and Borboa failed to consider the significant information in their possession or easily obtained which refuted the allegations, including reports or even speaking with E.F.'s pediatrician, his surgeon, DDD Regional Nurse, or E.F.'s therapist.  This is in direct violation of A.R.S. § 8-456(C)(1) and is conclusive evidence of negligence under Arizona law.  *St. George*, 241 Ariz. at 166, 384 P.3d at 1246.

159.    As a direct and proximate result of Defendants' negligence *per se* arising from violation of Arizona Statutes, Plaintiffs have suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## Count Five

### Negligence And/Or Gross Negligence

### (Against Defendants Wangler, Burden, Garcia,  and Borboa)

160.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraphs as through fully set forth herein.

161.    Plaintiffs allege this claim against Defendants Wangler, Burden, Garcia, and Borboa.

162.    Wangler, Burden, Garcia, Borboa and Lujan, each of them, acted with negligence and gross negligence and breached their duty to protect the legal rights of

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

25

Plaintiffs by (1) failing to complete a prompt and through investigation, (2) seeking to create favorable evidence, rather than evaluating the existing evidence, (3) resurrecting old and discredited claims against Jessica, (4) separating E.F. from his mother for a second significant period of time, and (5) separating E.F. from his mother at a time of medical crisis.

163.    As a direct and proximate result of Wangler's, Burden's, Garcia's, and Borboa's breaches of their duty of care, Plaintiffs suffered irreparable harm and will continue to suffer, general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## Count Six

### Negligence And/Or Gross Negligence
### (Against Defendant State of Arizona)

164.    Plaintiffs re-allege and incorporate all allegations contained in the foregoing paragraph as through fully set forth herein.

165.    The State negligently placed E.F. in the Welcome Center to his detriment.

166.    On October 26, 2023, DCS Welcome Center employee Manrique dispensed to E.F. a cocktail of toxic medications, *i.e.* 5mg Aripiprazole, 25mg Hydroxyzine and 50mg Sertraline.  These medications were not E.F.'s and belonged to another patient.

167.    The 5 mg Aripiprazole, 25 mg Hydrozyzine, and 50 mg Setraline were negligently dispensed to E.F. in violation of the State and DCS' own medication policy as set for in paragraph 128 above.

168.    Manrique failed to recognize that she gave the wrong medication to E.F.

169.    The State failed to notice the medical error for almost two hours when the female child who was supposed to receive the medication brought it to their attention that she had not received her medication.

170.    The State through  the Welcome Center staff called poison control.

171.    Due to the negligent actions of the State E.F. had to be hospitalized after becoming unresponsive two times.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

172.    The above-mentioned incident was caused by the careless, negligent and unlawful acts and/or omission of the State and Defendant Manrique.

173.    As a direct and proximate result of the State and Manrique's negligence, E.F. suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

**Count Seven**

**Intentional Inflection Of Emotional Distress**

**(Against All Defendants)**

174.    Plaintiff re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

175.     This claim is asserted against all Defendants.

176.    The actions of the Defendants in removing E.F. from his sole caretaker and mother for a second time, while he was still recovering from the trauma of the first forced separation from his mother, was extreme and outrageous, when there was no factual foundation or basis for this removal, and any purported evidence to support the removal—the report of Dr. Cahill—was essentially manufactured.

177.    The Defendants acted with either intent to cause emotional distress or recklessly disregarded the near certainty that such distress would result from their conduct when they wrongfully removed E.F. and prohibited Jessica from having any visits with E.F.

178.    Defendants' conduct alleged above caused Plaintiffs severe emotional distress.

179.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

## Count Eight

### Aiding and Abetting Tortious Conduct

### (Against Defendant Cahill)

180.    Plaintiff re-allege and incorporate all allegations contained in the foregoing paragraphs as though fully set forth herein.

181.    This claim is asserted against Defendant Cahill.

182.    The State of Arizona and the DCS Defendants committed various torts against Plaintiffs resulting is E.F.'s wrongful removal, as alleged herein.

183.    Defendant Cahil knew that the removal of E.F. was wrongful.

184.    She substantially assisted or encouraged the DCS Defendants' tortious conduct by preparing a report purporting to "substantiate" FDIA, despite the lack of any meaningful or reliable medical evidence supporting such a diagnosis.

185.    As a direct and proximate result of Defendant Cahill's conduct, Plaintiffs suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A. General damages and special damages according to proof including, but not limited to economic losses, medical costs, hedonic damages, psychological trauma, and emotional distress;

B. For taxable cost and pre- and post-judgment interest to the extent permitted by law;

C. For punitive and/or exemplary damages to extent permitted by law and in an amount appropriate to punish the wrongful conduct alleged herein and to deter such conduct in the future;

D. For attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1998 and state law, as applicable; and

28

E.  For such other relief as the Court deems just and proper under the circumstances.

**RESPECTFULLY SUBMITTED** this 15th day of January, 2025.

**MILLS + WOODS LAW PLLC**

By */s/ Thomas A. Connelly*
Thomas A. Connelly
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014

**GILLESPIE, SHIELDS, & TAYLOR**

DeeAn Gillespie Strub
Jenny D. Jansch
7319 North 16th Street
Phoenix, AZ 85020

*Attorneys for Plaintiffs*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

29

# EXHIBIT 1

1            THE COURT:  Ms. Gillespie, I have a couple

2     of questions I need to ask and then you can resume,

3     but --

4            MS. GILLESPIE-STRUB:  Okay.  Thank you,

5     Judge.

6            THE COURT:  Ma'am, I just -- I said I want

7     enlist form (phonetic) from you.  The verified

8     petition says, "Medical professionals are concerned of

9     others subjecting the child to medical abuse."  I know

10    Dr. Christensen said that.  Is there any other medical

11    care provider that you're aware of that expressed

12    concerns that mother is subjecting the child to

13    medical abuse of Dr. Christensen?

14            THE WITNESS:  None, Your Honor.  Only

15    Christensen.  Dr. Schroeder did indicate that she did

16    see no more need for any of this and more than

17    anything was just the concern of what the past was,

18    but she did on -- when she testified, that she

19    indicated that ███████ is doing great, so

20    (indiscernible).

21            UNIDENTIFIED FEMALE SPEAKER:  From child

22    abuse.

23            THE COURT:  Okay.  What --

24            UNIDENTIFIED FEMALE SPEAKER:

25    (Indiscernible) Christensen.

1              THE COURT:  Okay.  So I don't know who is

2    speaking.  I think it's perhaps Ms. Fidler but again,

3    I can hear you.  Please stop.

4              MS. GILLESPIE-STRUB:  It was not us, Your

5    Honor.  It was not us.  I'm on mute.

6              THE COURT:  Okay.  Well, if somebody else is

7    observing, then I will certainly expel you from this

8    proceeding.  Stop that.

9              All right.  Ma'am, specifically the verified

10    petition states, she meaning mom, has sought medical

11    testing and procedures performed on the child despite

12    multiple medical professionals determining that they

13    were unnecessary.  Tell me exactly the medical testing

14    that she has sought and who determined it was

15    unnecessary.

16              THE WITNESS:  One of the examples, Your

17    Honor, was the one from January 2020 wherein she went

18    to PCH with ███████ indicating that he had fever and

19    asked for additional tests and assessment, and after

20    denied, you know, she became not upset, but, you know,

21    it was what everybody testified on a minute ago.

22              THE COURT:  Okay.  So the one incident that

23    you're referring to is the fever incident; is that

24    correct?  Is there any other --

25              THE WITNESS:  The one I can think of right

1    now.  The one I can think of right now at this moment,

2    yes, Your Honor.

3              THE COURT:  Okay.  So she thinks she says

4    there was a fever.  By the time she gets to the

5    hospital, there isn't a fever and that's what you're

6    talking about.  Okay, any -- and then what procedures

7    has she sought despite multiple medical professionals

8    determining they were unnecessary?

9              THE WITNESS:  At the moment when I wrote my

10   report, it was on the medical records and the initial

11   record review that was completed indicated that PCH

12   was not in agreement with the procedure, and that's

13   when she went to Banner in order to have the procedure

14   completed for ████████

15             THE COURT:  Okay.  And then we just heard

16   the testimony from a doctor that that was something

17   that that Dr. Huliman, I believe it was, perhaps it

18   was the other doctor, recommended that she see Dr.

19   Acosta, right?

20             THE WITNESS:  Correct.  Yes, Your Honor.

21             THE COURT:  Okay.  So has there been any

22   healthcare provider that you're aware of that

23   suggested that that, the October surgery, was

24   unnecessary?

25             THE WITNESS:  Not to my knowledge right now.

1    I'm sorry.

2              THE COURT:  Okay.  All right.  I know there

3    is the -- I'm looking at the next line of the

4    dependency petition, page 7.  Mother has reported that

5    the symptoms and behaviors that are -- have reported

6    symptoms and behaviors that are inconsistent with

7    medical observation.  What specifically, aside from

8    the fever, are you talking -- are you referring to?

9              THE WITNESS:  I'm not too sure from on page

10   -- you are, Your honor.  I only have two pages.

11             THE COURT:  And is the dependency petition,

12   I believe that it's verified by Ms. Burns but are you

13   aware of any symptoms that are reported that are

14   inconsistent with medical observation?

15             THE WITNESS:  The only thing I am aware of

16   is one of some of █████████ allergic reactions, so what

17   he believes to be allergic to like red iodine, the red

18   food coloring that we were clear that that is not

19   something that he's allergic to but no, Your Honor.  I

20   cannot think of anything else.

21             THE COURT:  Okay.  And was that a basis of a

22   removal?

23             THE WITNESS:  I apologize.  No.

24             THE COURT:  Okay.  What information has

25   mother provided in the medical history that is

1    inconsistent with the medical record?  Can you

2    identify everything for me?

3              THE WITNESS:  No, Your Honor.  I would not

4    be able to identify everything for you.

5              THE COURT:  Anything?

6              THE WITNESS:  I mean, one of the situations

7    was the procedure that was done by Dr. Acosta that,

8    you know, the Department believed, it was not

9    recommended.  And now after the trial, we see that --

10   I apologize -- the doctor that testified a minute ago

11   did complete the referral.

12             THE COURT:  Okay.  And so that brings us to

13   the next line of the dependency petition that says,

14   "In particular, mother sought having an ileostomy

15   surgery performed on the child despite multiple

16   professionals determining that the procedure was

17   unnecessary."  And I think you've just testified --

18   please, correct me if I'm wrong, every doctor has

19   believed it has been necessary, correct?

20             THE WITNESS:  Correct, Your Honor.

21             THE COURT:  Ma'am?

22             THE WITNESS:  Correct, Your Honor.

23             Your Honor?

24             THE COURT:  Yes.

25             THE WITNESS:  Oh, I apologize.

```
 1              THE COURT:  Okay.  So largely at this point
 2   in time, the incident involving the fever back in
 3   January where mom took the kid in the fever and -- or
 4   took the kid to the ER and the kid maybe had a fever
 5   that resolved or maybe didn't have a fever and she's
 6   making it up.  At this point in time, is that the
 7   basis of this case or is there anything else?
 8              THE WITNESS:  I mean, it was the continuous
 9   medical appointments that the Department was able to
10   find, you know, about 500 and so medical visits of
11   █████████ and mom's to the doctor including Emergency
12   Room.
13              THE COURT:  Okay.  But which one of those
14   were not warranted and throughout the child's several
15   years.  I mean, we agreed that he had some medical
16   issues, right, and developmental issues.
17              THE WITNESS:  Yes, Your Honor.
18              THE COURT:  Okay.  So of those 500 that you
19   have counted up, other than the number, was there any
20   particular visit that you believed to have been
21   exaggerated other than the fever incident?
22              THE WITNESS:  Not at the moment, Your Honor.
23              THE COURT:  Okay.
24              Ms. Strub, anything else from you?
25              MS. GILLESPIE:  No, thank you, Your Honor.
```

1                    THE COURT:  Okay.  Ms. Boddington, any

2      redirect?

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 2

**GILLESPIE SHIELDS GOLDFARB & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
Email: mailroom@gillaw.com

**DeeAn Gillespie Strub, Esq.**
*Attorneys for Mother, Jessica Fidler*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

In Re the Matter of:

████████

DOB: ████████

Person(s) under 18 years of age.

Case No. JD533286

**MOTHER'S MOTION FOR SUMMARY JUDGMENT**

Assigned to:
*The Honorable Kristin Culbertson*

Pursuant to Ariz. Juv. Ct. Rule of Proc. 46(D), Mother, JESSICA FIDLER ("Mother"), moves for summary judgement of that portion of the Dependency Petition ("the Petition") filed by the Department of Child Safety ("DCS") on March 31, 2020, which asks that this Court to find ████ F████ ("████ dependent as to her. There are no genuine issues of material fact and, as a matter of law, DCS cannot satisfy its burden to prove that ████ is dependent as to Mother. Mother's Statement of Facts (MSOF) in support of this motion is filed concurrently with this motion. *See* Ariz. R. Civ. P. 56(c)(3)(B) and is incorporated herein by reference.

Mother requests to be heard on this motion at oral argument. This Motion is supported by the following Memorandum of Points and Authorities.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 • Fax (Mesa): (480) 985-7552

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    DCS' ALLEGATIONS OF DEPENDENCY ARE NOT SUPPORTED BY CREDIBLE MATERIAL FACTS

In proving dependency, DCS is limited to the allegations contained in the petition. *See* Carolina H. v. ADES, 232 Ariz. 569, 571 ¶ 11 (App. 2013). In light of this well-established law, the undisputed material facts of this matter support the Court granting summary judgment on the issue of dependency. Over the course of the three days of the recent hearing, the Court heard from numerous medical professionals not only that ▮▮▮▮ questioned hemi-colectomy surgery was medically recommended and beneficial, but that they had no concerns that Mother was subjecting ▮▮▮▮ to over-medicalization.

At the recent September 14, 2020 hearing, this Court correctly questioned Marisol Manjarrez, the current DCS caseworker, as to what evidence supported the numerous allegations in the dependency petition. Caseworker Manjarrez conceded that as to each of the allegations in the dependency petition about which this Court questioned her, there was no actual evidence to support the same, aside from Mother taking the child to the hospital in January 2020 due to a fever, plus ▮▮▮▮ overall number of hospital visits. ▮▮▮▮ is a child with an indisputably complex medical history. *See* **MSOF No. 8(M), 17, 65.**

None of ▮▮▮▮ treating doctors have indicated that the child has been over-medicalized, or that any of the child's numerous hospital visits were unwarranted. ▮▮▮▮ medical professionals include his pediatrician Dr. Hurliman, his immunologist, Dr. Bauer, the GI specialist Dr. Schroeder, the geneticist Dr. Grebe, the mitochondrial specialist Dr. Frye, the surgeon Dr. Acosta, the cardiologist Dr. Alhadheri, and the interim head of psychology, Dr. Carlson.

Dr. Hurliman unequivocally testified he never observed Mother to push for any unnecessary medical treatments. *See* **MSOF No. 8(A).** The DDD nurse supervisor, Sonya

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

Rodriguez, who oversaw ███ medical care for an extended period of time, indicated that while ███ was put on the excessive hospital visit list for 2017, he was not on the list for 2018 or 2019. *See* **MSOF No. 3(U)**. 2017 was a medically trying year for ███ *See* **MSOF Nos. 3(A), 3(U), 55-59, 71 and 72**. The home health nurse, Leslie Barrett, who saw the child on an almost-daily basis, stated that she saw the same symptoms which Mother reported to the medical professionals. *See* **MSOF No. 4(V) and 5(O)**. Dr. Hurliman and both Nurses Rodriguez and Barrett testified they had no concerns that Mother ever subjected ███ to over-medicalization, and that ███ is safe and happy in her care. *See* **MSOF No. 4(Q), 4(T), 6(C), 6(E), 8(A), 8(B) and 8(M)**.

The following are the Court's instructive questions to DCS as stated at the September 14, 2020 hearing:

THE COURT: …The verified petition says, "Medical professionals are concerned of others subjecting the child to medical abuse." I know Dr. Christensen said that. Is there any other medical care provider that you're aware of that expressed concerns that mother is subjecting the child to medical abuse of Dr. Christensen?

THE WITNESS: None, Your Honor. Only Christensen…

THE COURT: All right. Ma'am, specifically the verified petition states, she meaning mom, has sought medical testing and procedures performed on the child despite multiple medical professionals determining that they were unnecessary. Tell me exactly the medical testing that she has sought and who determined it was unnecessary.

THE WITNESS: One of the examples, Your Honor, was the one from January 2020 wherein she went to PCH with ███ indicating that he had fever and asked for additional tests and assessment, and after denied, you know, she became not upset, but, you know, it was what everybody testified on a minute ago.

THE COURT: Okay. So the one incident that you're referring to is the fever incident; is that correct? Is there any other--

THE WITNESS: The one I can think of right now. The one I can think of right

now at this moment, yes, Your Honor.

THE COURT:  Okay.  So she thinks she says there was a fever. By the time she gets to the hospital, there isn't a fever and that's what you're talking about. Okay, any -- and then what procedures has she sought despite multiple medical professionals determining they were unnecessary?

THE WITNESS:  At the moment when I wrote my report, it was on the medical records and the initial record review that was completed indicated that PCH was not in agreement with the procedure, and that's when she went to Banner in order to have the procedure completed for ███████

THE COURT:  Okay. And then we just heard the testimony from a doctor that that was something that that Dr. Hurliman, I believe it was, perhaps it was the other doctor, recommended that she see Dr. Acosta, right?

THE WITNESS:  Correct. Yes, Your Honor.

THE COURT:  Okay. So has there been any healthcare provider that you're aware of that suggested that that, the October surgery, was unnecessary?

THE WITNESS:  Not to my knowledge right now. I'm sorry.

THE COURT:  Okay. All right. I know there is the -- I'm looking at the next line of the dependency petition, page 7. Mother has reported that the symptoms and behaviors that are -- have reported symptoms and behaviors that are inconsistent with medical observation. What specifically, aside from the fever, are you talking -- are you referring to?

THE WITNESS:  I'm not too sure from on page--you are, Your honor. I only have two pages.

THE COURT:  And is the dependency petition, I believe that it's verified by Ms. Burns but are you aware of any symptoms that are reported that are inconsistent with medical observation?

THE WITNESS:  The only thing I am aware of is one of some of ███████ allergic reactions, so what he believes to be allergic to like red iodine, the red food coloring that we were clear that that is not something that he's allergic to but no, Your Honor. I cannot think of anything else.

THE COURT:  Okay. And was that a basis of a removal?

THE WITNESS:  I apologize. No.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480) 985-4000 ♦ Fax (Mesa): (480) 985-7552

THE COURT: Okay. What information has mother provided in the medical history that is inconsistent with the medical record? Can you identify everything for me?

THE WITNESS: No, Your Honor. I would not be able to identify everything for you.

THE COURT: Anything?

THE WITNESS: I mean, one of the situations was the procedure that was done by Dr. Acosta that, you know, the Department believed, it was not recommended. And now after the trial, we see that--I apologize--the doctor that testified a minute ago did complete the referral.

THE COURT: Okay. And so that brings us to the next line of the dependency petition that says, "In particular, mother sought having an ileostomy surgery performed on the child despite multiple professionals determining that the procedure was unnecessary." And I think you've just testified--please, correct me if I'm wrong, every doctor has believed it has been necessary, correct?

THE WITNESS: Correct, Your Honor.

THE COURT: Ma'am?

THE WITNESS: Correct, Your Honor, Your Honor?

THE COURT: Yes.

THE WITNESS: Oh, I apologize.

THE COURT: Okay. So largely at this point in time, the incident involving the fever back in January where mom took the kid in the fever and--or took the kid to the ER and the kid maybe had a fever that resolved or maybe didn't have a fever and she's making it up. At this point in time, is that the basis of this case or is there anything else?

THE WITNESS: I mean, it was the continuous medical appointments that the Department was able to find, you know, about 500 and so medical visits of ▮▮▮▮ and mom's to the doctor including Emergency Room.

THE COURT: Okay. But which one of those were not warranted and throughout the child's several years, I mean, we agreed that he had some medical issues, right, and developmental issues.

5

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. So of those 500 that you have counted up, other than the number, was there any particular visit that you believed to have been exaggerated other than the fever incident?

THE WITNESS: Not at the moment, Your Honor.

THE COURT: Okay.

## II.    FACTUAL BACKGROUND

On January 20, 2020, Mother took ████ to PCH because he had had an elevated fever at home.[1] *See* **MSOF No. 2**. On January 29, Dr. Bo Borch-Christensen called DCS.[2] The CSRA intake information (based on Dr. Christensen's call) contains glaring and prejudicial inaccuracies, including among other things, that Mother insisted on an unnecessary and harmful surgery for her son and "doctor-shopped." The inaccurate and prejudicial information in the CSRA, when coupled with DCS' botched investigation, led to ████ being unnecessarily removed from his Mother and hospitalized in early April 2020. ████ was healthy when he was hospitalized. *See* **MSOF Nos. 5(I) and 7(B)**. The only basis for his hospitalization was for observation, to remove the IV fluids prescribed by Dr. Alhadheri, and take him off the regime of supplements prescribed by Dr. Frye that

---

[1] The child's fever had subsided by the time he arrived at the hospital due to Mother following Dr. Alhadheri's protocol for providing an IV bolus. Mother nevertheless insisted on a blood culture because the child had a central line, which causes a persistent danger of infection. In May 2019, a similar situation occurred when ████ had a temperature at home, necessitating a trip to the ER. His temperature had dropped by the time he reached the hospital just as it had in this instance. At that time, a subsequent blood culture revealed Eliron had an infection. Mother was understandably concerned that the possibility of an infection should be ruled out and reasonably insisted a blood culture be taken. Dr. Hurliman affirmed that blood cultures should be taken if the child presents with a fever. *See* **MSOF No. 8(C)**.

[2] Dr. Christensen is a hospitalist at PCH who admittedly only treated ████ on one occasion in 2017 until he called DCS in 2020. Thereafter, he worked closely with the initial caseworker Lisa Burns and orchestrated the child's hospitalization at PCH on April 3, 2020. *See* **MSOF No. 6(C), 6(G) and 7(A)**. Shortly after his interaction with ████ and Mother in 2017, Mother filed a grievance with PCH against Dr. Christensen regarding his abrupt and inappropriate disparaging of the child's other treating professionals in his conversations with Mother.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

were associated with his mitochondrial disorder. While hospitalized, the cecostomy flushes were discontinued, but ████ remained on Miralax for constipation.

During Eliron's April 2020 hospitalization, DCS only accelerated what Mother and the child's treating professionals had already planned and anticipated.[3] The IVIG was scheduled to be tapered and discontinued in the Spring of 2020.[4] Mother had questioned both geneticist Dr. Grebe and pediatrician Dr. Hurliman as to whether ████ needed Dr. Frye's recommended supplements, but followed their advice to heed Dr. Frye's recommendation.

Finally, Dr. Acosta's remedial hemicolectomy surgery provided ████ significant relief from his previous bowel issues (*See* **MSOF No. 4(BB) and 5(E)**), and the child was well on his way to the greater sense of GI regulation that occurred during the April hospitalization.[5] It was not necessary to remove ████ from his Mother to accomplish the

---

[3] Mother followed medical advice as her child's symptoms fluctuated. She worked closely with ████ medical team in their efforts to unravel the tangled web of ████ complex medical needs. Mother sought for a responsible tapering of medical interventions, which has now occurred.

[4]     Home health nurse Leslie Barrett testified as follows:

    Q    Okay.  As it relates to the Broviac and the fluids, was it mother's hope that that too can be eliminated overtime?
    A    Yes.
    Q    In fact, in the spring of 2020, did you accompany mother to an appointment with Dr. -- the immunologist doctor, Bauer to discuss lessening the frequency of the IVIg fluids he was receiving?
    A    Yes, (indiscernible).
    Q    Was there a plan set forth in 2019 that it was a hope as Eliron grew and mature that the Broviac could eventually be removed?
    A    Yes, there was a hope of planning.
    Q    And was mother in concurrent with that?
    A    Yes.

See MSOF No.

[5] Early in his life, ████ was diagnosed with a troubling redundant colon. PCH, which is a primarily a teaching hospital, did not recognize this critical condition. See MSOF No. 10 and 42. ████ suffered for years until Dr. Acosta at Banner requested the barium enema that definitively identified the source of much ████ GI distress. See MSOF No. 23.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax (602) 870-9783
Telephone (Mesa): (480)-985-4000 • Fax (Mesa) (480) 985-7552

reduction of ███████ interventions. *See* **MSOF No. 2**. Lisa Burns testified that Mother consented to the removal of the Broviac, the supplements, and the eventual removal of the cecostomy tube. *See* **MSOF Nos. 3(E), 5(H), 7(H) and 82.**

Dr. Christensen, in concert with DCS, orchestrated ███████ unnecessary removal from his Mother on the day of the initial TDM so ███ could be promptly hospitalized. This was DCS' attempt to support Dr. Christensen's (and then Drue Kaplan Siekmann's)[6] "concerns" that Mother over-medicalized her son. Dr. Christensen still labored under the false belief that Mother caused her son to be subjected to an unnecessary surgery. *See* **SMOF No. 7(F) and 7(G).** DCS' woefully inadequate investigation (*see* **MSOF Nos. 6(C), 6(F), 6(G) and 6(H)**), in contravention of the statutory mandate to perform a *thorough investigation* per ARS § 8-456(C)(1), irresponsibly compounded the initial errors. DCS simply stepped up in a joint effort with Dr. Kathryn Coffman of PCH's child-protective team to validate Dr. Christensen's uninformed and biased "concerns."

DCS is mandated by statute to perform a thorough investigation. However, DCS failed to do any of the following, all of which should have been part of a thorough investigation in a complex matter such as this one, and which would have brought to light information leading to the referral being closed as unsubstantiated:

1.    DCS failed to return calls to DDD and get information from supervising nurse Sonya Rodriguez, who had critical information specifically rebutting Dr. Christensen's concerns.

---

[6] Ms. Kaplan Siekmann's report is as unreliable and uninformed as Dr. Christensen's report. It carries over gross fundamental error. She is not a medical provider, nor was she provided with all available and relevant documents. She cherry-picked information that would conform with pre-conceived erroneous notions. Exhibit 40, 569: "I don't believe that I've reviewed those [home health nurse documentation]. Exhibit 40, 570: "It [home health nurse documentation] would definitely be helpful in confirming information reported by mother to doctors at the hospital." Exhibit 40, 575: "They [Dr. Hurliman's records] were not part of my initial review." Exhibit 40, 568: "I would like to see specifically where that said that, but I'm not really sure because I'm not a medical doctor."

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

2.     DCS failed to communicate with or reach out to ▮▮▮ long-time treating pediatrician, Dr. Hurliman, who was very involved in coordinating all of the specialists who treated ▮▮▮ Dr. Hurliman would also have rebutted Dr. Christensen's concerns and clarified his factual inaccuracies, for example, that Mother was "doctor-shopping" and seeking for unnecessary procedures and surgeries, and that no PCH doctors recommended an ileostomy as a form of relief for ▮▮▮

3.     DCS failed to speak with Dr. Bauer, who would have verified there was a plan in place to taper ▮▮▮ off his fluids by the spring of 2020 and that in general, many children with immune issues did much better after the COVID lockdowns.

4.     DCS failed to speak with ▮▮▮ s cardiologist Dr. Alhadheri, who also would have rebutted Dr. Christensen's concerns that Mother was seeking unnecessary treatments and interventions. Dr. Alhadheri would have clarified that 2017 was an especially difficult year for ▮▮▮ medically. He would verify that during 2017, it was discovered that guanfacine, an ADHD medication, was causing unintended side effects mirroring POTS and causing great difficulty for ▮▮▮

5.     DCS failed to contact Dr. Frye, who would verify the tests he ordered for ▮▮▮ were of his own accord and not pushed by Mother. The mito cocktail supplements he prescribed for ▮▮▮ were not pushed by Mother but were a result of Dr. Frye's impressions ▮▮▮ coupled with the child's test results.

6.     DCS failed to communicate with Dr. Grebe, ▮▮▮ geneticist, who would have verified Mother was hesitant to put ▮▮▮ on the mito cocktail recommended by Dr. Frye and sought Dr. Grebe's opinion. Mother thereafter

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa) (480) 985-7552

followed Dr. Grebe's opinion that she simply follow Dr. Frye's recommendations.

7. DCS failed to speak with ▌▌▌▌ GI specialist, Dr. Schroeder, who would have rebutted Dr. Christiansen's claims that Mother was "doctor-shopping," that no medical professional recommended an ileostomy, and that the hemi-colectomy ultimately performed by Dr. Acosta was not warranted or beneficial.

8. DCS failed to discuss with Mother the fact that Dr. Christensen only saw the child once in summer 2017, and that she filed a complaint with PCH against Dr. Christensen because of his unprofessional and unfair criticism of Drs. Alhadheri and Bauer, e.g. calling Dr. Bauer a "quack."

Instead of doing any of the above, DCS relied solely on Dr. Christensen, who sought to bolster his position by involving his colleague, Dr. Coffman, who fell prey to Dr. Christensen's biased, inaccurate and uninformed impressions.

In her medical note electronically signed on April 16, 2020, after DCS' involvement, Dr. Coffman claimed that she was "peripherally following this case *at the request of Dr. Borch-Christensen* because of concern about possible medical child abuse" (emphasis added). She acknowledged that ▌▌▌▌ is "a seven-year-old boy with a complex medical history who has been a patient at PCH since 2013 and carries multiple diagnoses including ADHD, developmental delay, dysautonomia, seizures, hypogammaglobinemia, GERD, constipation, GI dysmotility, asthma, allergic rhinitis, recurrent sinusitis, postural orthostatic tachycardia syndrome (POTS), mitochondrial disorder, recurrent fevers, and skin eruptions." She goes on to say that over the course of ▌▌▌▌ 524 visits to PCH over a seven-year period, *"concern about over-medicalization has arisen"* (emphasis added). She does not reference any doctor besides Dr. Borch-Christensen and his associate, Dr.

10

Kovacik, neither of whom are ▮▮▮▮ treating specialists. She simply parrots Dr. Christensen's narrative *without firsthand knowledge or specifics*, as follows: "Many of the diagnoses he carries are not supported by the results of medical evaluation, and there is a concern that there is misrepresentation of some of his symptoms by his Mother, as well as demands by her for more and more testing and procedures."[7] *See* **MSOF No. 83.**

Dr. Coffman negligently misstated that ▮▮▮▮ was on Atenolol for presumed POTS. Her statement is inaccurate. *See* **MSOF No. 4(B) and 83.** Dr. Alhadheri prescribed ▮▮▮▮ Atenolol in March 2020, not for POTS, but for exaggerated sinus tachycardia after test results revealed said condition. Had she done a careful medical review, Dr. Coffman would have seen that the issue of possible POTS was resolved back in 2017 when the child was taken off Guanfacine. Unfortunately, she simply took her colleague, Dr. Christensen, at his word.

Dr. Coffman points to no specific procedure or testing Mother has requested that was not recommended by a medical professional. Dr. Coffman was unable to do so because there are none. In fact, Dr. Coffman egregiously misstates part ▮▮▮▮ surgical history. She claims "a cecostomy... was placed at Banner for reported constipation and motility problems. This was done despite an eval at Cincinnati Children's Motility Center in 2018 that revealed no primary colonic motility issues." *See* **MSOF No. 83.** If she had carefully reviewed her own PCH records rather than simply relying on Dr. Christensen's misapprehensions, Dr. Coffman would have verified that ▮▮▮▮ cecostomy was put in place back in 2016 at PCH by its own surgeon, Dr. Notrica. Further, a careful review of ▮▮▮▮ medical records would have informed Dr. Coffman that the surgery ▮▮▮▮

---

[7] DCS' completion of a *thorough* investigation, as noted above, would have uncovered the complexities of ▮▮▮▮ underlying medical circumstances and the vital fact that ▮▮▮▮ numerous treating specialists did not share Dr. Christensen's "concerns." ▮▮▮▮ medical history as contained in the stipulation the Court requested (which was filed with the Court on September 14, 2020) directly undercuts Dr. Christensen and the State's position that ▮▮▮▮ was an otherwise healthy child made sick by his Mother.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

received at Banner in October 2019 was the partial hemi-colectomy, not a cecostomy, a beneficial surgery supported by referrals from ▇▇▇▇s PCH medical team for his redundant colon that had plagued him for years and went undiagnosed during his years of care at PCH.

Mother has carefully followed the recommendations ▇▇▇▇ treating physicians. Dr. Coffman naïvely allowed himself to be pulled into "substantiating" Dr. Christensen's uninformed, inaccurate and irresponsible false narrative regarding Mother over-medicalizing ▇▇▇▇ *See* **MSOF No. 83.** ▇▇▇▇ is indisputably a child with complex medical issues. *See* **MSOF No. 8(M), 17, 64 and 65.** Dr. Christensen simply used Dr. Coffman as an authoritative figure to bolster and justify his wrong-headed DCS referral.

Dr. Christensen failed to inform himself regarding the nature and necessity of ▇▇▇▇ GI surgery, which led to his grossly inaccurate referral to DCS on January 29, 2020. Dr. Christensen falsely asserted in his DCS referral that Mother "doctor-shopped" for an ileostomy, which he claimed no doctors at PCH recommended, which was untrue. Dr. Christensen failed to understand that Drs. Hurliman and Schroeder were both supportive of an ileostomy (which is a reversible surgery) to allow ▇▇▇▇ bowels to rest from his GI distress. Dr. Hurliman testified "…I think she was looking for a solution. Truly, …that was going to be beneficial for him, and wanted to make sure that… it was the right thing." *See* **MSOF No. 8(K).** Mother did not push for an ileostomy, but was seeking for a medical solution to help her son.

Dr. Christensen failed to inform himself. Dr. Christensen was also uninformed concerning Dr. Acosta's astute diagnosis of ▇▇▇▇ redundant colon and the necessity of the subsequent hemi-colectomy to resolve the child's chronic GI distress. ▇▇▇▇ hemicolectomy surgery was recommended and beneficial. It was a permanent solution in place of a temporary ileostomy procedure. *See* **MSOF Nos. 3(D), 4(BB), 5(D), 5E, 5(O),**

Dr. Bo Borch-Christensen's conference with PCH child abuse specialist Dr. Kathryn Coffman, (who has never seen ███ nor carefully reviewed his chart,) only compounded Dr. Christensen's error and caused further confusion regarding the misdiagnosis of over-medicalization. Dr. Coffman irresponsibly authorized a letter (Exhibit 13, Bates 2964, written on 4/10/20, and electronically signed on 4/16/20) based on her conference with Dr. Christensen, which contained serious inaccuracies.

Dr. Christensen acknowledged the child's pediatrician, Dr. Hurliman, with whom he had spoken *after* placing the January 29, 2020 call to DCS, *did not share or agree with his view* that Mother was a danger to the child. *See* **MSOF Nos. 6(C) and 7(I).** Dr. Christensen failed to mention Dr. Hurliman's critical opinion to investigator Lisa Burns or to her assistant Drue Kaplan Siekmann, who participated in Ms. Burns' investigation.

If either Burns or Kaplan Siekmann had fulfilled their duty to complete a thorough investigation prior to ███ removal from his Mother, they would have unequivocally learned that Dr. Hurliman did not support Dr. Christensen's concerns. They would have also learned that Mother did not "doctor-shop," and that Dr. Hurliman was supportive of a potential ileostomy surgery, as well as the ultimate hemi-colectomy surgery.

Dr. Hurliman's pivotal and clarifying information was absent, both from the CSRA, as well as Drue Kaplan Sickmann's report, rendering both forensically unreliable. Shamefully, Dr. Christensen also omitted any reference to Dr. Hurliman's position from the medical file he orchestrated upon the child's April 3, 2020 admission for observation. Christensen created an incomplete and inaccurate medical file to justify his January 29, 2020 call to DCS. In his recent testimony, accompanied by his attorney, Dr. Christensen tellingly stated he could not say if ███ would be in danger if returned to his Mother's care. *See* **MSOF No. 7(A).**

Caseworker Lisa Burns was assigned to investigate Dr. Christensen's referral to

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone (602) 870-9700 ◆ Fax (602) 870-9783
Telephone (Mesa) (480)-985-4000 ◆ Fax (Mesa) (480) 985-7552

DCS. As part of her investigation, on March 3, 2020, she interviewed ████ at his home and determined he was healthy and safe.[8] ████ was also healthy and safe on April 3, 2020, when she caused him to be needlessly removed from his Mother's care. DCS' verified dependency petition was irresponsibly inaccurate. This pivotal and damaging deficit was revealed by the Court's astute questioning of DCS caseworker Marisol Manjarrez at the hearing on September 14, 2020. *See* **MSOF No. 2.**

When the sources of information are properly evaluated, what becomes manifestly clear is that the field of medical professionals who worked with ████ on a regular basis do not support the notion that he is not safe with his Mother, was subjected to unnecessary procedures, that he is over-medicalized, or unsafe in his Mother's care. These professionals each worked with ████ independently, sometimes conferring, but each had their own independent opinions. In contrast, DCS' entire case is built solely on the allegations made by Dr. Christensen, as supported by Dr. Coffman and Drue Kaplan Siekmann.[9] However, the reports submitted by the latter two were both largely derivative of Dr. Christensen's inaccurate and uninformed assessment. Neither Dr. Coffman nor Ms. Kaplan Siekmann ever even met the child. Neither of them ever spoke with the pediatrician, Dr. Hurliman; the surgeon, Dr. Acosta; the DDD Nurse Rodriguez.; or the home health Nurse Barrett.

## III.    STANDARD OF REVIEW.

---

[8] Exhibit 2, 133: During that visit, the home was found to be free of visible safety hazards. Adequate food for the child was observed in the home. ████ had his own room and bed. Ms. Burns also spoke with the child's home health nurse, who had no concerns regarding the child remaining in Mother's care. She also received the name of DDD supervising nurse, Sonya Rodriguez. Ms. Burns assigned Drue Kaplan Siekmann, a licensed master's-level social worker, to help with her investigation. However, Lisa Burns did not request that Ms. Kaplan speak with the DDD nurse; the home health nurse; the child's pediatrician, Dr. Hurliman; surgeon, Dr. Acosta; or any other of ████ treating specialists, nor did Ms. Burns herself speak with any of these individuals as part of her investigation.

[9] Christensen cannot constitute material fact neither can anything that flows from it. (expand)

15

A.    **Because Parents have a Fundamental, Constitutional Right, and a Statutory Right, to the Custody of their Child, a Heightened Standard of Review is Required.**

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Nearly a century ago, in *Meyer v. Nebraska*, the Supreme Court "held that the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own." *Id.* at 65 (citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923).) Given the extensive Supreme Court precedent on this issue, "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at 66.

The Supreme Court has recognized a parent's rights to their child as being as essential to the functioning of a free society as other fundamental rights, such as the right of persons to speak freely or to exercise their chosen religion. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("In a long line of cases, [the Supreme Court has] held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the right[] ... to direct the education and upbringing of one's children.") Since *Meyer*, the decisions of the Supreme Court have "made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" *Lassiter v. Department of Social Services*, 452 U.S. 18, 27 (1981).

In Arizona, "[o]ur state's elected representatives enshrined those interests in statute as well." *Trish A. v. DCS*, 2019 WL 3819595, *8, ¶ 36 (August 15, 2019) (BOLICK, J, dissenting).. A.R.S. 1-601 (a), states: "The liberty of parents to direct the upbringing,

16.

education, health care and mental health of their children is a fundamental right." The legislature also saw fit to statutorily require that, "[t]his state…shall not infringe on these rights without demonstrating that the compelling governmental interest as applied to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." "A dependency petition invokes the authority of the court to act on behalf of a child who is alleged to be a dependent child." Ariz. R.P. Juv. Ct. 48(A). When the state files a dependency petition, it unquestionably seeks to infringe on the fundamental rights of parents. Thus, under Arizona statutory law, to infringe on the fundamental right of a parent by seeking to assume authority over a child, the State must therefore demonstrate that declaring a child dependent involves an interest of the highest order, that the dependency is narrowly tailored, and that dependency is the least restrictive means of achieving the compelling government interest.

Additionally, "[t]he Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.'" *Troxel*, 530 U.S. at 65. The Supreme Court has "long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.'" *Id.* (quoting *Glucksberg*, 521 U.S. at 719). "The Clause also includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Id.* Thus, under Supreme Court precedent, to properly invoke the authority of the court to infringe on the fundamental right of a parent, the State must provide the parent with due process. "The government may not interfere with [a parent's] fundamental right unless a court finds that: (1) the parent is unable to parent the child for any reason defined by statute; and (2) the parent has been afforded due process." *Carolina H. v. Arizona Dep't of Econ. Sec.*, 232 Ariz. 569, 571, ¶ 6 (Ct. App. 2013). Given the

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ● Fax: (602) 870-9783
Telephone (Mesa) (480)-985-4000 ● Fax (Mesa): (480) 985-7552

fundamental rights involved, the Court should ensure that parents in dependency proceedings are afforded the utmost procedural protections.

## B. Standard of Review Generally Applicable to Motions for Summary Judgment.

The rules of civil procedure "generally do not apply in juvenile proceedings." *Don L. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 556, ¶ 7 (App.1998). Here, however, Ariz. Juv. Ct. Rule of Proc. 46(D), with the exception of the timeframe within which a motion for summary judgment may be filed, expressly incorporates Ariz. R. Civ. P. 56. Under the rule, a "court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law." Ariz. R. Civ. P. 56(a).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Substantive law identifies which facts are material. *Id.* at 248. And "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

When a party fails to make a sufficient showing establishing the existence of an essential element of that party's case, and on which the party bears the burden of proof, summary judgment is mandated. *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986). In cases where the nonmoving party will bear the burden of proof, a summary judgment motion may be made without the production of evidence showing the absence of a genuine issue of material fact. *Id.* at 324–25. "Instead, . . . the burden on the moving party may be discharged by 'showing' – that is, pointing out to the court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party satisfies

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ● Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ● Fax (Mesa): (480) 985-7552

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

this burden, the party opposing the motion is required to come forward with evidence establishing the existence of a genuine issue of material fact that must be resolved at trial. *National Bank of Arizona v. Thruston*, 218 Ariz. 112, 115 (App. 2008).

A court must view the evidence in a light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* Because the moving party bears the burden of persuasion, the movant must come forward with evidence it believes demonstrates the absence of a genuine issue of material fact and must explain why summary judgment should be entered in its favor. *Id.* This burden does not shift to the non-moving party. *Id.* Only where the evidence or inferences would permit a jury to resolve a material issue in favor of either party, is summary judgment improper. *Id.*

In considering a summary judgment motion, a trial court must apply the same standards used for a directed verdict and, further, must take into account the substantive evidentiary burden that will be applicable to the claim at trial. *Orme School v. Reeves*, 166 Ariz. 301, 310 (1990). If the evidence supports only one conclusion, and no reasonable fact-finder could conclude otherwise from the evidence, then the fact is not genuinely in dispute. *Id.* at 311. A trial court "view[s] the evidence and reasonable inferences in the light most favorable to the party opposing the motion," *Andrews v. Blake*, 205 Ariz. 236, 240 ¶ 12 (2003), to determine "whether any genuine issues of material fact exist," *Brookover v. Roberts Enter., Inc.*, 215 Ariz. 52, 55 ¶ 8 (App. 2007).

As relevant here, a "[d]ependent child" is defined as one who is "[i]n need of proper and effective parental care and control and who has ... no parent or guardian willing to exercise or capable of exercising such care and control." A.R.S. § 8–201(15)(a)(i)[10]. "[DCS] must prove dependency by a preponderance of the evidence." *Michael M. v. Ariz. Dep't of*

___
[10] Absent material revisions after the relevant dates, statutes and rules cited refer to the current version unless otherwise indicated.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

*Econ. Sec.*, 217 Ariz. 230, 233, ¶ 10 (App. 2007). "Additionally, after the evidence has been presented, the juvenile court must find that [DCS] met its burden of proof and the factual allegations in the petition are true." *Carolina H. v. Arizona Dep't of Econ. Sec.*, 232 Ariz. 569, 571, 307 P.3d 996, 998 (Ct. App. 2013) (citing A.R.S. § 8–844(C)(1)(a)(ii)); Ariz. R.P. Juv. Ct. 55(E)(3)). "If, however, the court does not find by a preponderance of the evidence that the allegations contained in the petition are true, the court shall dismiss the petition, and return the child to the parent." *Id.* (internal quotation marks and brackets omitted) (citing A.R.S. § 8–844(C)(2); Ariz. R.P. Juv. Ct. 55(E)(2).)

There is an absence of evidence that ▮▮▮ is dependent as to Mother. DCS will not be able to sustain its burden. Thus, there is no genuine issue of material fact, and summary judgment should be granted in Mother's favor.

**C.  ▮▮▮ is Not Dependent as to Mother Under A.R.S. § 8-201(15)(a); DCS Will Not be Able to Satisfy its Burden of Proof**

In order to prove that ▮▮▮ is dependent to Mother, DCS must prove that the parent is unable to parent the child for a reason that is defined in A.R.S. § 8-201(15). *See Carolina H.*, 232 Ariz. at 571, ¶ 7 ("Before a child can be found dependent, the State must allege and prove by a preponderance of the evidence one of the grounds found in [the statute].") DCS is limited to proving dependency to the statutory grounds alleged in the Petition. *See id.* (holding that a court cannot amend a dependency petition to conform to the evidence). DCS cannot satisfy its burden as to any of the alleged statutory grounds in the Petition.

**D.  DCS Fails to Provide any Facts Supporting the Legal Definition of Abuse and Neglect.**

In section VI(A)(1) of its Petition, under the subtitle, "Allegations," DCS alleges: "Mother is *unable* to parent due to *abuse and neglect*." (Petition, l. 8.) DCS then lists various facts which it purports supports its allegation, including Mother "engaging in medical child abuse" by *subjecting* ▮▮▮ to "at least 524 medical visits to providers "*set*

up by *Mother*," "doctor shopping," and "insist[ing] that the child undergo an *ileostomy* surgery."

By definition, under A.R.S. §8-201, "[a]buse means the infliction or allowing of physical injury, impairment of bodily function or disfigurement or the infliction of or allowing another person to cause serious emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior and which emotional damage is **diagnosed by a medical doctor or psychologist** and is caused by the acts or omission of an individual who has the care, custody and control of a child.

Arizona Revised Statutes § 201(2) includes:

(a)     Inflicting or allowing sexual abuse pursuant to section 13-1404, sexual conduct with a minor pursuant to section 13-1405, sexual assault pursuant to section 13-1406, molestation of a child pursuant to section 13-1410, commercial sexual exploitation of a minor pursuant to section 13-3552, sexual exploitation of a minor pursuant to section 13-3553, incest pursuant to section 13-3608 or child sex trafficking pursuant to section 13-3212.

(b)     Physical injury that results from permitting a child to enter or remain in any structure or vehicle in which volatile, toxic or flammable chemicals are found or equipment is possessed by any person for the purpose of manufacturing a dangerous drug as defined in section 13-3401.

(c)     Unreasonable confinement of a child.

None of the provisions defining abuse in the statute above are applicable in this matter.

Under A.R.S. § 8-201, "neglect" is defined. An allegation that a parent is *neglecting* to provide proper and effective parental care, however, is not a statutory ground for dependency. By statute, a child is only dependent if (1) a parent is *unable* or *unwilling* to provide proper and effective parental care and control; (2) the child is "[d]estitute or who is not provided with the necessities of life, including adequate food, clothing, shelter or medical care;" or (3) the "home is unfit by reason of abuse, neglect, cruelty or depravity by a parent." Under the statute, a child is not dependent if a child's parent is willing and able

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ● Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ● Fax (Mesa): (480) 985-7552

to provide proper and effective parental care and control. Mother is willing and able to provide ▮▮▮ with proper care. DCS' allegation as to neglect therefore, fails to properly allege that ▮▮▮ is dependent as to Mother under any of the statutory definitions of dependency provided in A.R.S. § 201(15)(a).

E.    **No Material Facts Support DCS' Allegations in its Dependency Petition that ▮▮▮ is Dependent as to his Mother.**

DCS made twelve main allegations against Mother in its dependency petition. None are supported by any material facts. These allegations are addressed below.

1.    "Mother is unable to parent due to abuse and neglect." While DCS makes a sweeping generalization in this allegation, it has failed to produce any material facts that meet the legal definition of abuse or neglect as set forth above.

2.    '▮▮▮ medical providers have expressed concern that Mother is engaging in medical child abuse of ▮▮▮ This sweeping generalized allegation is not supported by any material fact. It is understandable that DCS investigated Dr. Christensen's January 29, 2020 referral. However, DCS failed in its statutory mandate to conduct a thorough investigation per ARS § 8-456(C)(1). If the law had been followed, DCS would have readily learned that Dr. Christensen's concerns were without factual basis and were not shared by a host of ▮▮▮ treating professionals and diagnostic physicians, and the matter would have been closed as unsubstantiated.[11]

Rather than performing its statutorily-mandated thorough investigation,[12] DCS allowed Dr. Borch-Christensen to act as their agent and unduly relied upon his influence.

[11] These include Dr. Hurliman, ▮▮▮ 's pediatrician; Dr. Carlson, the interim head of psychology at PCH; Dr. Schroeder, the GI; Dr. Bauer, the immunologist; Dr. Acosta, the surgeon who performed the hemicolectomy; and Sonya Rodriguez, the DDD supervising nurse and home health nurse, among others.

[12] DCS' completion of a *thorough* investigation would have uncovered the complexities of Efiron's underlying medical circumstances, ▮▮▮ medical history as contained in the stipulation the Court requested (which was filed with the Court on September 14, 2020) directly undercuts Dr. Christensen and the State's position that ▮▮▮ was an otherwise healthy child made sick by his Mother.

22

His biased and inaccurate conclusions are not supported by ▆▆▆ medical records. His colleague, Dr. Kathryn Coffman of PCH conducted no independent review. She has never met the child. She also unreasonably relied on the opinion of Dr. Christensen. She acted without the awareness that many other medical professionals did not share his opinions. It was irresponsible for Dr. Coffman to rely solely on Dr. Christensen's report, given that she should have known he had only seen the child on one occasion, almost three years prior, and her own medical note acknowledged the complexity of the child's medical history. Dr. Coffman's unfortunate reliance on Dr. Christensen's opinion caused her to compound error and confusion by citing inaccurate information in her medical record.[13] In a situation where a child has a complex medical history, the doctors' failure to do a thorough review of the medical records or to consult with the child's treating specialists allowed their myopic view to perpetuate harmful and prejudicial error. For instance, the false notions that no PCH medical provider was supportive of an ileostomy to provide interim relief for ▆▆▆ and that Mother "doctor-shopped" to obtain an invasive unnecessary surgery would have been promptly dispelled through proper inquiry. The home health nurse Leslie Barrett testified to those issues as follows:

> Q      Because Dr. Notrica declined to do the surgery, did Dr. Schroeder and Dr. Hurliman refer mother to a different hospital to have this reviewed?
> A      Yes, I believe they met together and they talked with -- excuse me, sorry. They met together and they discussed it and they referred mom to meet with Dr. Acosta.
> Q      Did Dr. Acosta find a better solution for ▆▆▆
> A      He had an entirely a -- an different game plan is that the idea that he came up with was not what we were thinking. And he wanted to have a

---

[13] Exhibit 13, 2964. Dr. Coffman compounded Dr. Christensen's error by claiming in her medical record that ▆▆▆ "has a central line in place for treatment of presumed POTS, as well as a cecostomy that was placed at Banner for reported constipation and motility problems." She erred with regard to the basis for the central line and she erred as to the cecostomy, which is actually placed in 2016 at PCH because Eliron's redundant bowel condition had not yet been properly diagnosed.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1530 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone (602) 870-9700 ♦ Fax (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

barium enema done to see where the bowel was at and what was really going on. And then he -- his plan, as he has stated, he stated where the appointment I was at that he had taken care of kids -- other kids in that situation. And many times, they have redundant colon, meaning -- redundant meaning that it's been stressed or if there's excess, you know, a length to the colon which creates longer exit time and challenge with emptying. And his idea was to remove that redundant part and reconnect and create a shorter route for █████ to be able to exit his bowel more easily.

    Q    Did mother confer with █████ pediatrician and Dr. Schroeder prior to the decision being made to go with Dr. Acosta's recommendation?

    A    Yes, she did.

    Q    Was there a consensus that that surgery from Dr. Acosta would help █████

    A    Yes, there was.

    Q    And did it help █████

    A    Yes, I believe it did.

    . . .

    Q    Okay. In the years that you've worked with Jessica as █████ mom, did you ever have any concerns that she was not following medical advice?

    A    No.

    Q    Okay. Have you ever had concerns that mother was exaggerating or falsifying information about her son?

    A    No.

    Q    Did you ever have any concerns that mother was making up symptoms that did not exist?

    A    No.

    Q    What was mother's stated goals for her son, █████

    A    To be a normal child.

    Q    Okay.

    A    A healthy, normal child.

    Q    Okay. Did you have any concerns about her parenting or what you observed in her interaction with █████

    A    No.

    Q    Did you have any concerns about her as a parent assisting █████ with his medical needs and working with the doctors that he needed to work with?

    A    No.

    Q    Did you ever have concerns that she would not follow medical advice?

    A    No.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone (602) 870-9700 ◆ Fax (602) 870-9783
Telephone (Mesa) (480)-985-4000 ◆ Fax (Mesa) (480) 985-7552

3.    "The child has been subjected to at least 524 medical visits to providers set up by Mother." If proper inquiry had been made by investigator Lisa Burns and her assistant Drue Kaplan Siekmann, they would have learned from the DDD supervising nurse Sonya Rodriguez that Mother was actively seeking to reduce ████ hospitalizations and interventions. The following clarifying testimony from Sonya Rodriguez should have been elicited as part of the investigation:

> Q    Did she express concerns there were too many hospitalizations and too many doctor's appointments?
> A    I do remember the hospitalizations.
> Q    Okay.
> A    Of not wanting to go, not something said there was too many.
> Q    Okay. What was her concern about not wanting to go to the hospital?
> A    She was trying to keep him home as much as possible.
> Q    Okay. Is there a list that sent to DDD of individuals who have excessive doctor's appointments?
> A    Hospitalizations?
> Q    Yes.
> A    Related to hospitalizations?
> Q    Yes.
> A    Yes
> Q    Okay. Has ████ ever been on that list?
> A    He was.
> Q    When was that? When was the last time he was on the list?
> A    2017.
> Q    Okay. He wasn't on the list in 2018?
> A    No.
> Q    He wasn't on the list in 2019?
> A    No.
> Q    And he wasn't on the list from January through April of 2020?
> A    No.

Proper investigation would have also revealed that home health nurse Leslie Barrett recognized the complexity of ████ medical condition and Mother's frustration with the many hospitalizations.

Q    Did ▆▆▆ temperature fluctuate significantly even within a short period of time?

A    Yes.

Q    Did mother have frustrations about a care plan that required her to take ▆▆▆ to the hospital if his temperature reached 100.4?

A    Yes, there was a concern for that.

Q    Did she feel like it was too much that it was sometimes not necessary to have to take him?

A    Yes.

Q    Did she often confer with the medical professionals to see if it was really necessary to take him to the hospital?

A    Yes.

Q    Is it your understanding when ▆▆▆ -- it was your observation when ▆▆▆ was taken to a hospital, it was according to a protocol that has been set forth by the medical providers?

A    Yes.

Q    Were there times you'll accompany his mother to the hospital with ▆▆▆ because of a temperature issue only to be turned away because by the time you got to the hospital, the temperature had changed? It has happened on more than one occasion?

A    Yes.

Q    Did you ever observed mother to seek any unnecessary care for her son?

A    No.

4.    "Medical professionals have not observed the symptoms and behaviors reported by Mother, and she is not providing medical professionals with ▆▆▆ medical history that is consistent with the medical records." Once again, a proper investigation would have included discussions with DDD nurse Sonya Rodriguez which would have verified Mother was simply following medical directives and was actively seeking to minimize ▆▆▆'s medical interventions if possible,

Q    Okay. Did mom express concern – did Dr. Frye also prescribe for ▆▆▆ Do you remember a Mito Cocktail being prescribed by Dr. Frye?

A    Yes.

Q    Did mom express some concerns about that and the complications it might provide ▆▆▆

A    Yes.

Q    Okay. Was ▆▆▆ taking Atenolol, a beta-blocker?

A    Yes.

Q    Why was he proscribed that?

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 • Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 • Fax (Mesa): (480) 985-7552

A    Tachycardia, increased heart rate?

Q    Do you know who prescribed it?

A    The cardiologist prescribed it.

Q    Do you know if Ms. Fidler spoke with Dr. Hurliman after it was prescribed to make sure that it was appropriate and that it wouldn't harm █████

A    Yes.

Q    Okay. How was the tachycardia confirmed?

A    Holter monitor.

. . .

Q    Okay. We've talking about █████ receiving IV fluids. Was there a time when █████ did not received IV fluids?

A    Yes.

Q    And was that approximately August of '17 through April of '18?

A    I believe so about its progress

Q    Did any of █████ physicians state that he should continue with the IV fluids – that he should not continue with the IV fluids?

A    No

Q    At the care conference, was there a consensus that he should continue with the IV fluids?

A    Yes.

Q    Recently, █████ began receiving daytime fluids. Were you aware that the school indicated that they saw an improvement with █████ with the daytime fluids?

A    Yes.

5.    "Medical professionals are concerned that Mother is 'doctor shopping' to find providers who will perform requested medical procedures on the child, despite multiple specialists having determined that such procedures are unnecessary." The false notion that Mother "doctor-shopped" perhaps arose because PCH *referred* her to Cincinnati for specialty GI testing not available locally. Mother was also *referred* to Dr. Acosta at Banner Hospital by Drs. Hurliman and Schroeder when PCH surgeon Dr. Notrica declined to perform the recommended ileostomy surgery. Mother did not doctor shop. She followed PCH's referrals.    DDD nurse Sonya Rodriguez provided the following clarifying information:

Q    Did you ever see mother seeking to Doctor Schroe--or find doctors who would agree with her if she didn't like what another doctor said?

A    No.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ● Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ● Fax (Mesa): (480) 985-7552

Q    Was there a circumstance where ▮▮▮ went back to Cincinnati at the recommendation of his GI specialist, Dr. Schroeder, to have some testing done at Cincinnati?

A    Yes.

Q    Did mother keep you in the loop of all of this recommended treatment?

A    Yes.

Q    After that, did mother confer with Dr. Hurliman, ▮▮▮▮ pediatrician, and Dr. Schroeder, his GI specialist, about potentially allowing the child's bowel to rest to a reversible surgery called an ileostomy?

A    Yes.

6.    "In particular, Mother insisted that the child undergo an ileostomy surgery, in which the end or loop of the small intestine is cut off and brought to the surface of the skin and waste is collected in an external pouch system adhered to the skin. Medical professionals have described ileostomy surgery as an invasive and lifestyle altering operation with potentially life-threating complications." Mother never insisted the child have an ileostomy. Dr. Hurliman, the child's pediatrician, as referenced on p. 12, stated, "…I think she was looking for a solution. Truly, …that was going to be beneficial for him, and wanted to make sure that… it was the right thing." The ileostomy was a possible procedure recommended by professionals in Cincinnati and endorsed by Drs. Schroeder and Hurliman. A surgery date had actually been scheduled in Cincinnati for the ileostomy. The idea was to allow ▮▮▮ some relief from the lengthy bowel flushes and abdominal pain he was enduring. This reversible surgery was carefully contemplated to give the child's bowels a rest. ▮▮▮ had a cecostomy placed in 2016 because of his chronic bowel issues.

He suffered for years with chronic bowel issues including recurring abdominal pain and lengthy cecostomy flushes that interfered with him just being a kid. Ultimately, surgeon Dr. Acosta at Banner diagnosed the child with a significant redundant colon which was the root of much of his bowel distress. Again, proper communication with nurses Sonya Rodriguez and Leslie Barrett would have revealed the following:

Q    Do you know when – did ▮▮▮ have a cecostomy tube placed?

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-935-4000 ♦ Fax (Mesa): (480) 985-7552

A     yes.

Q     Do you know when that was placed?

A     I'm the nurse (phonetic) in 2017 [*sic*, should read 2016].

Q     Okay. And did any doctors ever question whether or not – as long as you were on the case – ever question whether or not that was an appropriate medical intervention to help ████?

A     No

Q     Okay. Was it your understanding that Dr. Acosta's surgical intervention perhaps could eliminate that?

A     Yes.

. . . .

Q     Did ████ have that procedure done by Dr. Acosta in October of 2018? '19?

A     Yes. '19, yes.

Q     Okay. All right. What are your observations of the outcome of the hemicolectomy that Dr. Acosta performed?

A     It appears now that he is able to stool.

7.     "While seeking to have this procedure performed, she subjected him to numerous laboratory tests, x-rays and hospitalizations." The barium enema x-ray ordered by Dr. Acosta was necessary to diagnose the root cause of ████ chronic GI distress. There are no identified unnecessary laboratory tests or hospitalizations associated with the GI surgery. The imaging obtained after the barium enema evaluation revealed a significant amount of redundant colon no identified by any of the PCH medical professionals.

8.     "Multiple medical specialists determined that the surgery was unnecessary, but Mother continued to request the surgery be performed." This assertion is flatly wrong, and the issue has long since been put to rest as acknowledged by current caseworker Marisol Manjarrez's answers to the court's questions on September 14, 2020.

9.     "The child's symptoms have been observed by medical professionals to disappear when the child is isolated from Mother and then reappear after she reestablishes contact with him." DCS has provided no concrete examples of Mother inducing symptoms in ████ Their effort to claim her responding to ████ fever on January 20, 2020 by

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ◆ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ◆ Fax (Mesa): (480) 985-7552

takin ▆ to PCH, where his fever was deemed to have subsided, is not a material fact

that supports this assertion for dependency.

To the contrary, ▆ condition has actually regressed since removal from his

Mother's care as testified by DDD supervising nurse Sonya Rodriguez:

> Q    Okay. Discussing things that you had seen ▆ regress and
> since he's been removed from mom, and where you mentioned that prior to
> removal, you had witnessed him being able to do certain things. I'll go back,
> my thinking is that he was able to cut up his food; was that correct?
> A    Yes.
> Q    Did you witness him do that or was that something the mother
> said?
> A    No, I witnessed it.
> Q    Okay. And you were made aware that since removal, he was not
> able to cut up his food?
> A    Yes.
> Q    And who told you that?
> A    During the CFT meeting, it was said.
> Q    Okay. And what were some of the other things that you said that
> he has regressed in since removal?
> A    Tying his shoes, riding a bike.
> Q    And were these things that you saw him do first like witnessed
> firsthand?
> A    Yes.
> Q    No, you didn't just – are these things the mother told you?
> A    No, I witnessed it.
> Q    You did witness – sorry. Okay. And you said in the CFT you
> were told that he wasn't able to do that. Who in the CFT said that ▆ wasn't
> able to cut up his own food?
> A    Placements.

10.    "Specifically, during his hospitalizations, his condition has quickly stabilized and

has been released to Mother and then bring him back for further hospitalizations." Prior to

Dr. Acosta's corrective GI surgery, ▆ experienced greater temperature fluctuations.

Because he had a central line, which subjected him to a higher risk of infection, Mother was

compelled to follow the medical directive to take ▆ to the hospital if his temperature

reached 100.4 degrees. Home health nurse Leslie Barrett recognized Mother was frustrated

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

with the mandate to so frequently take her son to the hospital. She also observed there were numerous times when ▬ temperature at home warranted a trip to the hospital but by the time of admission had dropped to a normal range.

11.    "Medical professionals in Ohio raised concerns that Mother was potentially subjecting the child to medical abuse as early as 2013." DCS has provided no support at all for this assertion. ▬ was not in Ohio in 2013, so this allegation has no basis whatsoever. ▬ was in Cincinnati in 2018 and 2019, however, it is doubtful any Ohio medical professionals would raise concerns about medical abuse during that timeframe because the Cincinnati hospital actually scheduled the child for an ileostomy surgery. Mother elected not to have the surgery performed in Ohio because the child's treating physicians were in Arizona. DCS has flipped Mother's efforts to be a responsible parent in seeking relief for her son's chronic bowel issues and has unreasonably tried to use it against her.

12.    "Family members have also expressed concern to a DCS case manager and medical professionals that Mother was medically abusing ▬ This statement is a distortion of reality. A thorough investigation would have revealed that only one family member expressed concern regarding Dr. Acosta's surgery. That distant cousin lives out of state, had not seen Mother in decades and had never met the child. Drs. Acosta, Schroeder and Hurliman carefully considered this family member's letter and gave it the weight it was due: none. To the contrary, maternal grandmother and maternal uncles have been fully supportive of Mother's care ▬ DCS has completely ignored their input to ▬ detriment.

### F.    DCS cannot meet its burden to prove its allegation of dependency.

The Court has heard Mother was sometimes short with medical providers out of her anxiety and concern for her son's complex medical conditions. This does not give rise to a dependency. The Arizona Court of Appeals has made it clear: "A child is not entitled to a

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1830 S. Stapley Drive, Suite 212 Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

perfect parent or even a good one. What a child is entitled to is a parent that does not "engage in conduct that is unlawful or to abuse or neglect a child in violation of the laws of this state." *Aaron W. v. Dep't of Child Safety*, 2019 WL 4695887, at *7 (Ariz. Ct. App. Sept. 26, 2019)" (quoting A.R.S. § 1-602(B).) The court has cautioned that juvenile courts "must be vigilant in ensuring that the basic care provision in A.R.S. § 8-201(15)(a)(i) is not interpreted so broadly as to capture conduct that may be subjectively improper or ineffective, but adequate nonetheless." *Id*. The language of the statute is not unconstitutionally vague, only because courts applying it "utilize commonly understood terms which give clear notice of the standard to be applied in the adjudication proceeding." *Id*.

A parent being short, or anxious, with their child's physician may not fit the ideal of a perfect parent, but neither does it in any possible way satisfy the statutory definition of neglect or form the basis of a dependency. If DCS removed from every parent who ever reached the end of their tether, all children would be subject to removal by the State. Being short or anxious is not conduct that could possibly be commonly understood to be deemed "neglect" in violation of the laws of this state. Even if, however, contrary to the appellate court's caution, the court was to apply an expansive, broad and constitutionally questionable definition of neglect that included such conduct, such conduct is not at issue here. Mother has responsibly referred herself for counseling, DBT therapy, and relies upon an excellent family support system.

DCS may claim that this statutory basis for dependency is satisfied because Mother acknowledges she was dealing with heightened anxiety prior to █████ removal from her care. At the most, however, DCS' assertions would support a determination that, in the past, █████ may have been dependent as to Mother. But even these grounds would fail because they were not pled in the dependency petition. It has long been established that in

dependency proceedings, the court's concern is the *current* welfare of the child. *See In re Pima County Juvenile Action No. J-31853*, 18 Ariz. App. 219 (1972); *Clifford v. Woodford*, 83 Ariz. 257, 260 (1957). The Court of Appeals has recently reiterated this fact, holding that the focus at every stage of a dependency proceeding is the present circumstances. *Dep't of Child Safety v. Stocking-Tate in & for Cty. of Yuma*, No. 1 CA-SA 19-0001, 2019 WL 2482325, at *5 (Ariz. Ct. App. June 14, 2019). "This focus," the court held," is consistent with the directive that, at all stages of the removal and dependency proceedings, the paramount concern is the child's health and safety." *Id.* (citing Ariz. R.P. Juv. Ct. 36 ("The rules [of procedure for the juvenile court] should be interpreted in a manner designed to protect the best interests of the child, giving paramount consideration to the health and safety of the child.") "When a state expresses such an interest through particular legislation, its policy judgments are entitled to judicial deference." *Id.* The court held that courts "cannot interpret the rules and statutes in a way that permits the court to ignore presently known facts...and remain true to the principle of treating the child's welfare as paramount." *Id.*

### G.    DCS cannot meet its burden under A.R.S. § 1-601.

As noted above, A.R.S. 1-601 (b), states: "[t]his state...shall not infringe on these rights without demonstrating that the compelling governmental interest as applied to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." "When a state expresses such an interest through particular legislation, its policy judgments are entitled to judicial deference." *Dep't of Child Safety v. Stocking-Tate in & for Cty. of Yuma*, No. 1 CA-SA 19-0001, 2019 WL 2482325, at *5 (Ariz. Ct. App. June 14, 2019) (quoting *Ariz. Dep't of Econ. Sec. v. Lee ex. rel. Cty. of Maricopa*, 228 Ariz. 150, 153, ¶ 13 (App. 2011). In its petition, DCS has not claimed any facts which it asserts demonstrate that declaring ▮▮▮ dependent involves an interest of

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive. Suite 212. Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

the highest order, that the dependency is narrowly tailored, and that dependency is the least restrictive means of achieving the compelling government interest, nor does it even claim to do so. DCS' failure to follow its statutory mandate also supports this Court granting Mother's motion. In actuality, the facts demonstrate the opposite.

It is indisputable that ███ is a child with complex medical issues treated by numerous medical specialists. This can be verified by his PCH pediatrician, Dr. Hurliman; DDD nurse Sonya Rodriguez; and his home health nurse, Leslie Barrett – medical professionals with the most intimate knowledge of ███ medical conditions and care. These providers have no concerns of Mother over-medicating the child or reporting conditions that were different than what ███ was actually experiencing. To the contrary, all of these providers affirm that it was Mothers stated desire to seek not only a coordination of ███ s care among his various providers, but also to lessen the number of received interventions as her personal goal was to for her son to lead a healthy, happy life.

The coordinated efforts of Dr. Christensen and the inept investigator Lisa Burns resulted in a manipulative scheme to remove a healthy child from a parent to bolster claims that she over-medicalized her son. Mother should have been involved in the opportunity to converse with the doctors about removing the medications prescribed by Dr. Frye. Even though kept out of the loop, she agreed to do it. Mother was also excluded from the conversations with Dr. Bauer about terminating ███ IVIG, yet nevertheless consented, as that had been the plan all along. Mother also consented to the removal of ███ cecostomy tube recognizing Dr. Acosta's surgery created the foundation for the eventual elimination of the need for cecostomy flushes. Mother also readily consented to the removal of ███ s Broviac.

The United States Supreme Court has held that until the State has established that a parent is unfit, by presenting clear and convincing evidence of unfitness, "the interests of

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive. Suite 212. Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

the child and his natural parents coincide to favor use of error-reducing procedures."
*Santosky v. Kramer*, 455 U.S. 745, 761 (1982); *see also Donald W. v. DCS*, 247 Ariz. 9, 22
¶ 48 (App. 2019) ("Until a parent is deemed unfit and unable to correct the problem, it
remains in the child's best interests to unite the child with the parent.") Thus, in this
dependency proceeding—in which, by definition, the State has not proven a parent unfit
and unable to correct the problem— the best interest of the child is the same as that of the
parent; that their relationship will not be erroneously infringed upon by the State. DCS's
statutorily defined interest is to protect children and *preserve families*. A finding of
dependency furthers neither interest. Thus, the State cannot show that its interest in
infringing on Mother's fundamental parental rights is an interest "of the highest order."

The State recklessly rushed to judgment in contravention of its duty to ▮▮▮ and
his Mother. Without a thorough investigation, DCS relied primarily on the claims of Dr.
Borch-Christensen, a hospitalist who only saw ▮▮▮ one time in 2017, and who may have
been offended because Mother complained to PCH about his lack of professionalism. Dr.
Christensen was brazenly critical of Dr. Acosta's surgery, claiming it was unnecessary,
despite having failed to consult with the many other doctors who had treated the child, or
even examining the surgery records proving up the life-altering benefit of the surgery for
▮▮▮▮.

**Conclusion.**

Justice Bolick has recently observed: "the process our state has constructed," for
removing children from parents, "creates the very real prospect that parents will lose their
children not because they deserve to, but because they are unable to effectively defend their
rights in a system that is stacked hopelessly against them." *Trish A.*, * 15 ¶ 73 (BOLICK,
J, dissenting). This is such a case. The State's case plan from the beginning of this case was
severance.

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone (602) 870-9700 • Fax: (602) 870-9783
Telephone (Mesa) (480)-985-4000 • Fax (Mesa)) (480) 985-7552

GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street, Phoenix, Arizona 85020
1630 S. Stapley Drive, Suite 212, Mesa, Arizona 85204
Telephone: (602) 870-9700 ♦ Fax: (602) 870-9783
Telephone (Mesa): (480)-985-4000 ♦ Fax (Mesa): (480) 985-7552

The State has used its unlimited resources to stubbornly resist admitting error. Dr. Hurliman, Dr. Schroeder, Dr. Carlson, DDD Nurse Rodriguez, Home Health Nurse Barrett, Dr. Christensen, investigator Burns, caseworker Manjarrez have all been interviewed and/or testified in this matter. The sum of the information revealed that Dr. Christensen was wrong; that Lisa Burns didn't know what she was talking about, and failed in her duty to conduct a thorough investigation; and that Marisol Manjarrez did not pay attention to the interviews or testimony and persists in her failure to recognize that Dr. Christensen was wrong and had motivation for bias.

The State's undaunted quest for a dependency finding, especially in light of the Court's questions and comments at the September 14 hearing, is manifestly unreasonable. Mother, a single parent, has borne an unnecessarily heavy burden of mounting attorney fee debt because of the State's inability to concede error. Even now, because there is no material fact to support its petition, the State is belatedly rushing to arrange interviews of mitochondrial Dr. Frye, geneticist Dr. Grebe, immunologist Dr. Bauer, and Dr. Christensen's colleague, Dr. Coffman in a desperate effort to find any shred of evidence to support its ill-fated dependency. If any of these doctors had material firsthand knowledge of Mother fabricating systems or over-medicalizing her son, that would have come to light long ago. The States unseemly and untimely effort is to avoid facing its error and unnecessarily and unreasonably running up Mother's fees.

The State cannot meet its burden to prove that ▮▮▮ is dependent as to Mother. Mother requests that this Court find that DCS could not meet its burden to prove its allegations in the petition, grant summary judgment on the petition in Mother's favor, and dismiss the dependency so ▮▮▮ can promptly be returned to his Mother's care.

The State opposed Mother's Motion for Summary Judgment. The Guardian Ad Litem has not provided his position.

Date:  October 16, 2020.

*Respectfully,*

**GILLESPIE SHIELDS GOLDFARB & TAYLOR**

By:

DeeAn Gillespie Strub, Esq.
7319 North 16th Street
Phoenix, Arizona 85020
*Counsel for Mother Jessica Fidler*

ORIGINAL filed this date with a copy
hand-delivered to The Honorable Kristin
Culbertson

COPY of the foregoing hand-delivered
this date to:

Lisa Boddington, Esq.
Lisa.boddington@azag.gov
Gregory Coordes, Esq.
Assistant Attorney General
120 West 1st Avenue, 2nd Floor
Mesa, Arizona 85210

Electronic copy provided this date via
DropBox to:

Jason M. Leach, Esq.
jasonleachlaw@outlook.com

By: */s/ Marie Costello*

# EXHIBIT 3

# APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILD
## Superior Court of Arizona for Maricopa County

REMOVAL REQUEST # RR2023-22793

COUNTY OF ORIGIN Maricopa

DCS CASE ID AS00863831

I, Alonzo Borboa, hereby affirm the following statement of facts:

1. I am employed by the Arizona Department of Child Safety. By virtue of my education, training and experience I am qualified and authorized to conduct child abuse and neglect investigations. I am currently assigned to investigate the case involving the child named in this application and declaration for removal, or am that person's supervisor. I make this declaration in support of this application. Further, I have the following qualifications: Positions:
August 2022 – Present OCWI Assistant Training Manager
December 2019 – August 2022 OCWI Investigator
April 2018 – December 2019 DCS Program Specialist
May 2016 – April 2018 DCS Child Safety Investigator

   Training:
   Safe AZ Renovations Advanced Forensic Interview Training (AFIT)
   DCS Specialist CORE training (240 hours)

   Education:
   Bachelor's in Secondary Education (2011)
   Master's in Psychology (2020)

2. This application and declaration is in support of for ex-parte removal of the following children:

| Child Name | DOB | Sex | ICWA Status |
|---|---|---|---|
| E▓ F▓ | ▓/2011 | F | No |

3. The mother(s) is/are:
The mother of E▓ F▓ is Jessica Fidler

4. The father(s) is/are:
The father of E▓ F▓ is Unknown

5. The legal guardian(s) is/are:
The legal guardian of E▓ F▓ is None or Unknown

# APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILD
## Superior Court of Arizona for Maricopa County

6. Probable cause exists to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect, and it is contrary to the child's welfare to remain in the home under A.R.S. §8-821(A). Specifically, Specific present danger condition(s) or impending danger threat(s) for each child listed on this application:
Child's condition is the result of deliberate, preconceived planning or thinking that the caregiver is responsible for and that preceded the child's serious injuries or condition;

Circumstances that require temporary custody including a detailed account of circumstances and supporting facts:
Today, Dr. Cahill completed a forensic medical review of documents pertaining to H▋▋ and Ms. Fidler and Dr. Cahill arrived at the conclusion that Ms. Fidler meets the criteria for Factitious Disorder Imposed on Another (FDIA). Dr. Cahill has reviewed copious amounts of medical records pertaining to H▋▋, and Ms. Fidler has exposed H▋▋ to an alarming number of medical and psychological diagnoses. B▋▋ was removed from Ms. Fidler's care in 2020 and he showed significant improvement in a short period of time. He asked to have his cecostomy tube removed from him and was fine afterwards. E▋▋ was able to complete his tasks of daily living and he did not show evidence of the cognitive or mental health issues that Ms. Fidler claimed he had. After H▋▋ was returned to Ms. Fidler's care she insisted on having his cecostomy tube replaced in the emergency room. Ms. Filder did not want E▋▋ to use anesthesia, so he suffered immensely. Ms. Fidler is obsessed with constipation and she is constantly flushing the child's cecostomy tube and feeding him laxatives. B▋▋ did not see a doctor for 30 days when he was previously in foster care, and he now has numerous specialists to attend to many of his fabricated conditions and diagnoses. Dr. Cahill reports that Ms. Fidler is abusing E▋▋ and she recommends that E▋▋ be removed from her care for a period of 4-8 weeks, and that she have no contact with the child. If ▋▋ improves again then, this would support the diagnoses of FDIA and Dr. Cahill suggests that parental rights be terminated.

E▋ will continue to be exposed to countless unnecessary and harmful medical procedures if he remains in Ms. Fidler's care. The child has a cecostomy tube placed in him, which was removed when he was in foster care and Ms. Fidler had it replaced once the child returned to her care. The child will continue to suffer and he will not have the opportunity to live a more normal life if he remains in Ms. Fidler's care. The father was an unknown sperm donor.

7. I, Alonzo Borboa, declare under penalty of perjury that the information contained within this application and declaration is true and correct to the best of my knowledge and belief.

10/24/2023 2:36 PM

## ORDER FOR EX-PARTE REMOVAL OF CHILD
### Superior Court of Arizona for Maricopa County

REMOVAL REQUEST # RR2023-22793

COUNTY OF ORIGIN Maricopa

DCS CASE ID AS00863831

## TO ANY DCS REPRESENTATIVE IN THE STATE OF ARIZONA

Proof by application and declaration having been made this date 10/24/2023 before me by Alonzo Borboa of the Department of Child Safety ("DCS"), and on the basis of the evidence presented in such application and declaration, and pursuant to A.R.S. §8-821(A), I find probable cause exists to believe that temporary custody is clearly necessary to protect the following child E███ F███ from suffering abuse or neglect. I further find, for the reasons indicated below and pursuant to A.R.S. §8-821(A), that probable cause exists to believe that it is contrary to the child's welfare to remain in the home.

- ☑ Domestic violence or violent behavior
- ☑ Mental health issues
- ☑ Risk of abuse or neglect of child(ren)
- ☑ Unfit or unsafe home environment for child(ren)

Therefore, **IT IS ORDERED** granting DCS's request for authorization to remove E███ F███ and authorizing DCS to remove this child.

**IT IS FURTHER ORDERED** directing DCS to conduct a due diligence search pursuant to A.R.S. § 8-514.07.

*ETBingert*

_____                    10/24/2023 2:44 PM
Hon. Elizabeth Bingert

## NOTICE OF REMOVAL/*AVISO DE TRASLADO*

Check (✓) the applicable section (A or B) of this form./ *Marque con* ✓ *la sección(es) pertinente (A o B) en este formulario.*

☑ **A. Notice of Removal -**    **School/Day Care/Safe Haven/Other Location**
    *Aviso de Traslado*      *Escuela/Cuidado Diurno/Refugio Seguro/Otro Local*

As of   10/24/2013    2:56 PM   The following child(ren)   [redacted]   F[redacted]
*Desde*    Date /*Fecha*    Time/*Hora*   *El siguiente niño(s)*    Name of Child(ren)/*Nombre de niño(s)*

at    Gilbert Az 85296
*en*

Address of School/Day Care/Safe Haven/Other Location *(No., Street, City, State, ZIP)*
*Dirección de Escuela/Cuidado Diurno/Refugio Seguro/Otro Local (Núm. Calle, Ciudad, Estado, Código Postal)*

was/were placed into temporary custody by Arizona Department of Child Safety (DCS). A **"Temporary Custody Notice"** or other notice as appropriate to the situation concerning the above action will be served by DCS to the child(ren)'s parent, guardian or custodian following requirements of A.R.S.§ 8-821, in addition to a copy of this notice of removal.

*fue/fueron colocado(s) bajo la custodia temporal del Departamento de Seguridad del Menor (DCS por sus siglas en inglés) del Departamento de Seguridad del Menor de Arizona. Según los requisitos de A.R.S.§ 8-821, además del presente Aviso de Traslado, DCS presentará al padre/madre/guardián o custodio del niño(s) un "Aviso de Custodia Temporal" u otro aviso pertinente a la situación y acción de referencia.*

☐ **B. Notice of Removal -**    **Court Ward**
    *Aviso de Traslado*      *Bajo Tutela del Tribunal*

As of   _____   _____   The following child(ren) _____
*Desde*    Date /*Fecha*    Time/*Hora*   *El siguiente niño(s)*      Name of Child(ren)/*Nombre de niño(s)*

at _____
*en*

Address of School/Day Care/Safe Haven/Other Location *(No., Street, City, State, ZIP)*
*Dirección de Escuela/Cuidado Diurno/Refugio Seguro/Otro Local (Núm. Calle, Ciudad, Estado, Código Postal)*

was/were placed into temporary custody by Arizona Department of Child Safety (DCS). The Arizona Department of Child Safety intends to notify the court of the removal of the above-named child(ren) by filing a Motion for a Change of Physical Custody. If you are the parent, guardian or custodian and oppose the removal of the child from your physical custody, you or your attorney must notify the court and request a hearing.

*fue/fueron colocado(s) bajo la custodia temporal de Departamento de Seguridad del Menor (DCS). El Departamento de Seguridad del Menor de Arizona va a presentar una Moción para Cambio de Custodia Física y así notifica al tribunal que el niño(s) mencionado arriba ha sido traslado(s). Si usted es el padre/madre, guardián o custodio de este niño(s) y se opone a que se le(s) traslada de sus custodia física, usted o su abogado debe así informarlo al tribunal y pedir una audiencia.*

The following signature block pertains to section A or B, whichever is used, and must be completed.
*La sección siguiente se relaciona con ambas partes A o B, la que se haya usado, y es requisito llenarla.*

| DCS REPRESENTATIVE'S NAME (Please Print and sign) *Nombre en letra de imprenta, y firma del representante del DCS* | DCS OFFICE PHONE NO. *TEL. OFICINA DE DCS* | DATE/*FECHA* |
|---|---|---|
| Alonzo Borboa | (480) 341-2748 | 10/24/2013 |

| DCS ADDRESS *(No., Street, City, State, ZIP)/ Dirección de DCS (Núm. Calle, Ciudad, Estado, Código Postal)* | |
|---|---|
| 3003 N. Central Ave. Phoenix, Az 85012 | |

| DCS SUPERVISOR'S NAME (Please print and sign) *Nombre en letra de imprenta, y firma del supervisor(a) del DCS* | DATE/*FECHA* |
|---|---|
| N. Hale Garcia | 10/24/2013 |

**DISTRIBUTION: Original** of section **A** – location of removal; **Original** of Section **B** – person(s) who had physical custody of the child at time of removal of a Court Ward; **Copy** of section **A** – parent, guardian or custodian to whom a Temporary Custody Notice is served, and the case record; **Copy** of section **B** – the case record.

See reverse for EOE/ADA/GINA Disclosures.
*Vea al reverse para la Declaraciones de EOE/ADA/GINA.*

CSO-1000A (6-18)
PAGE 2 ON REVERSE

ARIZONA DEPARTMENT OF CHILD SAFETY
**TEMPORARY CUSTODY NOTICE**

On (Date) 10/24/13  At (Time) 4:54  ☐ AM ☑ PM , temporary custody of *(child's name)* E▮▮▮ F▮▮

was taken at *(Address)* L-Thart Abymgetterth DCWI/OCS

**Type of abuse or neglect requiring temporary custody:** Select the circumstance(s) that most clearly describe the danger to the child(ren) and reason temporary custody is necessary.

☐ Medical examination is required to diagnose abuse.

☐ The child is unsupervised or alone now or on a daily basis, or has been left with a person who is unwilling or unable to provide adequate care.

☐ The caregiver is unable to perform essential parental responsibilities due to substance use, mental illness, physical impairment, cognitive limitations.

☐ The caregiver is unable or unwilling to perform essential parental responsibilities and there is no other appropriate caretaker immediately available.

☐ The caregiver is out of control and cannot focus or manage his/her behavior in ways to properly perform parental responsibilities.

☐ The caregiver's behavior is violent, bizarre, erratic, unpredictable, incoherent, or totally inappropriate and is a threat to child safety.

☐ The caregiver is brandishing weapons, known to be dangerous and aggressive, or is behaving in attacking or aggressive ways that are a threat to child safety.

☐ The caregiver has not, cannot, or will not protect the child from serious or severe harm, including harm from other persons having access to the child.

☐ Dynamics in the household include a person establishing power, control, or coercion over a caregiver in a way that impairs necessary supervision or care of the child and has caused, or will likely cause, serious or severe harm to the child's physical, mental, or emotional health.

☐ The caregiver has an extremely negative perception of the child, and/or has extremely unrealistic expectations for the child's behavior.

☐ Physical conditions in the home are hazardous and immediately threaten the child's safety.

☐ The caregiver is subjecting the child to brutal or bizarre punishment or there is severe to extreme maltreatment alleged to be occurring.

☐ The child requires immediate medical attention, and the absence of medical treatment could seriously affect the child's health and well-being.

☐ The child is actively endangering self or others and the caregiver cannot or will not control the child's behavior or arrange or provide necessary care.

☐ There is evidence of recent sexual abuse, the perpetrator currently has access to the child, and no protective action is being taken by a caregiver.

☐ The child has injuries such as facial bruises, injuries to the head, multiple plane injuries, injuries to a non-ambulatory child, immersion burns.

☐ The child has serious injuries that the caregivers and others cannot or will not explain, or the explanation is inconsistent with the child's injuries or condition.

☑ The caregiver deliberately harmed the child, or caused or threated to cause serious or severe harm to the child.

☐ The child is profoundly fearful (terrified) of their present home situation, or a particular person living in or having access to the home.

☐ The caregiver previously endangered a child and/or caused harm to a child and circumstances indicate the person will likely cause severe harm to the child.

☐ There is evidence of abuse or neglect and the caregiver cannot produce the child, refuses access to or is likely to flee with the child, or actively avoids DCS.

☐ Criminal activity by the caregiver or criminal activity of other persons living in or having access to the home will likely result in severe harm to the child.

Select how temporary custody was obtained: ☐ Parent or Guardian Consent ☑ Court Authorized ☐ Exigent Circumstances

**The Department of Child Safety (DCS) must:**

- Return your child within **72 hours** *(not including weekends and holidays)* unless DCS files a legal paper, called a petition, with Juvenile Court. If a petition is filed, your child will be kept in the temporary custody of DCS.

- Return your child within **12 hours** if your child was removed for a medical examination, unless abuse is revealed, **and**

- Inform you of the right to give a verbal, telephonic or written response to the allegations and have the response included in the investigation report. Any documentation you give, what you say or write, will be included in the case record and can be used in court proceedings.

| DCS REPRESENTATIVE'S NAME (Please print) | AREA CODE AND PHONE NO. |
|---|---|
| Alonzo Barboa | (480) 341-2748 |

ARIZONA DEPARTMENT OF CHILD SAFETY ADDRESS (No., Street, City, State, ZIP)
3003 N. Central Ave. Phoenix, AZ 85012

| DCS SUPERVISOR'S NAME (Please print) | AREA CODE AND PHONE NO. |
|---|---|
| Nichole Garcia | (602) 542-1013 |

**METHOD OF NOTICE:** On (date) 10/14/13 , at (time) 7:27  ☐ AM ☑ PM , I served noticed to *(parent, guardian or custodian)* (print name)

Method used: ☑ In-Person ☐ Left at Residence ☐ Verbal ☐ Fax   Date: 10/27/13   Time: 7:17 PM

Address where mailed/left/given (No., Street, City, State, ZIP) Tillart AZ 85296

**What is the child or child's parents American Indian heritage/ancestry:**   Has the tribe been notified? ☐ Yes ☐ No ☑ N/A

PARENT, GUARDIAN OR CUSTODIAN'S SIGNATURE

| DCS REPRESENTATIVE'S SIGNATURE (Or law enforcement officer) | DATE |
|---|---|
| | 10/14/13 |

ROUTING: Original – Parent/Guardian/Custodian; 1ˢᵗ Copy – Sent to Assistant Attorney General to file with the Petition; 2ⁿᵈ Copy – Retained in the case record

ARIZONA DEPARTMENT OF CHILD SAFETY

## NOTICE OF DUTY TO INFORM

When the Department of Child Safety (DCS) receives an allegation of child abuse or neglect by a parent, guardian custodian or adult member of household and a report is taken, Arizona law requires DCS to conduct an investigation. The following allegation concerning your child (or children) is currently being investigated by DCS.

IN 10701 578

neglect / physical abuse

This *notice* is to inform you that:

- DCS has no legal authority to compel or make you cooperate with the investigation or to accept services, but it is our hope that by working together we can find solutions to ensure that your child (or children) is safe and that your family has what it needs.

- DCS has a duty to proceed with the investigation even if you decide not to cooperate to ensure that your child (or children) is safe, although we would prefer to carry on with the investigation with your support.

- DCS has the authority to petition the Juvenile Court for a determination that your child (or children) is dependent and in need of protection. Your refusal to cooperate with the investigation or services offered does not in itself form a basis for DCS to take temporary custody of your child (or children), unless it is clearly necessary to protect your child (or children) from abuse or neglect.

- You have the right to provide written, telephonic or verbal responses to the allegation, including any documentation, and to have the information considered in determining whether your child (or children) is in need of child safety services.

- Anything you say or write can be used in a court proceeding and may be included in DCS's report of the investigation.

- Any written response that you provide, including any documentation, will be included in the DCS case record.

- Any information that you provide in response to the complaint or allegation(s) will be considered during the investigation.

- You have the right to appeal determinations made by DCS about the results of the investigation and will be notified in writing of these results and how to appeal.

- You may call the DCS Office of the Ombudsman to file a complaint regarding services, actions, lack of actions, or treatment by the DCS staff. The Office of the Ombudsman will review your complaint and determine the type of response needed. The telephone number is 1-877-527-0765 or (602) 364-0777.

- You have the right to file a complaint with the Arizona Ombudsman-Citizens Aide. The telephone number in Phoenix is (602) 277-7292, and statewide, toll-free is 1-800-872-2879. The Ombudsman-Citizen Aide office is available to handle inquiries, concerns and complaints about agency actions, including DCS.

More information about DCS and your parental rights are outlined in the pamphlet, **"Guide to Department of Child Safety"** that I am leaving with you today.

**ASK: Is the child's parent(s) of American Indian heritage/ancestry?** ☐ Yes ☑ No

*If Yes, Mother's Tribe:* _____ *Father's Tribe:* _____

☐ Unknown *(explain):* _____

By signing this form, you are acknowledging that I have reviewed the information contained in this notice with you.

| PARENT, GUARDIAN OR CUSTODIAN'S SIGNATURE | PARENT, GUARDIAN OR CUSTODIAN'S NAME *(Please print)* | | DATE |
|---|---|---|---|
| telephonic | Jesica Fidler | | 10/24/23 |
| DCS REPRESENTATIVE'S SIGNATURE | DCS REPRESENTATIVE'S NAME *(Please print)* | TELEPHONE NUMBER | DATE |
| | Alonzo Borbon | 480 791-278 | 10/24/23 |

Equal Opportunity Employer/Program • Under Titles VI and VII of the Civil Rights Act of 1964 (Title VI & VII), and the Americans with Disabilities Act of 1990 (ADA), Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title II of the Genetic Information Nondiscrimination Act (GINA) of 2008; the Department prohibits discrimination in admissions, programs, services, activities, or employment based on race, color, religion, sex, national origin, age, disability, genetics and retaliation. The Department must make a reasonable accommodation to allow a person with a disability to take part in a program, service or activity. For example, this means if necessary, the Department must provide sign language interpreters for people who are deaf, a wheelchair accessible location, or enlarged print materials. It also means that the Department will take any other reasonable action that allows you to take part in and understand a program or activity, including making reasonable changes to an activity. If you believe that you will not be able to understand or take part in a program or activity because of your disability, please let us know of your disability needs in advance if at all possible. To request this document in alternative format or for further information about this policy, contact your local office; TTY/TDD Services: 7-1-1. • Free language assistance for department services is available upon request. • Disponible en español en la oficina local.

CSO-1034A
(03/2019)



ARIZONA DEPARTMENT OF CHILD SAFETY
## PRESENT DANGER PLAN

**Describe the present danger condition that is occurring and is placing the child(ren) in danger:**

There are Concerns that mother is abusing █
as ██ is ████ his cecostomy tube was placed
back and she ████ is harming him.

█ ██

List Names of U[...]

**Select the type of present danger plan:**

- [ ] The threatening person leaves the home.
- [ ] The protective parent and child leave the home and go a safe environment.
- [ ] A responsible adult is in the home at the predetermined specific time.
- [ ] A responsible adult routinely monitors the home.
- [ ] A responsible adult moves into the home seven days a week, 24 hours per day.
- [ ] The child is cared for outside of the home periodically.
- [ ] The child lives with someone in the family network part-time.
- [ ] The child lives with a responsible adult for seven days a week, 24 hours per day.
- [ ] The child is placed in the temporary custody of DCS by a Voluntary Placement Agreement, CSO-1043.
- [x] The child is placed in the temporary custody of DCS.

**Describe the specific action(s) to keep the child(ren) safe, when the action(s) is required, and the adult(s) who will be responsible for those actions:**

█ will reside ████ In a foster home.

*End date of present danger plan (must be within 14 days or less):*  10/27/23

**Level of contact allowed between child and parent/caregiver: (frequency, duration, location, level of supervision)**

Jessica is currently allowed no contact with █.

**Describe how the DCS Specialist will oversee that the plan is followed and sufficient:**

OCWI will maintain contact with the family.

*~ Must also complete Page 2. See Page 2 for EOE/ADA/GINA Disclosure ~*

CSO-1034A
(03/2019)
Page 2



ARIZONA DEPARTMENT OF CHILD SAFETY
## PRESENT DANGER PLAN

### Present Danger Plan Participants

Name of Responsible Adult, if applicable | Phone No. (include area code)

Address ( No., Street, Apt. No., City, State, Zip Code)

Name of Responsible Adult, if applicable | Phone No. (include area code)

Address ( No., Street, Apt. No., City, State, Zip Code)

**As a Responsible Adult, I acknowledge the following:**
Please initial each item:

| | To follow the Present Danger Plan as prescribed; |
| | To be present at times needed to ensure child's safety; |
| | To be present when threats are likely to occur; |
| | That I am physically able to protect child; |
| | That I will cooperate with and support DCS in carrying out the Present Danger Plan; |
| | That I will maintain contact with the DCS Specialist; |
| | That I will notify the DCS Specialist or DCS Supervisor immediately if I am unable to carry out the plan; |
| | That I will notify the DCS Specialist or DCS Supervisor immediately if the parent/caregiver attempts to have unapproved contact with the child; |
| | That I will ask for assistance and guidance from DCS as needed. |

**Specialist Phone No.:** 480-341-7778

### Child Abuse Hotline: 1-888-767-2445

**As a Parent/Guardian, I acknowledge the following:**
Please initial each item:

| | I have read the Present Danger Plan (the PDP) and/ or the PDP has been explained to me. I understand that the PDP is necessary to keep my child(ren) safe. |
| | I was given a chance to ask questions and discuss the PDP. I was told I did not have to agree to the PDP. |
| | I understand that agreeing to the PDP is not an admission of wrongdoing. |
| | I have received a copy of the PDP. |
| | I understand the PDP is voluntary, meaning I have a choice of whether to agree or not agree to the PDP. |
| | I may end the PDP at any time. I understand that to end the PDP before the time expires, I need to notify the DCS Specialist or the DCS Program Supervisor immediately. |
| | I understand that if DCS believes the PDP is not working to keep my child(ren) safe, or if DCS believes I am ending the PDP in a way that causes my child(ren) to be unsafe, DCS may take temporary custody of my child(ren). |
| | I understand that if DCS takes temporary custody of my child(ren), it allows DCS to make decisions about where my child can live and make legal decisions about their care. |
| | I understand that if DCS takes temporary custody of my child(ren), DCS must provide me with either a court order and/or temporary custody notice. |

Parent/Guardian 1 Signature | Date | Parent/Guardian 2 Signature | Date

Responsible Adult's Signature | Date | Additional Responsible Adult's Signature | Date

Child's Signature (as appropriate) Alonzo Borbon | Date 10/24/23 | Child's Signature (as appropriate) | Date 10/24/23
Print name of DCS Representative Nichole | Date | DCS Representative Signature |

### Supervisory Approval of Present Danger Plan

By Phone ☐ In Person | | Garcia | 10/24/23
Supervisor Approval | Print name of DCS Representative | DCS Representative Signature | Date

Routing: Original – Parent/Caregiver; Yellow – Responsible Adult; Pink – DCS Record

Equal Opportunity Employer/Program. The Department of Child Safety (DCS) prohibits discrimination in admissions, programs, services, activities, or employment based on race, color, religion, sex, national origin, age, disability, genetics, or retaliation. Reasonable accommodations to allow a person with a disability to take part in a program, service, or activity are available upon request. To request this document in alternative format or for further information about this policy contact your local office; TTY/TDD Services: 7-1-1. Free language assistance for DCS services is available upon request.

# EXHIBIT 4

Clerk of the Superior Court
*** Electronically Filed ***
M. Engle, Deputy
10/27/2023 12:53:58 PM
Filing ID 16814687

1   KRISTIN K. MAYES
    Attorney General
2

3   KRISTI VILLARREAL-REX
    Assistant Attorney General
4   State Bar No. 024797
    CFP/PSS
5   2005 N. Central Ave. C007AG
    Phoenix, Arizona 85004
6   Telephone: (602) 542-1645
    PSSDurango@azag.gov
7

8   Attorneys for the Department of Child Safety

9                    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

10

11                        IN AND FOR THE COUNTY OF MARICOPA

12  | In the Matter of:                          | No. JD533286 R                               |
    |                                            |                                              |
13  |           ████  FIDLER                     | **DCS'S DEPENDENCY PETITION AND**            |
    |      d.o.b. ████████                       | **PETITION FOR PATERNITY AND/OR**            |
14  |                                            | **CHILD SUPPORT**                            |
15  |                                            |                                              |
    |                                            | **(OUT-OF-HOME)**                            |
16  |                                            |                                              |
17  |                                            | DCS CASE I.D. NO. AS00850609                 |
18  | Person under 18 years of age.              |                                              |

19

20          Petitioner, the Department of Child Safety (DCS or the Department), by and

21  through undersigned counsel, hereby alleges upon information and belief:

22                                           **I.**

23                                     <u>**Jurisdiction**</u>

24          The Juvenile Court has exclusive original jurisdiction over dependency matters

25  pursuant to A.R.S. § 8-202(B).    The Superior Court has original jurisdiction in

26

27  proceedings to establish paternity pursuant to A.R.S. § 25-801.

28

                                             1

**II.**

**Venue**

Venue in this county is proper pursuant to A.R.S. §§ 8-206(A) and 25-802 as Maricopa County is the residence of the child and/or the acts of dependency are alleged to have occurred in Maricopa County.

**III.**

**Identity of Child, Placement and Applicability of the
Indian Child Welfare Act**

A.　　██████ FIDLER:

    1.　　██████ FIDLER is a male child whose date of birth is November 26, 2011.

    2.　　██████ FIDLER is a dependent child within the provisions of A.R.S. § 8-201(15).

    3.　　██████ FIDLER is currently placed with DCS.

    4.　　██████ FIDLER is not an Indian child as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4). DCS has no information that the child is an enrolled member of any tribe or that a parent is an enrolled member of a tribe and the child is eligible for enrollment.

**IV.**

**Parties**

The following individuals are alleged to be the parents, guardians, and/or Indian Custodians of the child who is the subject of this Petition, upon information and belief:

A.　　JESSICA FIDLER is the mother of ██████ FIDLER.

2

1      1.       Her date of birth is June 30, 1980.

2      2.       Her address is confidential.  Her phone number is confidential.

### V.
### Temporary Custody

Upon information and belief, ▮▮▮▮ FIDLER was taken into temporary physical custody on October 24, 2023, at 2:54 p.m., as authorized by an order of the Superior Court dated October 24, 2023.  The Superior Court authorization and DCS's application for court authorization are attached to this Petition.

### VI.
### Allegations

A.     Upon information and belief, DCS alleges that ▮▮▮▮ FIDLER is dependent due to abuse and/or neglect as to Mother, JESSICA FIDLER.

     1.       Mother is unable to provide proper and effective parental care and control due to an unfit home and/or abuse and/or neglect.  The child was subject to a prior dependency case in 2020 to 2021 due to concerns that Mother's behaviors led to excessive and/or unnecessary medical interventions for the child.  When the child was removed from Mother's care in the prior case, his symptoms improved dramatically, and medical interventions were decreased successfully.  The family participated in services, the child returned home to Mother, and the dependency was dismissed.  Since the child has been with Mother, his health care utilization has significantly increased.  According to a forensic psychological evaluation, Mother has

1
2
3
4
5
6
7

continued to engage in behaviors such as inducing and/or fabricating and/or falsifying and/or exaggerating the child's symptoms, which have led to excessive and/or unnecessary medical interventions for the child. The child is at risk of further abuse and/or neglect in Mother's care and the psychologist recommended that Mother and the child be separated for the child's safety.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2.    Mother is unable to provide proper and effective parental care and control due to mental health issues. Mother has a history of mental health issues. There was a prior dependency case on the child due to concerns that Mother's behaviors led to excessive and/or unnecessary medical care for the child. A 2020 psychological evaluation that Mother underwent as part of that dependency case concluded that she has several mental health diagnoses, including an unspecified depressive disorder and a generalized anxiety disorder. As part of the evaluation, Mother acknowledged that her anxiety significantly contributed to the child receiving excessive medical care. While the child was placed out of the home, his symptoms improved dramatically and his medical care utilization significantly decreased. The family participated in services and the child returned home to Mother. Since the child has been with Mother, his health care utilization has again increased considerably and Mother's mental health continues to be a concern. Mother reported to DCS that she went into a mental health hospital due to her self-harming behaviors after the prior dependency case

was dismissed.  Mother reported that she take an antidepressant.  The Department received a hotline report in January 2023 with continued concerns that Mother's behavior has led to excessive and/or unnecessary medical interventions for the child.  As part of its investigation, DCS obtained a medical records review and evaluation by a psychologist.  As a result of this evaluation, the psychologist reported that Mother meets the criteria for Factitious Disorder Imposed Upon Another and recommended that Mother and the child be separated.

### VII.
### Aggravating Circumstances

Pursuant to A.R.S. §§ 8-841(C)(5) and 8-846(D)(1), DCS has not yet made a determination or cannot determine at this time whether aggravating circumstances exist.

### VIII.
### Paternity

The Department, pursuant to A.R.S. §§ 25-803 and 25-806, alleges:

A.    The State of Arizona is entitled to bring this action pursuant to A.R.S. §§ 25-801 through 25-817.

B.    The Department requests the Court for any child identified herein whose paternity has not been legally established, enter a judgment of paternity.

C.    If any of the identified fathers fails to timely comply with an order from this Court to establish his paternity, the Court may immediately enter a judgment of paternity upon request of DCS.

D.    Upon information and belief, Mother reported that the child's father was a sperm donor from Israel and that she does not have information regarding his identity or whereabouts.

## IX.
## Facts Supporting Contrary to the Welfare of the Children Finding

Continuation of the child in the home would be contrary to the child's welfare. Mother has a history of mental health issues.  The child was subject to a prior dependency case in 2020 to 2021 due to concerns that behaviors by Mother, JESSICA FIDLER, led to excessive and/or unnecessary medical interventions for the child.  A 2020 psychological evaluation that she underwent as part of the dependency case concluded that she has several mental health diagnoses, including an unspecified depressive disorder and a generalized anxiety disorder.  As part of the evaluation, Mother acknowledged that her anxiety significantly contributed to the child receiving excessive medical care.  When the child was removed from Mother's care in the prior case, his symptoms improved dramatically, and medical interventions were decreased successfully.  The family participated in services and the child returned home to Mother.  Since the child has been with Mother, his health care utilization has again increased considerably and Mother's mental health continues to be a concern.  Mother reported to DCS that she went into a mental health hospital due to her self-harming behaviors after the child was returned to her care in the previous dependency case.  Mother reported that she take an antidepressant.  After receiving a hotline report in January 2023 with continued concerns that Mother's behavior has led to excessive and/or unnecessary medical interventions for

6

the child, DCS obtained a medical records review and evaluation by a psychologist. According to the evaluation, Mother has continued to engage in behaviors such as inducing and/or fabricating and/or falsifying and/or exaggerating the child's symptoms, which have led to excessive and/or unnecessary medical interventions for the child. The evaluation noted that Mother meets the criteria for Factitious Disorder Imposed Upon Another and recommended that Mother and the child be separated. The identity and whereabouts of the child's father are unknown.

**X.**

**Facts Supporting Reasonable Efforts Finding**

It is further requested that the Court find, based upon the verified allegations of the petition, that reasonable efforts have been made to prevent removal of the child from the home. The child was subject to a prior dependency case due to similar concerns as those outlined in this petition. The family engaged in services on that case and the case was dismissed in November 2021. In January 2023, DCS received another hotline report with concerns of medical child abuse by Mother. The Department obtained a forensic records review by a psychologist and the psychologist noted concerns that Mother was engaging in behavior consistent with a diagnosis of Factitious Disorder Imposed upon Another. The psychologist recommended that Mother and the child be separated. The Department obtained a court order authorizing the child's removal and took the child into temporary custody. The Department held a Team Decision Making meeting on October 26, 2023.

///

///

7

**XI.**
**Facts Supporting Relative or Non-Relative Placement**

The Department made attempts to identify and assess placement with the child's grandparent or another member of the child's extended family, including a person who has a significant relationship with the child, but such a placement is not in the child's best interests at this time because the Department obtained a forensic medical records review by a psychologist, and the psychologist noted concerns that Mother was engaging in behavior consistent with a diagnosis of Factitious Disorder Imposed upon Another. The psychologist recommended that the child and Mother be separated to see if the child's symptoms improve. The psychologist recommended that during this time, Mother should not have access to the child and that the child should not be placed with anyone who is supportive of Mother. The child's current placement is the least restrictive consistent with the child's best interests.

**XII.**
**Financial Responsibility for the**
**Support of the Child**

The parent(s) should pay an appropriate amount as determined by law for the care, maintenance and support of the child while in care pursuant to A.R.S. §§ 8-241, 8-243 and 8-243.01.

///

///

///

///

8

# XIII.
## Education

With regard to possible special education issues of any child named herein who is not placed with a parent, or for any child subsequently removed from a parent(s) physical custody, DCS hereby requests an order providing that:

1.   In the event a public education agency or Arizona early intervention provider advises DCS that it needs to locate a parent of any child named in this petition to serve as the Individuals With Disabilities Education Act (IDEA) parent for that child and a parent can no longer be located by DCS; or

2.   In the event the parent or legal counsel for the parent tells the public education agency, or DCS/its legal counsel that the parent will not serve as the IDEA parent for the child named in this petition; or

3.   If the parent is subject to a no contact order as to any of the children; or

4.   If a public education agency or an Arizona early intervention provider following reasonable efforts to try and get a parent to respond to its requests to act as the IDEA parent for any child named in this petition, fails to obtain a response or any cooperation of a parent, an adult relative, stepparent, or foster parent with whom the child lives (but not staff of a group home or other residential facility) shall have authority to serve as the IDEA parent.

The IDEA parent represents the children's special education interests under Parts B or C of the IDEA.  The purpose of such representation is to ensure that a child with a

suspected/known disability receives prompt assessment and evaluation for eligibility for early intervention services or appropriate educational services, which may include special education and related services designed to meet the child's unique needs.

## REQUEST FOR RELIEF

Based upon the foregoing allegations, immediate action is required.

WHEREFORE, DCS requests this Court find and/or order that:

1.    The Juvenile Court has jurisdiction over the subject matter and, after proper service on the parents, guardians, and/or Indian custodians, the persons before this Court;

2.    Venue is proper in this county;

3.    The child is a temporary ward of the Court, placed in the care, custody, and control of DCS, 3003 North Central Avenue, Phoenix, Arizona 85012, and;

    a.   Placing ████ FIDLER in the physical custody of DCS;

4.    Continuation of the child in the home would be contrary to the child's welfare;

5.    Reasonable efforts have been made to prevent removal of the child from the home;

6.     The Department made attempts to identify and assess placement with a grandparent or extended family, including a person who has a significant relationship with the child and such a placement is not in the child's best interest at this time;

10

7.      The child is not an Indian child as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4);

8.      In accordance with A.R.S. § 25-809 and other applicable law that:

     a.      JESSICA FIDLER is the mother of the child born out of wedlock;

     b.      A determination as to the identity of the biological father is necessary to establish paternity for any child named in this petition who was born out of wedlock;

     c.      If genetic testing has been ordered, a father's failure to participate may result in an order of paternity naming him the legal father; and

     d.      After the establishment of paternity, enter an order requiring the Clerk of the Court to send a certified copy of the paternity order for any child born in the State of Arizona, to the Arizona Office of Vital Records, P.O. Box 3887, Phoenix, Arizona 85030-3887, which shall establish, pursuant to A.R.S. § 36-323, a new birth certificate for the child reflecting the name of the father;

9.      A Preliminary Protective Hearing be set pursuant to A.R.S. § 8-824, an Initial Dependency Hearing pursuant to A.R.S. §§ 8-842 and 8-843, a Publication Hearing, and a Permanency Hearing pursuant to A.R.S. § 8-862;

10.     The matter be assigned to the Court-Appointed Special Advocate (CASA) Program to determine if it is appropriate for the assignment of an advocate;

11

11.  The matter be assigned to the Foster Care Review Board (FCRB) to perform the duties required by statute;

12.  All persons are prohibited from removing the children from the State of Arizona without prior written approval of DCS;

13.  Any judgment and orders for the care, paternity, custody, support or such other relief, as the child's welfare and the interests of the State may require under the provisions of Title 8 and Title 25 of the Arizona Revised Statutes;

14.  That the parent(s) or legal guardian(s) shall provide the DCS Child Safety Worker or its attorney with a recent educational history (including the name(s) and location(s) of the school(s) each child named in the Petition recently attended and the grade in which each child was most recently enrolled.)  The parent(s) or legal guardian(s) shall also provide or confirm the date of birth of each child named in the Petition;

15.  An individual other than a biological or adoptive parent is authorized to act as the IDEA parent under the circumstances delineated herein;

16.  All medical, dental and mental health providers, health plans, Regional Behavioral Health Authorities (RBHAs), as well as other Health Insurance Portability and Accountability Act (HIPAA) covered providers who have provided any services to the child, make available to any guardian ad litem for the child and/or attorney for the child the various medical, dental, mental health, genetic and other health care records of the child;

12

17.   The allegations in this Petition are true by a preponderance of the evidence and that the child is dependent to all alleged parents, guardians, and/or Indian custodians as defined by A.R.S. § 8-201(15), and that the child be made a ward of the court committed to the care, custody, and control of DCS;

**18.   The parent, guardian, or Indian custodian be advised as follows;**

**a.   Failure to appear without good cause may result in a finding that the parent, guardian or Indian custodian has waived his/her legal rights and admitted the allegations in the dependency petition;**

**b.   That hearings may go forward in his/her absence and may result in an adjudication of dependency, permanent guardianship or termination of parental rights based upon the record and evidence presented to the Court, as well as an order of paternity, suspension or termination of an existing current child support order, custody, or change of custody in a consolidated family law matter and an order for child support if paternity has been established;**

**c.   Proceedings for permanent guardianship pursuant to A.R.S. §§ 8-871 and 8-872 or proceedings for termination of parental rights pursuant to A.R.S. § 8-533 may be initiated based upon**

**the grounds set forth in statute or for failure to participate in reunification services; and**

**d.    If a child is under three years of age, within six months after removal from the home, the Court will determine whether the parent, guardian or Indian custodian has substantially neglected or willfully refused to participate in reunification services offered by DCS; admonish the parent, guardian, or Indian custodian that substantially neglecting or willfully refusing to remedy the circumstances that cause a child to be in an out-of-home placement, including refusing to participate in reunification services, is a ground for termination of parental rights; and**

19.    That the parent(s) or legal guardian(s) provide to this Court, as required by A.R.S. § 8-841(E)(5), at the Preliminary Protective Hearing and/or the Initial Dependency Hearing:   the names, type of relationship, and all available information necessary to locate persons related to the child or who have a significant relationship with the child.  Persons related to the child include the child's grandparents, great-grandparents, brothers or sisters of whole or half-blood, aunts, uncles and first cousins. If the parent(s) or legal guardian(s) do not have sufficient information available to locate a relative or person with a significant relationship with the child, the parent or guardian must inform this Court of this fact.   The parent(s) or legal

guardian(s) must inform DCS immediately if the parent(s) or guardian(s) becomes aware of information related to the existence or location of a relative or person with a significant relationship with the child.

20.    Notice is given that if DCS has temporary custody of a child or legal custody pursuant to a court order, it has the authority to consent to: evaluation and treatment for emergency conditions that are not life threatening; routine medical and dental treatment and procedures, including early periodic screening diagnosis and treatment services, and services by health care providers to relieve pain or treat symptoms of common childhood illnesses or conditions; surgery; blood transfusions; general anesthesia; and testing for the presence of the Human Immunodeficiency Virus (HIV).  A.R.S. § 8-514.05(C).

21.    Notice is given that DCS is proposing to substantiate any allegations of abuse and/or neglect contained in the dependency petition for placement in the DCS Central Registry.  The DCS Central Registry is a confidential list of DCS findings that tracks abuse and neglect.  If the court finds your child dependent based upon allegations of abuse and/or neglect contained in the dependency petition, you will be placed in the DCS Central Registry.  *See* A.R.S. § 8-804.

22.    Notice is given that under the Arizona Rules of Family Law Procedure 5.1(C), during any dependency/guardianship proceeding in the juvenile division, the assigned juvenile division may suspend, modify, or terminate a

child support order for current support if the parent entitled to receive the child support no longer has legal or physical custody of the child, and, except in Title IV-D cases may make appropriate orders regarding any past due support or child support arrears. The assigned juvenile division may direct that the wage assignment be quashed or modified.

RESPECTFULLY SUBMITTED this 27th day of October, 2023.

KRISTIN K. MAYES
Attorney General

/s/ Kristi Villarreal-Rex

KRISTI VILLARREAL-REX
Assistant Attorney General

1

**VERIFICATION**

2   STATE OF ARIZONA              )
                                  )  ss.
3   COUNTY OF MARICOPA            )

4

5        I, Nichole Garcia, am an employee of the Petitioner, the Department of Child

6   Safety, and I am authorized to make this verification on its behalf.  I verify under penalty

7   of perjury that I have read the foregoing Petition and upon information and belief the

8

9   foregoing contents are true and correct.

10       DATED this 27th day of October, 2023.

11

12                                        _Nichole Garcia_____
                                          Signature of Nichole Garcia
13
                                          _OCWI Manager_____
14                                        Title

15

16

17

18

19

20

21

22

23

24

25   AF / Fidler / HDM#11636961

26

27

28

19

APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILD
Superior Court of Arizona for Maricopa County

REMOVAL REQUEST # RR2023-22793

COUNTY OF ORIGIN Maricopa

DCS CASE ID AS00863831

I, Alonzo Borboa, hereby affirm the following statement of facts:

1.  I am employed by the Arizona Department of Child Safety. By virtue of my education, training and experience I am qualified and authorized to conduct child abuse and neglect investigations. I am currently assigned to investigate the case involving the child named in this application and declaration for removal, or am that person's supervisor. I make this declaration in support of this application. Further, I have the following qualifications: Positions:
    August 2022 – Present OCWI Assistant Training Manager
    December 2019 – August 2022 OCWI Investigator
    April 2018 – December 2019 DCS Program Specialist
    May 2016 – April 2018 DCS Child Safety Investigator

    Training:
    Safe AZ Renovations Advanced Forensic Interview Training (AFIT)
    DCS Specialist CORE training (240 hours)

    Education:
    Bachelor's in Secondary Education (2011)
    Master's in Psychology (2020)

2.  This application and declaration is in support of for ex-parte removal of the following children:

| Child Name | DOB | Sex | ICWA Status |
|------------|-----|-----|-------------|
| ▮ Fidler | 11/26/2011 | F | No |

3.  The mother(s) is/are:
    The mother of ▮ Fidler is Jessica Fidler

4.  The father(s) is/are:
    The father of ▮ Fidler is Unknown

5.  The legal guardian(s) is/are:
    The legal guardian of ▮ Fidler is None or Unknown

APPLICATION AND DECLARATION FOR EX-PARTE REMOVAL OF CHILD
Superior Court of Arizona for Maricopa County

6.  Probable cause exists to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect, and it is contrary to the child's welfare to remain in the home under A.R.S. §8-821(A). Specifically, Specific present danger condition(s) or impending danger threat(s) for each child listed on this application:
Child's condition is the result of deliberate, preconceived planning or thinking that the caregiver is responsible for and that preceded the child's serious injuries or condition;

Circumstances that require temporary custody including a detailed account of circumstances and supporting facts:
Today, Dr. Cahill completed a forensic medical review of documents pertaining to ██████ and Ms. Fidler and Dr. Cahill arrived at the conclusion that Ms. Fidler meets the criteria for Factitious Disorder Imposed on Another (FDIA).  Dr. Cahill has reviewed copious amounts of medical records pertaining to ██████ and Ms. Fidler has exposed ██████ to an alarming number of medical and psychological diagnoses.  ██████ was removed from Ms. Fidler's care in 2020 and he showed significant improvement in a short period of time.  He asked to have his cecostomy tube removed from him and was fine afterwards.  ██████ was able to complete his tasks of daily living and he did not show evidence of the cognitive or mental health issues that Ms. Fidler claimed he had. After ██████ was returned to Ms. Fidler's care she insisted on having his cecostomy tube replaced in the emergency room.  Ms. Fidler did not want ██████ to use anesthesia, so he suffered immensely.  Ms. Fidler is obsessed with constipation and she is constantly flushing the child's cecostomy tube and feeding him laxatives.  ██████ did not see a doctor for 30 days when he was previously in foster care, and he now has numerous specialists to attend to many of his fabricated conditions and diagnoses.  Dr. Cahill reports that Ms. Fidler is abusing ██████ and she recommends that ██████ be removed from her care for a period of 4-8 weeks, and that she have no contact with the child.  If ██████ improves again then, this would support the diagnoses of FDIA and Dr. Cahill suggests that parental rights be terminated.

██████ will continue to be exposed to countless unnecessary and harmful medical procedures if he remains in Ms. Fidler's care.  The child has a cecostomy tube placed in him, which was removed when he was in foster care and Ms. Fidler had it replaced once the child returned to her care.  The child will continue to suffer and he will not have the opportunity to live a more normal life if he remains in Ms. Fidler's care.  The father was an unknown sperm donor.

7.  I, Alonzo Borboa, declare under penalty of perjury that the information contained within this application and declaration is true and correct to the best of my knowledge and belief.

10/24/2023 2:36 PM

# ORDER FOR EX-PARTE REMOVAL OF CHILD
## Superior Court of Arizona for Maricopa County

REMOVAL REQUEST # RR2023-22793

COUNTY OF ORIGIN Maricopa

DCS CASE ID AS00863831

TO ANY DCS REPRESENTATIVE IN THE STATE OF ARIZONA

Proof by application and declaration having been made this date 10/24/2023 before me by Alonzo Borboa of the Department of Child Safety ("DCS"), and on the basis of the evidence presented in such application and declaration, and pursuant to A.R.S. §8-821(A), I find probable cause exists to believe that temporary custody is clearly necessary to protect the following child ███ Fidler from suffering abuse or neglect. I further find, for the reasons indicated below and pursuant to A.R.S. §8-821(A), that probable cause exists to believe that it is contrary to the child's welfare to remain in the home.

- ☑ Domestic violence or violent behavior
- ☑ Mental health issues
- ☑ Risk of abuse or neglect of child(ren)
- ☑ Unfit or unsafe home environment for child(ren)

Therefore, **IT IS ORDERED** granting DCS's request for authorization to remove ███ Fidler and authorizing DCS to remove this child.

**IT IS FURTHER ORDERED** directing DCS to conduct a due diligence search pursuant to A.R.S. § 8-514.07.

_ETBingert_

10/24/2023 2:44 PM

_____
Hon. Elizabeth Bingert

CSO-1000A (6-18)
PAGE 2 ON REVERSE

ARIZONA DEPARTMENT OF CHILD SAFETY
**TEMPORARY CUSTODY NOTICE**

On *(Date)* 10/24/13  At *(Time)* 1:54 ☐ AM ☑ PM , temporary custody of *(child's name)* Elison Adler
was taken at *(Address)* 7929 ____ Wagner Rd ____ by *(Agency)* DCS / DCS

**Type of abuse or neglect requiring temporary custody:** Select the circumstance(s) that most clearly describe the danger to the child(ren) and reason temporary custody is necessary:

☐ Medical examination is required to diagnose abuse.

☐ The child is unsupervised or alone now or on a daily basis, or has been left with a person who is unwilling or unable to provide adequate care.

☐ The caregiver is unable to perform essential parental responsibilities due to substance use, mental illness, physical impairment, cognitive limitations.

☐ The caregiver is unable or unwilling to perform essential parental responsibilities and there is no other appropriate caretaker immediately available.

☐ The caregiver is out of control and cannot focus or manage his/her behavior in ways to properly perform parental responsibilities.

☐ The caregiver's behavior is violent, bizarre, erratic, unpredictable, incoherent, or totally inappropriate and is a threat to child safety.

☐ The caregiver is brandishing weapons, known to be dangerous and aggressive, or is behaving in attacking or aggressive ways that are a threat to child safety.

☐ The caregiver has not, cannot, or will not protect the child from serious or severe harm, including harm from other persons having access to the child.

☐ Dynamics in the household include a person establishing power, control, or coercion over a caregiver in a way that impairs necessary supervision or care of the child and has caused, or will likely cause, serious or severe harm to the child's physical, mental, or emotional health.

☐ The caregiver has an extremely negative perception of the child, and/or has extremely unrealistic expectations for the child's behavior.

☐ Physical conditions in the home are hazardous and immediately threaten the child's safety.

☐ The caregiver is subjecting the child to brutal or bizarre punishment or there is severe to extreme maltreatment alleged to be occurring.

☐ The child requires immediate medical attention, and the absence of medical treatment could seriously affect the child's health and well-being.

☐ The child is actively endangering self or others and the caregiver cannot or will not control the child's behavior or arrange or provide necessary care.

☐ There is evidence of recent sexual abuse, the perpetrator currently has access to the child, and no protective action is being taken by a caregiver.

☐ The child has injuries such as facial bruises, injuries to the head, multiple plane injuries, injuries to a non-ambulatory child, immersion burns.

☐ The child has serious injuries that the caregivers and others cannot or will not explain, or the explanation is inconsistent with the child's injuries or condition.

☑ The caregiver deliberately harmed the child, or caused or threated to cause serious or severe harm to the child.

☐ The child is profoundly fearful (terrified) of their present home situation, or a particular person living in or having access to the home.

☐ The caregiver previously endangered a child and/or caused harm to a child and circumstances indicate the person will likely cause severe harm to the child.

☐ There is evidence of abuse or neglect and the caregiver cannot produce the child, refuses access to or is likely to flee with the child, or actively avoids DCS.

☐ Criminal activity by the caregiver or criminal activity of other persons living in or having access to the home will likely result in severe harm to the child.

Select how temporary custody was obtained: ☐ Parent or Guardian Consent  ☑ Court Authorized  ☐ Exigent Circumstances

**The Department of Child Safety (DCS) must:**

- Return your child within **72 hours** *(not including weekends and holidays)* unless DCS files a legal paper, called a petition, with Juvenile Court. If a petition is filed, your child will be kept in the temporary custody of DCS.

- Return your child within **12 hours** if your child was removed for a medical examination, unless abuse is revealed, and

- Inform you of the right to give a verbal, telephonic or written response to the allegations and have the response included in the investigation report. Any documentation you give, what you say or write, will be included in the case record and can be used in court proceedings.

| | |
|---|---|
| DCS REPRESENTATIVE'S NAME *(Please print)*<br>Alonzo Urbina | AREA CODE AND PHONE NO.<br>(480)341-2748 |
| ARIZONA DEPARTMENT OF CHILD SAFETY ADDRESS *(No., Street, City, State, ZIP)*<br>3003 N. Central Ave Phoenix AZ 85012 | |
| DCS SUPERVISOR'S NAME *(Please print)*<br>Nichole Garcia | AREA CODE AND PHONE NO.<br>(602)542-1013 |

**METHOD OF NOTICE:** On *(date)* 10/24/13 ,at *(time)* 7:__  ☐ AM ☑ PM , I served noticed to *(parent, guardian or custodian) (print name)*

Method used: ☑ In-Person  ☐ Left at Residence  ☐ Verbal  ☐ Fax    Date: 9/24/13    Time: ____
Address where mailed/left/given (No., Street, City, State, ZIP) 3819 ____ Juniper Dr. Litchfield 85396

| What is the child or child's parents American Indian heritage/ancestry: | Has the tribe been notified? ☐ Yes  ☐ No  ☐ N/A |
|---|---|
| PARENT, GUARDIAN OR CUSTODIAN'S SIGNATURE | |

| | |
|---|---|
| DCS REPRESENTATIVE'S SIGNATURE *(Or law enforcement officer)* | DATE<br>10/24/13 |

ROUTING: Original – Parent/Guardian/Custodian; 1st Copy – Sent to Assistant Attorney General to file with the Petition; 2nd Copy – Retained in the case record

CSO-1524

(8-19)

ARIZONA DEPARTMENT OF CHILD SAFETY
**TEAM DECISION MAKING (TDM) SUMMARY REPORT**
**SAFETY PLANNING**



| CHILDS CASE NAME:<br>Jessica Fidler | | CHILDS CASE ID NO.:<br>AS00863831 | |
|---|---|---|---|
| DCS SPECIALIST'S NAME:<br>Alonzo Borboa | | DCS SUPERVISOR'S NAME:<br>Nichole Garcia | |
| TDM FACILITATOR'S NAME:<br>Monica Sandoval | | TDM MEETING:<br>Date: 10/26/2023 Time : 1:00PM | |

| Child(ren) with Safety Concerns | | Mother/Guardian's<br>Name | Father/Guardian's<br>Name |
|---|---|---|---|
| **Name** | **DOB** | | |
| ▉ Fidler | ▉ | Jessica Fidler | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

What efforts have been made to include all parents and/or legal guardians in the meeting?
Mother, Jessica stated that the father was a sperm donor from Israel and she has provided the Department with the donor number ID.

What is the reason for today's meeting?
-Mother, Jessica provided a history of her involvement with the Department regarding Munchausen syndrome
-The Dept served of 10/24/23 of the child, for concerns of abuse, and they have 72 hours to either return him or move forward with the Dependency.
-Jessica stated that the removal order contained in accuracy, the professional and the Department is relying on may not have given accurate information that could have influenced the Department's decision.
-Jessica stated that one of the letters from the Doctor at PCH in the prior dependency has inaccuracies in the CSRA and that is influencing the Department perspective.

What are the current safety concerns? *(What is worrying us)*
Mother has behaviors that indicate she has Munchausen syndrome
Mother replaced the C-Tube
Mother is fabricating or exaggerating the child's symptoms
This case has been open an extended period of time January of 2023, a lack of communication and updates because of the medical review and police involvement
Jessica stated that she has no concerns of child safety while the child is in her care and only has concerns with inaccuracies, lack of communication from medical providers and DCS, and the child's safety and well-being while being with the Department. Jessica stated that ▉ was abused in the past while in the foster care system.
Jessica stated that the Department has not following up
MGM, Jamie stated that she is concerned that she was not approved as placement
MGM, Jamie is concerned that ▉ is not being noticed or heard and the child experiencing trauma

**How have parent's demonstrated protection of the child(ren) in the past?** *(Including thinking, feeling, doing):*

Jessica stated that ▮▮ has therapy, social group with other reunified children, and Mother has assited him in communicating with her and having self-advocacy

Jessica stated that he's in sports, music, and karate

Jessica stated that he is involved in the Jewish church and religious activities

Jessica stated that he has games & they do game night together

Jessica stated that she is in IDC therapy

Jessica stated that she knows how to seek community resources

Jessica stated that she has insurance and he go to medical and dental appointments

▮▮ is a pleasant kid, smart kid, good personality, and Jessica has been in communication with the Department

Jessica stated that she shows concerns for the child

Jessica stated that she has family support and is able to maintain connections (they are there for emotional support for Mother)

Jessica stated that maternal uncles are male role models for ▮▮

Jessica stated that she has stable housing

MGM, Jamie stated that Jessica is a good mom and communicates well with him, she engages with him, and is aware of his developmental milestones when he was growing up

MGM, Jamie stated that Jessica is tolerant

MGM, Jamie stated that ▮▮ has good behaviors she lets him have choices

Jessica stated that she is supportive, she allows him choices when it comes to discipline and to reflect on his behaviors

Jessica stated that ▮▮ is maturing, resilient, more independent, and becoming responsible

Jessica stated that she uses a love and logic style parenting, she is confident in her parenting and communicate with doctors, and is protective

MGM, stated that ▮▮ has a positive view of his mother

Jessica stated that he has ALTCS insurance

Jessica stated that she is employed at community league service

Jessica stated that she has transportation

**Strengths and resources available to help support the plan:**

Jessica stated that she would like communication with the child

Jessica stated that Therapy (DBT-Mom) & (Child-DDD) for both her and the child is in place

Jessica stated that she has support from family, friends, and her attorney

Jessica stated that Sonja Rodriguez or a 3rd party goes to medical appointments with her

The Department suggested a Psychological evaluation

It was suggested by La Frontera that a Casa or GAL for the child

Jessica suggested that the current caregiver and doctors are consulted before ▮▮ is seen by another medical provider

**What needs to happen to ensure the safety of the child(ren)?** *(Ideas regarding custody and placement, supportive resources, and/or transition planning)*:

Jessica stated that she wants the child returned to her care and communication with the child

Jessica stated that Placement with MGM, Jamie

Jessica suggested that other family and friends be assessed and considered for placement

Jessica stated that the Department takes into consideration to continue with their Jewish practices and activities

MGM, Jaime suggest an OOH placement with the mother removed from the home and MGM being placement

The Department suggested an OOH, dependency petition file w/o MGM being placement

The Department suggest Psychological evaluation

La Frontera suggest Casa or GAL for the child

Jessica suggested that the current caregiver and doctors are consulted before he is seen by another medical provider

**Can the threat be effectively managed in the home?** *(Explain why or why not)*

No

1.  Is it possible to manage the danger in the home? If it is possible, what actions need to be taken to keep the child safe, when do we need those actions to be taken, and are there appropriate adults who are available and can carry out the actions needed?
    No

2.  Are the parents, guardians, and/or custodians willing, demonstrating and able to cooperate with an in-home safety plan?
    Yes

3.  Is the home environment (and behaviors) calm, consistent, and predictable enough?
    No

4.  Can the danger threat be managed without the results of a professional evaluation?

5. Is there a suitable place/residence available for the duration of the plan?
   Yes

---

If the answer is no to one or more of the questions above, what would need to occur for an in-home plan to be sufficient *(Conditions for Return)*?
The Department stated that the conditions of return requires additional information from their legal Department and other parties in order to determine the conditions of return.

---

Recommendations/Safety Plan:
OOH

---

**Legal Custody** *(Specify for each child)*

| Maintain child in parent/guardian's custody | In-home dependency | Return child to parent/guardian's custody |
|---|---|---|
| Voluntary out-of-home care | In-home intervention | Dependency out-of-home care<br>█ Fidler |

Placement *(Specify for each child)*:
OOH

---

Current/Last school attended *(Specify for each child):* If a safety, out-of-home placement or permanency decision results in a change to the child's living arrangement, document the school placement decision (remain in the school of origin or enroll in a new school) using the Best Interests Determination and Transportation Plan CSO 1348A.

The child will remain in the same school Learning Foundation for Performing Arts

Plan for sibling contact (if applicable) and parenting time *(Specify for each child)*:
   Not applicable

**Follow up tasks to be completed (within 7-10 days)**

| WHO | WHAT | WHEN |
|---|---|---|
| DCS | File out of home dependency petition | 72 hours |
| DCS | TCN | completed |
| DCS | Case Aide vistation | TBD |
| DCS | Parenting Time | TBD |
| DCS | In-unit Psych Consult | 7-10 Days |
| DCS | RR | Completed |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Back-up plan *(If applicable, is valid for 5 business days from the TDM date):*
N/A

**Signatures of Participants (Signature does not imply agreement)**
**Firmas de Participantes (Su firma no significa que acepta un acuerdo)**

| Print Name<br>*Nombre en Letra de Molde* | Signature/*Firma* | Role/*Relacion* | Telephone Number<br>*Numero de Telefonico* |
|---|---|---|---|
| Jessica Fidler | | Mother | In-Person |
| Nicole Garcia | | OCWI  Supervisor | In-Person |
| Alonzo Borboa | | OCEI Specialist | In-Person |
| Christine LaLonggia | | La Frontera | In-Person |
| Jamie | | MGM | In-Person |
| Garette | | Maternal Uncle | Virtual |
| DeeAn Gillespie | | Attorney for Mother | In-Person |
| Michelle Feltes | | Paralegal | In-Person |
| Sonya Rodriguez | | DDD District Nurse | Virtual |
| Annette Heywood Ruskin | | Therapsit for child | Virtual |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Equal Opportunity Employer/Program • Under Titles VI and VII of the Civil Rights Act of 1964 (Title VI & VII), and the Americans with Disabilities Act of 1990 (ADA), Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title II of the Genetic Information Nondiscrimination Act (GINA) of 2008; the Department prohibits discrimination in admissions, programs, services, activities, or employment based on race, color, religion, sex, national origin, age, disability, genetics and retaliation. The Department must make a reasonable accommodation to allow a person with a disability to take part in a program, service or activity. For example, this means if necessary, the Department must provide sign language interpreters for people who are deaf, a wheelchair accessible location, or enlarged print materials. It also means that the Department will take any other reasonable action that allows you to take part in and understand a program or activity, including making reasonable changes to an activity. If you believe that you will not be able to understand or take part in a program or activity because of your disability, please let us know of your disability needs in advance if at all possible. To request this document in alternative format or for further information about this policy, contact your local office; TTY/TDD Services: 7-1-1. • Free language assistance for Department services is available upon request. • Ayuda gratuita con traducciones relacionadas con los servicios del DCS está disponible a solicitud del cliente.

1    ORIGINAL of the foregoing filed
     this 27th day of October, 2023, with:

2

3    Clerk of the Court
     Maricopa County Superior Court

4    Juvenile Division/Durango Facility
     3131 West Durango

5    Phoenix, AZ 85009-6292

6

7    Copy of the foregoing hand-delivered
     this 27th day of October, 2023, to:

8

9    Honorable
     Maricopa County Superior Court

10   Juvenile Division/Durango Facility
     3131 West Durango

11   Phoenix, AZ 85009-6292

12   Copies of the foregoing mailed
     this 27th day of October, 2023, to:

13

14   Foster Care Review Board
     1501 W. Washington, Suite 128

15   Phoenix, Arizona 85007

16

17   Alonzo Borboa
     Case Manager

18   Site Code: O15A

19

20    _/s/ Andrea Fontes_____

21   AF / ▮▮▮▮ / HDM#11636961

22

23

24

25

26

27

28



CLERK OF THE
SUPERIOR COURT
RECEIVED CCB #1
DOCUMENT DEPOSITORY

2025 JAN 21 PM 1:32

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

JESSICA FIDLER, an individual; et al.

Plaintiff(s)

vs.

STATE OF ARIZONA, a government entity; et al.

Defendant(s)

Case No.:    CV2024 - 030202

PROOF OF SERVICE

**FILED**

BY: R. Matthews DEP

I,         Larry White          , declare that I am a citizen of the United States, over the age of eighteen and not a party to this action and that within the boundaries of the state where service was affected, I was authorized by law to perform said service.

Received documents from: DeeAn Gillespie Strub, Gillespie Shields & Taylor; 7319 N. 16th Street, Suite 100, Phoenix, Arizona 85020

Documents to be served: 1. Summons 2. First Amended Complaint (Jury Trial Requested) 3. Certificate Of Compulsory Arbitration

Entity/Person being served: Alonzo Borboa

SERVICE DETAILS

Manner of Service: In person hand delivery

To: Alma, aunt, resident authorized to accept for Alonzo Borboa

At the location: 2664 W. Ocaso Circle, Mesa, Arizona 85202

On this date:    1/17/2025                          At this time:    4:45 p.m.

State of Arizona

County of Maricopa

SUBSCRIBED AND SWORN to before me this 20th day of January, 2025, by the affiant.

Signature of Notary Public

CHERYL PRITCHETT
Notary Public - Arizona
Maricopa County
Commission # 597251
My Comm. Expires Mar 30, 2025

LJ Legal Service

722 E. Osborn Road, #335

Phoenix, Arizona 85014

CLERK OF THE
SUPERIOR COURT
RECEIVED COB #1
DOCUMENT DEPOSITORY

2025 JAN 21 PM 1: 33

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
**IN AND FOR THE COUNTY OF MARICOPA**

**FILED**
**BY: R. Matthews DEP**

JESSICA FIDLER, an individual; et al.                          Case No.:    CV2024 - 030202
Plaintiff(s)

                            vs.                          PROOF OF SERVICE

STATE OF ARIZONA, a government entity; et al.
Defendant(s)

        I,        Larry White        , declare that I am a citizen of the United States, over the age of eighteen and not a party to this action and that within the boundaries of the state where service was affected, I was authorized by law to perform said service.

  Received documents from: DeeAn Gillespie Strub, Gillespie Shields & Taylor; 7319 N. 16th Street, Suite 100, Phoenix, Arizona 85020
  Documents to be served: 1. Summons 2. First Amended Complaint (Jury Trial Requested) 3. Certificate Of Compulsory Arbitration

Entity/Person being served: Dana Burden

                            SERVICE DETAILS

    Manner of Service: In person hand delivery
                To: Hunter Burden, resident authorized to accept for Dana Buren at her usual place of abode.

    At the location: 20413 N. 29th Place, Phoenix, Arizona 85080

    On this date:    1/16/2025                          At this time:    7:00 p.m.

─────────────────────────────────────────────────────────────────────
State of Arizona
County of Maricopa

SUBSCRIBED AND SWORN to before me this 20th day of January, 2025, by the affiant.

Signature of Notary Public

LJ Legal Service
722 E. Osborn Road, #335
Phoenix, Arizona 85014

CHERYL PRITCHETT
Notary Public - Arizona
Maricopa County
Commission # 597251
My Comm. Expires Mar 30, 2025



CLERK OF THE
SUPERIOR COURT
RE~~~~~ CCS #1
DOCUMENT DEPOSITORY

2025 JAN 21 PM 1:33

**IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
**IN AND FOR THE COUNTY OF MARICOPA**

**FILED**
**BY: R.Matthews DEP**

JESSICA FIDLER, an individual; et al.

Plaintiff(s)

vs.

STATE OF ARIZONA, a government entity; et al.

Defendant(s)

Case No.:    CV2024 - 030202

PROOF OF SERVICE

I,    Larry White    , declare that I am a citizen of the United States, over the age of eighteen and not a party to this action and that within the boundaries of the state where service was affected, I was authorized by law to perform said service.

Received documents from: DeeAn Gillespie Strub, Gillespie Shields & Taylor; 7319 N. 16th Street, Suite 100, Phoenix, Arizona 85020

Documents to be served: 1. Summons 2. First Amended Complaint (Jury Trial Requested) 3. Certificate Of Compulsory Arbitration

Entity/Person being served: State of Arizona

SERVICE DETAILS

Manner of Service: In person hand delivery

To: Montoya Joseph Arizona Attorney General's office authorized to accept for the State of Arizona

At the location: 2005 N. Central Avenue, Phoenix, Arizona 85004

On this date:    1/16/2025    At this time:    1:45 p.m.

State of Arizona

County of Maricopa

SUBSCRIBED AND SWORN to before me this 20th day of January , 2025, by the affiant.

Signature of Notary Public

LI Legal Service
722 E. Osborn Road, #335
Phoenix, Arizona 85014

CHERYL PRITCHETT
Notary Public - Arizona
Maricopa County
Commission # 597251
My Comm. Expires Mar 30, 2025



CLERK OF THE
SUPERIOR COURT
~~~~~~~~~~~~~ CO #1
DOCUMENT DEPOSITORY

2025 JAN 21 PM 1:34

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

JESSICA FIDLER, an individual; et al.

Plaintiff(s)

vs.

STATE OF ARIZONA, a government entity; et al.

Defendant(s)

Case No.:    CV2024 - 030202

PROOF OF SERVICE

**FILED**
BY: R. Matthews **DEP**

    I,    Cheryl Pritchett    , declare that I am a citizen of the United States, over the age of eighteen and not a party to this action and that within the boundaries of the state where service was affected, I was authorized by law to perform said service.

Received documents from: DeeAn Gillespie Strub, Gillespie Shields & Taylor; 7319 N. 16th Street, Suite 100, Phoenix, Arizona 85020

Documents to be served: 1. Summons 2. First Amended Complaint (Jury Trial Requested) 3. Certificate Of Compulsory Arbitration

Entity/Person being served: Edwin Wangler

### SERVICE DETAILS

Manner of Service: Drop service at the front door

Explain: I arrived at the residence of Edwin Wangler at 30134 N. 71st Drive, Peoria, Arizona 85385. There is a Ford Expedition parked in the driveway AZ license plate #BTE3542. There is a RING doorbell. I push the doorbell several times. A females voice answers and says, can I help you. I say I am a officer of the court and I have legal documents for Edwin Wangler. The female says I own this house and to get the fuck away from my door. I again ask does Edwin Wangler live here. She says he is not here and she owns the house and get away from my door or I will call the Police. I tell her she is welcome to call the Police. I ask the female for her last name. She says Stephanie. There is a walkway stone in front of the house that says Wangler. I believe Stephanie assisting Edwin Wangler in avoiding service, so I advise her that I am leaving the legal documents for Edwin Wangler at the front door. I placed the legal documents at the front door and I left.

On this date:   1/19/2025            At this time:   8:55 a.m.

State of Arizona

County of Maricopa

SUBSCRIBED AND SWORN to before me this 20<sup>TH</sup> day of JANUARY , 2025, by the affiant.

Signature of Notary Public



LJ Legal Service
722 E. Osborn Road, #335
Phoenix, Arizona 85014

LARRY WHITE
Notary Public - State of Arizona
MARICOPA COUNTY
Commission # 612377
Expires October 10, 2025

CLERK OF THE SUPERIOR COURT
FILED
JAN 2 7 2025    12:43 pm
I. Ramirez, Deputy

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

JESSICA FIDLER, et al.                                          Case No.:    CV2024 - 030202
Plaintiff(s)

             vs.                                          PROOF OF SERVICE

STATE OF ARIZONA, et al.
Defendant(s)

        I,      Shante Pritchett      , declare that I am a citizen of the United States, over the age of eighteen and not a party to this action and that within the boundaries of the state where service was affected, I was authorized by law to perform said service.

Received documents from: Jenny D. Jansch, Gillespie Shields & Taylor; 7319 N. 16th Street, Suite 100, Phoenix, Arizona 85020
  Documents to be served: 1. Summons 2. First Amended Complaint (Jury Trial Requested) 3. Certificate Of Compulsory Arbitration

Entity/Person being served: Nichole Garcia

### SERVICE DETAILS

Manner of Service: In person hand delivery

To (Name): Nichole Garcia

At this location: 2120 N. Central Avenue, Phoenix, Arizona

On this date:  1/21/2025            At this time:  10:55 a.m.

State of Arizona
County of Maricopa

SUBSCRIBED AND SWORN to before me this 24ᵀᴴ day of JANUARY, 2025, by the affiant.



Signature of Notary Public

LJ Legal Service
722 E. Osborn Road, #335
Phoenix, Arizona 85014

LARRY WHITE
Notary Public - State of Arizona
MARICOPA COUNTY
Commission # 612377
Expires October 10, 2025

Clerk of the Superior Court
*** Electronically Filed ***
K. Higuchi-Mason, Deputy
2/5/2025 3:40:07 PM
Filing ID 19289402

1 | Daniel J. O'Connor, Jr., Bar No. 010081
2 | Danny O'Connor, III, Bar No. 034188
Jenn Tetreault, Bar No. 035566
3 | **O'CONNOR & DYET, P.C.**
7955 South Priest Drive
4 | Tempe, AZ 85284
5 | daniel.oconnor@ocdlawfirm.com
danny.oconnor@ocdlawfirm.com
6 | jenn.tetreault@ocdlawfirm.com
602-241-7000
7 | *Attorneys for Defendants State of Arizona,*
*Alonzo Borboa, Nichole Garcia, Edwin*
8 | *Wangler, and Dana Burden*

9

10 | **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

11 | **IN AND FOR THE COUNTY OF MARICOPA**

12

| | |
|---|---|
| JESSICA FIDLER, an individual; E.F., a minor, through his parent and guardian JESSICA FIDLER, | Case No.: CV2024-030202 |
| Plaintiffs, | |
| vs. | **ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT (REVISED)** |
| STATE OF ARIZONA, a government entity; ALONZO BORBOA, individually and as an employee with the State of Arizona Department of Child Safety; NICHOLE GARCIA, individually and as an employee with the State of Arizona Department of Child Safety; EDWIN WANGLER, individually and as an employee with the State of Arizona Department of Child Safety; DANA BURDEN, individually and as an employee with the State of Arizona Department of Child Safety; JANET CAHILL, Ph.D, individually; JOHN and JANE DOES 1-10; BLACK and WHITE ENTITIES 1-10, | (Assigned to the Honorable Christopher Whitten) |
| Defendants. | |

Defendants State of Arizona (the "State"), Alonzo Borboa ("Borboa"), Nichole Garcia ("Garcia"), Edwin Wangler ("Wangler"), and Dana Burden ("Burden") (collectively, "Defendants") through undersigned counsel, for their Answer to Plaintiffs' First Amended Complaint (Revised) (the "Complaint"), hereby admits, denies, and alleges as follows:

Answering Defendants deny each and every, all and singular, of the allegations in the Complaint not expressly admitted herein.

Answering Defendants deny negligence, fault, liability, causation, Plaintiffs' damages, and that they are indebted to Plaintiffs in any amount under any legal theory whatsoever and demand strict proof thereof.

Answering Defendants ask this Court to take judicial notice of *Fidler v. Arizona*, CV-22-00300-PHX-ROS, 2023 WL 2759023 (D. Ariz. Apr. 3, 2023), attached hereto as **Exhibit 1**, and *Fidler v. Arizona*, 23-15691, 2024 WL 1553703 (9th Cir. Apr. 10, 2024), attached hereto as **Exhibit 2**. *See Fovargue v. Singer*, 77 Ariz. 305, 308 (1954) (applying *res judicata* when dismissal of prior action was involuntary and not for lack of jurisdiction or improper venue); Ariz. R. Evid. 201 (allowing this Court to take judicial notice of adjudicative facts at any stage of the proceedings).

## **JURISDICTION AND VENUE**[1]

1.    Defendants lack sufficient information to admit or deny the allegations contained in paragraph 1 of the Complaint and therefore deny the same and demand strict proof thereof.

---

[1] The allegations of footnote 1 of the Complaint are not directed at Defendants such that no answer is required, but in the case that such allegations are determined to be directed at Defendants, Defendants admit the allegations of footnote 1 of the Complaint. Any and all headers and sub-headers Defendants adopt as used in the Complaint are for reference only and Defendants make no admissions thereby.

2.      Defendants lack sufficient information to admit or deny the allegations contained in paragraph 2 of the Complaint and therefore deny the same and demand strict proof thereof.

3.      Defendants deny the allegations contained in paragraph 3 of the Complaint and demand strict proof thereof.

4.      In response to paragraph 4 of the Complaint, Defendants admit only that the acts specified in the Complaint, if they occurred, arose with primary effect in Maricopa County, Arizona. Defendants deny the remaining allegations contained in paragraph 4 of the Complaint and demand strict proof thereof.

5.      In response to paragraph 5 of the Complaint, Defendants admit only that the acts specified in the Complaint, if they occurred (the "Acts Alleged"), arose with primary effect in Maricopa County, Arizona. Defendants deny the remaining allegations contained in paragraph 5 of the Complaint and demand strict proof thereof.

## THE PARTIES

6.      Defendants lack sufficient information to admit or deny the allegations contained in paragraph 6 of the Complaint and therefore deny the same and demand strict proof thereof.

7.      Defendants lack sufficient information to admit or deny the allegations contained in paragraph 7 of the Complaint and therefore deny the same and demand strict proof thereof.

8.      Defendants admit the allegations contained in Paragraph 8 of the Complaint.

9.      In response to paragraph 9 of the Complaint, Defendants admit only that the State is a government entity, the State has a Department of Child Safety ("DCS") and Office of Child Welfare Investigations ("OCWI"), and Defendants Borboa, Garcia, Wangler, and Burden are currently or previously were employees of the State. Defendants deny the

remaining allegations contained in paragraph 9 of the Complaint and demand strict proof thereof.

10.    In response to paragraph 10 of the Complaint, Defendants admit only that DCS operates a Welcome Center that opened in August of 2023 that is intended to be a first stop for some children coming into the care of DCS. Defendants deny the remaining allegations contained in paragraph 10 of the Complaint and demand strict proof thereof.

11.    In response to paragraph 11 of the Complaint, Defendants admit only that Defendant Borboa is an individual who acted under the color of law as an OCWI investigator at the time of the Acts Alleged. Defendants deny the remaining allegations contained in paragraph 11 of the Complaint and demand strict proof thereof.

12.    In response to paragraph 12 of the Complaint, Defendants admit only that Defendant Garcia is an individual who acted under the color of law as an OCWI investigator and supervisor at the time of the Acts Alleged. Defendants deny the remaining allegations contained in paragraph 12 of the Complaint and demand strict proof thereof.

13.    In response to paragraph 13 of the Complaint, Defendants admit only that Defendant Wangler is an individual who acted under the color of law as OCWI Chief at the time of the Acts Alleged. Defendants deny the remaining allegations contained in paragraph 13 of the Complaint and demand strict proof thereof.

14.    In response to paragraph 14 of the Complaint, Defendants admit only that Defendant Burden is an individual who acted under the color of law as DCS Deputy Chief at the time of the Acts Alleged. Defendants deny the remaining allegations contained in paragraph 14 of the Complaint and demand strict proof thereof.

15.    In response to paragraph 15 of the Complaint, Defendants admit only that Defendant Janet Cahill, Ph.D. ("Dr. Cahill") was contacted by various Defendants in the course of the time of the Acts Alleged. Defendants deny the remaining allegations contained in paragraph 15 of the Complaint and demand strict proof thereof.

16.    In response to paragraph 16 of the Complaint, Defendants incorporate their admissions in response to paragraphs 11 to 15 of the Complaint. Defendants deny the remaining allegations contained in paragraph 16 of the Complaint and demand strict proof thereof.

17.    In response to paragraph 17 of the Complaint, Defendants incorporate their admissions in response to paragraphs 11 to 16 of the Complaint. Defendants deny the remaining allegations contained in paragraph 17 of the Complaint and demand strict proof thereof.

18.    The allegations of paragraph 18 of the Complaint are not directed at Defendants such that no answer is required, but in the case that such allegations are determined to be directed at Defendants, Defendants deny the allegations of paragraph 18 of the Complaint and demand strict proof thereof.

19.    The allegations of paragraph 19 of the Complaint are not directed at Defendants such that no answer is required but in the case that such allegations are determined to be directed at Defendants, Defendants deny the allegations of paragraph 18 of the Complaint and demand strict proof thereof.

## FACTUAL ALLEGATIONS[2]

20.    Defendants admit the allegations of paragraph 20 of the Complaint.

21.    Defendants lack sufficient information to admit or deny the allegations contained in paragraph 21 of the Complaint and therefore deny the same and demand strict proof thereof.

---

[2] The allegations of footnote 2 of the Complaint are not directed at Defendants such that no answer is required, but in the case that such allegations are determined to be directed at Defendants, Defendants deny the allegations of footnote 2 of the Complaint and demand strict proof thereof.

22.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 22 of the Complaint and therefore deny the same and demand strict proof thereof.

23.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 23 of the Complaint and therefore deny the same and demand strict proof thereof.

24.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 24 of the Complaint and therefore deny the same and demand strict proof thereof.

25.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 25 of the Complaint and therefore deny the same and demand strict proof thereof.

26.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 26 of the Complaint and therefore deny the same and demand strict proof thereof.

27.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 27 of the Complaint and therefore deny the same and demand strict proof thereof.

28.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 28 of the Complaint and therefore deny the same and demand strict proof thereof.

29.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 29 of the Complaint and therefore deny the same and demand strict proof thereof.

30.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 30 of the Complaint and therefore deny the same and demand strict proof thereof.

31.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 31 of the Complaint and therefore deny the same and demand strict proof thereof.

32.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 32 of the Complaint and therefore deny the same and demand strict proof thereof.

33.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 33 of the Complaint and therefore deny the same and demand strict proof thereof.

34.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 34 of the Complaint and therefore deny the same and demand strict proof thereof.

35.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 35 of the Complaint and therefore deny the same and demand strict proof thereof.

36.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 36 of the Complaint and therefore deny the same and demand strict proof thereof.

37.     In response to paragraph 37 of the Complaint, Defendants admit only that E.F. was admitted to Phoenix Children's Hospital ("PCH") on June 29, 2017, and evaluated at PCH by Dr. Bo Borch-Christensen ("Dr. Christensen") on July 1, 2017. *See Fidler*, 2023 WL 2759023, at *1. Defendants lack sufficient information to admit or deny the remaining

allegations contained in paragraph 37 of the Complaint and therefore deny the same and demand strict proof thereof.

38.    Defendants lack sufficient information to admit or deny the allegations contained in paragraph 38 of the Complaint and therefore deny the same and demand strict proof thereof.

39.    In response to paragraph 39 of the Complaint, Defendants admit only that PCH providers refused to perform an ileostomy on E.F. and that the child instead received a less invasive hemi-colectomy. *See id.* Defendants lack sufficient information to admit or deny the remaining allegations contained in paragraph 39 of the Complaint and therefore deny the same and demand strict proof thereof.

40.    In response to paragraph 40 of the Complaint, Defendants admit only that PCH providers concluded E.F. did not have an infection on January 28, 2020. *See id.* Defendants lack sufficient information to admit or deny the remaining allegations contained in paragraph 40 of the Complaint and therefore deny the same and demand strict proof thereof.

41.    In response to paragraph 41 of the Complaint, Defendants admit only that Dr. Christensen called the child abuse hotline maintained by DCS to report Plaintiff on January 29, 2020. *See id.* Defendants lack sufficient information to admit or deny the remaining allegations contained in paragraph 41 of the Complaint and therefore deny the same and demand strict proof thereof.

42.    Defendants lack sufficient information to admit or deny the remaining allegations contained in paragraph 42 of the Complaint and therefore deny the same and demand strict proof thereof.

43.    Defendants deny the allegations contained in paragraph 43 of the Complaint and demand strict proof thereof.

44.    Defendants lack sufficient information to admit or deny the remaining allegations contained in paragraph 44 of the Complaint and therefore deny the same and demand strict proof thereof.

45.    Defendants admit the allegations contained in paragraph 45 of the Complaint.

46.    Defendants admit the allegations contained in paragraph 46 of the Complaint.

47.    In response to paragraph 47 of the Complaint, Defendants admit only that the juvenile court approved temporary custody of E.F., the child was removed from Plaintiff's custody on April 3, 2020, and taken to PCH. *See id.* at *3. Defendants lack sufficient information to admit or deny the remaining allegations contained in paragraph 47 of the Complaint and therefore deny the same and demand strict proof thereof.

48.    In response to paragraph 48 of the Complaint, Defendants admit only that E.F. was placed with foster parents on April 17, 2020. *See id.* at *4. Defendants lack sufficient information to admit or deny the remaining allegations contained in paragraph 48 of the Complaint and therefore deny the same and demand strict proof thereof.

49.    Defendants deny the allegations contained in paragraph 49 of the Complaint and demand strict proof thereof.

50.    Defendants lack sufficient information to admit or deny the allegations contained in paragraph 50 of the Complaint and therefore deny the same and demand strict proof thereof.

51.    In response to 51 of the Complaint, Defendants admit only that DCS employees approved the decision to seek severance instead of planning for E.F. to return to Plaintiff. *See id.* at *4. Defendants lack sufficient information to admit or deny the remaining allegations contained in paragraph 51 of the Complaint and therefore deny the same and demand strict proof thereof.

52.    In response to 52 of the Complaint, Defendants admit only that complete hearing transcripts, and only complete transcripts, can speak for themselves and, nevertheless,

as Plaintiff has been repeatedly admonished in prior proceedings, it "should [be] obvious that [Plaintiff cannot] base [42 U.S.C.] § 1983 claims on in-court testimony." *See id.* at *9; Ariz. R. Evid. 106 ("If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time."). Defendants deny the remaining allegations in paragraph 52 of the Complaint and demand strict proof thereof.

53.    In response to 53 of the Complaint, Defendants only admit that complete record of the juvenile court, and only the complete record, can speak for itself. *See* Ariz. R. Evid. 106. Defendants deny the remaining allegations in paragraph 53 of the Complaint and demand strict proof thereof.

54.    Defendants admit the allegations contained in paragraph 54 of the Complaint.

55.    Defendants admit the allegations contained in paragraph 55 of the Complaint.

56.    In response to paragraph 56 of the Complaint, Defendants admit only that Plaintiff filed a lawsuit against Dr. Christensen, the State, and State employees. *See generally*, *Fidler*, 2023 WL 2759023. Defendants deny the remaining allegations in paragraph 56 of the Complaint and demand strict proof thereof.

57.    Defendants admit the allegations contained in paragraph 57 of the Complaint.

58.    Defendants admit the allegations contained in paragraph 58 of the Complaint.

59.    Defendants lack sufficient information to admit or deny the allegations contained in paragraph 59 of the Complaint and therefore deny the same and demand strict proof thereof.

60.    Defendants lack sufficient information to admit or deny the allegations contained in paragraph 60 of the Complaint and therefore deny the same and demand strict proof thereof.

61.    Defendants admit the allegations contained in paragraph 61 of the Complaint.

62.     In response to paragraph 62 of the Complaint, Defendants admit only that DCS employees Natacha Pavlina ("Pavlina") and Defendant Borboa were involved in the DCS investigation opened as a consequence of the report specified in paragraph 61 of the Complaint, which was designated as Intake Summary No. IN10301578 and DCS Report No. AS00863831 (collectively, the "DCS Report"). Defendants deny the remaining allegations contained in paragraph 62 of the Complaint and demand strict proof thereof.

63.     In response to paragraph 63 of the Complaint, Defendants admit only that Pavlina contacted the Gilbert Police Department concerning the allegations made in the DCS Report. Defendants deny the remaining allegations contained in paragraph 63 of the Complaint and demand strict proof thereof.

64.     In response to paragraph 64 of the Complaint, Defendants admit only that Pavlina contacted the Gilbert Police Department concerning the allegations made in the DCS Report. Defendants deny the remaining allegations contained in paragraph 64 of the Complaint and demand strict proof thereof.

65.     In response to paragraph 65 of the Complaint, Defendants admit only that Pavlina contacted the Gilbert Police Department concerning the allegations made in the DCS Report. Defendants deny the remaining allegations contained in paragraph 65 of the Complaint and demand strict proof thereof

66.     In response to paragraph 66 of the Complaint, Defendants admit only that Defendants were unaware of Plaintiff's primary address as a result of her participation in the Address Confidentiality Program ("ACP") and that the DCS Report involves claims that Plaintiff was not allowing medical providers to deliver medical equipment and supplies for E.F. to her home. Defendants deny the remaining allegations contained in paragraph 66 of the Complaint and demand strict proof thereof.

67.     Defendants deny the allegations contained in paragraph 67 of the Complaint and demand strict proof thereof.

1    68.    Defendants deny the allegations contained in paragraph 68 of the Complaint
2    and demand strict proof thereof.

3    69.    In response to paragraph 69 of the Complaint, Defendants admit only that DCS
4    contacted Defendant Dr. Cahill regarding the DCS Report. The remaining allegations of
5    paragraph 69 of the Complaint are not directed at Defendants such that no answer is required,
6    but in the case that such allegations are determined to be directed at Defendants, Defendants
7    deny the allegations of paragraph 69 of the Complaint and demand strict proof thereof.

8    70.    Defendants deny the allegations contained in paragraph 70 of the Complaint
9    and demand strict proof thereof.

10    71.    In response to paragraph 71 of the Complaint, Defendants admit only that
11    Defendant Dr. Cahill was in communication with DCS regarding the DCS Report. The
12    remaining allegations of paragraph 71 of the Complaint are not directed at Defendants such
13    that no answer is required, but in the case that such allegations are determined to be directed
14    at Defendants, Defendants deny the allegations of paragraph 71 of the Complaint and demand
15    strict proof thereof.

16    72.    Defendants deny the allegations contained in paragraph 72 of the Complaint
17    and demand strict proof thereof.

18    73.    Defendants deny the allegations contained in paragraph 73 of the Complaint
19    and demand strict proof thereof.

20    74.    Defendants deny the allegations contained in paragraph 74 of the Complaint
21    and demand strict proof thereof.

22    75.    Defendants deny the allegations contained in paragraph 75 of the Complaint
23    and demand strict proof thereof.

24    76.    Defendants deny the allegations contained in paragraph 76 of the Complaint
25    and demand strict proof thereof.

26

77.     In response to paragraph 77 of the Complaint, Defendants admit only that Defendant Dr. Cahill completed a forensic medical review of documents pertaining to E.F. and arrived at the conclusion that Plaintiff met the criteria for Factitious Disorder Imposed on Another ("FDIA") such that if E.F. improves after being removed from Plaintiff's care, that would support her conclusion of FDIA and her suggestion would therefore be that Plaintiff's parental rights be terminated. Defendants deny the remaining allegations contained in paragraph 77 of the Complaint and demand strict proof thereof.

78.     Defendants deny the allegations contained in paragraph 78 of the Complaint and demand strict proof thereof.

79.     Defendants deny the allegations contained in paragraph 79 the Complaint and demand strict proof thereof.

80.     In response to paragraph 80 of the Complaint, Defendants admit only that Defendant Borboa asserted in a declaration attached to DCS's Dependency Petition that probable cause existed to believe that temporary custody was clearly necessary to protect E.F. from suffering abuse or neglect on the basis of, *inter alia*, Defendant Dr. Cahill's conclusion, as stated in response to paragraph 77 of the Complaint. Defendants assert that the complete court file of *In the Matter of [E.F] Fidler*, No. JD533286-R (Maricopa Cty. Super. Ct. Oct. 27, 2023) (the "Dependency Petition"), and only the complete file, can speak for itself. *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in paragraph 80 of the Complaint and demand strict proof thereof.

81.     In response to paragraph 81 of the Complaint, Defendants admit only that DCS employees assisted in the preparation of the Dependency Petition and/or documents supporting the same. Defendants assert that the complete court file regarding the Dependency Petition, and only the complete file, can speak for itself. *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in paragraph 81 of the Complaint and demand strict proof thereof.

82.     In response to paragraph 82 of the Complaint, Defendants admit only that DCS employees assisted in the preparation of the Dependency Petition and/or documents supporting the same. Defendants assert that the complete court file regarding the Dependency Petition, and only the complete file, can speak for itself. *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in paragraph 82 of the Complaint and demand strict proof thereof.

83.     In response to paragraph 83 of the Complaint, Defendants admit only that Defendant Borboa asserted in a declaration attached to DCS's Dependency Petition that probable cause existed to believe that temporary custody was clearly necessary to protect E.F. from suffering abuse or neglect on the basis of, *inter alia*, Defendant Dr. Cahill's conclusion that Plaintiff met the criteria for FDIA such that if E.F. improves after being removed from Plaintiff's care, that would support Dr. Cahill's conclusion that Plaintiff had FDIA and Dr. Cahill's suggestion would therefore be that Plaintiff's parental rights be terminated because she would continue to expose E.F. to countless unnecessary and harmful medical procedures. Defendants assert that the complete court file regarding the Dependency Petition, and only the complete file, can speak for itself. *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in paragraph 83 of the Complaint and demand strict proof thereof.

84.     In response to paragraph 84 of the Complaint, Defendants admit only that Defendant Borboa asserted in a declaration attached to DCS's Dependency Petition that probable cause existed to believe that temporary custody was clearly necessary to protect E.F. from suffering abuse or neglect. Defendants assert the declaration speaks for itself such that the complete declaration and court file regarding the Dependency Petition, and only the complete documents and corresponding file, can speak for itself. *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in paragraph 84 of the Complaint and demand strict proof thereof.

85.     Defendants deny the allegations contained in paragraph 85 of the Complaint and demand strict proof thereof.

86.     Defendants deny the allegations contained in paragraph 86 of the Complaint and demand strict proof thereof.

87.     Defendants deny the allegations contained in paragraph 87 of the Complaint and demand strict proof thereof.

88.     Defendants admit the allegations contained in paragraph 88 of the Complaint.

89.     Defendants deny the allegations contained in paragraph 89 of the Complaint and demand strict proof thereof.

90.     In response to paragraph 90 of the Complaint, Defendants admit only that while at the Welcome Center, E.F. consumed medications intended for another child. Defendants deny the remaining allegations contained in paragraph 90 of the Complaint and demand strict proof thereof.

91.     Defendants admit the allegations contained in paragraph 91 of the Complaint.

92.     In response to paragraph 92 of the Complaint, Defendants admit that DCS policy recommends that caregivers maintain a medication log and document therein, *inter alia*, the child's name, medication name, dosage, and date and time given. Defendants deny the remaining allegations contained in paragraph 92 of the Complaint and demand strict proof thereof.

93.     Defendants deny the allegations contained in paragraph 93 of the Complaint and demand strict proof thereof.

94.     Defendants deny the allegations contained in paragraph 94 of the Complaint and demand strict proof thereof.

95.     Defendants deny the allegations contained in paragraph 95 of the Complaint and demand strict proof thereof.

96.     In response to paragraph 96 of the Complaint, Defendants admit only that E.F. was transported to Banner Thunderbird Medical Center while at the Welcome Center on October 27, 2023. Defendants deny the remaining allegations contained in paragraph 96 of the Complaint and demand strict proof thereof.

97.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 97 of the Complaint and therefore deny the same and demand strict proof thereof.

98.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 98 of the Complaint and therefore deny the same and demand strict proof thereof.

99.     Defendants deny the allegations contained in paragraph 99 of the Complaint and demand strict proof thereof.

100.     Defendants admit the allegations contained in paragraph 100 of the Complaint.

101.     Defendants lack sufficient information to admit or deny the allegations contained in paragraph 101 of the Complaint and therefore deny the same and demand strict proof thereof.

102.     Defendants deny the allegations contained in paragraph 102 of the Complaint and demand strict proof thereof.

103.     In response to paragraph 103 of the Complaint, Defendants admit only that E.F. was placed with a group home following his release from the hospital. Defendants deny the remaining allegations contained in paragraph 103 of the Complaint and demand strict proof thereof.

104.     In response to paragraph 104 of the Complaint, Defendants admit only to the statements made and attached to the Dependency Petition and assert that the complete court file regarding the Dependency Petition, and only the complete file, can speak for itself. *See*

1    Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in

2    paragraph 104 of the Complaint and demand strict proof thereof.

3        105.    In response to paragraph 105 of the Complaint, Defendants admit only to the

4    actual statements made and attached to the Dependency Petition and assert that the complete

5    court file regarding the Dependency Petition, and only the complete file, can speak for itself.

6    *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in

7    paragraph 105 of the Complaint and demand strict proof thereof.

8        106.    In response to paragraph 106 of the Complaint, Defendants admit only to the

9    actual statements made and attached to the Dependency Petition and assert that the complete

10   court file regarding the Dependency Petition, and only the complete file, can speak for itself.

11   *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in

12   paragraph 106 of the Complaint and demand strict proof thereof.

13       107.    In response to paragraph 107 of the Complaint, Defendants admit only to the

14   actual statements made and attached to the Dependency Petition and assert that the complete

15   court file regarding the Dependency Petition, and only the complete file, can speak for itself.

16   *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in

17   paragraph 107 of the Complaint and demand strict proof thereof.

18       108.    In response to paragraph 108 of the Complaint, Defendants admit only to the

19   actual statements made and attached to the Dependency Petition and assert that the complete

20   court file regarding the Dependency Petition, and only the complete file, can speak for itself.

21   *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in

22   paragraph 108 of the Complaint and demand strict proof thereof.

23       109.    Defendants deny the allegations contained in paragraph 109 of the Complaint

24   and demand strict proof thereof.

25       110.    In response to paragraph 110 of the Complaint, Defendants admit only to the

26   actual statements made and attached to filings regarding the Dependency Petition and assert

that the complete court file regarding the Dependency Petition, and only the complete file, can speak for itself. *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in paragraph 110 of the Complaint and demand strict proof thereof.

111.    In response to paragraph 111 of the Complaint, Defendants admit only to the actual statements made and attached to filings regarding the Dependency Petition and assert that the complete court file regarding the Dependency Petition, and only the complete file, can speak for itself. *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in paragraph 111 of the Complaint and demand strict proof thereof.

112.    Defendants deny the allegations contained in paragraph 112 of the Complaint and demand strict proof thereof.

113.    Defendants deny the allegations contained in paragraph 113 of the Complaint and demand strict proof thereof.

114.    Defendants admit the allegations contained in paragraph 114 of the Complaint.

115.    The allegations of paragraph 115 of the Complaint are not directed at Defendants such that no answer is required, but in the case that such allegations are determined to be directed at Defendants, Defendants deny the allegations of paragraph 115 of the Complaint and demand strict proof thereof.

116.    The allegations of paragraph 116 of the Complaint are not directed at Defendants such that no answer is required, but in the case that such allegations are determined to be directed at Defendants, Defendants deny the allegations of paragraph 116 of the Complaint and demand strict proof thereof.

117.    In response to paragraph 117 of the Complaint, Defendants admit only that DCS employees instructed the return of E.F. to Plaintiff's custody on or about November 7, 2023. Defendants therefore deny the remaining allegations contained in paragraph 117 of the Complaint and demand strict proof thereof.

118.    Defendants lack sufficient information to admit or deny the allegations contained in paragraph 118 of the Complaint and therefore deny the same and demand strict proof thereof.

119.    Defendants lack sufficient information to admit or deny the allegations contained in paragraph 119 of the Complaint and therefore deny the same and demand strict proof thereof.

120.    In response to paragraph 120 of the Complaint, Defendants admit only to the actual statements made regarding the Dependency Petition and assert that the complete court file and transcripts regarding the Dependency Petition, and only the complete file and transcripts, can speak for themselves. *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in paragraph 120 of the Complaint and demand strict proof thereof.

121.    In response to paragraph 121 of the Complaint, Defendants admit only to the actual statements made regarding the Dependency Petition and assert that the complete court file and transcripts regarding the Dependency Petition, and only the complete file and transcripts, can speak for themselves. *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in paragraph 121 of the Complaint and demand strict proof thereof.

122.    Defendants deny the allegations contained in paragraph 122 of the Complaint and demand strict proof thereof.

123.    Defendants deny the allegations contained in paragraph 123 of the Complaint and demand strict proof thereof.

124.    In response to paragraph 124 of the Complaint, Defendants admit only to the actual orders made regarding the Dependency Petition and assert that the complete court file and orders regarding the Dependency Petition, and only the complete file and orders, can

speak for themselves. *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in paragraph 124 of the Complaint and demand strict proof thereof.

125.    Defendants lack sufficient information to admit or deny the allegations contained in paragraph 125 of the Complaint and therefore deny the same and demand strict proof thereof.

126.    Defendants admit the allegations contained in paragraph 126 of the Complaint.

## CLAIMS FOR RELIEF

### Count One

**42 U.S.C. § 1983 – Breach of Plaintiffs' First, Fourth, and Fourteenth Amendment rights to familial association (Against Defendants Wangler, Burden, Garcia, Borboa, and Cahill)**

127.    Defendants incorporate all prior answers as if fully set forth herein.

128.    In response to paragraph 128 of the Complaint, Defendants deny that Defendants are the proper Defendants for Plaintiff's claim and therefore deny the same and demand strict proof thereof.

129.    Defendants deny the allegations contained in paragraph 129 of the Complaint and demand strict proof thereof.

130.    Defendants deny the allegations contained in paragraph 130 of the Complaint and demand strict proof thereof.

131.    Defendants deny the allegations contained in paragraph 131 of the Complaint and demand strict proof thereof.

132.    Defendants deny the allegations contained in paragraph 132 of the Complaint and demand strict proof thereof.

133.    Defendants deny the allegations contained in paragraph 133 of the Complaint and demand strict proof thereof.

134.    Defendants deny the allegations contained in paragraph 134 of the Complaint and demand strict proof thereof.

135.    Defendants deny the allegations contained in paragraph 135 of the Complaint and demand strict proof thereof.

136.    Defendants deny the allegations contained in paragraph 136 of the Complaint and demand strict proof thereof.

137.    Defendants deny the allegations contained in paragraph 137 of the Complaint and demand strict proof thereof.

138.    Defendants deny the allegations contained in paragraph 138 of the Complaint and demand strict proof thereof.

**Count Two**

**Retaliation**
**(Against Defendants Wangler, Burden, Garcia, and Borboa)**

139.    Defendants incorporate all prior answers as if fully set forth herein.

140.    In response to paragraph 140 of the Complaint, Defendants deny that Defendants are the proper Defendants for Plaintiff's claim and therefore deny the same and demand strict proof thereof.

141.    Defendants deny the allegations contained in paragraph 141 of the Complaint and demand strict proof thereof.

142.    Defendants deny the allegations contained in paragraph 142 of the Complaint and demand strict proof thereof.

143.    Defendants deny the allegations contained in paragraph 143 of the Complaint and demand strict proof thereof.

144.    Defendants deny the allegations contained in paragraph 144 of the Complaint and demand strict proof thereof.

145.    Defendants deny the allegations contained in paragraph 145 of the Complaint and demand strict proof thereof.

**Count Three**

**Abuse of Process**
**(Against Defendants Wangler, Burden, Garcia, and Borboa)**

146.    Defendants incorporate all prior answers as if fully set forth herein.

147.    In response to paragraph 147 of the Complaint, Defendants deny that Defendants are the proper Defendants for Plaintiff's claim and therefore deny the same and demand strict proof thereof.

148.    In response to paragraph 148 of the Complaint, Defendants admit only to the actual filings made regarding the Dependency Petition and assert that the complete court file regarding the Dependency Petition, and only the complete file, can speak for itself. *See* Ariz. R. Evid. 106. Defendants therefore deny the remaining allegations contained in paragraph 148 of the Complaint and demand strict proof thereof.

149.    Defendants deny the allegations contained in paragraph 149 of the Complaint and demand strict proof thereof.

150.    Defendants deny the allegations contained in paragraph 150 of the Complaint and demand strict proof thereof.

**Count Four**

**Negligence *Per Se***
**(Against Defendants Wangler, Burden, Garcia, and Borboa)**

151.    Defendants incorporate all prior answers as if fully set forth herein.

152.    In response to paragraph 152 of the Complaint, Defendants deny that Defendants are the proper Defendants for Plaintiff's claim and therefore deny the same and demand strict proof thereof.

153.    Defendants admit the allegations contained in paragraph 153 of the Complaint.

154.    Defendants deny the allegations contained in paragraph 154 of the Complaint and demand strict proof thereof.

155.    Defendants admit the allegations contained in paragraph 155 of the Complaint.

156.     Defendants deny the allegations contained in paragraph 156 of the Complaint and demand strict proof thereof.

157.     Defendants deny the allegations contained in paragraph 157 of the Complaint and demand strict proof thereof.

158.     Defendants deny the allegations contained in paragraph 158 of the Complaint and demand strict proof thereof.

159.     Defendants deny the allegations contained in paragraph 159 of the Complaint and demand strict proof thereof.

**Count Five**

**Negligence and/or Gross Negligence**
**(Against Defendants Wangler, Burden, Garcia, and Borboa)**

160.     Defendants incorporate all prior answers as if fully set forth herein.

161.     In response to paragraph 161 of the Complaint, Defendants deny that Defendants are the proper Defendants for Plaintiff's claim and therefore deny the same and demand strict proof thereof.

162.     Defendants deny the allegations contained in paragraph 162 of the Complaint and demand strict proof thereof.

163.     Defendants deny the allegations contained in paragraph 163 of the Complaint and demand strict proof thereof.

**Count Six**

**Negligence and/or Gross Negligence**
**(Against Defendant State of Arizona)**

164.     Defendants incorporate all prior answers as if fully set forth herein.

165.     Defendant State denies the allegations contained in paragraph 165 of the Complaint and demands strict proof thereof.

166.     Defendant State denies the allegations contained in paragraph 166 of the Complaint and demands strict proof thereof.

- 23 -

167.    Defendant State denies the allegations contained in paragraph 167 of the Complaint and demands strict proof thereof.

168.    Defendant State denies the allegations contained in paragraph 168 of the Complaint and demands strict proof thereof.

169.    Defendant State denies the allegations contained in paragraph 169 of the Complaint and demands strict proof thereof.

170.    Defendant State denies the allegations contained in paragraph 170 of the Complaint and demands strict proof thereof.

171.    Defendant State denies the allegations contained in paragraph 171 of the Complaint and demands strict proof thereof.

172.    Defendant State denies the allegations contained in paragraph 172 of the Complaint and demands strict proof thereof.

173.    Defendant State denies the allegations contained in paragraph 173 of the Complaint and demands strict proof thereof.

<div align="center">

**Count Seven**

**Intentional Inflection [sic] of Emotional Distress**
**(Against all Defendants)**

</div>

174.    Defendants incorporate all prior answers as if fully set forth herein.

175.    In response to paragraph 175 of the Complaint, Defendants deny that Defendants are the proper Defendants for Plaintiff's claim and therefore deny the same and demand strict proof thereof.

176.    Defendants deny the allegations contained in paragraph 176 of the Complaint and demand strict proof thereof.

177.    Defendants deny the allegations contained in paragraph 177 of the Complaint and demand strict proof thereof.

178.    Defendants deny the allegations contained in paragraph 178 of the Complaint and demand strict proof thereof.

179.    Defendants deny the allegations contained in paragraph 179 of the Complaint and demand strict proof thereof.

**Count Eight**

**Aiding and Abetting Tortious Conduct**
**(Against Defendant Cahill)**

180.    Defendants incorporate all prior answers as if fully set forth herein.

181.    The allegations of paragraph 181 of the Complaint are not directed at Defendants such that no answer is required, but in the case that such allegations are determined to be directed at Defendants, Defendants deny the allegations of paragraph 181 of the Complaint and demand strict proof thereof.

182.    The allegations of paragraph 182 of the Complaint are not directed at Defendants such that no answer is required, but in the case that such allegations are determined to be directed at Defendants, Defendants deny the allegations of paragraph 182 of the Complaint and demand strict proof thereof.

183.    The allegations of paragraph 183 of the Complaint are not directed at Defendants such that no answer is required, but in the case that such allegations are determined to be directed at Defendants, Defendants deny the allegations of paragraph 183 of the Complaint and demand strict proof thereof.

184.    The allegations of paragraph 184 of the Complaint are not directed at Defendants such that no answer is required, but in the case that such allegations are determined to be directed at Defendants, Defendants deny the allegations of paragraph 184 of the Complaint and demand strict proof thereof.

185.    The allegations of paragraph 185 of the Complaint are not directed at Defendants such that no answer is required, but in the case that such allegations are

determined to be directed at Defendants, Defendants deny the allegations of paragraph 185 of the Complaint and demand strict proof thereof.

**AFFIRMATIVE DEFENSES**

186.    As and for a separate and affirmative defense, and in the alternative, Defendants allege that the Complaint fails to state a claim upon which relief can be granted.

187.    As and for a separate and affirmative defense, and in the alternative, neither the actions nor inactions of Defendants violated the state or federal constitutional rights of Plaintiff.

188.    As and for a separate and affirmative defense, and in the alternative, Defendants deny that they were deliberately indifferent to, or even aware of, conditions posing a substantial risk of serious harm to Plaintiffs' rights.

189.    As and for a separate and affirmative defense, and in the alternative, Defendants allege that Plaintiffs failed to demonstrate the requisite showing of intent necessary to sustain a cause of action alleging a constitutional violation, thereby warranting a dismissal of said claims in their entirety.

190.    As and for a separate and affirmative defense, and in the alternative, Defendants allege that at all times relevant to the Complaint, Defendants acted in good faith, and did not violate Plaintiffs' constitutional rights of which a reasonable DCS employee would have known, or that was clearly established by law, thereby affirmatively raising the defense of qualified immunity.

191.    As and for a separate and affirmative defense, and in the alternative, Defendants assert their entitlement to all immunities applicable under federal or state law, including, without limitation, the immunities set forth in A.R.S. §§ 12-820 and 12-821 *et. seq.,* and all immunities afforded to public employees, absolute or qualified.

192.    As and for a separate and affirmative defense, and in the alternative, Defendants assert they have been sued in their official capacity only and are not a proper party to Plaintiffs'

- 26 -

42 U.S.C. § 1983 claims because state employees in their official capacity do not constitute a "person" within the meaning of 42 U.S.C. § 1983, because a suit against the official capacity officers is akin to a suit against the State itself. *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989).

193.     As and for a separate and affirmative defense, and in the alternative, Plaintiffs' claims are barred by Plaintiffs' failure to join an indispensable party.

194.     As and for a separate and affirmative defense, and in the alternative, Defendants allege that Plaintiff has failed to mitigate her damages, thus barring or reducing her recovery.

195.     As and for a separate and affirmative defense, and in the alternative, Defendants allege that Plaintiff was contributorily negligent and/or any damages received by Plaintiff were the result of an intervening/superseding cause or occurred as a result of the negligence of someone other than Defendants, all of which bar recovery to Plaintiff herein.

196.     Arizona is a comparative-fault state. A.R.S. § 12-2506. As and for a separate and affirmative defense, and in the alternative, Plaintiff's alleged damages were the result of Plaintiff's or others' negligence, inattention, assumption of the risk, or other wrong or unsafe act(s), thereby reducing or eliminating Plaintiff's damages by the percentage of fault attributed to Plaintiff or others.

197.     As and for a separate and affirmative defense, and in the alternative, Defendants allege that if, indeed, they are determined to be liable for the allegations contained in the Complaint, then Defendants are entitled to contribution from other defendants, named or unnamed, by way of the Doctrine of Contribution.

198.     As and for a separate and affirmative defense, and in the alternative, Defendants allege that Plaintiff assumed the risk of her damages, acted in direct and intentional violation of Arizona law, and acted intentionally and knowingly, jeopardizing her safety and well-being, all of which bar recovery or reduce recovery to Plaintiffs herein from Defendants.

199.    As and for a separate and affirmative defense, and in the alternative, Defendants allege that Plaintiff's claim is barred, or, alternatively, that Plaintiff's damages must be reduced due to the applicability of the Doctrine of Mitigation of Damages and avoidable consequences.

200.    As and for a separate and affirmative defense, and in the alternative, Defendants allege Plaintiff may have failed to preserve relevant evidence. Therefore, Defendants assert the defense of spoliation of evidence and will request an adverse jury instruction at the time of trial.

201.    As and for a separate and affirmative defense, and in the alternative, Defendants allege that unknown third persons or entities caused Plaintiff's alleged damages. Defendants will identify such other persons or entities, as required by Ariz. R. Civ. Pro. 26(b)(5), with the relative degree of fault, if any, to be determined, according to A.R.S. § 12-2506.

202.    As and for a separate and affirmative defense, and in the alternative, Plaintiff's claims may be barred by A.R.S. § 12-821.01 for failing to properly serve a notice of claim and/or an adequate notice of claim.

203.    Although Defendants do not presently have specific facts in support of the additional defenses stated in this paragraph, it wishes to put Plaintiffs on notice that they do not waive and reserve the right to assert each of the following defenses which, through subsequent discovery may be supported by the facts: lack of jurisdiction over the person and/or entity, accord and satisfaction, arbitration and award, discharge in bankruptcy, duress, estoppel, set-off, failure to join an indispensable party, failure of consideration, fraud, illegality, laches, license, payment, release, *res judicata*, statute of frauds, statute of limitations, spoliation of the evidence, insufficiency of process and insufficiency of service of process and waiver and any affirmative defense available under Ariz. R. Civ. Pro. 8 and 12.

WHEREFORE, having fully Answered the Complaint, Defendants pray that same be dismissed with Plaintiffs taking nothing, and Defendants be granted their attorneys' fees and costs incurred herein.

Dated this 5th day of February, 2025.

**O'CONNOR & DYET, P.C.**

By: /s/ Jenn Tetreault
      Daniel J. O'Connor, Jr.
      Danny O'Connor III
      Jenn Tetreault
      *Attorneys for Defendants State of Arizona,*
      *Alonzo Borboa, Nichole Garcia, Edwin*
      *Wangler, and Dana Burden*

**Original** of the foregoing e-filed with the Court and a **copy** sent by e-mail this 5th day of February, 2025 to:

Thomas A. Connelly
Robert T. Mills
Sean A. Woods
MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
docket@millsandwoods.com

DeeAn Gillespie Strub
Jenny D. Jansch
GILLESPIE, SHIELDS, & TAYLOR
7319 North 16th Street
Phoenix, Arizona 85020
mailroom@gillaw.com

*Attorneys for Plaintiffs*

By: /s/ Laura Larson

EXHIBIT 1

Case 2:25-cv-00570-DLR    Document 1-1    Filed 02/18/25    Page 380 of 449

Fidler v. Arizona, Not Reported in Fed. Supp. (2023)

2023 WL 2759023
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

Jessica FIDLER, Plaintiff,
v.
State of ARIZONA, et al., Defendants.

No. CV-22-00300-PHX-ROS
|
Signed April 3, 2023

**Attorneys and Law Firms**

Deean Gillespie Strub, Sandra T. Daussin, Gillespie Shields Goldfarb & Taylor, Phoenix, AZ, Robert T. Mills, Sean Anthony Woods, Thomas A. Connelly, Mills & Woods Law PLLC, Phoenix, AZ, for Plaintiff.

Julie S. Rhodes, Michael Robert Niederbaumer, Arizona Attorney General's Office, Phoenix, AZ, Timothy James Watson, Provident Law PLLC, Scottsdale, AZ, for Defendants State of Arizona, Child, Lisa Burns, Melinda Quigley, Marisol Manjarrez, Kimmesha Edwards, Francisco Sanez, III.

Kira Nicole Barrett, Mary Margaret Curtin, Rebecca Noel Cain, Steven Daniel Crocchi, Gordon Rees Scully Mansukhani LLP, Phoenix, AZ, for Defendant Drue Kaplan-Siekman.

Michael Freeman Tamm, Sydney Darci Goodhand, Vincent John Montell, Quintairos Prieto Wood & Boyer PA, Scottsdale, AZ, for Defendants Phoenix Children's Hospital Incorporated, Bo Borch-Christensen, Unknown Borch-Christensen, Kathryn Coffman, Unknown Coffman.

## ORDER

Roslyn O. Silver, Senior United States District Judge

*1 Plaintiff Jessica Fidler alleges state officials took temporary custody of her son, E.F., in 2020 because of an embarrassing interaction one defendant had with Fidler in 2017. According to Fidler, two doctors, five employees of the Arizona Department of Child Safety, and an independent social worker all agreed to take custody of E.F. as part of a revenge campaign stemming from the 2017 interaction. Fidler's claims are premised on this far-reaching agreement,

but she has not alleged sufficient facts under the law to render those claims plausible. The Third Amended Complaint, Fidler's fourth attempt to state claims, will be dismissed without leave to amend.

## BACKGROUND

The following facts are taken from the Third Amended Complaint. Many of these facts differ significantly from the facts set forth in dismissing the Second Amended Complaint. (Doc. 119).

Fidler's son, E.F., was born in 2011. Fidler believes E.F. has always suffered from a wide array of medical problems and Fidler has sought extensive medical treatment for E.F. The relevant events began in 2017. On June 29, 2017, E.F. was admitted to Phoenix Children's Hospital ("PCH"). On July 1, 2017, Dr. Bo Borch-Christensen evaluated E.F. and spoke with Fidler. According to the Third Amended Complaint, Dr. Christensen and Fidler disagreed on the appropriate treatment for E.F. (Doc. 122 at 9-10). In particular, Dr. Christensen believed E.F. was receiving too many medical interventions while Fidler believed E.F. was receiving appropriate care. As a result of this disagreement, Fidler prohibited Dr. Christensen from ever treating E.F. again.

During the years following that 2017 interaction, E.F. continued to receive extensive medical treatments at various facilities, including PCH. Of particular importance, in the summer of 2019 medical providers at PCH and elsewhere recommended E.F. undergo an ileostomy which "involves cutting a hole in the abdominal wall and leaving the hole open." (Doc. 122 at 11). Two doctors at PCH agreed "the ileostomy would be beneficial for E.F.," but the surgeon at PCH who would perform the operation "disagreed." The PCH doctors who believed the ileostomy was merited "recommended [Fidler] take E.F. to Banner hospital for another opinion." (Doc. 122 at 11). After additional testing at Banner, E.F.'s doctors concluded the ileostomy was not appropriate. Instead, E.F. had a "hemi-colectomy" to remove part of his bowel. (Doc. 122 at 12). In October 2019, E.F. was admitted to PCH for abdominal pain. Fidler alleges, Dr. Christensen "somehow learned some details of why E.F. was hospitalized." (Doc. 122 at 12). Fidler then alleges, "upon information and belief," Dr. Christensen "discussed E.F.'s care" with the PCH physician who was caring for E.F. at that time. (Doc. 122 at 12). The complaint does not allege Dr. Christensen took any actions after that discussion.

In "late January 2020" Fidler took E.F. to PCH because E.F. "was running a fever." (Doc. 122 at 14). A PCH emergency room doctor "ran a test to see if there was an infection." (Doc. 122 at 14). On January 28, 2020, "the results came back negative for an infection." (Doc. 122 at 14). The day after the test results, Dr. Christensen called the child abuse hotline maintained by the Arizona Department of Child Safety ("DCS") and reported Fidler may be abusing E.F. During that call, Dr. Christensen stated Fidler had taken E.F. to Banner "to have an unnecessary bowel surgery" and E.F. was now on a feeding tube. As a result of Dr. Christensen's call, DCS opened an investigation.

**\*2** On February 20, 2020, Dr. Christensen and Dr. Kathryn Coffman, another PCH doctor, attended a meeting with DCS investigator Lisa Burns and "DCS service provider [Drue] Kaplan-Siekmann joined by phone." (Doc. 122 at 15). During that meeting, Dr. Christensen allegedly made eight statements the complaint identifies as false. Some of the allegedly false statements, however, were accurate given allegations elsewhere in the complaint.

During the February meeting Dr. Christensen allegedly stated Fidler had taken "E.F. to see doctors in Cincinnati and in California." (Doc. 122 at 15). The complaint alleges this statement was "false." But elsewhere the complaint alleges E.F. was "seen by medical specialists in Cincinnati, Ohio and at Stanford hospital in California." (Doc. 122 at 8). Dr. Christensen's statement, therefore, was not false under the complaint's allegations. Dr. Christensen also stated "[a]fter PCH doctors refused to perform an unnecessary bowel surgery (i.e., an ileostomy), [Fidler] took E.F. to Banner." (Doc. 122 at 15). The complaint alleges that was false but, as previously noted, the complaint alleges that is what happened. (Doc. 122 at 11). There is no explanation in the complaint for identifying the statements as "false" when they are consistent with Fidler's own allegations.

The remaining false statements by Dr. Christensen at the February 2020 meeting were Fidler "likely has Munchausen by Proxy," Fidler "was very confrontational with doctors," Dr. Christensen had treated E.F. on "multiple occasions," "E.F. did not require the medical treatments he received," the specialists in Cincinnati "found E.F. to have no [bowel] issues," and Banner surgeons had performed an ileostomy on E.F. (Doc. 122 at 15). The complaint alleges these false statements, and all subsequent actions by Dr. Christensen and

every other defendant, were due to Dr. Christensen having a personal vendetta against Fidler.

According to the complaint, Dr. Christensen's reports of potential abuse and false statements were caused by his inability "to endure the frequent reminders of [Fidler's] lack of faith in his abilities." (Doc. 122 at 13). E.F. visited PCH many times between July 1, 2017, and January 29, 2020. According to the complaint, these visits resulted in Dr. Christensen being "reminded that [Fidler] believe[d] that he was incompetent." Thus, the complaint alleges, "upon information and belief," Dr. Christensen's peers repeatedly asked him "why he could not treat E.F." (Doc. 122 at 13). Those questions allegedly resulted in Dr. Christensen being "humiliated in front of his peers" because he "had to explain this situation." (Doc. 122 at 14). Eventually, "[Dr.] Christensen had enough of the humiliation of not being able to treat E.F." and he "called the DCS Hotline in retaliation." That retaliation continued at the February 20, 2020, meeting. (Doc. 122 at 14).

The complaint provides no hint why Dr. Christensen's alleged personal humiliation was enough to convince seven other individuals to work with Dr. Christensen to remove E.F. from Fidler's custody. But Dr. Christensen's quest for revenge is described as the sole basis for the subsequent chain of events. The DCS employee assigned to investigate Dr. Christensen's complaint was DCS investigator Lisa Burns. From the very outset Burns decided to "ignore[ ] the fact that Christensen was motivated by pride, rather than a desire to protect E.F." (Doc. 122 at 16). Burns allegedly decided to conduct an incompetent investigation to ensure E.F. was removed from Fidler's custody.

**\*3** During her investigation Burns did not speak with E.F.'s doctors and only spoke with E.F.'s home-health nurse "briefly." (Doc. 122 at 17). Burns also failed to "investigate or consider" Fidler's "documented anxiety disorder." (Doc. 122 at 17). The complaint alleges Fidler's anxiety disorder was "the explanation for [E.F.'s] increased doctor visits." (Doc. 122 at 36). The complaint does not allege how Burns would have conducted an investigation into Fidler's mental health nor are there allegations how knowledge of Fidler's anxiety disorder would have impacted the investigation.

After intentionally failing to conduct a sufficient investigation, Burns and her supervisor, Melinda Quigley, realized that "something had to be done to satisfy" the "statutory duty" to investigate Dr. Christensen's statements. (Doc. 122 at 18). It is difficult to understand the complaint's

Case 2:25-cv-00570-DLR    Document 1-1    Filed 02/18/25    Page 382 of 449

Fidler v. Arizona, Not Reported in Fed. Supp. (2023)

logic in alleging Burns deliberately chose to conduct an incompetent investigation but then Burns and Quigley were concerned that they needed to comply with the "statutory duty" to investigate. If the complaint is accepted as true, Burns and Quigley knowingly wished to remove E.F. to exact revenge on Dr. Christensen's behalf. It is implausible Burns and Quigley would have this motivation but also be concerned that they comply with the governing statutes by conducting an appropriate investigation. At any rate, Burns and Quigley agreed to hire Drue Kaplan-Siekmann "to perform a forensic review of E.F.'s medical records." (Doc. 122 at 18).

Kaplan-Siekmann was a "freelance contractor" DCS hired to review cases. (Doc. 122 at 18). Burns and Quigley allegedly chose Kaplan-Siekmann because she was willing "to rubberstamp" Dr. Christensen's false claims. (Doc. 122 at 18). And Kaplan-Siekmann allegedly wished "to keep DCS satisfied" so she agreed to reach whatever result Burns and Quigley requested. (Doc. 122 at 19). As with the allegations regarding Burns, the complaint's allegations regarding Kaplan-Siekmann make very little sense.

The complaint alleges Kaplan-Siekmann had "no medical background," very little relevant training, and was not competent to review medical records. But the complaint then alleges Kaplan-Siekmann's should have reviewed more of E.F.'s medical records than she reviewed. If Kaplan-Siekmann was not competent to review medical records, it is unclear why the complaint alleges Kaplan-Siekmann erred by not reviewing more medical records. The complaint also alleges Kaplan-Siekmann was unqualified to reach any opinions and her report issued on March 19, 2020, was simply a regurgitation of Dr. Christensen's false allegations. The complaint describes Kaplan-Siekmann as acting with "malice," indicating Kaplan-Siekmann knew her report was false. (Doc. 122 at 36). But accepting the allegations that Kaplan-Siekmann lacked the requisite background and training to reach reliable opinions, the complaint does not allege how Kaplan-Siekmann could have known Dr. Christensen's reports were false.

After Burns' intentionally incompetent investigation and Kaplan-Siekmann's intentionally false report, DCS filed a dependency petition with the juvenile court. The petition, signed by Burns, was filed on March 30, 2020. The petition contained "the same false allegations" from Dr. Christensen and Kaplan-Siekmann which Burns recited and Quigley "rubber-stamped." (Doc. 122 at 22). The juvenile court approved temporary custody and E.F. was removed from

Fidler's custody on April 3, 2020. Upon gaining custody of E.F., Burns took E.F. to PCH. Burns allegedly waited until April 3 to take custody of E.F. so she could "control the investigation, through Dr. Christensen, and expedite the placement of E.F. in foster care." [1] (Doc. 122 at 23). After being examined by Dr. Christensen, E.F. was admitted to PCH.

**\*4** Shortly after E.F.'s admission, Dr. Christensen and Burns agreed to ask Dr. Coffman, the PCH physician who attended the February 2020 meeting, to review E.F.'s medical records. They chose Dr. Coffman because they knew she "would perform only a cursory review" and it was "her custom and practice to align herself with DCS's position." (Doc. 122 at 24). Dr. Coffman "wrote a letter to DCS summarizing her findings." (Doc. 122 at 25). In preparing that letter Dr. Coffman allegedly "did not conduct her own review of E.F.'s medical records" but chose to "simply re-count[ ] Christensen's false allegations." (Doc. 122 at 25). The complaint alleges Dr. Coffman "knew or should have known" the contents of her letter were false. However, given the allegation that Dr. Coffman did not conduct a review of E.F.'s medical records, it is not clear how Dr. Coffman either "knew or should have known" she was conveying inaccurate information to DCS.

While E.F. was hospitalized in April 2020, Dr. Christensen "removed all of the medical treatments that E.F. was receiving." (Doc. 122 at 27). Approximately two weeks after being removed from Fidler's custody, E.F. was placed with non-Jewish foster parents. E.F. remained with those foster parents from April 17, 2020, through November 3, 2020. That placement was selected by Marisol Manjarrez, a DCS caseworker. Manjarrez allegedly was aware of "Jewish placement options" but she opted to place E.F. with non-Jewish foster parents. (Doc. 122 at 27). At some unspecified time during his stay with foster parents, E.F.'s bowel symptoms started to "flare up." (Doc. 122 at 27). The complaint alleges the "flare up" was due to Dr. Christensen ceasing E.F.'s medical treatments in early April 2020. (Doc. 122 at 27). E.F.'s foster parents interfered with E.F.'s religious beliefs by insisting he cut his hair on a "Jewish holy day," forcing E.F. to eat pork, insisting E.F. eat meat and dairy together, and prohibiting E.F. from attending Jewish religious services. (Doc. 122 at 30-31).

While E.F. was with the foster parents, Manjarrez limited Fidler's visits and "would not allow [Fidler] to attend or participate in E.F.'s doctors' appointments." (Doc. 122 at 28).

Manjarrez's supervisors, Kimmesha Edwards and Francisco Saenz [2] III, approved Manjarrez's decision to seek severance and adoption instead of planning for E.F. to return to Fidler. (Doc. 122 at 28). The complaint does not explicitly allege Edwards and Saenz were aware these events were occurring as a result of Dr. Christensen's desire to retaliate against Fidler for the 2017 encounter. However, that appears to be Fidler's theory.

Based on these events, Fidler, on behalf of herself and on behalf of E.F., alleges the following claims in the Third Amended Complaint:

- § 1983 claim against Dr. Christensen, Burns, Quigley, Kaplan-Siekmann, and Dr. Coffman for violating her right to freedom of association under the First Amendment and due process under the Fourteenth Amendment;

- A § 1983 claim against Dr. Christensen, Burns, Quigley, Kaplan-Siekmann, and Dr. Coffman for judicial deception in the submission to the juvenile court seeking temporary custody of E.F.;

- A § 1983 claim against Dr. Christensen, Burns, Quigley, Kaplan-Siekmann, and Dr. Coffman for conspiring to violate Fidler's rights to due process;

- A § 1983 claim against Burns, Quigley, Manjarrez, Saenz, and Edwards for violating Fidler's "right to Due Process under the Fourth and Fourteenth Amendments for failing to make reasonable efforts to preserve the family relationship";

- A § 1983 claim against Manjarrez, Edwards, and Saenz for violating Fidler's right to "freedom of religion" under the First Amendment;

- A § 1983 claim against Burns, Quigley, Manjarrez, Saenz, and Edwards for violating Fidler's "due process" right to make medical decisions for E.F.;

- **\*5** • A § 1983 claim against Burns, Quigley, Manjarrez, Saenz, and Edwards for violating Fidler's "due process" right to be with E.F. during medical treatments;

- A "negligence per se" claim against Dr. Christensen and Dr. Coffman;

- A "gross negligence" claim against Dr. Christensen and Dr. Coffman; [3]

- A medical malpractice claim against Dr. Christensen for care provided to E.F.;

- A "negligence" claim against PCH that appears to be based on hiring or retaining unqualified employees.

Fidler also alleged claims against the foster parents but those claims have been dismissed. The remaining defendants have organized into three groups and each group has filed a motion to dismiss. Defendants Burns, Quigley, Manjarrez, Edwards, and Saenz filed a joint motion. Defendants Dr. Christensen, Dr. Coffman, and PCH filed a joint motion. And Defendant Kaplan-Siekmann filed her own motion.

## ANALYSIS

Fidler believes an interaction with Dr. Christensen in 2017, and his ongoing "embarrassment," fueled an agreement amongst eight individuals to take custody of E.F. and mistreat him while in state custody. That factual premise underlies all claims in the Third Amended Complaint but Fidler has not alleged sufficient facts to make it plausible there was such an agreement. All claims will be dismissed without leave to amend.

### A. Factual Allegations are Implausible

"Establishing the plausibility of a complaint's allegations is a two-step process that is context-specific and requires the reviewing court to draw on its judicial experience and common sense." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995–96 (9th Cir. 2014). A court must first identify those allegations "that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 996. Second, a court must "assume the[ ] veracity of well pleaded factual allegations and determine whether they plausibly give rise to an entitlement to relief." *Id.* The factual allegations must be sufficiently plausible such "that it is not unfair to require the opposing [parties] to be subject to the expense of discovery and continued litigation." *Id.* And "[w]hen considering plausibility, courts must also consider an obvious alternative explanation for [defendants'] behavior." *Id.*

According to the Third Amended Complaint, Dr. Christensen was upset in 2017 when he was told he could not treat E.F. again. For the next two and a half years, Dr. Christensen allegedly was humiliated when E.F. received treatment

at PCH. The complaint alleges these humiliating events occurred based "upon information and belief." Thus, upon information and belief, Dr. Christensen's peers "asked [Dr.] Christensen why he could not treat E.F." (Doc. 122 at 13). This was humiliating to Dr. Christensen because he "had to explain this situation" many times. (Doc. 122 at 14). The complaint does not contain factual allegations regarding which colleagues Dr. Christensen had these discussions with over the years. [4] Nor does the complaint allege when these discussions occurred. The timing of these discussions is of special importance because it is highly implausible Dr. Christensen would wait more than two years to embark on a convoluted attempt at revenge.

**\*6** The complaint alleges Dr. Christensen eventually "had enough of the humiliation" after he learned Fidler had sought treatment for E.F. for an alleged infection in 2020. (Doc. 122 at 14). When the test results from E.F.'s 2020 visit came back negative, Dr. Christensen decided to embark on a quest for revenge by calling the DCS hotline. [5] If, however, Dr. Christensen was motivated by embarrassment with his colleagues, it is unclear why the complaint links the negative test results to his decision to contact DCS. That is, the complaint describes Dr. Christensen's initial report to DCS as being prompted by the test results, not by any allegedly humiliating interaction with a colleague.

After his report, the complaint alleges Dr. Christensen somehow recruited Burns to help with his revenge campaign. There are no allegations why Burns would be interested in helping Dr. Christensen vindicate his embarrassment. But Dr. Christensen and Burns then convinced Burns' supervisor, Quigley, to help with obtaining retribution. Again, there are no factual allegations why Quigley would agree to pursue this goal. Next, Burns and Quigley recruited Kaplan-Siekmann because she would "rubberstamp Christensen's false claims." (Doc. 122 at 18). This alleged willingness to "rubberstamp" allegations does not explain why Kaplan-Siekmann agreed to seek revenge for Dr. Christensen's embarrassment.

After Kaplan-Siekmann started working on the case, and perhaps after Kaplan-Siekmann prepared her report stating there was possible abuse, Dr. Christensen and Burns allegedly convinced Dr. Coffman to help. The complaint alleges Dr. Coffman knew E.F. was not being abused and the only basis for the investigation was Dr. Christensen's "malicious motive to redeem his reputation and even the score with [Fidler]." (Doc. 122 at 25). The complaint does not allege how

Dr. Coffman knew this nor does it allege why Dr. Coffman would have agreed to help Dr. Christensen in this way. For unexplained reasons, Dr. Coffman prepared a knowingly false letter restating Dr. Christensen's allegations.

After the juvenile court approved temporary custody of E.F., Burns was able to convince another DCS employee, Manjarrez, that Fidler and E.F. should pay a price for causing Dr. Christensen's embarrassment. Allegedly to increase the injury to Fidler and E.F., Manjarrez refused to place E.F. in a Jewish home. Manjarrez's supervisors, Edwards and Saenz, knew the whole sequence of events was due to Dr. Christensen's "malice" and there was no abuse happening. (Doc. 122 at 28). Despite that knowledge, and for reasons not alleged in the complaint, Edwards and Saenz approved the continuation of the revenge campaign. Finally, after E.F. was returned to Fidler's custody, Edwards and Saenz took a final act of vengeance on behalf of Dr. Christensen by approving Marjarezz's decision to implement "a family reunification team" instead of closing the case entirely. (Doc. 122 at 29).

There are no factual allegations offering a plausible motivation for every individual involved in handling E.F.'s case to inflict harm on Fidler and E.F. A plaintiff is not always required to plead the defendants' motivations. But "[t]he level of factual specificity needed to satisfy [Rule 8's] pleading requirement will vary depending on the context." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013). Given that the entire complaint is dependent on all defendants agreeing to harm Fidler, some factual specificity regarding defendants' motivation was needed. At the very least, some factual allegations the various defendants even knew each other was necessary. It is implausible eight people, many with no connection to Dr. Christensen, set out to seize custody of E.F. and place him in an inappropriate foster home solely because Dr. Christensen was embarrassed.

**\*7** When assessing plausibility, the Court must "consider an obvious alternative explanation for [Defendants'] behavior." *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014). The "obvious alternative explanation" here is that Dr. Christensen believed Fidler was seeking excessive medical interventions for E.F. In fact, in a previous complaint Fidler alleged Dr. Christensen made a note in 2017 reflecting his opinion that E.F. was receiving excessive medical care. (Doc. 45 at 16). Fidler also alleged "multiple members of the hospitalist team" believed E.F. was receiving excessive care. (Doc. 45 at 17). Instead of a malicious motive based on embarrassment, the "obvious

alternative explanation" is that Dr. Christensen believed E.F. was being mistreated.

In January 2020, Fidler took E.F. to PCH for testing. When Dr. Christensen learned those test results were negative, he concluded Fidler had again sought medical treatment when it may not have been merited. Based on that, Dr. Christensen contacted DCS. Burns investigated, Kaplan-Siekmann conducted a review of some records, and Dr. Coffman also reviewed some aspects of E.F.'s medical records. Burns, Kaplan-Siekmann, and Dr. Coffman concluded abuse was possible. As a result, the juvenile court approved removal of E.F. from Fidler. Manjarrez believed the investigation had been adequate and placed E.F. with foster parents she deemed acceptable. Rather than seeking to remedy the humiliation of Dr. Christensen, Edwards and Saenz viewed Manjarrez's actions as appropriate under the circumstances. Overall, instead of an implausible chain of events involving an explicit agreement amongst eight individuals to vindicate Dr. Christensen's feelings, the obvious alternative explanation is Defendants' behavior was the routine handling of abuse allegations. Crucially, there are no plausible factual allegations that "exclude the possibility [this] alternative explanation is true." *Eclectic*, 751 F.3d at 996-97.

There is "a sheer possibility" the eight defendants set out to harm Fidler and E.F. to satisfy Dr. Christensen. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But the current "complaint pleads facts that are merely consistent with [Defendants'] liability." *Id.* Thus, the complaint "stops short of the line between possibility and plausibility of entitlement to relief." *Id.* Because Fidler's basic factual theory is not plausible, all the § 1983 claims will be dismissed.

Fidler's implausible factual theory also dooms the "negligence per se" and "gross negligence" claims. Those claims appear to be based on a convoluted theory that Burns "delegated" her statutory duties as a DCS investigator to Dr. Christensen, Kaplan-Siekmann, and Dr. Coffman. Those three individuals then breached the duties of DCS investigators set out in statute. *See* A.R.S. § 8-529. The theory appears to be that Burns delegated this authority to ensure Dr. Christensen's goal of revenge could be obtained. There are no factual allegations rendering it plausible Burns would pursue this course to help Dr. Christensen nor are there factual allegations that Burns had legal authority to "delegate" her statutory duties.

Fidler's medical malpractice claim does not fail because of the implausible agreement amongst all defendants. Instead, this claim fails because the allegations tying Dr. Christensen's treatment to E.F.'s symptoms are entirely speculative. The medical malpractice claim is based on treatment E.F. received in April 2020. That treatment allegedly led to a "flare up" of E.F.'s bowel symptoms sometime between April 2020 and November 2020. But the complaint alleges these "flare ups" happened routinely "prior to DCS's involvement." (Doc. 122 at 9). The complaint alleges E.F.'s symptoms "had largely resolved" as of October 2019, meaning prior to Dr. Christensen's treatment. But claiming treatment in April 2020 resulted in "flare ups" potentially seven months later is insufficient to state a claim for medical malpractice. Given the overall implausibility of the complaint, more specific allegations regarding treatment and injury were necessary.

*8 Finally, the complaint alleges a negligence claim directly against PCH. This claim does not depend on the implausible eight-person agreement. The claim still fails, however, because it is not supported by any meaningful factual allegations. The complaint alleges PCH owed a duty to ensure the employees it hired were qualified and properly trained. This sounds like a "negligent hiring" or "negligent retention" claim. *See Steven v. Swift Transp. Co.*, 2010 WL 3723119, at *2 (Ariz. Ct. App. 2010) (identifying "negligent hiring" and "negligent retention" as distinct claims against employer). But the complaint does not contain any allegations how PCH erred in hiring or retaining Dr. Christensen or Dr. Coffman. Therefore, the claim against PCH must be dismissed.

**B. Miscellaneous Flaws in Complaint**

Beyond implausibility and the various flaws undermining the state law claims, the Third Amended Complaint suffers from a wide variety of other flaws. Perhaps the most obvious flaw is that Fidler realleged a standalone claim for "conspiracy." The Court previously informed Fidler "[c]onspiracy is not itself a constitutional tort under § 1983." (Doc. 119 at 25). That statement was a direct quote from an en banc Ninth Circuit opinion. *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012). The Court went on to instruct Fidler "conspiracy should not be a separate claim." (Doc. 119 at 26). Despite that information, Fidler again alleged a standalone claim for "conspiracy." (Doc. 122 at 41).

Another flaw related to Fidler's improper conspiracy claim is the complaint's identification of Dr. Christensen and Dr. Coffman as "state actors" at all relevant times. (Doc. 122 at

50). This allegation appears to be based on the implausible theory that Burns "delegated" her statutory obligations as a DCS investigator to Dr. Christensen and Dr. Coffman. There is no meaningful explanation how this alleged delegation occurred nor is there any explanation why this rendered Dr. Christensen and Dr. Coffman "state actors."

Yet another flaw is the complaint lists the state of Arizona as a defendant in the caption and in its body. (Doc. 122 at 1, 3). It has never been clear if Fidler is attempting to assert claims against the State of Arizona. At the very least, there is no explanation for Fidler continuing to identify the State of Arizona as a defendant but never including the State of Arizona as a defendant on any particular claims.

The complaint's final flaw is Fidler's attempt to impose liability on supervisors based on the actions of their subordinates. The Court previously informed Fidler this was not a viable way to pursue supervisory liability. (Doc. 119 at 9). Despite that, the complaint again alleges claims against supervisors, Edwards and Saenz, based merely on some general allegations that they approved the conduct of their subordinates. (Doc. 122 at 28-29). Fidler is incapable or unwilling of pleading viable claims for supervisory liability.

### C. Amendment Would be Futile

Fidler has repeatedly amended her complaint, yet the Third Amended Complaint did not fix obvious flaws the Court identified. The history of Fidler's allegations during this case establish it would be futile to grant further leave to amend.

Fidler's original complaint alleged fifteen claims, including claims brought under 42 U.S.C. § 1983, against various combinations of sixteen defendants. [6] Included as defendants on some of the § 1983 claims were high-level supervisors at DCS, including the agency's head. There were no allegations those individuals were involved in the relevant events other than conclusory statements that they "ratified" their subordinates' conduct. (Doc. 1-3 at 30). It should have been obvious that such § 1983 claims against supervisors were not viable. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (noting "vicarious liability is inapplicable to ... § 1983 suits" meaning "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution").

**\*9** Fidler's original complaint did not allege Dr. Christensen was driven to remove E.F. from Fidler's custody because

of embarrassment in front of his colleagues. Instead, the complaint alleged Dr. Christensen's made a report to DCS based "on inaccurate information and inaccurate medical history reports." (Doc. 1-3 at 30). That seemed to indicate Dr. Christensen had been negligent, not malicious. Regardless of Dr. Christensen's motivation, the original complaint explicitly based one § 1983 claim against him on "his testimony under oath" during the juvenile dependency proceedings. (Doc. 1-3 at 36). It should have been obvious Fidler could not base § 1983 claims on Dr. Christensen's in-court testimony. *See, e.g.*, *Lisker v. City of Los Angeles*, 780 F.3d 1237, 1241 (9th Cir. 2015) (noting "[w]itnesses ... are absolutely immune from liability for testimony at trial"). Before any defendant answered the original complaint, Fidler filed an Amended Complaint. (Doc. 1-3 at 114).

Fidler's Amended Complaint again included obviously defective § 1983 claims against high-level DCS supervisors based only on those supervisors "ratif[ying]" their subordinates' conduct. (Doc. 1-3 at 139). And the Amended Complaint again improperly based claims against Dr. Christensen on his in-court testimony during the juvenile proceedings. (Doc. 1-3 at 141, 148). After some defendants moved to dismiss, Fidler filed a Second Amended Complaint. (Doc. 45). But even the Second Amended complaint still named supervisors without allegations of their personal involvement and based claims on Dr. Christensen's in-court testimony. (Doc. 45 at 35). In responding to the Second Amended Complaint, most defendants moved to dismiss or for judgment on the pleadings.

On November 3, 2022, the Court issued a thirty-page order resolving the pending motions. (Doc. 119). That Order noted the Second Amended Complaint contained "no meaningful allegations of involvement" by five of the named defendants (Defendants Quigley, Manjarrez, Edwards, Saenz, and Adam). (Doc. 119 at 8). As supervisory defendants, the Court noted Fidler would need far more specific allegations of their personal involvement should she wish to pursue claims against them. (Doc. 119 at 9-10). But based on the allegations in the Second Amended Complaint, it was "obvious" these five defendants had to be dismissed. (Doc. 119 at 8). The Order further explained Fidler could not base her claims on Dr. Christensen's in-court testimony. The Court granted limited leave to amend and Fidler filed her Third Amended Complaint.

As already analyzed, the Third Amended Complaint attempts to allege claims against eight defendants based on an

Fidler v. Arizona, Not Reported in Fed. Supp. (2023)

Case 2:25-cv-00570-DLR    Document 1-1    Filed 02/18/25    Page 387 of 449

agreement to seek revenge against Fidler because of Dr. Christensen's embarrassment. This agreement is an entirely new basis for Fidler's various claims and is supported by allegations "upon information and belief." [7] Given the history of this case, these allegations are nothing more than speculation. It is appropriate to allege facts based on "information and belief" when a plaintiff "has obtained hearsay evidence or other secondhand information." *Martinez v. City of W. Sacramento*, 2021 WL 2227830, at *6 (E.D. Cal. June 2, 2021). Alternatively, "information and belief" allegations may be used to allege a broader pattern of events based on a "specific factual example" identified in the complaint. *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1161 (9th Cir. 2022). It is not proper, however, for a plaintiff to allege events "upon information and belief" when the events are merely what plaintiff believes would be sufficient to support liability. For example, if Fidler knew Dr. Christensen had many conversations over a two-year period with his colleagues regarding E.F., she should have alleged factual details regarding those conversations. Baseless speculation that such conversations occurred is not enough. Inviting Fidler to amend and speculate anew would be futile.

**\*10** Fidler is incapable or unwilling to plead sufficient factual allegations to state plausible claims for relief. Fidler has already filed four complaints and there has been very little meaningful clarification on why she is suing many of the defendants. In these circumstances, granting leave to amend would be futile.

Accordingly,

**IT IS ORDERED** the Motions to Dismiss (Doc. 140, 143, 147) are **GRANTED**.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2759023

---

### Footnotes

1    The complaint contains allegations regarding the formation of an "agent/subagent" relationship between Burns and Dr. Christensen. The complaint alleges that, once this relationship was in place, all of Dr. Christensen's knowledge "was imputed to Burns, Quigley, and DCS." (Doc. 122 at 23). The complaint also alleges all the defendants knowingly agreed to seize E.F. based on false premises. Because the complaint alleges all defendants knew there was no abuse occurring, the allegations regarding an "agent/subagent" relationship allowing for imputation of Dr. Christensen's knowledge appear unnecessary.

2    The Court previously informed Fidler the correct name was "Saenz" not "Sanez." (Doc. 119 at 6 n.3). Despite that, the amended complaint continues to refer only to "Sanez."

3    The complaint includes Kaplan-Siekmann as a defendant on the "negligence per se" and "gross negligence claims." However, the parties agree those claims are not being pursued against Kaplan-Siekmann. (Doc. 143 at 3).

4    The complaint alleges, upon information and belief, "Dr. Mangone" discussed E.F. with Dr. Christensen sometime "between October 2019 and January 2020." (Doc. 122 at 12). Given the other allegations of the complaint, this allegation appears to be a guess rather than a recital of something Fidler knows or has sufficient reason to believe. Moreover, the complaint does not identify the colleagues who asked Dr. Christensen about E.F. between 2017 and 2019.

5    Fidler argues the Court should "infer [Dr.] Christensen is a proud man, vulnerable to humiliation if he is publicly questioned" based on his interactions with Fidler in 2017. (Doc. 156 at 6). It is unusual to request the Court make inferences regarding a defendant's personality when assessing the plausibility of claims. Fidler cites no authority that inferences regarding a defendant's personality type are appropriate.

**Fidler v. Arizona, Not Reported in Fed. Supp. (2023)**

Case 2:25-cv-00570-DLR   Document 1-1   Filed 02/18/25   Page 388 of 449

6    The named defendants were the State of Arizona, DCS, Burns, Quigley, Manjarrez, Edwards, Saenz, Bryan Adams, Michael Faust, Amber Lamonte, Kaplan-Siekman, PCH, Dr. Christensen, Dr. Coffman, Jason Treguboff, and Leigh Ann Treguboff. (Doc. 1-3 at 8-9)

7    The Third Amended Complaint's inconsistency with prior complaints is not the basis for dismissal or for denying leave to amend. *See PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 860 (9th Cir. 2007) ("The short of it is that there is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations."). However, the fact that Fidler did not allege this wide-ranging agreement until her fourth attempt to state claims creates a unique "context" meriting additional skepticism regarding the plausibility of her allegations. *Eclectic*, 751 F.3d at 995 (noting courts must use "context-specific" analysis when determining plausibility).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 2

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

APR 10 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| JESSICA FIDLER, an individual and guardian of minor on behalf of E.F., | No. 23-15691 |
| Plaintiff-Appellant, | D.C. No. 2:22-cv-00300-ROS |
| v. | MEMORANDUM* |
| STATE OF ARIZONA, a government entity; et al., | |
| Defendants-Appellees. | |

Appeal from the United States District Court
for the District of Arizona
Roslyn O. Silver, District Judge, Presiding

Argued and Submitted April 1, 2024
Phoenix, Arizona

Before: HAWKINS, BADE, and DESAI, Circuit Judges.

Plaintiff-Appellant Jessica Fidler, on behalf of herself and her son, E.F.,

appeals the district court's order dismissing her third amended complaint against

various defendants allegedly involved in the temporary removal of E.F. from her

custody. We have jurisdiction under 28 U.S.C. § 1291. "We may affirm the

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

district court's dismissal of the complaint on any basis supported by the record."
*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 839 (9th Cir. 2020).  We affirm.

1.       We review the district court's order de novo, *Douglas v. Noelle*, 567 F.3d
1103, 1106 (9th Cir. 2009), and apply a two-step, "context-specific" inquiry,
*Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995 (9th Cir.
2014).  We first separate the conclusory allegations from the nonconclusory
allegations and then ask whether those nonconclusory allegations, taken as true,
state a plausible entitlement to relief.  *Id.* at 996.  A claim is plausible "when the
plaintiff pleads factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.
Iqbal*, 556 U.S. 662, 678 (2009).

         In addition to asserting that the claims against them are implausible, the state
appellees assert that they are entitled to absolute or qualified immunity from
liability for Fidler's civil rights claims.  We reject their argument that they are
absolutely immune because no claim challenges "discretionary, quasi-prosecutorial
decisions to institute court dependency proceedings to take custody away from
parents."  *Miller v. Gammie*, 335 F.3d 889, 898 (9th Cir. 2003) (en banc).
Qualified immunity is therefore the only potentially applicable immunity defense.
*Id.* at 897.  In reviewing a qualified immunity defense at the motion to dismiss
stage, we ask "whether the complaint alleges sufficient facts, taken as true, to

support the claim that the officials' conduct violated clearly established constitutional rights of which a reasonable officer would be aware." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018).

2.      In Claims Two and Three, Fidler alleges that defendants Dr. Bo Borch-Christensen, Dr. Kathryn Coffman, Lisa Burns, Melinda Quigley, and Drue Kaplan-Siekmann violated her and E.F.'s rights to familial association by judicial deception.  To state a plausible claim of judicial deception, a plaintiff must plead "(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1147 (9th Cir. 2021).  Fidler concedes that all § 1983 claims against Drs. Christensen and Coffman were properly dismissed because they were not state actors.  *See* 42 U.S.C. § 1983 (requiring that a defendant act "under color of" state law to be liable).

The judicial deception claims were also properly dismissed against the remaining defendants.  The third amended complaint contains no allegations that Quigley and Kaplan-Siekmann made material statements to the state court.  Nor does it contain any nonconclusory allegations supporting the inference that Burns made false statements deliberately or with a reckless disregard for the truth. Therefore, Fidler did not establish a plausible entitlement to relief in Claims Two and Three.

3

3.    Claim One alleges that Burns, Quigley, and Kaplan-Siekmann violated Fidler's and E.F.'s rights to familial association under the First and Fourteenth Amendments by conducting an inadequate investigation.[1]  Similarly, Claim Four alleges that Burns, Quigley, Marisol Manjarrez, Francisco Saenz, and Kimmesha Edwards violated the plaintiffs' right to familial association under the Fourth and Fourteenth Amendments by "failing to make reasonable efforts to preserve the family relationship."  We conclude that Claim Four was forfeited as to Manjarrez, Saenz, and Edwards because Fidler does not distinctly raise and argue the claim against them in her opening brief.  *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).

"Our cases hold that the Fourteenth, First, and Fourth Amendments provide a guarantee 'that parents will not be separated from their children without due process of law except in emergencies.'"  *Keates*, 883 F.3d at 1236 (quoting *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107–09 (9th Cir. 2001)).  The right to familial association is violated when a defendant removes a child from his parents' custody without their consent or a court order and absent

---

[1] If Claim One is based on the claim that Fidler and E.F. were "harmed by legal errors made by the state court[]," it is barred by the *Rooker-Feldman* doctrine.  *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1140 (9th Cir. 2004).  But we construe the claim to instead "allege[] that the defendants' wrongful conduct has caused [them] harm," and thus, it is not barred.  *Id.*  To the extent the claim alleges the defendants committed judicial deception, it fails for the same reasons as Claims Two and Three.

reasonable cause to believe that the seizure is necessary to avert imminent, serious bodily harm. *Id.* at 1237–38. An official also violates the right when his or her conduct "shocks the conscience." *Capp v. County of San Diego*, 940 F.3d 1046, 1060 (9th Cir. 2019) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).

These claims fail against Quigley and Kaplan-Siekmann because there are no plausible allegations that those defendants did anything to violate Fidler's or E.F.'s rights to familial association. The third amended complaint contains no allegations that Quigley personally participated in E.F.'s removal or placement with a foster family beyond supervising Burns. *See Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) ("In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation: there is no respondeat superior liability under section 1983."). And the nonconclusory allegations demonstrate only that Kaplan-Siekmann reviewed some documents and submitted a report to the Arizona Department of Child Safety. This conduct does not constitute a plausible constitutional violation. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that a plausible claim "requires more than labels and conclusions").

Claims One and Four also fail against Burns because it was not clearly established that her investigation was unreasonable. *See Keates*, 883 F.3d at 1234–

35.  The district court correctly concluded that the allegations that Burns "rubber-stamped" Dr. Christensen's report were implausible.  After receiving Dr. Christensen's report of potential abuse, Burns met with the Scottsdale Police Department, retained Kaplan-Siekmann to review records, and interviewed Fidler and E.F.  The state court accepted Burns' investigation as sufficient to issue a temporary dependency order.  Under these circumstances, Burns was not on notice that her conduct was constitutionally deficient.  *See Moore v. Garnand*, 83 F.4th 743, 750 (9th Cir. 2023) (stating that law is clearly established when "every reasonable official would have understood that what he is doing violates that right" (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))).  We affirm the dismissal of Claims One and Four.

4.    Claim Five against Manjarrez, Saenz, and Edwards fails because Fidler points to no clearly established law that E.F. had a First Amendment right to be placed with a family that practices a certain religion or a family that would allow him to fully practice his religion.  *See id.* at 753 (observing that the plaintiff has the "burden to identify the clearly established law").  The claim independently fails against Saenz and Edwards because the third amended complaint contains no factual allegations that they personally participated in the deprivation of any right. *See Jones*, 297 F.3d at 934.

5.    Claims Six and Seven allege violations of Fidler's rights to direct and

participate in E.F.'s medical care. "The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000). Therefore, state officials are "required to: (1) notify the parents of a medical examination of their children; (2) obtain parental consent or a court order in advance of the medical examination; and (3) permit the parent to be present at the examination." *Benavidez*, 993 F.3d at 1150. The third amended complaint includes no factual allegations that, if taken as true, show that Burns, Quigley, Manjarrez, Saenz, or Edwards were responsible for (1) E.F. receiving medical examinations (2) without notice to Fidler and (3) without permission for her to be present. Fidler therefore did not state a plausible entitlement to relief in Claims Six and Seven. *See id.*

6.     Claim Ten alleges medical malpractice by Dr. Christensen. On appeal, Fidler relies entirely on the theory that Dr. Christensen treated E.F. when Dr. Christensen accessed E.F.'s medical records. But she cites no authority for the proposition that accessing medical records constitutes treatment under Arizona law. Regardless, the third amended complaint does not plausibly allege that any treatment by Dr. Christensen caused damages, so the claim fails. *See Seisinger v. Siebel*, 203 P.3d 483, 492 (Ariz. 2009) ("In medical malpractice actions, as in all negligence actions, the plaintiff must prove the existence of a duty, a breach of that

duty, causation, and damages.").  And absent plausible allegations that employees of Phoenix Children's Hospital are liable for negligence, the negligence claim against the hospital in Claim Twelve was properly dismissed.  *Cf. Laurence v. Salt River Project Agric. Improvement & Power Dist.*, 528 P.3d 139, 150 (Ariz. 2023) ("[E]xonerating or acquitting an employee of tortious acts must exonerate or acquit the employer from vicarious liability.").

   **AFFIRMED.**[2]

_____

[2] Fidler confirmed at oral argument that she does not appeal the dismissal of Claims Eight, Nine, or Eleven.  She also does not argue that the district court erred by denying leave to amend, and we conclude that the district court was within its discretion to do so.  *See Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint.").

Clerk of the Superior Court
*** Electronically Filed ***
L. Sanchez, Deputy
2/7/2025 6:16:36 PM
Filing ID 19305366

1   Thomas A. Connelly (AZ Bar #109430)
2   Robert T. Mills (AZ Bar #018853)
    Sean A. Woods (AZ Bar #028930)
3   **MILLS + WOODS LAW PLLC**
    5055 North 12th Street, Suite 101
4   Phoenix, Arizona 85014
5   Telephone 480.999.4556
    docket@millsandwoods.com
6
7   DeeAn Gillespie Strub (AZ Bar #009987)
    Jenny D. Jansch (AZ #024431)
8   **GILLESPIE, SHIELDS, & TAYLOR**
    7319 North 16th Street
9   Phoenix, Arizona 85020
10  Telephone: (602) 870-9700
    Fax: (602) 870-9783
11  mailroom@gillaw.com

12  *Attorneys for Plaintiffs*

13
                **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**
14              **IN AND FOR THE COUNTY OF MARICOPA**

15  JESSICA FIDLER, an individual;              Case No. CV2024-030202
16  E.F., a minor, through his parent and
    guardian JESSICA FIDLER,
17                                              **NOTICE OF LODGING "ANSWERS**
                    Plaintiffs,                 **AND RESPONSES" FROM**
18                                              **DEFENDANT JANET CAHILL**
                vs.
19                                              (Hon. Christopher Whitten)
20  STATE OF ARIZONA; et al.,

21                  Defendants.

22          Plaintiffs Jessica Fidler and E.F.[1] hereby give notice to the Court and all Defendants

23  who have appeared or filed responsive pleadings in this matter that on or about 31 January

24  2025, undersigned counsel received via UPS ground delivery, the document attached hereto

25  as Attachment A, titled *Answers and Reponses to Superior Court of Arizona in Maricopa*

26  *County, Case Number CV2024-030202* (the "document"). The document does not include

27  a service certificate; thus, counsel does not know whether the document was also sent to

28
    _____
    [1]     E.F. is a fictitious name used to protect the identity of the minor.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

the Court or to any other Defendants. Nor does counsel see an entry in the docket for this matter showing the document to have been filed with the Court Clerk or that Defendant Cahill paid the filing fee. Finally, there is no indication in the document that Defendant Cahill is represented by counsel; it seems she is appearing pro per. Defendant Cahill's last known street address and email address are contained below in the service certificate.

**RESPECTFULLY SUBMITTED** this 7th day of February 2025.

**MILLS + WOODS LAW PLLC**

By */s/ Thomas A. Connelly*
Thomas A. Connelly
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014

**GILLESPIE, SHIELDS, & TAYLOR**

DeeAn Gillespie Strub
Jenny D. Jansch
7319 North 16th Street
Phoenix, AZ 85020

*Attorneys for Plaintiffs*

**ORIGINAL** E-Filed with the Clerk of
the Maricopa County Superior Court
and **COPIES** E-Served this 7th day
of February 2025 via TurboCourt or Email to:


Janet Cahill
jcahill25@icloud.com
2004 San Juan Cir.
Minden, NV 89423
*Pro per*


Daniel J. O'Connor, Jr.
Danny O'Connor, III

2

1  Jenn Tetreault
2  O'CONNOR & DYET P.C.
   daniel.oconnor@ocdlawfirm.com
3  danny.oconnor@ocdlawfirm.com
   jenn.tetreault@ocdlawfirm.com
4  7955 S. Priest Dr.
5  Tempe, AZ 85284
   *Attorneys for State Defendants State of Arizona, Alonzo Borboa,*
6  *Nichole Garcia, Edwin Wangler, and Dana Burden*

7

8        */s/ Thomas A. Connelly*

9

10

11

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ATTACHMENT A

# Answers and Responses to
# Superior Court of Arizona  in Maricopa County.
# Case Number CV2024-030202

## Janet Cahill, Ph.D.

Served on 1/17/25.

This  lawsuit was sent to me by Jessica Fidler, and I am assuming her lawyer, Thomas A. Connelly.  Ms. Fidler has a son who is referred to in the records as E. F.

It is clear that the purpose of this lawsuit is an attempt to threaten me and the DSF staff in the Maricopa County Child Protection Agency regarding whether Ms. Fidler met the criteria for FDIA. In my case Ms. Fidler's threats  appear to be based on her efforts to have custody of E.F. She and  her lawyer, Mr. Connelly, made many deceptive statements and incorrect information regarding M.Fidler's relationship to FDIA. I explain  what FDIA is shortly .

I should mention at the onset that both Ms. Fidler and Mr. Connelly have no professional knowledge  of FDIA and many of their statements they said were  incorrect, made up or even ridiculous.

 I became involved in the case on October 24, 2023. At that time I was hired by Arizona Child Protection Agency to and asked to complete an evaluation of Ms. Fidler  and determine if she met the criteria for FDIA.

Multiple professionals in the case were concerned about Ms. Fidler's interactions with E.F., especially her use of treatments for him. My understanding was the  Arizona agency did not have a a psychologist who was an expert in Munchausen by Proxy or FDIA. The agency asked if I would be willing to make such an evaluation in this case. I agreed to do so. I have done this with many other agencies in many states.

At that time, I was  a licensed Psychologist  and expert in children protection evaluations and treatment recommendations. This included Parental Capacity Evaluations. My expertise also included  FDIA cases. Over the course of my career I have  completed over 4,500.00 child protection evaluations including FDIA cases. I will provide my credentials shortly. However, it is important to understand from the beginning that psychologists, who do the sort of work must agree to represent the best interest of the child. I have done that over the course of my entire career.

I should also mention that I  have not been involved in this case since 2023 and I am not aware of the current situation. Also - I have retired completely and not doing any more cases or involvement with children projection. I don't understand why Ms. Fidler is sending threats out at this time.

## Clarification of FDIA

FDIA, - is **Factitious disorder imposed another,** and is defined as the use of over treatment of a child by a caregiver. The caregiver is doing this to the child for their own (the caretaker's) psychological needs and not for the needs of the child. The caretaker may also over treat the child's physical needs. They are doing it on purpose. They use the child to get attention, resources and may want to be seen as an exceptional parent.

FDIA is consider to be a very dangerous type of child abuse and often has severe consequences for the child including death.

There are other names for FDIA.
For example Munchausen by Proxy, and Factitious disorder.

# Research on FDIA

There is a very large amount of research that defines and explores FDIA. Here are some examples. (Note that the names Munchausen by Proxy and FDIA are used for these resources)

Munchausen by Proxy: Presentations in Special Education (Auoub, Schreier and Kelle) and the APSAC Practice Guidelines.
Forensic assessment 0f (pages )

Munchausen by proxy presentations in special education.
results can be catastrophically dangerous for the child if it is not in appropriately diagnosed.

Forensic assessment of illness, falsification, Munchausen by proxy and factitious disorder, NOS, written by Mary Sanders and Brenda Burch.

Considering Suffolk Kotoeri abuse, and Munchausen by proxy in the evaluation of children experiencing apparently life-threatening events and sudden infant death syndrome. This was written by Thomas L Truman,et al

Position paper definitional issues in Munchausen by proxy. This was develop with the APSAC task force on Munchausen by proxy using definitions for the working group. I have been in that committee.

Munchausen by proxy victims in adulthood, and for us look, this was written by Judith at Leebo.

There are many, many more research articles on this topic. It is a well researched protocol.

One of the most important tools, is the Practice Guidelines for Munchausen by Proxy: Clinical and Case Management Guidance. This protocol was develop by the American Professional Society on the Abuse of Children (APSAC). APSAC strongly supports the use of those Practice Guidelines. It is used in cases where FDIA, or Munchauen by Proxy may be occurring. These guidelines are also based on extensive evidence based research. I used theseGuideline in my evaluation of Ms. Fidler.

Members of the APSAC Practice Guidelines are considered to be experts in Munchausen by Proxy. I was a member at the time of this report. Using the APSAC protocols is considered to be best practice. I used it for this case and concluded Ms. Fidler met the criteria for FDIA.

# Records used by Dr. Cahill to confirm the diagnosis of FDIA for Ms.Fidler.

1.  The Practice Guidelines from the American Professional Society on the Abuse of Children (APSAC)were used for this case. I have concluded those records the paper reports.

2 .The best practice protocol for FDIA requires the use of Annex A. This part of the protocol and provides symptoms consistent with FDIA. It also includes the dates, the specific symptoms, the objective evidence and the type of fabrication. I completed the Appendix A for this report.

3.The combination of these reports and the use of the Guidelines are consistent with my diagnosis that that Ms. Fidler met the criteria for FDIA.

# False Statements from Ms. Fidler and Mr. Connelly found in the Lawsuit

First I will respond to the blatant lies and misinformation that apparently came from Mr Connelly and I am assuming was supported by Ms. Fidler. These were not little lapses. They were flat out lies using misinformation, and attempts to attack my credentials.

1)For example Mr. Connelly stated "The report of Dr. Cahill was manufactured." This is one of there more ridiculous statements. I can assure you I was not at home playing with crayons and making up reports. I was reviewing massive numbers of records need for this diagnosis.

2)78. Another statement from Ms. Fiedler wrote- "There is no medical evidence to support her diagnosis."

Response- There was ample medical evidence to make the diagnosis and I reviewed all of them myself. Ms.Fidler was not with me when I was reviewing records . Hence, unless she has superman vision, there is was no way she could determine what I was reading or not reading.

80. Both Mr. Connelly and Ms. Fidler referred to the report as inaccurate. Neither Ms. Fidler or Mr. Connolly do not have the professional skills needed to complete the FDIA protocol. Ergo they have no ability to determine if the report is correct. Mr. Connolly certainly did not present any understanding or specific issues of FDIA. He was clearly making up stuff as he went along. Ms. Fidler exposed E.F. to an alarming number of medical and psychological treatments, yet continued to deny she over treated him. To my knowledge neither Mr. Connely nor Ms. Fidler, have any professional training or credentials for FDIA. Mr. Connelly is a lawyer not a psychologist.

183 - One of them also stated, "Defendant Cahill knew that the removal of E.F. was wrong." This is this the most this egregious of their statements, and is simply not defensible. E.F. was the victim of child abuse from Ms. Fidler. I concluded Ms. Filer met the criteria for FDIA. I am ethically bound to protect children exposed to that disorder and other types of abuse.I stand by my diagnosis and my recommendations that E.F. not be returned to his mother.

Another statement -135 from Ms. Fidler and Mr. Connelly was -"…Dr. Cahill had a meeting of the minds with the minds with the DCS workers  This is absolutely true. In fact that both myself and the DCS, independently determined Ms. Fidler was over treating her son for her own needs.  I have not been in touch with the case for two years so I cannot speak  for  DCS at this time. However, during my overvaluations in 2023  they did raise concerns about Ms. Fidler. It is normal for an evaluator discuss this with staff members. - it is good practice..

176 another statement read, -  read, "… there was no factual foundation or basis for this removal, and any purported evidence to support the removal  support the removal - the report of Dr. Cahill — was essentially manufactured.

---

This is also completely untrue and I reviewed a massive  amount of medical records and found many, many examples  falsification and other symptoms of FDIA. I have no idea where they came  up the forensic reliability for nonsense. In addition I read and reviewed extensive records and interviews for the this case that strongly supported the presences of FDIA. I have suffice reports and other sources, including DCF to make that conclusion. I had more than ample information to make this diagnosis and specified that in the Annex A I wrote for this case.

5. Based upon a very careful and though review of this case I did recommend that the child be removed from Ms. Fidler for a separation test be uses. . This is considered with the APSP protocol of the APSP practice guidelines. This is explained below. I followed these guidelines and concluded Ms. Fidler met the criteria for FDIA. It is very important to understand how dangerous and damaging this diagnosis is. Child exposed to FDIA can have catastrophic consequences  for them.  As a licensed psychologist I have the ethical responsibility to diagnose that disorder if it exists. And my evaluate included it did exist with Ms. Fidler. I am ethically required to address the needs of the child.

I have not had any contact with Ms. Fidler since I my report in October of 20223. I don't know what is going on in the case, except that Ms.Fidler is making up issues and clearly attempting to punish me and the caseworkers in the case. Throughout this dcoutionment she and I am assuming her lying about my role and recommendations in this case. This is consistent with Ms. Flier's prior behavior in 2023 and before.

# Final Answer and Response  to this Lawsuit.

I did agree to agree to complete a FDIA evaluation on Ms. Fidler regarding her son In 2023. I did at the request of the Arizona chid protection agency. I concluded Ms. Fidler met the criteria for FDIA.

I used the appropriate guidelines in this evaluation. It is relevant to know that the FDIA guidelines, as well as other evaluations in child protection, state that the focus needs to be on the best interest of the child. I maintained that demand in this case. Once FDIA is diagnosed, and the caregiver continues to deny the diagnosis and or continue to over treat the child, I have the ethical responsibility to recommend removal from the caretaker and /or a separation test. This is due to the high risk involved with FDIA.

As stated earlier I have not been involved with this case for the past two years, so I do not have current information. I have retired, and I no longer work in child protection.


I am sad that it appears this case is ongoing. This not in the best interest of E.F.

 I am proud of the work I did and sincerely hope that helped E.F. have the normalcy and healthy life he deserves.



Janet Cahill, Ph.D.

Record 2.



The American
Professional Society
on the Abuse of Children®

Strengthening Practice Through Knowledge

In partnership with

THE NEW YORK FOUNDLING

www.apsac.org    www.nyfoundling.org    @TheNYFoundling

# Practice Guidelines

# Munchausen by Proxy: Clinical and Case Management Guidance

Copyright © 2017 All rights reserved by the American Professional Society on the Abuse of Children (APSAC) in Partnership with The New York Foundling. **No part may be reproduced without a citation including the following:**

**Author:** APSAC Taskforce  **Title:** Munchausen by Proxy: Clinical and Case Management Guidance  **Publication Date:** 2017    **Publisher:** The American Professional Society on the Abuse of Children (APSAC)  **Retrieved from:**  https://www.apsac.org/guidelines

APSAC encourages broad distribution of the document in its entirety. No pages may be omitted when reproducing this document in electronic or print versions. Any questions regarding use of this document should be directed to info@apsac.org. Learn more about APSAC at  www.apsac.org.

Munchausen by Proxy

# APSAC Practice Guidelines

## Table of Contents

Purpose.................................................................................................................3
Terminology and Definitions.............................................................................3
    Original Terms Describing the Abuse and Neglect Combined with the Psychopathology........3
    Terms Describing the Abuse and Neglect ............................................................4
    Term Describing the Abuser's Psychopathology and Actions ...............................4
Background ..........................................................................................................5
    Epidemiology.....................................................................................................5
    Methods by Which Conditions May be Intentionally Falsified or Induced................5
    Risk and Harm ....................................................................................................7
    Etiology..............................................................................................................7
    Abuser Psychopathology ...................................................................................8
Approaches to Identifying APCF, CFIC, and MCA.........................................8
    Role of the Physician and Other Clinicians in Diagnostic Assessment...............8
    Warning Signs....................................................................................................9
    General Clinical Approach ...............................................................................10
    Clinical Documentation ...................................................................................11
    Record Analysis ...............................................................................................12
    Video Surveillance...........................................................................................13
    Separation From the Abuser ............................................................................14
    Example of Differential Diagnosis of APCIF, CFIC, and MCA ......................16
Approaches to Psychiatric Evaluation of Alleged Abuser.............................17
Reporting Requirements and CPS and Police Investigations ........................18
    Medical, Mental Health, and Education Professionals .....................................18
    Family Meeting and Informing Conference ....................................................18
    Child Protection Services (CPS).......................................................................19
    Police and Legal Investigations ......................................................................20
Case Management and Treatment....................................................................21
    Child Protection and Placement.......................................................................21
    Reunification Services .....................................................................................22
    Supervised Visitation .......................................................................................22
    Child Therapy ...................................................................................................23
    Abuser Therapy................................................................................................23
    Family Therapy.................................................................................................24
    Reunification of Family ...................................................................................25
    Long-Term Monitoring....................................................................................25
    Clinical Monitoring..........................................................................................25
References...........................................................................................................27

# APSAC Practice Guidelines

## Purpose

These Guidelines reflect current knowledge about best practices related to the identification, reporting, assessment, and management of Munchausen by proxy (defined here as "Abuse by pediatric condition falsification, caregiver-fabricated illness in a child, or medical child abuse that occurs due to a specific form of psychopathology in the abuser called factitious disorder imposed on another").

There are two components to the guidance presented: (1) Identification, assessment, and initial management of suspected cases of abuse or neglect meeting the definition for abuse by pediatric condition falsification, caregiver-fabricated illness in a child, or medical child abuse, regardless of the motivation or co-morbid psychopathology of the abuser, and (2) Education, assessment, and management guidance for cases of these forms of abuse and neglect due to factitious disorder imposed on another in the abuser.

In cases of Munchausen by proxy (MBP), some victims have genuine symptoms, disorders, or impairments that are intentionally exaggerated, undertreated, or exacerbated by the abuser. In other cases, all symptoms, disorders and impairment are completely fabricated by the abuser. The guidance provided in this document applies to both situations.

Guidance is not provided for the ongoing management of families in which the suspected abusers have anxiety, psychosis, malingering, or other explanations for episodes of abuse or neglect that do not meet criteria for factitious disorder imposed on another (FDIA). Such families are generally easier to assess, treat, manage, and reunify using standard evaluation and treatment approaches.

These guidelines are intended to provide guidance to medical providers, mandated reporters, child protective service workers, law enforcement, attorneys, therapists, and any other professionals who may be involved with reporting, assessing, and treating children affected by this form of child abuse and neglect and their abusive caregiver(s). Guidelines are not intended as a standard of practice to which practitioners are expected to adhere in all cases and are not meant to establish a legal standard of care. Best practices will continue to evolve as new evidence becomes available. As experience and scientific knowledge expands, further revision of these guidelines is expected.

## Terminology and Definitions

### Original Terms Describing the Abuse and Neglect Combined With the Psychopathology

### Munchausen syndrome by proxy (MSBP) / Munchausen by proxy (MBP)

The MSBP/MBP definition encapsulates both the psychopathology of the abuser and the abuse of the victim. MSBP/MBP was never a formal *International Classification of Disease* (*ICD*) or *Diagnostic and Statistical Manual of Mental Disorders* (*DSM*) diagnosis (American Psychiatric Association, 2013). It is a term that has historically been used (and still is often used) to describe situations in which an individual diagnosed with factitious disorder imposed on another (FDIA)

3

engages in falsifying a condition or illness in another. The victims of this form of abuse span the age range and may include animals (American Psychiatric Association, 2013).

Dr. Roy Meadow (1977) first described MSBP in the literature when he coined the term to refer to mothers deliberately falsifying illness in their children. Meadow used the term to describe the combination of the abuse (and neglect) and the motivation of the caregiver. Since that time, thousands of cases have been described in the literature. This is a form of abuse and neglect that can lead to significant child morbidity and mortality. *Munchausen syndrome by proxy* is the most widely recognized term, but the means of diagnosis, psychodynamics, and outcomes continue to be misunderstood. Due to confusion surrounding whether the term should be applied to the child as a victim of abuse or to the abuser who intentionally falsifies illness, several other terms have been proposed.

### Terms Describing the Abuse and Neglect

### Pediatric condition falsification (PCF)
In 1996, APSAC created a task force to more clearly define this type of abuse and neglect (Ayoub et al., 2002, 2004). The task force coined the term *pediatric condition* (illness, impairment, or symptom) *falsification* (PCF) to refer to a form of child maltreatment in which an adult falsifies physical or psychological signs or symptoms in a victim, causing the victim to be regarded as more ill or impaired than is objectively true.

### Abuse by pediatric condition falsification (APCF)
The words *abuse by* have been added to make it very clear that this term refers to child abuse and neglect.

### Caregiver-fabricated illness in a child: A manifestation of child maltreatment (CFIC)
CFIC is the most recent term recommended by the American Academy of Pediatrics to describe this type of abuse and neglect of the child victim (Flaherty & MacMillan, 2013).

### Medical child abuse (MCA)
*Medical child abuse* is a term used by many medical providers to describe when a child receives unnecessary and harmful, or potentially harmful, medical care at the instigation of a caregiver (Roesler & Jenny, 2009). This term substantially overlaps with APCF and CFIC. APCF includes MCA and also false or induced problems presented to non-medical providers.

### Term Describing the Abuser's Psychopathology and Actions

### Factitious disorder imposed on another (FDIA)
FDIA is a *DSM-5* psychiatric diagnosis (American Psychiatric Association, 2013). It is used to describe the psychopathology of some APCF, CFIC, or MCA abusers. Individuals with this diagnosis have falsified or induced physical, psychological, or developmental signs or symptoms in another individual. Intentional deception is associated with this behavior, differentiating it from a delusional or other psychiatric disorder. The deceptive falsification behavior persists even when there are no evident external rewards for the behavior such as money, child custody, or

access to drugs, although these motivations may co-exist. The victim of this behavior is presented to others as ill, impaired, or injured.

Compared with the previous version, the primary DSM changes include (1) an increased emphasis on deception as the cornerstone of the disorder (and subsequently, a need to identify deception as part of the FDIA evaluation process); (2) the fact that malingering (by proxy) may be a co-morbidity; (3) a simplified approach to motivation by requiring evidence only of internal motivation (primary gain) and not needing to determine a specific motivation (attention, sick role, or other); and (4) the ability to diagnose after a single episode of illness or condition falsification if the criteria are met.

A diagnosis of FDIA does not indicate decreased responsibility for harm or freedom from legal liability; however, the abuser's intention is generally not to torture or kill the child, though this may occur. This diagnosis may be similar to making a diagnosis of pedophilic disorder, with the primary goal of the behavior to satisfy a psychological need of the abuser. While secondary gain (malingering) may be present, it is not the driving force. Individuals with pedophilic disorder or FDIA ignore the needs and wellbeing of the victim in order to satisfy their own needs.

## Background

### Epidemiology
The American Academy of Pediatrics (Flaherty & MacMillan, 2013) reports an estimated incidence of approximately from 0.5 to 2.0 per 100,000 children younger than 16 years. However, this form of abuse and neglect is significantly underrecognized and underreported. Therefore, these estimates likely underrepresent the actual extent of this abuse. Bass and Glaser (2014) identified published cases from 24 countries, indicating that this form of abuse and neglect spans the globe.

### Methods by Which Conditions May Be Intentionally Falsified or Induced
Falsification of illness may take many forms and may occur along a broad spectrum of severity. See Table 1 for examples. Falsification always includes a caregiver giving or producing false information or withholding information in order to deceive. The abuser may also exaggerate symptoms, simulate symptoms, and withhold medications, nutrition, or treatments to exacerbate symptoms or induce illness. Abusers may coach others, even very young victims, to collaborate with them or corroborate false claims. Corroborating parties may or may not be aware of the fabrications. Due to the persistent and often escalating nature of this form of abuse and neglect, even seemingly mild presentations that are solely based on false reports of symptoms have the potential to lead to death. Additionally, the abuse and neglect typically extends far beyond the clinical setting. Abusers typically maintain the false story and behave accordingly in all settings and with all friends, family, and professionals. Nevertheless, it is clear from reports of abusers and hidden video surveillance that the deceptions are conscious and often carefully planned, and that efforts are exerted to conceal the deception. Thus, this form of abuse is pervasive and typically includes emotional abuse and neglect.

**Table 1. Types of Falsification.**

| Type of Falsification | Examples |
|---|---|
| Producing false information | Providing false information about current symptoms and limitations in the child; the child's medical or other history; and prior findings, recommendations, or treatments. Examples include saying a child has seizures when there are none and providing altered diagnostic medical documentation. |
| Withholding information | Failing to provide pertinent information that would help to explain the child's presentation. An example is not informing the clinician that the child is vomiting due to poison that was just administered. |
| Exaggeration | Providing clinical information that is based on a genuine symptom of limitation, but is enhanced in order for the child to be seen as more severely ill or impaired than is true. An example is reporting more frequent or treatment-resistant seizures than truly exist. |
| Simulation | Altering biological specimens or medical test procedures to yield abnormal results. Examples include presenting contaminated urine samples, placing one's own blood in child's stool sample, or interfering with a diagnostic test to produce abnormal results. |
| Neglect | Withholding medications, nutrition, or treatments to exacerbate symptoms. An example is failing to administer seizure medication as prescribed. |
| Induction | Directly creating symptoms or impairments. Examples include poisoning, suffocating, starving, and infecting. |
| Coaching | Manipulating another to answer questions by clinicians and others in a manner that substantiates the false claims of the abuser. Adults and very young victims can be effectively coached to (knowingly or unknowingly) collaborate with the abuser and corroborate the false claims of the abuser. Examples are spouses who repeat what the abuser has told them to be true as if it were fact or a child victim who is *reminded* to report specific symptoms to the clinician. |

Varying patterns of abuse and neglect have been identified. Some individuals with FDIA target all children in their care and others serially focus on the youngest child, the most challenging child, the children with genuine underlying medical problems, or the children with whom they have disrupted attachments. Intergenerational abuse and neglect has been identified. There may be periods of time in which no abuse occurs for some time but then restarts.

Any medical condition can be created, falsified, or exaggerated (Levin & Sheridan, 1995). However, this form of abuse is not confined to medical conditions. Falsified symptoms may also be behavioral or psychiatric (e.g., falsely reporting the child is harming himself or others, or falsely reporting symptoms consistent with a mental illness or disability) (Schreier, 1997) or educational (e.g., falsely reporting learning disabilities, attention deficit disorders, or autism) (Ayoub et al., 2002; Frye & Feldman, 2012). Common medical conditions that are falsified or induced include the following: allergies, asthma, apnea, gastrointestinal problems, failure to thrive, fevers, infections, and seizures (Roesler & Jenny, 2009; Rosenberg, 1987; Sheridan, 2003). Clinicians and forensic experts have observed an increase in frequency of false reports of

autism and mitochondrial disorders in recent years. Finally, classical forms of child abuse and neglect may occur co-morbidly or may also be volitionally falsified (Schreier, 1996). All reports of suspected abuse or neglect of any type should be evaluated by adapting the best available assessment practices with the cautions outlined in these guidelines, especially the need to rely upon objective data and to consider ways in which the signs and symptoms of abuse and neglect could be simulated or induced. If it is determined that false abuse and neglect allegations are the result of an abuser attempting to meet his or her own psychological needs, this would also meet criteria for FDIA.

### Risk and Harm

Victims may be directly harmed by the abuser's induction behaviors, frequently undergo unnecessary and invasive evaluations and interventions, be kept out of appropriate school settings, miss social and developmental opportunities, and misperceive themselves to be excessively ill or disabled. Iatrogenic medical conditions may arise from unnecessary interventions, and the child may become ill or permanently physically or mentally harmed as a result of well-intended diagnostic and treatment efforts.

Permanent physical harm that has resulted from APCF, CFIC, or MCA child abuse and neglect includes blindness, altered gut function, brain damage, hearing loss, scarring, removal of organs, surgical alteration of anatomy, limps, and other sequela, including death. Children who survive this form of abuse and neglect are often left with severe psychological damage and significant confusion about their health and relationships. Psychological harm varies, but may include overly compliant or aggressive behavior, adoption of self-falsification or somatizing behaviors, loss of a positive self-image, posttraumatic stress disorder, and disordered eating. This form of abuse and neglect can permeate every aspect of the victim's life. Occasionally, children and teens may be aware of the abuse, but do not inform others of what is happening to them. More frequently, they vigorously defend the abuser and do not grasp what has happened to themselves. Thus, it can take a significant amount of time for specialized and comprehensive intervention to yield positive outcomes.

Family members, friends, professionals, and community members may also be affected by long-term emotional concerns for the child they believe to be ill and by revelation of the truth.

### Etiology

Based upon cases in which intent has been revealed or determined, APCF, CFIC, or MCA child abuse and neglect occurs when abusers' psychological needs take precedence over the needs of the child, paving the way for them to harm the child in order to have those needs met. Needs cited by those who have admitted to this behavior have included the need to receive care and attention; to be perceived as smart, caring, selfless, or in control; to manipulate and humiliate a powerful figure; to manipulate a spouse; or, for the excitement of being in a medical setting. Some who have admitted to this behavior consider addiction to a substance to be an appropriate analogy to describe their persistence and single-mindedness in engaging in falsification behavior. Those who engage in this behavior often report a personal history of childhood abuse or domestic violence; however, when possible to verify this, these reports frequently turn out to be false. They may falsify or induce symptoms in themselves, and may themselves be victims of APCF, CFIC, or MCA.

7

**Abuser Psychopathology**

Individuals with FDIA are predominantly female and have typically been found to have a coexisting personality disorder, usually cluster B disorders (i.e., borderline, histrionic, sociopathic, or mixed) (Bass & Jones, 2011). Bools, Neale, and Meadow (1994) found that of 47 mothers who had induced illness in their children, 72% had personal histories of a somatic symptom disorder or factitious disorder imposed on self. Twenty-one percent had a history of substance misuse, 55% had histories of self-destructive behaviors, and 89% had a personality disorder. They discovered that five of the 19 women they interviewed (26%) had histories of learning problems. Some abusers have no obvious or diagnosable personality disorder, or the presence of a personality disorder may not be known due to insufficient data.

### Approaches to Identifying APCF, CFIC, and MCA

Clinicians should consider the possibility of APCF, CFIC, or MCA in children with highly unusual clinical presentations, when clinical findings are unexpectedly inconsistent with the reports of the caregiver, or when a child's response to standard treatments is surprising. The cornerstone of determining if APCF, CFIC, or MCA is present is identifying unexplained discrepancies, deception, induction, or intentional neglect by the caregiver who created the clinician's misperceptions regarding the true functional and symptom status of the victim.

One major misconception among clinicians is the idea that underlying medical or other disorders that could account for the signs or reported symptoms need to be ruled out  for a conclusion of APCF, CFIC, OR MCA to be made. In fact, children with genuine underlying medical, psychological, or developmental problems are often the targets of this form of abuse and neglect. Some abusers of genuinely ill or impaired children recognize that their own psychological needs are being met by continuing engagement with the medical, mental health, or educational professionals who are treating their children, thus sparking the abuser's desire to keep these rewarding relationships in place.

Some abusers are attracted to diagnoses that encapsulate a large array of possible symptoms, perhaps to evade detection. An example is a parent who falsely attributes a wide variety of symptoms or behaviors to a nonexistent or equivocal mitochondrial disorder. As is true with any genuine illness, if the child has a mitochondrial disorder (or other genetic disorder) and the parent is exaggerating or falsifying symptoms so that it appears to be more severe than is true, this would also be considered abuse.

**Role of the Physician and Other Clinicians in Diagnostic Assessment**

Pediatricians and other primary care medical providers are a common point of contact for this type of abuse and neglect. Thus, it is important for primary care providers, as well as specialists and emergency room personnel, to include APCF, CFIC, or MCA in their differential diagnosis of children with complex, confusing, or multiorgan system disease. In mental health settings, the point of contact and evaluation may be a psychiatrist, psychologist, or other mental health specialist.

8

# APSAC Practice Guidelines

The history provided by a parent is commonly used to determine which tests to order, formulate a diagnosis, support school or other accommodations, and determine what treatments, procedures, medications, and surgeries to recommend. Healthcare providers are trained to rely on the truthfulness of the child's caregiver. Medical and other clinical training does not prepare pediatricians or specialists to doubt or question the history provided by a caregiver or patient, particularly when the caregiver appears dedicated, competent, and well versed in clinical terminology. Highly competent clinicians can be misled into providing unnecessary or harmful care to the child. Some abusers seek out clinicians who provide nonstandard or substandard care to further their goals.

Fragmented care among multiple providers facilitates deception. Ideally, primary care providers serve as gatekeepers of care, but often specialists cross refer without coordinating with the child's primary care provider. All primary care clinicians should be familiar with the warning signs in Table 1 and the recommendations in Table 2. The AAP (Stirling, J. & American Academy of Pediatrics Committee on Child Abuse and Neglect, 2007) recommends that pediatricians answer three questions in the consideration of reporting possible abuse:
1.   Are the history, signs, and symptoms credible?
2.   Is the child receiving unnecessary and harmful or potentially harmful medical care?
3.   If so, who is instigating the evaluations or treatments?

As in all forms of child abuse and neglect, the motivation of the parent may or may not be evident to the clinician. Regardless of motivation, if the child is receiving or is at risk of receiving unnecessary, harmful, or potentially harmful medical care at the insistence or instigation of a caregiver, the clinician should consider the need to report to the proper authorities (consulting with others, as needed).

## Warning Signs
1.   Reported symptoms or behaviors that are not congruent with observations. For example, the abuser says the child cannot eat, and yet the child is observed eating without the adverse symptoms reported by the abuser.
2.   Discrepancy between the abuser's reports of the child's medical history and the medical record.
3.   Extensive medical assessments do not identify a medical explanation for the child's reported problems.
4.   Unexplained worsening of symptoms or new symptoms that correlate with abuser's visitation or shortly thereafter.
5.   Laboratory findings that do not make medical sense, are clinically impossible or implausible, or identify chemicals, medications, or contaminants that should not be present. An example is a serum sodium level that is not clinically within reason.
6.   Symptoms resolve or improve when the child is separated and well protected from the influence and control of the abuser.
7.   Other individuals in the home or the caregiver have or have had unusual or unexplained illnesses or conditions.
8.   Animals in the home have unusual or unexplained illnesses or conditions—possibly similar to the child's presentation (e.g., seizure disorder).

9. Conditions or illnesses significantly improve or disappear in one child and then appear in another child, such as when another child is born and the new child begins to have similar or other unexplained symptoms.
10. Caregiver is reluctant to provide medical records, claims that past records are not available, or refuses to allow medical providers to discuss care with previous medical providers.
11. The abuser reports that the other parent is not involved, does not want to be involved, and is not reachable.
12. A parent, child, or other family member expresses concern about possible falsification or high-healthcare utilization.
13. Observations of clear falsification or induction by the caregiver. This may take the form of false recounting of past medical recommendations, test or exam results, conditions, or diagnoses.

**General Clinical Approach**

Some abusers have an uncanny ability to portray themselves as, and persuade others that they are, caring and good caregivers (Schreier, 2002; Schreier & Libow, 1993). Some become social hubs for caregivers of other chronically ill children in the hospital or in their community. Some attempt to establish personal relationships with the professionals supporting them, sometimes successfully luring clinicians or other professionals (including legal professionals) to cross important role boundaries. Further, doctors, therapists, social workers, friends, family, victims, lawyers, and judges are routinely successfully misled to believe the false claims and denials of the abuser. Some abusers are adept at enlisting professionals to serve as their advocates. Such professionals may strongly oppose colleagues and data suggesting that the suspected abuser is the agent of harm to the child. Such staff splitting is typical and underscores the need for an objective analysis of the data and clear guidelines for contacting Child Protection Teams.

Healthcare providers, including mental health experts, do no better than the general public in determining through an interview whether someone is lying. Because it is not possible to detect deception by clinical interview (ten Brinke, Stimson, & Carney, 2014), the value of traditional mental health assessment and evaluation techniques is limited. Table 2 summarizes evaluation and treatment recommendations for clinicians caring for a suspected victim.

**Table 2. Evaluation and Treatment.**

| Recommendations for Clinicians Caring for a Suspected Victim |
|---|
| 1. Gather all medical records from past and present treating professionals (see procedure to analyzing caregiver behavior documented in the records in Tables 3 and 4). |
| 2. Make contact and regularly communicate with <u>both</u> parents (all caregivers). |
|    a. Provide all caregivers with ongoing education and feedback about findings and recommendations. |
|    b. Ask all caregivers to repeat back the information provided to them. |
|    c. Carefully document all education and other discussions with the caregivers. |
| 3. Collect collateral data from school personnel and other independent observers who have regular access to the child. |
| 4. Review suspected abuser's online social media activity. |
| 5. Carefully devise evaluation and rehabilitation plans that systematically and objectively |

challenge claims made by the suspected abuser or victim.

    a.  All descriptions of symptoms and disability made by family members must be considered possibly inaccurate. For example, in suspected victims, g-tubes and other non-oral feeding interventions should not be placed based solely on verbal reports of symptoms. Objective inpatient observations by clinicians of feeding attempts provide important data for clinical decision making.

    b.  Family members cannot be relied upon to properly prepare the child for diagnostic assessments or treatments. For example,

        i.  Consider performing a toxicology screen prior to manometry testing to ensure no gut-altering substances have been ingested.

        ii.  Consider having a sitter in the room for a pH probe test to ensure that the child is provided only the prescribed oral intake and to ensure the probe position is not changed.

6.  Meet with the other clinicians involved in the care of the child to compare data and coordinate plans.

7.  Alert other clinicians (verbally and in the chart) about the poor reliability of symptom reports or behavior of the suspected abuser, the importance of relying upon objective data, to proceed conservatively, and the need to document well.

8.  Minimize school accommodations, prescriptions, and invasive testing and treatments.

9.  While devising evaluation and rehabilitation plans, consultation with an expert is recommended.

10. Report reasonable suspicion of child abuse and neglect to the proper authorities.

Hospital protocols have been published to provide guidance for assessment and management (Parnell & Day, 1998; Sanders, 1999). Optimally, a Board Certified Child Abuse Pediatrician or another professional with APCF, CFIC, or MCA expertise would be involved in all assessments.

## Clinical Documentation

Careful documentation is as important as a careful evaluation. Details can be extremely helpful to those conducting a medical or educational record analysis, including information such as,

1.  Who reported that they witnessed the child with symptoms or impaired functioning (and if they saw the symptoms or impaired functioning at the onset),

2.  The names of past clinicians who made diagnoses of the child,

3.  Exactly what education or clinical instruction has been provided to the caregiver and that caregiver's ability to understand the education or clinical instructions using the teach-back method,

4.  Episodes of nonadherence or leaving (or threatening to leave) the hospital against medical advice,

5.  Requests by the caregiver for specific assessments or interventions,

6.  Episodes of unexplained equipment malfunctions or suspected tampering, and

7.  Other concerning behaviors.

For example, documenting "emesis x3" does not reflect if someone informed the clinician that the child had vomited three times, if the clinician saw the emesis, if the clinician saw the child vomit, or the amount or appearance of the emesis. The documentation is far more helpful when attention is paid to including these details in the medical record. All involved professionals

should be reminded of the importance of carefully documenting all pertinent details in the chart related to each interaction with the patient, suspected abuser, and other caregivers.

## Record Analysis

Analysis using the available records is the cornerstone of evaluation of this form of abuse and neglect. While clinicians often review records as a standard part of providing care, analyzing the records for behavioral evidence of falsification allows for a broader assessment of the child and suspected abuser. Additionally, a medical record analysis sometimes provides information that reduces the suspicion of abuse or neglect. A task that is typically not covered by health insurance, record analysis often falls to forensic experts who are hired after an initial report of suspected abuse or neglect has been made.

To maximize the validity of the record analysis, all medical records of each child should be obtained whenever possible. When feasible, such as in some legal settings, the medical records of the alleged abuser(s) are also useful to obtain due to the high co-morbidity of falsification upon self and others. It is helpful to analyze the records of all the children in the household because evidence of falsification of illness in siblings may be present even if not initially identified (Bools, Neale, & Meadow, 1992). Any clinician, regardless of discipline or degree, with expertise in the evaluation of this form of abusive and neglectful behavior may analyze the records to evaluate behavior patterns. A comprehensive description of the medical record analysis is described in Sanders and Bursch (2002).

The gold standard medical record analysis requires the creation of a chronological table of nearly every telephone call, office appointment, emergency room visit, pharmacy record, and hospitalization. Missed appointments and hospital discharges against medical advice (as well as threats to leave against medical advice) are also important to include in the table. The table will reveal patterns of healthcare utilization, including the number of healthcare facilities and specialty services involved in the family's care. Columns to include in the table are as follows: Date, name of patient, who brought child in for care, healthcare contact information (location, name and specialty of clinician), history and problems reported by the caregiver, objective data (clinical observations and test results), diagnosis, recommendations, and other important or historical data. Table 3 gives an example. This table can be used as a reference for evaluators and legal professionals, especially if it is in an electronic format that allows for quick searching.

## Table 3. Chronological Table of Patient Health Care.

| Date | Patient/ BIB | Health Care Contact | Subjective Caregiver Reports | Objective Findings | Diagnosis/ Recommendations | Other |
|------|------|------|------|------|------|------|
| 9/17/17 | Alexis<br><br>BIB<br>mom | Dr. Lee, Emergency Medicine, Memorial Hospital ER | Hx of constipation since birth. Followed by GI who advised her to go to ER. Reports 6 days of projectile emesis and food refusal. | NAD. Labs & vitals WNL. Exam benign except for mild diaper rash. KUB WNL. Eagerly took 4 oz. of formula from bottle. No emesis in ER. | *Diaper rash* – Advised mom to keep baby's skin clean and dry. Hydrocortisone cream prescribed. *AGE suspected* – Provided IVF and return if sxs persist. | Mom accurately summarized all guidance and agreed to plan. However, she did not remember the name of GI doctor. |

Unlike a simple review of records, a chronological table allows for pattern analysis of the individual family members and the involved clinicians. A thorough, carefully organized table lends itself to complete analysis of the family's illness and medical treatment trajectories as well as the behavior of family members during medical care encounters. It also allows the evaluator to crosscheck information presented by the patient or suspected abuser about past healthcare encounters and medical problems against the objective data. Table 4 presents key points related to conducting a record analysis.

**Table 4. Key Points: Record Analysis.**

| Key Point | Example |
|---|---|
| Identify and consider the source of the documented information. | Did the documenting clinician actually witness the child vomiting? |
| Determine if suspected abuser should reasonably have had accurate information. | • Was the caregiver provided with adequate education, feedback, and recommendations?<br>• Is there evidence that the caregiver understood the information provided to him or her? |
| Examine primary data and check norms utilized for interpretation. | Review test results, not just the interpretation of test results. |
| Determine if diagnoses or conclusions match objective data. | Was the diagnosis based on the verbal report of the caregiver or was it based on objective data? |
| Determine if objective findings could have been falsified or induced. | In a child victim found to have slowed motility, consider assessing for external agents or dietary manipulations that might have caused that finding. |
| Determine if the illness history makes sense. | • Are there genetic explanations for several children in the same family having similar problems or diagnoses?<br>• Is there a way that a child can be allergic to water? |
| Compare timelines of healthcare-seeking behavior with other records and collateral data. | Identify circumstances and stressors that coincide with healthcare crises. |
| Review available literature. | • Differentiating sudden infant death syndrome from suffocation (Meadow, 1990; Southall & Samuels, 1995),<br>• Identifying falsified chronic intestinal pseudo-obstruction (Hyman, Bursch, Beck, DiLorenzo, & Zeltzer, 2002),<br>• Detecting failure to thrive due to illness falsification (Mash, Frazier, Nowacki, Worley, & Goldfarb, 2011). |

### Video Surveillance

Video recordings of illness induction, whether hidden (covert) or through visible video cameras (overt), can provide compelling direct evidence to judges, juries, and to the family and the abuser. Some abusers have confessed, or been more willing to explore their behavior, after viewing such recordings. Based on the existing laws in the United States, including the Fourth Amendment right to privacy, video surveillance of the child in the hospital room may be permissible for (1) protection of the child patient, (2) assistance in diagnostic evaluations and treatment, much as the way cardiopulmonary monitors are routinely used to monitor inpatients, or (3) protection of the facility and employees from allegations of negligence. Video surveillance is best used to document caregiver attempts at illness induction (e.g., suffocation) or simulation (e.g., tampering with equipment or interfering with tests), or to document the absence of falsely reported symptoms (e.g., apnea, seizures).

Some recommend that video surveillance be reserved for situations in which the child cannot be otherwise properly assessed and protected. It can be a helpful tool if there is a reasonable expectation that, within a reasonable observation period of time, the caregiver will be found to induce (e.g., suffocate or attempt to contaminate IV fluid) or falsely report transient events (e.g., apnea or seizures) for which video surveillance could disprove the caregiver's reports. If it is used to identify induction, continuous monitoring is strongly recommended to allow staff to immediately intervene if the child is being harmed. Video monitoring might also provide information that would help confirm or explain the symptoms, indicating they had not been falsified by a caregiver (Hall, Eubanks, Meyyazhagan, Kenney, & Johnson, 2000; Southall, 1995; Yorker 1995).

If the surveillance is covert, the most legally robust procedure is to obtain a court-ordered warrant prior to starting such surveillance. The petition for the warrant should specify what area will be searched (viewed) and what possible evidence may be found. However, case law exists to suggest that a hospital room is not a place that offers a constitutionally protected reasonable expectation of privacy. On the contrary, parents may expect their child to be monitored and observed, particularly in pediatric settings when infants are at risk of or being evaluated for apnea (Yorker, 1995) or other life-threatening conditions. It is recommended that hospitals add a sentence to the consent for treatment form that parents sign upon admission to a hospital that acknowledges the possibility of video surveillance in any public space in the hospital (Yorker, 1995). State laws may vary depending on whether the hospital is private or public. To provide as much privacy as possible, it is recommended that the camera be focused on the child's bed. Audio can also be helpful, such as to capture coaching behavior or a child arguing with the parent about a symptom or the need for an intervention. However, audio recording can represent an additional invasion of privacy that is not necessary in other situations, such as when suffocation of an infant is suspected. State laws vary related to consent for audio recording.

While video surveillance may be useful, congruent with other forms of child abuse and neglect, it is not necessary to make a determination of APCF, CIFC, or MCA. Because video surveillance evidence can be misleading or may not be admitted into evidence, clinicians are encouraged to collect and provide additional corroborating data to child protective and police investigators, if safe and feasible. For instances in which the diagnosis is clear, video surveillance may be

counterproductive by exposing the child to an unnecessary risk by prolonging the evaluation phase when immediate protection is needed.

## Separation From the Abuser

Although fraught with clinical, legal, and ethical concerns, separating the child from the suspected abuser is often the only way to objectively evaluate the wellbeing of the child. Clinicians can consider utilizing an escalating approach to achieve separation. A suspected abuser may first be asked to voluntarily refrain from caregiving duties or from visiting the child in the hospital for a period of time. In some situations, an alternate parent or caregiver who does not live in the home may be willing to temporarily care of the child. If a suspected abuser directly asks if he or she is being suspected of illness falsification, an honest answer is typically recommended, pending consideration of safety issues related to sharing this information (for the child, the suspected abuser, and the evaluator). One can highlight that evaluators who assess for this diagnosis if warning signs are present are providing high-quality and comprehensive care. Further, it may be helpful to inform the suspected abuser that the goal of the evaluation is to help the family regardless of the identified cause, including if it is determined to be a case of child abuse or neglect. Some locations allow for hospital personnel to impose strict visitation or caregiving boundaries on caregivers or to place clinical observers in the hospital room. However, court orders are sometimes required to achieve a diagnostic separation. If the clinical evaluation indicates that the child has been or is at risk for harm, such separations may be lengthy or permanent.

If the child's condition or functioning improves when sufficiently protected from the influence of the suspected abuser (at the same time that the child is receiving support for normal or improved functioning), many courts will use the concept of *res ipsa loquitur*, which translated from Latin means "the thing speaks for itself," to consider the improved condition or functioning to be compelling circumstantial evidence of APCF, CFIC, or MCA. As with video surveillance, however, separation should not be the only component of the evaluation.

Well-implemented diagnostic separations require several safeguards and caveats. First, the separation must be for a sufficient length of time to be valid. For example, if the child with reports of uncontrolled epilepsy for several years normally has a grand mal seizure once a week and the longest reported time between seizures is one month, then the separation would need to be inclusive of these timelines. Additionally, the strength of the conclusion of seizure falsification would depend on how long the child is objectively observed.

Second, all tests must be done with the utmost of care and fairness to the suspected caregiver(s) and child. Unmitigated symptoms following separation from the suspected abuser are an indicator that a child's symptoms may be genuine. However, it is important to be mindful that APCF, CFIC, or MCA victims with pre-existing medical conditions may only have some of their problems resolved or may only experience a change in the level of severity of symptoms after separation. In some cases, a victim may have iatrogenic illnesses or conditions due to having received unnecessary treatment in the past. Such iatrogenic problems may or may not resolve following separation.

15

Third, care and vigilance are needed to ensure that the victim is fully protected during the separation. Abusers may surreptitiously poison, intimidate, or coach a child victim, thus perpetuating illness or impairment during separation. They may try to gain access and influence the child by convincing the visit monitor or foster parent that they are not a threat to the child. Please see the recommended visitation guidelines.

Fourth, evaluators must be mindful of how changes in treatment around the time of separation can influence a child's symptoms. If treatments are changed right before or after the child is placed in protective care, the change in treatment might account for the change in symptoms. Related, improvements in symptoms or functioning can be incorrectly attributed to treatment changes made at the time the child is taken into protective care. Thus, it is helpful to be thoughtful about how to systematically implement changes in the treatment plan for optimal clarity regarding cause and effect. For example, one would not expect seizures to stop because an antiepileptic medication was stopped. If a child had a genuine seizure disorder, one would expect an increase in seizures in this situation. However, one might not be surprised if that same child reported being less sleepy at school once the medication was stopped.

Finally, if a history of symptom or impairment induction by poisoning is suspected, it is helpful to have an assessment plan in place so that all visit monitors and foster parents know what to do if there is an occurrence of acute symptoms during or within hours of a visit. The plan may require bringing the child to a medical setting or submitting a biological sample to a laboratory for analysis, in which case it will also be important to have clear chain of evidence protocols in place. Toxicology experts can be invaluable in developing toxicology screening plans based on symptom presentations and in considering cross-reactivity that could cause false positives (Holstege & Dobmeier, 2006). Lastly, it is a good idea to ensure the lab preserves serum from any blood draws so that confirmatory or additional tests may be performed, if needed.

### Example of Differential Diagnosis of APCIF, CFIC, and MCA
Consider the example of a parent who persistently interprets or reports a child's movements to be seizures despite repeatedly normal medical evaluations and feedback. If such a parent persists in exposing the child to unneeded evaluations and treatments, and persistently requests unneeded school accommodations, this may be abusive and require a mandated report to CPS, regardless of the parent's motivation or psychopathology.

Because the child in the example above received unnecessary and harmful, or potentially harmful, medical care at the instigation of a caregiver, the MCA term applies to the situation (Roesler & Jenny, 2009). If deception is apparent, the APCF and CFIC terms also apply (Ayoub et al., 2002, 2004; Flaherty & MacMillan, 2013).

If the parent is reporting that an EEG showed, or that a physician diagnosed the child with, epilepsy when it is known by the parent that this is not true, this deceptive behavior may reflect malingering (if external, or secondary, gain is the primary motivation) or be due to FDIA (if internal, or primary, gain is the driving motivation).

If the child is having seizures due to smothering by the parent, this child abuse could be due to malingering, FDIA, or physical abuse (e.g., a parent attempting to stifle a crying child).

16

## APSAC Practice Guidelines

If the child has a seizure disorder that the parent is knowingly undertreating or significantly exaggerating for the parent's primary gain (psychological reasons), this would satisfy the criteria for FDIA. If the same parent were engaged in this neglectful behavior for external gain, the parent would be considered to be malingering. Regardless of the reason for the behavior, it would also constitute medical neglect.

If the parent has an inaccurate belief (without the presence of deception) related to reports of seizure activity, the resulting abuse by overmedicalization might be due to a delusional disorder or anxiety in the parent. This behavior would be considered MCA. Delusional disorders typically can be distinguished from FDIA and malingering by the lack of deception and by the morbid (and less feasible) nature of the symptom description (e.g., a delusional person might report that seizures are being caused by a melting brain or by a nonexistent parasite infestation, but no previous clinician has believed them).

The above scenario could also be enacted in a mental health setting with a parent falsely claiming his or her child suffers from psychogenic nonepileptic seizures. While not meeting the definition of MCA if medical intervention is not being sought, this scenario would meet the definition for APCF.

Regardless of the scenario, any clinician who suspects an individual is being harmed by abuse or neglect is legally required to report reasonable suspicions to Child Protective Services (CPS) or police in order to protect the suspected victim.

### Approaches to Psychiatric Evaluation of Alleged Abuser

Evaluation of the psychopathology of the suspected abuser generally occurs after the suspicion of abuse or neglect has been reported to child protection agencies. Because caregivers are not registered patients when they are in clinical settings for their children and because they rarely admit to any wrongdoing, mental health clinicians embedded in pediatric clinical settings are generally not able to evaluate if the caregiver meets criteria for FDIA or a related disorder. It typically requires the mandate of a court to obtain cooperation to participate in a psychiatric or psychological assessment.

Mental health professionals are as vulnerable as any other professionals to being misled by a factitious disordered individual, so it is important that any such evaluators have expertise on this topic or have access to consultants who can guide them.

Clinical interviews and psychological testing cannot be used as evidence that abuse or neglect did not occur. In fact, as in all forms of child abuse and neglect, an abuser may appear completely normal upon testing or interview. While the record analysis and other collateral information generally allow one to determine if illness or condition falsification or overmedicalization has occurred, the mental health evaluation allows for the formulation and evaluation of hypotheses about the driving causes of the caregiver's behavior. For example, if the suspected abuser demonstrates clear signs of extreme anxiety or of a psychotic thought process, this information might explain why they engaged in the abusive behavior. Diagnostic clarity and

17

consideration of possible motivations allow the evaluator to opine about the likelihood that treatment will be successful and to provide appropriate treatment recommendations, including specific modalities for an abuser with identified psychiatric co-morbidity. A protocol for performing these evaluations is described in Sanders and Bursch (2002).

## Reporting Requirements and CPS and Police Investigations

### Medical, Mental Health, and Education Professionals

Many mandated reporters want to be sure the caregiver is volitionally falsifying prior to reporting possible child abuse or neglect. Such caution may lead to substantial delays in protecting victims, particularly in cases in which the suspected abuser thwarts efforts to challenge medical claims or refuses to provide access to collateral sources of information (such as records, past providers, or the other parent). In such cases, CPS can assist clinicians in conducting proper evaluations. Referral to CPS is based on child harm, not the motivation of the suspected abuser.

Most states require providers to report to CPS or police if they suspect or have reasonable cause to believe a child is a victim of abuse or neglect, and if they are reporting suspected abuse in good faith. If a mandated reporter writes in the chart, *suspected Munchausen by proxy*, that reporter is charting that this is a case of suspected child abuse or neglect. As with any form of abuse or neglect, a CPS report is indicated unless the mandated reporter adequately ruled out MBP (or APCF, CFIC, or MCA) and documented how it was ruled out. Unreported suspicions of abuse or neglect can result in criminal or civil penalties for the mandated reporter. Although a clear conclusion of APCF, CFIC, or MCA is not required for the suspicion to be reported, inclusion in the CPS report of any of supporting data is extremely helpful to child abuse authorities who may not have the expertise to conduct such an evaluation.

### Family Meeting and Informing Conference

When it becomes apparent that a child is not as ill or impaired as the caregiver reports, the treatment team may need to hold a meeting to inform the parents of the diagnostic findings and treatment recommendations. It is extremely important that both parents obtain this information. The team should decide on a case-by-case basis how best to inform both parents as one parent may not be aware of the overmedicalization of the child due to the behavior of the other parent. In this family meeting, conclusions that the child is not as sick or impaired as reported are presented along with recommendations to remove unneeded treatments and interventions and to use a rehabilitation model to treat the child. The offending caregiver's response to this information and subsequent compliance with withdrawing treatments may reveal how amenable the parent is to intervention. However, in all cases of APCF, CFIC, or MCA, a protective services referral will be necessary to ensure the suspected abuser does not sabotage treatment. Furthermore, the literature documents cases of maternal suicide, psychiatric decompensation, suicide attempts, flight, or child abduction upon being presented with evidence that the child is healthier than presented, or of illness fabrication, exaggeration or medical child abuse (Vennemann et al., 2006; Yorker & Kahan, 1991). Whenever the diagnostic or other potentially stressful update meetings occur, a safety plan should be in place and psychological support available.

18

In some cases, the information may not rise to the reasonable cause to believe reporting threshold, but be concerning enough to alert hospital colleagues (verbally or within the medical record) to document any conflicting data or statements and to be circumspect in their efforts to evaluate and treat the child, with an emphasis on using objective findings for diagnosis and treatment.

**Child Protection Services (CPS)**
Some jurisdictions have created CPS protocols and guidance to support caseworkers and supervisors (Arizona Department of Child Safety, 2012; Michigan Governor's Task Force, 2013). However, most CPS professionals have not been trained to understand and investigate this form of child abuse and neglect. Even if they are, this is a very labor-intensive and specialized form of abuse and neglect to investigate. As previously mentioned, it is recommended that the mandated reporter help the CPS agency understand exactly what and why they are reporting. For example, medical neglect might be reported for a parent who is not properly administering medications in order to cause increased seizures. CPS might incorrectly close the case because the child has frequent contact with medical clinics, not appreciating the risks related to the medication noncompliance. It is recommended that the mandated reporter make it very clear what types of abusive behaviors are being reported along with the observed or suspected harm to the child. If a child has a genuine seizure disorder, failure to administer prescribed medications is hazardous and negligent. Additionally, the child may be exposed to excessive amounts of medical intervention (such as escalating doses of anti-seizure medication), may be missing out on school and social events, and may be repeatedly informed that he or she has an unstable or dangerous medical or mental problem, thus harming the child's self-perception. Overall, then, the CPS report might include concerns about medical abuse, emotional abuse, and medical, educational, and social neglect.

CPS will likely need outside resources to adequately evaluate these cases. As described before, all medical records should be obtained for the index child as well as other children, alive or dead. If possible, it is recommended that the medical records of the caregivers also be obtained. Once all of the records are obtained directly from the treating facilities (not records provided by the suspected abuser or another family member), a professional with expertise in assessing suspected APCF, CFIC, or MCA should organize and analyze them. It is *not* sufficient to have a clinician with general medical knowledge read the record. The primary goal is to systematically analyze the behavior patterns of the suspected abuser to detect deception and signs of illness induction. School and other records may also be very helpful, if available. Some states give CPS legal access to all the child's records once a report is filed. This can be utilized to obtain records when the parent refuses access to them.

It is recommended that at least one CPS worker in each county be trained in this form of abuse and neglect. The CPS worker should be able to take the lead in any reports of this type of abuse and have expert consultation available as needed.

In some jurisdictions, CPS must notify the suspected abuser that he or she is the subject of a child abuse investigation—often within several days of the initiation of the case. This notification can jeopardize the investigation and put the child at risk if the child is not taken into protective custody at the same time. It is recommended that, in locations in which such

19

notification procedures are mandated, a protocol be established about how to safely handle such cases. Bursch (2018) provides additional CPS guidance.

## Police and Legal Investigations

Many states require cross-reporting, and it is recommended that police be notified along with CPS when abuse or neglect is first reported. Depending on the nature of the abuse, there could be physical evidence present in the victim's hospital room or other locations that police will need to collect. It may not become clear until later in the investigation that induction of symptoms occurred. Police access to a possible crime scene at the time of the report is important to an effective law enforcement investigation. Police may immediately attempt to locate and preserve all social media accounts, blogs, or any other electronic writing activity by the suspected abuser. If involved, police should coordinate closely in a multidisciplinary manner with Child Protection Services, medical personnel, and prosecutors to ensure all facets of the investigation are covered. Finding and preserving the social media accounts of the suspected abuser *before* the first CPS interview is very important, as the suspected abuser may delete his or her social media accounts once the nature of the allegation is apparent.

Police and CPS should coordinate obtaining all medical records for the victim. Police should also attempt to locate cooperative witnesses outside the medical community that knew the victim and abuser. Police need to obtain, by consent or search warrant, all electronic communication (text messages, emails) between these witnesses and the abuser if these witnesses state that the abuser communicated electronically about the health of the victim. Consideration should be given to including all text messages, emails, and social media posts into the medical record spreadsheet, sorted by date (Brown, Gonzalez, Wiester, Kelly, & Feldman, 2014; Feldman & Brown, 2002; Sanders & Bursch, 2002) as part of the behavior analysis. This document can also be used as a reference for prosecutors and others, especially if in an electronic format that allows for quick searching.

The police investigator should also be prepared to obtain and execute search warrants for the suspected abuser's computing devices, including smart phones, if probable cause can be established. Probable cause may be established with a combination of friends reporting the abuser researching medical ailments, toxic substance or other incriminating topics on the computer that were subsequently presented to clinicians (documented in the medical records or reported by a clinician), or by the existence of a false or exaggerated medical history in the social media records.

The police investigator should attempt to interview the suspected abuser. All interviews should be recorded (both video and audio if possible). The timing of this interview is case specific. In cases of suspected illness induction, it should be delayed until the child is safe. The investigator should approach the suspected abuser in an open, curious manner. This stance will allow the alleged abuser to simply give his or her story. If the story does not fit the evidence, these data then allow the investigator to review the discrepancies with the alleged abuser. Review of discrepancies with the abuser may result in an admission. Although they frequently maintain a stance of denial, those with FDIA are typically legally competent and aware of their deceptive actions.

20

# APSAC Practice Guidelines

Investigators should confirm every detail reported by the suspected abuser. This includes details not related to the abuse. For instance, if the suspected abuser reports attending nursing school, investigators should subpoena the suspected abuser's transcript from that school. Investigators should also obtain the suspected abuser's own medical history and medical records as there is the possibility that the suspected abuser has also feigned his or her own illness.

Coordination and cooperation among law enforcement, Child Protective Services, clinicians, and the prosecutor's office are essential for a successful criminal prosecution (Weber, 2014).

## Case Management and Treatment

Case management of MBP cases can be extremely challenging and resource depleting due to the severe and insidious nature of the associated psychopathology. Thus, it is extremely important that case managers and all treating clinicians have ongoing access to medical and mental health MBP experts for appropriate consultation and guidance. This expert input is particularly valuable when important decisions are being made, such as decisions related to placement, reunification, visitation guidelines, and treatment and rehabilitation plans.

### Child Protection and Placement

Following an allegation of abuse or neglect, the first priority is the protection of the child from further harm. Siblings may also be at risk. Research has suggested that 35%-50% of siblings are abused (sometimes fatally) prior to the identification of MBP abuse in the index child (Davis et al., 1998; Grey & Bentovim, 1996). As with other forms of child abuse and neglect, even typically developing and verbal teens may not be able to protect themselves or even be aware that they have been the targets of MBP abuse or neglect.

If children are removed from a suspected abuser, placement decisions must be made very carefully. Per usual CPS protocol, child abuse victims are frequently placed with a nonabusing parent (in the case of divorced families) or extended family members (e.g., grandparents). In cases of suspected MBP, this placement choice can be insufficient to adequately protect the children. Placement with relatives of family friends should be done *only* if such individuals acknowledge the abusive behaviors, agree to protect the children, and have the ability to protect them. It is important to remember that parents or other relatives of the suspected abuser may be at increased risk to abuse or neglect the children as this behavior is sometimes multigenerational. The victim's parent may have previously been similarly abused or neglected by the child's grandparent (Libow, 2002). Since one possible motivation for illness falsification and healthcare utilization is to escape an abusive family member, this possibility will also need to be evaluated before placement with a family member. Further, the relentless pressure by those with FDIA to gain access to and control over the child victim can wear down even the most resilient or well-meaning and skilled caregivers. In most cases, a specialized assessment is needed to fully ascertain their willingness and ability to protect the children from an abusive caregiver. Most frequently, the children are best placed with foster parents who do not know or interact with the suspected abuser. Sometimes a medical foster home is indicated, as the child may have genuine medical needs or may need to be weaned from care under skilled medical observation.

21

Re-abuse (further falsification or other abuse or neglect) is a risk for children who have been deemed by CPS or the courts to be safe to return to the home of the abuser. Re-abuse rates have been found to range from 17% for mild cases of MBP to 50% for moderate cases (Bools, Neal, & Meadow, 1993; Davis et al., 1998). Reunification is often not possible in cases of severe MBP abuse or neglect.

### Reunification Services
In assessing the risk to the current or future children, factors regarding the original abusive acts as well as the alleged abuser response to the allegations are important safety variables to consider. The younger the child victim and the more severe and chronic the MBP abuse or neglect, the greater the possibility of future lethality. There is evidence that individuals with FDIA are very difficult to treat and a significant number of them have continued to abuse or neglect their children during and following treatment (McGuire & Feldman, 1989; Rosenberg, 1987). Treatment has been successful in rare cases, only when the abuser has been able to acknowledge his or her abusive behaviors and alter behaviors related to the child's health. The abuser must develop increased empathy for his or her victims, and learn and consistently use more effective coping skills (Berg & Jones, 1999; Roesler & Jenny, 2009; Sanders, 1996).

If the family is offered reunification services, a case plan must be put into place that provides safety as well as appropriate treatment. A treatment team consisting of child protection, foster care parents, physicians, visitation supervisors, and therapists must have open communication and should have access to all assessments that have taken place. The team must check the veracity of everything the caregiver says as ongoing deception is common and team members are frequently pit against each other by the deceptive abuser. The case plan should be court ordered and supervised. Voluntary services are insufficient. Simple compliance with these plans does not assure reunification. It is necessary for the caregiver to not only comply but also *benefit* from the interventions provided in order to truly provide a safe environment for his or her child(ren).

Caregivers should not be permitted to have telephone contact with the children or attend medical visits, except as supervised by either Child Protection or another team professional. Components of a comprehensive case plan appear in the following paragraphs.

### Supervised Visitation
Ideally, staff that is highly trained in child development and MBP should oversee supervised visitation. These cases are very difficult to safely supervise and typically require a higher level of supervision than is commonly provided to families. Ideally, this should be Therapeutic Supervised Visitation, which is provided by staff with master's degrees. These staff should be included in the treatment team.

The visit supervisor should be watchful for subtle messages suspected abusers and other caregivers give to the children during visits (verbal, nonverbal, or written) that maintain focus on medical complaints. They should be alert to efforts by the children to use physical or other complaints to obtain the abuser's care and attention. They should be aware of the significant impact of the prior abuse and neglect on the children's development, identity, and self-image.

22

Most children have a strong desire to maintain contact with their caregivers, including the suspected abuser. It may be in these children's best interest to continue visitation with caregivers if properly supervised, especially if they are older. However, the supervisor must not leave the child alone with the alleged abuser at any time. They must not allow the alleged abuser to give the child anything to consume or apply any topical products to the child, as there have been numerous cases in which an abuser has given the child substances to induce illness during supervised visits. Visit supervisors are encouraged to document comments and behaviors of family members during the visits to provide ongoing information about the caregivers' behaviors, family dynamics, and the progress they make in therapy.

Specific visitation guidelines based on the abuser's behavior are typically required. General recommendations are presented in Table 5.

**Table 5. General Visitation Guidelines.**

- A professional familiar with the case and with the court orders should closely monitor all visitations in a neutral location.
- The suspected abusers (and related caregivers) should not discuss health-related issues, including diet, with their child.
- They should not give their child food, drinks, candy, gum, lotions, or medicine.
- They should not attempt to influence the child to distrust children's services staff, his or her foster family, or treatment team.
- The child should be visible at all times.
- All conversation must be audible to the monitor.
- All physical contact must be developmentally and socially appropriate.
- All gifts and cards must be socially and developmentally appropriate, with only one gift allowed per visit and examined before it is provided to the child.

**Child Therapy**

Children may not realize they are or were being victimized. Therefore, it may be confusing for them to consider this possibility. It is important to be aware that their sense of reality may be significantly impacted. If the abusive caregiver is able to admit to his or her behavior and explain it to the child, this may be helpful for both the caregiver and child in moving forward. If the caregiver is unable to do this in a timely manner, the therapist may help the older child (about 10 years of age or older, depending on the child's developmental capacity for abstract thought) gather past medical information and use a neutral stance to allow the child to independently consider (and potentially reformulate) his or her past experiences (Bursch, 1999). Thus, the child may begin to gain some understanding of how the past abuse and neglect may have created a lifestyle of illness that may now cease or change. Therapists need to be alert to the possibility that the child has developed iatrogenic medical trauma symptoms, attachment disorders, somatizing disorders, anxiety, collusive condition falsification behavior (even in young children), and other commonly seen problems developed by children who have suffered abuse or neglect. Those who have been prevented from eating may struggle with eating normally. Those who have suffered physical harm, from induction or medical intervention, may continue to exhibit associated signs and symptoms.

23

Therapists may work closely with rehabilitation staff to support independent functioning with behavior plans and to support appropriate self-perceptions of health and abilities. School and social reintegration are important components of treatment.

### Abuser Therapy

Falsification behavior due to FDIA is highly unlikely to stop simply upon diagnosis and confrontation. Because most abusers with FDIA also have personality disorders and deny their abusive behaviors, treatment success is frequently not possible. Indicators of successful treatment that apply broadly to many forms of child abuse and neglect are presented in Table 6 (Berg & Jones, 1999; Flaherty & MacMillan, 2013; Sanders, 1996). Those less likely to benefit from therapy include those with severe personality disorders and those who have engaged in more lethal forms of abusive behaviors, such as suffocation or poisoning (Davis et al., 1998; Jones, 1987).

**Table 6. Indicators of Successful Treatment.**

1. The caregiver is able to fully admit to the abuse and neglect, including details;
2. The caregiver is able to demonstrate empathy for the victimized child(ren);
3. The caregiver has developed strategies to better identify and manage his or her needs in order to avoid abusing the child(ren) in the future; and
4. The caregiver has demonstrated these skills, with monitoring, over a significant period of time.

Treatment approaches vary, but all should include a focus on the caregiver taking responsibility for abusive behaviors and developing more effective coping strategies. The need for effective therapy pertains to the offending parent as well as to the other parent if he or she failed to recognize abuse or protect the child. One narrative therapy approach includes the deconstruction of the dominant story of illness and disability in favor of the acknowledgment of the alternative narrative of improved health and wellness that would support appropriate parenting and safety (Sanders, 1996). Evidence-based therapy that addresses the abuser's co-morbidities may be helpful. Examples include dialectical behavioral therapy or trauma-focused cognitive behavioral therapy. Treatment with psychotropic medication may also be indicated for psychiatric co-morbidities. Those abusers who acknowledge their behavior and make good therapy progress should also have a social support network and a relapse prevention plan in place prior to any reunification attempts. The original evaluator optimally conducts all evaluations of progress. Therapists are not appropriate evaluators as they may be charmed or misled by abusers and may overestimate therapy progress. Additionally, therapy is compromised if the abuser is aware that the therapist is advising the court.

### Family Therapy

If the family moves toward reunification, the child may be introduced to the caregiver therapy once both are well prepared for such an exposure. These sessions may be helpful to the child if the caregiver is able to acknowledge the APCF, CFIC, or MCA behaviors and take responsibility for those behaviors with the child. This type of encounter may give the child the opportunity to gain clarification about the past abuse and neglect and to express how the abuser has impacted him or her. A protocol that provides guidelines for this type of therapy is currently under review for publication (Sanders & Bursch, 2017).

Intensive family-focused hospital-based interventions can be effective with abusers who are less severely impaired by a personality disorder and who acknowledge the abusive behavior (Berg & Jones, 1999).

### Reunification of Family

Reunification efforts should consider the child's need for early permanency. These needs may have a much shorter timeline than that required for caregiver treatment. Reunification with the abuser is especially dangerous in cases of illness induction or when the caregiver–child dynamic is highly dysfunctional.

If partial or no progress has been made in therapy, typically within six months of receiving appropriate therapy, reunification is not recommended. Partial progress that is deemed to be genuine suggests that further treatment may be effective. In such cases, reunification may be a reasonable case plan. If significant progress has been made in therapy and reunification appears feasible, a forensic evaluation by an expert should take place to confirm that meaningful progress has been made and that sufficient supports are in place. Reunification, if it is attempted, should occur over a significant period of time with support and long-term monitoring in place.

### Long-Term Monitoring

Long-term monitoring should occur after reunification, including frequent communication with the child's pediatrician, therapists, and school. The ability of the parent to refrain from future abuse and neglect must be proven over several years, optimally throughout the childhood years of the children in the home. The courts may recommend a lengthy probation period, during which the abuser would need to receive court authorization to move or travel out of the jurisdiction.

### Clinical Monitoring

To attempt to identify any reoccurrence of APCF, CFIC, or MCA behaviors, the caregivers should be required to engage in a clinical monitoring plan. The child should have a primary care clinical home that can direct and be aware of all investigations and interventions. Caregivers must agree to authorize all treatment through a clinical team that has been informed about the past APCF, CFIC, or MCA abuse and neglect, believe the allegations to be true, and accept responsibility for case management and communication with involved others. It is best if the primary clinician is the clinician who identified the APCF, CFIC, or MCA behaviors, with a second clinician back up, such that all treatment is authorized by one of these two clinicians only. Typically, this clinician would be the child's primary care physician and a backup. This physician team is asked to take on the responsibility of monitoring the family's access to care throughout the childhood years of all the present and future children. If the physicians retire or the family needs to move, the family must authorize a release of information regarding the past abuse and neglect allegations to the accepting physician team. The court-mandated plan should not allow the caregiver to switch healthcare providers without justification and approval.

Caution must be taken to ensure that a clinical monitoring plan is not the only safety net in place. Abusers engage in abusive and neglectful behavior outside the clinical setting, often on a daily basis, in service of the larger illness story they perpetuate with the victim(s) and others.

# APSAC Practice Guidelines

Therefore, the clinical monitoring is only one component of a larger safety plan. For example, children should also be enrolled in daycare or school to assist monitoring. If the abuser is sufficiently wealthy to pay cash for clinical care or medical equipment, it may require additional planning and effort to track healthcare utilization.

Clinicians caring for children with a history of suspected APCF, CFIC, or MCA provide a basic level of safety when they are conservative in prescribing practices and other treatment recommendations, as well as in their support for school accommodations. They should take suspected caregiver and patient reports of symptoms with a dose of skepticism and engage the other parent or protective adults in the care of the child, if possible. Effective clinicians provide ongoing feedback to the caregivers about any problematic behavior they encounter. They do not allow themselves to be pressured to provide treatments or recommendations that are not necessary. They document clearly and with details, maintain professional boundaries, and consult with colleagues and experts as needed. Finally, they provide education about normal development and body functions to caregivers, documenting such education was provided along with the caregiver's reaction to the education and understanding of the information when asked to repeat it back to the clinician.

Members of the APSAC Taskforce: Abuse by Pediatric Condition Falsification are as follows:

- Randell Alexander, MD, PhD, University of Florida, College of Medicine—Jacksonville
- Catherine Ayoub, RN, EdD, Harvard Medical School, Boston Children's Hospital, Massachusetts General Hospital
- Brenda Bursch, PhD, Departments of Psychiatry & Biobehavioral Sciences, and Pediatrics, David Geffen School of Medicine at University of California, Los Angeles.
- Kenneth Feldman, MD, Seattle Children's Hospital
- Marc Feldman, MD, University of Alabama
- Danya Glaser, MD, Great Ormond Street Hospital for Children, London, United Kingdom
- James Hamilton, PhD, University of Alabama
- Carole A. Jenny, MD, Pediatrics, University of Washington, Seattle
- Michael Kelly, MD, Department of Psychiatry, Stanford Medical School
- Bethany Mohr, MD, Michigan Medicine, University of Michigan, Ann Arbor
- Thomas A. Roesler, MD, Seattle Children's Hospital
- Mary Sanders, PhD, Stanford Medical School
- Herbert Schreier, MD, Department of Psychiatry, UCSF–Benioff Children's Hospital Oakland
- Suzanne M. Schunk, LCSW, ACSW Southwest Human Development, Phoenix, Arizona
- John Stirling, MD, FAAP, Child Abuse Pediatrics, San Diego
- Claudia Wang, MD, Department of Pediatrics, David Geffen School of Medicine at University of California, Los Angeles.
- Michael Weber, BS, Tarrant County Texas District Attorney Investigator
- Beatrice Yorker, RN, MS, JD, California State University, Los Angeles

26

### References

American Psychiatric Association (APA). (2013). *Diagnostic and statistical manual of mental disorders: Fifth edition (DSM-5)*. Arlington, VA: American Psychiatric Association.

Arizona Department of Child Safety. (2012). *Investigating Munchausen by proxy: Policy and procedure manual.* Chapter 2, Section 4.6. Retrieved from https://extranet.azdes.gov/dcyfpolicy/Content/02_Investigation_Asssessment_Case%20Plann ing/investigations/investigations_mbp.htm

Ayoub, C. C., Alexander, R., Beck, D., Bursch, B., Feldman, K. W., Libow, J. . . . Yorker, B. (2002). Position paper: Definitional issues in Munchausen by proxy. *Child Maltreatment, 7*(2), 105-111.

Ayoub, C. C., Alexander, R., Beck, D., Bursch, B. Feldman, K. W., Libow, J. . . . Yorker, B. (2004). Erratum. *Child Maltreatment, 9*(3), 337.

Ayoub, C. C., Schreier, H. A., & Keller C. (2002). Munchausen by proxy: Presentations in special education. *Child Maltreatment, 7*(2), 149-159.

Bass, C., & Glaser, D. (2014, April). Early recognition and management of fabricated or induced illness in children. *The Lancet, 383*(9926), 1412-1421.

Bass, C., & Jones, D. (2011). Psychopathology of abusers of fabricated or induced illness in children: Case studies. *The British Journal of Psychiatry, 199,* 113-118.

Berg, B., & Jones, D. P. (1999). Outcome of psychiatric intervention in factitious illness by proxy (Munchausen's syndrome by proxy*). Archives of Disease in Childhood, 81*(6), 465-472.

Bools, C. N., Neale, B. A., & Meadow, S. R. (1992). Co-morbidity associated with fabricated illness (Munchausen syndrome by proxy*). Archives of Disease in Childhood, 67,* 77-79.

Bools, C. N., Neale, B. A., & Meadow, S. R. (1993). Follow-up of victims of fabricated illness (Munchausen syndrome by proxy). *Archives of Disease in Childhood, 69,* 625-630.

Bools, C. N., Neale, B. A., & Meadow, S. R. (1994). Munchausen syndrome by proxy: A study of psychopathology. *Child Abuse & Neglect, 18,* 773-788.

Brown, A. N., Gonzalez, G. R., Wiester, R. T., Kelly, M. C., & Feldman, K. W. (2014). Caregiver blogs in caregiver fabricated illness in a child: A window on the caregiver's thinking? *Child Abuse & Neglect, 38*(3), 488-497.

Bursch, B. (1999, October). Individual psychotherapy with child victims. In H. Schreier (Chair), *Munchausen by proxy: Psychiatric presentations, treatment findings, what to do when a new child is born.* Symposium meeting of the American Academy of Child & Adolescent Psychiatry, Chicago.

Bursch, B. (in press). Child Protective Services management of cases of suspected child abuse/neglect due to factitious disorder imposed on another. *APSAC Advisor.*

Davis, P., McClure, R. J., Rolfe, K., Chessman, N., Pearson, S., Sibert, J. R., Meadow, R. (1998). Procedures, placement, and risks of further abuse after Munchausen syndrome by proxy, non-accidental poisoning, and non-accidental suffocation. *Archives of Diseases in Childhood, 78,* 217-221.

Feldman, M. D., & Brown, R. M. (2002). Munchausen by proxy in an international context. *Child Abuse & Neglect, 26,* 509-524.

Flaherty, E. G., & MacMillan, H. L. (2013). Caregiver-fabricated illness in a child: A manifestation of child maltreatment. *Pediatrics, 132*(3), 590-597.

Schreier, H. A. (1997). Factitious presentation of psychiatric disorder: When is it Munchausen by proxy? *Child Psychology and Psychiatry Review. 2,* 108-115.

Schreier, H. A. (2002, May). On the importance of motivation in Munchausen by proxy: The case of Kathy Bush. *Child Abuse & Neglect, 26*(5), 537-549.

Schreier, H. A., & Libow, J. A. (1993). *Hurting for Love.* New York: Guilford Press.

Sheridan, M. S. (2003). The deceit continues: An updated literature review of Munchausen syndrome by proxy. *Child Abuse & Neglect, 27*(4), 431-451.

Southall, D. P., & Samuels, M. P. (1995, April). Some ethical issues surrounding covert video surveillance—A response. *Journal of Medical Ethics, 21*(2), 104-105, 115.

Stirling, J., & American Academy of Pediatrics Committee on Child Abuse and Neglect. (2007). Beyond Munchausen syndrome by proxy: Identification and treatment of child abuse in the medical setting. *Pediatrics, 119,* 1026-1030.

ten Brinke L., Stimson D., & Carney, D. R. (2014, May). Some evidence for unconscious lie detection. *Psychological Science, 25*(5), 1098-1105.

Vennemann, B., Pendercamp, M., Weinmann, W., Fallon-Marquardt, M., Pollak, S., & Brandis, M. (2006). A case of Munchausen syndrome by proxy with subsequent suicide of the mother. *Forensic Science International, 158*(2), 195-199.

Weber, M. C. (2014). Investigating medical child abuse. *The Texas Prosecutor, 44*(1), 34-40.

Yorker, B. C. (1995). Covert video surveillance of Munchausen syndrome by proxy: The exigent circumstances exception. In *Health Matrix: Journal of Law—Medicine. Case Western Reserve University Law Review, 5*(2), 325-346.

Yorker, B. C., & Kahan, B. B. (1991). The Munchausen syndrome by proxy variant of child abuse in the family courts. *Juvenile and Family Court Journal, 42*(3), 51-58.

 

*Strengthening Practice Through Knowledge*

# About APSAC

The American Professional Society on the Abuse of Children (APSAC) is the premiere, multidisciplinary professional association serving individuals in all fields concerned with child maltreatment. The physicians, attorneys, social workers, psychologists, researchers, law enforcement personnel and others who comprise our membership have all devoted their careers to ensuring the children at risk of abuse receive prevention services, and children and families who become involved with maltreatment receive the best possible services.

APSAC meets our goal of 'strengthening practice through knowledge' by supporting, aggregating and sharing state-of-the-art knowledge though publications and educational events. Our publications include the peer-reviewed, professional journal <u>Child Maltreatment</u>; the widely distributed translational newsletter <u>The APSAC Advisor</u>; news blasts on current research findings, <u>The APSAC Alert</u>; and Practice Guidelines like this document. Regular training events include our annual colloquia, attracting the top experts in the field to present to peers and colleagues at all stages of their careers; highly acclaimed forensic interviewing clinics and advanced training institutes held at the International Conference on Child and Family Maltreatment. We regularly initiate and test new CEU eligible training courses, and are currently developing, and an online course for early career professionals.

If you found these Practice Guidelines valuable and would like access to all of APSAC's publications, resources, and training discounts, please consider becoming a member. Learn more about becoming a member at <u>apsac.org/membership</u>.

To make a donation to support the creation and updating of APSAC Practice Guidelines, go to <u>bit.ly/DonateToAPSAC.</u>

Thank you for supporting APSAC!

**Appendix A -Records Review for Eliron Fidler**

| Date | Symptoms | Objective Evidence | Type of Falsification |
|---|---|---|---|
| 4/23/19 Member profile. Information | Eliron ( 7 at time)diagnosed with Dysautonomia, Seizures, ADD, developmental delays, hypogammaglobinemia and SPD. Taking hypogammaglobinemia guanfacine (for ADHD). Had frequent ER visits due to dehydration. The report stated he needs constant adult supervision. Not clear where this information was coming from. | Doctors have determined there is nothing wrong with his colon. He was given IV fluids maintain hydration. | Fabrication |
| | Eliron had a diagnosis of Epilepsy. He frequently got ds hydrated. Report stated he was not potty training. Can't brush teeth. Cannot due two step directions. He has cecostomy flush daily. Had speech therapy. Described as having many health issuers. Social without social maturity. In first grade in regular classroom. Cannot evacuate at home. | Symptoms report came from Ms. Fidler | |
| | Mom wants him to improve on communication, physical balance, holding a pen and other skills. | | |
| | He was receiving Speech, occupational and physical therapy | | |

| DCS 2/4/20 | DCS received information that Eliron was getting too much treatment. Mom was contacted and stated he was receiving adequate and appropriate treatment for his conditions. | DCS reported concerns that Elinor was getting too many treatments. The school had a third party come in. That party did not agree Eliron needed an RN. | Mom giving incorrect information. |
| | | | No evidence of seizures |
| | | | Exaggeration – after his removal he did many tasks on his own. |
| | DCS stated they were calling for out-of-state medical records. Elion was doing well in school. In regular classes. | | |
| | | Risk assessment still reported Elirion had seizures, not evacuate at home or in in vehicles, lacks community safety, lacks stranger danger, problems with mobility, invades personal space, runaway risk. | |
| | | The risk assessment stated Elirion will hold his breath for 30-60 seconds, but no warnings that a seizure is about to happen. | |
| | | He was diagnosed with Epilepsy. Not clear by whom. Reported he needed constant adult supervision | |
| 3/9/20 ALTCS Member Service Plan | Physical therapy consultation. Mom stated he needed physical therapy. | No not clear that he needed physical therapy. | Fabrication |
| 5/7/20 Changes in ISP | Elirion was discharged from PCH on 4/17/20 by DCS to rule out | Multiple changes occurred. "His medical diagnoses have been | Possible exaggeration but direct information from mom not included. |

| Source | Description | Analysis | Pattern |
|---|---|---|---|
| Arizona Dept of Child Safety (4/17/20) | medical concerns. He was placed in a Child Development. Discharged with constipation diagnosed with Adjustment disorder. rule out and is receiving on going counseling services. He was diagnosed with Adjustment disorder. | These behaviors are not consistent with Mom's information. Functioning much better away from Mom. No need for extensive medical care | The dramatic improvement is consistent with a pattern of FDIA |
| Arizona Dept of Child Safety (5/4/20) | Elion placed with child development home. Has supervised visits with Mom, 2x per week. Since his placement, going to bathroom on his own.. Dramatic increase in daily leaving skills.e.g brushing teeth and tying shoes. Doing better in school. | These behaviors are not consistent with Mom's informationNo need for extensive medical care. | The dramatic improvement away from the alleged perpetrator (in this case Mom) is consistent with a pattern of FDIA |
| | Place in child development home. He was gradually reducing wetting the bed. He no longer took Miralax. He was described as "healthy and happy". All of his considerable medications were changed to as needed. He did not need an inhaler. Eliron decided to have his central line tube removed. He was adapting well to his foster home. | It is relevant that Eliron asked to have his central tube removed. Also, he made very quick progress on constipation, and accidents. All of the medical problems Mom reported did not occur out of her care. | |
| Arizona Dept of Child Safety (6/16/20) | Eliron is in foster care. He stated he was doing good. He was becoming more independent. He was using a pull up at night due to some accidents. However, he is not using one during the day | These behaviors are not consistent with Mom's information. Functioning much better away from Mom. Eliron was adjusting well to his placement and had a dramatic decrease in | The dramatic improvement of health away from the alleged perpetrator (in this case Mom) is consistent with a pattern of FDIA |

| | | | |
|---|---|---|---|
| Arizona Dept of Child Safety (8/13/20) | consistently. There was planning to remove his cecostomy tube. Eliron was eating well and had a good relationship with his foster parents.<br><br>Eliron placed in foster care. Mom not able to control his treatment. Eliron described as doing "amazing adjustment" for online school. He was managing tasks of daily living on his own. He had no doctor's appointment in the last 30 days. No medical appointments were present. He was developing peer relationships. Eliron stated he loved his foster parents. The case plan at that point was Adoption | medical concerns. It is relevant he has an accident during a visit with Mom.<br><br>These behaviors are not consistent with Mom's information. Functioning much better away from Mom. No need for extensive medical care. | The dramatic improvement of health away from the alleged perpetrator (in this case Mom) is consistent with a pattern of FDIA |
| 12/01/20 Meeting of Arizona of Dept of economic security | There were dramatic improvement in Eliron since his removing for his mother. | Eliron no longer diagnosed with dysautonomia, seizures, ADD, developmental delays. Most other medications were stopped because they were not needed. He no longer needed cecostomy treatments. Does not have developmental delays. No behavioral problems. There were not medical concerns. He has not been to urgent care, since his removal from Ms. Fidler | The dramatic improvement of health away from the alleged perpetrator (in this case Mom) is consistent with a pattern of FDIA |
| 1/26/21 communication skills | Mom was present during the IEP meeting . IEP concluded Eliron is normally developed for a child his age, average reading, comprehension, working memory, | After his removal there was a dramatic improvement in his social skills and health. Foster parents say he is doing better in speech and occupations therapy. | Possible fabrication and induced. Mom continues to report his has problems like a heart condition. No information from report to know if |

| | | | |
|---|---|---|---|
| Banner Health (6/30/21) | and academics. "No concerns noted at this time." Psychologist said he had "other health impairment") – Mitochondriana dysfunction. This appears to be based on information from Mom. | Eliron is reported to like the foster placement. Mother states one is weak and Eliron had a heart genetic call Mythic. He needs to be check by the doctor every 5 weeks. | that is true. At that time, Eliron was 9 and doing virtual schooling' |
| | Eliron was 9 under the care of his mother. She supported all of his diagnosis like ADHD. She also stated he developmental delays. She also stated Eliron's cecostomy was removed in 6/2020. Since that time she stated he had continued issues with constipation and extended abdomen. Eliron was hospitalized at that point. The doctor suggested giving MiraLax. She opted for what appears to be a more complex treatment | The Mom appeared to be the only source of information for the procedures. She presents as extremely obsessed about constipation and other medical problems she said Eliron had. | Exaggeration |
| Arizona Dept of Child Safety (7/21/20) | Eliron was in foster care. He was undergoing a cecostomy procedure. It appears he was removed the cecostomy. | Mom was blocked from the procedure. Later Eliron spoke to his mother and said he was happy that he did not need a cecostomy. Some evidence mom wanted to intrude into the procedure. Mom stated he needed the cecostomy. There is no evidenced he had problems after the removal | Fabrication that he needed a central tube. |
| Therapist from Buwalda Psych services (5/15/22) | Individual therapy for Eliron -set up and participated by Mom. | | coaching and fabrication. Mom set the goals for the therapy. She coached Eliron to said he had problems he didn't have. |

| | | | |
|---|---|---|---|
| Second round of Buwalda Psych Services (9/17/21) | Mom reported he had ADHD without evidence. Alleged the foster parents bullied Elion without evidence. Mom reported Eliron was acting out at home. Mom stated Eliron is having anxiety, headache and stomach because of the anniversary of him being placed in foster care. Mom told the therapist Elion was bullied in foster care. The therapist primarily used play therapy and did discuss ADHD. All information appeared to come from mom. Mom had therapist coach Eliron to make a case he needs and IEP. Other reports stated he did not need an IEP.<br><br>Eliron was very scared about getting another cecostomy | Mom attended the session. She said she had concerns about Eliron's clean out. She stated Eliron was still have accidents. Eliron covered his ears and sat behind his Mom. She stated the session by discussing his bowels. She also discussed her experience with DCS in the session and said she should decide Eliron's medical choices.<br><br>In the second session Mom sent an email to the therapist stating she wanted to discuss the pros and cons of a cecostomy. She wanted the therapist to help Eliron understand the procedure. The therapist noted that was out of her range of expertise.<br><br>Mom also wanted to discuss an upcoming GI appointment. At the intake, Mom stated Eliron had been diagnosed with ADHD. She stated Eliron struggles with defecation and enuresis. She stated he was treated badly by his foster parents. She was asking for trauma treatment for Eliron because of this alleged bullying. | Exaggeration – mom was clearly trying to have the therapist focus on her concerns regarding his bowels and describing the foster parents are bullies.<br><br>Mom took control of the treatment and tried to get the therapist to support Mom's intense plan to replace the central tube.<br><br>This pattern of attempting to manipulate professionals is consistent with a diagnosis of FDIA. |
| Banner Health (3/25/22) | Eliron under Mom's care. He then had a problem list of ADHD, | Mom brought Eliron to the ER for a replacement central line. She | Producing false information – Mom in an attempt to rush the procedure. |

| Banner Health 6/17/22 | cecostomy, chronic constipation, Discern CM Hx Influenza Dose, Dysautonomia, Encopresis, Fecal impaction, Immunodeficiency, low serum, mitochondrial dysfunctions | stated Eliron would not need an anesthesia. However, Eliron was extremely anxious and did calm down. Several staff members worked for 30 minutes and were not able to calm him. Mom was informed he needed to be placed under general anesthesia. | Made false statements about his need for Anastasia. |
| | Mom brought him ER – patient type was emergency | The emergency was her needed to replace the cecostomy | Exaggeration |
| Oct 2023 – information from DCS staff | Mom was giving him very high levels of. MiraLAX was doctor shopping. Mome not allow to go to one hospital had stated Eliron has enormous problems and diagnoses. | She appears to be obsessed with constipation. She restricts his actives and developmental group. | Fabrication/Exaggeration |



**ARIZONA DEPARTMENT OF CHILD SAFETY**

### Note

**Case:** JESSICA FIDLER

**Title Of Note:** FIDLER, JESSICA –1919 E THOMAS RD, 1919 E THOMAS RD, Phoenix – 850167710, Arizona, Maricopa, United States

**Case ID:** CS00180811

**Note Type:** 950920001

**Date and Time Note Created:** 8/13/2020 5:41:00 PM

**Date and Time of Contact:** 8/13/2020 11:00:00 AM

**Staff Creating Note:** svc.GRDDataMig02P #

**Contact Type:** In Person

**Staff Role:**

### Participants Involved in the Contact:

| Person Name | Date Of Birth |
|---|---|
| ELIRON FIDLER | 11/26/2011 |
| JASON SCOTT TREGUBOFF | 4/8/1975 |
| LEIGH ANN TREGUBOFF | 3/24/1983 |

### Narrative:

NARRATIVE Location and duration of time spent alone with each child, and discussion and observations while alone with each child. If a child was not seen alone for a portion of the visit, reason and/or efforts to see the child alone: Location: At placement- Duration: 1 hour Child safety: Up on arriving Eliron was to sitting on his school assigned sitting, he was on the computer doing his work. Placement indicated that Eliron has been doing amazing adjusting to doing online school, there has been no issues he is waking up at 6am to get ready for school. The routine is waking up and showering, which placement needs to redirect him to how to wash his hair and how to wash his body. After he gets dressed on his own and they go down stairs to get ready for breakfast. Eliron told CSS that today Jason (foster dad) made him eggs and waffle and he also had apple sauce and water. Eliron indicated that he likes when Jason makes packages but he has not made them in a while. While Eliron was talking to CSS he was still paying attention to his teacher, he was able to continue to answer the questions that the teacher was asking. Eliron was very excited telling CSS about how his classmates and how he would be having a play date on Friday with some school teachers, he as well told CSS that tomorrow would be his teachers birthday and she said she was 27 but she looks older. Safety plan oversight: There is no visible marks or bruises on Eliron; therefore, there is no safety plan oversight needed. Physical and dental health: Eliron has not had any doctor's appointments in the last 30 days. The last medical appointment was the lab he had done in order to know his levels. This was shared with mother and all attorneys. There is no upcoming medical appointments. Mental/behavioral health: Eliron participates in individual counseling through Touchstone; he continues to build rapport with Travis.



**ARIZONA DEPARTMENT OF CHILD SAFETY**

### Note

As well, through DDD services he receives occupational therapy, which will
now be in person for 2 hours and speech therapy in person for two hours.
There are no additional behavioral health services. Education/school/child
care and child development: Eliron is in school, he is doing the online
school, he said he likes school. CSS asked about his teachers name, her
name is Ms. Maly is Eliron's teacher he is in 3rd grade. Eliron was very
excited to tell CSS about his school, his classmates and how school works.
Other needs of the child: Placement indicated there is nothing needed at
this time. Family Relationships: Eliron has visits with mother twice a week
for two hours, there is no issues after visits. He as well participates in
monthly in person visit with MGM and bi-weekly phone calls (zoom) with MGM.
Social interests, and extracurricular, enrichment, and cultural activities
that allow the child to have typical experiences for the child's age:
Eliron likes to play with is switch, he loves swimming he is very good at
it (he is no longer using floatiest). Eliron goes for bike rides with
foster family when it is not too hot. Eliron was very excited to tell CSS
they had a sleep over last week Friday and he was up until midnight playing
with the foster boys and a few friends. Important relationships/connections
for the child: Eliron has completed assignments for school where he put he
loves Leigh and Jason, he finds it very easy to open up to them. As well,
he said his best friend is Corbin. Important relationships/connections for
the child: Eliron has completed assignments for school where he put he
loves Leigh and Jason, he finds it very easy to open up to them. As well,
he said his best friend is Corbin. Permanency planning: The case plan is
Severance and Adoption Court orders, court hearings, and case meetings:
08/19/2020 at 1:30 - Motion and Pre-Trial- Honorable Judge Culbertson.
Caregiver's needs: Placement indicated there is nothing needed at this
time, they indicated there is no need for the allowance yet as they are all
good with clothes. Additional Information/Follow Up Needed: -

Confidential Psychological Evaluation

# Records REVIEW FOR Factitious Disorder Imposed on Another

Janet Cahill, Ph.D.
jcahill25@icloud.com

This report should be used in tandem with the APSAC Best Practice Guidelines for Munchausen by Proxy.

Confidential Psychological Evaluation

## Client Information and Reason for Referral:

Caregiver: Jessica Fidler

Child: Eliron Fidler – DOB: 11/26/11)  Age 11

Date of Review: 10/17/23

## Description of Protocol

The protocol used for this assessment is consistent with Best Practice Standards for the diagnosis or rule out of  Munchausen by Proxy (MBP). MBP has many different names for the same diagnosis. This is because many different professionals can become involved with these cases. For example, medical doctors, psychologists, social workers, and child protection staff. Each professional has a different  name for the illness. Medical doctors, for example, refer to it as Medical Child Abuse. The most common term is Munchausen by Proxy (MBP). Psychologists use the term of Factious Disorder Imposed on Another (FDIA). What it is important to understand is that all the professionals are observing the same symptoms and diagnosis.

I am a licensed psychologist and will use the term FDIA. The criteria and symptoms used come from the Diagnostic and Statistical Manual 5 (DSM 5).

The diagnosis of FDIA occurs when there is some evidence that a child is being abused by a caregiver who is overtreating them. The caregiver is most commonly the mother of the child. However, it must be someone who has custody of the child is the primary caregiver. The abuse in FDIA is different from other form of abuse or neglect.

## What is FDIA?

FDIA is a serious form of child abuse and mental illness. It occurs when the caregiver is deliberately overtreating or inducing symptoms.  It is important to understand that the caregiver is doing this on purpose to meet their own psychological needs such as getting attention. For example, the caregiver gave false information that the child vomits constantly on the way to school. However, when the school nurse examines the child and the car and finds no evidence of vomiting. The caregiver was fabricating the symptoms.

The APSAC Practice Guidelines had seven types of this  type of fabrication:

- Producing false information
- Withholding information
- Exaggeration
- Simulation (for example altering medical specimens)
- Neglect ( for example withholding medications or nutrition)



JANET CAHILL
(00) 920-1502
2004 BRN JUAN CIR
MINDEN NV 89423

SHIP
TO: THOMAS A CONNELLY
STE 101
5055 N 12TH ST

PHOENIX AZ 85014-3345

AZ 850 9-10

1 LBS
SHP WT: 1 LBS
1 OF 1
DATE: 28 JAN 2025

UPS GROUND
TRACKING #: 1Z 7EX 714 03 9562 7421

BILLING: P/P

Janet Cahill
2864 San Juan Cir
Minden, NV 89423

Thomas A.Connelly
5055 N. 12 St
Suite 101
Phoenix AZ 85014

« Return to search results

## Case Information

| | | | |
|---|---|---|---|
| **Case Number:** | CV2024-030202 | **Judge:** | Whitten, Christopher |
| **File Date:** | 10/22/2024 | **Location:** | Downtown |
| **Case Type:** | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Jessica Fidler | Plaintiff | Female | Thomas Connelly |
| E F | In The Matter Of | Unknown | Pro Per |
| State Of Arizona | Defendant | | Jennie Tetreault |
| Alonzo Borboa | Defendant | Male | Jennie Tetreault |
| Nichole Garcia | Defendant | Female | Jennie Tetreault |
| Desiree Manrique | Defendant | Female | Pro Per |
| Edwin Wangler | Defendant | Male | Jennie Tetreault |
| Dana Burden | Defendant | Female | Jennie Tetreault |
| David Lujan | Defendant | Male | Pro Per |
| Janet Cahill | Defendant | Female | Pro Per |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 2/7/2025 | NOL - Notice of Lodging | 2/10/2025 | |
| **NOTE:** | NOTICE OF LODGING "ANSWERS AND RESPONSES" FROM DEFENDANT JANET CAHILL | | |
| 2/5/2025 | ANS - Answer | 2/6/2025 | |
| **NOTE:** | ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT (REVISED) / CO-CHRG $263.00 R# 30134754 | | |
| 1/27/2025 | AFS - Affidavit Of Service | 1/31/2025 | |
| **NOTE:** | NICHOLE GARCIA | | |
| 1/21/2025 | AFS - Affidavit Of Service | 1/24/2025 | |
| **NOTE:** | EDWIN WANGLER | | |
| 1/21/2025 | AFS - Affidavit Of Service | 1/24/2025 | |
| **NOTE:** | ALONZO BORBOA | | |
| 1/21/2025 | AFS - Affidavit Of Service | 1/24/2025 | |
| **NOTE:** | STATE OF ARIZONA | | |
| 1/21/2025 | AFS - Affidavit Of Service | 1/24/2025 | |
| **NOTE:** | DANA BURDEN | | |
| 1/15/2025 | NOT - Notice | 1/16/2025 | |
| **NOTE:** | Notice of Errata | | |
| 1/15/2025 | AMC - Amended Complaint | 1/16/2025 | |
| **NOTE:** | First Amended Complaint | | |
| 1/15/2025 | AMC - Amended Complaint | 1/16/2025 | |
| **NOTE:** | First Amended Complaint (Revised) | | |
| 10/22/2024 | COM - Complaint | 10/23/2024 | |
| **NOTE:** | Complaint | | |
| 10/22/2024 | CSH - Coversheet | 10/23/2024 | |
| **NOTE:** | Civil Cover Sheet | | |
| 10/22/2024 | CCN - Cert Arbitration - Not Subject | 10/23/2024 | |
| **NOTE:** | Certificate Of Compulsory Arbitration - Is Not Subject To | | |
| 10/22/2024 | SUM - Summons | 10/23/2024 | |
| **NOTE:** | Summons | | |
| 10/22/2024 | SUM - Summons | 10/23/2024 | |
| **NOTE:** | Summons | | |
| 10/22/2024 | SUM - Summons | 10/23/2024 | |
| **NOTE:** | Summons | | |
| 10/22/2024 | SUM - Summons | 10/23/2024 | |
| **NOTE:** | Summons | | |
| 10/22/2024 | SUM - Summons | 10/23/2024 | |
| **NOTE:** | Summons | | |

| 10/22/2024 | SUM - Summons | | 10/23/2024 |
| **NOTE:** | Summons | | |
| 10/22/2024 | SUM - Summons | | 10/23/2024 |
| **NOTE:** | Summons | | |
| 10/22/2024 | SUM - Summons | | 10/23/2024 |
| **NOTE:** | Summons | | |

## Case Calendar
**There are no calendar events on file**

## Judgments

| Date | (F)or / (A)gainst | Amount | Frequency | Type | Status |
|------|-------------------|--------|-----------|------|--------|
| **No records found.** | | | | | |