# ATTACHMENT A

# Answers and Responses to
# Superior Court of Arizona  in Maricopa County.
# Case Number CV2024-030202

## Janet Cahill, Ph.D.

Served on 1/17/25.

This  lawsuit was sent to me by Jessica Fidler, and I am assuming her lawyer, Thomas A. Connelly.  Ms. Fidler has a son who is referred to in the records as E. F.

It is clear that the purpose of this lawsuit is an attempt to threaten me and the DSF staff in the Maricopa County Child Protection Agency regarding whether Ms. Fidler met the criteria for FDIA. In my case Ms. Fidler's threats  appear to be based on her efforts to have custody of E.F. She and  her lawyer, Mr. Connelly, made many deceptive statements and incorrect information regarding M.Fidler's relationship to FDIA. I explain  what FDIA is shortly .

I should mention at the onset that both Ms. Fidler and Mr. Connelly have no professional knowledge  of FDIA and many of their statements they said were  incorrect, made up or even ridiculous.

 I became involved in the case on October 24, 2023. At that time I was hired by Arizona Child Protection Agency to and asked to complete an evaluation of Ms. Fidler  and determine if she met the criteria for FDIA.

Multiple professionals in the case were concerned about Ms. Fidler's interactions with E.F., especially her use of treatments for him. My understanding was the  Arizona agency did not have a a psychologist who was an expert in Munchausen by Proxy or FDIA. The agency asked if I would be willing to make such an evaluation in this case. I agreed to do so. I have done this with many other agencies in many states.

At that time, I was  a licensed Psychologist  and expert in children protection evaluations and treatment recommendations. This included Parental Capacity Evaluations. My expertise also included  FDIA cases. Over the course of my career I have  completed over 4,500.00 child protection evaluations including FDIA cases. I will provide my credentials shortly. However, it is important to understand from the beginning that psychologists, who do the sort of work must agree to represent the best interest of the child. I have done that over the course of my entire career.

I should also mention that I  have not been involved in this case since 2023 and I am not aware of the current situation. Also - I have retired completely and not doing any more cases or involvement with children projection. I don't understand why Ms. Fidler is sending threats out at this time.

## Clarification of FDIA

FDIA, - is **Factitious disorder imposed another,** and is defined as the use of over treatment of a child by a caregiver.  The caregiver is doing this to the child for  their own (the caretaker's) psychological needs and not for the needs of the  child. The caretaker may also over treat the child's  physical needs. They are doing it on purpose. They use the child to get attention, resources and may  want to be seen as an exceptional parent.

 FDIA is consider to be a very dangerous type of child abuse and often has severe consequences for the child including death.

There are other names for FDIA.
For example Munchausen by Proxy,  and Factitious disorder.

# Research on FDIA

There is a very large amount of research that defines and explores FDIA. Here are some examples. (Note that the names Munchausen by Proxy and FDIA are used for these resources)

Munchausen by Proxy: Presentations in Special Education (Auoub, Schreier and Kelle) and the APSAC Practice Guidelines.
Forensic assessment 0f (pages )

Munchausen by proxy presentations in special education.
results can be catastrophically dangerous for the child if it is  not in appropriately diagnosed.

Forensic assessment of illness, falsification, Munchausen by proxy and factitious disorder, NOS, written by Mary Sanders and Brenda Burch.

Considering Suffolk Kotoeri abuse, and Munchausen by proxy in the evaluation of children experiencing apparently life-threatening events and sudden infant death syndrome. This was written by Thomas L Truman,et al

Position paper definitional issues in Munchausen by proxy. This was develop with the APSAC task force on Munchausen by proxy using definitions for the working group. I have been in that committee.

Munchausen by proxy victims in adulthood, and for us look, this was written by Judith at Leebo.

There are many, many more research articles on this topic. It is a well researched protocol.

One of the most important tools, is the Practice Guidelines for Munchausen by Proxy: Clinical and Case Management Guidance.  This protocol was develop by the American Professional Society on the Abuse of Children (APSAC). APSAC strongly supports the use of those Practice Guidelines. It is used in cases where FDIA, or Munchauen by Proxy may be occurring. These guidelines are also based on extensive evidence based research. I used theseGuideline in my evaluation of Ms. Fidler.

Members of the APSAC Practice Guidelines  are considered to be experts  in Munchausen by Proxy. I was a member at the time of this report. Using the APSAC protocols is considered to be best practice. I used it for  this case and concluded Ms. Fidler met the criteria for FDIA.

# Records used by Dr. Cahill to confirm the diagnosis of FDIA for Ms.Fidler.

1. The Practice Guidelines from the American Professional Society on the Abuse of Children (APSAC)were used for this case. I have concluded those records the paper reports.

2 .The best practice protocol for FDIA requires the use of Annex A. This part of the protocol and provides symptoms consistent with FDIA. It also includes the dates, the specific symptoms, the objective evidence and the type of fabrication. I completed the Appendix A for this report.

3.The combination of these reports and the use of the Guidelines are consistent with my diagnosis that that Ms. Fidler met the criteria for FDIA.

# False Statements from Ms. Fidler and Mr. Connelly found in the Lawsuit

First I will respond to the blatant lies and misinformation that apparently came from Mr Connelly and I am assuming was supported by Ms. Fidler. These were not little lapses. They were flat out lies using misinformation, and attempts to attack my credentials.

1)For example Mr. Connelly stated "The report of Dr. Cahill was manufactured." This is one of there more ridiculous statements. I can assure you I was not at home playing with crayons and making up reports. I was reviewing massive numbers of records need for this diagnosis.

2)78. Another statement from Ms. Fiedler wrote- "There is no medical evidence to support her diagnosis."

Response- There was ample medical evidence to make the diagnosis and I reviewed all of them myself. Ms.Fidler was not with me when I was reviewing records . Hence, unless she has superman vision, there is was no way she could determine what I was reading or not reading.

80. Both Mr. Connelly and Ms. Fidler referred to the report as inaccurate. Neither Ms. Fidler or Mr. Connolly do not have the professional skills needed to complete the FDIA protocol. Ergo they have no ability to determine if the report is correct. Mr. Connolly certainly did not present any understanding or specific issues of FDIA. He was clearly making up stuff as he went along. Ms. Fidler exposed E.F. to an alarming number of medical and psychological treatments, yet continued to deny she over treated him. To my knowledge neither Mr. Connelly nor Ms. Fidler, have any professional training or credentials for FDIA. Mr. Connelly is a lawyer not a psychologist.

183 - One of them also stated, "Defendant Cahill knew that the removal of E.F. was wrong." This is this the most this egregious of their statements, and is simply not defensible. E.F. was the victim of child abuse from Ms. Fidler. I concluded Ms. Filer met the criteria for FDIA. I am ethically bound to protect children exposed to that disorder and other types of abuse.I stand by my diagnosis and my recommendations that E.F. not be returned to his mother.

Another statement -135 from Ms. Fidler and Mr. Connelly was -"…Dr. Cahill had a meeting of the minds with the minds with the DCS workers  This is absolutely true. In fact that both myself and the DCS, independently determined Ms. Fidler was over treating her son for her own needs.  I have not been in touch with the case for two years so I cannot speak  for  DCS at this time. However, during my overvaluations in 2023  they did raise concerns about Ms. Fidler. It is normal for an evaluator discuss this with staff members. - it is good practice..

176 another statement read, -  read, "… there was no factual foundation or basis for this removal, and any purported evidence to support the removal  support the removal - the report of Dr. Cahill — was essentially manufactured.

---

This is also completely untrue and I reviewed a massive  amount of medical records and found many, many examples  falsification and other symptoms of FDIA. I have no idea where they came  up the forensic reliability for nonsense. In addition I read and reviewed extensive records and interviews for the this case that strongly supported the presences of FDIA. I have suffice reports and other sources, including DCF to make that conclusion. I had more than ample information to make this diagnosis and specified that in the Annex A I wrote for this case.

5. Based upon a very careful and though review of this case I did recommend that the child be removed from Ms. Fidler for a separation test be uses. . This is considered with the APSP protocol of the APSP practice guidelines. This is explained below. I followed these guidelines and concluded Ms. Fidler met the criteria for FDIA. It is very important to understand how dangerous and damaging this diagnosis is. Child exposed to FDIA can have catastrophic consequences  for them.  As a licensed psychologist I have the ethical responsibility to diagnose that disorder if it exists. And my evaluate included it did exist with Ms. Fidler. I am ethically required to address the needs of the child.

I have not had any contact with Ms. Fidler since I my report in October of 20223. I don't know what is going on in the case, except that Ms.Fidler is making up issues and clearly attempting to punish me and the caseworkers in the case. Throughout this dcoutionion she and I am assuming her lying about my role and recommendations in this case. This is consistent with Ms. Flier's prior behavior in 2023 and before.

# Final Answer and Response  to this Lawsuit.

I did agree to agree to complete a FDIA evaluation on Ms. Fidler regarding her son In 2023. I did at the request of the Arizona chid protection agency. I concluded Ms. Fidler met the criteria for FDIA.

I used the appropriate guidelines in this evaluation. It is relevant to know that the FDIA guidelines, as well as other evaluations in child protection, state that the focus needs to be on the best interest of the child. I maintained that demand in this case. Once FDIA is diagnosed, and the caregiver continues to deny the diagnosis and or continue to over treat the child, I have the ethical responsibility to recommend removal from the caretaker and /or a separation test. This is due to the high risk involved with FDIA.

As stated earlier I have not been involved with this case for the past two years, so I do not have current information. I have retired, and I no longer work in child protection.

I am sad that it appears this case is ongoing. This not in the best interest of E.F.

I am proud of the work I did and sincerely hope that helped E.F. have the normalcy and healthy life he deserves.

Janet Cahill, Ph.D.

Record 2.



**apsac** The American
Professional Society
on the Abuse of Children®

*Strengthening Practice Through Knowledge*

In partnership with
THE NEW YORK FOUNDLING

www.apsac.org   www.nyfoundling.org   @TheNYFoundling

# Practice Guidelines

## Munchausen by Proxy: Clinical and Case Management Guidance

Copyright © 2017 All rights reserved by the American Professional Society on the Abuse of Children (APSAC) in Partnership with The New York Foundling. **No part may be reproduced without a citation including the following:**

**Author:** APSAC Taskforce  **Title:** Munchausen by Proxy: Clinical and Case Management Guidance  **Publication Date:** 2017   **Publisher:** The American Professional Society on the Abuse of Children (APSAC)  **Retrieved from:** https://www.apsac.org/guidelines

APSAC encourages broad distribution of the document in its entirety. No pages may be omitted when reproducing this document in electronic or print versions. Any questions regarding use of this document should be directed to info@apsac.org. Learn more about APSAC at www.apsac.org.

Munchausen by Proxy

# APSAC Practice Guidelines

## Table of Contents

Purpose..................................................................................................................................3
Terminology and Definitions.................................................................................................3
    Original Terms Describing the Abuse and Neglect Combined with the Psychopathology........3
    Terms Describing the Abuse and Neglect ...........................................................................4
    Term Describing the Abuser's Psychopathology and Actions ...............................................4
Background ...........................................................................................................................5
    Epidemiology...................................................................................................................5
    Methods by Which Conditions May be Intentionally Falsified or Induced................................5
    Risk and Harm .................................................................................................................7
    Etiology..........................................................................................................................7
    Abuser Psychopathology ...................................................................................................8
Approaches to Identifying APCF, CFIC, and MCA.................................................................8
    Role of the Physician and Other Clinicians in Diagnostic Assessment....................................8
    Warning Signs..................................................................................................................9
    General Clinical Approach ...............................................................................................10
    Clinical Documentation ..................................................................................................11
    Record Analysis .............................................................................................................12
    Video Surveillance.........................................................................................................13
    Separation From the Abuser .............................................................................................14
    Example of Differential Diagnosis of APCIF, CFIC, and MCA ............................................16
Approaches to Psychiatric Evaluation of Alleged Abuser....................................................17
Reporting Requirements and CPS and Police Investigations ..............................................18
    Medical, Mental Health, and Education Professionals .........................................................18
    Family Meeting and Informing Conference .......................................................................18
    Child Protection Services (CPS) .......................................................................................19
    Police and Legal Investigations .......................................................................................20
Case Management and Treatment.......................................................................................21
    Child Protection and Placement.......................................................................................21
    Reunification Services ....................................................................................................22
    Supervised Visitation......................................................................................................22
    Child Therapy ...............................................................................................................23
    Abuser Therapy.............................................................................................................23
    Family Therapy..............................................................................................................24
    Reunification of Family ..................................................................................................25
    Long-Term Monitoring ...................................................................................................25
    Clinical Monitoring........................................................................................................25
References............................................................................................................................27

# APSAC Practice Guidelines

## Purpose

These Guidelines reflect current knowledge about best practices related to the identification, reporting, assessment, and management of Munchausen by proxy (defined here as "Abuse by pediatric condition falsification, caregiver-fabricated illness in a child, or medical child abuse that occurs due to a specific form of psychopathology in the abuser called factitious disorder imposed on another").

There are two components to the guidance presented: (1) Identification, assessment, and initial management of suspected cases of abuse or neglect meeting the definition for abuse by pediatric condition falsification, caregiver-fabricated illness in a child, or medical child abuse, regardless of the motivation or co-morbid psychopathology of the abuser, and (2) Education, assessment, and management guidance for cases of these forms of abuse and neglect due to factitious disorder imposed on another in the abuser.

In cases of Munchausen by proxy (MBP), some victims have genuine symptoms, disorders, or impairments that are intentionally exaggerated, undertreated, or exacerbated by the abuser. In other cases, all symptoms, disorders and impairment are completely fabricated by the abuser. The guidance provided in this document applies to both situations.

Guidance is not provided for the ongoing management of families in which the suspected abusers have anxiety, psychosis, malingering, or other explanations for episodes of abuse or neglect that do not meet criteria for factitious disorder imposed on another (FDIA). Such families are generally easier to assess, treat, manage, and reunify using standard evaluation and treatment approaches.

These guidelines are intended to provide guidance to medical providers, mandated reporters, child protective service workers, law enforcement, attorneys, therapists, and any other professionals who may be involved with reporting, assessing, and treating children affected by this form of child abuse and neglect and their abusive caregiver(s). Guidelines are not intended as a standard of practice to which practitioners are expected to adhere in all cases and are not meant to establish a legal standard of care. Best practices will continue to evolve as new evidence becomes available. As experience and scientific knowledge expands, further revision of these guidelines is expected.

## Terminology and Definitions

### Original Terms Describing the Abuse and Neglect Combined With the Psychopathology

### Munchausen syndrome by proxy (MSBP) / Munchausen by proxy (MBP)

The MSBP/MBP definition encapsulates both the psychopathology of the abuser and the abuse of the victim. MSBP/MBP was never a formal *International Classification of Disease* (*ICD*) or *Diagnostic and Statistical Manual of Mental Disorders* (*DSM*) diagnosis (American Psychiatric Association, 2013). It is a term that has historically been used (and still is often used) to describe situations in which an individual diagnosed with factitious disorder imposed on another (FDIA)

engages in falsifying a condition or illness in another. The victims of this form of abuse span the age range and may include animals (American Psychiatric Association, 2013).

Dr. Roy Meadow (1977) first described MSBP in the literature when he coined the term to refer to mothers deliberately falsifying illness in their children. Meadow used the term to describe the combination of the abuse (and neglect) and the motivation of the caregiver. Since that time, thousands of cases have been described in the literature. This is a form of abuse and neglect that can lead to significant child morbidity and mortality. *Munchausen syndrome by proxy* is the most widely recognized term, but the means of diagnosis, psychodynamics, and outcomes continue to be misunderstood. Due to confusion surrounding whether the term should be applied to the child as a victim of abuse or to the abuser who intentionally falsifies illness, several other terms have been proposed.

## Terms Describing the Abuse and Neglect

### Pediatric condition falsification (PCF)
In 1996, APSAC created a task force to more clearly define this type of abuse and neglect (Ayoub et al., 2002, 2004). The task force coined the term *pediatric condition* (illness, impairment, or symptom) *falsification* (PCF) to refer to a form of child maltreatment in which an adult falsifies physical or psychological signs or symptoms in a victim, causing the victim to be regarded as more ill or impaired than is objectively true.

### Abuse by pediatric condition falsification (APCF)
The words *abuse by* have been added to make it very clear that this term refers to child abuse and neglect.

### Caregiver-fabricated illness in a child: A manifestation of child maltreatment (CFIC)
CFIC is the most recent term recommended by the American Academy of Pediatrics to describe this type of abuse and neglect of the child victim (Flaherty & MacMillan, 2013).

### Medical child abuse (MCA)
*Medical child abuse* is a term used by many medical providers to describe when a child receives unnecessary and harmful, or potentially harmful, medical care at the instigation of a caregiver (Roesler & Jenny, 2009). This term substantially overlaps with APCF and CFIC. APCF includes MCA and also false or induced problems presented to non-medical providers.

## Term Describing the Abuser's Psychopathology and Actions

### Factitious disorder imposed on another (FDIA)
FDIA is a *DSM-5* psychiatric diagnosis (American Psychiatric Association, 2013). It is used to describe the psychopathology of some APCF, CFIC, or MCA abusers. Individuals with this diagnosis have falsified or induced physical, psychological, or developmental signs or symptoms in another individual. Intentional deception is associated with this behavior, differentiating it from a delusional or other psychiatric disorder. The deceptive falsification behavior persists even when there are no evident external rewards for the behavior such as money, child custody, or

access to drugs, although these motivations may co-exist. The victim of this behavior is presented to others as ill, impaired, or injured.

Compared with the previous version, the primary DSM changes include (1) an increased emphasis on deception as the cornerstone of the disorder (and subsequently, a need to identify deception as part of the FDIA evaluation process); (2) the fact that malingering (by proxy) may be a co-morbidity; (3) a simplified approach to motivation by requiring evidence only of internal motivation (primary gain) and not needing to determine a specific motivation (attention, sick role, or other); and (4) the ability to diagnose after a single episode of illness or condition falsification if the criteria are met.

A diagnosis of FDIA does not indicate decreased responsibility for harm or freedom from legal liability; however, the abuser's intention is generally not to torture or kill the child, though this may occur. This diagnosis may be similar to making a diagnosis of pedophilic disorder, with the primary goal of the behavior to satisfy a psychological need of the abuser. While secondary gain (malingering) may be present, it is not the driving force. Individuals with pedophilic disorder or FDIA ignore the needs and wellbeing of the victim in order to satisfy their own needs.

## Background

### Epidemiology
The American Academy of Pediatrics (Flaherty & MacMillan, 2013) reports an estimated incidence of approximately from 0.5 to 2.0 per 100,000 children younger than 16 years. However, this form of abuse and neglect is significantly underrecognized and underreported. Therefore, these estimates likely underrepresent the actual extent of this abuse. Bass and Glaser (2014) identified published cases from 24 countries, indicating that this form of abuse and neglect spans the globe.

### Methods by Which Conditions May Be Intentionally Falsified or Induced
Falsification of illness may take many forms and may occur along a broad spectrum of severity. See Table 1 for examples. Falsification always includes a caregiver giving or producing false information or withholding information in order to deceive. The abuser may also exaggerate symptoms, simulate symptoms, and withhold medications, nutrition, or treatments to exacerbate symptoms or induce illness. Abusers may coach others, even very young victims, to collaborate with them or corroborate false claims. Corroborating parties may or may not be aware of the fabrications. Due to the persistent and often escalating nature of this form of abuse and neglect, even seemingly mild presentations that are solely based on false reports of symptoms have the potential to lead to death. Additionally, the abuse and neglect typically extends far beyond the clinical setting. Abusers typically maintain the false story and behave accordingly in all settings and with all friends, family, and professionals. Nevertheless, it is clear from reports of abusers and hidden video surveillance that the deceptions are conscious and often carefully planned, and that efforts are exerted to conceal the deception. Thus, this form of abuse is pervasive and typically includes emotional abuse and neglect.

**Table 1. Types of Falsification.**

| Type of Falsification | Examples |
|---|---|
| Producing false information | Providing false information about current symptoms and limitations in the child; the child's medical or other history; and prior findings, recommendations, or treatments. Examples include saying a child has seizures when there are none and providing altered diagnostic medical documentation. |
| Withholding information | Failing to provide pertinent information that would help to explain the child's presentation. An example is not informing the clinician that the child is vomiting due to poison that was just administered. |
| Exaggeration | Providing clinical information that is based on a genuine symptom of limitation, but is enhanced in order for the child to be seen as more severely ill or impaired than is true. An example is reporting more frequent or treatment-resistant seizures than truly exist. |
| Simulation | Altering biological specimens or medical test procedures to yield abnormal results. Examples include presenting contaminated urine samples, placing one's own blood in child's stool sample, or interfering with a diagnostic test to produce abnormal results. |
| Neglect | Withholding medications, nutrition, or treatments to exacerbate symptoms. An example is failing to administer seizure medication as prescribed. |
| Induction | Directly creating symptoms or impairments. Examples include poisoning, suffocating, starving, and infecting. |
| Coaching | Manipulating another to answer questions by clinicians and others in a manner that substantiates the false claims of the abuser. Adults and very young victims can be effectively coached to (knowingly or unknowingly) collaborate with the abuser and corroborate the false claims of the abuser. Examples are spouses who repeat what the abuser has told them to be true as if it were fact or a child victim who is *reminded* to report specific symptoms to the clinician. |

Varying patterns of abuse and neglect have been identified. Some individuals with FDIA target all children in their care and others serially focus on the youngest child, the most challenging child, the children with genuine underlying medical problems, or the children with whom they have disrupted attachments. Intergenerational abuse and neglect has been identified. There may be periods of time in which no abuse occurs for some time but then restarts.

Any medical condition can be created, falsified, or exaggerated (Levin & Sheridan, 1995). However, this form of abuse is not confined to medical conditions. Falsified symptoms may also be behavioral or psychiatric (e.g., falsely reporting the child is harming himself or others, or falsely reporting symptoms consistent with a mental illness or disability) (Schreier, 1997) or educational (e.g., falsely reporting learning disabilities, attention deficit disorders, or autism) (Ayoub et al., 2002; Frye & Feldman, 2012). Common medical conditions that are falsified or induced include the following: allergies, asthma, apnea, gastrointestinal problems, failure to thrive, fevers, infections, and seizures (Roesler & Jenny, 2009; Rosenberg, 1987; Sheridan, 2003). Clinicians and forensic experts have observed an increase in frequency of false reports of

6

autism and mitochondrial disorders in recent years. Finally, classical forms of child abuse and neglect may occur co-morbidly or may also be volitionally falsified (Schreier, 1996). All reports of suspected abuse or neglect of any type should be evaluated by adapting the best available assessment practices with the cautions outlined in these guidelines, especially the need to rely upon objective data and to consider ways in which the signs and symptoms of abuse and neglect could be simulated or induced. If it is determined that false abuse and neglect allegations are the result of an abuser attempting to meet his or her own psychological needs, this would also meet criteria for FDIA.

### Risk and Harm
Victims may be directly harmed by the abuser's induction behaviors, frequently undergo unnecessary and invasive evaluations and interventions, be kept out of appropriate school settings, miss social and developmental opportunities, and misperceive themselves to be excessively ill or disabled. Iatrogenic medical conditions may arise from unnecessary interventions, and the child may become ill or permanently physically or mentally harmed as a result of well-intended diagnostic and treatment efforts.

Permanent physical harm that has resulted from APCF, CFIC, or MCA child abuse and neglect includes blindness, altered gut function, brain damage, hearing loss, scarring, removal of organs, surgical alteration of anatomy, limps, and other sequela, including death. Children who survive this form of abuse and neglect are often left with severe psychological damage and significant confusion about their health and relationships. Psychological harm varies, but may include overly compliant or aggressive behavior, adoption of self-falsification or somatizing behaviors, loss of a positive self-image, posttraumatic stress disorder, and disordered eating. This form of abuse and neglect can permeate every aspect of the victim's life. Occasionally, children and teens may be aware of the abuse, but do not inform others of what is happening to them. More frequently, they vigorously defend the abuser and do not grasp what has happened to themselves. Thus, it can take a significant amount of time for specialized and comprehensive intervention to yield positive outcomes.

Family members, friends, professionals, and community members may also be affected by long-term emotional concerns for the child they believe to be ill and by revelation of the truth.

### Etiology
Based upon cases in which intent has been revealed or determined, APCF, CFIC, or MCA child abuse and neglect occurs when abusers' psychological needs take precedence over the needs of the child, paving the way for them to harm the child in order to have those needs met. Needs cited by those who have admitted to this behavior have included the need to receive care and attention; to be perceived as smart, caring, selfless, or in control; to manipulate and humiliate a powerful figure; to manipulate a spouse; or, for the excitement of being in a medical setting. Some who have admitted to this behavior consider addiction to a substance to be an appropriate analogy to describe their persistence and single-mindedness in engaging in falsification behavior. Those who engage in this behavior often report a personal history of childhood abuse or domestic violence; however, when possible to verify this, these reports frequently turn out to be false. They may falsify or induce symptoms in themselves, and may themselves be victims of APCF, CFIC, or MCA.

**Abuser Psychopathology**
Individuals with FDIA are predominantly female and have typically been found to have a coexisting personality disorder, usually cluster B disorders (i.e., borderline, histrionic, sociopathic, or mixed) (Bass & Jones, 2011). Bools, Neale, and Meadow (1994) found that of 47 mothers who had induced illness in their children, 72% had personal histories of a somatic symptom disorder or factitious disorder imposed on self. Twenty-one percent had a history of substance misuse, 55% had histories of self-destructive behaviors, and 89% had a personality disorder. They discovered that five of the 19 women they interviewed (26%) had histories of learning problems. Some abusers have no obvious or diagnosable personality disorder, or the presence of a personality disorder may not be known due to insufficient data.

### Approaches to Identifying APCF, CFIC, and MCA

Clinicians should consider the possibility of APCF, CFIC, or MCA in children with highly unusual clinical presentations, when clinical findings are unexpectedly inconsistent with the reports of the caregiver, or when a child's response to standard treatments is surprising. The cornerstone of determining if APCF, CFIC, or MCA is present is identifying unexplained discrepancies, deception, induction, or intentional neglect by the caregiver who created the clinician's misperceptions regarding the true functional and symptom status of the victim.

One major misconception among clinicians is the idea that underlying medical or other disorders that could account for the signs or reported symptoms need to be ruled out  for a conclusion of APCF, CFIC, OR MCA to be made. In fact, children with genuine underlying medical, psychological, or developmental problems are often the targets of this form of abuse and neglect. Some abusers of genuinely ill or impaired children recognize that their own psychological needs are being met by continuing engagement with the medical, mental health, or educational professionals who are treating their children, thus sparking the abuser's desire to keep these rewarding relationships in place.

Some abusers are attracted to diagnoses that encapsulate a large array of possible symptoms, perhaps to evade detection. An example is a parent who falsely attributes a wide variety of symptoms or behaviors to a nonexistent or equivocal mitochondrial disorder. As is true with any genuine illness, if the child has a mitochondrial disorder (or other genetic disorder) and the parent is exaggerating or falsifying symptoms so that it appears to be more severe than is true, this would also be considered abuse.

**Role of the Physician and Other Clinicians in Diagnostic Assessment**
Pediatricians and other primary care medical providers are a common point of contact for this type of abuse and neglect. Thus, it is important for primary care providers, as well as specialists and emergency room personnel, to include APCF, CFIC, or MCA in their differential diagnosis of children with complex, confusing, or multiorgan system disease. In mental health settings, the point of contact and evaluation may be a psychiatrist, psychologist, or other mental health specialist.

8

# APSAC Practice Guidelines

The history provided by a parent is commonly used to determine which tests to order, formulate a diagnosis, support school or other accommodations, and determine what treatments, procedures, medications, and surgeries to recommend. Healthcare providers are trained to rely on the truthfulness of the child's caregiver. Medical and other clinical training does not prepare pediatricians or specialists to doubt or question the history provided by a caregiver or patient, particularly when the caregiver appears dedicated, competent, and well versed in clinical terminology. Highly competent clinicians can be misled into providing unnecessary or harmful care to the child. Some abusers seek out clinicians who provide nonstandard or substandard care to further their goals.

Fragmented care among multiple providers facilitates deception. Ideally, primary care providers serve as gatekeepers of care, but often specialists cross refer without coordinating with the child's primary care provider. All primary care clinicians should be familiar with the warning signs in Table 1 and the recommendations in Table 2. The AAP (Stirling, J. & American Academy of Pediatrics Committee on Child Abuse and Neglect, 2007) recommends that pediatricians answer three questions in the consideration of reporting possible abuse:
1.    Are the history, signs, and symptoms credible?
2.    Is the child receiving unnecessary and harmful or potentially harmful medical care?
3.    If so, who is instigating the evaluations or treatments?

As in all forms of child abuse and neglect, the motivation of the parent may or may not be evident to the clinician. Regardless of motivation, if the child is receiving or is at risk of receiving unnecessary, harmful, or potentially harmful medical care at the insistence or instigation of a caregiver, the clinician should consider the need to report to the proper authorities (consulting with others, as needed).

## Warning Signs
1. Reported symptoms or behaviors that are not congruent with observations. For example, the abuser says the child cannot eat, and yet the child is observed eating without the adverse symptoms reported by the abuser.
2. Discrepancy between the abuser's reports of the child's medical history and the medical record.
3. Extensive medical assessments do not identify a medical explanation for the child's reported problems.
4. Unexplained worsening of symptoms or new symptoms that correlate with abuser's visitation or shortly thereafter.
5. Laboratory findings that do not make medical sense, are clinically impossible or implausible, or identify chemicals, medications, or contaminants that should not be present. An example is a serum sodium level that is not clinically within reason.
6. Symptoms resolve or improve when the child is separated and well protected from the influence and control of the abuser.
7. Other individuals in the home or the caregiver have or have had unusual or unexplained illnesses or conditions.
8. Animals in the home have unusual or unexplained illnesses or conditions—possibly similar to the child's presentation (e.g., seizure disorder).

9. Conditions or illnesses significantly improve or disappear in one child and then appear in another child, such as when another child is born and the new child begins to have similar or other unexplained symptoms.
10. Caregiver is reluctant to provide medical records, claims that past records are not available, or refuses to allow medical providers to discuss care with previous medical providers.
11. The abuser reports that the other parent is not involved, does not want to be involved, and is not reachable.
12. A parent, child, or other family member expresses concern about possible falsification or high-healthcare utilization.
13. Observations of clear falsification or induction by the caregiver. This may take the form of false recounting of past medical recommendations, test or exam results, conditions, or diagnoses.

### General Clinical Approach
Some abusers have an uncanny ability to portray themselves as, and persuade others that they are, caring and good caregivers (Schreier, 2002; Schreier & Libow, 1993). Some become social hubs for caregivers of other chronically ill children in the hospital or in their community. Some attempt to establish personal relationships with the professionals supporting them, sometimes successfully luring clinicians or other professionals (including legal professionals) to cross important role boundaries. Further, doctors, therapists, social workers, friends, family, victims, lawyers, and judges are routinely successfully misled to believe the false claims and denials of the abuser. Some abusers are adept at enlisting professionals to serve as their advocates. Such professionals may strongly oppose colleagues and data suggesting that the suspected abuser is the agent of harm to the child. Such staff splitting is typical and underscores the need for an objective analysis of the data and clear guidelines for contacting Child Protection Teams.

Healthcare providers, including mental health experts, do no better than the general public in determining through an interview whether someone is lying. Because it is not possible to detect deception by clinical interview (ten Brinke, Stimson, & Carney, 2014), the value of traditional mental health assessment and evaluation techniques is limited. Table 2 summarizes evaluation and treatment recommendations for clinicians caring for a suspected victim.

### Table 2. Evaluation and Treatment.

| Recommendations for Clinicians Caring for a Suspected Victim |
|---|
| 1. Gather all medical records from past and present treating professionals (see procedure to analyzing caregiver behavior documented in the records in Tables 3 and 4). |
| 2. Make contact and regularly communicate with <u>both</u> parents (all caregivers). <br>    a. Provide all caregivers with ongoing education and feedback about findings and recommendations. <br>    b. Ask all caregivers to repeat back the information provided to them. <br>    c. Carefully document all education and other discussions with the caregivers. |
| 3. Collect collateral data from school personnel and other independent observers who have regular access to the child. |
| 4. Review suspected abuser's online social media activity. |
| 5. Carefully devise evaluation and rehabilitation plans that systematically and objectively |

challenge claims made by the suspected abuser or victim.
   a. All descriptions of symptoms and disability made by family members must be considered possibly inaccurate. For example, in suspected victims, g-tubes and other non-oral feeding interventions should not be placed based solely on verbal reports of symptoms. Objective inpatient observations by clinicians of feeding attempts provide important data for clinical decision making.
   b. Family members cannot be relied upon to properly prepare the child for diagnostic assessments or treatments. For example,
      i. Consider performing a toxicology screen prior to manometry testing to ensure no gut-altering substances have been ingested.
      ii. Consider having a sitter in the room for a pH probe test to ensure that the child is provided only the prescribed oral intake and to ensure the probe position is not changed.
6. Meet with the other clinicians involved in the care of the child to compare data and coordinate plans.
7. Alert other clinicians (verbally and in the chart) about the poor reliability of symptom reports or behavior of the suspected abuser, the importance of relying upon objective data, to proceed conservatively, and the need to document well.
8. Minimize school accommodations, prescriptions, and invasive testing and treatments.
9. While devising evaluation and rehabilitation plans, consultation with an expert is recommended.
10. Report reasonable suspicion of child abuse and neglect to the proper authorities.

Hospital protocols have been published to provide guidance for assessment and management (Parnell & Day, 1998; Sanders, 1999). Optimally, a Board Certified Child Abuse Pediatrician or another professional with APCF, CFIC, or MCA expertise would be involved in all assessments.

### Clinical Documentation
Careful documentation is as important as a careful evaluation. Details can be extremely helpful to those conducting a medical or educational record analysis, including information such as,
   1. Who reported that they witnessed the child with symptoms or impaired functioning (and if they saw the symptoms or impaired functioning at the onset),
   2. The names of past clinicians who made diagnoses of the child,
   3. Exactly what education or clinical instruction has been provided to the caregiver and that caregiver's ability to understand the education or clinical instructions using the teach-back method,
   4. Episodes of nonadherence or leaving (or threatening to leave) the hospital against medical advice,
   5. Requests by the caregiver for specific assessments or interventions,
   6. Episodes of unexplained equipment malfunctions or suspected tampering, and
   7. Other concerning behaviors.

For example, documenting "emesis x3" does not reflect if someone informed the clinician that the child had vomited three times, if the clinician saw the emesis, if the clinician saw the child vomit, or the amount or appearance of the emesis. The documentation is far more helpful when attention is paid to including these details in the medical record. All involved professionals

should be reminded of the importance of carefully documenting all pertinent details in the chart related to each interaction with the patient, suspected abuser, and other caregivers.

**Record Analysis**

Analysis using the available records is the cornerstone of evaluation of this form of abuse and neglect. While clinicians often review records as a standard part of providing care, analyzing the records for behavioral evidence of falsification allows for a broader assessment of the child and suspected abuser. Additionally, a medical record analysis sometimes provides information that reduces the suspicion of abuse or neglect. A task that is typically not covered by health insurance, record analysis often falls to forensic experts who are hired after an initial report of suspected abuse or neglect has been made.

To maximize the validity of the record analysis, all medical records of each child should be obtained whenever possible. When feasible, such as in some legal settings, the medical records of the alleged abuser(s) are also useful to obtain due to the high co-morbidity of falsification upon self and others. It is helpful to analyze the records of all the children in the household because evidence of falsification of illness in siblings may be present even if not initially identified (Bools, Neale, & Meadow, 1992). Any clinician, regardless of discipline or degree, with expertise in the evaluation of this form of abusive and neglectful behavior may analyze the records to evaluate behavior patterns. A comprehensive description of the medical record analysis is described in Sanders and Bursch (2002).

The gold standard medical record analysis requires the creation of a chronological table of nearly every telephone call, office appointment, emergency room visit, pharmacy record, and hospitalization. Missed appointments and hospital discharges against medical advice (as well as threats to leave against medical advice) are also important to include in the table. The table will reveal patterns of healthcare utilization, including the number of healthcare facilities and specialty services involved in the family's care. Columns to include in the table are as follows: Date, name of patient, who brought child in for care, healthcare contact information (location, name and specialty of clinician), history and problems reported by the caregiver, objective data (clinical observations and test results), diagnosis, recommendations, and other important or historical data. Table 3 gives an example. This table can be used as a reference for evaluators and legal professionals, especially if it is in an electronic format that allows for quick searching.

**Table 3. Chronological Table of Patient Health Care.**

| Date | Patient/ BIB | Health Care Contact | Subjective Caregiver Reports | Objective Findings | Diagnosis/ Recommendations | Other |
|------|--------------|---------------------|------------------------------|--------------------|----------------------------|-------|
| 9/17/17 | Alexis<br><br>BIB mom | Dr. Lee, Emergency Medicine, Memorial Hospital ER | Hx of constipation since birth. Followed by GI who advised her to go to ER. Reports 6 days of projectile emesis and food refusal. | NAD. Labs & vitals WNL. Exam benign except for mild diaper rash. KUB WNL. Eagerly took 4 oz. of formula from bottle. No emesis in ER. | *Diaper rash* – Advised mom to keep baby's skin clean and dry. Hydrocortisone cream prescribed. *AGE suspected* – Provided IVF and return if sxs persist. | Mom accurately summarized all guidance and agreed to plan. However, she did not remember the name of GI doctor. |

Unlike a simple review of records, a chronological table allows for pattern analysis of the individual family members and the involved clinicians. A thorough, carefully organized table lends itself to complete analysis of the family's illness and medical treatment trajectories as well as the behavior of family members during medical care encounters. It also allows the evaluator to crosscheck information presented by the patient or suspected abuser about past healthcare encounters and medical problems against the objective data. Table 4 presents key points related to conducting a record analysis.

**Table 4. Key Points: Record Analysis.**

| Key Point | Example |
|---|---|
| Identify and consider the source of the documented information. | Did the documenting clinician actually witness the child vomiting? |
| Determine if suspected abuser should reasonably have had accurate information. | • Was the caregiver provided with adequate education, feedback, and recommendations?<br>• Is there evidence that the caregiver understood the information provided to him or her? |
| Examine primary data and check norms utilized for interpretation. | Review test results, not just the interpretation of test results. |
| Determine if diagnoses or conclusions match objective data. | Was the diagnosis based on the verbal report of the caregiver or was it based on objective data? |
| Determine if objective findings could have been falsified or induced. | In a child victim found to have slowed motility, consider assessing for external agents or dietary manipulations that might have caused that finding. |
| Determine if the illness history makes sense. | • Are there genetic explanations for several children in the same family having similar problems or diagnoses?<br>• Is there a way that a child can be allergic to water? |
| Compare timelines of healthcare-seeking behavior with other records and collateral data. | Identify circumstances and stressors that coincide with healthcare crises. |
| Review available literature. | • Differentiating sudden infant death syndrome from suffocation (Meadow, 1990; Southall & Samuels, 1995),<br>• Identifying falsified chronic intestinal pseudo-obstruction (Hyman, Bursch, Beck, DiLorenzo, & Zeltzer, 2002),<br>• Detecting failure to thrive due to illness falsification (Mash, Frazier, Nowacki, Worley, & Goldfarb, 2011). |

### Video Surveillance

Video recordings of illness induction, whether hidden (covert) or through visible video cameras (overt), can provide compelling direct evidence to judges, juries, and to the family and the abuser. Some abusers have confessed, or been more willing to explore their behavior, after viewing such recordings. Based on the existing laws in the United States, including the Fourth Amendment right to privacy, video surveillance of the child in the hospital room may be permissible for (1) protection of the child patient, (2) assistance in diagnostic evaluations and treatment, much as the way cardiopulmonary monitors are routinely used to monitor inpatients, or (3) protection of the facility and employees from allegations of negligence. Video surveillance is best used to document caregiver attempts at illness induction (e.g., suffocation) or simulation (e.g., tampering with equipment or interfering with tests), or to document the absence of falsely reported symptoms (e.g., apnea, seizures).

Some recommend that video surveillance be reserved for situations in which the child cannot be otherwise properly assessed and protected. It can be a helpful tool if there is a reasonable expectation that, within a reasonable observation period of time, the caregiver will be found to induce (e.g., suffocate or attempt to contaminate IV fluid) or falsely report transient events (e.g., apnea or seizures) for which video surveillance could disprove the caregiver's reports. If it is used to identify induction, continuous monitoring is strongly recommended to allow staff to immediately intervene if the child is being harmed. Video monitoring might also provide information that would help confirm or explain the symptoms, indicating they had not been falsified by a caregiver (Hall, Eubanks, Meyyazhagan, Kenney, & Johnson, 2000; Southall, 1995; Yorker 1995).

If the surveillance is covert, the most legally robust procedure is to obtain a court-ordered warrant prior to starting such surveillance. The petition for the warrant should specify what area will be searched (viewed) and what possible evidence may be found. However, case law exists to suggest that a hospital room is not a place that offers a constitutionally protected reasonable expectation of privacy. On the contrary, parents may expect their child to be monitored and observed, particularly in pediatric settings when infants are at risk of or being evaluated for apnea (Yorker, 1995) or other life-threatening conditions. It is recommended that hospitals add a sentence to the consent for treatment form that parents sign upon admission to a hospital that acknowledges the possibility of video surveillance in any public space in the hospital (Yorker, 1995). State laws may vary depending on whether the hospital is private or public. To provide as much privacy as possible, it is recommended that the camera be focused on the child's bed. Audio can also be helpful, such as to capture coaching behavior or a child arguing with the parent about a symptom or the need for an intervention. However, audio recording can represent an additional invasion of privacy that is not necessary in other situations, such as when suffocation of an infant is suspected. State laws vary related to consent for audio recording.

While video surveillance may be useful, congruent with other forms of child abuse and neglect, it is not necessary to make a determination of APCF, CIFC, or MCA. Because video surveillance evidence can be misleading or may not be admitted into evidence, clinicians are encouraged to collect and provide additional corroborating data to child protective and police investigators, if safe and feasible. For instances in which the diagnosis is clear, video surveillance may be

counterproductive by exposing the child to an unnecessary risk by prolonging the evaluation phase when immediate protection is needed.

**Separation From the Abuser**
Although fraught with clinical, legal, and ethical concerns, separating the child from the suspected abuser is often the only way to objectively evaluate the wellbeing of the child. Clinicians can consider utilizing an escalating approach to achieve separation. A suspected abuser may first be asked to voluntarily refrain from caregiving duties or from visiting the child in the hospital for a period of time. In some situations, an alternate parent or caregiver who does not live in the home may be willing to temporarily care of the child. If a suspected abuser directly asks if he or she is being suspected of illness falsification, an honest answer is typically recommended, pending consideration of safety issues related to sharing this information (for the child, the suspected abuser, and the evaluator). One can highlight that evaluators who assess for this diagnosis if warning signs are present are providing high-quality and comprehensive care. Further, it may be helpful to inform the suspected abuser that the goal of the evaluation is to help the family regardless of the identified cause, including if it is determined to be a case of child abuse or neglect. Some locations allow for hospital personnel to impose strict visitation or caregiving boundaries on caregivers or to place clinical observers in the hospital room. However, court orders are sometimes required to achieve a diagnostic separation. If the clinical evaluation indicates that the child has been or is at risk for harm, such separations may be lengthy or permanent.

If the child's condition or functioning improves when sufficiently protected from the influence of the suspected abuser (at the same time that the child is receiving support for normal or improved functioning), many courts will use the concept of *res ipsa loquitur*, which translated from Latin means "the thing speaks for itself," to consider the improved condition or functioning to be compelling circumstantial evidence of APCF, CFIC, or MCA. As with video surveillance, however, separation should not be the only component of the evaluation.

Well-implemented diagnostic separations require several safeguards and caveats. First, the separation must be for a sufficient length of time to be valid. For example, if the child with reports of uncontrolled epilepsy for several years normally has a grand mal seizure once a week and the longest reported time between seizures is one month, then the separation would need to be inclusive of these timelines. Additionally, the strength of the conclusion of seizure falsification would depend on how long the child is objectively observed.

Second, all tests must be done with the utmost of care and fairness to the suspected caregiver(s) and child. Unmitigated symptoms following separation from the suspected abuser are an indicator that a child's symptoms may be genuine. However, it is important to be mindful that APCF, CFIC, or MCA victims with pre-existing medical conditions may only have some of their problems resolved or may only experience a change in the level of severity of symptoms after separation. In some cases, a victim may have iatrogenic illnesses or conditions due to having received unnecessary treatment in the past. Such iatrogenic problems may or may not resolve following separation.

Third, care and vigilance are needed to ensure that the victim is fully protected during the separation. Abusers may surreptitiously poison, intimidate, or coach a child victim, thus perpetuating illness or impairment during separation. They may try to gain access and influence the child by convincing the visit monitor or foster parent that they are not a threat to the child. Please see the recommended visitation guidelines.

Fourth, evaluators must be mindful of how changes in treatment around the time of separation can influence a child's symptoms. If treatments are changed right before or after the child is placed in protective care, the change in treatment might account for the change in symptoms. Related, improvements in symptoms or functioning can be incorrectly attributed to treatment changes made at the time the child is taken into protective care. Thus, it is helpful to be thoughtful about how to systematically implement changes in the treatment plan for optimal clarity regarding cause and effect. For example, one would not expect seizures to stop because an antiepileptic medication was stopped. If a child had a genuine seizure disorder, one would expect an increase in seizures in this situation. However, one might not be surprised if that same child reported being less sleepy at school once the medication was stopped.

Finally, if a history of symptom or impairment induction by poisoning is suspected, it is helpful to have an assessment plan in place so that all visit monitors and foster parents know what to do if there is an occurrence of acute symptoms during or within hours of a visit. The plan may require bringing the child to a medical setting or submitting a biological sample to a laboratory for analysis, in which case it will also be important to have clear chain of evidence protocols in place. Toxicology experts can be invaluable in developing toxicology screening plans based on symptom presentations and in considering cross-reactivity that could cause false positives (Holstege & Dobmeier, 2006). Lastly, it is a good idea to ensure the lab preserves serum from any blood draws so that confirmatory or additional tests may be performed, if needed.

### Example of Differential Diagnosis of APCIF, CFIC, and MCA
Consider the example of a parent who persistently interprets or reports a child's movements to be seizures despite repeatedly normal medical evaluations and feedback. If such a parent persists in exposing the child to unneeded evaluations and treatments, and persistently requests unneeded school accommodations, this may be abusive and require a mandated report to CPS, regardless of the parent's motivation or psychopathology.

Because the child in the example above received unnecessary and harmful, or potentially harmful, medical care at the instigation of a caregiver, the MCA term applies to the situation (Roesler & Jenny, 2009). If deception is apparent, the APCF and CFIC terms also apply (Ayoub et al., 2002, 2004; Flaherty & MacMillan, 2013).

If the parent is reporting that an EEG showed, or that a physician diagnosed the child with, epilepsy when it is known by the parent that this is not true, this deceptive behavior may reflect malingering (if external, or secondary, gain is the primary motivation) or be due to FDIA (if internal, or primary, gain is the driving motivation).

If the child is having seizures due to smothering by the parent, this child abuse could be due to malingering, FDIA, or physical abuse (e.g., a parent attempting to stifle a crying child).

16

If the child has a seizure disorder that the parent is knowingly undertreating or significantly exaggerating for the parent's primary gain (psychological reasons), this would satisfy the criteria for FDIA. If the same parent were engaged in this neglectful behavior for external gain, the parent would be considered to be malingering. Regardless of the reason for the behavior, it would also constitute medical neglect.

If the parent has an inaccurate belief (without the presence of deception) related to reports of seizure activity, the resulting abuse by overmedicalization might be due to a delusional disorder or anxiety in the parent. This behavior would be considered MCA. Delusional disorders typically can be distinguished from FDIA and malingering by the lack of deception and by the morbid (and less feasible) nature of the symptom description (e.g., a delusional person might report that seizures are being caused by a melting brain or by a nonexistent parasite infestation, but no previous clinician has believed them).

The above scenario could also be enacted in a mental health setting with a parent falsely claiming his or her child suffers from psychogenic nonepileptic seizures. While not meeting the definition of MCA if medical intervention is not being sought, this scenario would meet the definition for APCF.

Regardless of the scenario, any clinician who suspects an individual is being harmed by abuse or neglect is legally required to report reasonable suspicions to Child Protective Services (CPS) or police in order to protect the suspected victim.

### Approaches to Psychiatric Evaluation of Alleged Abuser

Evaluation of the psychopathology of the suspected abuser generally occurs after the suspicion of abuse or neglect has been reported to child protection agencies. Because caregivers are not registered patients when they are in clinical settings for their children and because they rarely admit to any wrongdoing, mental health clinicians embedded in pediatric clinical settings are generally not able to evaluate if the caregiver meets criteria for FDIA or a related disorder. It typically requires the mandate of a court to obtain cooperation to participate in a psychiatric or psychological assessment.

Mental health professionals are as vulnerable as any other professionals to being misled by a factitious disordered individual, so it is important that any such evaluators have expertise on this topic or have access to consultants who can guide them.

Clinical interviews and psychological testing cannot be used as evidence that abuse or neglect did not occur. In fact, as in all forms of child abuse and neglect, an abuser may appear completely normal upon testing or interview. While the record analysis and other collateral information generally allow one to determine if illness or condition falsification or overmedicalization has occurred, the mental health evaluation allows for the formulation and evaluation of hypotheses about the driving causes of the caregiver's behavior. For example, if the suspected abuser demonstrates clear signs of extreme anxiety or of a psychotic thought process, this information might explain why they engaged in the abusive behavior. Diagnostic clarity and

17

consideration of possible motivations allow the evaluator to opine about the likelihood that treatment will be successful and to provide appropriate treatment recommendations, including specific modalities for an abuser with identified psychiatric co-morbidity. A protocol for performing these evaluations is described in Sanders and Bursch (2002).

## Reporting Requirements and CPS and Police Investigations

### Medical, Mental Health, and Education Professionals

Many mandated reporters want to be sure the caregiver is volitionally falsifying prior to reporting possible child abuse or neglect. Such caution may lead to substantial delays in protecting victims, particularly in cases in which the suspected abuser thwarts efforts to challenge medical claims or refuses to provide access to collateral sources of information (such as records, past providers, or the other parent). In such cases, CPS can assist clinicians in conducting proper evaluations. Referral to CPS is based on child harm, not the motivation of the suspected abuser.

Most states require providers to report to CPS or police if they suspect or have reasonable cause to believe a child is a victim of abuse or neglect, and if they are reporting suspected abuse in good faith. If a mandated reporter writes in the chart, *suspected Munchausen by proxy*, that reporter is charting that this is a case of suspected child abuse or neglect. As with any form of abuse or neglect, a CPS report is indicated unless the mandated reporter adequately ruled out MBP (or APCF, CFIC, or MCA) and documented how it was ruled out. Unreported suspicions of abuse or neglect can result in criminal or civil penalties for the mandated reporter. Although a clear conclusion of APCF, CFIC, or MCA is not required for the suspicion to be reported, inclusion in the CPS report of any of supporting data is extremely helpful to child abuse authorities who may not have the expertise to conduct such an evaluation.

### Family Meeting and Informing Conference

When it becomes apparent that a child is not as ill or impaired as the caregiver reports, the treatment team may need to hold a meeting to inform the parents of the diagnostic findings and treatment recommendations. It is extremely important that both parents obtain this information. The team should decide on a case-by-case basis how best to inform both parents as one parent may not be aware of the overmedicalization of the child due to the behavior of the other parent. In this family meeting, conclusions that the child is not as sick or impaired as reported are presented along with recommendations to remove unneeded treatments and interventions and to use a rehabilitation model to treat the child. The offending caregiver's response to this information and subsequent compliance with withdrawing treatments may reveal how amenable the parent is to intervention. However, in all cases of APCF, CFIC, or MCA, a protective services referral will be necessary to ensure the suspected abuser does not sabotage treatment. Furthermore, the literature documents cases of maternal suicide, psychiatric decompensation, suicide attempts, flight, or child abduction upon being presented with evidence that the child is healthier than presented, or of illness fabrication, exaggeration or medical child abuse (Vennemann et al., 2006; Yorker & Kahan, 1991). Whenever the diagnostic or other potentially stressful update meetings occur, a safety plan should be in place and psychological support available.

In some cases, the information may not rise to the reasonable cause to believe reporting threshold, but be concerning enough to alert hospital colleagues (verbally or within the medical record) to document any conflicting data or statements and to be circumspect in their efforts to evaluate and treat the child, with an emphasis on using objective findings for diagnosis and treatment.

**Child Protection Services (CPS)**
Some jurisdictions have created CPS protocols and guidance to support caseworkers and supervisors (Arizona Department of Child Safety, 2012; Michigan Governor's Task Force, 2013). However, most CPS professionals have not been trained to understand and investigate this form of child abuse and neglect. Even if they are, this is a very labor-intensive and specialized form of abuse and neglect to investigate. As previously mentioned, it is recommended that the mandated reporter help the CPS agency understand exactly what and why they are reporting. For example, medical neglect might be reported for a parent who is not properly administering medications in order to cause increased seizures. CPS might incorrectly close the case because the child has frequent contact with medical clinics, not appreciating the risks related to the medication noncompliance. It is recommended that the mandated reporter make it very clear what types of abusive behaviors are being reported along with the observed or suspected harm to the child. If a child has a genuine seizure disorder, failure to administer prescribed medications is hazardous and negligent. Additionally, the child may be exposed to excessive amounts of medical intervention (such as escalating doses of anti-seizure medication), may be missing out on school and social events, and may be repeatedly informed that he or she has an unstable or dangerous medical or mental problem, thus harming the child's self-perception. Overall, then, the CPS report might include concerns about medical abuse, emotional abuse, and medical, educational, and social neglect.

CPS will likely need outside resources to adequately evaluate these cases. As described before, all medical records should be obtained for the index child as well as other children, alive or dead. If possible, it is recommended that the medical records of the caregivers also be obtained. Once all of the records are obtained directly from the treating facilities (not records provided by the suspected abuser or another family member), a professional with expertise in assessing suspected APCF, CFIC, or MCA should organize and analyze them. It is *not* sufficient to have a clinician with general medical knowledge read the record. The primary goal is to systematically analyze the behavior patterns of the suspected abuser to detect deception and signs of illness induction. School and other records may also be very helpful, if available. Some states give CPS legal access to all the child's records once a report is filed. This can be utilized to obtain records when the parent refuses access to them.

It is recommended that at least one CPS worker in each county be trained in this form of abuse and neglect. The CPS worker should be able to take the lead in any reports of this type of abuse and have expert consultation available as needed.

In some jurisdictions, CPS must notify the suspected abuser that he or she is the subject of a child abuse investigation—often within several days of the initiation of the case. This notification can jeopardize the investigation and put the child at risk if the child is not taken into protective custody at the same time. It is recommended that, in locations in which such

19

notification procedures are mandated, a protocol be established about how to safely handle such cases. Bursch (2018) provides additional CPS guidance.

**Police and Legal Investigations**

Many states require cross-reporting, and it is recommended that police be notified along with CPS when abuse or neglect is first reported. Depending on the nature of the abuse, there could be physical evidence present in the victim's hospital room or other locations that police will need to collect. It may not become clear until later in the investigation that induction of symptoms occurred. Police access to a possible crime scene at the time of the report is important to an effective law enforcement investigation. Police may immediately attempt to locate and preserve all social media accounts, blogs, or any other electronic writing activity by the suspected abuser. If involved, police should coordinate closely in a multidisciplinary manner with Child Protection Services, medical personnel, and prosecutors to ensure all facets of the investigation are covered. Finding and preserving the social media accounts of the suspected abuser *before* the first CPS interview is very important, as the suspected abuser may delete his or her social media accounts once the nature of the allegation is apparent.

Police and CPS should coordinate obtaining all medical records for the victim. Police should also attempt to locate cooperative witnesses outside the medical community that knew the victim and abuser. Police need to obtain, by consent or search warrant, all electronic communication (text messages, emails) between these witnesses and the abuser if these witnesses state that the abuser communicated electronically about the health of the victim. Consideration should be given to including all text messages, emails, and social media posts into the medical record spreadsheet, sorted by date (Brown, Gonzalez, Wiester, Kelly, & Feldman, 2014; Feldman & Brown, 2002; Sanders & Bursch, 2002) as part of the behavior analysis. This document can also be used as a reference for prosecutors and others, especially if in an electronic format that allows for quick searching.

The police investigator should also be prepared to obtain and execute search warrants for the suspected abuser's computing devices, including smart phones, if probable cause can be established. Probable cause may be established with a combination of friends reporting the abuser researching medical ailments, toxic substance or other incriminating topics on the computer that were subsequently presented to clinicians (documented in the medical records or reported by a clinician), or by the existence of a false or exaggerated medical history in the social media records.

The police investigator should attempt to interview the suspected abuser. All interviews should be recorded (both video and audio if possible). The timing of this interview is case specific. In cases of suspected illness induction, it should be delayed until the child is safe. The investigator should approach the suspected abuser in an open, curious manner. This stance will allow the alleged abuser to simply give his or her story. If the story does not fit the evidence, these data then allow the investigator to review the discrepancies with the alleged abuser. Review of discrepancies with the abuser may result in an admission. Although they frequently maintain a stance of denial, those with FDIA are typically legally competent and aware of their deceptive actions.

Investigators should confirm every detail reported by the suspected abuser. This includes details not related to the abuse. For instance, if the suspected abuser reports attending nursing school, investigators should subpoena the suspected abuser's transcript from that school. Investigators should also obtain the suspected abuser's own medical history and medical records as there is the possibility that the suspected abuser has also feigned his or her own illness.

Coordination and cooperation among law enforcement, Child Protective Services, clinicians, and the prosecutor's office are essential for a successful criminal prosecution (Weber, 2014).

## Case Management and Treatment

Case management of MBP cases can be extremely challenging and resource depleting due to the severe and insidious nature of the associated psychopathology. Thus, it is extremely important that case managers and all treating clinicians have ongoing access to medical and mental health MBP experts for appropriate consultation and guidance. This expert input is particularly valuable when important decisions are being made, such as decisions related to placement, reunification, visitation guidelines, and treatment and rehabilitation plans.

### Child Protection and Placement

Following an allegation of abuse or neglect, the first priority is the protection of the child from further harm. Siblings may also be at risk. Research has suggested that 35%-50% of siblings are abused (sometimes fatally) prior to the identification of MBP abuse in the index child (Davis et al., 1998; Grey & Bentovim, 1996). As with other forms of child abuse and neglect, even typically developing and verbal teens may not be able to protect themselves or even be aware that they have been the targets of MBP abuse or neglect.

If children are removed from a suspected abuser, placement decisions must be made very carefully. Per usual CPS protocol, child abuse victims are frequently placed with a nonabusing parent (in the case of divorced families) or extended family members (e.g., grandparents). In cases of suspected MBP, this placement choice can be insufficient to adequately protect the children. Placement with relatives of family friends should be done *only* if such individuals acknowledge the abusive behaviors, agree to protect the children, and have the ability to protect them. It is important to remember that parents or other relatives of the suspected abuser may be at increased risk to abuse or neglect the children as this behavior is sometimes multigenerational. The victim's parent may have previously been similarly abused or neglected by the child's grandparent (Libow, 2002). Since one possible motivation for illness falsification and healthcare utilization is to escape an abusive family member, this possibility will also need to be evaluated before placement with a family member. Further, the relentless pressure by those with FDIA to gain access to and control over the child victim can wear down even the most resilient or well-meaning and skilled caregivers. In most cases, a specialized assessment is needed to fully ascertain their willingness and ability to protect the children from an abusive caregiver. Most frequently, the children are best placed with foster parents who do not know or interact with the suspected abuser. Sometimes a medical foster home is indicated, as the child may have genuine medical needs or may need to be weaned from care under skilled medical observation.

21

Re-abuse (further falsification or other abuse or neglect) is a risk for children who have been deemed by CPS or the courts to be safe to return to the home of the abuser. Re-abuse rates have been found to range from 17% for mild cases of MBP to 50% for moderate cases (Bools, Neal, & Meadow, 1993; Davis et al., 1998). Reunification is often not possible in cases of severe MBP abuse or neglect.

## Reunification Services

In assessing the risk to the current or future children, factors regarding the original abusive acts as well as the alleged abuser response to the allegations are important safety variables to consider. The younger the child victim and the more severe and chronic the MBP abuse or neglect, the greater the possibility of future lethality. There is evidence that individuals with FDIA are very difficult to treat and a significant number of them have continued to abuse or neglect their children during and following treatment (McGuire & Feldman, 1989; Rosenberg, 1987). Treatment has been successful in rare cases, only when the abuser has been able to acknowledge his or her abusive behaviors and alter behaviors related to the child's health. The abuser must develop increased empathy for his or her victims, and learn and consistently use more effective coping skills (Berg & Jones, 1999; Roesler & Jenny, 2009; Sanders, 1996).

If the family is offered reunification services, a case plan must be put into place that provides safety as well as appropriate treatment. A treatment team consisting of child protection, foster care parents, physicians, visitation supervisors, and therapists must have open communication and should have access to all assessments that have taken place. The team must check the veracity of everything the caregiver says as ongoing deception is common and team members are frequently pit against each other by the deceptive abuser. The case plan should be court ordered and supervised. Voluntary services are insufficient. Simple compliance with these plans does not assure reunification. It is necessary for the caregiver to not only comply but also *benefit* from the interventions provided in order to truly provide a safe environment for his or her child(ren).

Caregivers should not be permitted to have telephone contact with the children or attend medical visits, except as supervised by either Child Protection or another team professional. Components of a comprehensive case plan appear in the following paragraphs.

## Supervised Visitation

Ideally, staff that is highly trained in child development and MBP should oversee supervised visitation. These cases are very difficult to safely supervise and typically require a higher level of supervision than is commonly provided to families. Ideally, this should be Therapeutic Supervised Visitation, which is provided by staff with master's degrees. These staff should be included in the treatment team.

The visit supervisor should be watchful for subtle messages suspected abusers and other caregivers give to the children during visits (verbal, nonverbal, or written) that maintain focus on medical complaints. They should be alert to efforts by the children to use physical or other complaints to obtain the abuser's care and attention. They should be aware of the significant impact of the prior abuse and neglect on the children's development, identity, and self-image.

Most children have a strong desire to maintain contact with their caregivers, including the suspected abuser. It may be in these children's best interest to continue visitation with caregivers if properly supervised, especially if they are older. However, the supervisor must not leave the child alone with the alleged abuser at any time. They must not allow the alleged abuser to give the child anything to consume or apply any topical products to the child, as there have been numerous cases in which an abuser has given the child substances to induce illness during supervised visits. Visit supervisors are encouraged to document comments and behaviors of family members during the visits to provide ongoing information about the caregivers' behaviors, family dynamics, and the progress they make in therapy.

Specific visitation guidelines based on the abuser's behavior are typically required. General recommendations are presented in Table 5.

**Table 5. General Visitation Guidelines.**

- A professional familiar with the case and with the court orders should closely monitor all visitations in a neutral location.
- The suspected abusers (and related caregivers) should not discuss health-related issues, including diet, with their child.
- They should not give their child food, drinks, candy, gum, lotions, or medicine.
- They should not attempt to influence the child to distrust children's services staff, his or her foster family, or treatment team.
- The child should be visible at all times.
- All conversation must be audible to the monitor.
- All physical contact must be developmentally and socially appropriate.
- All gifts and cards must be socially and developmentally appropriate, with only one gift allowed per visit and examined before it is provided to the child.

**Child Therapy**

Children may not realize they are or were being victimized. Therefore, it may be confusing for them to consider this possibility. It is important to be aware that their sense of reality may be significantly impacted. If the abusive caregiver is able to admit to his or her behavior and explain it to the child, this may be helpful for both the caregiver and child in moving forward. If the caregiver is unable to do this in a timely manner, the therapist may help the older child (about 10 years of age or older, depending on the child's developmental capacity for abstract thought) gather past medical information and use a neutral stance to allow the child to independently consider (and potentially reformulate) his or her past experiences (Bursch, 1999). Thus, the child may begin to gain some understanding of how the past abuse and neglect may have created a lifestyle of illness that may now cease or change. Therapists need to be alert to the possibility that the child has developed iatrogenic medical trauma symptoms, attachment disorders, somatizing disorders, anxiety, collusive condition falsification behavior (even in young children), and other commonly seen problems developed by children who have suffered abuse or neglect. Those who have been prevented from eating may struggle with eating normally. Those who have suffered physical harm, from induction or medical intervention, may continue to exhibit associated signs and symptoms.

23

Therapists may work closely with rehabilitation staff to support independent functioning with behavior plans and to support appropriate self-perceptions of health and abilities. School and social reintegration are important components of treatment.

### Abuser Therapy

Falsification behavior due to FDIA is highly unlikely to stop simply upon diagnosis and confrontation. Because most abusers with FDIA also have personality disorders and deny their abusive behaviors, treatment success is frequently not possible. Indicators of successful treatment that apply broadly to many forms of child abuse and neglect are presented in Table 6 (Berg & Jones, 1999; Flaherty & MacMillan, 2013; Sanders, 1996). Those less likely to benefit from therapy include those with severe personality disorders and those who have engaged in more lethal forms of abusive behaviors, such as suffocation or poisoning (Davis et al., 1998; Jones, 1987).

**Table 6. Indicators of Successful Treatment.**

1. The caregiver is able to fully admit to the abuse and neglect, including details;
2. The caregiver is able to demonstrate empathy for the victimized child(ren);
3. The caregiver has developed strategies to better identify and manage his or her needs in order to avoid abusing the child(ren) in the future; and
4. The caregiver has demonstrated these skills, with monitoring, over a significant period of time.

Treatment approaches vary, but all should include a focus on the caregiver taking responsibility for abusive behaviors and developing more effective coping strategies. The need for effective therapy pertains to the offending parent as well as to the other parent if he or she failed to recognize abuse or protect the child. One narrative therapy approach includes the deconstruction of the dominant story of illness and disability in favor of the acknowledgment of the alternative narrative of improved health and wellness that would support appropriate parenting and safety (Sanders, 1996). Evidence-based therapy that addresses the abuser's co-morbidities may be helpful. Examples include dialectical behavioral therapy or trauma-focused cognitive behavioral therapy. Treatment with psychotropic medication may also be indicated for psychiatric co-morbidities. Those abusers who acknowledge their behavior and make good therapy progress should also have a social support network and a relapse prevention plan in place prior to any reunification attempts. The original evaluator optimally conducts all evaluations of progress. Therapists are not appropriate evaluators as they may be charmed or misled by abusers and may overestimate therapy progress. Additionally, therapy is compromised if the abuser is aware that the therapist is advising the court.

### Family Therapy

If the family moves toward reunification, the child may be introduced to the caregiver therapy once both are well prepared for such an exposure. These sessions may be helpful to the child if the caregiver is able to acknowledge the APCF, CFIC, or MCA behaviors and take responsibility for those behaviors with the child. This type of encounter may give the child the opportunity to gain clarification about the past abuse and neglect and to express how the abuser has impacted him or her. A protocol that provides guidelines for this type of therapy is currently under review for publication (Sanders & Bursch, 2017).

24

Intensive family-focused hospital-based interventions can be effective with abusers who are less severely impaired by a personality disorder and who acknowledge the abusive behavior (Berg & Jones, 1999).

### Reunification of Family
Reunification efforts should consider the child's need for early permanency. These needs may have a much shorter timeline than that required for caregiver treatment. Reunification with the abuser is especially dangerous in cases of illness induction or when the caregiver–child dynamic is highly dysfunctional.

If partial or no progress has been made in therapy, typically within six months of receiving appropriate therapy, reunification is not recommended. Partial progress that is deemed to be genuine suggests that further treatment may be effective. In such cases, reunification may be a reasonable case plan. If significant progress has been made in therapy and reunification appears feasible, a forensic evaluation by an expert should take place to confirm that meaningful progress has been made and that sufficient supports are in place. Reunification, if it is attempted, should occur over a significant period of time with support and long-term monitoring in place.

### Long-Term Monitoring
Long-term monitoring should occur after reunification, including frequent communication with the child's pediatrician, therapists, and school. The ability of the parent to refrain from future abuse and neglect must be proven over several years, optimally throughout the childhood years of the children in the home. The courts may recommend a lengthy probation period, during which the abuser would need to receive court authorization to move or travel out of the jurisdiction.

### Clinical Monitoring
To attempt to identify any reoccurrence of APCF, CFIC, or MCA behaviors, the caregivers should be required to engage in a clinical monitoring plan. The child should have a primary care clinical home that can direct and be aware of all investigations and interventions. Caregivers must agree to authorize all treatment through a clinical team that has been informed about the past APCF, CFIC, or MCA abuse and neglect, believe the allegations to be true, and accept responsibility for case management and communication with involved others. It is best if the primary clinician is the clinician who identified the APCF, CFIC, or MCA behaviors, with a second clinician back up, such that all treatment is authorized by one of these two clinicians only. Typically, this clinician would be the child's primary care physician and a backup. This physician team is asked to take on the responsibility of monitoring the family's access to care throughout the childhood years of all the present and future children. If the physicians retire or the family needs to move, the family must authorize a release of information regarding the past abuse and neglect allegations to the accepting physician team. The court-mandated plan should not allow the caregiver to switch healthcare providers without justification and approval.

Caution must be taken to ensure that a clinical monitoring plan is not the only safety net in place. Abusers engage in abusive and neglectful behavior outside the clinical setting, often on a daily basis, in service of the larger illness story they perpetuate with the victim(s) and others.

# APSAC Practice Guidelines

Therefore, the clinical monitoring is only one component of a larger safety plan. For example, children should also be enrolled in daycare or school to assist monitoring. If the abuser is sufficiently wealthy to pay cash for clinical care or medical equipment, it may require additional planning and effort to track healthcare utilization.

Clinicians caring for children with a history of suspected APCF, CFIC, or MCA provide a basic level of safety when they are conservative in prescribing practices and other treatment recommendations, as well as in their support for school accommodations. They should take suspected caregiver and patient reports of symptoms with a dose of skepticism and engage the other parent or protective adults in the care of the child, if possible. Effective clinicians provide ongoing feedback to the caregivers about any problematic behavior they encounter. They do not allow themselves to be pressured to provide treatments or recommendations that are not necessary. They document clearly and with details, maintain professional boundaries, and consult with colleagues and experts as needed. Finally, they provide education about normal development and body functions to caregivers, documenting such education was provided along with the caregiver's reaction to the education and understanding of the information when asked to repeat it back to the clinician.

Members of the APSAC Taskforce: Abuse by Pediatric Condition Falsification are as follows:

- Randell Alexander, MD, PhD, University of Florida, College of Medicine—Jacksonville
- Catherine Ayoub, RN, EdD, Harvard Medical School, Boston Children's Hospital, Massachusetts General Hospital
- Brenda Bursch, PhD, Departments of Psychiatry & Biobehavioral Sciences, and Pediatrics, David Geffen School of Medicine at University of California, Los Angeles.
- Kenneth Feldman, MD, Seattle Children's Hospital
- Marc Feldman, MD, University of Alabama
- Danya Glaser, MD, Great Ormond Street Hospital for Children, London, United Kingdom
- James Hamilton, PhD, University of Alabama
- Carole A. Jenny, MD, Pediatrics, University of Washington, Seattle
- Michael Kelly, MD, Department of Psychiatry, Stanford Medical School
- Bethany Mohr, MD, Michigan Medicine, University of Michigan, Ann Arbor
- Thomas A. Roesler, MD, Seattle Children's Hospital
- Mary Sanders, PhD, Stanford Medical School
- Herbert Schreier, MD, Department of Psychiatry, UCSF–Benioff Children's Hospital Oakland
- Suzanne M. Schunk, LCSW, ACSW Southwest Human Development, Phoenix, Arizona
- John Stirling, MD, FAAP, Child Abuse Pediatrics, San Diego
- Claudia Wang, MD, Department of Pediatrics, David Geffen School of Medicine at University of California, Los Angeles.
- Michael Weber, BS, Tarrant County Texas District Attorney Investigator
- Beatrice Yorker, RN, MS, JD, California State University, Los Angeles

26

## References

American Psychiatric Association (APA). (2013). *Diagnostic and statistical manual of mental disorders: Fifth edition (DSM-5)*. Arlington, VA: American Psychiatric Association.

Arizona Department of Child Safety. (2012). *Investigating Munchausen by proxy: Policy and procedure manual*. Chapter 2, Section 4.6. Retrieved from https://extranet.azdes.gov/dcyfpolicy/Content/02_Investigation_Asssessment_Case%20Plann ing/investigations/investigations_mbp.htm

Ayoub, C. C., Alexander, R., Beck, D., Bursch, B., Feldman, K. W., Libow, J. . . . Yorker, B. (2002). Position paper: Definitional issues in Munchausen by proxy. *Child Maltreatment, 7*(2), 105-111.

Ayoub, C. C., Alexander, R., Beck, D., Bursch, B. Feldman, K. W., Libow, J. . . . Yorker, B. (2004). Erratum. *Child Maltreatment, 9*(3), 337.

Ayoub, C. C., Schreier, H. A., & Keller C. (2002). Munchausen by proxy: Presentations in special education. *Child Maltreatment, 7*(2), 149-159.

Bass, C., & Glaser, D. (2014, April). Early recognition and management of fabricated or induced illness in children. *The Lancet, 383*(9926), 1412-1421.

Bass, C., & Jones, D. (2011). Psychopathology of abusers of fabricated or induced illness in children: Case studies. *The British Journal of Psychiatry, 199,* 113-118.

Berg, B., & Jones, D. P. (1999). Outcome of psychiatric intervention in factitious illness by proxy (Munchausen's syndrome by proxy*). Archives of Disease in Childhood, 81*(6), 465-472.

Bools, C. N., Neale, B. A., & Meadow, S. R. (1992). Co-morbidity associated with fabricated illness (Munchausen syndrome by proxy*). Archives of Disease in Childhood, 67,* 77-79.

Bools, C. N., Neale, B. A., & Meadow, S. R. (1993). Follow-up of victims of fabricated illness (Munchausen syndrome by proxy). *Archives of Disease in Childhood, 69,* 625-630.

Bools, C. N., Neale, B. A., & Meadow, S. R. (1994). Munchausen syndrome by proxy: A study of psychopathology. *Child Abuse & Neglect, 18,* 773-788.

Brown, A. N., Gonzalez, G. R., Wiester, R. T., Kelly, M. C., & Feldman, K. W. (2014). Caregiver blogs in caregiver fabricated illness in a child: A window on the caregiver's thinking? *Child Abuse & Neglect, 38*(3), 488-497.

Bursch, B. (1999, October). Individual psychotherapy with child victims. In H. Schreier (Chair), *Munchausen by proxy: Psychiatric presentations, treatment findings, what to do when a new child is born.* Symposium meeting of the American Academy of Child & Adolescent Psychiatry, Chicago.

Bursch, B. (in press). Child Protective Services management of cases of suspected child abuse/neglect due to factitious disorder imposed on another. *APSAC Advisor.*

Davis, P., McClure, R. J., Rolfe, K., Chessman, N., Pearson, S., Sibert, J. R., Meadow, R. (1998). Procedures, placement, and risks of further abuse after Munchausen syndrome by proxy, non-accidental poisoning, and non-accidental suffocation. *Archives of Diseases in Childhood, 78,* 217-221.

Feldman, M. D., & Brown, R. M. (2002). Munchausen by proxy in an international context. *Child Abuse & Neglect, 26,* 509-524.

Flaherty, E. G., & MacMillan, H. L. (2013). Caregiver-fabricated illness in a child: A manifestation of child maltreatment. *Pediatrics, 132*(3), 590-597.

Schreier, H. A. (1997). Factitious presentation of psychiatric disorder: When is it Munchausen by proxy? *Child Psychology and Psychiatry Review, 2,* 108-115.

Schreier, H. A. (2002, May). On the importance of motivation in Munchausen by proxy: The case of Kathy Bush. *Child Abuse & Neglect, 26*(5), 537-549.

Schreier, H. A., & Libow, J. A. (1993). *Hurting for Love.* New York: Guilford Press.

Sheridan, M. S. (2003). The deceit continues: An updated literature review of Munchausen syndrome by proxy. *Child Abuse & Neglect, 27*(4), 431-451.

Southall, D. P., & Samuels, M. P. (1995, April). Some ethical issues surrounding covert video surveillance—A response. *Journal of Medical Ethics, 21*(2), 104-105, 115.

Stirling, J., & American Academy of Pediatrics Committee on Child Abuse and Neglect. (2007). Beyond Munchausen syndrome by proxy: Identification and treatment of child abuse in the medical setting. *Pediatrics, 119,* 1026-1030.

ten Brinke L., Stimson D., & Carney, D. R. (2014, May). Some evidence for unconscious lie detection. *Psychological Science, 25*(5), 1098-1105.

Vennemann, B., Pendercamp, M., Weinmann, W., Fallon-Marquardt, M., Pollak, S., & Brandis, M. (2006). A case of Munchausen syndrome by proxy with subsequent suicide of the mother. *Forensic Science International, 158*(2), 195-199.

Weber, M. C. (2014). Investigating medical child abuse. *The Texas Prosecutor, 44*(1), 34-40.

Yorker, B. C. (1995). Covert video surveillance of Munchausen syndrome by proxy: The exigent circumstances exception. In *Health Matrix: Journal of Law—Medicine. Case Western Reserve University Law Review, 5*(2), 325-346.

Yorker, B. C., & Kahan, B. B. (1991). The Munchausen syndrome by proxy variant of child abuse in the family courts. *Juvenile and Family Court Journal, 42*(3), 51-58.

 

The American
Professional Society
on the Abuse of Children®

In partnership with

THE NEW YORK FOUNDLING

*Strengthening Practice Through Knowledge*

# About APSAC

The American Professional Society on the Abuse of Children (APSAC) is the premiere, multidisciplinary professional association serving individuals in all fields concerned with child maltreatment. The physicians, attorneys, social workers, psychologists, researchers, law enforcement personnel and others who comprise our membership have all devoted their careers to ensuring the children at risk of abuse receive prevention services, and children and families who become involved with maltreatment receive the best possible services.

APSAC meets our goal of 'strengthening practice through knowledge' by supporting, aggregating and sharing state-of-the-art knowledge though publications and educational events. Our publications include the peer-reviewed, professional journal Child Maltreatment; the widely distributed translational newsletter The APSAC Advisor; news blasts on current research findings, The APSAC Alert; and Practice Guidelines like this document. Regular training events include our annual colloquia, attracting the top experts in the field to present to peers and colleagues at all stages of their careers; highly acclaimed forensic interviewing clinics and advanced training institutes held at the International Conference on Child and Family Maltreatment. We regularly initiate and test new CEU eligible training courses, and are currently developing, and an online course for early career professionals.

If you found these Practice Guidelines valuable and would like access to all of APSAC's publications, resources, and training discounts, please consider becoming a member. Learn more about becoming a member at apsac.org/membership.

To make a donation to support the creation and updating of APSAC Practice Guidelines, go to bit.ly/DonateToAPSAC.

Thank you for supporting APSAC!

**Appendix A -Records Review for Eliron Fidler**

| Date | Symptoms | Objective Evidence | Type of Falsification |
|---|---|---|---|
| 4/23/19 Member profile. Information | Eliron ( 7 at time)diagnosed with Dysautonomia, Seizures, ADD, developmental delays, hypogammaglobinemia and SPD. Taking hypogammaglobinemia guanfacine (for ADHD). Had frequent ER visits due to dehydration. The report stated he needs constant adult supervision. Not clear where this information was coming from.<br><br>Eliron had a diagnosis of Epilepsy. He frequently got ds hydrated. Report stated he was not potty training. Can't brush teeth. Cannot due two step directions. He has cecostomy flush daily. Had speech therapy. Described as having many health issuers. Social without social maturity. In first grade in regular classroom. Cannot evacuate at home.<br><br>Mom wants him to improve on communication, physical balance, holding a pen and other skills.<br><br>He was receiving Speech, occupational and physical therapy | Doctors have determined there is nothing wrong with his colon. He was given IV fluids maintain hydration.<br><br>Symptoms report came from Ms. Fidler | Fabrication |

| DCS 2/4/20 | DCS received information that Eliron was getting too much treatment. Mom was contacted and stated he was receiving adequate and appropriate treatment for his conditions.<br><br>DCS stated they were calling for out-of-state medical records. Eliron was doing well in school. In regular classes. | DCS reported concerns that Elinor was getting too many treatments. The school had a third party come in. That party did not agree Eliron needed an RN.<br><br>Risk assessment still reported Eliron had seizures, not evacuate at home or in in vehicles, lacks community safety, lacks stranger danger, problems with mobility, invades personal space, runaway risk.<br>The risk assessment stated Eliron will hold his breath for 30-60 seconds, but no warnings that a seizure is about to happen. | Mom giving incorrect information.<br><br>Exaggeration – after his removal he did many tasks on his own.<br>No evidence of seizures |
|---|---|---|---|
| **3/9/20 ALTCS Member Service Plan** | Physical therapy consultation. Mom stated he needed physical therapy. | He was diagnosed with Epilepsy. Not clear by whom.<br>Reported he needed constant adult supervision<br><br>No not clear that he needed physical therapy. | Fabrication |
| 5/7/20 Changes in ISP | Eliron was discharged from PCH on 4/17/20 by DCS to rule out | Multiple changes occurred. "His medical diagnoses have been | Possible exaggeration but direct information from mom not included. |

| | | | |
|---|---|---|---|
| Arizona Dept of Child Safety (4/17/20) | medical concerns. He was placed in a Child Development. Discharged with constipation | rule out and is receiving on going counseling services. He was diagnosed with Adjustment disorder. | The dramatic improvement is consistent with a pattern of FDIA |
| | Elion placed with child development home. Has supervised visits with Mom, 2x per week. Since his placement, going to bathroom on his own.. Dramatic increase in daily leaving skills..e.g brushing teeth and tying shoes. Doing better in school | These behaviors are not consistent with Mom's information. Functioning much better away from Mom. No need for extensive medical care | |
| Arizona Dept of Child Safety (5/4/20) | Place in child development home. He was gradually reducing wetting the bed. He no longer took Miralax. He was described as "healthy and happy". All of his considerable medications were changed to as needed.. He did not need an inhaler. Elion decided to have his central line tube removed. He was adapting well to his foster home. | These behaviors are not consistent with Mom's information.No need for extensive medical care. It is relevant that Elion asked to have his central tube removed. Also, he made very quick progress on constipation, and accidents. All of the medical problems Mom reported did not occur out of her care. | The dramatic improvement away from the alleged perpetrator (in this case Mom) is consistent with a pattern of FDIA |
| Arizona Dept of Child Safety (6/16/20) | Eliron is in foster care. He stated he was doing good. He was becoming more independent. He was using a pull up at night due to some accidents. However, he is not using one during the day | These behaviors are not consistent with Mom's information. Functioning much better away from Mom. Eliron was adjusting well to his placement and had a dramatic decrease in | The dramatic improvement of health away from the alleged perpetrator (in this case Mom) is consistent with a pattern of FDIA |

| | | |
|---|---|---|
| Arizona Dept of Child Safety (8/13/20) | consistently. There was planning to remove his cecostomy tube. Eliron was eating well and had a good relationship with his foster parents. | medical concerns. It is relevant he has an accident during a visit with Mom. |
| | Eliron placed in foster care. Mom not able to control his treatment. Eliron described as doing "amazing adjustment" for online school. He was managing tasks of daily living on his own. He had no doctor's appointment in the last 30 days. No medical appointments were present. He was developing peer relationships. Eliron stated he loved his foster parents. The case plan at that point was Adoption | These behaviors are not consistent with Mom's information. Functioning much better away from Mom. No need for extensive medical care. | The dramatic improvement of health away from the alleged perpetrator (in this case Mom) is consistent with a pattern of FDIA |
| 12/01/20 Meeting of Arizona of Dept of economic security | There were dramatic improvement in Eliron since his removing for his mother. | |
| | Eliron no longer diagnosed with dysautonomia, seizures, ADD, developmental delays. Most other medications were stopped because they were not needed. He no longer needed cecostomy treatments. Does not have developmental delays. No behavioral problems. There were not medical concerns. He has not been to urgent care, since his removal from Ms. Fidler | The dramatic improvement of health away from the alleged perpetrator (in this case Mom) is consistent with a pattern of FDIA |
| 1/26/21 communication skills | Mom was present during the IEP meeting . IEP concluded Eliron is normally developed for a child his age, average reading, comprehension, working memory, | |
| | After his removal there was a dramatic improvement in his social skills and health.  Foster parents say he is doing better in speech and occupations therapy. | Possible fabrication and induced. Mom continues to report his has problems like a heart condition. No problems like a heart condition. No information from report to know if |

| | | |
|---|---|---|
| Banner Health (6/30/21) | and academics. "No concerns noted at this time." Psychologist said he had "other health impairment") – Mitochondriana dysfunction. This appears to be based on information from Mom. | |
| | Eliron is reported to like the foster placement. Mother states one is weak and Eliron had a heart genetic call Mythic. He needs to be check by the doctor every 5 weeks. | that is true. At that time, Eliron was 9 and doing virtual schooling" |
| | Eliron was 9 under the care of his mother. She supported all of his diagnosis like ADHD. She also stated he developmental delays. She also stated Elion's cecostomy was removed in 6/2020. Since that time she stated he had continued issues with constipation and extended abdomen. Eliron was hospitalized at that point. The doctor suggested giving MiraLax. She opted for what appears to be a more complex treatment | The Mom appeared to be the only source of information for the procedures. She presents as extremely obsessed about constipation and other medical problems she said Eliron had. |
| Arizona Dept of Child Safety (7/21/20) | | Exaggeration |
| | Eliron was in foster care. He was undergoing a cecostomy procedure. It appears he was removed the cecostomy. | Mom was blocked from the procedure. Later Eliron spoke to his mother and said he was happy that he did not need a cecostomy. Some evidence mom wanted to intrude into the procedure. Mom stated he needed the cecostomy. There is no evidenced he had problems after the removal |
| | | Fabrication that he needed a central tube. |
| Therapist from Buwalda Psych services (5/15/22) | Individual therapy for Eliron -set up and participated by Mom. | |
| | | coaching and fabrication. Mom set the goals for the therapy. She coached Eliron to said he had problems he didn't have. |

| | | |
|---|---|---|
| Second round of Buwalda Psych Services (9/17/21) | Mom reported he had ADHD without evidence. Alleged the foster parents bullied Elion without evidence. Mom reported Eliron was acting out at home. Mom stated Eliron is having anxiety, headache and stomach because of the anniversary of him being placed in foster care. Mom told the therapist Elion was bullied in foster care. The therapist primarily used play therapy and did discuss ADHD. All information appeared to come from mom. Mom had therapist coach Elion to make a case he needs and IEP. Other reports stated he did not need an IEP.<br><br>Eliron was very scared about getting another cecostomy | Mom attended the session. She said she had concerns about Eliron's clean out. She stated Eliron was still have accidents. Eliron covered his ears and sat behind his Mom. She stated the session by discussing his bowels. She also discussed her experience with DCS in the session and said she should decide Eliron's medical choices.<br><br>In the second session Mom sent an email to the therapist stating she wanted to discuss the pros and cons of a cecostomy. She wanted the therapist to help Eliron understand the procedure. The therapist noted that was out of her range of expertise.<br><br>Mom also wanted to discuss an upcoming GI appointment. At the intake, Mom stated Eliron had been diagnosed with ADHD. She stated Eliron struggles with defecation and enuresis. She stated he was treated badly by his foster parents. She was asking for trauma treatment for Eliron because of this alleged bullying. | Exaggeration – mom was clearly trying to have the therapist focus on her concerns regarding his bowels and describing the foster parents are bullies.<br><br>Mom took control of the treatment and tried to get the therapist to support Mom's intense plan to replace the central tube.<br><br>This pattern of attempting to manipulate professionals is consistent with a diagnosis of FDIA. |
| Banner Health (3/25/22) | Eliron under Mom's care. He then had a problem list of ADHD, | Mom brought Eliron to the ER for a replacement central line. She | Producing false information – Mom in an attempt to rush the procedure. |

| | | | |
|---|---|---|---|
| Banner Health 6/17/22 | cecostomy, chronic constipation, Discern CM Hx Influenza Dose, Dysautonomia, Encopresis, Fecal impaction, Immunodeficiency, low serum, mitochondrial dysfunctions | Mom brought him ER – patient type was emergency | stated Eliron would not need an anesthesia. However, Eliron was extremely anxious and did calm down. Several staff members worked for 30 minutes and were not able to calm him. Mom was informed he needed to be placed under general anesthesia. | The emergency was her needed to replace the cecostomy | Made false statements about his need for Anastasia. | Exaggeration |
| Oct 2023 – information from DCS staff | | Mom was giving him very high levels of. MiraLAX was doctor shopping. Mome not allow to go to one hospital had stated Eliron has enormous problems and diagnoses. | She appears to be obsessed with constipation. She restricts his actives and developmental group. | | Fabrication/Exaggeration | |



**ARIZONA DEPARTMENT OF CHILD SAFETY**

**Note**

Case: JESSICA FIDLER

**Title Of Note:** FIDLER, JESSICA -1919 E
THOMAS RD, 1919 E THOMAS RD, Phoenix -
850167710, Arizona, Maricopa, United
States

Case ID: CS00180811

**Note Type:** 950920001

**Date and Time Note Created:**
8/13/2020 5:41:00 PM

**Date and Time of Contact:** 8/13/2020
11:00:00 AM

**Staff Creating Note:**
svc.GRDDataMig02P #

**Contact Type:** In Person

**Staff Role:**

**Participants Involved in the Contact:**

| Person Name | Date Of Birth |
|---|---|
| ELIRON FIDLER | 11/26/2011 |
| JASON SCOTT TREGUBOFF | 4/8/1975 |
| LEIGH ANN TREGUBOFF | 3/24/1983 |

**Narrative:**

NARRATIVE Location and duration of time spent alone with each child, and
discussion and observations while alone with each child. If a child was not
seen alone for a portion of the visit, reason and/or efforts to see the
child alone: Location: At placement- Duration: 1 hour Child safety: Up on
arriving Eliron was to sitting on his school assigned sitting, he was on
the computer doing his work. Placement indicated that Eliron has been doing
amazing adjusting to doing online school, there has been no issues he is
waking up at 6am to get ready for school. The routine is waking up and
showering, which placement needs to redirect him to how to wash his hair
and how to wash his body. After he gets dressed on his own and they go down
stairs to get ready for breakfast. Eliron told CSS that today Jason (foster
dad) made him eggs and waffle and he also had apple sauce and water. Eliron
indicated that he likes when Jason makes packages but he has not made them
in a while. While Eliron was talking to CSS he was still paying attention
to his teacher, he was able to continue to answer the questions that the
teacher was asking. Eliron was very excited telling CSS about how his
classmates and how he would be having a play date on Friday with some
school teachers, he as well told CSS that tomorrow would be his teachers
birthday and she said she was 27 but he looks older. Safety plan
oversight: There is no visible marks or bruises on Eliron; therefore, there
is no safety plan oversight needed. Physical and dental health: Eliron has
not had any doctor's appointments in the last 30 days. The last medical
appointment was the lab he had done in order to know his levels. This was
shared with mother and all attorneys. There is no upcoming medical
appointments. Mental/behavioral health: Eliron participates in individual
counseling through Touchstone; he continues to build rapport with Travis.



**ARIZONA DEPARTMENT OF CHILD SAFETY**

## <u>Note</u>

As well, through DDD services he receives occupational therapy, which will now be in person for 2 hours and speech therapy in person for two hours. There are no additional behavioral health services. Education/school/child care and child development: Eliron is in school, he is doing the online school, he said he likes school. CSS asked about his teachers name, her name is Ms. Maly is Eliron's teacher he is in 3rd grade. Eliron was very excited to tell CSS about his school, his classmates and how school works. Other needs of the child: Placement indicated there is nothing needed at this time. Family Relationships: Eliron has visits with mother twice a week for two hours, there is no issues after visits. He as well participates in monthly in person visit with MGM and bi-weekly phone calls (zoom) with MGM. Social interests, and extracurricular, enrichment, and cultural activities that allow the child to have typical experiences for the child's age: Eliron likes to play with is switch, he loves swimming he is very good at it (he is no longer using floatiest). Eliron goes for bike rides with foster family when it is not too hot. Eliron was very excited to tell CSS they had a sleep over last week Friday and he was up until midnight playing with the foster boys and a few friends. Important relationships/connections for the child: Eliron has completed assignments for school where he put he loves Leigh and Jason, he finds it very easy to open up to them. As well, he said his best friend is Corbin. Important relationships/connections for the child: Eliron has completed assignments for school where he put he loves Leigh and Jason, he finds it very easy to open up to them. As well, he said his best friend is Corbin. Permanency planning: The case plan is Severance and Adoption Court orders, court hearings, and case meetings: 08/19/2020 at 1:30 - Motion and Pre-Trial- Honorable Judge Culbertson. Caregiver's needs: Placement indicated there is nothing needed at this time, they indicated there is no need for the allowance yet as they are all good with clothes. Additional Information/Follow Up Needed: -

Confidential Psychological Evaluation

# Records REVIEW FOR Factitious Disorder Imposed on Another

Janet Cahill, Ph.D.
jcahill25@icloud.com

This report should be used in tandem with the APSAC Best Practice Guidelines for
Munchausen by Proxy.

Elron Fidler

Confidential Psychological Evaluation

## Client Information and Reason for Referral:

Caregiver: Jessica Fidler

Child: Eliron Fidler – DOB: 11/26/11)  Age 11

Date of Review: 10/17/23

## Description of Protocol

The protocol used for this assessment is consistent with Best Practice Standards for the diagnosis or rule out of  Munchausen by Proxy (MBP). MBP has many different names for the same diagnosis. This is because many different professionals can become involved with these cases. For example, medical doctors, psychologists, social workers, and child protection staff. Each professional has a different  name for the illness. Medical doctors, for example, refer to it as Medical Child Abuse. The most common term is Munchausen by Proxy (MBP). Psychologists use the term of Factious Disorder Imposed on Another (FDIA). What it is important to understand is that all the professionals are observing the same symptoms and diagnosis.

I am a licensed psychologist and will use the term FDIA. The criteria and symptoms used come from the Diagnostic and Statistical Manual 5 (DSM 5).

The diagnosis of FDIA occurs when there is some evidence that a child is being abused by a caregiver who is overtreating them. The caregiver is most commonly the mother of the child. However, it must be someone who has custody of the child is the primary caregiver. The abuse in FDIA is different from other form of abuse or neglect.

## What is FDIA?

FDIA is a serious form of child abuse and mental illness. It occurs when the caregiver is deliberately overtreating or inducing symptoms.  It is important to understand that the caregiver is doing this on purpose to meet their own psychological needs such as getting attention. For example, the caregiver gave false information that the child vomits constantly on the way to school. However, when the school nurse examines the child and the car and finds no evidence of vomiting. The caregiver was fabricating the symptoms.

The APSAC Practice Guidelines had seven types of this  type of fabrication:

- Producing false information
- Withholding information
- Exaggeration
- Simulation (for example altering medical specimens)
- Neglect ( for example withholding medications or nutrition)

Elron Fidler



Janet Cahill
2884 San Juan Cir
Minden, NV 89423

JANET CAHILL
(DN)
2884 SAN JUAN CIR
MINDEN NV 89423

SHIP THOMAS A CONNELLY
TO:
STE 101
5055 N 12TH ST

PHOENIX    AZ 85014-3345

AZ 850 9-10

1 LBS
SHP WT: 1 LBS
SHIP OF 1
DATE: 20 JAN 2025

UPS GROUND
TRACKING #: 1Z 7EX 714 03 9562 7421

BILLING: P/P

Thomas A.Connelly
5055 N. 12 St
Suite 101
Phoenix AZ 85014